## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
United States Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

     Plaintiff,

   v.

HONEYWELL INTERNATIONAL, INC.,
101 Columbia Road
Morristown, NJ 07962

     Defendant.

Case: 1:08-cv-00961
Assigned To : Roberts, Richard W.
Assign. Date : 6/5/2008
Description: General Civil

COMPLAINT OF THE UNITED STATES
OF AMERICA

1.  VIOLATIONS OF THE FALSE
   CLAIMS ACT, 31 U.S.C. §
   3729(a)(1);

2.  VIOLATIONS OF THE FALSE
   CLAIMS ACT, 31 U.S.C. §
   3729(a)(2);

3.  UNJUST ENRICHMENT

Related cases:  CV No. 04-0280 (Judge Roberts)
       CV No. 07-1144 (Judge Roberts)

Plaintiff, the United States of America, alleges as follows:

### OVERVIEW

1.   This is an action brought by the United States to recover damages and civil penalties

under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and to recover damages for unjust

enrichment.  All of these claims are premised upon the misconduct of Honeywell International,

Inc. (Honeywell) in causing to be submitted false claims for payment and false statements in

connection with the sale of defective body armor, primarily ballistic "bullet-proof" vests, to the

United States and to state, local, and tribal law enforcement agencies funded in part by federal

funds.  These defective vests contained a Honeywell product known as Zylon Shield (Z Shield)

that was patented by Honeywell and sold to Armor Holdings, Inc., and its subsidiaries (Armor

Holdings), who subsequently used Z Shield in bullet-proof vests sold to the United States and to

state, local, and tribal law enforcement agencies. The model numbers of these defective Z Shield

vests include, but are not limited to: XTZX2-1, XTX3A-1, XTX3A-2, XTX2-1, XTX2-2,

XTX2A-1, XTX2A-2, WM-3A-9212, WM-2-9301, SE3AZ-1, SE3A-5, SE2A-5, SE2-6,

PIIIA-4.5, PIIA-6.1, PIIA-4.1, PII-6.0-PHILLY, PII-6.0, PII-4.4, FEDAGNT-1, CBIIA/3-4.6,

CBIIA/3-4.1, and 3AXTZX (hereinafter Z Shield Vests).

    2.  Honeywell obtained the Zylon fiber used in Z Shield from Toyobo Co. Ltd. and

Toyobo America, Inc. (collectively Toyobo), the fiber maker of Zylon. Honeywell employed a

patented and exclusive process to manufacture Z Shield. The product specifications, dated

September 2000, explain that Z Shield is composed ". . . from unidirectional [meaning that all of

the fibers are oriented in the same direction] PBO [Zylon] fiber impregnated in a resin matric,

cross-plied in a (0/90) degree orientation, sandwiched in thermoplastic film." Honeywell then

marketed Z Shield as "groundbreaking" technology offering superior ballistic protection to

products containing woven Zylon and other aramids used in body armor and sold Z Shield to

Armor Holdings, which incorporated this material into its bullet proof vests.

    3.  The United States alleges that Honeywell knew, within the meaning of the FCA, that

the Z Shield it sold to Armor Holdings for use in bullet proof vests was defective and degraded

more quickly than represented. As a result of this misconduct, the United States paid for

defective Z Shield Vests.

    4.  In particular, at the time that Honeywell manufactured and sold Z Shield, it possessed

a wealth of scientific data showing that Z Shield degraded quickly over time in hot and humid

environmental conditions. Honeywell understood that this degradation would negatively impact

the ballistic performance of bullet proof vests containing Z Shield so that over a short period of

time these vests would no longer be fit for use as body armor. Indeed, in September 2003, a Honeywell employee had authored a draft report (the Honeywell Draft Report) that explicitly made the connection between degradation and ballistic performance. Honeywell also understood that Armor Holdings sold numerous Z Shield Vests to the United States and to state, local, and tribal authorities, who paid for vests in part with federal funds, that Armor Holdings offered their customers a five-year warranty on all of the Z Shield Vests (until the Summer of 2004, when Armor Holdings decreased the warranty to thirty months on several Z Shield Vest models due to its own internal concerns about Z Shield degradation that arose from Armor Holdings' in-house test data and test data from its outside consultant, Exponent), and that, due to the degradation problems, the Z Shield Vests would not protect the end user for five years from rounds the Z Shield Vests were certified to stop.

5. Honeywell, however, did not inform the United States, or any state, local or tribal authorities, of any of its technical data or the Honeywell Draft Report highlighting the environmental degradation problems with Z Shield. Honeywell also did not share all of its technical data or the Honeywell Draft Report with Armor Holdings. Furthermore, Honeywell downplayed the risks associated with the degradation data that Honeywell did disclose to Armor Holdings even though Honeywell knew that Armor Holdings relied upon it for scientific expertise regarding Z Shield. Moreover, Honeywell discouraged Armor Holdings from taking steps to notify the end users about problems with Z Shield or to mitigate the risk. For example, Honeywell attempted to discourage Armor Holdings from shortening the warranty period on Z Shield Vests due to a concern with the negative market impact of such a step. Honeywell also consistently encouraged Armor Holdings to utilize Z Shield in its bullet proof vests up to the

time, in August 2005, that the National Institute of Justice (NIJ) effectively decertified Zylon

from use in bullet-proof vests due to this degradation problem.  Indeed, even after NIJ took this

action, Honeywell failed to share its technical data with NIJ and encouraged Armor Holdings to

attempt to re-certify Z Shield Vests so that they could continue to be sold in the United States.

## JURISDICTION

6.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331.

Defendant Honeywell is doing and/or previously did business within this District.  Additionally,

claims for payment for Z Shield Vests purchased under the Bullet Proof Vest Grant Partnership

Act (BPVGPA) were submitted to the Office of Justice Programs (OJP) of the Department of

Justice (DOJ).  The OJP is located within this District.  From 2000 to 2005, Armor Holdings sold

over 1700 vests containing the Honeywell Z Shield to federal agencies in this District.  The

United States paid over $1.3 million for these vests.  In addition, all of the Z Shield Vests sold

through the BPVGPA were sold in this District.  The United States paid for, in whole or in part,

over 11,000 vests containing Honeywell's Z Shield through the BPVGPA and paid nearly $20

million for the Z Shield Vests.

7.  Venue is proper within this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. §

3732(a).  Defendant Honeywell is doing and/or previously did business within this District.

## PARTIES

8.  The plaintiff is the United States of America.  The United States brings this lawsuit

on behalf of its agencies, including, but not limited to, DOJ, GSA, the Department of Defense

(DOD), the Department of the Treasury, the Department of Homeland Security (DHS), and other

4

federal agencies which purchased, or provided funds for the purchase of, ballistic vests made in whole or in part with Z Shield manufactured by Honeywell.

9.  Defendant Honeywell is a United States corporation doing business in this District. Honeywell's business address is 101 Columbia Road, Morristown, NJ 07962.

## BACKGROUND

**A.     The False Claims Act**

10.  The FCA provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> * * *
>
> is liable to the United States Government . . . .
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

11.  As explained in more detail below, the United States' underlying theory of liability against Honeywell is that Honeywell knew that Z Shield had a latent defect in that it degraded quickly over time in hot and humid conditions.  Honeywell also knew that this degradation

negatively impacted ballistic performance, that Armor Holdings warranted the Z Shield Vests against defects in materials for five years (until the Summer of 2004, as detailed above), and that because of this latent defect the Z Shield Vests would not be fit for use over this five year period. Yet, Honeywell did not disclose this degradation to Armor Holdings or the United States. Nor did Honeywell disclose that because of this degradation the Z Shield Vests were unfit for use in that they would not protect the end user, through the five year warranty period, against rounds the Z Shield vests were certified to stop. As a result, Honeywell knowingly caused Armor Holdings to submit false claims for defective Z Shield vests to the United States, and the state, local, and tribal authorities using federal funds, in whole or in part.

**B.    The Federal Programs for Bullet-Proof Vests**

    **1.    The GSA Program**

    12.  GSA is the agency of the federal government responsible for administering the Multiple Award Schedule (MAS) contracting program (also known as the Federal Supply Schedule (FSS)).

    13.  Under the MAS program, GSA negotiates contracts for commonly used commercial off-the-shelf items with contractors. Federal agencies can then purchase products under MAS contracts directly from contractors at pre-negotiated prices, terms and conditions. Products are grouped under pre-designated Special Item Numbers (SINs), which connote broad categories of commercial products or services.

    14.  The GSA Schedule included bullet proof vests from Armor Holdings containing the Z Shield manufactured by Honeywell. Until the Summer of 2004, all of these vests carried a five-year warranty. The claims for payment for each and every Z Shield Vest sold to the United

States under the GSA schedule were false claims in that the Z Shield in those vests was defective and degraded substantially and quickly, well before the expiration of the warranty.

**2.    Other Federal Purchases**

15.  Other federal agencies purchased vests directly from Armor Holdings containing Z Shield apart from the GSA Schedule.  The claims for payment for each and every Z Shield Vest sold to the United States under federal contracts by Armor Holdings were false claims in that the Zylon in those vests was defective and degraded substantially and quickly, well before the expiration of the warranty.

**3.    The Bullet Proof Vest Grant Partnership Act Program**

16.  In late 1997, after the shooting deaths of two state troopers who lacked body armor due to inadequate funding in their jurisdictions, Congress created a grant program called the BPVGPA, 42 U.S.C. § 3796ll, *et seq.*  Under the BPVGPA, the United States reimburses eligible state, local and tribal authorities for up to fifty percent of the cost of body armor.  The exact amount state, local and tribal law enforcement agencies are reimbursed for any specific vest depends on the entitlement cap for each such agency for that fiscal year.  The BPVGPA grant program is administered by OJP.

17.  Purchasers under the BPVGPA grant program cannot present claims for reimbursement until they certify to OJP that they have paid for and received the vests.  State, local and tribal authorities do not receive funds from the BPVGPA in advance of their purchases or in advance of their receipt of the vests.

18.  Armor Holdings sold numerous bullet proof vests containing Z Shield manufactured by Honeywell to state, local, and tribal law enforcement entities under the BPVGPA.  After the

presentment of these claims, the federal government reimbursed, in part, these state, local, and tribal law enforcement agencies for these Z Shield vests under the BPVGPA. The claims for payment for each and every Z Shield Vest presented to the United States by state, local and tribal law enforcement agencies pursuant to the BPVGPA were false claims in that the Z Shield in those vests was defective, unfit for use as body armor, and degraded substantially and quickly in hot and humid conditions, well before the expiration of the five-year warranty.

**C.    Development of Bullet Proof Vests Containing Z Shield**

19.    PBO fiber stands for poly-p-phenylenebezobiroxazole and is a high strength organic fiber. The United States Air Force, SRI International, Inc., and Southwest Research Labs jointly developed PBO fiber in the 1980s, but did not attempt to commercialize this fiber. Instead, they sold the rights to PBO fiber to Dow Chemical Company (Dow). In the early 1990s, Dow worked jointly with Toyobo on production technology for PBO. In the mid-1990s, Toyobo purchased the rights to PBO from Dow. Toyobo then commercialized PBO fiber under the trade name Zylon and, in 1998, body armor containing Zylon began being sold to law enforcement agencies in the United States by a company called Second Chance Body Armor, Inc. Zylon body armor proved very popular with law enforcement due to its light weight and within a few years after its introduction into the United States, several body armor companies utilized Zylon, including Armor Holdings.

20.    Two basic processes converted Zylon fiber into body armor. In the first and most common process, the Zylon fiber went to a weaver who turned the Zylon into woven fabric. The body armor manufacturers than obtained this woven Zylon fabric from the weavers and used this fabric in their body armor. The body armor manufacturers would put layers of this fabric in their

8

vests (called panels), with some manufacturers selling vests containing nothing but Zylon as the ballistic material, while others produced so-called hybrid vests that consisted of panels of both Zylon fabric and other aramid products.

21. In the second process, panels of Zylon fiber are laminated, rather than woven, to create a shield product that could then be used for body armor. Honeywell (then Allied Signal) entered into a non-disclosure agreement with Toyobo to develop a laminated shield product out of Zylon fibers and obtained patents over this Zylon shield product, including Patent Nos. 5587230 and 6642159 relating to the manufacturing process for Z Shield.

22. Honeywell's attempts to develop a commercially viable Zylon shield product failed and so Honeywell formed a business relationship with a Dutch ballistic shield manufacturer, DSM, to perform so-called "tolling services" (a manufacturing process that converts a raw material into a shield product) that converted Zylon fiber into a shield product suitable for lamination. DSM's tolling efforts succeeded and, by 2000, Honeywell, with DSM's assistance, was able to sell to body armor manufacturers a Zylon laminate, with the trade name Z Shield.

23. Honeywell sold Z Shield to Armor Holdings, which then used the Z Shield in bullet proof vests sold to the United States and to state, local and tribal authorities. Armor Holdings was the exclusive distributor in the United States of body armor containing Honeywell's Z Shield and purchased well over one hundred thousand pounds of Z Shield for more than $15 million. A substantial portion of this Z Shield was used in Armor Holdings' vests paid for, in whole or in part, with federal funds. Indeed, the federal government has paid nearly $20 million for Z Shield Vests.

24. Honeywell and Armor Holdings marketed Z Shield vests as "groundbreaking" technology that offered the highest levels of ballistic protection and represented the state of the art in ballistic performance. As a result, the Z Shield vests were substantially more expensive than other bullet proof vests.

**D.    The Importance of Tensile Strength in Body Armor's Ballistic Performance**

25. Early on in its commercial development, Toyobo identified ballistic applications in body armor as one of the most promising uses for Zylon fiber due to the high tensile strength of Zylon. Tensile strength measures the force required to pull a material to the point where it breaks and is generally expressed in force per unit of a cross sectional area. Put in terms of a formula, tensile strength measures the maximum load that a material can support without fracture or breakage divided by the original cross sectional area of the material.

26. The relationship between tensile strength and ballistic performance has long been discussed in the scientific literature. In the context of bullet proof vests and other body armor, it is generally accepted that the higher the tensile strength of body armor the more protection it offers the wearer against bullets and other projectiles.

**E.    Ballistic Testing of Body Armor**

27. Body armor, and the fiber, woven fabric, and laminated materials used in body armor, undergo a variety of testing to help assess ballistic performance. The two most common tests are the V-50 and V-0 tests.

28. The V-50 test attempts to measure the ballistic performance of a material by shooting a number of rounds into the material to find the velocity (as measured by feet or meters per second) at which half the rounds penetrate through the material and half the rounds do not

penetrate it. Typically, the V-50 test is performed using a number of different rounds based on the threat levels faced by the likely end users. The higher the V-50 test results the better the ballistic performance.

29. The V-0 test, on the other hand, attempts to measure whether a material can withstand the impact of a certain round at a certain velocity without penetration or excessive back face trauma, which measures the effect of a non-penetrating round on the rear face of a strike plate and is used to gauge a projectile's likely impact on internal organs. Even if body armor stops a bullet from penetrating the armor, the wearer can still be injured if the round travels through too many panels of armor.

**F.    NIJ Specifications for New Body Armor**

30. NIJ tests and certifies the bullet proof materials in new body armor to ensure that they meet minimum ballistic standards as determined by NIJ specifications. This certification identifies the types of rounds (called "threat levels") that the body armor should be able to stop. To develop these certifications, NIJ employs both V-50 and V-0 tests and performs tests on new bullet proof materials utilized in body armor. During the period when Z Shield Vests were sold, the protocols for this testing were set forth in NIJ standard 0101.04, beginning in September 2000, and before that in NIJ standard 0101.03. NIJ certified all of the Z Shield Vests sold by Armor Holdings.

**G.    The Five Year Warranty on Z Shield Vests**

31. Honeywell, and others in the body armor industry, understood that end users wore body armor for a number of years before replacing it. In 1987, Du Pont published an influential article that recommended replacing body armor every five years. This article served as the

predicate for an industry-standard recommending the replacement of bullet proof vests every five years and offering five year warranties.

32.  Like the rest of the industry, Armor Holdings offered a five year warranty on the Z Shield Vests through the Summer of 2004, when it reduced the warranty on several of its Z Shield Vest models to 30 months.  The Armor Holdings five year warranty appeared in specifications for the Z Shield Vests provided to end users, and the typical language stated "Warranty.  Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels against defects in materials and workmanship.  The alteration of ballistic panels in any way shall render the warranty void."  Honeywell knew that Armor Holdings offered this five-year warranty on the Z Shield Vests.

**H.    Armor Holding's Reliance on Honeywell's Technical Expertise Regarding Z Shield**

33.  Honeywell knew that Armor Holdings relied on Honeywell's technical expertise regarding Z Shield, even to the point of having Honeywell draft Z Shield fact sheets and other marketing materials that Armor Holdings distributed to its sales force for use in selling the Z Shield Vests.  Honeywell performed tensile strength testing on Z Shield and interpreted the results for Armor Holdings.  Honeywell utilized a variety of tests to determine how Z Shield's tensile strength reacted in hot and humid conditions, as well as so-called "accelerated aging" tests to help determine whether Z Shield would lose tensile strength over time and , if so, the amount of that loss and its impact on ballistic performance.  As a result, Honeywell conducted ballistic testing on both new and used Z Shield Vests.

## HONEYWELL'S COVER UP OF Z SHIELD'S LATENT DEFECTS

**A.    Honeywell Received Early Warning Signals of Degradation Problems with Z Shield**

34.  Toyobo and Honeywell worked jointly on the development of a viable commercial Z Shield product for the ballistics market in the United States.  This collaboration included sharing scientific data between the companies.  Honeywell had a team of scientists working on developing ballistics products, including Z Shield, led by Dr. Lori Wagner (Wagner).

35.  In April 2000, Toyobo's scientists informed Honeywell that ". . . the color of Zylon change[d] rapidly and after that the strength decrease[d] . . ." when Zylon fiber was exposed to light.  Toyobo sent Honeywell two charts showing Zylon fiber's degradation when exposed to light, and these charts showed a 35% drop in the fiber's tensile strength after just 100 hours of exposure to light.   Additional exposure to light resulted in continued diminished tensile strength. This lead to concern on Honeywell's part, especially after Toyobo's own data showed a 50% decrease in Zylon fiber's tensile strength after exposure to light for extended periods.

36.  Honeywell downplayed to Armor Holdings the impact of light on Z Shield–a pattern by Honeywell that would repeat itself, as detailed below.  In particular, in June 2000, Honeywell sent Armor Holdings testing data showing only a three percent drop in the performance of Z Shield after exposure to 40 hours of light.  Honeywell, however, failed to share with Armor Holdings the Toyobo data showing 35% and 50% drops in tensile strength after exposure to light. Instead, Honeywell downplayed the light problems to Armor Holdings even though Honeywell knew that Armor Holdings lacked the technical expertise to assess light's impact on ballistic performance.  Honeywell also failed to share this data with the United States.

37. After learning of the light degradation, Honeywell became concerned about other potential sources of degradation and, in June 2000, Honeywell began testing Z Shield's reaction to moisture. At the time, one of Honeywell's scientists noted that "I am concerned . . . about the long term damage that moisture can do to the product . . . Sweat/rain is the biggest threat." Thus, by June 2000, Honeywell knew that environmental conditions, such as sweat, humidity, and rain, all of which were highly foreseeable issues with the usage of Z Shield Vests, were likely sources of degradation and reduced tensile strength that could impact ballistic performance. Yet, Honeywell did not share these concerns with Armor Holdings or the United States.

**B.      Honeywell Discounted The Failed German Vest Tender And The Toyobo Degradation Data**

38. In June 2001, two body armor manufacturers, Mehler, a German company, and Second Chance were awarded a contract to supply Zylon vests to police departments in Germany. The Mehler vest was a so-called hybrid vest because it contained part Z Shield and part woven Zylon. The Z Shield for the Mehler vest came from DSM and, as detailed above, DSM assisted Honeywell in the tolling process for Z Shield. During testing in connection with the German vest tender, DSM reported a failure of the Mehler Z Shield vest and, as a result, DSM became extremely concerned about Z Shield's suitability for ballistic applications.

39. On July 5, 2001, DSM sent a letter to many companies in the body armor industry, including Honeywell, Armor Holdings, and Toyobo, with the caption "URGENT***** URGENT***** URGENT*****URGENT." The letter announced that DSM had "serious indications that the use of [PBO Shield] in bullet resistant vests is not justified" and that ". . . the use of PBO-fiber in general may not be justified in bullet resistant vests." As a result of these

findings, the letter made clear that "[b]ecause of the serious nature of these indications DSM HPF decided to put on hold the market introduction of its PBO-fiber containing product . . .".

40.  The day after the DSM announcement, July 6, 2001, Toyobo issued its own letter to the body armor industry, including Honeywell and Armor Holdings, announcing that its own testing had not found "any serious indication[s]" relating to Zylon fiber, as DSM's data had found.  The letter from Toyobo, however, did state that the DSM data may highlight a specific problem with Z Shield that was not applicable to woven Zylon.  The letter also stated that "Toyobo makes no warranty and assumes no liability whatsoever in connection with any use of Zylon fiber."

41.  In response to this data and of its own accord, without Honeywell's input, Armor Holdings, on July 9, 2001, issued a body armor storage advisory warning its customers to store body armor containing woven Zylon or Z Shield in a dry and cool place and not to store it at temperatures above 120 degrees F and 50% humidity.

42.  Honeywell, however, downplayed the risks of the DSM data, telling the president of Armor Holdings, for example, in a letter dated July 6, 2001, from Honeywell's business director for high performance fibers, that ". . . from the little information we have on DSM's testing, we [Honeywell] do not believe the [DSM] testing mimics conditions to which the PBO shield would be subjected."

43.  On July 18, 2001, Toyobo published a letter to its customers indicating that its own data showed that the "serious indications" found by DSM were potentially a "unique characteristic" of the Z Shield product that likely did not apply to all types of Zylon.  The next

day, on July 19, 2001, Honeywell contacted Toyobo and expressed its disappointment with the July 18 Toyobo letter despite having none of the data upon which Toyobo based this conclusion.

44.  DSM continued testing Z Shield, and, in mid-August 2001, DSM provided Honeywell with additional test data showing Z Shield losing 20% of its tensile strength when exposed to 60 degrees C (about 156 F) and 80% relative humidity and 40% of its tensile strength when exposed to 80 degrees C (about 208 F) and 80% relative humidity.  DSM also stated that it had confirmed the link between a decline in tensile strength and a decline in the ballistic performance of Z Shield.  Additional testing a month later by DSM, this time exposing Z Shield to heat without humidity, showed substantial declines in Z Shield's tensile strength.  Yet, Honeywell continued to represent Z Shield as a safe and effective material suitable for body armor.

45.  Toyobo also continued to release some, but not all, of its own accelerated aging data showing the negative impact of heat and humidity on Zylon fiber's tensile strength.  On August 28, 2001, a Toyobo letter to Honeywell admitted that Toyobo had ". . . found out a little bigger strength drop than we expected . . ." under conditions of 40 degrees C (about 104 F and just 5.4 degrees above normal body resting temperature) and 80% relative humidity.  A month later, on September 28, 2001, Toyobo published a technical bulletin that showed, in less than 100 days of exposure to these conditions, Zylon fiber's tensile strength declining by 10% at 40 degrees C (about 104 F) and 80% relative humidity, by 20% at 60 degrees C (about 156 F) and 80% relative humidity, and by 37% at 80 degrees C (about 208 F) and 80% relative humidity.

46.  More degradation data came from Toyobo on a periodic basis, including data in November 2001 showing a decline of 18% tensile strength of Zylon fiber when exposed for 150

days to temperatures of 40 degrees C (about 104 F) and 80% relative humidity and also showing a logarithmic, as opposed to a linear, decline in tensile strength, which raised the possibility that further drops in tensile strength would accelerate over time.

47. Toyobo later withdrew this November 2001 data, claiming on January 1, 2002, that this data was ". . . statistically not correct and not reliable . . . ." In reality, Toyobo had simply removed the bad data points that had been published in November and republished its earlier test results without the offending data points. Notwithstanding this data manipulation, Toyobo continued to publish periodically additional test results showing substantial declines in Zylon's tensile strength when exposed to heat and humidity. In the face of this Toyobo data, Honeywell continued to minimize the risks of Z Shield and Armor Holdings continued to sell Z Shield vests.

**C.    Honeywell Selectively Disclosed Its Test Data to Hide The Degradation Problems With Z Shield**

**1.    Honeywell's Environmental Exposure and Ballistics Testing**

48. In response to the DSM and Toyobo testing, Honeywell began its own environmental exposure testing of Z Shield under hot and humid conditions in a so-called "Florida room" at its Richmond, Virginia facility. Honeywell called this Z Shield testing "accelerated aging," the purpose of which was to simulate aging conditions by exposing Z Shield to elevated levels of heat and humidity in the Florida room. As noted in a Honeywell technical bulletin, from October 2003, "[a]ccelerated aging . . . seeks to determine the response of the material in normal-usage conditions over a relatively long time by subjecting the product, in a shorter time span, to stresses that are more severe . . . than that experienced under normal environmental or operational conditions. For example, in one of the more common forms, data taken at higher temperatures

17

on a rapid time scale can be used to determine data at lower temperatures on a much slower time scale."

49. After subjecting Z Shield to accelerated aging, Honeywell performed ballistics testing, primarily V-50 testing, to see how much ballistic performance the Z Shield retained after accelerated aging. Honeywell termed this "ballistic integrity." To find out Z Shield's ballistic integrity, Honeywell would compare the ballistic performance in V-50 testing of new Z Shield with the ballistic performance of Z Shield after accelerated aging. The difference between these two figures represents the loss of ballistic performance after accelerated aging and provides a rough measure of how used Z Shield vests would perform over time. The head of Honeywell's ballistic lab in Richmond performed and/or supervised most of this testing. Within three weeks of the failure of the German vest tender, on July 25, 2001, Honeywell's initial accelerated aging data showed a 13.3% decline in the ballistic integrity of Z Shield when exposed to 90 degrees C (about 234 F) for one week. The same testing showed that the non-Zylon shield products of Honeywell that were tested as controls lost little, if any, of their ballistic integrity.

50. Notwithstanding this unfavorable data, in a Honeywell letter to Armor Holdings, dated August 9, 2001, Honeywell emphasized other, more favorable preliminary data, in which Honeywell had attempted to mimic DSM's testing and had found ". . . no significant shift in V-50 values for the 2-week Z Shield test at 70 C [about 182 F]."

51. After reviewing Honeywell's accelerated aging data, Wagner worried about Z Shield's ballistic integrity in hot and humid environmental conditions. For example, in an internal Honeywell e-mail, dated September 25, 2001, Wagner admitted that "Z Shield exhibited significant drop[s] . . ." in V-50 ballistic testing of 13% after two weeks and 17% after four

18

weeks. She also admitted that the V-0 test results for Z Shield ". . . were not encouraging . . ." and termed the test results ". . . perplexing to say the least." But Honeywell did not share these concerns with Armor Holdings.

52. Honeywell continued accelerated age testing at a variety of different temperatures and humidity levels and the test results continued to show substantial declines in Z Shield's ballistic performance, much larger than for the other materials being tested as controls. In early October 2001, Honeywell found a 13% decline in Z Shield's ballistic integrity in accelerated age tests for two weeks at 70 C (about 182 F) and 80% relative humidity, 16.5% at four weeks under the same conditions, and 8% at four weeks at 70 C without controlled relative humidity.

53. On October 4, 2001, Honeywell provided these results to Armor Holdings, but downplayed them. In a conference call that day, Wagner stressed to Armor Holdings that this testing had been "under extreme conditions," claimed that the Armor Holdings' storage advisory addressed the issue, and did not recommend any changes in the sales or marketing tactics for the Z Shield Vests. That same day, Honeywell told Armor Holdings that it planned more Z Shield testing, which Honeywell ". . . believe[d] will confirm, the continued viability of this product."

54. Honeywell's optimism proved unfounded, however, as its additional accelerated age testing continued to show degradation problems with Z Shield. In late November 2001, Honeywell's ballistics testing after accelerated aging found a 6.9% decline in a used hybrid Z Shield vest's ballistic integrity after four weeks exposure to 40 C (about 104 F) and 70% relative humidity. Tests on new rolls of Z Shield also showed a 3% decline in ballistic integrity after four weeks exposure to the same conditions. Wagner, however, downplayed this data, telling Armor

Holdings that 40 C and 70% relative humidity represented "extreme condition[s]" unlikely to be encountered by a vest user in the field.

55. As Honeywell's testing continued, the data got worse. On January 31, 2002, Honeywell found a decline in Z Shield's ballistic performance of nearly 10% after 12 weeks exposure at 40 degrees C (about 104 F), which Wagner termed toward the ". . . extremes of the potential real world conditions." In May 2002, Honeywell tested a one year old Armor Holdings vest containing Z Shield and found a sharp drop in ballistic performance even without any accelerated aging. After accelerated aging, Honeywell found a 14.8% drop in ballistic performance after exposure of this vest to 70 degrees C (about 182 F) and 80% relative humidity for 28 days. Then, in July 2002, Honeywell found a 13.6% decline in ballistic integrity of Z Shield in testing of Z Shield samples exposed for 24 weeks to 40 C (about 104 F) and 70% relative humidity. By, January 2003, Honeywell's testing showed a 15% decline in ballistics integrity after four weeks exposure to 70 C (about 182 F) and 80% relative humidity. Honeywell shared the results of this testing with Armor Holdings, but continued to down play the risks of Z Shield in discussions between the companies.

**2.    The Honeywell Draft Report Summarizing This Data Sounds An Alarm**

56. Honeywell continued accelerated aging and ballistic testing for several years. In September 2003, a Honeywell employee authored the Honeywell Draft Report. The Honeywell Draft Report carried the following caption in all capital, bold letters, "**INTENDED ONLY FOR HONEYWELL CONFIDENTIAL REVIEW PURPOSES**" and provided both visual and quantitative assessments of Z Shield's performance in the accelerated age testing.

57. Regarding visual assessment, the Honeywell Draft Report stated that the Z Shield samples ". . . showed the most severe signs of deterioration out of all the Florida Room Samples" and described Z Shield "darkening" and "show[ing] increased loft" after four weeks exposure in the Florida Room, blistering of Z Shield after eight weeks exposure, and delamination beginning after 16 weeks exposure and becoming "significant" after 28 weeks exposure.

58. On the quantitative side, the Honeywell Draft Report indicated that Z Shield performed poorly, stating that Z Shield ". . . demonstrated the largest loss in percent V-50 retention . . ." and that Z Shield ". . . demonstrated a significant loss in percent V-50 retention after just four weeks . . ." of exposure in the Florida room. The Honeywell Draft Report then noted that ". . . no further reduction in performance was noted after 28 weeks of exposure," but explained this seeming anomaly, which is inconsistent with the other Honeywell data detailed above, by raising the prospect that ". . . the ballistic performance loss was a result of fiber chemical and physical property changes" in the Z Shield. In other words, the physical properties of Z Shield changed after even a short exposure to accelerated aging.

59. The Honeywell Draft Report indicated that even a small reduction in ballistic performance made it likely that the Z Shield Vests would no longer be fit for use. Specifically, the Honeywell Draft Report opined that ". . . a percent V-50 retention loss of as little as 2% should be considered significant" and that ". . . a small reduction in V-50 capability may no longer meet NIJ specifications if adequate margins of safety were not used in the design criteria." The Report also opined that ". . . a V-50 difference of only 5% could require anywhere between 10-20% higher solution aerial density to pass a given NIJ specification."

60. These small V-50 reductions, which Honeywell admitted could take the vests outside of NIJ specifications for new vests, pale in comparison to the actual drops in ballistic performance found in Honeywell's own V-50 testing, as detailed above, at between 10 and 15%. Yet, Honeywell never shared the Honeywell Draft Report, or the information contained therein, with Armor Holdings and never requested that Armor Holdings add layers to any of its Z Shield vests.

### 3.    Honeywell's Warehouse Data

61. In addition to its accelerated age and ballistics testing detailed above, Honeywell tested Z Shield that had been aged at one of its warehouses in the Richmond area without exposure to any additional heat or humidity.  Beginning no later than October 2001, Honeywell obtained data from its warehouse that was more favorable than the accelerated age testing in the Florida room.  This warehouse data showed an average tensile strength loss for Z Shield of 1.38% in the first year.  Yet, even this warehouse data highlighted a "significant" degradation issue after less than two years of Z Shield vest's exposure to warehouse conditions, because the Honeywell Draft Report had opined that even a "small reduction" in ballistic retention could take a vest outside of NIJ's  ballistic specifications.

### 4.    Honeywell's Selective Disclosure of the Test Data and Unwarranted Defense of Z Shield

62. On January 22, 2003, Honeywell met with Armor Holdings to discuss the Z Shield test data.  Prior to this meeting, Honeywell had told Armor Holdings that it was in the process of conducting additional tests on Z Shield and had not seen any data that should cause Armor Holdings to reconsider marketing or selling Z Shield.  This meeting represented the most

comprehensive discussion, up to this point, between Honeywell and Armor Holdings about Honeywell's accelerated aging data.

63.   In an internal Honeywell meeting to discuss strategy at the upcoming meeting with Armor Holdings, Honeywell personnel were instructed to "[s]tamp all data Honeywell Confidential (every page); provide some of the test data, but not the conclusions; "keep our tone calm"; tell Armor Holdings we need to "continue to test and evaluate" Z Shield and that the data remained inconclusive; and offer to assist Armor Holdings by giving them a "defense to attacks" against Z Shield.  At this meeting, Honeywell provided Armor Holdings with the data from its Florida Room and warehouse testing and emphasized the positive warehouse test results and the overall safety and suitability of Z Shield.  Honeywell also emphasized that Armor Holdings must keep as confidential all of the data Honeywell provided to Armor Holdings.

64.   In February 2003, Honeywell provided Armor Holdings with technical comments about a "ballistic fiber cheat sheet" to provide "talking points" for the Armor Holdings' sales force to defend the Z Shield Vests in the marketplace.  Honeywell stressed to Armor Holdings that Honeywell  "would prefer that you not reference Honeywell as the author" and ". . . will not take nor do we want any credit for the information supplied."  Also, on March 4, 2003, Wagner wrote to Armor Holdings to remind them of the confidentiality " . . . agreement and the requirements it carries for anyone in your company to keep all information provided to you by Honeywell as confidential."

65.   In April 2003, Honeywell published a technical paper disclosing the favorable warehouse test data, but failing to disclose any of the negative accelerated aging data.  While

claiming that ". . . the safety of law enforcement is always of primary importance to Honeywell
. . .", this paper misleadingly stated that "[i]n the case of our Z Shield material, no loss of
ballistic performance has been observed based on V-50 testing of material stored in an
uncontrolled warehouse environment for more than three years" without mentioning that the
accelerated age tests had shown sharp declines in ballistic performance after just a few months
exposure to elevated levels of heat and humidity.

66.  Shortly thereafter, Wagner began drafting a Z Shield Ballistic Material paper that
purported to be a neutral, scientific look at the pros and cons of Z Shield, but in reality was a
sales piece targeted to reassure potential customers in the marketplace about the safety of Z
Shield Vests.  In a draft of this document, Wagner made it clear that she would not mention any
of the accelerated age testing, but instead would emphasize the more positive warehouse data.
Also, while not disclosing Honeywell's own accelerated age data, Wagner decided to discuss
Toyobo's accelerated age data, which had already been made public, ". . . to look like we are
paying attention to what is published."  She then outlined ways to minimize and raise questions
about the Toyobo data, while expressing a cavalier attitude toward the safety issues stating that
"[b]lah . . . blah . . . blah . . . blah . . . blah . . .  I can keep writing–but this is the same stuff all
over again from the last publications we wrote.  I can make it sound different or outline/arrange it
slightly different but the issue is the data."

67.  In June 2003, two woven Zylon vests manufactured by Second Chance failed,
resulting in the death of one police officer and serious bodily injury to another.  Almost
immediately, suitability and safety questions arose regarding Zylon vests, including those with Z
Shield.

68. Yet, notwithstanding the two officer shootings and Honeywell's professed concern with "the safety of law enforcement," Honeywell continued its strategy of defending the Z Shield Vests against "industry attacks" by emphasizing the more positive warehouse data in public statements without publicly disclosing the negative accelerated age data. In June 2003, shortly after the shooting death of the first officer, Honeywell issued a public statement citing its warehouse data and misleadingly stating that these findings ". . . indicate Z Shield has remained at the same high level of ballistic protection" over a three year time period.

69. Furthermore, Honeywell never disclosed the Honeywell Draft Report to anyone outside of the company, including Armor Holdings. As a result, Honeywell never provided Armor Holdings with the visual Z Shield assessments showing darkened material, blistering, and delamination or with the quantitative summary concluding that even a small reduction in ballistic performance (and much smaller than the reductions found in Honeywell's own testing) could take Z Shield vests outside of specifications. Similarly, Honeywell never advised Armor Holdings to add any layers to its Z Shield vests or to shorten the warranty period in light of the substantial declines found in the accelerated age testing of Z Shield.

70. Moreover, in the Fall of 2003, Honeywell wrote several technical bulletins, for the use of Armor Holdings' sales representatives in the field, that emphasized the safety and suitability of the Z Shield Vests. Honeywell sent these technical bulletins to Armor Holdings for sales and marketing purposes, including a fact sheet about Zylon sent in September 2003 and several technical bulletins about Z Shield in October 2003. These bulletins addressed, among other things, Z Shield's reaction to light exposure, its ballistic performance after aging, and how to interpret accelerated aging data. Yet, despite addressing Z Shield's ballistic performance after

aging and how to interpret this data, these Honeywell bulletins failed to disclose any of the negative accelerated age data. Instead, the bulletin on Z Shield's ballistic performance after aging, for example, disclosed only the warehouse test data and misleadingly concluded that "[b]ased on the data and from experience with other ballistic materials, there is no significant anticipated change in the ballistic performance response of the Z Shield material for the five year suggested life span of most ballistic resistant vests assuming proper use and care."

71. Honeywell also evaluated Armor Holding's test data on used Z Shield Vests that were within the warranty period. This used vest testing had been performed, in mid-2004, by Armor Holdings' in-house ballistics expert and by an outside consultant, Exponent, and showed substantial declines in the tensile strength of used Z Shield Vests compared to new Z Shield Vests. Exponent also employed statistical modeling showing that one, popular model of Z Shield Vest (the XTZX2-1 model) had a "failure probability" of 10% after 30 months, 29% after 36 months of use, and 85% after 48 months of use. Exponent defined "failure" as the probability that this Z Shield Vest model would no longer stop rounds from penetrating that this model had been certified to stop.

72. In response to this test data, Armor Holdings eventually decreased the warranty on several Z Shield Vest models to 30 months. Honeywell, however, noted its disagreement with Armor Holdings' decision to shorten the warranty on any Z Shield Vest models and Wagner protested to Armor Holdings that this step was unnecessary and would negatively impact the Z Shield market.

73. Indeed, even as late as July 2005, Honeywell continued to downplay the risks of Z Shield, representing to Armor Holdings that ". . . Honeywell does not have any [Z Shield] data

that supports a catastrophic loss of tensile strength." Moreover, at no point during the time that federal funds were used to purchase Armor Holdings' Z Shield vests did Honeywell disclose any of the accelerated age test data to the United States, to any states, localities, or tribal authorities, or to the general public

## D.    Additional Misconduct by Honeywell in Furtherance of the Cover Up

### 1.    Substandard Z Shield

74. After DSM refused to toll Z Shield for Honeywell due to DSM's concern about Zylon degradation, Honeywell, in mid-2001, switched to another tolling company to assist it, FMS. From the beginning, FMS had difficulty producing the same quality of Z Shield as DSM. As a result, by February 2002, Honeywell had to convince Armor Holdings to accept lower specifications for the Z Shield that it purchased from Honeywell.

75. By mid-2003, FMS could not reliably meet even these lower specifications, and much of the Z Shield from this period failed Honeywell's ballistics testing. Honeywell responded to this problem by complaining to FMS about its tolling services and looking for markets abroad where it could sell the substandard Z Shield to countries that lacked ballistics testing requirements.

76. In December 2003, FMS responded to Honeywell's complaints about substandard Z Shield by informing Honeywell that FMS had found a 10-15% decrease in the strength of the Zylon fiber that it received from Toyobo and that FMS believed the Zylon fiber was degrading over time. FMS told Honeywell that the degrading Zylon fiber from Toyobo was the cause of its tolling problems and suggested halting its Z Shield tolling services because of this degradation problem.

77. In response, that same month, Honeywell contacted Toyobo seeking a rebate on the basis of FMS's disclosures about substandard Zylon. In February 2004, Honeywell reached a settlement with Toyobo in which Toyobo paid Honeywell $3 million in exchange for a release and indemnification from Honeywell relating to potential liabilities for Z Shield. Honeywell did not share the information about FMS's concern or the Toyobo settlement with Armor Holdings, the United States, or the general public.

78. Despite relying on FMS's concern about degraded Zylon fiber to seek compensation from Toyobo, Honeywell failed to resolve the Z Shield manufacturing problems with FMS. Nevertheless, Honeywell demanded that FMS continue its tolling services because Armor Holdings still wanted to buy Z Shield. Under pressure from Honeywell, FMS continued its tolling service and Honeywell continued to supply Z Shield to Armor Holdings. Yet, not until January 2005 did Honeywell admit to Armor Holdings that Honeywell ". . . had no confidence in our ability to make shields that meet the minimum ballistic spec required." Even then, Honeywell continued to sell Z Shield to Armor Holdings and did so up until the time that NIJ effectively decertified all Zylon products, including the Z Shield Vests, in August 2005.

**2.    Red Thread**

79. In May 2003, Hexcel Corporation (Hexcel), one of the weavers of Zylon fabric, noticed large dark red discolored portions of Zylon on its looms (Red Thread). Hexcel informed Toyobo about this problem, and testing revealed that this Red Thread Zylon fiber had tensile strength 10 to 30% lower than regular Zylon fiber. In actuality, Toyobo had a Red Thread problem with Zylon from the very beginning of its production. But Toyobo had managed to keep

this a secret until Hexcel's discovery, which marked the first time that anyone outside of Toyobo had identified a Red Thread problem.

80.   Despite using a lamination rather than a weaving process, Red Thread still represented a threat to Honeywell's Z Shield because it impacted the Zylon fiber, which was the raw material in Z Shield.   Accordingly, in June 2003, Toyobo met with Honeywell, informed the company about this Red Thread problem, and told Honeywell to inspect its Z Shield product for signs of Red Thread.   A month later, in August 2003, Toyobo published a white paper released widely in the body armor industry, including to Honeywell and Armor Holdings, admitting that from October 2002 through February 2003, Zylon fiber had been "contaminated by sodium hydroxide" and that the tensile strength of the Red Threat decreased up to 20% compared to regular Zylon.   Toyobo later confirmed this 20% figure in a private meeting with Honeywell, in February 2004, to discuss the Red Thread problem.

81.   Despite these warning signs, Honeywell downplayed the significance of Red Thread to Armor Holdings, continued to emphasize the safety and suitability of Z Shield in ballistic applications, and offered Armor Holdings a "retroactive rebate" of $165,000.

**Honeywell Understood that Z Shield Was Defective, but Kept**
**this from Armor Holdings and the United States**

82.   As detailed above, Honeywell knew that Z Shield degraded quickly in hot and humid conditions and that this latent defect rendered Z Shield unfit for ballistic use because it adversely impacted Z Shield's ballistic performance.   Yet, Honeywell emphasized the positive data to Armor Holdings, authored technical papers and bulletins supporting Z Shield's fitness for use in body armor, and consistently reassured Armor Holdings about Z Shield's safety.

83. In short, Honeywell knew that Z Shield was a defective product that would not adequately protect end users throughout the five year warranty period. Honeywell also knew that Armor Holdings relied on it for technical expertise regarding Z Shield. Yet, Honeywell did not disclose the defective nature of Z Shield to Armor Holdings. As a result, Honeywell caused Armor Holdings to submit false claims to the United States in the sale of defective Z Shield Vests.

**NIJ's Ballistic Testing Confirms the Defective Nature of Z Shield**

84. Following the June 2003 officer shootings, NIJ began a study of Zylon vests. Honeywell, Toyobo, and the rest of the body armor industry publicly applauded the NIJ's testing effort, but failed to provide their negative test results on Zylon to the Government. NIJ conducted V-0 testing on 18 Z Shield Vests and V-50 testing on six Z Shield vest. At least 15 of the Z Shield Vests that underwent V-0 testing were within the five year warranty period. In the V-0 testing, NIJ determined that all 18 of the Z Shield Vests failed ballistics testing, with 15 of them suffering bullet penetrations. NIJ also found in V-50 testing that five of the six Z Shield Vests had lost at least 30% of their tensile strength and 29% of their ballistic integrity, with losses running as high as 43% of tensile strength and 91% of ballistic integrity.

85. NIJ also tested numerous vests from other body armor companies that contained woven Zylon fabric as opposed to Z Shield. In this testing, the bulk of the woven Zylon vests also failed, with 58% of all Zylon vests being penetrated by at least one bullet and 91% having excessive back face deformation. But no group of vests performed as poorly as the Z Shield Vests in this NIJ testing. Following this report, all body armor manufacturers stopped using Zylon in any form.

## COUNT 1

## VIOLATIONS OF THE FALSE CLAIMS ACT,
### 31 U.S.C. § 3729(a)(1)

86. The United States re-alleges and incorporates herein by reference paragraphs 1 through 85.

87. Honeywell knowingly caused to be presented false or fraudulent claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729(a)(1). Specifically, Honeywell caused to be presented by state, local, and tribal law enforcement agencies false claims for payment to the United States under the BPVGPA for Armor Holdings' Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty. Additionally, Honeywell caused to be presented false claims for payment by Armor Holdings to the United States under the GSA FAS Schedule for the Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty. Moreover, Honeywell caused to be presented additional false claims for payment by Armor Holdings to the United States for purchases outside of the GSA contract for the Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty. Each and every claim for payment for any Armor Holdings' Z Shield vest presented to the United States was false. All of these claims were knowingly false claims under the FCA.

88. Had the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers. But Honeywell did not inform the United States of the defects in Z Shield and instead took affirmative steps to cover up those risks.

31

89.  By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT 2

### VIOLATIONS OF THE FALSE CLAIMS ACT,
### 31 U.S.C. § 3729(a)(2)

90.  The United States re-alleges and incorporates herein by reference paragraphs 1 through 85.

91.  Honeywell knowingly made or caused to be made false statements in order to get false claims paid by the United States in violation of the FCA, 31 U.S.C. § 3729(a)(2). Specifically, Honeywell, made or caused to be made false statements in connection with false claims for payment by state, local, and tribal law enforcement agencies to the United States under the BPVGPA for Armor Holdings' Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty.  Additionally, Honeywell made or caused to be made false statements in connection with false claims for payment by Armor Holdings to the United States under the GSA FAS Schedule for the Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty.  Moreover, Honeywell made or caused to be made false statements in connection with false claims for payment by Armor Holdings to the United States for purchases outside of the GSA contract for the Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty.  All of these claims were knowingly false claims under the FCA.

92.  Had the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers.  But

Honeywell did not inform the United States of the defects in Z Shield and instead took affirmative steps to cover up those risks.

93. By virtue of these false statements, the United States suffered damages in an amount to be determined at trial.

## COUNT 3

## UNJUST ENRICHMENT

94. The United States re-alleges and incorporates by reference paragraphs 1 through 84.

95. From 2001 through 2005, the United States paid for defective Z Shield vests due to false statements and omissions by Honeywell.

96. Had the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers. But Honeywell did not inform the United States of the defects in Z Shield and instead took affirmative steps to cover up those risks.

97. By reason of the above-described payments, Honeywell has received money, directly or indirectly, to which they were not entitled. Honeywell, therefore, has been unjustly enriched in an amount to be established at trial. By virtue of its payments to Armor Holdings for Z Shield Vests, the United States is entitled to those proceeds.

## PRAYERS FOR RELIEF

**AS TO COUNT 1:**

As against Honeywell, judgment in an amount equal to:

1. Statutory damages in an amount to be established at trial;

2. Civil penalties for each false claim or false statement as provided by law;

3. The costs of this action, plus interest, as provided by law; and

4. Any other relief that this Court deems appropriate.

**AS TO COUNT 2:**

As against Honeywell, judgment in an amount equal to:

1. Statutory damages in an amount to be established at trial;

2. Civil penalties for each false claim or false statement as provided by law;

3. The costs of this action, plus interest, as provided by law; and

4. Any other relief that this Court deems appropriate.

**AS TO COUNT 3:**

As against Honeywell, judgment in an amount equal to:

1. The money paid to or received by Honeywell, directly or indirectly, relating to the sale

of Z Shield vests to the United States;

2. The costs of this action, plus interest, as provided by law; and

3. Any other relief that this Court deems appropriate.

Dated: June 5, 2008

GREGORY G,. KATSAS
Acting Assistant Attorney General

By:

MICHAEL D. GRANSTON
ALAN E. KLEINBURD
ALICIA J. BENTLEY
A. THOMAS MORRIS
CALLIE R. OWEN
JULLIA F. CALLAHAN
ATTORNEYS
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel:    202-307-1086
Fax:    202-305-7797

# CIVIL COVER SHEET

JS-44
(Rev. 2/01 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | HONEYWELL INTERNATIONAL, INC. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Morris County, NJ<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: In land condemnation cases, use the location of the tract of land involved |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Alicia J. Bentley<br>A. Thomas Morris<br>United States Department of Justice<br>601 D Street NW, Room 9126<br>Washington, D.C.  20004<br>(202) 616-9854 | Eugene F. Assaf<br>Craig S. Primis<br>Kirkland & Ellis LLP<br>655 15th Street, N.W.<br>Washington, D.C. 20005-5793<br>(202) 879-5000 |

## II BASIS OF JURISDICTION
(SELECT ONE BOX ONLY)

◉ 1  U.S. Government
     Plaintiff

○ 2  U.S. Government
     Defendant

○ 3  Federal Question
     (U.S. Government Not a Party)

○ 4  Diversity
     (Indicate Citizenship of
     Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES
( FOR DIVERSITY CASES ONLY!)     (SELECT ONE FOR PLAINTIFF AND ONE FOR DEFENDANT)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place<br>of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of<br>Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a<br>Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Select one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A.  Antitrust | ○ B. Personal Injury/<br>Malpractice | ○ C. Administrative Agency<br>Review | ○ D. Temporary Restraining<br>Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410  Antitrust | ☐ 310   Airplane<br>☐ 315   Airplane Product Liability<br>☐ 320   Assault, Libel & Slander<br>☐ 330   Federal Employers Liability<br>☐ 340   Marine<br>☐ 345   Marine Product Liability<br>☐ 350   Motor Vehicle<br>☐ 355   Motor Vehicle Product Liability<br>☐ 360   Other Personal Injury<br>☐ 362   Medical Malpractice<br>☐ 365   Product Liability<br>☐ 368   Asbestos Product Liability | ☐ 151  Medicare Act<br><br>**Social Security:**<br>☐ 861  HIA ((1395ff)<br>☐ 862  Black Lung (923)<br>☐ 863  DIWC/DIWW (405(g)<br>☐ 864  SSID Title XVI<br>☐ 865  RSI (405(g)<br><br>**Other Statutes**<br>☐ 891  Agricultural Acts<br>☐ 892  Economic Stabilization Act<br>☐ 893  Environmental Matters<br>☐ 894  Energy Allocation Act<br>☐ 890  Other Statutory Actions (If<br>        Administrative Agency is Involved) | Any nature of suit from any category may be<br>selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ◉ E.  General Civil (Other)     OR     ○ F.  Pro Se General Civil | | | |
|---|---|---|---|
| **Real Property**<br>☐ 210  Land Condemnation<br>☐ 220  Foreclosure<br>☐ 230  Rent, Lease & Ejectment<br>☐ 240  Torts to Land<br>☐ 245  Tort Product Liability<br>☐ 290  All Other Real Property<br><br>**Personal Property**<br>☐ 370  Other Fraud<br>☐ 371  Truth in Lending<br>☐ 380  Other Personal Property<br>        Damage<br>☐ 385  Property Damage Product<br>        Liability | **Bankruptcy**<br>☐ 422  Appeal 28 USC 158<br>☐ 423  Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535  Death Penalty<br>☐ 540  Mandamus & Other<br>☐ 550  Civil Rights<br>☐ 555  Prison Condition<br><br>**Property Rights**<br>☐ 820  Copyrights<br>☐ 830  Patent<br>☐ 840  Trademark | **Forfeiture/Penalty**<br>☐ 610  Agriculture<br>☐ 620  Other Food &Drug<br>☐ 625  Drug Related Seizure of<br>        Property 21 USC 881<br>☐ 630  Liquor Laws<br>☐ 640  RR & Truck<br>☐ 650  Airline Regs<br>☐ 660  Occupational  Safety/Health<br>☐ 690  Other<br><br>**Federal Tax Suits**<br>☐ 870  Taxes (US plaintiff or<br>        defendant)<br>☐ 871  IRS-Third Party 26 USC 7609 | **Other Statutes**<br>☐ 400  State Reapportionment<br>☐ 430  Banks & Banking<br>☐ 450  Commerce/ICC Rates/etc.<br>☐ 460  Deportation<br>☐ 470  Racketeer Influenced & Corrupt<br>        Organizations<br>☐ 810  Selective Service<br>☐ 850  Securities/Commodities/Exchange<br>☐ 875  Customer Challenge 12 USC 3410<br>☐ 900  Appeal of fee determination under equal<br>        access to Justice<br>☐ 950  Constitutionality of State Statutes<br>☒ 890  Other Statutory Actions  (if not<br>        administrative agency review or Privacy Act) |

| ○ G. Habeas Corpus/2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

False Claims Act, 31 U.S.C. § 3729, causing false claims to be made to the United States for defective bullet-proof vests

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   DEMAND $ n/a   Select YES only if demanded in complaint

JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction)  ☒ YES ☐ NO   If yes, please complete related case form.

DATE 6/5/08   SIGNATURE OF ATTORNEY OF RECORD _____

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.