# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:08-cv-00961 (RWR)** |
| | ) | |
| **HONEYWELL INTERNATIONAL INC.,** | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT HONEYWELL INTERNATIONAL INC.'S MOTION TO DISMISS

Defendant, by its undersigned attorneys, moves pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure to dismiss this action on the grounds that the Government has failed to state a claim upon which relief may be granted and has failed to plead its False Claims Act counts with the requisite particularity. In support of this motion, the Court is respectfully referred to the Memorandum of Points and Authorities filed in support of the motion, the Exhibits attached to the motion, and the entire record in this case.

Date:   July 10, 2008

Respectfully submitted,

/s/ Craig S. Primis
Eugene F. Assaf, P.C. (D.C. Bar No. 449778)
Craig S. Primis, P.C. (D.C. Bar No. 454796)
Jennifer W. Cowen (D.C. Bar No. 974412)
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Attorney for Defendant
Honeywell International Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:08-cv-00961 (RWR)** |
| | ) | |
| **HONEYWELL INTERNATIONAL INC.,** | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT HONEYWELL INTERNATIONAL INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

Date:   July 10, 2008

Eugene F. Assaf, P.C. (D.C. Bar No. 449778)
Craig S. Primis, P.C. (D.C. Bar No. 454796)
Jennifer W. Cowen (D.C. Bar No. 974412)
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Attorneys for Defendant
Honeywell International Inc.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

LEGAL STANDARDS ON A MOTION TO DISMISS....................................................4

BACKGROUND ..........................................................................................................5

    A.    Honeywell And Z Shield. ...............................................................5

    B.    Government Certification Of Vests Containing Z Shield......................6

    C.    Honeywell's And Armor Holdings' Response To Concerns About Z Shield. ..................................................................................7

    D.    This Action. .................................................................................8

ARGUMENT .................................................................................................................9

I.    COUNTS I AND II FAIL AS A MATTER OF LAW BECAUSE THE GOVERNMENT HAS NOT ALLEGED ANY FALSE CLAIM. .....................9

    A.    The Complaint Fails To Satisfy Rule 9(b)...........................................10

    B.    The Government Has Not Identified Any Objective Falsehood............12

    C.    The Government Has Not Identified Any Falsehood That Was A Condition Of Payment. ................................................................17

II.    COUNT II FAILS FOR THE ADDITIONAL REASON THAT THE GOVERNMENT HAS NOT IDENTIFIED ANY "FALSE RECORD OR STATEMENT" UNDER SECTION 3729(a)(2). ..............................................20

III.    THE GOVERNMENT HAS FAILED TO ALLEGE THE INTENT REQUIRED TO STATE A CLAIM UNDER THE FALSE CLAIMS ACT. ......................23

    A.    Count I Fails Because The Government Has Failed To Allege That Honeywell Knowingly Caused The Submission Of A False Claim.....................24

    B.    Count II Fails Because The Government Has Failed To Allege That Honeywell Knowingly Made a False Statement Or Record Or That It Did So With The Purpose Of Getting The Federal Government To Pay A False Claim.....................27

IV.    COUNT III FAILS BECAUSE THE GOVERNMENT HAS FAILED TO ALLEGE ANY UNJUST ENRICHMENT. ....................................................29

CONCLUSION.............................................................................................................31

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison Engine Co. v. U.S. ex rel. Sanders*,
　128 S.Ct. 2123 (2008).........................................................................................2, 3, 9, 28

*Bell Atl. Corp. v. Twombly*,
　127 S. Ct. 1955 (2007)...........................................................................................4, 12, 20

*Boisjoly v. Morton Thiokol, Inc.*,
　706 F. Supp. 795 (D. Utah 1988).....................................................................................22

*Cahill v. Curtiss-Wright Corp.*,
　57 F. Supp. 614 (W.D. Ky. 1944).....................................................................................25

*Cephas v. MVM, Inc.*,
　403 F. Supp. 2d 17 (D.D.C. 2005).....................................................................................5

*Crane Helicopter Servs., Inc. v. United States*,
　45 Fed. Cl. 410 (Fed. Cl. 1999).......................................................................................25

*EEOC v. St. Francis Xavier Parochial Sch.*,
　117 F.3d 621 (D.C. Cir. 1997).....................................................................................5, 12

*Ellipso, Inc. v. Mann*,
　460 F. Supp. 2d 99 (D.D.C. 2006)...................................................................................30

*Harrison v. Westinghouse Savannah River Co.*,
　176 F.3d 776 (4th Cir. 1999)...........................................................................................25

*Hinson ex rel. N.H. v. Merritt Educ. Ctr.*,
　521 F. Supp. 2d 22 (D.D.C. 2007)...............................................................................5, 12

*Hull v. Eaton Corp.*,
　825 F.2d 448 (D.C. Cir. 1987).........................................................................................15

*In re XM Satellite Radio Holdings Sec. Litig.*,
　479 F. Supp. 2d 165 (D.D.C. 2007).................................................................................10

*Kowal v. MCI Commc'ns Corp.*,
　16 F.3d 1271 (D.C. Cir. 1994)...........................................................................................4

*Krooth & Altman v. North Am. Life Assurance Co.*,
    134 F. Supp. 2d 96 (D.D.C. 2001) ................................................................ 5

*Lee v. Wolfson*,
    265 F. Supp. 2d 14 (D.D.C. 2003) .............................................................. 15

*Luckey v. Baxter Healthcare Corp.*,
    183 F.3d 730 (7th Cir. 1999) ............................................................... 13, 21

*McQueen v. Woodstream Corp.*,
    244 F.R.D. 26 (D.D.C. 2007) .................................................................... 30

*Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001) ..................................................................... 19

*New World Commc'ns, Inc. v. Thompsen*,
    878 A.2d 1218 (D.C. 2005) ...................................................................... 30

*Ontario Hydro v. Zallea Sys., Inc.*,
    569 F. Supp. 1261 (D. Del. 1983) ............................................................ 14

*Riggiladez v. Harvey*,
    510 F. Supp. 2d 106 (D.D.C. 2007) ............................................................ 4

*Shenandoah Assocs. Ltd. P'ship v. Tirana*,
    182 F. Supp. 2d 14 (D.D.C. 2001) ........................................................ 30, 31

*U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*,
    251 F. Supp. 2d 28 (D.D.C. 2003) ........................................................ 10, 17

*U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*,
    297 F. Supp. 2d 272 (D.D.C. 2004), *aff'd*, 393 F.3d 1321
    (D.C. Cir. 2005) ................................................................................ 12, 26

*U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*,
    472 F. Supp. 2d 787 (E.D. Va. 2007) ...................................................... 12

*U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Group*,
    298 F. Supp. 2d 91 (D.D.C. 2004) ........................................................... 12

*U.S. ex rel. Gudur v. Deloitte Consulting LLP*,
    512 F. Supp. 2d 920 (S.D. Tex. 2007) ..................................................... 21

*U.S. ex rel. Hopper v. Anton*,
    91 F.3d 1261 (9th Cir. 1996) ................................................................... 21

*U.S. ex rel. Joseph v. Cannon*,
    642 F.2d 1373 (D.C. Cir. 1981) ............................................................ 4, 10

*U.S. ex rel. K&R Ltd. v. Mass. Housing Fin. Agency*,
    — F.3d —, 2008 WL 2651088 (D.C. Cir. July 8, 2008) ................................................. 24

*U.S. ex rel. Lamers v. City of Green Bay*,
    168 F.3d 1013 (7th Cir. 1999) ....................................................................................... 13

*U.S. ex rel. Roby v. Boeing Co.*,
    100 F. Supp. 2d 619 (S.D. Ohio 2000) ........................................................................... 21

*U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
    214 F.3d 1372 (D.C. Cir. 200) ....................................................................... 19, 21, 24, 26

*U.S. ex rel. Stebner v. Steward & Stevenson Servs., Inc.*,
    305 F. Supp. 2d 694 (S.D. Tex. 2004) ...................................................................... 18, 20

*U.S. ex rel. Totten v. Bombardier Corp.*,
    286 F.3d 542 (D.C. Cir. 2002) ..................................................................................... 4, 10

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
    389 F.3d 1251 (D.C. Cir. 2004) ....................................................................................... 10

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) .................................................................................... 2, 3, 12

*United States v. Krizek*,
    111 F.3d 934 (D.C. Cir. 1997) ......................................................................................... 24

*United States v. Prabhu*,
    442 F. Supp. 2d 1008 (D. Nev. 2006) .............................................................................. 13

*United States v. Sci. Applications Int'l Corp.*,
    No. 04-1543, 2008 WL 2060602 (D.D.C. May 15, 2008)................................................. 1

*United States v. Southland Mgmt. Corp.*,
    326 F.3d 669 (5th Cir. 2003) ........................................................................................... 18

*Wang v. FMC Corp.*,
    975 F.2d 1412 (9th Cir. 1992) ......................................................................................... 25

**Statutes, Rules and Regulations**

28 C.F.R. § 33.100(c)................................................................................................... 6, 13

31 U.S.C. § 2126............................................................................................................. 28

31 U.S.C. § 2128............................................................................................................. 28

31 U.S.C. § 2129............................................................................................................. 28

31 U.S.C. § 2130 ................................................................................................ 28

31 U.S.C. § 3729(a)(1) ......................................................................................... 8

31 U.S.C. § 3729(a)(1)–(2) .................................................................................. 9

31 U.S.C. § 3729(a)(2) .............................................................................. 8, 20, 28

31 U.S.C. § 3729(b) ...................................................................................... 24, 27

31 U.S.C. § 3729(b)(3) ....................................................................................... 24

31 U.S.C. § 3729(c) ............................................................................................ 10

42 U.S.C. § 3796*ll*(b)(2) ................................................................................ 6, 13

42 U.S.C. § 3796*ll*-2(1) .................................................................................... 13

42 U.S.C. § 3796*ll*-2(1)(A) ................................................................................. 6

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 4

Fed. R. Civ. P. 9(b) .............................................................................................. 4

NIJ Standard 0101.03, § 4.4.1 .............................................................................. 7

NIJ Standard 0101.03, § 4.4.2 .............................................................................. 7

NIJ Standard 0101.04, § 1 .................................................................................... 7

NIJ Standard 0101.04, § 4.5.1(j) .......................................................................... 7

NIJ Standard 0101.04, § 4.5.1(l) .......................................................................... 7

NIJ Standard 0101.04, § 4.5.2 .............................................................................. 7

## Other Authorities

Charles A. Wright & Arthur Miller,
    5A Fed. Prac. & Proc. Civ. 3d § 1327 (2008) ................................................. 5

*Williston on Contracts* 4th, § 52:46 ................................................................ 14

## PRELIMINARY STATEMENT

It should go without saying that, to state a cause of action under the False Claims Act ("FCA"), the Government must at a minimum identify a false claim. But that basic requirement is the beginning and the end of this FCA case, because the Government has not identified a single false claim for payment in its Complaint. The Government's entire case is premised on the notion that a repair-or-replace warranty for body armor containing Honeywell's Z Shield product, which was limited by care and use instructions requiring vests to be stored in a cool, dry place, somehow *guaranteed* a certain level of performance for five years. According to that theory, any failure to meet that level of performance gave rise to a "false claim." But in advancing this "underlying theory of liability," the Government violates the basic rule that it must "point to a single, specific false claim or sufficiently detailed description of one" to proceed under the Act, *United States v. Sci. Applications Int'l Corp.*, No. 04-1543, 2008 WL 2060602, at *5 (D.D.C. May 15, 2008) ("*SAIC*") (internal quotation marks omitted), and chooses instead to rely on nothing more than a partial quotation of an unidentified warranty from an unidentified document presented to unidentified purchasers at an unspecified point in time—and not attached to this Complaint.

Presumably the Government leaves out these details because the actual "typical" warranty referenced in the Complaint contains key terms—omitted by the Government—that completely undermine the Government's case. Those terms make clear that there is no guarantee of any particular level of performance for any particular amount of time but rather the promise to repair or replace if a vest is defective. The Government's suggestion otherwise misapprehends basic principles of contract law that it elsewhere has recognized. As early as 2001, DOJ's National Institute of Justice ("NIJ") warned vest purchasers that "*a manufacturer's warranty should not be interpreted as a benchmark for service life*" and that the warranty is "*not a*

*reflection of the anticipated service life of the product*." (Ex. A, NIJ Guide 100-01, at 62 (Nov. 2001) (emphasis added).) NIJ's admission only confirms that the purported performance guarantee upon which the Government relies does not exist and cannot give rise to a "false claim" under the FCA.

The Government's selective reliance on an unidentified warranty is troubling for yet another reason: namely, that a "typical" warranty contained additional language, also omitted, that disclosed the very risk the Government now claims was hidden in this case. The typical warranty expressly warns the vest owner to "avoid storing your vest in places where it is exposed to persistent high temperatures (120°F and above) in combination with high humidity (50% and above) for long uninterrupted periods of time (two weeks or more)" and limits warranty coverage solely to those who follow these instructions. (Ex. B, ABA Warranty, at HW0139558.) If the basic facts about which the Government now complains were disclosed in the warranty document that forms the basis of the alleged "false claim," there cannot be a false claim under the FCA.

The Government's "warranty as fraud" theory in this case is exactly the type of inappropriate expansion of the FCA the Supreme Court criticized just last Term in *Allison Engine Co. v. U.S. ex rel. Sanders*, 128 S. Ct. 2123 (2008). There the Court specifically warned against attempts by the Department of Justice to "expand the FCA well beyond its intended role of combating 'fraud against the Government.'" *Id.* at 2128 (emphasis omitted). If the Government's falsity-free "warranty as fraud" were recognized, it would contravene the Supreme Court's warning as well as the settled rule that the FCA "cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008). Indeed, it would

convert every breach of warranty into a potential claim of fraud by the Government and in the process "render meaningless the fundamental distinction between actions for fraud and breach of contract." *Id.* This unprecedented and dramatic expansion of the Act would render the FCA "almost boundless," *Allison Engine Co.*, 128 S. Ct. at 2128, exactly what the Supreme Court warned against. This Court should heed that warning and dismiss the Government's Complaint.

In the end, the Complaint speaks more loudly in what it does ***not*** say than what it does say. Notwithstanding the repeated conclusory allegations of a defect and vests that are "unfit" for use, the Complaint does ***not*** allege that a single police officer or first responder was ever injured or killed while wearing a vest containing Z Shield. And for all the allegations that the warranty on vests containing Z Shield was somehow untrue, the Government does not allege that either Honeywell or Armor Holdings Inc. ("Armor Holdings") did not intend to honor the warranty or that any request for a replacement vest under the warranty was denied. And finally, the Complaint does not allege that Honeywell or Armor Holdings failed to satisfy ***any*** government regulation or standard of performance. To the contrary, the Government concedes that vests containing Z Shield satisfied the only governing DOJ/NIJ standard, which applied solely to new vests and did not set any criteria addressing deterioration over time. With no injuries, no denied warranty claims, no guarantee of future performance in the warranty, and an admission that the vests met the sole standard the Government identifies, it is inexplicable why the Government brought this suit in the first place.

For these reasons and the reasons set forth below, Honeywell respectfully requests that the Complaint be dismissed in its entirety for failure to state a claim. Because the Government has been investigating this case for nearly two years and has had the opportunity to take extensive pre-filing discovery, any dismissal should be with prejudice.

## LEGAL STANDARDS ON A MOTION TO DISMISS

The Court must dismiss a complaint if it fails to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). All complaints brought under the False Claims Act must be pleaded with particularity under Federal Rule of Civil Procedure 9(b). *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002) ("because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)"); Fed. R. Civ. P. 9(b). To meet this requirement, a complaint must plead with specificity the "time, place, and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud." *U.S. ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (internal quotation marks omitted). Generalized and vague allegations cannot meet Rule 9(b)'s requirements. *Id.*

Although "the Court accepts as true all of the factual allegations set forth in the complaint, and construes the complaint liberally in favor of the plaintiff," *Riggiladez v. Harvey*, 510 F. Supp. 2d 106, 109 (D.D.C. 2007) (internal citations omitted),[1] the Court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (internal quotation marks omitted); *Kowal*, 16 F.3d at 1276. Plaintiffs must make more than a base assertion of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1965.

---

[1] Honeywell strongly disputes the allegations in the complaint and will contest these allegations at the appropriate stage of the case if necessary.

In evaluating the legal sufficiency of a claim, the Court may consider "facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." *Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 521 F. Supp. 2d 22, 27 (D.D.C. 2007); *see also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (same). A court may also consider materials that are "referred to in the complaint" and "central to the plaintiffs' claims," even if they have not been attached to the complaint or expressly incorporated by reference. *See Krooth & Altman v. North Am. Life Assurance Co.*, 134 F. Supp. 2d 96, 99 (D.D.C. 2001); *Cephas v. MVM, Inc.*, 403 F. Supp. 2d 17, 20 (D.D.C. 2005). "When a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control." Charles A. Wright & Arthur Miller, 5A Fed. Prac. & Proc. Civ. 3d § 1327 (2008).

## BACKGROUND

### A.    Honeywell And Z Shield.

Honeywell did not make or design the body armor at issue in this case. Nor did Honeywell have any contract with the Government as it relates to the sale of such armor. Rather, Honeywell supplied a key component of the body armor in this case: a product called "Z Shield." (Compl. ¶¶ 1, 23.) Honeywell did not offer a five-year warranty on Z Shield. Honeywell did not control the design process or the manufacturing process of the vests. The vest designer and manufacturer chose how many layers of Z Shield to use in ballistic panels, what other materials to use in those ballistic panels, how to manufacture those panels and how to manufacture the ultimate vest. (Compl. ¶¶ 1, 2, 20–23.) The body armor designer and manufacturer that used Z Shield is a company called Armor Holdings. (Compl. ¶¶ 1, 23.) Any vests at issue in this case were sold by Armor Holdings, and it was Armor Holdings that provided the warranty on them.

(Compl. ¶¶ 23, 32.)   There is no allegation that Honeywell failed to meet any specifications required by Armor Holdings.

Honeywell developed Z Shield using Zylon, a fiber manufactured by yet another company.  (Compl. ¶ 21.)   Z Shield is made by placing a layer of Zylon fibers in a single direction within a "resin matric," which is then "cross-plied" and "sandwich[ed] in thermoplastic film."  (Compl. ¶ 2.)  Honeywell's method of converting Zylon thread into Z Shield is entirely different from the weaving process used by other manufacturers who have also been sued by the Department of Justice under the False Claims Act.  (Compl. ¶¶ 2, 20, 21.)  While the woven product in those cases is alleged to have failed, causing injury or death (Compl. ¶ 67), there is no allegation in this case that a single law enforcement officer was injured or killed while wearing a vest containing Z Shield.

**B.      Government Certification Of Vests Containing Z Shield.**

Throughout the relevant time period, the Government paid for vests that met the only standards that it identifies in this case—namely those set by the NIJ.  (Compl. ¶ 30.)  Those standards are the ***only*** standards that body armor is required to meet to be reimbursable under the Bullet Proof Vest Grant Partnership Act Program ("BPVGPA Program"), a program through which state, local, and tribal officials can seek federal reimbursement for purchases of body armor.  *See* 42 U.S.C. § 3796*ll*(b)(2) (permitting grants to be made for "purchase of armor vests"); 42 U.S.C. § 3796*ll*-2(1)(A) (defining "armor vest" as armor "found to meet or exceed" NIJ standards); 28 C.F.R. § 33.100(c) (defining "armor vest" as one meeting NIJ standards).  Initially, that standard was NIJ Standard 0101.03, but it was superseded early in the relevant time period by NIJ Standard 0101.04.

To receive NIJ certification, the body armor had to be tested by an NIJ-approved testing facility, using the procedures set by the NIJ, and it had to meet the performance requirements

established by the NIJ.  (*See* Ex. C, NIJ Standard 0101.04, § 1 (stating that the standard sets "performance requirements and test methods for the ballistic resistance of personal body armor"); *id.* § 4.5.1(l) (permitting manufacturers to label vests as compliant with NIJ standards when they have been successfully tested at "an NIJ-approved testing facility").)  As part of that certification process, body armor was tested to ensure that it could stop specified rounds of ammunition.  (Compl. ¶ 30.)  Each vest and its ballistic panels were also required to have permanently affixed labels containing care and use instructions.  (Ex. C, NIJ Standard 0101.04, § 4.5.1(j), § 4.5.2; Ex. D, NIJ Standard 0101.03, § 4.4.1, § 4.4.2.)  NIJ certified that all of the vests at issue in this case—the vests designed and manufactured by Armor Holdings using Z Shield—complied with its voluntary performance standards and had been tested by a NIJ-approved testing facility using the methods established by those standards.  (Compl. ¶ 30; Ex. C, NIJ Standard 0101.04, §§ 1, 4.5.1(l).)

NIJ Standards 0101.03 and 0101.04 applied only to *new* vests (Compl. ¶ 30), and contained no standards for performance of vests as they experienced wear and tear over time. Neither set of standards required vest manufacturers to offer a warranty of any kind as a prerequisite to certification; nor did they set any length of time for service life of the vests.

### C.    Honeywell's And Armor Holdings' Response To Concerns About Z Shield.

On July 5, 2001, one of the companies in the Z Shield supply chain—the toller (or manufacturer) of Z Shield—alerted Honeywell and the vest manufacturer, Armor Holdings, to potential concerns about the capabilities of Z Shield.  (*See* Compl. ¶ 39.)  On July 9, 2001, Armor Holdings issued a storage advisory "warning its customers."  (Compl. ¶ 41.)  It informed them that "[r]ecent laboratory 'accelerated aging' tests of the Zylon fiber … indicate that the ballistic performance of such material can be adversely affected if it is stored in a manner that exposes the material to extreme temperatures (158°F and above) and excessive humidity (80%

and above) for a continuous period of two (2) weeks or more."  (Ex. E, July 9, 2001 AHI Storage

Advisory, at HW000291 (cited in Compl. ¶ 41).)  It reminded customers that "the way [they]

consistently care for and store [their] vest[s] when [they are] not in use could adversely affect

[their] ballistic performance."  (*Id.*)  It expressly directed customers to "store body armor

containing woven Zylon or Z Shield in a dry and cool place and not to store it at temperatures

above 120 degrees F and 50% humidity."  (Compl ¶ 41.)  In addition, the Complaint

acknowledges that Honeywell conducted extensive testing following the warning from its toller.

(*See, e.g.*, Compl. ¶¶ 44, 49, 52, 54, 55.)

### D.     This Action.

The Government filed this suit against Honeywell on June 5, 2008.  The Government

alleges both that it purchased vests containing Z Shield as a direct customer of Armor Holdings

(Compl. ¶¶ 1, 15), and that through the BPVGPA Program it reimbursed state, local, and tribal

law enforcement for the purchase of vests containing Z Shield.  (Compl. ¶ 18.)

According to the Government, Z Shield suffered from a "latent defect" of which the

Government was unaware, namely that it "degraded quickly over time in hot and humid

conditions."  (Compl. ¶ 11.)  Predicated on this allegation, the Government alleges in Count I

that Honeywell violated 31 U.S.C. § 3729(a)(1) by "knowingly caus[ing] to be presented false or

fraudulent claims to the United States for payment … for Armor Holdings' Z Shield vests, which

Honeywell knew were defective and ***would not meet the five year warranty***."  (Compl. ¶ 87

(emphasis added).)  Count I further alleges that Honeywell caused Armor Holdings to submit

false or fraudulent claims to the United States—both "under the GSA FAS Schedule" and other

federal law enforcement contracts—for vests, "which Honeywell knew were defective and ***would***

***not meet the five year warranty***."  (Compl. ¶ 87 (emphasis added).)  Similarly, in Count II, the

Government alleges that Honeywell violated 31 U.S.C. § 3729(a)(2) both through the sales of

vests reimbursed by the BPVGPA Program and through direct sales to various government agencies. (Compl. ¶ 91.) Specifically, it alleges that Honeywell "made or caused to be made false statements in connection with false claims for payment … for Armor Holdings' Z Shield Vests, which Honeywell knew were defective and ***would not meet the five year warranty***." (Compl. ¶ 91 (emphasis added).) Finally, in Count III, the Government alleges that Honeywell was unjustly enriched by the Government's payment for Z Shield vests. (Compl. ¶ 96.)

Although the Government relies heavily upon the warranty in attempting to state a claim under both False Claims Act sections, it never quotes or describes the relevant portions of the warranty in full and, in fact, leaves out multiple key warranty provisions that undermine its claims, as discussed in further detail below. (Compl. ¶ 32.) The Government purports to be relying on "typical" warranty language. But it does not attach any warranty to its Complaint, it does not identify what document this "typical" language is allegedly drawn from, and it does not describe anything about that document. (Compl. ¶ 32.)

## ARGUMENT

## I. COUNTS I AND II FAIL AS A MATTER OF LAW BECAUSE THE GOVERNMENT HAS NOT ALLEGED ANY FALSE CLAIM.

The False Claims Act imposes liability for any person who "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government … a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1)–(2). Although the elements of subsections (a)(1) and (a)(2) differ in certain respects, both require (1) a claim for payment, (2) that was false, and (3) that defendant knew was false. *See Allison Engine Co.*, 128 S. Ct. at 2129–30. The first of these components—a "claim"—has a specific meaning in the statute, defined in relevant part as "***any***

9

*request or demand* … *for money or property*" from the Government.  *See* 31 U.S.C. § 3729(c) (emphasis added).  Honeywell does not contest for purposes of this motion that Armor Holdings was "requesting or demanding" payment from the Government in exchange for body armor, or that states and localities were "requesting or demanding" reimbursement from the Government through the BPVGPA program.  But the second key component—the "falsity" of any claim—is conspicuously absent from the Government's allegations.  The Government has failed to plead it with the particularity required by Rule 9(b), and what the Government does plead fails to supply the falsity required as a matter of law.

> **A.      The Complaint Fails To Satisfy Rule 9(b).**

As a threshold matter, the Government's core "theory of liability"—that the warranty accompanying Z Shield vests gave rise to a "false claim" for payment—does not get past the entry point for an FCA claim:  Rule 9(b).  It is settled in this Circuit that the heightened pleading requirements of Rule 9(b) apply to actions brought under the FCA.  *Totten*, 286 F.3d at 552.  As a result, to state an FCA claim, the Government "must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." *Joseph*, 642 F.2d at 1385 (internal quotation marks omitted).  "Rule 9(b) requires plaintiffs to 'explain *why* the statements were fraudulent' in order to survive a motion to dismiss," *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 183 (D.D.C. 2007) (emphasis added) (internal quotation marks omitted), and "to identify individuals allegedly involved in the fraud," *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004).

The principal function of Rule 9(b) is to "ensure that defendants have notice of the charges against them adequate to prepare a defense."  *U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 34 (D.D.C. 2003).  Yet here, the Government has given

no notice as to the nature, timing, or even the source of the falsity that allegedly gives rise to a "false claim" under the Act. Paragraph 32 of the Complaint contains the entirety of the Government's allegations about the substance of the warranty, but it is devoid of any allegations about (1) from which document the Government pulled the allegedly "typical" warranty language; (2) the date of the allegedly "typical" warranty; (3) the identity of the people who provided or received the particular warranty language that is quoted; or (4) any basis for suggesting that this language is "typical." These missing allegations are critical to satisfying Rule 9(b), because as the Government alleges elsewhere in the Complaint, thousands of vests containing Z Shield, in at least 23 different models, were sold to an unspecified number of federal, state, and local customers over a five-year period. (Compl. ¶¶ 1, 6, 8, 23.) It is telling that nowhere in the 97 paragraphs of its Complaint did the Government elect to identify the document in which its alleged warranty is found, let alone attach any warranty, despite the fact that the warranty is the centerpiece of its "underlying theory of liability." One can only surmise that the Government elected not to do so in the hopes of avoiding the argument that the document on its face is not a warranty or that it contains limits on the warranty that undermine the Government's Complaint.

This is exactly the type of gamesmanship Rule 9(b) is intended to prevent. The rule requires more than a partial quotation from an unidentified and undated document purporting to create a warranty, particularly where the Government seeks to use a warranty provided by one party (Armor Holdings) to state a claim against another party (Honeywell) that is not alleged to have given the Government or any other entity a warranty of its own. The Government's warranty allegations thus fall short of the stringent pleading standards of Rule 9(b), and are so

deficient that they fail to satisfy even the more liberal pleading requirements of Rule 8(a) as described in the Supreme Court's recent *Twombly* decision.

The Government has, however, expressly referenced in its Complaint the "typical" warranty that accompanied vests containing Z Shield. Thus, the Court may consider on this motion to dismiss the actual "typical" warranty that accompanied the vests in question. *See EEOC*, 117 F.3d at 624; *Hinson*, 521 F. Supp. at 27. That warranty, which Honeywell has attached to its motion as part of a complete document for the Court's review and which it discusses at length below, provides the obvious explanation for why the Government has attempted to hide the ball and avoid any specificity in its Complaint: the warranty is limited, it contains no false statements, it provides a remedy for defects that the Government does not allege it ever sought, and it specifically warns against the risks the Government says were hidden.

### B. The Government Has Not Identified Any Objective Falsehood.

Even beyond Rule 9(b), the Government's FCA claims fail because the Government has not alleged a false claim, the *sine qua non* of any action for relief under the False Claims Act. "Falsity" under the FCA requires an "objective falsehood." *See*, *e.g.*, *Wilson*, 525 F.3d at 376–77 ("To satisfy this first element of an FCA claim, the statement or conduct alleged must represent an objective falsehood."); *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 797 (E.D. Va. 2007). As one district court in this Circuit has held, to be "false" for purposes of the FCA, "'***the claim must be a lie***.'" *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 297 F. Supp. 2d 272, 277 (D.D.C. 2004) (emphasis added), *aff'd*, 393 F.3d 1321 (D.C. Cir. 2005); *see also id.* ("[I]nnocent mistakes, negligence, and the common failings of scientists or engineers are insufficient."); *U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Group*, 298 F. Supp. 2d 91, 102 (D.D.C. 2004). In short, it is well-settled that "it is not sufficient to

demonstrate that the person's practices could have or should have been better.  Instead, plaintiff must demonstrate that an ***objective gap*** exists between what the Defendant represented and what the Defendant would have stated had the Defendant told the truth."  *United States v. Prabhu,* 442 F. Supp. 2d 1008, 1033 (D. Nev. 2006) (emphasis added); *see also Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir. 1999); *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999).

There is no such "objective gap" here.  The Government admits, as it must, that the vests in question all satisfied the only specification that the Justice Department identifies as having actually required: they were all certified under the standards set by NIJ.  (Compl. ¶ 30.)  Indeed, this was the only requirement imposed by statute or regulation for reimbursement under the BPVGPA Program.  *See* 42 U.S.C. § 3796*ll*(b)(2) (permitting grants to be made for "purchase of armor vests"); 42 U.S.C. § 3796*ll*-2(1)(A) (defining "armor vest" as armor "found to meet or exceed" NIJ standards); 28 C.F.R. § 33.100(c) (defining "armor vest" as one meeting NIJ standards).

Faced with this regulatory scheme and the resulting absence of any contractual, statutory or regulatory commitment on which to base its allegations, let alone a breach of that commitment, the Government articulates what it calls its "underlying theory of liability." (Compl. ¶ 11.)  That theory relies exclusively on the existence of a five-year warranty and an allegedly "latent defect" that somehow rendered that warranty "false."  (Compl. ¶ 11.)  This theory, even taken on its own terms, fails for two reasons: (1) the Government has not identified anything in an actual warranty that was objectively false, in no small part because it has failed to provide an example of any actual warranty in its entirety; and (2) everything the Government characterizes as "latent" was specifically disclosed.

13

**First**, the Government omitted key passages of Armor Holdings' standard-form warranty (Ex. B)[2] that refute the notion of a "false claim" altogether. Specifically, it omitted the language that makes clear what was actually warranted: Any ballistic panels determined to be defective would be "repaired or replaced at" Armor Holdings' option. (Ex. B, ABA Warranty, at HW0139557.) In essence, the Government attempts to transform this warranty into something it was not—an unqualified guarantee of service life for five years. But the express terms of the warranty make plain that it offered repair, replacement or refund—nothing more and nothing less. (*Id*.)

The Government's warranty theory contravenes basic principles of contract law. It is well-established under the Uniform Commercial Code that "[t]here is a vast difference between a warranty of future performance and a repair or replacement warranty." *Ontario Hydro v. Zallea Sys., Inc.*, 569 F. Supp. 1261, 1266 (D. Del. 1983) (recognizing that the latter "merely provides a *remedy* if the product becomes defective," while the former "*guarantees the performance* of the product itself for a stated period of time") (emphasis in original). A repair-or-replace warranty is not a promise that an event will not occur, but rather a promise about what a manufacturer or seller will do should it occur. Because of this vital difference, the law provides that a warranty for future performance exists only when a warranty "***expressly*** provide[s] some form of guarantee that the product will perform in the future as promised." *Id*. at 1266 (emphasis added); *see also Williston on Contracts* 4th, § 52:46 ("To be deemed a warranty as to future performance, the warranty must expressly provide some form of guarantee that the product will perform in the future as promised; thus, a seller's mere commitment to repair or replace the goods if they fail to perform does not fall in this category."); *Lee v. Wolfson*, 265 F. Supp. 2d 14,

---

2    The warranty attached as an exhibit was one provided by American Body Armor, a subsidiary of Armor Holdings.

19–20 (D.D.C. 2003) (recognizing failure to allege that warranty had "explicitly extend[ed] to future performance of the goods"); *Hull v. Eaton Corp.*, 825 F.2d 448, 456 (D.C. Cir. 1987) ("Appellants do not claim that the alleged warranty explicitly extended to future performance."). The Government cannot meet this basic test of contract law by re-writing the warranty to say what it wants. Without an express guarantee, the Government's "underlying theory of liability" falls apart.

Though the Government now fails to apprehend these well-settled principles of contract law, it previously (and publicly) specifically embraced them with respect to warranties provided for bullet-resistant body armor. The Department of Justice admitted, publicly, that vest manufacturer warranties do ***not*** guarantee service life of the vests. In 2001, the National Institute of Justice—the division of DOJ that certified these very vests—cautioned:

> It is important for agencies to recognize that a manufacturer's warranty ***should not be interpreted as a benchmark for service life***. The warranty exists solely to limit the manufacturer's liability on the product and is ***not a reflection of the anticipated service life of the product***.

NIJ Guide 100-01 (Nov. 2001) at 62 (emphasis added). The Department cannot reconcile the current Complaint with its own prior statements, which confirm that the Department cannot state a claim on the so-called "underlying theory of liability" set forth in the Complaint.

***Second***, there is no objective falsity because what the Government characterizes as "latent" was disclosed. In yet another critical omission, the Government fails to present to the Court the fact that the warranty ***disclosed*** the facts the Government now claims were hidden. The undisclosed "latent defect" alleged in the Complaint is that Z Shield "degraded quickly over time in hot and humid conditions." (Compl. ¶ 11.) Yet the care and use instructions accompanying the vests expressly warned:

> When not in use, avoid storing your vest in places where it is exposed to persistent ***high temperatures*** (120 F and above) in combination with ***high***

> *humidity* (50% and above) for long uninterrupted periods of time (two weeks or
> more).

(Ex. B, ABA Warranty, at HW0139558 (emphasis added).)  And the warranty was contingent on

proper care and maintenance of the armor, including the *specific avoidance of high heat and*

*humidity*.  The very first sentence of the warranty unambiguously limited it based on compliance

with all care and use information, stating, "*Subject to the warning limitations set forth in this*

*Use and Care Manual*, [Armor Holdings] extends the following Express Limited Warranty …."

(*Id.* at HW0139557 (emphasis added).)  The warranty further stated: "This limited warranty does

not cover anything resulting from misuse, abuse, neglect, alteration, breakage, interruption,

damage, improper fit, [or] *failure to perform care and maintenance as instructed*."  (*Id.* at

HW0139556 (emphasis added).)

        These limitations addressed the very issue of which the Government complains.  They

expressly instructed users to avoid exposing the vests to high heat and humidity for a period of as

little as two weeks.  And they echoed the equally detailed July 9, 2001 product warning issued

by Armor Holdings (*see* Compl. ¶ 41), which explained that "[r]ecent laboratory 'accelerated

aging' tests of the Zylon fiber … indicate *that the ballistic performance of such material can be*

*adversely affected* if it is stored in a manner that exposes the material to extreme temperatures

(158°F and above) and excessive humidity (80% and above) for a continuous period of two (2)

weeks or more."  (Ex. E, July 9, 2001 AHI Storage Advisory, HW000291 (cited in Compl. ¶ 41)

(emphasis added).)  That warning further advised that armor should be "stored at normal room

temperature in a dry place" and should not be stored "where it is exposed to persistent high

temperatures (120°F and above) in combination with high humidity (50% and above)" for

periods of "two weeks or more."  (*Id.*)  The Complaint does not address these warnings, much

less allege that they were somehow insufficient to inform vest purchasers of the very product limitations the Government claims went undisclosed.

### C.    The Government Has Not Identified Any Falsehood That Was A Condition Of Payment.

Even if the Government had identified any "objective falsity" in the warranty or customer disclosures, which it has not, a claim cannot be "false" under the FCA unless it is false with respect to a condition of government payment. As this Court has recognized, liability under the FCA requires a showing of either "factual" falsity or "legal" falsity—both of which concern whether the falsity was a condition of payment in some form. *See SAIC*, 2008 WL 2060602, at *6. An invoice for goods not delivered or services not rendered may constitute *factual* falsity. *Id*. at *5. With factual falsity, the condition for payment speaks for itself: as in any sales transaction, the government as purchaser implicitly conditions payment on actually receiving goods or services. By contrast, a claim may be *legally* false, even if the goods or services are delivered as invoiced, in two different ways: (1) through an express certification, where the claim "falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite for payment," *id*. at *5; or (2) through an implied certification, where there is no explicit certification, but compliance with the law, regulation, or contract term is "'so important to the contract that the government would not have honored the claim presented to it if it were aware of the violation,'" *id*. at *6 (quoting *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 33 (D.D.C. 2003)).

The Government alleges neither factual nor legal falsity here. Factual falsity is absent because the Government does not allege that it was invoiced for goods not delivered or goods different from those that were delivered. The Government concedes that it received NIJ-certified Z Shield vests, (*see* Compl. ¶ 30 ("NIJ certified all of the Z Shield Vests sold by Armor

Holdings")), and it does not and cannot allege that it was invoiced for anything other than those NIJ-certified vests.  Moreover, although the Complaint makes references to alleged "defects" in the vests, it does not allege that the disclosures in the warranties or 2001 storage advisory were insufficient, or that the Government changed its purchasing behavior in light of these disclosures. The allegations simply do not support the idea that a failure by Armor Holdings or Honeywell to disclose even **more** information or data, beyond these clear warnings and limitations, constituted a material omission that impacted the Government's purchasing decisions.  Indeed, any alleged defects standing alone could not support the Government's FCA claims because its "underlying theory of liability" is predicated on the notion that the warranty in conjunction with supposed defects gave rise to a false claim.  (*See*, *e.g.*, Compl. ¶¶ 87 ("which Honeywell knew were defective **and would not meet the five year warranty**") (emphasis added), 91 (same).)

Nor are there allegations that any claim, either directly from Armor Holdings to the Government or through the BPVGPA Program, contained any express or implied "certification" of compliance with any law, regulation or contract term beyond the NIJ certification requirements (and the Government admits that the NIJ standards were met).  Any implicit suggestion in the Complaint that the warranty was itself a "certification" is not substantiated by any factual allegations or the relevant case law.  Courts have held that there can be no "legal falsity" if, as here, the Government received the "benefit of its bargain."  *U.S. ex rel. Stebner v. Steward & Stevenson Servs., Inc.*, 305 F. Supp. 2d 694, 701 (S.D. Tex. 2004); *see also United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674–75 (5th Cir. 2003) ("It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act.").  As with any form of "falsity" under the FCA, a false certification can give rise to a "false claim" only if its substance was "a condition of [the] contract."  *U.S. ex rel.*

18

*Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000); *see also Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001) ("'[A] claim cannot be determined to be true or false without consideration of whether the decisionmaker ***should*** pay the claim—that is, a claim is 'false' only if the Government or other customer would not pay the claim if the facts about the misconduct alleged to have occurred were known.'") (citation omitted).

Here, however, there is no allegation that the warranty was ***any*** part of the Government's bargain, much less a material part on which payment was conditioned. *SAIC*, 2008 WL 2060602, at *5–6. The Government does not allege that any warranty was negotiated by GSA as part of the MAS program or required by GSA or any other government agency (*see* Compl. ¶¶ 13–14), or that any warranty was ever negotiated by or presented to the Government as part of the BPVGPA Program. (*See* Compl. ¶¶ 16–17.) Indeed, the Government does not allege that any person in the Government was aware of the warranty, or even believed that any warranty was a guarantee of service life.

Nowhere does the Government sufficiently allege that it received anything less than the benefit of its bargain, which was for nothing other than NIJ-certified Z Shield vests. Moreover, the Government does not allege that Honeywell was not entitled to payment for Z Shield, or that Armor Holdings was not entitled to payment for the vests. Where, as here, the Government does not and cannot allege that the five-year warranty was a condition or prerequisite, or even "critical" to the government's decision to pay, any "false certification" theory has no application. *Siewick*, 214 F.3d 1372; *see also SAIC*, 2008 WL 2060602, at *6. It is particularly inapplicable here where the warranty provided for repair or replacement. In a similar case, another district court found that where a contract "contemplate[d] the need for … repairs and require[d the contractor] to provide them at its own expense," absent the "inten[tion] to renege on this

19

warranty, the relator's submission fails to demonstrate nonconformance that deprives the Government of the benefit of its bargain." *Stebner*, 305 F. Supp. 2d at 701. The result should be no different here.

The Government's conclusory allegation that "[h]ad the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers" (*see*, *e.g.*, Compl. ¶ 88) cannot save this claim. That statement is unsupported by any specific factual allegations that the five-year warranty was a condition of the Government's payment and merely mouths the legal standard without any factual basis to support it. If the Supreme Court's decision last Term in *Twombly* made anything clear, it is that this sort of bare allegation of legal conclusions is insufficient to state a claim under even the liberal pleading standards of Rule 8(a). *Twombly*, 127 S. Ct. at 1965.

## II. COUNT II FAILS FOR THE ADDITIONAL REASON THAT THE GOVERNMENT HAS NOT IDENTIFIED ANY "FALSE RECORD OR STATEMENT" UNDER SECTION 3729(a)(2).

The Government's claim under section 3729(a)(2) must fail for yet another reason. A claim under section 3729(a)(2) requires *two* layers of falsity: (1) a false claim; and (2) false statements or false records made to get that claim paid. Not only has the Government failed to allege a false claim for the reasons described above, but it has also failed to allege any "*false record or statement*" made to get a "false or fraudulent claim" paid. 31 U.S.C. § 3729(a)(2). Contrary to well-settled law, the Government's theory of "falsity" in Honeywell's records and statements relies on the notion that (1) Honeywell exhibited flawed scientific judgment in how it interpreted certain data and evaluated the relative accuracy and relevance of different data, allegedly "downplaying" certain data and "emphasizing" others; (2) Honeywell did not disclose to Armor Holdings an internal draft report that was scientifically inconclusive on its face; and (3) Honeywell never communicated data directly to the Government, despite its lack of privity of

contract with the Government.  None of these allegations supports the argument that Honeywell submitted "false records or statements" to get false claims paid by the government.  Count II fails for this reason as well.

In recognizing the threshold requirement of an "objective" falsehood for purposes of "falsity" under the FCA, see Part I, *infra*, courts have also made clear there can be no "objective" falsehood where subjective and legitimate differences in judgment—particularly scientific judgment—are involved.  *See, e.g.*, *U.S. ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ ***cannot be false***.") (emphasis added); *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) ("[D]ifferences in interpretations are not false certifications under the Act."); *Luckey*, 183 F.3d at 733 (recognizing that "taking one side of a medical or scientific dispute" is not "fraud"); *U.S. ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007).  As this Circuit has recognized, falsity under the FCA requires underlying "'facts'… that the speaking party could reasonably classify as true or false."  *Siewick*, 214 F.3d at 1378.  An estimate or opinion can qualify as "false" for purposes of the FCA only if the speaker "knows facts which would ***preclude*** such an opinion."  *Id*. (internal quotation marks omitted) (emphasis added).  In *Siewick*, for example, the court concluded no falsity was present because "[h]ere there is only legal argumentation and possibility," no objective "facts" that could be classified as objectively "false."  *Id*.  Similarly, here, there is only scientific "argumentation and possibility"—no allegations of objective facts that were falsely stated.

The Government's allegations about Honeywell's conduct with respect to Armor Holdings relate solely to Honeywell's scientific judgment and opinion.  Though the Complaint

focuses on the variety of tests Honeywell conducted and the datasets it gathered—the "accelerated aging data" (Compl. ¶ 48 *et seq.*) on the one hand and the "warehouse data" (Compl. ¶ 61) on the other—at no point does the Government allege that ***any*** of these data were inherently "false" or somehow "falsified" by Honeywell.  Nor does the Complaint allege, despite conclusory statements to the contrary, that Honeywell failed to share these data with Armor Holdings.  In fact, the Complaint is replete with admissions of Honeywell's disclosure of both datasets.  (*See, e.g.*, Compl. ¶¶ 53, 54, 55, 63 ("At this meeting, Honeywell provided Armor Holdings with the data from its Florida Room and warehouse testing.").)

Instead, the Government attacks as "false" Honeywell's scientific conclusion that the warehouse testing was the more important gauge, and invokes the repeated refrain that Honeywell "downplayed" certain data and "emphasized" others.  (*See, e.g.*, Compl. ¶¶ 63, 73.) Even putting to one side the fact that neither "downplaying" nor "emphasizing" is "falsifying," all of the Government's examples of alleged "downplaying" or "emphasizing" involve both a disclosure of the data and a reasonable scientific judgment about that data that cannot be "false" as a matter of law.  *See, e.g.*, *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 810 (D. Utah 1988) (granting motion to dismiss after concluding document reflecting engineering judgment was "clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim").

Furthermore, after a multi-year investigation involving pre-complaint discovery from Honeywell and other manufacturers in the body-armor industry, the only document concerning heat and humidity that the Government alleges was not disclosed to Armor Holdings was a single "Honeywell Draft Report" from September 2003.  (*See* Compl. ¶¶ 56–60.)  Although the Complaint quotes from the "Draft Report" selectively, a review of the document in its entirety

makes clear there could be no false representation "by omission" because the report contained no objective facts independent of scientific analysis. The report itself states that "[t]he statistical confidence intervals on the ballistic results ***prevent us from drawing hard conclusions on any of the products***." (Ex. F, Honeywell Draft Report, at HW0061242 (emphasis added).) The idea that Honeywell's failure to provide scientifically inconclusive data could be characterized as a "false statement" under the FCA is unprecedented and contrary to the case law's well-defined parameters of objective falsity.

As for the allegation that Honeywell somehow did something wrong by not providing its test data directly to the Government, there is a simple explanation for that. Honeywell had no privity of contract with the Government, much less an obligation to disclose data independently to the Government that it was already disclosing directly to Armor Holdings. The Government alleges no facts to support the inference that Honeywell had an independent obligation to provide data to the Government directly, instead of to the vest manufacturer that actually provided the product, invoiced the customer, and received the payments. Moreover, the Government, as a customer of Armor Holdings, had received the July 2001 storage advisory that instructed all customers to store vests in a cool dry place and not above 120°F and 50 percent humidity. The Government has not alleged that this advisory was insufficient.

## III.    THE GOVERNMENT HAS FAILED TO ALLEGE THE INTENT REQUIRED TO STATE A CLAIM UNDER THE FALSE CLAIMS ACT.

The Government has also failed to allege that Honeywell acted with the intent required to state a claim under either section 3729(a)(1) or section 3729(a)(2). Its failure to do so independently compels dismissal of Counts I and II.

### A. Count I Fails Because The Government Has Failed To Allege That Honeywell Knowingly Caused The Submission Of A False Claim.

To state a cause of action under section 3729(a)(1), the Government must allege that Honeywell acted "knowingly," that is, that Honeywell acted either (1) with reckless disregard for the falsity of the claims; (2) with deliberate ignorance as to their falsity; or (3) with actual knowledge of their falsity. 31 U.S.C. § 3729(b)(3). The Complaint alleges none of these.

The minimum scienter the Government must allege is "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b), *Siewick*, 214 F.3d at 1378 (reckless disregard is the "loosest standard of knowledge" under the FCA). Reckless disregard is "an extreme version of ordinary negligence" or, put another way, a form of "gross-negligence-plus." *United States v. Krizek*, 111 F.3d 934, 937 (D.C. Cir. 1997); *U.S. ex rel. K&R Ltd. v. Mass. Housing Fin. Agency*, No. 07-7014, 2008 WL 2651088, at *3 (D.C. Cir. July 8, 2008) (applying same). Submitting claims "with little or no factual basis" or utterly failing to review something submitted on one's behalf are examples of such extreme negligence. *Krizek*, 111 F.3d at 942. This Complaint shows nothing of the kind.

As an initial matter, the Government's misapprehension of the warranty undermines its ability to claim that it has sufficiently alleged knowledge within the meaning of the FCA. The Government has not alleged that the warranty's promise to repair or replace was not honored. Having failed to allege that, it does not allege and cannot contend that Honeywell acted with reckless disregard to, let alone deliberate indifference to or actual knowledge of, the truth or falsity of that repair-or-replace warranty. This alone dooms Count I.

Even if the warranty were as the Government has imagined it, the Government has still failed to allege that Honeywell acted with reckless disregard (or for that matter deliberate indifference or even actual knowledge) as to the falsity of any claim submitted to the

Government.  Instead, the sum of the Government's allegations that might pertain to knowledge reduce to a disagreement with Honeywell's scientific judgment about which of those datasets (high heat and high humidity or uncontrolled exposure to the elements) best predicted Z Shield's real-world performance.  The Government seems to think it was the testing at high heat and high humidity, but it offers no basis for thinking so.  The Government does not contest the validity of the warehouse results in any way and it concedes that the warehouse data favored Honeywell's conclusion regarding Z Shield.  (Compl. ¶ 61.)  At most, then, the Complaint alleges a situation in which a scientific judgment was made.  But, as a matter of law, Honeywell's exercise of its scientific judgment about the conclusion to be drawn from these tests cannot constitute reckless disregard.  *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) ("The phrase 'known to be false' in [*Hagood*] does not mean 'scientifically untrue'; it means a 'lie.'"); *cf. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999) ("Expressions of opinion are not actionable as fraud," even if those opinions prove to be incorrect.), *Crane Helicopter Servs., Inc. v. United States*, 45 Fed. Cl. 410, 434 (Fed. Cl. 1999) (relying on *Cahill v. Curtiss-Wright Corp.*, 57 F. Supp. 614, 616–17 (W.D. Ky. 1944)) ("A mistake in judgment, even though damaging, is not fraud").

Moreover, the Government cannot save its failure to allege scienter by pointing to allegations of supposed "downplaying" or emphasizing" or even purported failures to share information.  "Downplaying" or "emphasizing" are just ways of expressing the Government's disagreement with Honeywell's scientific judgment.  As for disclosures, the Complaint repeatedly admits that Honeywell shared its data with Armor Holdings.  (Compl. ¶¶ 50, 53–55, 62.)  Indeed, as explained above, after years of investigation, the ***only*** information concerning the

effect on Z Shield of high heat and high humidity that the Government has alleged was not shared with Armor Holdings is an inconclusive draft report.  (Compl. ¶¶ 56–60.)

Not only does the presence of such a scientific judgment undermine any contention that Honeywell acted with reckless disregard, but it also destroys any suggestion that Honeywell acted with deliberate indifference to or actual knowledge of the falsity of any claim.  By definition, reckless disregard is "the loosest standard of knowledge" under the FCA.  *Siewick*, 214 F.3d at 1378.  If it is not sufficiently alleged, then *a fortiori* neither actual knowledge nor deliberate indifference has been sufficiently alleged.

Finally, the Government's own knowledge of the purported defect in Z Shield further confirms that Honeywell did not act with the requisite intent.  "It is undisputed that [government knowledge] is relevant" to whether a person acted knowingly under the FCA.  *Bettis*, 297 F. Supp. 2d at 285 n.22.  One of the Government's principal contentions is that it did not know of any need to protect vests containing Z Shield from high humidity and high heat.  But as the Complaint alleges, on July 9, 2001, Armor Holdings sent an advisory "warning its customers" (which the Government alleges it is) instructing that the body armor be stored in a "dry and cool place" and "not to store it at temperatures above 120 degrees F and 50% humidity."  (Compl. ¶ 41.)  The advisory said even more.  It expressly informed them that "[r]ecent laboratory 'accelerated aging' tests of the Zylon fiber … indicate that the ***ballistic performance of such material can be adversely affected*** if it is stored in a manner that exposes the material to extreme temperatures (158°F and above) and excessive humidity (80% and above) for a continuous period of two (2) weeks or more."  (Ex. E, July 9, 2001 AHI Storage Advisory, HW000291 (cited in Compl. ¶ 41).)  It reminded each customer that "the way you consistently care for and store your vest when it is not in use ***could adversely affect its ballistic performance***."  (*Id.*

(emphasis added).)  It is no answer to say that this advisory did not suffice because Honeywell did not share its underlying data with the Government, because the fact remains that the advisory fully informed Armor Holdings' customers—including the Government—of the need to protect the vests from such conditions.

**B.      Count II Fails Because The Government Has Failed To Allege That Honeywell Knowingly Made a False Statement Or Record Or That It Did So With The Purpose Of Getting The Federal Government To Pay A False Claim.**

The Government has utterly failed to allege the scienter requirements for a claim under section 3729(a)(2).  To state a claim under section 3729(a)(2), the Government must allege both (1) that Honeywell knowingly made a false statement or record; and (2) that Honeywell did so with the express purpose of getting the Government to pay a false or fraudulent claim.  The Government has failed to allege—and cannot allege—either.  Thus, Count II must be dismissed.

Just as with a claim under section 3729(a)(1), to allege that Honeywell has acted knowingly within the meaning of the FCA, the Government must allege either that Honeywell acted with (1) reckless disregard of the truth or falsity of any false statement or record; (2) deliberate indifference to such truth or falsity; or (3) actual knowledge of the falsity of the statement or record.  31 U.S.C. § 3729(b).  The very same things that doom any contention that Honeywell knowingly caused a false claim to be submitted doom any contention that Honeywell knowingly made false statements or records.

The statements and records cited in the Complaint are part and parcel of Honeywell's scientific judgment.  And, as discussed above, the exercise of such judgment cannot be reckless disregard, and certainly not deliberate indifference to or actual knowledge of the falsity of any statements.  Similarly, the Government's own knowledge of the advisory warning that AHI's vests were to be kept in a cool, dry place (Compl. ¶ 41) further undermines any suggestion that

Honeywell acted knowingly.  The Complaint therefore fails to allege that Honeywell knowingly made a false statement or record.  This alone requires the dismissal of Count II.

Count II of the Complaint fails for the further reason that the Complaint fails to allege that Honeywell's express purpose in making any alleged false statement or record was to obtain payment from the "the Government itself."  *Allison Engine Co.*, 128 S. Ct. at 2128.  Just this past Term, the Supreme Court made plain that the phrase "to get" in section 3729(a)(2) renders it wholly "insufficient for a plaintiff asserting a § 3729(a)(2) claim to show merely that '[t]he false statement's use … result[ed] in obtaining or getting payment or approval of the claim[]' … or that 'government money was used to pay the false or fraudulent claim.'"  *Id.* at 2126 (first alteration in original and internal citations omitted).  To the contrary, the Government must meet a rigorous level of scienter to pursue a claim under section 3729(a)(2).  The Court held that a plaintiff "must prove that the defendant ***intended that the false record or statement be material to the Government's decision to pay or approve the false claim.***"  *Id.* (emphasis added).  Not only must the defendant intend for the false statement to be material, but he must also intend for the claim to be paid by the Government itself, "and not by another entity."  *Id.* at 2129.  In other words, "[w]hat § 3729(a)(2) demands is … that the defendant made a false record or statement ***for the purpose*** of getting 'a false or fraudulent claim paid or approved by the Government.'"  *Id.* at 2130 (emphasis added).  In reaching this conclusion, the Court rejected the Government's attempt to read this requirement out of the FCA as "impermissibly deviat[ing] from the statute's language" and "expand[ing] the FCA well beyond its intended role of combating fraud against the *Government*."  *Id.* at 2128 (emphasis in original and internal quotation marks omitted).

The Complaint contains no allegation even suggesting this level of scienter is present.  Nor could it.  First and foremost, the warranty was a repair-or-replace warranty that was not false

28

and thus Honeywell could not have had as its purpose obtaining payment from the Government for false claims.  Second, no such intent could be present where the vests met the only standard they were required to meet: NIJ certification.  It would be strange at the very least to suggest that a party intended to have a false claim paid by the Government by providing the Government with precisely what it contracted for.  Third, the Complaint nowhere alleges and could not allege that Honeywell intended for the ***Government*** to ***rely*** on any statement or record.  Any suggestion of such intent is particularly baseless with respect to sales to state, local, or tribal law enforcement who might or might not submit their vests purchases for reimbursement from the Government, all without the knowledge of Honeywell.  Fourth, as discussed above, this case fundamentally involves Honeywell's scientific judgment.  That judgment undercuts even the far lower scienter of reckless disregard.  There can be no contention, therefore, that the express purpose the Supreme Court has held is required for a claim under section 3729(a)(2) can be met in face of such a judgment.  In the end, the Government merely alleges that Honeywell's conduct was "in connection with" claims for payment by the Government.  (Compl. ¶ 91.)  This is nothing more than the sort of bare allegation that government money was used to pay an alleged false claim that the *Allison Engine* Court held was insufficient.  Accordingly, Count II must be dismissed.

## IV.    COUNT III FAILS BECAUSE THE GOVERNMENT HAS FAILED TO ALLEGE ANY UNJUST ENRICHMENT.

For the same reason that the Government's allegations fail to state a claim under the FCA, they also fail under common law principles of unjust enrichment.  The absence of any allegation that any party—either Honeywell, Armor Holdings, or the Government—received anything other than what it bargained for undermines not just Counts I and II, but also Count III.  As the courts of this Circuit have recognized, "[a]n unjust enrichment action … involves a quasi-contract, a contract implied in law.  Unjust enrichment occurs when a person retains a benefit

(usually money) which in justice and equity belongs to another." *See, e.g.*, *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 104 (D.D.C. 2006) (internal quotation marks omitted); *Shenandoah Assocs. Ltd. P'ship v. Tirana*, 182 F. Supp. 2d 14, 24 (D.D.C. 2001) (recognizing that the law of unjust enrichment is based on the doctrine that "a man shall not be allowed to enrich himself unjustly at the expense of another"). A plaintiff may recover for unjust enrichment where "'(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.'" *McQueen v. Woodstream Corp.*, 244 F.R.D. 26, 35-36 (D.D.C. 2007) (quoting *New World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005)); *Shenandoah*, 182 F. Supp. 2d at 24.

Although Honeywell and the Government had no direct contractual relationship, Honeywell had a contract with Armor Holdings, and Armor Holdings in turn had a contract with the Government. Armor Holdings received the benefit of its bargain with Honeywell, and the Government received the benefit of its bargain with Armor Holdings. The Government does not allege that it made a claim under the warranty and Armor Holdings refused to honor it. The Government does not allege that Honeywell failed to meet any specification Armor Holdings required. The Government's conclusory statement that the goods were "defective"—despite allegations elsewhere in the Complaint that "NIJ certified all of the Z Shield Vests" (Compl. ¶ 30) and NIJ certification is the only requirement that the Government identifies—does nothing to change the fact that all parties received what was bargained for. Moreover, as discussed extensively above, the Government was informed of the need to protect Z Shield from high heat and humidity because it was advised by Armor Holdings in 2001 of the need to do so. The claim for unjust enrichment thus cannot be premised on a failure to disclose. In short, unlike a standard unjust enrichment claim, there is no allegation here that Honeywell failed to render

payment upon receipt of goods or failed to deliver goods upon receipt of payment.  It is axiomatic that there can be no "unjust" retention of benefits when the parties all performed their contracts in full.  *See, e.g.*, *Shenandoah*, 182 F. Supp. 2d at 24.

## CONCLUSION

For foregoing reasons, the Court should grant Honeywell's motion to dismiss.


Date:   July 10, 2008                     Respectfully submitted,


                                          /s/ Craig S. Primis
                                          Eugene F. Assaf, P.C. (D.C. Bar No. 449778)
                                          Craig S. Primis, P.C. (D.C. Bar No. 454796)
                                          Jennifer W. Cowen (D.C. Bar No. 974412)
                                          KIRKLAND & ELLIS LLP
                                          655 15th Street, N.W.
                                          Washington, D.C. 20005
                                          (202) 879-5000


                                          Attorney for Defendant
                                          Honeywell International Inc.

**CERTIFICATE OF SERVICE**

This is to certify that on this 10th day of July, 2008, I electronically filed a true and correct copy of the foregoing Defendant's Motion To Dismiss, Defendant's Memorandum Of Points And Authorities In Support Of Its Motion To Dismiss, the exhibits thereto, and Proposed Order by using the CM/ECF system, which will send a notice of electronic filing to Albert Thomas Morris and Alicia J. Bentley, counsel for the Plaintiff.

/s/ Craig S. Primis

Craig S. Primis, P.C.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 1:08-cv-00961 (RWR)** |
| ) | |
| **HONEYWELL INTERNATIONAL INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### [PROPOSED] ORDER

Upon consideration of Defendant's Motion to Dismiss, the memoranda in support and

opposition thereto, as well as upon consideration of the arguments of the parties, it is this _____

day of _____, 2008:

**ORDERED** that Defendant's Motion to Dismiss is **GRANTED**; and

**FURTHER ORDERED** that Plaintiff's Complaint is hereby **DISMISSED WITH**

**PREJUDICE**.


_____
Richard W. Roberts
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 1:08-cv-00961 (RWR)** |
| ) | |
| **HONEYWELL INTERNATIONAL INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DECLARATION OF JENNIFER W. COWEN IN SUPPORT OF DEFENDANT
HONEYWELL INTERNATIONAL INC.'S MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

I, Jennifer W. Cowen, hereby declare:

1.      I am an attorney admitted to practice before this Court and an associate at Kirkland & Ellis LLP, attorneys for Defendants in the above-captioned action.  I submit this declaration in support of certain documentary evidence cited in the Defendant's Memorandum of Points and Authorities in Support of Motion to Dismiss.

2.      Exhibit A to Defendant's Motion to Dismiss is a true and correct copy of NIJ Guide 100-01, *Selection and Application Guide to Personal Body Armor* (November 2001), published by the National Institute of Justice's National Law Enforcement and Corrections Technology Center.

3.      Exhibit B to Defendant's Motion to Dismiss is a true and correct copy of a Use and Care Manual issued by American Body Armor, a subsidiary of Armor Holdings, Inc.

4.      Exhibit C to Defendant's Motion to Dismiss is a true and correct copy of the NIJ Law Enforcement and Corrections Standards and Testing Program's Standard for Ballistic Resistance of Personal Body Armor, NIJ Standard 0101.04.

5.      Exhibit D to Defendant's Motion to Dismiss is a true and correct copy of the NIJ Technology Assessment Program's Standard for Ballistic Resistance of Police Body Armor, NIJ Standard 0101.03.

6.      Exhibit E to Defendant's Motion to Dismiss is a true and correct copy of Armor Holdings' Body Armor Product Storage Advisory, dated July 9, 2001.

7.      Exhibit F to Defendant's Motion to Dismiss is a true and correct copy of a Draft Exposure Sample Testing Report authored by a Honeywell employee.

I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July 10, 2008

/s/ Jennifer W. Cowen
Jennifer W. Cowen

**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*



# Selection and Application
# Guide to Personal Body Armor

**NIJ Guide 100–01 (Update to NIJ Guide 100–98)**



**U.S. Department of Justice**
**Office of Justice Programs**
810 Seventh Street N.W.
Washington, DC 20531

**John Ashcroft**
*Attorney General*

**Deborah J. Daniels**
*Assistant Attorney General*

**Sarah V. Hart**
*Director, National Institute of Justice*

| Office of Justice Programs<br>World Wide Web Site<br>*http://www.ojp.usdoj.gov* | National Institute of Justice<br>World Wide Web Site<br>*http://www.ojp.usdoj.gov/nij* |

**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*

# Selection and Application Guide to Personal Body Armor

**NIJ Guide 100–01**
**(Replaces Selection and Application Guide to Police Body Armor, NIJ Guide 100–98)**

**November 2001**

Published by:
**The National Institute of Justice's**
**National Law Enforcement and Corrections Technology Center**
Lance Miller, *Testing Manager*
P.O. Box 1160, Rockville, MD 20849–1160
800–248–2742; 301–519–5060

NCJ 189633



**National Institute of Justice**

Sarah V. Hart
*Director*

**Office of Science and Technology**

Wendy Howe
*Program Manager, Standards and Testing*

Points of view are those of the authors and do not necessarily represent the official position of the U.S. Department of Justice. This document is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable by any party in any matter civil or criminal.

The National Law Enforcement and Corrections Technology Center is supported by Cooperative Agreement 96–MU–MU–K011 awarded by the U.S. Department of Justice, Office of Justice Programs, National Institute of Justice. The products, manufacturers, and organizations discussed in this publication are presented for informational purposes only and do not constitute product approval or endorsement by the National Institute of Justice, U.S. Department of Justice; National Institute of Standards and Technology, U.S. Department of Commerce; or Aspen Systems Corporation.

*The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.*

# Foreword

NIJ is pleased to release this updated edition of NIJ's guide to selecting body armor. The update incorporates several important changes:

First, it includes information from the new *Ballistic Resistance of Personal Body Armor, NIJ Standard–0101.04,* which was the result of 3 years of study, research, and collaboration by the Office of Law Enforcement Standards (OLES) at the National Institute of Standards and Technology. It also contains information on NIJ's new *Stab Resistance of Personal Body Armor, NIJ Standard–0115.00,* which was developed by OLES in conjunction with the Police Scientific Development Branch of the United Kingdom and released in September 2000.

Second, the title has changed from the *Selection and Application Guide to Police Body Armor to the Selection and Application Guide to Personal Body Armor*. The title change reflects recognition of the need for corrections officers to wear body armor just as law enforcement officers do.

We at NIJ, the National Law Enforcement and Corrections Technology Center (NLECTC) system, and OLES are excited about the forward progress and momentum that these new standards will produce in body armor technology.

We hope criminal justice agencies will use this guide as they select protective armor that is suited to their individual needs.

Your comments on the usefulness of this document or suggestions for future editions are welcome. Please send them to NLECTC, c/o *Selection and Application Guide to Personal Body Armor,* P.O. Box 1160, Rockville, MD 20849–1160; fax to 301–519–5149; or e-mail to asknlectc@nlectc.org.

*Sarah V. Hart*
*Director*
*National Institute of Justice*

# Table of Contents

Foreword ................................................................................................................iii

1. Overview of the Guide ...............................................................................1

2. A History of Body Armor..........................................................................3
   The History of NIJ's Body Armor Testing Program ........................................4
   The Use of Body Armor Today ......................................................................6

3. Why Wear Body Armor? ..........................................................................7
   The Cost ........................................................................................................7
   The Ballistic Threat ......................................................................................8
   The Stab Threat............................................................................................11
   Not Just Bullets and Knives ........................................................................11
   2,500 Reasons ..............................................................................................12

4. Body Armor Construction ......................................................................15
   How Does Ballistic-Resistant Body Armor Work? .....................................15
   How Does Stab-Resistant Body Armor Work? ...........................................15
   Construction Methods....................................................................................16
   Model and Style Designation .......................................................................17
   ISO 9000 ......................................................................................................19
   Materials Used ............................................................................................20

5. The NIJ Standards ..................................................................................23
   Developing the NIJ Standard for Ballistic Resistance of Personal Body Armor............23
   The Current Standard, NIJ Standard–0101.04 .............................................24
   Introducing Stab-Resistance of Personal Body Armor, NIJ Standard–0115.00..............25
   Cooperative Efforts Between NLECTC and Industry ..................................26
   The Standards Review Process......................................................................28

6. Ballistic-Resistant Personal Body Armor .............................................31
   Selecting the Appropriate Level of Protection ............................................31
   The "Takeaway" Problem ............................................................................32
   The Corrections Threat ................................................................................33
   Armor Classifications for Ballistic-Resistant Armor ..................................34
   Requirements ...............................................................................................36
   Performance Testing .....................................................................................38
   $V_{50}$ Testing .........................................................................................40
   Ballistic Limit Testing .................................................................................41
   Acceptance and In-Service Testing .............................................................41

7. Stab-Resistant Personal Body Armor....................................................43
   Armor Classifications for Stab-Resistant Armor .........................................43
   Developing the Testing Procedure ...............................................................44
   Overtest........................................................................................................44

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

**8. Armor Selection** ........................................................................45
    Armor Styles ....................................................................45
    Comfort and Fit................................................................46
    Coverage ..........................................................................48

**9. Purchasing Body Armor** ...........................................................51
    Overview ..........................................................................51
    The Procurement Process ................................................52
    Ensuring Compliance Status............................................53
    Model Procurement Specifications..................................54
    Protection/Testing Considerations ..................................58

**10. Maintaining Body Armor**.........................................................59
    Body Armor Life Expectancy..........................................60
    Testing Used Ballistic-Resistant Body Armor by Departments ..................................62

**11. Administrative Considerations** ................................................67
    Training and Education.....................................................67
    Issuing Body Armor.........................................................68
    Donating Serviceable Used Armor ..................................68
    Disposing of Body Armor.................................................69
    Liability............................................................................69
    When an Officer Is Shot ..................................................70

**Epilogue** .........................................................................................71

**Endnotes** ........................................................................................73

**Bibliography** ..................................................................................75

**Appendix A. Resource List**............................................................79

**Appendix B. 25 Questions and Answers About Personal Body Armor** ...........................................83

**Appendix C. The Effect of Body Armor on the Risk of Fatality in Felonious Assaults on Police Officers** ............................................91

**Appendix D. Model Procurement Specifications** ........................93

**Appendix E. Body Armor Inspection Sheet** ................................97

**Appendix F. Law Enforcement and Corrections Technology Advisory Council** ................99

**Appendix G. National Armor Advisory Board Member List**............................................105

**Appendix H. About the National Institute of Justice** ...............107

**Appendix I. About the Law Enforcement and Corrections Standards and Testing Program** ..................................109

**Appendix J. About the National Law Enforcement and Corrections Technology Center System** ........................................111

**Appendix K. About the Office of Law Enforcement Standards** ........................................115

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

# 1. Overview of the Guide

Lightweight body armor has been widely available for use by law enforcement personnel for more than 25 years. The dramatic reduction in officer homicides following the introduction of body armor, as shown in exhibit 1, attests to the protection it provides. This success story extends far beyond protection from handguns—an estimated 2,500[1] lives have been spared, including cases in which body armor prevented serious injuries to officers from other types of assaults or accidents.



**Exhibit 1: Trends in Officer Homicides, 1965–2000**

Source: FBI Uniform Crime Reports: *Law Enforcement Officers Killed and Assaulted, 1999, 1998, 1997, 1996, 1995, 1994*

The National Institute of Justice[2] (NIJ) has developed standards for body armor performance through its Office of Law Enforcement Standards (OLES). The standard for ballistic resistance of body armor was developed 28 years ago and has gone through four revisions. In September 2000, NIJ introduced its standard for stab and puncture resistance of body armor.

Body armor is tested as a part of the National Law Enforcement and Corrections Technology Center (NLECTC) voluntary equipment testing program to determine compliance with the NIJ standards, and NLECTC disseminates those test results and other pertinent information to the law enforcement and corrections communities. A consumer product list of armor models that

comply with the requirements of the standards is available from NLECTC through its Web site, JUSTNET, at http://www.justnet.org.[3]

While body armor is a household word in the criminal justice community, questions about its selection and use are frequently asked. This guide responds to commonly expressed concerns. It provides information to help determine what level of protection is consistent with the threats to which individual officers are exposed. It also discusses armor selection from the variety of styles available, together with the proper care of armor in service. The NIJ standards are discussed in detail, as well as the use of the standards in armor procurement. In addition, the guide discusses administrative concerns, including the issue of replacing inservice armor, and describes other sources of information.

NIJ asks all departments to exercise prudent judgment in selecting armor appropriate to their needs. In so doing, NIJ urges proper attention to those factors that affect the wearability of armor in order to encourage routine, full-time use by all on-duty officers. The temptation to order armor that provides more protection than realistically needed should be resisted, because doing so may increase the likelihood that the armor will not be worn routinely.

This guide opens with a history of the development of body armor and background on the lives it has saved. The heart of the guide—how to proceed to select and purchase body armor—begins with chapter 6 and includes chapters explaining how to assess the level of protection needed, things to think about when selecting armor, and ways to keep it in proper working order. An extensive collection of appendixes is available for reference.

# 2. A History of Body Armor

Humans throughout recorded history have used various types of materials to protect themselves from injury in combat and other dangerous situations. At first, protective clothing and shields were made from animal skins. As civilizations became more advanced, wooden shields and then metal shields came into use. Eventually, metal also was used as "clothing," what we now refer to as the suit of armor associated with the knights of the Middle Ages. However, with the advent of firearms (c.1500), most of the traditional protective devices were no longer effective. In fact, the only real protection available against firearms were manmade barriers, such as stone or masonry walls; manmade fortifications such as trenches and ditches; or natural barriers, such as rocks and trees.

One of the first recorded instances of soft armor use was by the medieval Japanese, who used armor manufactured from silk. Although the first U.S. law enforcement officer to lose his life in the line of duty, New York City Deputy Sheriff Isaac Smith, was shot and killed in 1792,[4] it was not until the late 19th century that the first use of soft armor in the United States was recorded. At that time, the military explored the possibility of using soft armor manufactured from silk. The project even attracted congressional attention after the assassination of President William McKinley in 1901. But while the garments were shown to be effective against low-velocity bullets (traveling at 400 feet per second (ft/s) or less), they did not offer protection against the new generation of handgun ammunition being introduced at that time that traveled at velocities of more than 600 feet per second. This, along with the prohibitive cost of manufacturing the garment ($80 each, which is equal to approximately $1,500 in today's dollars) made the concept unacceptable. Armor of this type was said to have been worn by Archduke Francis Ferdinand of Austria when he was killed by a shot to the head, thereby precipitating World War I.[5]

The U.S. Patent and Trademark Office lists records dating back to 1919 for various designs of bullet-resistant garments. One of the first documented instances where such a vest was demonstrated for use by law enforcement officers is detailed in the April 2, 1931, edition of the Washington, D.C., *Evening Star* (see photo, right), which reported on a vest demonstration for members of the Metropolitan Police Department. However, none of these designs proved entirely effective or feasible for law enforcement or corrections use.

Photo unavailable online

The next generation of ballistic vests was introduced during World War II. The "flak

jacket," constructed of ballistic nylon, provided protection primarily from munitions fragments and was ineffective against most pistol and rifle threats. These vests also were very cumbersome and bulky and were restricted primarily to military use. It would not be until the late 1960s that new fibers would be discovered that would make today's generation of concealable body armor possible.

## The History of NIJ's Body Armor Testing Program

During the 1960s this country witnessed a dramatic rise in officer fatalities. From 1966 to 1971, the number of law enforcement officers killed each year in the line of duty more than doubled, from 57 to 129 (see exhibit 1, page 1). Concerned by this rapid increase in officer fatalities and recognizing that a majority of the homicides were inflicted with handguns, the National Institute of Law Enforcement and Criminal Justice (NILECJ)—predecessor of the National Institute of Justice (NIJ)—initiated a research program to investigate the development of a lightweight body armor that on-duty police could wear full time.

The investigation readily identified new materials that could be woven into a lightweight fabric with excellent ballistic-resistant properties. Following initial laboratory research, the agency concluded that the objective of producing body armor suitable for full-time police use was achievable. In a parallel effort, the National Bureau of Standards' (now known as the National Institute of Standards and Technology) Law Enforcement Standards Laboratory (now known as the Office of Law Enforcement Standards (OLES)) developed a performance standard[6] that defined ballistic-resistant requirements for police body armor. The National Bureau of Standards was a part of the NIJ Technology Assessment Program, which today is known as the National Law Enforcement and Corrections Technology Center (NLECTC).

Of all the equipment developed and evaluated in the 1970s by NIJ, one of its most significant achievements was the development of body armor that employed DuPont's Kevlar® ballistic fabric, which was originally developed to replace steel belting in vehicle tires. Lester Shubin, who served as NIJ Technology Assessment Program Manager from 1971 to 1991, suspected the new substance might have potential to greatly improve personal armor. He and Nicholas Montanarelli, then an Army Land Warfare technology specialist, took a piece of Kevlar® to a gun range, folded it over a couple of times, and shot at it. The bullets did not go through.

During the following 5 years, from 1971 to 1976, more than $3 million of NIJ funds were devoted to the development of body armor. The research and development program was a team effort involving several of the most innovative and technologically advanced private and government organizations in the country. Contractors from the private sector were The Aerospace Corporation and MITRE Corporation. The U.S. Army's contribution included the efforts of Edgewood Arsenal, Aberdeen Proving Grounds, and Natick Laboratories. The Lawrence Livermore Laboratory and the National Bureau of Standards were also involved in the program, as were the Federal Bureau of Investigation (FBI) and the U.S. Secret Service.

## SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

The development of body armor by NIJ was a four-phase effort that took place over several years. The first phase involved testing Kevlar® fabric to determine whether it could stop a lead bullet. The second phase involved determining the number of layers of material necessary to prevent penetration by bullets of varying speeds and calibers and developing a prototype vest that would protect officers against the most common threats—the .38 Special and the .22 Long Rifle bullets. Bullets from 9mm, .45, and .32 caliber weapons also were investigated.

By 1973, researchers at the Army's Edgewood Arsenal responsible for vest design had developed a garment made of seven layers of Kevlar® fabric for use in field trials. During this preliminary testing, environmental trials determined that the penetration resistance of Kevlar® was degraded when wet. The bullet-resistant properties of the fabric also diminished upon exposure to ultraviolet light, including sunlight. Drycleaning agents and bleach also had a negative effect on the antiballistic properties of the fabric, as did repeated washing. To protect against these problems, the vest was designed with waterproofing, as well as with fabric coverings to prevent exposure to sunlight and other degrading agents.

The third phase of the initiative involved extensive medical testing to determine the performance level of body armor that would be necessary to save police officers' lives. It was clear to researchers that even when a bullet was stopped by the flexible fabric, the impact and resulting trauma from the bullet would leave a severe bruise at a minimum and, at worst, could kill by damaging critical organs. Subsequently, Army scientists designed tests to determine the effects of blunt trauma—the injuries suffered from forces created by the bullet impacting the armor. A byproduct of the research on blunt trauma was the improvement of tests that measure blood gases, which indicate the extent of injuries to the lungs.

The final phase involved monitoring the armor's wearability and effectiveness. An initial test in three cities determined that the vest was wearable, it did not cause undue stress or pressure on the torso, and it did not prevent the normal body movement necessary for police work. In 1975, an extensive field test of the new Kevlar® body armor was conducted, with 15 urban police departments cooperating. Each department served a population larger than 250,000, and each had experienced officer assault rates higher than the national average. The tests involved 5,000 garments, including 800 purchased from commercial sources. Among the factors evaluated were comfort when worn for a full working day, its adaptability in extreme temperatures, and its durability through long periods of use.

Equally important in this test was the psychological effect of the garments on the officers—whether wearing them would enable them to be more confident or relaxed in their encounters with the public or inspire them to take more chances with their lives or the lives of others. The tests showed that the armor could be worn without restricting officers' ability to do their jobs and, more importantly, that the vests worked.

The first instance of a vest saving a participating officer's life occurred less than 6 months after it was issued to him. During the 1-year demonstration period, 18 shooting incidents occurred in which body armor successfully protected the officers. The demonstration project armor issued

by NIJ was designed to ensure a 95-percent probability of survival after being hit with a .38 caliber bullet at a velocity of 800 ft/s. Furthermore, the probability of requiring surgery if hit by a projectile was to be 10 percent or less.

## The Use of Body Armor Today

A final report released in 1976 concluded that the new ballistic material was effective in providing a bullet-resistant garment that was light and wearable for full-time use. Private industry was quick to recognize the potential market for the new generation of body armor, and body armor became commercially available in quantity even before the NIJ demonstration program.

For the past 25 years, the routine use of body armor by law enforcement officers occurred primarily in the United States because assault by firearms on law enforcement officers in other countries was not as common. However, with the proliferation of international terrorism and related firearms attacks against officers, the use of body armor in other countries is becoming increasingly commonplace.

NLECTC has seen a dramatic increase in the number of submissions of new body armor models from manufacturers around the world. The NIJ standard for ballistic-resistant body armor has gained worldwide acceptance as a benchmark to judge the effectiveness of a given body armor model. In response, NIJ is reaching out to the international community in a cooperative effort for the development of future revisions of the standard.

While the most common type of threat faced by a police officers is from a gun, the most common threat a correctional officer is likely to face is from a knife or ice pick. In response to the needs of the corrections community, NIJ has developed a performance standard for stab- and puncture-resistant body armor, through a collaboration of OLES, the U.S. Secret Service, and the Police Scientific Development Branch (PSDB) in the United Kingdom (UK). In September 2000, NIJ introduced a performance standard for stab- and puncture-resistant body armor, *Stab Resistance of Personal Body Armor, NIJ Standard–0115.00.*

Today, more than 80 manufacturers produce body armor and participate in NIJ's voluntary compliance testing program. Other types of bullet-resistant armor, which were much heavier and bulkier than vests made with the new technology, have virtually disappeared from the market. Estimates indicate that the body armor industry conducts $200 million in business in the United States annually, the majority of which is for use related to law enforcement and the military.[7]

NIJ's body armor program was instrumental in developing a garment that is not only wearable, but that has contributed significantly to the safety of our Nation's law enforcement officers. Every facet of the development phase was aimed at protecting the life of the law officer on the street. This remains the program's purpose today.

# 3. Why Wear Body Armor?

## The Cost

Since the death of New York City Deputy Sheriff Isaac Smith in 1792, more than 15,000 officers have fallen in the line of duty—many of these men and women killed by firearms.[8]

The use of weapons of all types, particularly handguns, by those with criminal intent, poses a constant threat to police officers, whether they are responding to a domestic quarrel or to an armed robbery. All too frequently, a domestic disturbance erupts into violence when family members redirect their anger toward the officer attempting to effect a peaceful resolution. Similarly, a routine traffic stop can result in an unexpected armed confrontation. At times like these, an officer needs the protection provided by body armor.

Logic dictates the routine use of body armor. Still there are those who do not wear it regularly, often in spite of departmental regulations to do so. Those who do not wear armor usually claim that the bulk and weight of armor make it uncomfortable. But case studies and statistics support the importance of the routine use of body armor. As part of the Uniform Crime Reports, the Federal Bureau of Investigation (FBI) publishes its annual report *Law Enforcement Officers Killed and Assaulted* (LEOKA), which contains detailed analysis of the situations and circumstances surrounding assaults on law enforcement officers—a "must read" for all law enforcement personnel.

The 1994 edition of the LEOKA report contains a summary of an FBI study that demonstrates that the risk of sustaining a fatal injury for officers who do not routinely wear body armor is **14 times** greater than for officers who do. (A copy of the report summary is included in appendix C of this guide.)

The National Institute of Justice (NIJ) believes that it is in the best interest of all police departments to promote the full-time use of body armor. Aside from armor sparing officers and their families pain and suffering, the economic impact on a department when an officer is killed in the line of duty is staggering.

The following statistics illustrate the importance of wearing body armor to the entire law enforcement community and beyond. Since 1973 and as of January 1, 2001, a total of 2,500 "saves" have been attributed to the use of body armor. Fifty-eight percent of these saves were connected with felonious assaults and 42 percent with accidents, such as car crashes. Forty percent of the felonious assaults involved firearms, 12 percent represented cutting or slashing assaults, and 6 percent involved other types of assaults. According to the International Association of Chiefs of Police (IACP)/DuPont Kevlar Survivors' Club®, the estimated cost of an officer's death is $1.3 million. This figure is based on funeral expenses, death and pension benefits, and the cost to a department to hire and train a replacement officer.

In 1976, the Public Safety Officers' Benefits (PSOB) Act (42 U.S.C. 3796, et. seq.) was enacted into law by Congress to assist the families of State and local law enforcement officers and fire-fighters killed or permanently disabled in the line of duty. The families of these officers slain on or after September 29, 1976, were eligible to receive a $50,000 death benefit payment. In 1984, families of Federal law enforcement officers and firefighters killed or disabled in the line of duty were also made eligible. The benefit was increased to $100,000 in 1988, with a provision that this amount would be adjusted each October 1 to reflect the percentage of increase in the Consumer Price Index. For fiscal year (FY) 1999, the amount was $143,943. Since 1977, the Bureau of Justice Assistance (BJA), which administers this program, has received an average of 275 claims each year. In FY99, the PSOB program paid out a total of $29,837,908 in death and disability benefits to qualifying survivors under this program, and in FY00, a total of $28,292,684 in death and disability benefits.[9]

In addition to the Federal PSOB program, many States also have benefits available to the sur-vivors; however, each State varies as to the benefits they provide. Among the various benefits available are a one-time death benefit, a pension payment, waiver of property taxes, tuition-free education, and continuation of health care coverage for surviving children and/or spouses.

Concerns of Police Survivors (COPS), an organization dedicated to assisting and providing resources to the families of slain officers, has compiled information on benefits available to law enforcement survivors in all 50 States, the District of Columbia, and Puerto Rico. Information is updated on an ongoing basis. This information includes benefits sources and contact informa-tion. Information on how to contact COPS is included in the resource list (appendix A) at the end of this publication.

## The Ballistic Threat

The current generation of body armor was developed specifically to protect against injury from assault with handguns. A review of the statistics concerning weapons confiscated nationwide during the period from 1964 to 1974 identified the .38 caliber handgun, firing bullets at a veloc-ity of 800 ft/s, as the most common weapon threat to officers. In fact, .38 caliber and smaller handguns accounted for more than 85 percent of the confiscated weapons. Since the introduc-tion of body armor in the mid-1970s, a review of the *Law Enforcement Officers Killed and Assaulted* report continues to support the fact that the most common threat faced by law enforcement officers is handgun assaults. However, trends indicate that the 9mm semiauto-matic pistol has surpassed the .38 caliber handgun as the most common threat (see exhibit 2).

When an individual is hit by a bullet, the extent of the injury sustained depends on where the bullet strikes the body and the path or trajectory of the bullet into or through the body. Injury to the vital organs is most often fatal. Thus, the armor's primary and most obvious purpose is to prevent a bullet from penetrating the torso.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

| **Exhibit 2: Officers Feloniously Killed by Handguns** | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type and Size of Handgun As Reported (1985–1999) | | | | | | | | | | | | | | | |
| **Caliber of Handgun** | **1999** | **1998** | **1997** | **1996** | **1995** | **1994** | **1993** | **1992** | **1991** | **1990** | **1989** | **1988** | **1987** | **1986** | **1985** | **Caliber Totals** |
| .22 Caliber | 1 | 4 | 3 | 4 | 1 | 5 | 3 | 1 | 3 | 2 | 3 | 2 | | 5 | 3 | 41 |
| .22 Magnum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| .25 Caliber | 1 | 3 | 2 | 3 | 3 | 2 | 1 | 2 | 3 | 0 | 2 | 2 | 2 | 0 | 4 | 30 |
| .32 Caliber | 0 | 1 | 4 | 1 | 1 | 0 | 0 | 0 | 3 | 2 | 0 | 1 | 4 | 1 | 4 | 22 |
| .357 Magnum | 2 | 3 | 3 | 4 | 3 | 1 | 5 | 9 | 12 | 10 | 7 | 15 | 13 | 14 | 15 | 116 |
| .38 Caliber | 4 | 6 | 10 | 5 | 6 | 11 | 11 | 13 | 10 | 18 | 19 | 23 | 18 | 20 | 17 | 191 |
| .380 Caliber | 0 | 1 | 3 | 6 | 6 | 6 | 9 | 2 | 1 | 0 | 1 | 2 | 2 | 0 | 3 | 42 |
| 9 Millimeter | 12 | 14 | 9 | 10 | 12 | 26 | 11 | 8 | 12 | 8 | 4 | 6 | 4 | 4 | 3 | 143 |
| 9 x 18 Millimeter | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 10 Millimeter | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| .40 Caliber | 2 | 1 | 4 | 2 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 |
| .41 Magnum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| .44 Magnum | 0 | 1 | 0 | 1 | 3 | 2 | 0 | 1 | 0 | 1 | 0 | 6 | 3 | 1 | 1 | 20 |
| .45 Caliber | 1 | 5 | 4 | 3 | 4 | 2 | 3 | 2 | 4 | 2 | 2 | 4 | 0 | 5 | 3 | 44 |
| .455 Caliber | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Caliber Not Reported | 1 | 1 | 2 | 4 | 1 | 5 | 4 | 4 | 2 | 4 | 2 | 1 | 1 | 1 | 4 | 37 |
| **Yearly Total** | **25** | **40** | **44** | **44** | **43** | **63** | **50** | **42** | **50** | **48** | **40** | **62** | **48** | **51** | **58** | **708** |

Source: FBI Uniform Crime Reports: *Law Enforcement Officers Killed and Assaulted 1999, 1998, 1997, 1996, 1995, 1994*

In the case of hard armor, such as metal, rigid reinforced plastic, or ceramic materials, it is possible to use armor of such a thickness that it does not appreciably deform from the bullet impact. If, however, the armor that covers the torso deforms from the bullet impact, the surface of the armor against the body at the point of impact will be forced against or into the skin. Unlike a penetrating wound, in which the skin is broken and the bullet tears through the body, the deformation of armor from bullet impact results in blunt trauma. This type of nonpenetrating injury can cause severe contusions (bruises) or internal damage and can even result in death. As a result, this NIJ standard also evaluates the capabilities of the armor to prevent injury from blunt trauma.

Simply speaking, the design of ballistic-resistant armor requires identifying the threat, selecting a material or combination of materials that will resist that threat, and determining the number of layers of material necessary to prevent both penetration and blunt trauma injury. The armor's final weight is an important design factor in the selection of the ballistic-resistant material or materials to be used. The goal is to design the lightest possible unit that achieves the desired protection while still providing comfort and not restricting movement.

The degree of threat to armor from handguns depends on many factors: caliber, bullet configuration and composition (e.g., lead roundnose, jacketed hollow-point, full metal jacketed, armor piercing), weight, and impact velocity. Thus, armor that defeats a specific projectile at one impact velocity may not defeat the same caliber projectile at a higher velocity or of a different composition or configuration.

On the whole, a continuous range of threat levels undoubtedly exists for the different weapon and ammunition combinations available. As with clothing, which allows selection from a limited range of garment type and weight depending on climate and season, it has proven satisfactory to establish six armor types (protection level classifications) that enable the selection of armor to protect against most common threats, including sporting and armor-piercing rifle bullets.

All departments should periodically review the information used to select the level of protection (armor type classification) when the armor was purchased. Evaluate changes in service weapons or ammunition with respect to the type of armor used by officers. Equally important are changes in the weapons or ammunition of the local criminal population. If changes have occurred and increased the threat to officers, the department should consider upgrading its armor.

It should be noted that concealable ballistic-resistant body armor is potentially vulnerable to knife attack; hence, all officers should exercise due caution when confronted with these situations. However, numerous incidents have been documented in which body armor lessened injury. Several manufacturers currently market vests claiming to offer protection against knife attacks, although most of these vests carry warnings indicating that they do not provide protection against *all* sharp-edged and pointed threats, just as a ballistic-resistant vest cannot be totally bulletproof.

The details of armor classification and selection are discussed in chapters 6, 7, and 8. For the moment, it is sufficient to recognize the importance of being realistic in assessing the threat to officers. The weight and bulk of body armor can increase significantly as greater threat protection is demanded; both of these factors can discourage full-time use of body armor.

## The Stab Threat

The most common threat a correctional officer is likely to face is from a knife or ice pick. In response to the needs of the corrections community, NIJ has developed a performance standard for stab- and puncture-resistant body armor, through a collaboration of the Office of Law Enforcement Standards (OLES), the U.S. Secret Service, and the Police Scientific Development Branch (PSDB) in the United Kingdom (UK). *Stab Resistance of Personal Body Armor, NIJ Standard–0115.00,* was released in September 2000.

NIJ Standard–0115.00 places stab-resistant body armor into two categories, based on the kind of threat it is designed to stop. One category of protection, designated the "edged blade" class, stops engineered or high-quality blades, such as kitchen knives or those purchased at sporting goods stores, and represents the threat more commonly found on the street. The second category, the "spike" class, stops the types of improvised weapons commonly found in correctional facilities, typically of lower quality materials that may have been sharpened on concrete or other rough surfaces.

## Not Just Bullets and Knives

The original NIJ body armor effort focused solely on the urgent need to protect law enforcement personnel from handgun assault. As with most new technology, body armor has proven useful in ways not thought of when first put into service. The same properties that provide ballistic protection—resistance to penetration and blunt trauma—when combined with abrasion resistance have also saved many officers from serious physical injury in vehicular accidents.

In one incident, during the course of a routine patrol, an officer was negotiating a sweeping right-hand curve at a high rate of speed when his car ran off the edge of the pavement. As he brought it back onto the pavement, he lost control. After fishtailing several times, the car became airborne and crashed head on into a rocky hillside. The officer suffered a fractured sternum, sprained right thumb, possible concussion, and pain in the neck area. There is every reason to believe that the body armor the officer was wearing saved the officer's life.

Although the development of air bags and other safety-related technologies in vehicles has lessened the severity of injuries, medical experts have concluded that body armor mitigates injury in head-on collisions when the driver is thrown against the steering wheel, particularly when the seat belt is fastened.

Officers assigned to motorcycle duty are especially vulnerable to injury in vehicular accidents. A member of the California Highway Patrol was traveling at approximately 45 mph when he heard the sound of a vehicle approaching rapidly from the rear. He was attempting to move to the right when he was struck by the vehicle in the left rear. The motorcycle spun counterclockwise. He was thrown from the motorcycle, landing on his back and sliding on the pavement for approximately 100 feet before coming to a rest. He sustained only minor injuries to his right elbow and right leg. This convincing example demonstrates the nonballistic protection that body

armor can offer. In addition, body armor also has protected numerous officers from injury from physical assault with 2 by 4's, baseball bats, and other rigid objects.

## 2,500 Reasons

The first recorded incident of a U.S. law enforcement officer's life being saved as a result of wearing a concealable ballistic vest occurred May 17, 1973, in Detroit, Michigan. Police Officer Ron Jagielski, along with several other officers, was working on a plainclothes assignment involving narcotics trafficking. Ready to enter the residence under surveillance and make the bust, Jagielski was hit in the chest when a bullet pierced the building's front door. A .38 caliber special bullet was later found embedded in his ballistic vest, just below the area of his heart. Had it not been for the protection afforded by the body armor, Jagielski would surely have suffered a fatal injury.

Nearly a quarter-century later, on January 3, 1997, Deputy Henry Huff became the 2,000th law enforcement official to be placed on the IACP/DuPont list of those saved by concealable body armor. A member of the Walton County, Georgia, Sheriff's Office, Huff was shot at point blank range during a traffic stop by a 16-year-old male armed with a 9mm weapon. The surveillance camera in Huff's squad car caught the entire incident on videotape. Despite being shot twice in the chest, Huff was spared from serious injury.

The IACP/DuPont Kevlar Survivors' Club® commemorated the 2,500th body armor save in November 2000 by recognizing five officers selected from five different branches of law enforcement. One of the saves was Officer Jeffrey Seaman of the Philadelphia (Pennsylvania) Police Department, who found himself the subject of cartoonist Rob Armstrong's syndicated strip, "Jump Start." For 2 weeks, the strip featured Officer Seaman's story, depicting the actual shooting event, the reactions of his department and family, including his mother, a corporal in the same department, who had always encouraged her son to wear his body armor. The strip concluded during National Police Week in Washington, D.C., with Officer Seaman visiting the wall at the National Law Enforcement Officers' Memorial, and, in the final strip, being inducted in the Survivors' Club.

In 1987, a study by DuPont found that while most police officers recognized the dangers of their jobs and 65 percent of those surveyed owned body armor, only 15 to 20 percent actually used it. The reasons given for not wearing body armor ranged from legitimate concerns such as comfort and weight, to misconceptions about an officer's ability to survive blunt trauma caused by a bullet that has been stopped by a vest.

In that same year, the IACP Board of Officers authorized the formation of the IACP/DuPont Kevlar Survivors' Club®. The objectives of this club are to:

• Reduce death and disability by encouraging the increased wear of personal body armor through documentation of the armor's effectiveness.

| SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR |
|---|

- Recognize individuals who, as a result of wearing personal body armor, have survived a life-threatening incident.

- Serve the law enforcement community by collecting these important data and sharing valuable information related to these survivor incidents.

By publishing the accounts of saves in *Police Chief* magazine and engaging in other supportive efforts, the Survivors' Club has helped educate law enforcement officers about the benefits of always wearing body armor. Many departments now routinely provide body armor and mandate its wear while officers are on duty. In some locations, concerned citizens have undertaken fundraising activities to purchase body armor for local law enforcement officers.

According to a 1997 Bureau of Justice Statistics (BJS) survey of 700 State and local law enforcement agencies with 100 or more officers,[10] approximately 40 percent of sheriff's and municipal police departments, and 25 percent of State and county police departments, require all field officers to wear body armor, compared to almost 30 percent in the same survey conducted in 1993.[11]

The 1993 BJS survey also reported that more than 80 percent of the 661 agencies surveyed for that year provided either body armor or cash allowances to purchase body armor to all of their uniformed patrol officers. In comparison, the same survey conducted by BJS in 1987 indicated that only 28 percent of agencies surveyed provided armor or a cash allowance to purchase armor.[12]

# 4. Body Armor Construction

## How Does Ballistic-Resistant Body Armor Work?

When a handgun bullet strikes body armor, it is caught in a "web" of very strong fibers. These fibers absorb and disperse the impact energy that is transmitted to the vest from the bullet, causing the bullet to deform, or "mushroom." Additional energy is absorbed by each successive layer of material in the vest, until such time as the bullet has been stopped.

Because the fibers work together both in the individual layer and with other layers of material in the vest, a large area of the garment becomes involved in preventing the bullet from penetrating. This also helps in dissipating the forces that can cause nonpenetrating injuries (what is commonly referred to as "blunt trauma") to internal organs. Unfortunately, at this time no material exists that would allow a vest to be constructed from a single ply of material.

Today's generation of concealable body armor can provide varying levels of protection to defeat most common low- and medium-energy handgun rounds. Body armor designed to defeat rifle fire is of either semirigid or rigid construction, typically incorporating hard materials such as ceramics and metals. Because of its weight and bulkiness, it is impractical for routine use by uniformed patrol officers and is reserved for use in tactical situations, where it is worn externally for short periods of time when confronted with higher level threats.

## How Does Stab-Resistant Body Armor Work?

Stab-resistant body armor works by many of the same principles as ballistic-resistant body armor. Stab- and puncture-resistant armors are made from a variety of materials. The most common designs use multiple layers of materials. These layers are made from extremely strong fibers that can be either woven or laminated together. Other materials used are metals and composites. As the threat impacts the armor, the materials either deflect the threat, or due to their very high levels of tensile strength and cut and/or tear resistance, they slightly "stretch" before breaking or being cut. This "stretching" spreads the impact forces over a larger area of the armor and dissipates the strike energy from the threat, eventually stopping the threat. Most often, multiple layers of materials are needed to successfully stop typical threats. Some of the top layers of material may be defeated, but if properly designed, the armor will stop the threat with little to no penetration. The backing layers provide additional strength to the armor, and each layer assists in dissipating the strike energy.

Many of the same materials are used in both ballistic-resistant armor and stab-resistant armor, with one important distinction. Because knives, picks, and spikes are pointed, the initial contact forces for stabs threats are very high. These high forces pose a risk to ballistic-resistant armor. To counter this, stab-resistant armors are normally made from very tightly woven fabrics or from very closely spaced laminated layers.

## Construction Methods

Typically, concealable body armor is constructed of multiple layers of ballistic- or stab-resistant materials, assembled into the "protective panel." The protective panel is then inserted into the "carrier," which is constructed of conventional garment fabrics such as nylon or cotton. The protective panel may be permanently sewn into the carrier or may be removable. Although the overall finished product looks relatively simple in construction, the protective panel is very complex.

Manmade fabrics are available from a number of manufacturers in various styles and compositions, each type having unique ballistic- or stab-resistant properties. The body armor manufacturer may construct a given model of ballistic- or stab-resistant panel from a single fabric style or from two or more styles in combination. The location and number of layers of each style within the multiple-layer protective panel influence the overall performance of the panel. In addition, some manufacturers coat the fabric with various materials. For example, the manufacturer may add a layer of nonballistic or stab-resistant material for the sole purpose of increasing blunt trauma protection. Even composites of two or more different ballistic materials are available. As a consequence, it is impossible to compare one product with another based solely on the number of fabric layers in the protective panel.

The manner in which the ballistic- or stab-resistant panels are assembled into a single unit also differs from one manufacturer to another. In some cases, the multiple layers are bias stitched around the entire edge of the panel; in others, the layers are tack stitched together at several locations. Some manufacturers assemble the fabrics with a number of rows of vertical or horizontal stitching; some may even quilt the entire panel. No evidence exists that stitching impairs the ballistic- or stab-resistant properties of a panel. Instead, stitching tends to improve the overall performance, especially in cases of blunt trauma, depending on the type of fabric used.

The differences between protective panels in various manufacturers' products result from individual design concepts meant to achieve a given level of performance with minimum weight and maximum comfort or wearability. If armor has been demonstrated to provide the desired level of protection in accordance with the National Institute of Justice (NIJ) standards, the user should not be concerned with the design, but should look for proper fit and comfort.

Body armor intended for routine use is most often designed to be worn beneath the normal uniform shirt. Again, manufacturers tend to design different methods of attaching armor to the body. Hook-and-pile fasteners are common, as are "D" ring tightening straps. With the exception of metal fasteners of any type (which can deflect a bullet on impact and pose a hazard), the method of attachment is a matter of personal preference.

Since 1987, the National Law Enforcement and Corrections Technology Center (NLECTC) has tested more than 2,600 models of body armor for compliance with NIJ's ballistic-resistant performance standard. Of these, more than 1,600 comply with the requirements of the NIJ standard and are listed in the *Personal Body Armor Consumer Product List (CPL),* available from

NLECTC. Testing for compliance with NIJ's stab- and puncture-resistant performance standard began in October 2000. The number of body armor configurations available (including armor designed specifically for female officers) makes it possible for an officer to find comfortable armor suitable for routine use, consistent with his or her personal taste in appearance.

## Model and Style Designation

A manufacturer can, and frequently does, use identical ballistic- or stab-resistant panel construction to produce several different configurations of armor, such as an undergarment or an outerwear jacket used by plainclothes officers (e.g., denim jacket, simulated down vest), each of which provides the same level of protection.

For the purposes of the NLECTC body armor compliance procedures, the following definitions have been adopted:

**Body armor model.** A manufacturer designation (name, number, or other description) that serves to uniquely identify a specific configuration of body armor based on the details of the protective panel construction and the manner in which the armor is held in place on the torso. Separate model designations must be assigned to armor designed to fit the female and male torso.

**Body armor style.** A manufacturer designation (name, number, or other description) that is used to distinguish between different configurations of body armor product line, each of which is a minor stylistic variation of the same model of ballistic panel but does not have the potential to negatively affect the originally tested ballistic performance level of that model (e.g., the shape of the neckline, coverage, the size of the armhole openings, etc.).

The distinctions between body armor model and style were established to eliminate the need to retest a given body armor model for compliance with the NIJ standards each time a manufacturer incorporates the model into a different style of armor.

The intent of the NIJ program is to ensure that armor purchased for use by criminal justice personnel provides the rated level of protection. However, NIJ recognizes that individual departments often desire minor armor model modifications that do not have the potential to reduce the level of protection. There are a number of variations in configuration that a manufacturer can make to a model without the necessity of assigning a new model number to the modified units. These include:

1) Changes in color of the carrier material.

2) Changes in the placement of pockets or of straps designed to carry police equipment.

3) Changes in fabric used to encase ballistic panels; provided, however, that if the fabric used in the model tested for compliance was waterproof, the replacement fabric must exhibit equal or improved resistance to water.

4) Changes in the fabric of the carrier material; provided, however, that if any portion of the carrier of the sample tested for compliance contained elastic materials such as rubber or foam rubber, the replacement fabric must provide an equivalent amount and thickness of such material to maintain the original energy absorption.

5) Changes in the perimeter shape of the ballistic panels, including the shape and size of neck and arm openings, and extending or reducing the overall width of the ballistic panels to increase, decrease, or eliminate overlap of the ballistic panels.

6) Changes to the kind, style, or location of fabric attachment and adjustment mechanisms; provided, however, that such changes do not incorporate hard materials that could potentially be a ricochet hazard.

7) Changing from a removable panel carrier to one in which the ballistic panel is not removable.

The manufacturer **must assign a new model number and submit the new model for compliance testing** if any of the following modifications are made to a model on the CPL:

1) The addition or elimination of any layers of ballistic- or stab-resistant materials of the protective panel resulting in a different number of total layers in the panel.

2) Any alteration or changes to the sequence in which the layers are arranged or configured within the ballistic panel for vests consisting of multiple styles or types of materials.

3) Any change in the manner in which the ballistic panel is assembled (e.g., the addition or elimination of stitching and changes in stitch density or material).

4) Modification of an approved side-opening (solid front/back panels) of the concealable vest to create a front- or back-opening (commonly referred to as "tactical" or "detective" style) vest.

5) Changing from a permanent/nonremovable carrier to a removable ballistic carrier.

6) Changes to the closure mechanism (including the type or location, interior flaps or panels associated with the mechanism, and any exterior cover device) of front- or back-opening armor configurations.

7) Changing from a snug-fitting carrier to one that allows too much movement of the ballistic panel (e.g., ballistic panel sized to fit 38-inch chest inserted in a size-40 carrier).

Modifications not specifically addressed in these guidelines will be reviewed on a case-by-case basis and a determination will be rendered by NIJ. In all cases, the originally tested and archived vest will serve as the benchmark to determine if a change has occurred.

Once a model of armor has been tested and approved, and a letter of compliance has been issued by NLECTC, it becomes the responsibility of the manufacturer to ensure that **all subsequent production units** sold to law enforcement agencies or personnel labeled as being in compliance with NIJ standards are constructed identically to the model submitted to NLECTC for testing and which was found to comply with the requirements of the standards.

## ISO 9000

Several armor manufacturers advertise that their companies have obtained ISO 9000 certification. Some confusion exists as to what this certification means and its relationship to NIJ compliance testing. The following explains ISO 9000 and its significance to purchasers.

ISO stands for the International Organization for Standardization. Founded in 1946, its charter calls for it to provide harmonized standards for manufacturing quality that are to be used throughout the world. Through the years, ISO's role has expanded beyond the quality system into environmental issues, occupational health and safety, laboratory accreditations, and conformity assessment. Approximately 110 countries participate in ISO standards programs. International standards are prepared through the efforts of technical committees, working groups, and technical advisory groups.

ISO 9000 defines minimum guidelines for **quality management** in the manufacturing process. This voluntary certification process is designed to provide consistency in the manufacturing process that companies use. Companies are required to have a documented quality control system and their employees must follow these established procedures.

The three quality objectives of ISO 9000 are as follows:

• Achieve and sustain the quality of service so as to meet customer requirements consistently.

• Provide assurance to management that intended quality is achieved and sustained.

• Provide assurance to customers that intended quality is being achieved and sustained.

ISO 9000 has three levels of certification. The basic level, ISO 9003, has 16 requirements. The next level, ISO 9002, requires companies to meet all ISO 9003 requirements, plus servicing, process control, and purchasing requirements. The highest level, ISO 9001, requires companies to meet all the ISO 9002 requirements, as well as documented product design control requirements.

**It is important to note that the ISO 9000 certification process certifies the quality control system of companies, not the quality of their products or service.** ISO 9000 certification does not imply product conformity to any given set of requirements (such as the NIJ standards). Therefore, a clear and significant distinction exists between manufacturers that are ISO certified

and whether their products comply with the NIJ standards. ISO certification addresses the quality of the manufacturing **process** used by armor manufacturers, while the NIJ standards address the **performance** capabilities of specific models of armor produced by manufacturers.

## Materials Used

*Note: The following information has been prepared from product literature supplied by the manufacturer. All product descriptions and performance claims are the manufacturer's and do not represent findings or endorsement of these claims by the National Institute of Justice, U.S. Department of Justice; Office of Law Enforcement Standards, U.S. Department of Commerce; or Aspen Systems Corporation.*

Several manufacturers have been involved in developing and refining materials used in body armor. DuPont has developed law enforcement protection products for more than 25 years. Its Kevlar® brand fiber, first developed in 1965, was the first material identified for use in the modern generation of concealable body armor. Kevlar® is a manmade organic fiber, with a combination of properties allowing for high strength with low weight, high chemical resistance, and high cut resistance. Kevlar® is also flame resistant; does not melt, soften, or flow; and the fiber is unaffected by immersion in water (see the wet testing discussion in chapter 6 on page 36).

Kevlar® 29, introduced in the early 1970s, was the first generation of bullet-resistant fibers developed by DuPont and helped to make the production of flexible, concealable body armor practical for the first time. In 1988, DuPont introduced the second generation of Kevlar® fiber, known as Kevlar® 129. According to DuPont, this fabric offered increased ballistic protection capabilities against high-energy rounds such as the 9mm full metal jacket (FMJ). In 1995, Kevlar® Correctional™ was introduced, which provides puncture-resistant technology to both law enforcement and correctional officers against puncture-type threats.

The newest addition to the Kevlar® line is Kevlar® Protera, which DuPont made available in 1996. DuPont contends that the Kevlar® Protera is a high-performance fabric that allows lighter weight, more flexibility, and greater ballistic protection in a vest design due to the molecular structure of the fiber. Its tensile strength and energy-absorbing capabilities have been increased by the development of a new spinning process.

DuPont Kevlar® continues to develop and design new generations of high-performance solutions and innovations to provide multithreat protection to officers in the criminal justice community. This patented multithreat technology will enable the creation of armor that protects against firearms, commercially manufactured knives, and puncture-producing weapons like ice picks.

Spectra® fiber, manufactured by Honeywell, is an ultra-high-strength polyethylene fiber. Ultra high molecular weight polyethylene is dissolved in a solvent and spun through a series of small orifices, called spinnerets. This solution is solidified by cooling, and the cooled fiber has a gel-like appearance. Spectra® fiber, which Honeywell claims is the highest strength-to-weight fiber

in the world, is resistant to water penetration, has extremely high chemical resistance and very high cut resistance properties. Honeywell uses its Spectra® fiber to make its patented Spectra Shield® composite. A layer of Spectra Shield® composite consists of two unidirectional layers of Spectra® fiber, arranged to cross each other at 0- and 90-degree angles and held in place by a flexible resin. Both the fiber and resin layers are sealed between two thin sheets of polyethylene film. According to Honeywell, the resulting nonwoven fabric is incredibly strong, lightweight, flexible, and has excellent ballistic protection capabilities. Spectra Shield® is made in a variety of styles for use in both concealable and hard armor applications.

Honeywell also uses the Shield Technology process to manufacture another type of shield composite called GoldFlex®. GoldFlex® is manufactured using aramid fibers in place of the Spectra fiber. GoldFlex®, Spectra Shield®, and Spectra® fabrics offer body armor manufacturers an array of products to meet today's demanding and changing threats.

Another manufacturer, Twaron Products, has developed various forms of its aramid fiber Twaron® for body armor. According to Twaron, this fiber uses 1,000 or more finely spun single filaments that act as an energy sponge, absorbing a bullet's impact and quickly dissipating its energy through engaged and adjacent fibers. Because more filaments are used, the impact is dispersed more quickly. Twaron claims their patented Microfilament technology allows maximum energy absorption at minimum weights while enhancing comfort and flexibility.

Twaron Products maintains that the use of Twaron® in body armor significantly reduces the overall weight of the finished product, thus making vests more comfortable. Twaron Products continues to develop and manufacture lighter weight yarns with finer filaments, expanding their patented Microfilament product line.

Another fiber used to manufacture body armor is Dyneema®. Originated in the Netherlands, Dyneema® has an extremely high strength-to-weight ratio (a 1-mm-diameter rope of Dyneema® can bear up to a 240-kg load), is light enough that it can float on water, and has high energy absorption characteristics.

Zylon®, manufactured by Japanese company, Toyobo, is a PBO (polyphehylenebenzobisoxazole), a promising new entrant to the high-performance organic fibers market. PBO has outstanding thermal properties and almost twice the tensile strength of conventional para-aramid fibers. According to Toyobo, Zylon® will allow construction of comfortable protective garments because its excellent heat- and mechanical-resistant properties will provide light and flexible fabrics with improved comfort and mobility.

All fibers and materials noted in this chapter have a wide variety of uses in addition to ballistic garments. They are used for other types of protective clothing and equipment (e.g., bicycle and skateboarding helmets), marine and aircraft components, industrial cables, and recreational equipment such as fishing rods and tennis rackets. The materials described are some of the most commonly used; other materials (e.g., ballistic nylon) can also be used.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

The introduction of newer, high-performance fibers has dramatically decreased the weight and bulk of today's body armor and increased its comfort and wearability. It can be anticipated that newer materials will be developed and in conjunction with further advances in ballistic vest design, technology will continue to enhance the performance and comfort of tomorrow's body armor.

# 5. The NIJ Standards

The National Institute of Justice (NIJ) standards for *Ballistic Resistance of Personal Body Armor* and *Stab Resistance of Personal Body Armor* were developed by the National Institute of Standards and Technology's (NIST's) Office of Law Enforcement Standards (OLES) and issued by NIJ as voluntary national standards. These are performance rather than design standards, as are most OLES standards. Performance standards clearly specify a minimum satisfactory level of performance for each attribute that is critical to the equipment's intended use. In contrast, design standards specify the manner in which an item of equipment must be manufactured. Performance standards encourage design innovation and the use of advanced technology, addressing critical requirements only and not such attributes as comfort, color, or style— which are generally matters of user perception or preference.

The administrative procedures for NIJ's body armor compliance-testing program, which is administered by the National Law Enforcement and Corrections Technology Center (NLECTC), are designed to ensure the integrity of the test results. A series of pre- and post-test checks and balances ensure the laboratory's conformance to the NIJ testing procedure. When a manufacturer elects to have a model of armor tested, the test samples are delivered to NLECTC, where the labels and workmanship are inspected before the samples are given to an independent laboratory for testing. A 2-week period is allocated to accomplish the control function before the scheduled testing date. Following testing, the samples are returned to NLECTC, where test results are verified. The tested samples are then archived.

The NIJ body armor testing program relies on voluntary participation by manufacturers. However, many police departments require that armor be tested by NLECTC and found in compliance with NIJ standards before they purchase the armor. As a result, most manufacturers design their armor to comply with the standards and have each model tested for compliance by NLECTC. Whenever NIJ develops a new standard, NLECTC distributes the revision to industry representatives for their comments.

## Developing the NIJ Standard for Ballistic Resistance of Personal Body Armor

The selection of body armor has become increasingly complex as manufacturers have developed numerous models and designs, the variety of ballistic fabric styles has increased, and the protection requirements of police agencies have changed. All of these factors have necessitated changes in the NIJ body armor standard.

NIJ's first standard, 0101.00, *Ballistic Resistance of Police Body Armor,* was published in March 1972 in response to the law enforcement community's request for a benchmark against which to measure competing manufacturer claims. This first standard provided requirements only for resistance to actual penetration of the vest by a bullet and defined only three levels of

protection from various threats. The issue of whether the armor could prevent injury from blunt trauma was not addressed.

In 1975, NIJ requested that the Law Enforcement Standards Laboratory (LESL), the predecessor to OLES, begin revision of the first standard to reflect contemporary research on blunt trauma and the degradation of armor when wet. A revised standard, STD–0101.01,[13] was published in December 1978 to introduce the backface signature test for blunt trauma and wet testing.

At approximately the same time, the law enforcement community asked NIJ to establish an equipment testing program to provide independent verification of body armor compliance to the NIJ standard. NIJ entered into a cooperative agreement with the International Association of Chiefs of Police (IACP) to conduct the testing. The first results were published in 1978. Since then, the models and the names of their manufacturers that pass compliance testing have been published in the *Police Body Armor Consumer Product List,* now known as the *Personal Body Armor Consumer Product List (CPL),* which since 1999 has been available electronically through the NLECTC Web site, JUSTNET, at http://www.justnet.org. NLECTC also publishes other documents and guides, such as this one, to help police departments select and procure body armor.

In March 1985, NIJ amended the standard, issuing STD–0101.02, to take into account armors' susceptibility to angle shots and multishot assaults. NIJ STD–0101.02 also introduced threat level III-A, the highest protection level in concealable armor, in response to concerns from the law enforcement community about the need for protection from high-velocity and high-energy handgun rounds such as the submachine gun 9mm and .44 Magnum.[14] Published in April 1987, STD–0101.03 clarified labeling requirements, acceptance criteria, and backface signature measurement procedures.[15] NIJ also strengthened its administrative procedures for archiving models.

## The Current Standard, NIJ Standard–0101.04

In September 2000, NIJ issued *Ballistic Resistance of Personal Body Armor,* NIJ Standard–0101.04[16] the first revision in 13 years. There were a number of reasons for the revision. Since 1987, when the 0101.03 standard was adopted, there have been many changes in the design, manufacturing, and use of body armor. The ammunition and weapons threats that police officers face are different. Most officers today use autoloading pistols as their duty weapon instead of revolvers. Design technology used in making the vests has changed significantly, and new ballistic-resistant materials have been introduced. Administrative changes added to the NIJ standard over time have also made it unduly cumbersome for laboratory test personnel to administer the test. The revised standard reflects the changes in threats and designs and incorporates and streamlines the administrative changes. Testing under the revised standard was initiated in fall 2000.

The new 0101.04 standard represents a significant step toward ensuring consistent, well-documented testing of body under NIJ's program. The main intent of the revision was to

incorporate as many of the lessons learned from the long period of 0101.03 testing experience as possible, particularly in regard to clarification and definition of many of the methods and equipment used to test body armor for NIJ compliance.

In addition to the introduction of new test threat rounds, the new standard reinstates the "pat down" procedure or the smoothing of the armor panel between shots, which was performed in NIJ Standard–0101.02 and previous editions, and an increase from one to two measurements per panel for backface signature. The techniques and equipment for wet conditioning of the test armor, construction of the backing material fixture, and firing the test threat ammunition also have been updated and revised. A single, highly automated, computer-based reporting format and comprehensive database archival system will standardize reports, making testing data more manageable and accessible to users.

## Introducing Stab Resistance of Personal Body Armor, NIJ Standard–0115.00

While the most common type of threat faced by a police officers is from a gun, the most common threat a correctional officer is likely to face is from a knife or ice pick. In response to the needs of the corrections community, NIJ has developed a performance standard for stab- and puncture-resistant body armor through a collaboration of OLES, the U.S. Secret Service, and the Police Scientific Development Branch (PSDB) in the United Kingdom (UK). *Stab Resistance of Personal Body Armor, NIJ Standard–0115.00*[17] was released in October 2000.

This standard specifies the minimum performance requirements for body armor that is resistant to attack by typical pointed and edged weapons. The standard also describes the test methodology to be used for this assessment.

In developing the standard, NIJ relied on the extensive research experience of PSDB in the UK, where the primary threat to law enforcement officers is from sharp-edged and pointed weapons. As part of their initial research, PSDB created a model to determine the actual forces generated by an assailant during attack, and, from this model, developed realistic test methodologies and procedures that could be replicated in the laboratory. Several different types of blades were engineered to accurately reflect actual threats faced by law enforcement and correctional officers. Although these blades are specially designed to ensure consistency in testing procedures, they reflect many of the features found in the high-grade commercial knives or homemade instruments most commonly used in attacks.

The threats from ice picks and lower quality, prison-made knives and shivs are much more difficult to quantify than those from commercial knives. Research addressing homemade instruments continues, and any improvements from this research will be incorporated into future revisions of NIJ Standard–0115.00. For the present time, the same test methodology will be used for homemade weapons as is used for commercial knives, but the threat weapon

is a modified ice pick commonly used in the "California Ice Pick" test. A more complete discussion of the testing procedures, protection classes, and threat levels can be found in chapter 7.

This standard and the revised standard for ballistic-resistant body armor were circulated for review among the membership of the Law Enforcement and Corrections Technology Advisory Council (LECTAC), LECTAC's Weapons and Protective Systems Subcommittee, LECTAC's Executive Committee, and the National Armor Advisory Board (NAAB). NAAB is made up of law enforcement officers and body armor industry representatives, including fiber and fabric manufacturers, weavers, and armor manufacturers.

NIJ's policy on body armor has always been that preserving the life of the police or corrections officer is the sole criterion on which to judge body armor effectiveness. At present, an officer may select a garment that corresponds to an appropriate threat level and be confident that armor in compliance with NIJ's standard will defeat the stated threat level.

## Cooperative Efforts Between NLECTC and Industry

To further enhance its mission to support State and local law enforcement and corrections by identifying their needs, finding expedient and cost-effective solutions, and bringing those solutions to the attention of the law enforcement and corrections community, NIJ has developed a new cooperative effort between NLECTC and the body armor industry. The existing NLECTC program structure accomplishes this by refining the process for developing policy and by reviewing standards (see exhibit 3).

Key organizational components of NLECTC's policy development process are NIJ, LECTAC, NLECTC, OLES, LECTAC's technical subcommittees, and the testing laboratories. Industry's role has been formalized through the introduction of advisory boards, whose functions are included below.

**NIJ.** The Institute funds and manages all the activities of NLECTC, resolves disputes and appeals, conducts needs assessments, and coordinates input from the criminal justice system.

**LECTAC.** A key element in the policy and standards development process, LECTAC is composed of Federal, State, and local law enforcement and corrections professionals who are appointed by NLECTC with the approval of the LECTAC Executive Committee. LECTAC meets at least annually, and its chairperson keeps in close contact with NIJ and NLECTC throughout the year. The advisory council:

• Identifies critical product and technology needs of the criminal justice community.

• Recommends priorities and methods that form the basis from which standards and policies are developed.

• Assesses law enforcement and corrections equipment issues, including suggesting research and development priorities.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR



Exhibit 3: Policy Structure

- Suggests equipment to be tested and recommends the development of guides, bulletins, and other program publications.

- Strengthens links between NIJ and the criminal justice community.

**LECTAC subcommittees.** LECTAC's subcommittees report to the full council and meet on an as-needed basis. Subcommittees are formed to address major areas of technology research and development such as law enforcement and corrections operations, weapons and protective systems, communications, and contraband detection, among others. The chair of a subcommittee also serves as or appoints the chair of any advisory board assigned to that subcommittee.

**NLECTC.** NLECTC coordinates the testing of all equipment under the program and fields requests for information and technical assistance from law enforcement and corrections agencies. The criminal justice community looks to NLECTC for authoritative information on the latest technology and products. NLECTC:

- Coordinates equipment testing activities and collects results from laboratories.

- Publishes consumer product lists of products that comply with NIJ standards.

- Operates a toll-free information service and Internet site.

- Archives tested products.

- Issues publications on equipment and standards.

- Provides technical assistance to the criminal justice community.

- Serves as a resource to LECTAC and the advisory boards.

**OLES.** Funded by NIJ through an interagency agreement, OLES is part of NIST. As NIJ's principal agent for setting standards on law enforcement equipment, OLES:

- Conducts technical studies.

- Develops initial standards for testing and provides scientific and technical support to the technical committees and advisory boards.

- Provides technical assistance to criminal justice agencies.

- Evaluates and monitors testing laboratories.

**Testing laboratories.** Independent testing laboratories are evaluated by OLES and subsequently authorized by NLECTC to conduct testing of manufacturers' products in accordance with NIJ standards. Each product is tested before appearing in a *Personal Body Armor CPL*. The testing itself is contracted between the manufacturer and the laboratory, but the equipment must be submitted through NLECTC. Once a performance assurance program has been developed, laboratories selected by NLECTC to test body armor will be required to provide the manufacturers with a followup performance assurance program.

**Advisory boards.** Composed of industry and user representatives, NLECTC intends to establish advisory boards for each major equipment/technology focus that will report to the respective technical subcommittees of LECTAC. The boards will provide an opportunity for the industry and users to meet directly with LECTAC technical subcommittees. Currently, NAAB is the only advisory board that has been formed. It is composed of body armor manufacturers, fiber and fabric manufacturers, law enforcement management, and rank-and-file representatives from law enforcement. Board members review standards and policy and recommend revisions to the Weapons and Protective Systems Subcommittee of LECTAC. All advisory boards will recommend actions concerning possible modifications of NIJ standards. If an advisory board endorses a recommendation to their respective subcommittee, it will be referred to LECTAC for its full endorsement.

## The Standards Review Process

With advice from NAAB, NLECTC, and the Weapons and Protective Systems Subcommittee of LECTAC, NIJ has formalized a process for accommodating changes to the existing body armor standard. In this revised process, shown in exhibit 4, a suggestion for a change in the standard is

Selection and Application Guide to Personal Body Armor



Exhibit 4: Standards Review Process

*LECTAC's Weapons and Protective Systems Subcommittee.

submitted to NLECTC. NLECTC then conducts an immediate review to ensure that the suggestion is intelligible, relevant to the equipment in question, and has not been considered previously.

If the suggestion passes this review, copies are forwarded to the Weapons and Protective Systems Subcommittee and NAAB. If the suggestion has technical merit and is feasible, the subcommittee directs NLECTC to publish the suggestion and to solicit comments from the field. NLECTC also circulates the suggested change to NIJ, LECTAC, and OLES for review.

Comments from the field regarding the recommendations are provided to NLECTC in a specified number of copies. Copies are also provided by the commenter directly to the person or organization who made the suggestion. NLECTC forwards the comments, along with its recommendations regarding the comments, to NIJ, OLES, the Weapons and Protective System Subcommittee, and NAAB for review. The subcommittee then makes a final recommendation to LECTAC, which passes it on to NIJ. NIJ and the Office of General Counsel review the recommendation to ensure that it fully complies with the law and relevant policy. If it does, NLECTC publishes the decision and the effective date of the change.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

The following options are available to the reviewers when they consider a suggestion:

• Accept the suggestion as offered.

• Accept the suggestion with modifications.

• Refer the suggestion for further research.

• Reject the suggestion because it was improperly submitted, previously rejected, irrelevant, or not feasible.

Suggestions are processed at least annually. If a suggestion is rejected, an explanation is provided. NIJ does not consider revising the standard unless supporting research is presented, nor does NIJ change the standard without comments from law enforcement and the body armor industry. If NIJ errs, it is on the side of the user. The standards review process is similar for other equipment standards.

NIJ's responsiveness to law enforcement and industry concerns is evident in recent changes in the program. These changes include strengthening the program's management and policy structure, creating a process for modifying standards, inviting industry representatives to participate in the standards review process, and sending letters to manufacturers to clarify the responsibilities of those who choose to participate in the body armor program. (This last step is to prevent confusion and misunderstandings that might develop in the use of the NIJ standard and testing program for manufacturers' product advertising and marketing.)

NIJ is proud of the partnership it is forging among government, industry, and the Nation's police and corrections officers. Like all partnerships, the one between NIJ and body armor manufacturers must be based on mutual rights and responsibilities. In return for permission to use the NIJ label, NIJ also asks manufacturers to take responsibility for the safety of their products that are sold to law enforcement officers. Reciprocally, NIJ is committed to working with the manufacturers to adjust the standards and testing program to accommodate the needs and technological advancements of the body armor industry.

# 6. Ballistic-Resistant Personal Body Armor

## Selecting the Appropriate Level of Protection

The first step in selecting the appropriate protection level of body armor is to establish the level of protection that users need based on the realistic weapon threat they face. To date, body armor has not been known to fail to prevent the penetration of a bullet constituting a threat equal to or less than the protection rating of the armor. However, officers have died from wounds received from weapons or ammunition exceeding the rated protection of the armor. While 100-percent protection in all circumstances is impossible, the routine use of appropriate body armor significantly reduces the likelihood of fatal injury. Body armor selection is to some extent a tradeoff between ballistic protection and wearability. The weight and bulk of body armor are generally proportional to the level of ballistic protection it provides; therefore, comfort decreases as the protection level increases. All departments should strive to select body armor that their officers will wear, consistent with their ballistic protection requirements. Agencies should ensure that each officer knows and understands the protection that it affords, as well as its limitations.

The weapons and ammunition commonly found on the street may vary significantly with geographic location. Therefore, information concerning weapons and ammunition that are confiscated in both the local jurisdiction and nearby surrounding areas must be considered, as well as statistics concerning gun sales by local firearms dealers. Such data will permit an assessment of the current threat from street weapons. The National Institute of Justice (NIJ) strongly recommends the selection of an armor that protects against both the street threat and the officer's handgun. A review of reports on officers killed during the period from 1980 to 2000 shows that 163 of the 1,058 officers killed with a handgun, or on average one in six officers, was killed with his or her own service weapon.

Information from the Uniform Crime Reports (UCR), *Law Enforcement Officers Killed and Assaulted*[18] provides some insight into the overall threat to officers nationwide. Statistics based on the Federal Bureau of Investigation's (FBI's) UCR data reveal that from 1990 to 1999, 658 law enforcement officers were feloniously killed in the line of duty (see exhibit 5). Of these, 610 (92.7 percent) were killed by firearms—466 (71 percent) by handguns, 112 (17 percent) by rifles, 32 (4.9 percent) by shotguns—and 48 (7 percent) by other types of weapons. These other weapons included knives (10 fatalities); bombs (11, 8 of which occurred in a single incident—the bombing of the Alfred P. Murrah Federal Building in Oklahoma City); personal weapons (5); and automobiles and other fatal means not usually thought of as weapons (22).

Of the 466 deaths from handguns, between 1990 and 1999, 9mm handguns or lesser handguns were used in 311 (66.7 percent) of the cases.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR



**Exhibit 5: Law Enforcement Officers Feloniously Killed 1990–1999**

Handgun 466 **71%**

Rifle 112 **17%**

Shotgun 32 **4.9%**

Knife 10 **1.5%**

Bomb 11 **1.6%**

Personal Weapons 5 **0.7%**

Automobiles/Other 22 **3.3%**

Source: FBI Uniform Crime Reports: *Law Enforcement Officers Killed and Assaulted 1999*

## The "Takeaway" Problem

Another consideration in determining the appropriate threat level is the type of service weapon and ammunition used by the department. In reviewing the UCR data for the time period of 1980 to 1999, a total of 163 deaths, or 15.4 percent of deaths from handguns, resulted from officers being shot with their own service weapon (see exhibit 6). In these 163 cases, no documented incidents occurred of a round from the officer's service weapon penetrating the officer's body armor and causing the fatal injury.

A dramatic decline has occurred in the number of officers slain with their own weapons in the 1990s. For the period from 1980 to 1989, an average of 11.2 officers were slain annually with their own weapons; from 1990 to 1999, the average decreased to 5.2 officers. This decrease can most likely be attributed to several factors, including increased officer awareness of the problem, expanded use of body armor, enhanced officer safety and weapon retention training, and the emergence of holsters designed with security or antitakeaway features. However, officers should still be cognizant of the potential danger posed by their own sidearms, should these be used against them. Generally speaking, Type II-A and Type II armor provide protection against most types of handgun ammunition commonly used by law enforcement agencies today.

In analyzing potential weapon threats, a given police department will probably identify several threat levels, depending on the nature of specific assignments. Specialized armor will be re-quired for special weapons and tactics team operations, but these armors will only be issued and used as needed. As noted earlier, armor that provides protection against high-level threats

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

is generally heavy and bulky and therefore can be unsuitable for full-time use.

A department should avoid the temptation to purchase armor that provides protection far in excess of realistic needs. Such a purchase not only increases the cost, but increases the likelihood that the armor will not be worn. Overspecification of protection levels has been alleged as the most common reason that armor is not worn.

Recognizing that it may not be practical to protect against all possible handgun attacks, a department must carefully consider the selection of armor appropriate to its needs. In the final analysis,



**Exhibit 6: Officers Slain With Own Firearm Versus Total Officers Slain 1985–1999**

☐ Officers Feloniously Killed

☐ Officers Feloniously Killed With Handgun

■ Officers Feloniously Killed With Own Handgun

Source: FBI Uniform Crime Reports: *Law Enforcement Officers Killed and Assaulted 1994–1999 (Annual Reports)*

those responsible for selecting the level of protection for armor to be used routinely must exercise prudent judgment and decide whether the overall benefits of limited protection (purchasing a less protective armor type than the maximum level of protection indicated by threat analysis) outweigh the complete loss of protection if the armor is not worn.

## The Corrections Threat

While the FBI's Uniform Crime Reports *Law Enforcement Officers Killed and Assaulted (LEOKA)* provides detailed insight into the nature and types of assaults on police officers, there are no comparable statistics currently maintained for assaults on corrections officers. However, the statistics that are available indicate that the threat of assault is a common danger for corrections officers as well.

According to data compiled by the Bureau of Justice Statistics (BJS), between 1990 and 1997 the number of inmates in State and Federal custody has increased by a total of 434,000, or an average annual growth rate of 6.8 percent.[19] There was a one-third increase in the number of assaults by inmates on corrections facility staff between 1990 and 1995. In 1990, there were 10,731 reported assaults by inmates on corrections facility staff; in 1995, there were 14,165 reported assaults. The nature of the assaults has become more severe as well. In 1990, none of

the reported assaults resulted in the death of the staff member who was assaulted. By comparison, in 1995, 14 staff members were killed as a result of the assault.[20]

While the threat faced by the police officer is most frequently from firearms, a corrections officer faces an entirely different variety of threats. Because corrections officers are rarely equipped with firearms, and it is extremely rare for an inmate to obtain a firearm within a correctional facility, the most common threat faced is from pointed- and sharp-edged weapons. Most of these are homemade or improvised weapons, made from scraps of metal obtained through a variety of sources in the corrections environment.

While these threats are different from firearms, they are equally capable of inflicting serious or fatal injuries. Until recently, many protective garments designed for use against corrections threats were much heavier and bulkier than the ballistic-resistant counterparts worn by police officers, as materials technology generally did not allow for a protective vest for corrections applications to be made entirely of woven materials. Quite frequently, these vests incorporated thin sheets of metal and other types of hard plating to protect against typical corrections threats. However, in recent years significant breakthroughs in materials technology have made it possible for corrections officers to have access to stab- and puncture-resistant vests that are similar in weight and bulk to the ballistic-resistant vests worn by their police counterparts. It is anticipated that as these vests become more commonplace in the corrections workplace, corrections officer fatalities will decrease as police officer fatalities decreased after the introduction of ballistic-resistant armor in the mid- to late 1970s.

## Armor Classifications for Ballistic-Resistant Armor

NIJ Standard–0101.04 establishes six formal armor classification types, as well as a seventh special type, as follows:

**Type I (.22 LR; .380 ACP).** This armor protects against .22 long rifle lead round nose (LR LRN) bullets, with nominal masses of 2.6 g (40 gr), impacting at a minimum velocity of 320 m/s (1050 ft/s) or less, and against .380 ACP full metal jacketed round nose (FMJ RN), with nominal masses of 6.2 g (95 gr), impacting at a minimum velocity of 312 m/s (1025 ft/s) or less.

Type I body armor is light. This is the minimum level of protection every officer should have, and the armor should be routinely worn at all times while on duty. Type I body armor was the armor issued during the NIJ demonstration project in the mid-1970s. Most agencies today, however, because of increasing threats, opt for a higher level of protection.

**Type II-A (9mm; .40 S&W).** This armor protects against 9mm full metal jacketed round nose (FMJ RN) bullets, with nominal masses of 8.0 g (124 gr), impacting at a minimum velocity of 332 m/s (1090 ft/s) or less, and .40 S&W caliber full metal jacketed (FMJ) bullets, with

nominal masses of 11.7 g (180 gr), impacting at a minimum velocity of 312 m/s (1025 ft/s) or less. It also provides protection against Type I threats.

Type II-A body armor is well suited for full-time use by police departments, particularly those seeking protection for their officers from lower velocity 9mm and 40 S&W ammunition.

**Type II (9mm; .357 Magnum).** This armor protects against 9mm full metal jacketed round nose (FMJ RN) bullets, with nominal masses of 8.0 g (124 gr), impacting at a minimum velocity of 358 m/s (1175 ft/s) or less, and .357 Magnum jacketed soft point (JSP) bullets, with nominal masses of 10.2 g (158 gr), impacting at a minimum velocity of 427 m/s (1400 ft/s) or less. It also provides protection against Type I and Type IIA threats.

Type II body armor is heavier and more bulky than either Types I or II-A. It is worn full time by officers seeking protection against higher velocity .357 Magnum and 9mm ammunition.

**Type III-A (High Velocity 9mm; .44 Magnum).** This armor protects against 9mm full metal jacketed round nose (FJM RN) bullets, with nominal masses of 8.0 g (124 gr), impacting at a minimum velocity of 427 m/s (1400 ft/s) or less, and .44 Magnum jacketed hollow point (JHP) bullets, with nominal masses of 15.6 g (240 gr), impacting at a minimum velocity of 427 m/s (1400 ft/s) or less. It also provides protection against most handgun threats, as well as the Type I, II-A, and II threats.

Type III-A body armor provides the highest level of protection currently available from conceal-able body armor and is generally suitable for routine wear in many situations. However, depart-ments located in hot, humid climates may need to evaluate the use of Type III-A armor carefully.

**Type III (Rifles).** This armor protects against 7.62mm full metal jacketed (FMJ) bullets (U.S. military designation M80), with nominal masses of 9.6 g (148 gr), impacting at a minimum velocity of 838 m/s (2750 ft/s) or less. It also provides protection against Type I through III-A threats.

Type III body armor is clearly intended only for tactical situations when the threat warrants such protection, such as barricade confrontations involving sporting rifles.

**Type IV (Armor Piercing Rifle).** This armor protects against .30 caliber armor piercing (AP) bullets (U.S. military designation M2 AP), with nominal masses of 10.8 g (166 gr), impacting at a minimum velocity of 869 m/s (2850 ft/s) or less. It also provides at least single-hit protection against the Type I through III threats.

Type IV body armor provides the highest level of protection currently available. Because this armor is intended to resist "armor piercing" bullets, it often uses ceramic materials. Such mate-rials are brittle in nature and may provide only single-shot protection, since the ceramic tends to break up when struck. As with Type III armor, Type IV armor is clearly intended only for tacti-cal situations when the threat warrants such protection.

**Special type.** A purchaser who has a special requirement for a level of protection other than one of the above standard threat levels should specify the exact test rounds and minimum impact velocities to be used and indicate that this standard shall govern in all other respects.

## Requirements

The performance requirements of NIJ Standard–0101.04, which were developed with the active participation of body armor manufacturers, ensure that each armor type will provide a well-defined minimum level of ballistic protection.

Exhibit 7, reproduced from the standard, identifies the specific bullets and impact velocities that each armor type must withstand.

Types I, II–A, II, and III–A armor are required to prevent penetration from the impact of six bullets per panel, for two complete samples (front and back panels) at specified velocities and locations for two types of ammunition. Two of the impacts in each six-shot sequence must be at a 30-degree angle. A total of 48 shots are completed on four samples. Furthermore, the deformation of the backing material (a measure of blunt trauma protection) must not exceed 44mm (1.73 in). Deformation readings are taken on each panel at shot location 1, then at either shot location 2 or 3, whichever one had the highest shot velocity. The armor must meet these requirements while wet.

Type III armor requirements are identical to those above, except that only one type of ammunition is specified, and all six test rounds are fired perpendicular to the surface of the armor. A total of 12 shots are completed (6 shots per sample).

Type IV armor is required to resist penetration from only a single type of ammunition (armor piercing) and is only required to prevent penetration and backface deformation greater than 44mm (1.73 in) from a single perpendicular impact. A total of two samples are tested.

In addition to the ballistic requirements, the NIJ standard requires quality workmanship and specifies the minimum information that must be included on the armor's label. The maximum allowable deformation of the clay-backing material was determined through an extensive series of ballistic gelatin measurements and experiments conducted by a team of medical experts. This limit ensures protection from blunt trauma that arises from an impact occurring over vital locations. Even this level of protection, however, does not give an absolute guarantee of protection against internal injuries.

The rationale for the requirement that armor resist bullet penetration is obvious. The reasons for other ballistic requirements may not be apparent.

**Wet testing.** Certain ballistic fabrics lose ballistic-resistant efficiency when wet, but fully return to normal ballistic efficiency upon drying. Laboratory tests of non-water-repellent treated vests soaked in water have shown a reduction in ballistic efficiency of more than 20 percent

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

## Exhibit 7: Test Summary (NIJ Standard–0101.04)

| Armor Type | Test Round | Test Bullet | Bullet Weight | Reference Velocity (± 30 ft/s) | Hits Per Armor Part at 0° Angle of Incidence | BFS Depth Maximum | Hits Per Armor Part at 30° Angle of Incidence | Shots Per Panel | Shots Per Sample | Shots Per Threat | Total Shots Req'd |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | 1 | .22 caliber LR LRN | 2.6 g 40 gr. | 329 m/s (1080 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | 48 |
| | 2 | .380 ACP FMJ RN | 6.2 g 95 gr. | 322 m/s (1055 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | |
| IIA | 1 | 9 mm FMJ RN | 8.0 g 124 gr. | 341 m/s (1120 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | 48 |
| | 2 | .40 S&W FMJ | 11.7 g 180 gr. | 322 m/s (1055 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | |
| II | 1 | 9 mm FMJ RN | 8.0 g 124 gr. | 367 m/s (1205 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | 48 |
| | 2 | .357 Mag JSP | 10.2 g 158 gr. | 436 m/s (1430 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | |
| IIIA | 1 | 9 mm FMJ RN | 8.2 g 124 gr. | 436 m/s (1430 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | 48 |
| | 2 | .44 Mag SJHP | 15.6 g 240 gr. | 436 m/s (1430 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | |
| III | 1 | 7.62 mm NATO FMJ | 9.6 g 148 gr. | 847 m/s (2780 ft/s) | 6 | 44 mm (1.73 in) | 0 | 6 | 12 | 12 | 12 |
| IV | 1 | .30 caliber M2 AP | 10.8 g 166 gr. | 878 m/s (2880 ft/s) | 1 | 44 mm (1.73 in) | 0 | 1 | 2 | 2 | 2 |
| Special | * | * | * | * | * | 44 mm (1.73 in) | * | * | * | * | * |

*These items must be specified by the user.

Panel = Front or back component of typical armor sample.
Sample = Full armor garment, including all component panels (F&B).
Threat = Test ammunition round by caliber.

Notes: Armor parts covering the torso front and torso back, with or without side coverage, shall each be impacted with the indicated number of fair hits. Armor parts covering the groin and coccyx shall each be impacted with three fair hits at 0° angle of incidence. The deformation due to the first fair hit shall be measured to determine compliance. No fair hit bullet or one impacting at a velocity lower than the minimum required bullet velocity shall penetrate the armor.

Abbreviations:    AP—Armor Piercing
                  FMJ—Full Metal Jacket
                  JSP—Jacketed Soft Point
                  LRHV—Long Rifle High Velocity
                  RN—Round Nose
                  SJHP—Semi-Jacketed Hollow Point
                  SWC—Semi-Wadcutter

compared to that of dry vests. The cause of this phenomenon is not known, but it is theorized that water acts as a lubricant, which allows the bullet to pass through the fibers more easily.

An officer may confront an armed assailant in the rain, and body perspiration can also significantly reduce the ballistic efficiency of untreated fabrics. Laboratory tests conducted by the U.S. Army Natick R&D Command, using a mannequin that simulates human perspiration, verified that vests will absorb perspiration in amounts comparable to a vest that has been allowed to drain following immersion in water. A series of tests was also conducted by a research team from the U.S. Department of Justice, in which officers wearing untreated vests were subjected to strenuous exercise on a hot humid day. The amount of perspiration in the vests corresponded to the Natick experiments, and when ballistic tests were conducted, a significant reduction in the efficiency was noted. In view of this, the NIJ standard requires that a vest continue to provide the rated level of ballistic protection when wet.

The vast majority of body armor manufactured today uses materials that (1) are inherently waterproof or are treated with water repellants; (2) have a permanent water-repellant covering (such as rip-stop nylon); or (3) both. However, the standard requires wet testing to ensure that these vests still provide adequate protection in situations in which they are exposed to moisture.

Those purchasing body armor should be aware that some manufacturers offer models that are supposedly identical in construction to NIJ-tested and -approved models, except that they do not have the water-repellant treatment. NIJ considers the removal or alteration of water-repellant treatment to be a change in the design of the vest. NIJ does not, under any circumstances, recognize any model that "partially" complies with the standard.

**Angle shots.** All Type I through Type III-A body armors are required to resist the penetration of bullets striking at an angle to the surface, because the probability of being hit exactly perpendicular to the surface is low. Certain fabrics are less efficient ballistically by as much as 20 percent when a bullet strikes at an angle. Armor must provide the rated level of protection regardless of the angle of impact.

## Performance Testing

As a service to law enforcement, corrections, and manufacturers, NIJ's body armor compliance testing program tests body armor using independent testing laboratories to determine compliance with the requirements of NIJ Standard–0101.04. The models that comply with the requirements of this NIJ standard are added to its *Personal Body Armor Consumer Product List (CPL),* which is widely distributed to law enforcement agencies as a procurement aid.

Exhibit 8, from NIJ Standard–0101.04, shows the test setup for ballistic testing of police body armor. The chronograph measures the bullet velocity to ensure that each test round is within the range required by the standard. The armor being tested is mounted on a clay-backing material whose consistency is controlled.

**SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR**



**Exhibit 8: Ballistic Test Setup**

Backing Material Fixture

Armor Panel

Line of Flight

Stop Trigger (1 & 2)

Start Trigger (1 & 2)

Chronograph 2

Chronograph 1

Test Barrel

A - 5 m for Type I, II-A, II, and III-A armors; 15 m for Type III and IV armors

B - 2 m minimum for Type I, II-A, II, and III-A armors; 12 m minimum for Type III and IV armors

C - Approximately 1.5 m ± 6 mm

Exhibit 9, also from NIJ Standard–0101.04, shows the general locations of points of impact for each round fired in the six-shot sequence for each type of ammunition specified in exhibit 7 for the type of armor being tested. The deformation of the clay behind the impact of the first shot (location 1) is measured to determine compliance with the blunt trauma requirement. Following the deformation measurement, the armor is repositioned on the clay and the remaining five shots are fired, two of which (locations 5 and 6) are fired at an angle of 30 degrees to the armor surface. The armor is smoothed out, or "patted down," after each shot. After the first shot is taken, the panel is removed from the test fixture and the clay is trimmed, or "struck," back to its original level surface. A second deformation measurement is taken at either shot number 2 or number 3, depending on which shot had the highest velocity.

The armor is tested after being sprayed with a measured quantity of water for 3 minutes on each side before being mounted on the clay. Both the front and back of the armor are tested, and, if present, tests are conducted on groin and coccyx (end of spine) protection panels.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR



**Exhibit 9: Test Ammunition Shot Series**

The clay-backing material must be properly conditioned and must meet the requirements specified in the standard, as the only current means of relating deformation to blunt trauma protection. Some departments attempt to conduct their own tests using a variety of backing materials, including thick stacks of newspapers, wood, or even steel plates. This practice should be avoided, for the bullet interacts differently with the armor when backed with these materials than with the clay-backing material. Furthermore, other backing materials can be unsafe. In several cases, bullets have bounced back and injured the officer shooting at the armor.

# $V_{50}$ Testing

$V_{50}$ ballistic limit testing is a statistical test developed by the U.S. military to evaluate hard armor of homogenous construction used to protect vehicles. Many body armor manufacturers use a modified form of the military $V_{50}$ testing as a design tool to develop and assess new body armor designs. $V_{50}$ testing as used by body armor manufacturers experimentally identifies a velocity at which a specific projectile has a 50-percent chance of penetrating the armor being tested.

In this form of testing, the armor is mounted on the clay-backing material, and specified bullets are fired to determine the velocities at which the bullets do and do not penetrate the armor. A sufficient number of bullets are fired at various velocities to obtain groups of five nonpenetrating bullets and five penetrating bullets, with a velocity range of no more than 38 m/s (125 ft/s) between the lowest velocity nonpenetrating bullet and the highest velocity penetrating bullet. The $V_{50}$ ballistic limit is calculated as the average velocity of the 10 bullets.

$V_{50}$ ballistic limit testing allows manufacturers to evaluate various designs against one another to optimize their design for a specific type of body armor. A trend has emerged in which manufacturers publish $V_{50}$ test data and also put $V_{50}$ test information on the labels of some of their body armor.

$V_{50}$ ballistic limit testing is a useful and informative statistical tool for evaluating certain characteristics of armor. In addition to being helpful during the design phase of armor development,

it may also have the potential for being a valuable tool in evaluating armor's degradation over time. However, it does not evaluate the level of protection afforded against blunt trauma, nor is a uniform standard for $V_{50}$ ballistic limit testing used by all manufacturers.

## Ballistic Limit Testing

As part of NIJ Standard–0101.04, the Office of Law Enforcement Standards (OLES) has developed a performance assurance program to determine the ongoing performance of body armor currently in service or a new production unit of a previously tested and approved model. The Baseline Ballistic Limit test will establish a benchmark of penetration performance and will provide a reliable and consistent way to retest NIJ-compliant armor. The ballistic limit test does not have a pass or fail performance requirement; it provides additional information about the ballistic performance of a given armor model. The ballistic limit testing is done after the armor model has successfully passed the traditional penetration and backface signature testing. The performance assurance program is based on $V_{50}$ testing.

All ballistic-resistant materials can ultimately be overmatched whether by bigger or faster bullets or simply by firing the same bullet fast enough to eventually overcome the ability of the given material to stop it.

The $V_{50}$ ballistic limit, within statistical reason, identifies the velocity at which the armor material stops the bullet at least half the time. Knowing that the ballistic limit of a particular body armor model is well in excess of the NIJ reference velocity—at which no penetration is expected or allowed for in compliance testing—provides additional assurance of the overall ballistic performance of the armor even in instances where the encountered threat may be beyond the expected norm.

## Acceptance and In-Service Testing

Acceptance testing should be performed whenever a large-quantity purchase is received. However, NIJ does not consider this guiding rule to apply to blanket purchase agreements and term contracts, because manufacturers may produce individual purchase orders from several lots of material. In these cases, a department may want to carry out limited testing periodically, but, to test armor from each production lot would be expensive and impractical. Again, the manufacturer and the purchaser must address in the contract what will happen if any of the armor fails to comply with NIJ Standard–0101.04. For instance, the manufacturer might agree to replace any armor manufactured from the lot of ballistic material that failed testing. In addition, a department may want to test previously purchased armor that was manufactured from material lots not included in prior screening tests. To accurately assess its testing alternatives, a department must consider the structure of its blanket purchase agreement or term contract.

A department can accurately estimate testing costs only if it knows how many tests will need to be conducted. Thus, a department that requires acceptance testing—especially for small-quantity purchases—may want to include in its contract a clause limiting the number of ballistic material lots that will be used to manufacture the armor to a few lots or even one. Testing costs are either directly paid by the department or absorbed into the manufacturer's unit cost. Indirect costs associated with acceptance testing and later service-life testing include administrative paperwork; time for analyzing the results; and travel, if the department wants a representative to witness the ballistic testing.

Police departments often include armor testing costs and departmental travel as manufacturer-related expenses, which are part of the bid price. However, NIJ does not recommend this practice because the public served by a department might doubt the propriety of an officer who accepts travel expenses from the manufacturer when the performance of armor purchased is in question. Instead, NIJ suggests that the department separately budget for armor testing and contract directly with a National Law Enforcement and Corrections Technology Center (NLECTC)-approved laboratory. This provides a clearer picture of the armor purchase price per unit and provides the department with more flexibility in its testing program.

Finally, a department that elects to conduct acceptance or service-life testing must remember to order an adequate number of additional sets of armor to be used for testing. For more information on service life, or life cycle testing, please see the discussion on this topic in chapter 10 (page 60).

# 7. Stab-Resistant Personal Body Armor

## Armor Classifications for Stab-Resistant Armor

The first step in selecting the appropriate protection level of stab-resistant body armor is to establish the level of protection that users need based on the realistic weapon threat they face.

NIJ Standard–0115.00 places stab-resistant body armor into two categories based on the kind of threat it is designed to stop. One category of protection, designated the "edged blade" class, stops engineered or high-quality blades, such as kitchen knives or those purchased at sporting goods stores, and represents the threat more commonly found on the street. The second category, the "spike" class, stops the types of improvised weapons commonly found in correctional facilities, typically made of lower quality materials that may have been sharpened on concrete or other rough surfaces.

Within each of these two categories are three levels of protection, based on the energy that would impact the body armor during an attack. The amount of energy expended in an attack is expressed in joules. One joule is equivalent to 1 foot-pound of energy or the amount of energy delivered from a 1-pound weight dropped from a height of 1 foot.

Level 1 is a low-level protection armor suitable for extended wear, generally concealable, and capable of defeating 24 joules of energy. Level 2 armor is a general duty garment suitable for extended wear that may be concealable or worn over the uniform that will defeat 33 joules of energy. Level 3 is a high-level protection armor suitable for wear in high-risk situations that will defeat 43 joules of energy. As an example, a prison administrator might wear 24-joule body armor in the spike category, designed to stop improvised weapons, while a corrections officer on a high-security unit would wear the spike category, level 3, 43-joule body armor.

As stated in chapter 5, in developing the standard, NIJ relied on the extensive research experience of the Police Scientific Development Branch (PSDB) in the United Kingdom (UK), where the primary threat to law enforcement officers is from sharp-edged and pointed weapons. As part of their initial research, PSDB created a model to determine the actual forces generated by an assailant during attack, and, from this model, developed realistic test methodologies and procedures that could be replicated in the laboratory. Several different types of blades were engineered to accurately reflect actual threats faced by law enforcement and correctional officers. Although these blades are specially designed to ensure consistency in testing procedures, they reflect many of the features found in the high-grade commercial knives or homemade instruments most commonly used in attacks.

The threats from ice picks and lower quality, prison-made knives and shivs are much more difficult to quantify than those from commercial knives. Research addressing homemade instruments continues, and any improvements from this research will be incorporated into future revisions of NIJ Standard–0115.00. For the present time, the same test methodology will be used

for homemade weapons as is used for commercial knives, but the threat weapon is a modified ice pick commonly used in the "California Ice Pick" test.

## Developing the Testing Procedure

Before PSDB could develop equipment to test body armor under conditions that could be replicated in the laboratory, researchers examined the mechanics of stabbing, first reviewing medical data from more than 1,000 actual stabbing assaults in the UK. Using this information, they developed an instrumented blade, or "stabometer," that could measure the acceleration and force generated by a stabbing impact. Five hundred healthy male recruits used the stabometer, stabbing from a variety of directions and using a number of techniques such as a jab, roundhouse, overhead, and double- and single-handed stab. Measurements taken from these tests documented the energy of a stabbing incident. A second series of tests examined other factors that affect the stabbing act—technique, strength, attitude, coordination, and body position.

From this data, PSDB created a testing mechanism, the dual-mass drop system that accurately replicates the mechanical forces that would impact the body armor during an attack. For the highest level of protection, a vest should be able to withstand 43 joules of energy, allowing no more than 7 millimeters ($^1/_4$ inch) of penetration.

During the testing procedure, the body armor is placed on backing material designed to most accurately replicate the response of the human torso during a stabbing incident. The backing material is a composite consisting of alternating layers of closed-cell foam and neoprene rubber. To test nonflexible armor designs molded to the shape of the human torso, an alternate backing of modeling clay is used.

## Overtest

As part of the testing procedure, an overtest is performed for each level of protection. The test protocol increases the kinetic energy of the knife blade or spike by 50 percent to ensure that there is an adequate margin of safety in the armor design. At the higher energy condition, a maximum blade or spike penetration of 20mm (.79 inch) is allowable.

# 8. Armor Selection

## Armor Styles

**Concealable body armor.** The most widely used type of body armor is the protective undergarment, which is worn under the normal uniform shirt. If properly designed, these garments are relatively comfortable, lightweight, are not unduly restrictive of movement, and are available in a variety of designs.

Typical male and female undergarment body armor garments are designed to provide full front, side, and rear protection. Most undergarment armor uses a hook-and-pile tape fastening system; some older models may feature a "D" ring-fastening system. The ballistic panel is often contained in pouches in a polyester/cotton carrier. When purchasing undergarments of this type, two carriers should be ordered to permit one to be laundered while the other is worn. Metal fasteners should be avoided, for they can become secondary missiles. Hook-and-pile tape fasteners, such as those manufactured by Velcro Corp., should be at least $1^1/_2$ inches wide and should provide approximately 2 inches of adjustment. In addition, the fasteners should be anchored to a good-quality elastic, approximately 3 inches long, to facilitate proper adjustment and to compensate for body movement.

The concealed undergarments for female officers should conform to the female anatomy. The seam construction for such garments that include seams is critical. It is very important that the joined pieces overlap each other a minimum of 1 inch. Particular attention should be paid to the length of the garment, which is a frequent problem. The adjustment straps for the female undergarment may be fastened to the back to improve the overall appearance of the uniform.

Many manufacturers market loose-weave undershirts to be worn with body armor. These undershirts may appear to improve airflow over the armor, minimizing heat build-up and perspiration.

Protective undergarments are also available with special pouches that allow additional ballistic protection by inserting armor panels, commonly known as "trauma packs," in the front and in some cases, the rear. These panels may be hard, composed of metal, ceramic, or rigid plastic, or may be soft, made from additional layers of typical vest materials. Note that the increased protection applies only to the portion of the torso behind the insert. Thus far, the National Institute of Justice (NIJ) has not conducted research to determine the effectiveness of such inserts. In general, NIJ believes that agencies should select armor that provides the rated level of protection over the entire area of coverage, not just isolated areas.

Materials used to construct concealable body armor also permit the design of various other armor configurations, which are sometimes used by police officers assigned to nonuniform duty, such as detective or security details. These include the ballistic-protective sports coats and vests. In addition, raincoats and a variety of jackets, all with ballistic liners, are available. Officers can even purchase shirts with ballistic protection. Even more casual appearing protective vests, such

as a simulated down outer vest and a denim work jacket, are on the market. Numerous designs of tactical protective vests are also available. All these styles of body armor can meet the requirements for the NIJ standards.

**Semirigid body armor.** Body armor that provides protection against higher threat levels (III and IV), as specified in NIJ Standard–0101.04, will be of either semirigid or rigid construction. Semirigid armor can consist of a somewhat flexible material with impregnated ballistic fabrics or a garment composed of small articulated plates of ballistic material such as steel, ceramic, or plastic, reinforced with some type of woven ballistic material. This design borrows from the naturally occurring armor design of the armadillo. Semirigid vests are difficult to conceal and allow the use of dense materials (high areal density), while retaining limited movement.

**Rigid body armor.** Rigid body armor is composed of molded ballistic material, designed to cover certain portions of the body. Rigid body armor is perhaps the most restrictive of body movement and is also difficult to conceal. A typical tactical vest incorporates a panel of rigid armor into a typical concealable armor vest and is worn externally. In general, semirigid and rigid body armors are used only for short periods when expecting confrontation with high-level threats. Users should carefully review the labels of rigid armor to determine if it offers single-shot or multihit capability.

## Comfort and Fit

When selecting armor for full-time routine use by an officer, comfort is a major factor. Armor that is set aside or relegated to the trunk of a cruiser is of no benefit. The NIJ development effort recognized this "real world" problem and therefore emphasized comfort in the design of lightweight body armor for police use. Two fundamental factors were considered: fit—from the standpoint of mobility and the weight distribution of the armor—and heat discomfort. Both armor characteristics were evaluated by the U.S. Army Natick R&D Command using instrumented anatomical models of the human body. The weight-distribution measurements led to an improved design for the garments. Similarly, the dissipation of body heat through body armor was measured. Those tests demonstrated that, during normal activities, an individual wearing body armor would not suffer unduly from reduced dissipation of body heat. For example, the long-sleeved police uniform has roughly the same heat dissipation as utility army fatigues. Adding the original NIJ vest to the police uniform prevented about the same amount of heat loss as adding a liner to an army fatigue helmet.

Comfort, with respect either to fit or to heat dissipation, is at best subjective and a matter of individual sensation. However, adequate case history and field experience exist to indicate that body armor is suitable for full-time use and that an officer should accept minor discomfort in exchange for the protection that is afforded. To resolve questions concerning comfort, a few members of the department might wear samples of armor on a trial basis before the department makes a major purchase.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

The introduction of several new fabrics used to make the permanent protective cover for the ballistic- or stab-resistant element and the removable outershell carrier have greatly enhanced the comfort and wearability of body armor. GoreTex®, a fabric made of expanded Teflon®, is a water-resistant fabric that, according to the manufacturer, allows perspiration to evaporate but prevents moisture from reaching the ballistic material. By using GoreTex®, some manufacturers have eliminated the water-repellent treatment on the ballistic material, which they claim improves the "breatheability" of the vest.

CoolMax®, a fabric originally developed for use in athletic apparel, is now being used by some manufacturers in place of traditional cotton and nylon fabric in manufacturing the removable outershell carrier of the vest. According to the manufacturer, CoolMax® acts like a wick, drawing perspiration away from the body to the outer surface of the garment, where it can more easily evaporate.

Laboratory tests and comments from officers who wear body armor during their daily shifts have identified a number of factors that bear on the comfort of body armor when worn for extended periods of time. See exhibit 10 for a listing of factors to consider when evaluating armor.



**Exhibit 10: Design Elements That Contribute to Armor Comfort**

The shoulder, neck, and armholes should be feathered to minimize bulk and maximize comfort at these areas, but still not reduce protection.

The neck opening should not be too high and should be properly shaped.

The shoulder straps should be wide enough for comfort and to distribute the weight of the armor, but not so wide as to restrict movement.

The armholes of the armor should not be too small.

Seam construction of the armor should allow maximum flexibility and yet maintain protective coverage.

The armor should permit size adjustment while retaining protective integrity for the sides of the torso.

The armor should be wide enough to allow the front panel to overlap the back panel.

The carrier for the armor material should have a tail that can be tucked into the pants to prevent the armor from riding up.

The length of the front of the armor should not be too long; otherwise, it will be pushed up into the throat when the officer sits or bends.

The armor should be as light as possible, while still providing protection against the threat that is most prevalent in the geographical area of use.

The concealed undergarments for female officers should conform to the female anatomy. The seam construction for such garments that include seams is critical. It is very important that the joined pieces overlap each other a minimum of 1 inch. Particular attention should be paid to the length of the garment, which is a frequent problem. The adjustment straps for the female undergarment may be fastened to the back to improve the overall appearance of the uniform.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

## Coverage

It is possible to purchase armor that covers only the front torso, with a separate section that can be added to protect the rear torso and the sides. An officer who spends nearly the entire duty shift in a vehicle may be tempted to wear only chest protection, but this is not advisable.

Statistics bear grim testimony to the importance of using armor that provides full coverage. According to the UCR data from the period 1990 to 1999, 290 law enforcement officers were killed while wearing protective armor (see exhibit 11). Of those officers 160 (55.2 percent) were killed by gunshot wounds to the head; 101 (34.8 percent) died as a result of gunshot wounds to the upper torso; 18 (6.2 percent) died as a result of gunshot wounds below the waist; 5 (1.7 percent) were struck by automobiles; 2 (0.7 percent) were stabbed; and 4 (1.4 percent) died by other means.

Of the 101 officers killed by gunshot wounds to the upper torso, 40 (39.6 percent) were killed when the round entered the torso region between the panels of the vest or through the arm openings, and 34 (33.7 percent) were killed when the round landed above the coverage area of the vest (see exhibit 12). Therefore, a vest must provide full front, side, and back protection with the wrap-around portion going from front to back. Proper fit is equally important for ensuring adequate coverage and protection. Ideally, officers should be individually measured and fitted for concealable body armor. Because a large weight gain or loss can have an adverse impact on proper fit, armor should also be inspected routinely to ensure proper fit. Improperly fitting armor needs to be brought to a supervisor's attention immediately for corrective action.



**Exhibit 11: Officers Killed Wearing Protective Armor, by Cause of Death 1990–1999**

Other 4  **1.4%**

Stabbing 2  **0.7%**

Automobiles 5  **1.7%**

Gunshot Wounds Below Waist 18  **6.2%**

Gunshot Wounds to Upper Torso 101  **34.8%**

Gunshot Wounds to Head 160  **55.2%**

Source: FBI Uniform Crime Reports: *Law Enforcement Officers Killed and Assaulted 1999*

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR



**Exhibit 12: Upper Torso Deaths, by Location of Rounds 1990–1999**

Back/Below Vest Panels  7  **6.9%**

Penetrated Vest  20  **19.8%**
(All Rifle)

Above Vest Panel  34  **33.7%**

Between Vest
Panels  40  **39.6%**

Source: FBI Uniform Crime Reports: *Law Enforcement Officers Killed and Assaulted 1999*

Twenty of the 101 officers killed by gunshot wounds to the upper torso died as a result of rounds penetrating the body armor. Of these 20 incidents, all were the reported result of rifle rounds, which the armor was not designed to protect against. **It is important to note that no documented fatal injury has ever resulted from a round of ammunition penetrating body armor that NIJ had approved as protection against that level of threat.**

# 9. Purchasing Body Armor

## Overview

Before purchasing body armor, an agency must first assess its potential threats and determine what level of protection is required for its officers. Only after determining the protection needs of the department should those responsible for purchasing body armor begin to review specific products. Next, the department should select several models, preferably from several different manufacturers, from the *Personal Body Armor Consumer Product List (CPL)* that meet the department's protection needs. This document, published electronically on the National Law Enforcement and Corrections Technology Center (NLECTC) JUSTNET Web site, provides a listing of the armor models that have been tested and found to comply with National Institute of Justice (NIJ) standards, which independently validate the manufacturer's claims regarding the performance characteristics of the vest.

The next step is to solicit competitive bids from the companies or company representatives that manufacture these models and to choose a model, usually the most cost-effective option. When the armor arrives, the purchaser should verify that the armor received is the specific model that was ordered.

Criminal justice agencies can buy ballistic- and stab-resistant body armor for half the price by taking advantage of the U.S. Department of Justice's Bulletproof Vest Partnership (BVP) Grant Act of 1998, administered by the Bureau of Justice Assistance (BJA). The chief executive officer of a law enforcement agency can apply online to purchase NIJ-approved vests. (Go to http://vests.ojp.gov/leas.html to learn more about how the chief executive officer is defined and to learn more about the application process.) BJA will match up to 50 percent of the cost of the armor, including the cost of shipping and taxes. The Bulletproof Vest Partnership Program was enacted to save the lives of law enforcement officers by helping States and local and tribal governments equip their officers with body armor.

Congress appropriated $25 million for the program's second year. At least half the funds are provided to local government units with fewer than 100,000 residents. The Bulletproof Vest Partnership Grant Act of 2000 was recently enacted. This means the program will remain in effect for 3 more years, from 2002 to 2004. It also provides priority funding for jurisdictions with populations under 100,000 and increases the authorized funding level to $50 million each year. These changes will not take effect until 2002. The applications accepted in 2001 will be governed by the current BVP Act of 1998.

At a glance, purchasing body armor may seem like a relatively simple process. However, complications sometimes arise from various sources that make the purchasing process much more involved. Two of the principal problems that can complicate the purchasing process are obtaining objective information from salespeople and the tendency to overspecify departmental needs through the departmental procurement process.

A salesperson's goal is to persuade a department that his or her product is the best available. Sometimes, a salesperson will suggest a department include requirements unique to his or her company's product in purchase specifications. Also, some manufacturers use product demonstrations that are designed to show that their armor is superior to that of competitors. Departments should be cautious of these practices. Basing purchasing decisions on NIJ standards and the *Personal Body Armor CPL* can help departments avoid the problems caused by the use of a single manufacturer's construction and/or design specifications. These problems include paying higher rates if the specifications limit competition to a single source or purchasing armor that may not meet department needs.

Police departments often handle armor procurement as a committee action. This approach can result in overspecification of department needs, caused by trying to satisfy all of the committee members by including each member's personal preferences in the product specifications. A more efficient approach is to assign the task to two or three officers, provide resources to help them familiarize themselves with armor technology, and allow them to independently assess the department's needs. The officers should then make a decision, informing the department's administration, justifying their selection, and being prepared to demonstrate why their choice represents the needs of the majority of officers.

## The Procurement Process

Typically in the procurement process, an agency or department develops requirements, solicits bids, reviews bids and submitted samples, and then awards the contract to the bidder that best meets the price and product specifications.

Generally, armor purchases fall into one of four categories:

- Individual purchases from a distributor or retail outlet.

- Small-quantity departmental purchases.

- Large-quantity departmental purchases (several hundred units or more).

- As-needed purchases procured through an open-ended agreement (also called a term contract).

Individual or small-quantity purchases can be best described as "what you see is what you get." Large-quantity purchases should be made only through a competitive process involving several bids from the manufacturers that produce the models meeting the department's protective needs.

The NIJ standards focus on the protection characteristics of body armor, and the *Personal Body Armor CPL* presents the models that meet the requirements of the standards. Departments that base their purchases on the *Personal Body Armor CPL* need to specify in the purchase agreement any additional features they require, as determined during the needs assessment phase, such as color or area of coverage.

Procurement of law enforcement equipment should always focus on the following areas:

• Clarity. Ensure that the purchase agreement is not ambiguous in any way.

• Simplicity. Include only items essential to the purchase agreement.

• Internal consistency. Ensure that requirements for each individual item do not conflict with one another.

To ensure that bids involve only armor in compliance with NIJ Standard–0101.04 or NIJ Standard–0115.00, a typical purchase agreement might include the following wording:

The body armor model shall be tested by NLECTC and found to comply with all requirements of NIJ Standard–0101.04 (or NIJ Standard–0115.00). It shall be of Type (specify appropriate threat level and test ammunitions) as defined in that standard, and shall afford full protection to the torso front, torso back, and sides.

A purchaser needing special ballistic protection that would require additional testing should specify the exact test rounds to be used (listing such variables as caliber, bullet shape, bullet mass, configuration, and velocity) and state that NIJ Standard–0101.04 (or NIJ Standard–0115.00) will govern in other respects. When additional testing is needed, the police department should place reasonable time demands on the manufacturers.

A department developing a purchase agreement should be aware of two issues that may complicate the procurement process. The first, mentioned earlier in this chapter, is to describe a particular product in the product specifications section of the solicitation for bids, which would eliminate the chance of a truly competitive process. Instead, the department should consider requesting bids for armor that complies with NIJ standards and then add specific, nonprotective features only if essential. The second issue is the requirement that the department accept the lowest bid. Instead, the department should consider adding a clause in the bid solicitation that allows the agency to buy from the manufacturer offering the armor that best meets the department's needs and that the officers find most comfortable.

## Ensuring Compliance Status

Just as a department should not purchase a model of armor that has not been tested by NLECTC or does not comply with NIJ standards, a department also should not accept statements—written in the bid or verbally made by a salesperson—that the model shown is "just like" or "identical to" a model from the *Personal Body Armor CPL*. Instead, those responsible for procurement should ensure that the armor model designation on the ballistic panel label is identical to the one listed in the *Personal Body Armor CPL* and should receive proof (a copy of the compliance letter issued by NLECTC to the manufacturer for that model) that the armor is in compliance with NIJ standards. If the supplier or bidder cannot provide these two items, the department

should use another supplier. If a department still has questions about the compliance status of a particular model, they should contact NLECTC at 800–248–2742 or 301–519–5060.

## Model Procurement Specifications

Major purchases of armor give departments the chance to specify exactly what features they want included in the product design that will provide for officers' body armor needs. Also, each jurisdiction is subject to departmental procurement terms and must add specifications to the solicitation and purchase agreement as required by these terms. For instance, Federal procurements often include a clause requiring that the items purchased be manufactured in the United States; other jurisdictions may require that preference be given to small businesses or local manufacturers. Such contract conditions are often written in wording standard to all departmental purchasing orders and then inserted in appropriate sections of each bid package. Yet, departments should remember that overspecification can complicate the procurement process by making it difficult for a department to find a product that meets all of the specifications.

Documents related to the procurement of body armor should include certain items. The issues discussed in the remainder of this chapter apply to the specifications section of purchase orders and assume that the department has previously assessed its officers' protection needs and determined the appropriate type of armor, as specified in NIJ Standard–0101.04 and/or NIJ Standard 0115.00. Departments should not include requirements that are unreasonable or technically impossible to achieve.

The following guide to procurement specifications assumes the department has selected a specific type of armor from a single manufacturer that provides the needed protection level. (Appendix D provides an example of the procurement specifications section of a purchase agreement solicitation.) Negotiating an open-ended agreement (term contract) for multiple models, styles, and armor types from a single manufacturer involves a separate set of issues.

**Terms of agreement.** Whether a department purchases armor in a single quantity (buying one unit at a time or a quantity at one time), through a blanket purchase agreement, or under a term contract, the bidder must know how many units will be purchased, including the number of vests for female officers. Under a blanket purchase agreement, an agency can purchase units "as needed" during the life of the contract. No matter which approach is used, a department may want to include a clause for ordering additional units, which would make future purchases simpler because new bids would not be required.

**Prebid conference.** When purchasing a large quantity of armor or considering a blanket purchase agreement, a department may want to arrange a prebid conference between it and prospective bidders. Bidders and the department can then review the solicitation as well as the department's specifications, so that all parties clearly understand the department's needs. Also, a prebid conference may reveal any ambiguous or contradictory terms or requirements in the solicitation. If the solicitation needs to be modified, the department can issue an addendum.

**Bidding and award process.** The clauses in procurement packages should be self-explanatory and furnish adequate flexibility in purchasing the armor considered most appropriate for the department. Again, the *Personal Body Armor CPL* should be the main resource for departments. In the bid, the manufacturer should identify the specific model it proposes to provide. More-over, the final purchase agreement, if other than the bid solicitation package, must specify the model selected.

**Invoicing and delivery.** This section of the package should propose a detailed delivery sched-ule and should specify departmental invoicing and payment regulations and procedures.

**Warranty and insurance.** These clauses clarify the warranty on the purchased units. Here the department must specify the amount of product liability insurance required based on its needs or on the options available from the manufacturer. Product liability insurance can be expensive; a department should consult with counsel about liability insurance's benefits to the department before including an insurance clause.

**Armor specifications.** This section is the focal point of a procurement program, because here the department delineates the protection performance it expects of the armor to be purchased as well as departmental preferences about design and configuration. (See appendix D.)

**Item A—Compliance with NIJ standards.** Citing the ballistic performance required by speci-fying the appropriate armor type, as defined by NIJ Standard–0101.04, or the stab-performance requirements of NIJ Standard–0115.00, is a mandatory component of the specifications section. This information ensures that the armor ordered provides a known performance level.

**Item B—Labeling.** The label included on the protective panel is another critical item, as it alerts the wearer to how limited the protection provided is. It also states that the individual unit complies with NIJ Standard–0101.04 or NIJ Standard–0115.00. If the unit does not perform as stated on the label, a department may have the right to legal recourse.

Inclusion of the manufacturer's model number on the protective panel label is also important because it is the primary means for verifying that the armor received is that ordered and that the compliance matches the armor type listed on the purchase order. In past cases reviewed by NLECTC, armor has been labeled differently (i.e., providing a lower level of protection than that ordered) than what the purchase agreement has specified.

A manufacturer or distributor may use catalog numbers or similar designations to further identi-fy the product if the armor is properly identified as a specific model in compliance with either NIJ Standard–0101.04 or NIJ Standard–0115.00. The catalog number must be separate from the model or style number. Meanwhile, the model number should be unique and the same as the model number tested by NLECTC.

Again, it is important that departments purchase only models that have been tested by NLECTC and found to comply with either NIJ Standard–0101.04 or NIJ Standard–0115.00. By doing so, if there ever is any question about an individual unit's configuration or construction, the armor

can be compared with the unit of that particular model that was originally tested by NLECTC, which NLECTC retains in archival storage.

**Item C—Configuration.** Specifying a particular configuration of protective panel in a particular carrier is essential if the department believes that only one type of configuration will meet the department's needs. A department that wants to explore its configuration options may not want to include such a statement.

Manufacturers sometimes use protective panels that were tested and found to comply with NIJ Standard–0101.04 or NIJ Standard–0115.00 in more than one configuration. For instance, a protective panel may have been tested in a configuration with an open, unprotected area on the side of the torso; an identical protective panel may also be manufactured with the sides extended to create an overlapping configuration. These two are considered to be the same model.

**Item D—Adjustment options.** This clause identifies design features that will make the armor more comfortable for the wearer. However, this clause may not apply to tactical armor or other armor configurations worn outside of clothing.

**Item E—"Riding up."** Wearing armor for long periods of time can cause the armor to move up on the wearer's body, which decreases the officer's comfort. This clause applies only to concealable armor and may not be necessary if the adjustments in Item D are completed.

**Item F—Metals.** Departments should carefully evaluate purchasing armor that includes any metal components, as the wearer may be injured if a bullet strikes the metal part and ricochets, or if a piece of the metal component breaks off and becomes a secondary projectile.

**Item G—Color.** To ensure that the armor is properly concealed, it is important for departments to choose a color that will not be visible through the wearer's uniform.

**Item H—Quality.** This clause ensures that the manufacturer will produce the armor using suitable materials and high workmanship quality.

Departments should not include any specifications that are unique to one manufacturer's product so as not to reduce their available options to a single model. Likewise, they should not try to dictate how the protective panel used in the armor is constructed. For instance, a department should never specify a specific fabric or weave for the ballistic- or stab-resistant material, nor should it specify the number of layers of material to be used. Doing so could restrict the bid to a single manufacturer, result in armor that does not meet the requirements of NIJ Standard–0101.04 or NIJ Standard–0115.00, or create conflicting requirements, in which case the manufacturer could be released from liability if the armor does not perform properly. In addition, departments should not name a maximum weight, which could mean that officers would not receive the needed ballistic- or stab-resistant protection because the required type of armor weighed more than the specified limit.

## SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

Departments should also include in the procurement specifications any features identified as essential in the needs assessment phase. For instance, some departments have required that armor be designed so that the front and back panels cannot be worn separately, to prevent officers from wearing only the front part of the armor. Other departments require that concealable armor be supplied with two carriers, so that one can be laundered while the other is in use. Regarding armor configuration, NIJ recommends that armor provide side protection for full torso coverage. Overlapping the front and back panels by at least 1 inch—preferably 2 inches—will accomplish this. NIJ suggests that when overlapping the two panels, the front panel should overlap the back panel to prevent a round from "skipping" between the two panels.

If the department wants each officer's armor to be custom fitted, the specifications section should include a clause to that effect, stating how and where fittings will take place. Also, labeling specifications should require that a space be included on the label where the name of the officer can be printed on the armor label by the purchasing agency.

A number of other items can be included in the procurement specifications, such as requiring that the armor use nonmetallic "D" rings or hook-and-pile fasteners, but NIJ does not recommend this practice. Items of personal preference are best addressed when departments are inspecting the manufacturers' samples and evaluating them for comfort. In addition, prospective buyers should remember that specifying a number of required design characteristics increases the chance that the armor will become a custom or nonstandard design, which could require additional testing to ensure compliance with NIJ standards.

**Items to be submitted with the bid.** This section—a listing of the required items to be included in the bid package—should be self-explanatory to bidders. Because each department is subject to a particular set of procurement regulations, additional clauses addressing these requirements will most likely be necessary.

**Termination of agreement.** A clause that specifies the conditions under which the department can terminate the contract must be included in any procurement documents. If a department is purchasing through a blanket agreement or term contract, it may want to include a "for the convenience of the department" 30-day, written-notice clause allowing the department to cancel the agreement if officers find the armor received to be unacceptable—even though in full compliance with the procurement specifications.

Another justifiable reason for breaking the contract is if the armor is not delivered according to the predetermined shipping schedule, in which case the department should be allowed to cancel the contract and begin legal proceedings for default. Receiving a substandard product should also justify canceling the contract. When listing the product specifications, a department must be sure to define the reasons why the product may be rejected and the contract terminated. For instance, poor workmanship is a legitimate cause for rejection, but may be difficult to objectively establish unless previously defined in the purchase agreement.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

## Protection/Testing Considerations

Although body armor for routine, full-time wear has been available for approximately 25 years, the state-of-the-art technology continues to change. For instance, manufacturers once used almost exclusively a single type of fabric in constructing concealable body armor. Today, at least five different types of fiber are used to manufacture ballistic-resistant fabric, each of which is available in a variety of woven and nonwoven fabrics and panels. The ballistic protection properties differ among materials and often two or more types of fabrics or composites are used in combination to manufacture a vest. Because of these complexities, a department should not attempt to dictate how the ballistic element will be constructed, such as by specifying the number or types of layers of ballistic material. Armor performance is the critical issue, not the manufacturer's construction of the armor.

Many of these concepts are also true for stab-resistant armor, which has emerged as a viable option for corrections officers over the past several years. Advances in materials technology has allowed body armor manufacturers to design stab-resistant vests that are considerably lighter, more flexible, and wearable than models previously available, which were extremely bulky and frequently contained layers of metal or chain-mail type material.

# 10. Maintaining Body Armor

The proper care of today's modern body armor requires taking precautions when cleaning the garment. Every model of armor that complies with NIJ standards has an instruction label indicating how to clean the components. Individuals should follow these instructions, making certain that anyone else who cares for the garment is also aware of the correct cleaning procedures.

The protective panels, or inserts, of body armor should be washed by hand with cold water, using a sponge or soft cloth and mild home laundry detergent. Most manufacturers strongly recommend that the protective panel never be submerged in water. Bleach (including nonchlorine or peroxide-based bleach) or starch, even when highly diluted, should not be used as these may reduce the garment's level of protection. If a model of armor has a removable carrier, it is possible that the carrier may be machine washable. However, it is imperative to follow the manufacturer's care instructions found on the protective panel and carrier labels.

Body armor panels or inserts are not to be machine washed or dried, either in the home or commercially. The fabric can be damaged by laundry equipment, ultimately affecting its performance. Commercial laundries also use commercial detergents, which are much harsher than home detergents, and pose another threat to maintaining the ballistic- or stab-resistant properties of the fabric. According to DuPont, perchlorethylene is the only drycleaning solvent found so far that does not significantly degrade the ballistic protection provided by current body armor.[21] However, to eliminate the possibility of an accident and avoid the variety of drycleaning solvents in use, drycleaning armor is not recommended.

Most modern body armor contains water-repellant treated or inherently water-repellant fabrics, making hand washing possible by preventing the water used to wash the vest from degrading the ballistic capabilities of the vest. However, rinsing thoroughly is still important to remove all traces of soap. Rinsing properly prohibits the accumulation of residual soap film, which can absorb water and reduce the protective properties of certain types of ballistic- or stab-resistant fabric.

Body armor fabric should never be dried outdoors, even in the shade, as ultraviolet light is known to cause degradation of certain types of ballistic fabric. Tests have demonstrated that ballistic efficiency is significantly and adversely affected by exposure to sunlight for extended periods of time.

Each time body armor is washed, it should be inspected for any signs of wear. If the protective materials are not covered with a permanent cover (which is highly uncommon for a typical modern vest), and it appears that the thread used to sew layers together is wearing badly or that the fabric is unraveling, the vest should be returned to the manufacturer for replacement. Officers should never attempt to repair armor themselves under any circumstances.

Today, most manufacturers market concealable body armor with the protective panel sealed within a moisture barrier, such as thin rip-stop nylon or coated cloth, instead of chemically

waterproofing the fabric. The owner of such armor must routinely inspect it to be sure that the cover of the protective inserts has not been cut or damaged, which would allow moisture to penetrate the protective panel. Even if the outer covers have not been cut or otherwise damaged, the moisture barrier can still be damaged. When the protective material or the outershell carrier rubs over the protective panel cover as a result of the normal flexing that occurs when body armor is in use, it can wear through the cover and expose the armor to moisture penetration. It should also be noted that certain types of covering materials tend to make the armor much warmer to wear, because it significantly reduces the rate at which perspiration can evaporate or be absorbed.

The exceptional ballistic- and stab-resistant efficiency of materials used to construct body armor compensates for any of these limitations associated with maintenance and care. The user can easily care for and properly maintain body armor and ensure that it provides its rated protection throughout its service life.

When caring for hard armor, it is important to remember that hard body armor, particularly ceramic material, must be handled carefully because it is fragile. Ceramic materials—such as boron carbide, aluminum oxide, or silicon carbide—are extremely brittle. Such armor should not be dropped on hard surfaces and when used, the ceramic must serve as the striking (exterior) surface. It should also be inspected before each use to ensure that no surface cracks are present that would degrade ballistic performance.

## Body Armor Life Expectancy

One of the most frequently asked questions the National Law Enforcement and Corrections Technology Center (NLECTC) receives is, "How long does body armor last?" Unfortunately, no definitive answer can be given to this question. Every piece of armor will eventually have to be replaced. Body armor is not a one-time buy. For example, if a department changes its service weapons or ammunition, the armor worn by its officers must be shown to protect against the new weapons systems. The armor must be capable of defeating typical ammunition threats that the officers may face (see chapter 6). If an agency determines that the ammunition threats that they face have increased, upgrading to a higher level of protection may be appropriate. An individual's body weight may change over time, and armor that no longer fits or is uncomfortable is likely not to be worn.

Since no two pieces of armor are exposed to identical wear or care, each must be evaluated individually. Armor can generally be classified according to its appearance: "New," "Good," "Fair," or "Poor." Currently, the only method to evaluate armor's performance is destructive ballistic testing. The National Institute of Justice (NIJ), through its NLECTC system, is investigating development of alternative methods to evaluate body armor's ongoing performance and lifespan. The first step in this process is the introduction of the Baseline Ballistic Limit Test in NIJ Standard–0101.04. See page 41 for further discussion of this test.

Age alone does not cause body armor's ballistic resistance to deteriorate. The care and mainte-nance of a garment—or the lack thereof—have been shown to have a greater impact than age on the length of service life of a unit of body armor. Armor that is 10 years old and has never been issued may be perfectly acceptable for use, provided that the rated level of protection is still appropriate for the typical threats faced. Conversely, 2- or 3-year-old armor that has been worn regularly and improperly cared for may not be serviceable.

Limited studies of the ballistic-resistant capabilities of armor used for extended periods of time were initiated in 1983 by DuPont, at which time some of the armor tested had been in service for more than 8 years. Both the DuPont testing and a 1986 study by NIJ[22] *(Ballistic Tests of Used Body Armor)* found that age alone does not degrade the ballistic properties of armor. Armor manufactured in 1975 that remained in inventory without issue exhibited ballistic-resistant prop-erties identical to those at the time of manufacture. Both research studies included armor that had been in use for as long as 10 years and that had ballistic properties that were indistinguish-able from those of unused armor manufactured at the same time.

NIJ tests failed to demonstrate any significant differences in 10-year-old armor, regardless of the extent of use or apparent physical condition. For this testing, 24 Type I vests made of Kevlar®, issued as part of the original NIJ demonstration project in 1975, were returned by the departments. The vests were separated into categories based on use and wear. Eight vests had never been worn, another eight showed signs of heavy wear, and four showed signs of moderate or light wear. The test demonstrated that the armor that had been used showed no significant loss of ballistic performance when compared to the units that were not used.

In contrast, data from the DuPont study showed that used vests had lesser ballistic performance than new vests. Some vests with marginal performance had been in use for only 3 to 5 years. DuPont researchers concluded that, regardless of age, use and abuse can cause ballistic decay. For example, one poorly performing 3-year-old vest appeared to have been exposed to excessive ultraviolet radiation.

DuPont suggests that testing be considered at between 3 and 5 years of use,[23] but NIJ believes that tests are not necessary until the armor has been in service for 5 years. NIJ agrees, however, that armor should be visually inspected at least once a year and that ballistic tests should be conducted if the armor shows signs of excessive wear. If armor is worn only occasionally and properly maintained, there is no reason to be concerned that ballistic-resistant properties have deteriorated.

Independent of the above research studies, some departments have established formal replace-ment policies based solely on the length of time since the date of issuance. Some departments have selected 5 years for an automatic replacement cycle. Departments need to recognize that a replacement policy should be consistent with the way officers use their armor. If armor is worn only occasionally, such as tactical armor, the policy might be limited to purchasing armor for newly hired recruits and replacing a defined percentage to accommodate problems of fit or excessive wear and tear. However, a department with a high wear rate may wish to select a routine cycle, based on length of service.

Another issue relative to replacement guidelines is the manufacturer's warranty. Many body armor manufacturers currently offer a 5-year warranty on the products they sell to criminal justice agencies. This 5-year period is generally thought to be a reflection of the guidelines established by the early research conducted by DuPont. Recently, some manufacturers have offered warranties as long as for 12 years after purchase. It is important for agencies to recognize that a manufacturer's warranty should not be interpreted as a benchmark for service life. The warranty exists solely to limit the manufacturer's liability on the product and is not a reflection of the anticipated service life of the product.

For example, most new cars come with some type of manufacturer's warranty, such as 3 years or 36,000 miles, whichever comes first. The condition of each car sold under this warranty will vary due to any number of conditions (e.g., type/frequency of maintenance, variations in driving habits and conditions), but it is safe to say that the vast majority of these cars will still be operating at the end of this warranty period, and a significant number of these cars will offer many more miles of reliable service afterward. However, the manufacturer will no longer be responsible for any future major maintenance problems or cosmetic flaws. The same is true for protective armor. If the armor is properly cared for, shows no visible flaws or defects, still properly fits the officer, and still provides an adequate level of protection based upon a current assessment of the threats encountered, then it should be reasonable to presume that unit of armor is still serviceable. However, the manufacturer will not be held liable for any claims of inadequate performance after the expiration of the warranty period. For agencies that determine that it is not feasible to replace armor in accordance with a manufacturer's warranty cycle, the continued use of serviceable units of armor is definitely better than the alternative—to not wear the armor and have no protection. In this case, however, it is advisable for the agency to consult its liability insurance carrier to determine the implications this may have for its respective policy.

## Testing Used Ballistic-Resistant Body Armor by Departments

It appears that until further studies are conducted and nondestructive test methods developed, a department has little choice but to periodically conduct ballistic tests of representative samples of its armor. If it can afford to, a department should initiate test programs to evaluate the ballistic-resistant protection provided by existing armor—particularly if it has armor that is more than 5 years old. The department should consider replacement if the ballistic properties of armor are questionable.

As discussed in more detail in chapter 6, the Office of Law Enforcement Standards (OLES) has developed a performance assurance program to help determine the ongoing performance of body armor currently in service or a new production unit of a previously tested and approved model. The Baseline Ballistic Limit test establishes a benchmark of penetration performance and provides a reliable and consistent way to retest NIJ-compliant armor. The ballistic limit test does not have a pass or fail performance requirement, but provides additional information about the ballistic performance of a given armor model. The ballistic limit testing is done after the armor model has successfully passed the traditional penetration and backface signature testing.

The performance assurance program is based on a modified form of ballistic limit testing, commonly known as $V_{50}$. (See the discussion of $V_{50}$ testing in chapter 6, page 40.)

As a guideline, an agency should test extensively only when purchasing a significant quantity of armor. Armor testing is expensive, and departments must plan their actions based on their circumstances. For example, a department could probably buy at least four new sets of armor, depending on the threat level, for the cost of one NIJ test.

A department that elects to implement an armor-testing program for used or inservice armor must clearly establish the testing objective. Generally, this objective is to satisfy the department that its armor still provides as consistent a level of protection as when originally purchased. In these cases, the ballistic limit determination test outlined in sections 5.17 through 5.21 of NIJ Standard–0101.04 provides an abbreviated methodology for performing these tests.

An agency considering performing the ballistic limit determination test in accordance with NIJ Standard–0101.04 should initially select a sample of armor for testing that shows the heaviest signs of wear and use. This should be done for two reasons. First, it represents the "worst-case" scenario for testing, and second, it is the most logical unit of armor to be replaced, since the testing is destructive and the sample cannot be reissued after the test is completed. It is also highly recommended that the test be performed by a qualified independent testing laboratory, preferably one that is NIJ/NLECTC approved to perform compliance tests in accordance with NIJ Standard-0101.04. (A list of approved laboratories can be obtained by calling NLECTC at 800–248–2742, or from NLECTC's Internet site, JUSTNET, at http://www.justnet.org.) It is important to note that these test procedures are only applicable to models of armor that comply with NIJ Standard-0101.04. A vest that complies with a previous edition of the standard cannot be tested in this manner, as no baseline ballistic limit data exists for these models.

If armor passes the test, there should be no cause for concern. If the armor fails the test, the department should not automatically assume that all of the vests of that particular model owned by the department are unsafe. Rather, this suggests that these particular used vests have questionable protection capabilities. The agency may want to consider conducting additional testing of other units of this model from the same material production lot number, which should be indicated on the ballistic panel label. This testing will help determine if the failure was an isolated one or is representative of the entire purchase lot. If further testing results in additional failures, all vests from that lot of material should be replaced. Also, agencies that experience retest failures should contact NLECTC at 800–248–2742 and arrange to have their vests compared to the originally tested vests stored in NLECTC's archives. On several occasions, vests that have failed an agency's retesting have been found to differ in construction from the vest originally tested by the manufacturer as part of NIJ's voluntary compliance testing program.

When a unit of armor fails testing, the department will probably consider seeking redress from the manufacturer. Before taking such action, departments should do the following:

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

- Ensure that the vests were originally tested to an NIJ standard (and to which version of the NIJ standard) before testing samples to that standard's requirements. A manufacturer can be held responsible only for the terms of the contract it signed and the standards and specifications in that contract. Unless the department's purchase contract clearly addresses testing armor in service, lists the tests that will be conducted, and specifies the department's recourse should armor fail tests, NIJ recommends that the department carefully study its situation before proceeding.

- Have the legal adviser examine the contract and any statement on the armor label to determine whether grounds for legal action exist.

If the department decides to go forward with testing, it should contact the manufacturer. Establish in advance testing objectives, action to be taken based on the test results, and the manufacturer's position concerning the nature of tests to be performed. The manufacturer should have the right to be present during the testing. Given the opportunity to work with a department to determine a mutually satisfactory course of action, reputable manufacturers will normally cooperate. Conversely, a manufacturer suddenly confronted with allegations of a problem with its product without prior indication of the department's planned actions can be expected to become defensive, if not adversarial. Also, a manufacturer may have a legitimate complaint if its product's performance is questioned based on incorrect or improper test results. Even worse, if officers know of questionable data, they may lose confidence in their armor and stop wearing it.

A department that wants to conduct its own testing must, at a minimum, have a reliable chronograph and properly conditioned backing material. The use of alternate backing material (phone books, newspapers), and of commercially loaded ammunition of unknown velocity, is certain to provide inconsistent test data that cannot be correlated to testing conducted through NLECTC's voluntary compliance-testing program.

Departments that cannot afford to conduct ballistic testing at independent laboratories should at least follow these NIJ-recommended procedures:

- Inspect each unit of armor carefully upon purchase and prior to issue. Any evidence of poor workmanship or visible differences from samples shown before purchase should be brought to the manufacturer's attention immediately.

- Ensure that each unit of armor is properly and durably labeled in accordance with the requirements of the NIJ standard. Each ballistic panel should be clearly labeled with the NIJ-complying model designation as it appears in the *Personal Body Armor Consumer Product List.*

- Upon issue, the quartermaster or supervisor responsible for issuing the equipment should use a permanent marker to legibly enter on the label the name of the officer to whom the armor is issued and the date of issue. If possible, photocopies of these labels should be made and placed in a designated file.

- Institute a routine inspection program for body armor, just as a department would with vehicles or firearms. Develop a written policy on the frequency and extent of these inspections. At a minimum, inspect armor annually in conjunction with firearms training and qualification. The sample form in this manual (appendix E) can be used for this purpose. The International Association of Chiefs of Police (IACP) has prepared a model policy for the use of police body armor, and copies can be obtained from the association. Information on contacting IACP can be found in the resource list in appendix A.

- Instruct personnel to report any defects or damage to the body armor immediately. The quartermaster or supervisor should take immediate action to replace any body armor found to be unserviceable. NIJ does not recommend that the agency or anyone else other than the manufacturer attempt to repair damaged body armor.

- Develop written policies regarding guidelines for armor's replacement. A department must thoroughly assess its needs and requirements before instituting such a policy.

When concealable body armor was first introduced, the limits of deformation to evaluate blunt trauma protection had not yet been established. Sufficient historical data were not yet available to establish a reasonable service life for armor to provide the rated level of ballistic protection. The performance requirements for deformation were first established in 1978, when the NIJ standard was first revised. Consequently, armor purchased prior to 1978 was not tested for compliance with the current deformation requirement.

Similarly, body armor manufactured prior to 1985, when the NIJ standard was revised for the second time, was not tested for penetration resistance when struck at an angle. From 1985 to April 1987, manufacturers had their armor tested for compliance with the requirements of NIJ Standard–0101.02. Unfortunately, testing occurred prior to NLECTC's establishment and the testing program was administered differently; testing records are incomplete; and the samples tested were not retained in archival storage. Consequently, NLECTC cannot validate the results of testing done in accordance with NIJ Standard–0101.02. Should the manufacturer certification of compliance to NIJ Standard–0101.02 come into question, NLECTC cannot verify that a given armor model was in compliance with the standard or that it is identical to the armor tested.

Thus, any department with armor in its inventory that was purchased prior to the issuance of NIJ Standard–0101.03 in April 1987 might wonder whether that armor is suitable for current use or if it should be replaced. If the armor issued to officers was not tested to determine if it complies with NIJ Standard–0101.03, even if its rated level of protection (armor type) is consistent with current needs, it would be advisable to verify its performance. The only way to ensure that armor purchased to a prior edition of the NIJ standard conforms to the current requirements of NIJ standards is to test the armor. The names of NLECTC-approved independent testing laboratories (and the individuals to contact to arrange such tests) are available from NLECTC.

# 11. Administrative Considerations

## Training and Education

Departments need to train their officers on the proper care and use of body armor and increase routine wearing of it. To encourage use, departments must educate their officers on the benefits of wearing armor. Possible approaches are discussed below. Citing the statistical information provided throughout this document can also help.

Some departments mandate that officers must wear armor at all times while on duty. When these orders are properly enforced, officers usually wear their armor. However, officers sometimes ignore these orders and relegate their armor to their locker or patrol vehicle's trunk.

Some departments find they can increase the routine use of body armor by taking advantage of the controlled setting of the police academy. These departments issue body armor to all recruits when they report to the academy and require them to wear it throughout the training period. While no firm statistics are available, it appears that such action promotes the routine use of body armor by recruits when they are assigned to duty.

Another approach is to obtain an officer's commitment to wear the armor routinely for a period of at least 1 month. Generally, the officer realizes that the armor is not as uncomfortable as expected and continues to wear the armor thereafter. While the National Institute of Justice (NIJ) is not aware of documented studies, a consensus seems to exist among most officers that the armor "softens" after a short period of wear and becomes more pliable and comfortable.

It is essential that an officer understand that there is no such thing as bulletproof armor. While wearing armor routinely can be reassuring to an officer, the officer must keep in mind that the armor was selected on the basis of limited threat protection. Additional protection, including ballistic helmets, should be worn when an officer may be exposed to a weapon threat greater than the protection provided by normal armor.

When armor is issued, departments must ensure that each officer knows the level of protection provided by the armor relative to various weapons threats. Officers also must know that body armor may not be completely effective against attack by a knife or other sharp instrument, such as an ice pick. It may not protect against bullets from high-powered rifles. The department should make clear the level of protection offered.

Any training program should emphasize the importance of using good judgment. Departments should require their officers to read the Federal Bureau of Investigation (FBI) Uniform Crime Reports publication, *Law Enforcement Officers Killed and Assaulted.* The incidents described in that report each year reinforce the importance of routine use of body armor to protect against unexpected assaults. The report encourages officers to recognize that seemingly routine assignments can end in armed confrontation.

## Issuing Body Armor

Although body armor has been used for more than two decades, it is still a relatively new technology when compared to other types of police equipment. Much remains to be learned concerning its service life, and efforts continue to devise nondestructive methods of assessing the ballistic efficiency of armor that has been worn extensively.

When issuing body armor, a department's first obligation is to ensure that armor fits the officer it is issued to, for fit determines whether it will be comfortable and, to a large extent, whether it will be worn. Armor can be special ordered or tailored for those officers with unique body dimensions.

Maintaining accurate property records for all armor in inventory is essential. At any time, a department should be able to determine which armor was issued to each officer and the issue date, along with the name of the manufacturer, model number, armor type, and production lot number. The NIJ standard requires that body armor labels include a blank line for the date of issuance. The date should be entered with a permanent marking pen or stamp.

Proper records will be invaluable if a production lot is found to be defective after issuance. If a set of armor is found to be flawed, the department should inspect all armor from the same production lot, for the entire lot may be defective. Also, if armor is purchased from several manufacturers, departments can compare officer satisfaction and user experience for the different products. Good records also can assist in planning for the purchase of both new and replacement body armor.

Body armor will be frequently returned to inventory, often as the result of an officer retiring or accepting other employment. Armor may sometimes be removed from service because it no longer fits the individual to whom it was originally issued. Unless the armor shows signs of abuse, it may be reissued to another officer. NIJ strongly recommends that any unit of armor be carefully inspected prior to reissue. In one instance, an officer's life was spared only days after acquiring armor. The armor had been purchased privately by another officer who sold it upon leaving the department. The officer whose life was saved was its fifth owner.

In addition to reissuing armor to full-time police, a number of departments issue used armor that has been returned to inventory to members of their volunteer corps. Any department that has used but serviceable armor in its inventory should try to issue it to someone who will wear it.

## Donating Serviceable Used Armor

Departments that buy armor in large quantities—and that may have routine, scheduled replacement policies regardless of the armor's condition—may want to consider donating armor in good condition to smaller agencies with limited budgets. However, a department should first check with its legal adviser or insurance carrier to determine if this would be permitted under

the department's liability insurance and what waivers the recipient department would be required to sign.

## Disposing of Body Armor

When body armor is no longer serviceable, the department must dispose of it in a manner that will prevent illicit use. The majority of materials used in manufacturing body armor are either fire retardant or inherently fireproof, so incineration is not recommended. Cutting or shredding is, at best, a difficult and time-consuming process. Disposal in a public landfill is not recommended, because of both the potential for unauthorized parties to obtain the garments and the environmental concerns caused by disposing materials that may not be readily biodegradable.

Certain material manufacturers have an ongoing recycling program where out-of-service armor panels are destroyed by chopping the fabric into very small fragments and reusing the pulverized material in other nonballistic industrial applications. See the resource list in appendix A for contact information.

One possible option involves using the vests in the door panels of cruisers, behind desks and partitions in police station work areas, or as backstop material at indoor firing ranges. Trauma plates or hard armor inserts are not recommended for these applications due to potential rico-chet hazards. If retired concealable armor is used for these applications, the department should remove ballistic materials from the vehicle or equipment before selling or disposing of it. Another option may be to discuss a possible trade-in of old vests when making a new purchase.

## Liability

All administrators are painfully aware of the frequent lawsuits filed against police departments. Body armor liability centers on the protection that ballistic-resistant body armor does or does not provide.

In one incident, an officer wearing a vest was killed from an ambush with a high-powered rifle. The survivors' suit alleged that the officer did not know that the armor, intended to protect against handguns only, was incapable of protecting against a bullet from a high-powered rifle.

One individual made the fatal mistake of participating in a live demonstration of body armor involving a knife. The individual encouraged an "assailant" to attack with a knife and subsequently died from wounds received when the knife penetrated the armor. The distributor had covered the armor manufacturer's label with a second label, which stated that the armor would protect against lesser threats than the rated threat level. This resulted in a major lawsuit for compensation against several parties based on the mistaken assumption that a knife is a lesser threat than the ballistic threat specified on the armor label.

NIJ Standard–0101.04 defines levels of ballistic protection only. A knife is not a ballistic threat, and when considered in the context of the level of protection provided by ballistic-resistant body armor, it is not a lesser threat—it is an entirely different type of threat. To be considered stab or puncture resistant, body armor must be tested under NIJ's Standard–0115.00 for stab-resistant body armor.

Because of incidents such as those described above, the NIJ standard for ballistic-resistant body armor requires that the manufacturer clearly label the level of ballistic protection that the armor is capable of providing in accordance with the types classified in the standard. In addition, the standard requires that the labels on Type I through Type III-A armor include a warning notice that the armor is not intended to protect the wearer against rifle fire and, if appropriate, that the armor is not intended to protect the wearer from sharp-edged or pointed instruments. All administrators should insist on full compliance with the labeling requirements of the standard.

## When an Officer Is Shot

Although there may be no obvious sign of injury, any officer shot while wearing body armor should receive prompt medical attention. The medical staff at the R. Adams Cowley Shock Trauma Center, University of Maryland Medical System, Baltimore, states the following:

> Officers and police administrators must be aware of the possibility of blunt trauma injury sustained behind body armor that has stopped a ballistic threat (i.e., not been penetrated). Any officer who has had their body armor impacted by a ballistic threat should receive a medical evaluation as soon as possible. Even though the officer shows no after effects other than soreness or a bruise, the possibility of serious internal injury still exists. A prompt medical evaluation will allow for an assessment of occult serious injury.

Before the officer returns to duty, the lifesaving armor must be replaced with a new set. Retire the armor to a trophy case to advertise gratefully the protection that it afforded. An officer once protected will undoubtedly wear body armor routinely.

Contact the International Association of Chiefs of Police/DuPont Kevlar Survivors' Club® (see appendix A) and inform them of the incident. By sharing this information as part of the Survivors' Club's educational efforts, other officers will be made aware of the benefits of wearing body armor on a routine basis. As a result, other lives may be saved.

# Epilogue

For more than 30 years, the National Institute of Justice (NIJ) has been committed to ensuring the safety of the Nation's law enforcement officers through its research efforts and voluntary compliance testing program for body armor. The 2,500 lives that have been spared as a result of the use of body armor bears testament to the fact that, as the National Law Enforcement and Corrections Technology Center system's motto states, "Technology Saves Lives."

The information presented in this guide emphasizes the importance of thorough planning at every step in the selection and procurement process. Police administrators and procurement officials need to be aware of the many pitfalls that can result from body armor that is either inadequate or excessive. Both cases can result in deadly consequences for the line officer. Ultimately, an agency's goal is to obtain armor that meets its needs and will be worn routinely by its officers. One thing is certain: **The only armor that is absolutely guaranteed to fail to protect the wearer is the armor that is not worn.**

Administrators should adopt policies to encourage the full-time use of body armor by field personnel. Field supervisors should set an example for officers under their command by always wearing their armor when on duty. All personnel should receive training regarding body armor's capabilities and limitations, as well as proper care methods. All armor should be routinely inspected and when it is determined that it no longer fits properly or is no longer serviceable, it should be replaced immediately.

By disseminating the information in the guide to the appropriate personnel, it is NIJ's goal to save even more lives and continue to build upon the success resulting from its body armor standards and testing program.

# Endnotes

1. Source is International Association of Chiefs of Police/DuPont Kevlar Survivors' Club®.

2. The National Institute of Justice is the successor to the Law Enforcement Assistance Administration (LEAA), National Institute of Law Enforcement and Criminal Justice (NILECJ).

3. Write to NLECTC, P.O. Box 1160, Rockville, MD 20849–1160, or call 800–248–2742 or 301–519–5060.

4. Source is National Law Enforcement Officers' Memorial Fund, Inc.

5. Dean, Bashford, *Helmets and Body Armor in Modern Warfare,* New Haven, CT: Yale University Press, 1920.

6. National Institute of Law Enforcement and Criminal Justice, *Ballistic Resistance of Police Body Armor, NILECJ–STD–0101.00,* Washington, D.C.: U.S. Department of Justice, National Institute of Law Enforcement and Criminal Justice, March 1972.

7. Chappell, Kevin, "A Death-Defying Business: Fashion and Fear Fuel Sales of Bulletproof Clothing," *U.S. News & World Report,* 123:6 (August 11, 1997):46–47.

8. Source is National Law Enforcement Officers' Memorial Fund, Inc.

9. Source is the Bureau of Justice Assistance, Public Safety Officers' Benefits Program.

10. Reaves, Brian A. and Andrew L. Goldberg, *Law Enforcement Management and Administrative Statistics, 1997: Data for Individual State and Local Agencies with 100 or More Officers,* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, April 1999, NCJ 171681.

11. Reaves, Brian A. and Pheny Z. Smith, *Law Enforcement Management and Administrative Statistics, 1993: Data for Individual State and Local Agencies with 100 or More Officers,* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, September 1995, NCJ 148825.

12. Reaves, Brian A., *Police Departments in Large Cities: 1987,* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1989, NCJ 119220.

13. National Institute of Law Enforcement and Criminal Justice, *Ballistic Resistance of Police Body Armor, NILECJ–STD–0101.01,* Washington, D.C.: U.S. Department of Justice, National Institute of Law Enforcement and Criminal Justice, December 1978.

14. National Institute of Justice, *Ballistic Resistance of Police Body Armor, NIJ Standard–0101.02,* Washington, D.C.: U.S. Department of Justice, National Institute of Justice, March 1985.

15. National Institute of Justice, *Ballistic Resistance of Police Body Armor, NIJ Standard–0101.03,* Washington, D.C.: U.S. Department of Justice, National Institute of Justice, April 1987.

16. National Institute of Justice, *Ballistic Resistance of Personal Body Armor, NIJ Standard–0101.04,* Washington, D.C.: U.S. Department of Justice, National Institute of Justice, September 2000, NCJ 183651.

17. National Institute of Justice, *Stab Resistance of Personal Body Armor, NIJ Standard–0115.00,* Washington, D.C.: U.S. Department of Justice, National Institute of Justice, October 2000, NCJ 183652.

18. Federal Bureau of Investigation, *Law Enforcement Officers Killed and Assaulted,* Uniform Crime Reports, Washington, D.C.: U.S. Department of Justice, FBI, Annual.

19. Bureau of Justice Statistics, *Correctional Populations in the United States,* 1997 (Executive Summary), Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, November 2000, NCJ 177614.

20. Bureau of Justice Statistics, *Census of State and Federal Correctional Facilities,* 1995, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, August 1997, NCJ 164266.

21. *Personal Body Armor Facts Book,* DuPont, June 1994.

22. Frank, Daniel E., *Ballistic Tests of Used Body Armor,* NBSIR–86–3444, National Bureau of Standards (U.S.), August 1986.

23. See note 21 above.

# Bibliography

*Body Armor Field Evaluation Test and Evaluation Plan.* Aerospace Report No. ATR–75 (7921)–1. June 1975.

Bureau of Justice Statistics. *Census of State and Federal Correctional Facilities, 1995.* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, August 1997. NCJ 164266.

Bureau of Justice Statistics. *Correctional Populations in the United States, 1997* (Executive Summary). Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, November 2000. NCJ 177614.

Carroll, A. and C. Soderstrom. "A New Nonpenetrating Ballistic Injury." *Annals of Surgery,* 188:6 (December 1978):753–757.

Chappell, Kevin. "A Death-Defying Business: Fashion and Fear Fuel Sales of Bulletproof Clothing." *U.S. News & World Report,* 123:6 (August 11, 1997):46–47.

Clare, V., J. Lewis, A. Mickiewicz, and L. Sturdivan. *Body Armor Blunt Trauma Data.* EB–SR–75016. Washington, D.C.: U.S. Department of Justice, May 1976.

Dean, Bashford. *Helmets and Body Armor in Modern Warfare.* New Haven, CT: Yale University Press, 1920.

*Equipment Technology Center Bulletins.* No. 76–9 and No. 79–3. International Association of Chiefs of Police, Gaithersburg, MD.

Estey, J. "2,000 Survivors' Club Hits." *The Police Chief,* May 1997.

Federal Bureau of Investigation. *Law Enforcement Officers Killed and Assaulted.* Uniform Crime Reports. Washington, D.C.: U.S. Department of Justice, FBI, Annual.

Frank, Daniel E. *Ballistic Tests of Used Body Armor,* NBSIR–86–3444, National Bureau of Standards (U.S.), August 1986.

Goldfarb, M., T. Ciurej, M. Wienstein, and L. Metker. *Body Armor Medical Assessment.* Washington, D.C.: U.S. Department of Justice, May 1976.

*Limited Production Purchase Description for Body Armor, Small Arms (Handgun) Protective, Undergarment.* MP–1, LP/P DES 1–78A. Natick, MA: U.S. Army Natick R&D Command, April 1978.

*Limited Production Purchase Description for Cloth, Ballistic, Aramid, Water Repellent Treated Kevlar®.* LP/P DES 32–75A. Natick, MA: U.S. Army Natick R&D Command, March 1978.

Metker, L., R. Prather, P. Coon, C. Swann, C. Hopkins, and W. Sacco. *A Method of Soft Body Armor Evaluation: Cardiac Testing.* Technical Report ARCSL–TR–78034. Aberdeen Proving Ground, MD: Chemical Systems Laboratory, U.S. Army Armament Research and Development Command, November 1978.

*Model Body Armor Procurement Package.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Technology Assessment Program, January 1990.

Montanarelli, N., C. Hawkins, and L. Shubin. *Lightweight Body Armor for Law Enforcement Officers.* EB–SR–75001. Washington, D.C.: U.S. Department of Justice, March 1975.

National Institute of Justice. *Ballistic Resistance of Police Body Armor, NIJ Standard–0101.02.* Washington, D.C.: U.S. Department of Justice, National Institute of Justice, March 1985.

National Institute of Justice. *Ballistic Resistance of Police Body Armor, NIJ Standard–0101.03.* Washington, D.C.: U.S. Department of Justice, National Institute of Justice, April 1987.

National Institute of Justice. *Ballistic Resistance of Personal Body Armor, NIJ Standard– 0101.04.* Washington, D.C.: U.S. Department of Justice, National Institute of Justice, September 2000. NCJ 183651.

National Institute of Justice. *Stab Resistance of Personal Body Armor, NIJ Standard–0115.00.* Washington, D.C.: U.S. Department of Justice, National Institute of Justice, October 2000. NCJ 183652.

National Institute of Law Enforcement and Criminal Justice. *Ballistic Resistance of Police Body Armor, NILECJ–STD–0101.00.* Washington, D.C.: U.S. Department of Justice, National Institute of Law Enforcement and Criminal Justice, March 1972.

National Institute of Law Enforcement and Criminal Justice. *Ballistic Resistance of Police Body Armor, NILECJ–STD–0101.01.* Washington, D.C.: U.S. Department of Justice, National Institute of Law Enforcement and Criminal Justice, December 1978.

*NIJ's New Body Armor Initiative.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Technology Assessment Program, November 1993.

*Personal Body Armor Facts Book,* DuPont, June 1994.

*Police Body Armor Testing and Summary of Performance Testing Data.* Gaithersburg, MD: International Association of Chiefs of Police, December 1978.

Prather, R., C. Swann, and C. Hawkins. *Backface Signature of Soft Body Armors and the Associated Trauma Effects.* Technical Report No. ARCSL–TR–77–55. Aberdeen Proving Ground, MD: U.S. Army Armament Research and Development Command, November 1977.

*Protective Armor Development Program. Vol. I: Executive Summary.* Aerospace Reports No. ATR–75(7905)–1. Vol. II: Technical Discussion. No. ATR–75(7906)-1. Vol. III: Appendices. No. ATR–75(7906)–1, December 1974.

*Purchase Description for Jacket, Raid, Small Arms (Handgun) Protective, D–1.* Natick, MA: U.S. Army Natick R&D Command, August 1978.

Reaves, Brian A. *Police Departments in Large Cities: 1987.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1989, NCJ 119220.

Reaves, Brian A. and Andrew L. Goldberg. *Law Enforcement Management and Administrative Statistics, 1997: Data for Individual State and Local Agencies With 100 or More Officers.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, April 1999, NCJ 171681.

Reaves, Brian A. and Pheny Z. Smith. *Law Enforcement Management and Administrative Statistics, 1993: Data for Individual State and Local Agencies With 100 or More Officers.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, September 1995, NCJ 148825.

Rodzen, R., C. Ogden, F. Scribano, M. Burns, and E. Barron. *Design, Development and Fabrication of Full Scale Anatomical Load Distribution Analyzer.* Technical Report No. 73–18–CE. Natick, MA: U.S. Army Natick Development Center, November 1972.

Soderstrom, C., A. Carroll, and L. Shubin. *The Medical Assessment of a New Soft Body Armor.* Technical Report ARCSL–TR–77–57. Aberdeen Proving Ground, MD: Chemical Systems Laboratory, U.S. Army Armament Research and Development Command, January 1978.

$V_{50}$ *Testing.* Technical Brief. Washington, DC: U.S. Department of Justice, Office of Justice Programs, National Law Enforcement and Corrections Technology Center–Rocky Mountain, July 1997.

# Appendix A. Resource List

*The products, manufacturers, and organizations discussed in this publication are presented for informational purposes only and do not constitute product approval or endorsement by the National Institute of Justice, U.S. Department of Justice; National Institute of Standards and Technology, U.S. Department of Commerce; or Aspen Systems Corporation.*

For further information on the topics, organizations, and products discussed in this publication, please contact the following:

**Bulletproof Vest Partnership Grant Act (BVPGA) Program**
Bureau of Justice Assistance
810 Seventh Street N.W.
Washington, DC 20531
Tel: 877–75–VESTS (877–758–3787)
Internet: http://vests.ojp.gov
*Helps States, local governments, and tribal governments equip their law enforcement officers with armor vests.*

**Concerns of Police Survivors, Inc. (C.O.P.S.)**
P.O. Box 3199
South Highway 5
Camdenton, MO 65020
Tel: 800–784–2677
Fax: 573–346–1414
Internet: http://www.nationalcops.org
E-mail: cops@nationalcops.org
*Concerns of Police Survivors, Inc. provides resources to assist in rebuilding the lives of surviving family members of law enforcement officers killed in the line of duty, as determined by Federal criteria. Furthermore, COPS provides training to law enforcement agencies on survivor victimization issues and educates the public about the need to support the law enforcement profession and its survivors.*

**DSM High Performance Fibers, BV**
Eisterweg 3
6422 PN Heerlen, the Netherlands
Tel: 31–45–5436767
Fax: 31–45–5426538
*Manufacturers of Dyneema®.*

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

**DuPont Advanced Fibers Systems**
Spruance Plant
P.O. Box 27001
Richmond, VA 23261
Tel: 800–453–8527
Fax: 804–383–4120
Internet: http://www.dupont.com/afs
*Manufacturer of Kevlar® products.*

**Federal Bureau of Investigation (FBI)**
**Uniform Crime Reports (UCR)**
Criminal Justice Information Service Division
Program Support
1000 Custer Hollow Road
Clarksburg, WV 26306
Tel: 304–625–4995
Internet: http://www.fbi.gov/urc/ucp.htm
*Statistics on law enforcement officers killed and assaulted.*

**Honeywell**
Spectra Performance Materials
P.O. Box 31
Petersburg, VA 23804
Tel: 800–695–5969
Fax: 804–520–3388
Internet: http://www.honeywell.com
*Manufacturer of SPECTRA fibers.*

**International Association of Chiefs of Police (IACP)**
515 North Washington Street
Alexandria, VA 22314–2357
Tel: 800–843–4227
Fax: 703–836–4543
Internet: http://www.theiacp.org
*Model policies available from IACP on a wide range of law enforcement issues, including body armor.*

**IACP/DuPont**
**Kevlar Survivors' Club®**
5401 Jefferson Davis Highway
Richmond, VA 23234
Tel: 800–441–2746 or 804–383–3853
Fax: 804–383–2477
Contact: Ron McBride, Law Enforcement Consultant, or Anna Knight, Club Administrator
*Maintains the latest statistics on body armor "saves."*

**National Fraternal Order of Police (FOP)**
1410 Donelson Pike, #A17
Nashville, TN 37217
Tel: 615–399–0900
Fax: 615–399–0400
Internet: http://www.grandlodgefop.org
E-mail: glfop@grandlodgefop.org
*The FOP supports the routine use of body armor by all of its members.*

**National Law Enforcement Officers Memorial Fund, Inc.**
605 E Street N.W.
Washington, DC 20004
Tel: 202–737–3400
Fax: 202–737–3405
Internet: http://www.nleomf.com
E-mail: nleomcwf@erols.com
Contact: Craig W. Floyd
*Honors all law enforcement officers killed in the line of duty.*

**National Rifle Association (NRA)**
Law Enforcement Activities Division
11250 Waples Mill Road
Fairfax, VA 22030–9400
Tel: 703–267–1640
Internet: http://www.nrahq.org/safety/law/lebenefits.asp
Contact: Marion Mayer
*Through the NRA, selected body armor manufacturers offer discounts on their products to law enforcement officers who are NRA members.*

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

**The National "WE CARE" Foundation**
P.O. Box 117617
Carrollton, TX 75011–7617
Tel: 972–492–4189
E-mail: wecare1@airmail.net
*A nonprofit organization established in 1990 by the Law Enforcement Television Network (LETN) to assist police officers who are required to purchase their own body armor, but cannot afford to do so. Funds for the program are generated through the use of the Law Enforcement Visa card. A donation is made to the program every time a cardholder makes a purchase with this card. Random drawings are held to determine the recipients of the vests.*

**Public Safety Officers' Benefits (PSOB) Program**
Bureau of Justice Assistance
810 Seventh Street N.W.
Washington, DC 20531
Tel: 888–744–6513 or 202–307–0635
Fax: 202–307–3373
Internet: http://www.ojp.usdoj.gov/BJA/html/specprog.htm
*The PSOB program provides financial benefits for survivors of officers killed in the line of duty and for officers permanently and totally disabled in the line of duty.*

**Twaron Products**
801-F Blacklawn Road
Conyers, GA 30207
Tel: 800–451–6586
Fax: 770–929–8138
Internet: http://www.twaronproducts.com
*Manufacturer of Twaron®.*

# Appendix B. 25 Questions and Answers About Personal Body Armor

*The National Law Enforcement and Corrections Technology Center–National (NLECTC– National), located in Rockville, Maryland, administers the National Institute of Justice's (NIJ's) voluntary compliance testing programs for personal body armor. In addition to processing samples received for testing, NLECTC–National staff routinely respond to inquiries received from law enforcement, corrections, other criminal justice agencies, and product manufacturers about the testing program. The 25 most frequently asked questions regarding the body armor testing programs and their corresponding answers that follow are provided as part of NLECTC–National's commitment to provide timely and accurate information to the user community. If you have a question that is not found in this document, please contact NLECTC– National by telephone at 800–248–2742 or 301–519–5060, by fax at 301–519–5149, or by e-mail at asknlectc@nlectc.org.*

**Q: We're going to purchase body armor in the near future. Do you have any advice or suggestions?**

A: *Selection and Application Guide to Personal Body Armor, NIJ Guide 100–01,* contains important information to assist agencies and individual officers in selecting, purchasing, and caring for body armor. Recently, NIJ has introduced two new body armor standards (one for ballistics and one for stab and puncture resistance). To obtain a copy of the most current version, call NLECTC at 800–248–2742 or 301–519–5060, or download a copy from http://www.justnet.org.

Also, funds are available through the Bulletproof Vest Partnership Grant Act (BVPGA), administered by the Bureau of Justice Assistance (BJA), to assist law enforcement and corrections agencies with the purchase of ballistic- and stab-resistant armor. The BVPGA will provide funds to pay for up to half of the purchase price of armor models found to comply with NIJ standards. For more information on how to apply for these funds, visit the BVPGA World Wide Web site at http://vests.ojp.gov.

**Q: How does ballistic-resistant body armor work?**

A: When a bullet strikes a body armor panel, the fibers absorb and disperse the energy of the impact across a generalized area. Most concealable body armor is made of a number of layers; these layers assist in the energy dispersion process and help to reduce the effects of blunt trauma, caused by the force of the impacting projectile.

**Q: How does stab- and puncture-resistant body armor work?**

A: Stab- and puncture-resistant armors are made from a variety of materials. The most commonly used materials are made from extremely strong fibers, which can either be woven or laminated together. Other materials used are metals and composites. As the threat impacts the armor, the materials either deflect the threat, or due to their very high level of cut and/or tear resistance, they "stretch" and the impact forces are dissipated over a larger area of the armor.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

**Q: Is ballistic-resistant armor also stab/puncture resistant (or vice versa)?**

A: The materials technology that makes body armor ballistically resistant does not necessarily make it stab or puncture resistant (and vice versa). The IACP/DuPont KEVLAR Survivors Club® has documented a number of incidents over the years in which ballistic-resistant armor has provided some protection against attacks from a variety of sharp-edged and other weapons (e.g, clubs.). However, one should not presume that a ballistic-resistant vest will protect against nonballistic threats, or that a stab-resistant vest provides ballistic protection. Armor that complies with NIJ standards will clearly identify the types and level of threats that they are designed to protect against.

**Q: What types of ballistic-resistant materials are used to make body armor?**

A: Body armor can be made from a number of different types of woven or nonwoven materials. One of the first fibers used for modern ballistic-resistant material was Kevlar®, which is made by DuPont. Other materials include Spectra®, which is made by Honeywell (formerly AlliedSignal); Twaron®, made by Accordis (formerly Akzo Nobel), and Zylon®, made by Toyobo. These materials are manufactured in a variety of styles, and can be woven or nonwoven (laminated). Hard (nonfabric) armor plates can be made from a number of materials, including metals, ceramics, and other composite materials.

**Q: Which ballistic- or stab-resistant material is better?**

A: The NIJ standards for personal body armor (ballistic and stab/puncture resistant) establish minimum performance requirements to evaluate specific designs or "models" of armor. The standard is not intended to be a design specification, which would require manufacturers to use a specific type of material and/or design pattern to achieve a required level of protection. Instead, by measuring only the performance capabilities of the model, this allows armor manufacturers the ability to innovate by using any type or combination of types of materials, as well as design methods, to achieve the required level of protection.

**Q: What new technologies have been developed for body armor?**

A: Over the past 20 years, new materials and fabrics have been introduced that have contributed significantly to the wearability of body armor. Body armor manufacturers also have made a number of advances in design technology, resulting in body armor that has increased ballistic protection capabilities, more flexibility, less weight, and is ultimately more comfortable. New materials also have been developed that provide protection against sharp-edged and pointed weapons.

**Q: Is there a difference between male and female models of armor?**

A: Generally speaking, the difference between male and female models is that for female body armor, most manufacturers cut and stitch the material to create bust cups. This is why the NIJ standard views male and female vests as separate models, even though they may be made of exactly the same type and sequence of layers of ballistic materials. When a female model is tested, the laboratory is instructed to locate the seam that is created by folding and/or stitching

the material to make the bust cup, and to place one of the shots on that seam. This is done to ensure the weakest point of the vest (typically a seam) provides the minimum level of ballistic protection required by the standard.

It is important to note that this is a generalization. There are many different types and styles of female vests, and different ways of fitting vests to accommodate all of the various sizes and shapes needed for female officers. Some manufacturers have developed methods that "mold" the bust cups into the material, negating the need for cutting and stitching to create a bust cup. Other manufacturers simply alter the outside dimensions of the panel (e.g., enlarging the arm hole openings) to accommodate certain types of builds and body types (commonly referred to as a "unisex" vest).

In summary, when selecting a female vest, NIJ and NLECTC recommend that an agency look at and have its officers try on a variety of models from different manufacturers that have been tested and found to comply with the NIJ standard for personal body armor. This will assist in selecting the model that provides the best combination of comfort, fit, protection capability, and accessories and features. Be sure to ask the manufacturer's representative about ongoing customer support and what steps they will take to properly measure and fit the vests, as well as making adjustments once the vests have been delivered. Ask the representative for references from other agencies that have purchased their armor, and contact other agencies in your area who have recently purchased armor to learn about their experiences.

### Q: What type and threat level of armor should I wear?

A: First, assess the type of threat you face on a daily basis. Review data from shooting incidents in your area, as well as the types of weapons (firearms, knives, etc.) being confiscated from suspects. Also factor in what type of sidearm and duty ammunition you are carrying. FBI Uniform Crime Report (UCR) data indicate that approximately one in six officers who are killed in the line of duty are shot with their own weapon. Other considerations are the climate in which you work, typical duty assignment, and personal preference considerations (comfort and fit). Again, the decision is ultimately yours. The same concepts apply for correctional officers seeking stab- or puncture-resistant armor.

### Q: What are trauma plates?

A: Trauma plates are devices that can be added to the vest over a localized area (most commonly the mass center of the torso) to increase the wearer's protection against blunt trauma injuries. Blunt trauma injuries are caused by the impact forces of the bullet against the armor, resulting in nonpenetrating internal injuries such as bruises, broken ribs, or other injuries to internal organs. Trauma plates can be made of a hard substance such as metal wrapped in rubber or ballistic fabric, or they can be made of additional layers of ballistic fabric, similar to an armor panel. Some manufacturers even build trauma plates into the armor panel itself.

| SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR |
| --- |

**Q: Which manufacturer makes the best body armor?**

A: The NIJ standards for personal body armor (ballistic and stab/puncture resistant) and the voluntary compliance testing programs operated by NLECTC exist to ensure that models of armor offered for sale to law enforcement and corrections personnel are safe, reliable, and meet minimum performance requirements. Neither NIJ nor NLECTC "endorse" any particular manufacturer or model of armor, but provide a complete listing of all models that have been tested and found to comply with the NIJ standard. You can access this list, which is updated continuously, through our Internet site at http://www.justnet.org. If you do not have access to the Internet, you can also call NLECTC at 800–248–2742 or 301–519–5060 to get the most current information on models that comply with the standard.

**Q: What is the best way to care for body armor?**

A: Follow the manufacturer's care instructions provided with your armor or refer to the instructions on the armor labels. Failure to follow these instructions may damage the ballistic performance capabilities of the armor. The *Selection and Application Guide to Personal Body Armor* contains general guidelines on how to properly care for armor. This document can be obtained by calling NLECTC at 800–248–2742 or 301–519–5060, or can be downloaded from http://www.justnet.org.

**Q: How long does body armor last?**

A: There are a number of factors that can influence the service life cycle of body armor. NIJ has sponsored research that indicates that age is not the only factor in determining the service life of armor. Other factors to consider include: how regularly the armor is worn, how it is cared for, how properly it fits the wearer (most people lose or gain weight over a period of years), and the overall condition of the armor (e.g., Do the fasteners still work properly?). We encourage departments to have a routine inspection program for body armor, just as they would for weapons, vehicles, and other types of issued equipment. The *Selection and Application Guide to Personal Body Armor* contains a sample form that can be used as a checklist when inspecting armor.

**Q: How do I dispose of my old vest?**

A: Check with your department to see if it has a policy regarding the disposal of used body armor. If they do not, there are several organizations that accept donations of used vests for distribution to law enforcement agencies here in the United States. Check with your local Fraternal Order of Police. If you are not comfortable donating your armor to another agency, you may also contact the manufacturer of your vest to determine if it will dispose of your armor. Some agencies also have used retired armor in the door panels of police cars or special operations vehicles.

## SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

**Q: I understand that NIJ has published a new standard for ballistic-resistant armor. What are the major differences between the new version and NIJ Standard–0101.03?**

A: In September 2000, NIJ released *Ballistic Resistance of Personal Body Armor, NIJ Standard–0101.04.* This revision, the first of this standard in 13 years, was the result of a 3-year effort that included input from the law enforcement, body armor manufacturing, and fiber manufacturing communities. The Office of Law Enforcement Standards (OLES) coordinated the development of this new revision, performing most of the research with support from various components of the NLECTC system.

Technical highlights of the new standard (0101.04) include:

• Updated test rounds for certain NIJ armor types, replacing outdated or obsolete ammunition:

  - For Type I armor, the .38 Special has been replaced by the .380 ACP.

  - For Type IIA, the .357 Magnum has been replaced by the .40 S&W.

  - For Type IIIA, the .44 Magnum remains, but the test bullet has been changed to a semi-jacketed hollow point (SJHP) from the lead semi-wadcutter gas check (LSWGC), which is no longer manufactured.

All other test rounds remain unchanged from NIJ Standard–0101.03.

• A second backface signature (BFS) measurement on each panel.

• A single environmental test condition (wet).

• Restoration of the armor's original physical condition between impacts (commonly referred to as "pat-down").

• A Baseline Ballistic Limit test to establish benchmark penetration performance of the armor, which is useful for enhanced understanding of its protection, and to provide a consistent baseline for any future retesting that might be required.

**Q: Do models that comply with NIJ Standard–0101.03 automatically comply with NIJ Standard–0101.04?**

A: No. NIJ still continues to recognize the compliance status of models found to comply with NIJ Standard–0101.03 to that edition of the standard. If a manufacturer desires to submit a model of 0101.03-compliant armor to NLECTC for testing to 0101.04, they can, and if it is found to comply with 0101.04, then it will be recognized as complying with *both* editions of the standard.

**Q: OK, but what happens if that 0101.03-compliant model fails to comply with the requirements of 0101.04?**

A: Models that comply with NIJ Standard–0101.03 cannot "lose" their compliance status to that edition of the standard if they do not comply with the requirements of 0101.04. The model will

still be recognized as compliant with 0101.03, but cannot be considered for further testing to 0101.04.

**Q: Can manufacturers still submit new models of armor for testing to NIJ Standard–0101.03?**

A: No. As of October 2, 2000, all models of armor submitted to NLECTC for compliance testing will be tested in accordance with NIJ Standard–0101.04.

**Q: Is armor that complies with NIJ Standard–0101.04 "better" than armor that complies with NIJ Standard–0101.03?**

A: **NO.** It has only been tested to a different version of the standard. The development of NIJ Standard–0101.04 incorporates the knowledge and experience that has been gained in the past 13 years of armor testing, takes into account the advances in materials and design technology that have occurred in the industry, and updates the threats which the armor is tested against. It is simply the next evolutionary step in the development of NIJ's voluntary compliance testing program for ballistic-resistant armor, ensuring that law enforcement and corrections officers have access to armor that is safe, reliable, and meets currently defined protection needs.

**Q: With the release of NIJ Standard–0101.04, does this mean that we have to replace all the armor we have that complies with NIJ Standard–0101.03, including those we just purchased?**

A: **NO.** The advent and exclusive use of NIJ Standard–0101.04 in the Voluntary Compliance Testing Program does not imply that existing NIJ Standard–0101.03 compliant armor is in any way unsuitable for continued purchase and everyday use. In fact, such armor will still provide the same proven high degree of protection and performance that NIJ Standard–0101.03 demanded and produced. NIJ Standard–0101.03 compliant armor should not be considered inadequate or obsolete; it is simply armor that has not been tested and found compliant to NIJ Standard–0101.04's different requirements.

**Q: If a manufacturer offers to sell us a model that complies with NIJ Standard–0101.03, should we purchase it?**

A: If you determine that this model meets all of your protection and user defined requirements, **then there is no reason not to purchase it.** NIJ Standard–0101.03 compliant armor should not be considered inadequate or obsolete; it is simply armor that has not been tested and found compliant to NIJ Standard–0101.04's different requirements.

**Q: I'm a correctional officer, and I'm more interested in a vest that provides stab/puncture protection instead of ballistic protection. What assistance can you provide?**

A: For almost 30 years, NIJ has been a leader in the development and testing of ballistic-resistant armor. In September 2000, NIJ released *Stab Resistance of Personal Body Armor, NIJ Standard–0115.00.* This standard is the result of a 3-year collaborative effort between the Office of Law Enforcement Standards, the U.S. Secret Service, and the Police Scientific Development Branch of the United Kingdom, and establishes the first national minimum performance

requirements for stab- and puncture-resistant armor. NIJ Standard–0115.00 classifies armor into two protection classes, spike (puncture-resistant) and edged blade. For each protection class, there are three protection levels against which the armor can be tested. A voluntary compliance testing program has been established by NLECTC in accordance with this new standard, and models found to comply are listed in the Body Armor Database at http://www.justnet.org.

It is also important to note that armor models found to comply with NIJ Standard–0115.00 are also eligible for funding under the Bulletproof Vest Partnership Grant Act (BVPGA). For more details, visit the BVPGA Web site at http://vests.ojp.gov.

**Q: Who tests the armor to determine if it complies with NIJ Standards?**

A: Only NIJ-approved independent testing laboratories are recognized as official testing facilities for compliance testing to NIJ standards. A complete list of NIJ-approved laboratories can be found on JUSTNET at http://www.justnet.org, or call NLECTC at 800–248–2742 or 301–519–5060.

**Q: How is armor submitted for testing?**

A: The manufacturer submitting an armor model for testing must first negotiate a testing contract with an NIJ-approved testing laboratory. Neither NIJ nor NLECTC accepts any payment for testing services. The manufacturer then submits samples to NLECTC, where they are examined for workmanship and labeling requirements, which are defined in the NIJ standards. If the samples successfully complete this examination, they are sent to the approved laboratory with whom the manufacturer has negotiated the testing contract. The laboratory performs the test in accordance with the standard, and prepares a report of the test. The samples and the report are returned to NLECTC, where they are again examined and compared to the laboratory report. If the armor complies with the standard, a letter is issued to the manufacturer for that model and the model is listed on the *Personal Body Armor Consumer Product List (CPL),* which can be accessed at http://www.justnet.org.

**Q: How does a laboratory obtain NIJ approval to conduct body armor testing?**

A: To become an NIJ-approved laboratory, the laboratory must submit an application (available from NLECTC) that will be reviewed by NIJ to determine if the laboratory is technically capable of performing the testing. NLECTC will then conduct an onsite inspection that includes witnessing the testing of actual samples. The laboratory prepares a report of the test and returns the tested samples and report to NLECTC, where they are checked for accuracy. If the laboratory successfully completes all of these requirements, NIJ will issue a letter to the laboratory notifying it that it is an NIJ-approved laboratory and is authorized to conduct testing in accordance with NIJ standards. Manufacturers and other interested parties also will be notified of the laboratory's status. NIJ accepts applications from interested laboratories on a continuing basis. Laboratories seeking NIJ-approved status should contact NLECTC at 800–248–2742 or 301–519–5060. It is also important to note that laboratories are approved to perform testing in accordance with a specific NIJ standard. A test laboratory must complete a separate application and go through the complete approval process for each NIJ standard for which it wishes to perform testing.

# Appendix C. The Effect of Body Armor on the Risk of Fatality in Felonious Assaults on Police Officers*

*Source: FBI Uniform Crime Reports: *Law Enforcement Officers Killed and Assaulted, 1994.*

The move by law enforcement to equip its officers with high-quality body armor to better protect them in the event of an assault with a firearm is among the most visible and important contributions to safety in the history of policing. There has never been any serious debate raised about the logic or wisdom of equipping officers with body armor. While body armor is often described as uncomfortable, its use is nonetheless encouraged by most departments and required by many.

Past studies have attempted to determine the actual effectiveness of body armor in protecting the lives of law enforcement officers. These studies could not quantify the protective capabilities of body armor due to a lack of sufficient research design. Fundamentally, the research has been used to show the high percentage of deceased officers who were not wearing body armor at the time they were slain. What these studies attempted, but failed to quantify, was the actual protection provided by body armor.

A Federal Bureau of Investigation (FBI) study on protection provided by body armor has shown that the risk of fatality for officers assaulted with a firearm while not wearing body armor is 14 times higher than for officers wearing body armor. The study methodology, known as case-control design, was used to quantify the protection provided by body armor. This approach has been used in medical and public health research such as in the early 1950s and 1980s when it was used to identify the risks associated with smoking and toxic shock syndrome. In this study, it is applied to identify the risk of fatality associated with not wearing protective body armor during an assault with a firearm. This study compares a group of officers who survived an assault with a firearm to a group of officers assaulted with a firearm and slain. Members of both groups were shot with a firearm in the upper torso area, the area traditionally covered by body armor.

A comprehensive FBI database on law enforcement officers killed in the line of duty includes information on whether an officer was wearing body armor at the time of the attack. For this study, cases were selected based on the criterion of whether the officer was shot in an area that could be covered by conventional body armor (i.e., front and rear upper torso). Officers fatally wounded in the head, extremities, or other areas not traditionally covered by body armor were excluded. A group of 25 officers feloniously killed in the line of duty was randomly selected from an available 133 officers who met the initial criteria.

A similar selection process was used to select officers who survived an assault with a firearm. During 1992, the FBI expanded its data collection and solicited information on law enforcement officers who were seriously assaulted in the line of duty and survived. From the cases submitted to the FBI, a small comparison group was produced. This comparison group consisted of 25

officers who survived after being shot with firearms in the upper torso. The officers in the separate groups differed only on the survival outcome of their assaults. By comparing the survival outcome of the officers based on their use of body armor, a risk factor can be computed for the odds of fatality for officers shot in the upper torso while not wearing body armor.

In the following table, the relative risk of fatality for officers not wearing body armor is computed. The first column lists the total, 25 officers, who did not survive an assault with a firearm. As shown, only four of the slain officers were wearing body armor at the time of the assault. In contrast, for officers that survived, 18 wore armor at the time of the assault. The odds of fatality for officers not wearing armor is computed as (21/7), or 3. The odds of fatality for officers wearing armor is computed as (4/18), or .22. To arrive at the relative risk between the two groups, the odds of fatality while not wearing armor are divided by the odds of fatality while wearing armor (3/.22), or 13.5. This number can be interpreted as the odds, or relative risk, of fatality. For an officer shot in the torso while not wearing body armor, the relative risk of fatality is 14 times higher than for an officer who is wearing body armor. Equation 1 shows the computation of the relative risk ($\Psi$).

| Table 1. | | | |
|---|---|---|---|
| | **Deceased** | **Alive** | **Total** |
| **No Armor** | 21 | 7 | 28 |
| **Armor** | 4 | 18 | 22 |
| **Total** | 25 | 25 | 50 |

Eq. 1.                    $\Psi = (21 * 18)/(7 * 4) = 13.5$.

While the absolute risk of fatality could not be computed in this study, it is clear that officers who are not wearing armor at the time of an assault with a firearm are at significantly greater risk of fatality than officers who are wearing body armor at the time of assault. Further, this relative risk of term ($\Psi$) is not influenced by sample size, so it is likely that this relative risk of fatality would have been observed in samples of any size.

The results of this study affirm what law enforcement trainers have long been telling officers: body armor saves lives. By wearing body armor, a law enforcement officer can significantly increase his or her chances of surviving an assault with a firearm.

# Appendix D. Model Procurement Specifications

## Terms of agreement

A) Specific Quantity

The (jurisdiction) intends to purchase a total of (number spelled out) (number) units of body armor.

Of this total, (number spelled out) (number) shall be specially designed for issue to female officers. The successful bidder further agrees to supply the same model of armor at the unit price cost of the above quantity order for an additional period of (select appropriate period of time) months for issue to new officers or replacement purposes.

B) Open End Purchase Agreement (Term Contract)

The (jurisdiction) anticipates the purchase of a total of (number spelled out) (number) units of body armor during a (appropriate period of time)-month period beginning on or about (date). During this period, purchase orders will be issued for armor as needed at the contract unit price. It is estimated that (number) percent of the armor purchased will be specifically designated for issue to female officers. The term of this agreement shall be (appropriate period of time) months; however, the (jurisdiction) does not guarantee the purchase of any specific or minimum quantity of armor during the term of this agreement. The (jurisdiction) may, at its option and subject to agreement by the contractor, extend the term of this agreement at the same contract unit price for an additional period of (appropriate period of time) months.

## Bidding and award

Bids shall be submitted (specify standard departmental regulations; i.e., departmental form, letter quotation, etc.).

Bids will be accepted only for armor that has been tested by an independent testing laboratory as part of the National Institute of Justice (NIJ) National Law Enforcement and Corrections Technology Center (NLECTC) body armor compliance-testing program and found to fully comply with the requirements of NIJ Standard–0101.04 (or current edition) or NIJ Standard–0115.00 for stab-resistant armor.

The (jurisdiction) reserves the right to reject any or all bids in whole or in part as it is deemed in the best interest of the department.

In determining the most advantageous bid, the (jurisdiction) reserves the right to consider quality, workmanship, service, and dependability of the product and manufacturer, independent of price.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

The successful bidder agrees to provide (name of manufacturer) model (designation) armor properly identified on the label of each unit of armor.

Note: The model selected, which must be verified as having been tested by a NLECTC-approved testing laboratory and found to comply with NIJ Standard–0101.04 or 0115.00, must be incorporated in this document or separate purchase document at the time of award of said contract.

## Prebid conference

Specify date, time, and location. If attendance is a condition of bid acceptance, this must be noted.

## Invoicing and delivery

Specify consistent with the normal procurement practices of the jurisdiction.

## Warranty and insurance

Each unit of armor provided under this contract shall be warrantied for a minimum of (number spelled out) (number) years to be free from all defects in materials and workmanship.

Each unit of armor provided under this contract shall be warrantied for a minimum of (number spelled out) (number) years to meet the ballistic-resistant and deformation requirements of NIJ Standard–0101.04 (or NIJ Standard–0115.00 for stab-resistant models).

Manufacturers shall have a product liability performance insurance policy in a minimum amount of (specify per incident and total liability limits, and period of coverage as appropriate based upon recommendations of department's legal counsel and insurance commission). All insurance policies shall conform to the rules and regulations of (appropriate jurisdiction).

## Armor specifications

Each unit of armor shall be new, unused, constructed of the highest quality materials, and shall:

A) Be constructed identically to the original model tested by NLECTC and found to comply with the minimum performance requirements for Type (appropriate classification) armor as specified in NIJ Standard–0101.04 (or current edition) or NIJ Standard–0115.00 for stab-resistance.

B) Be labeled in accordance with the requirements of NIJ Standard–0101.04 or NIJ Standard–0115.00, clearly identifying the exact manufacturer model and, if appropriate, style specified in the contract document.

The manufacturer may, at its option, include in addition a catalog number for supplier or distributor convenience, provided that such number is properly identified and totally separate from the model/style designation line. Labels shall remain readable throughout the warranty period.

C) Be designed to be concealable under the standard (jurisdiction) uniform shirt. Provide full torso coverage, with front-to-back side overlap of ballistic panels. (Alternately, state other side protection requirements or other intended manner of use, such as a specific type of outerwear, i.e., tactical vest.)

D) Provide adjustment for the chest, waist, and shoulders with the minimum relief under arms, neck, and shoulder necessary to prevent chafing of the wearer.

E) Be designed in such a manner as to prevent the armor from "riding up" on the wearer during normal duty activities.

F) All closure, fastening, or accessory attachment devices should be made of materials that do not present a "secondary projectile" or "ricochet" hazard if struck by a bullet.

G) Incorporate a carrier for the ballistic element that is (appropriate choice) in color, and the coloring shall be permanent and not "bleed" onto other garments.

H) Be free from any defects affecting durability, serviceability, appearance, or the safety of the user. Workmanship and construction details, cutting, stitching, and finishing shall be in all cases in accordance with first-class commercial textile standard practices for the intended purpose.

## Items to be submitted with the bid

A) Sample of armor model being bid, labeled in accordance with the requirements above (item B, armor specifications).

Note: The sample provided by the successful bidder will become the property of (jurisdiction) and retained in archives for comparison with armor delivered under the resulting contract. Samples provided by unsuccessful bidders will be returned F.O.B.[1] (jurisdiction and shipping address) upon request following contract award.

B) Proof that the armor model offered has been tested by a NLECTC-approved laboratory and that NLECTC has found that model to be in full compliance with the requirements of NIJ Standard–0101.04 or NIJ Standard–0115.00.

C) Proof of liability insurability.

D) List of customers to whom the bidder has satisfactorily sold armor during the past three (3) years.

---

1. The risk of loss if goods are damaged or lost in transit with the Seller or the Buyer, depending on the shipping terms negotiated. The term F.O.B. means Free on Board, which means only that the Seller will place goods in or on the carrier's equipment without cost to the Buyer.

## Termination of agreement

See commentary.

## Acceptance testing

See commentary.

# Appendix E. Body Armor Inspection Sheet

Date: _____

Manufacturer: _____ Model/Style_____

Male _____Female _____ Size _____

Serial Number: _____

Issued To: _____

Inspected By: _____

| Yes | No | |
|-----|----|---|
| | | **A. Labeling:** |
| ____ | ____ | 1. Is a label securely attached to each part of the carrier and ballistic- or stab-resistant panels? |
| ____ | ____ | 2. Is information on the labels legible? |
| ____ | ____ | 3. Does the model comply with NIJ Standard–0101.04 (or NIJ Standard–0115.00 for stab-resistant models)? |
| | | **B. General Condition/Appearance** |
| ____ | ____ | 1. Does the carrier or permanent cover have any visible rips/tears/holes? |
| ____ | ____ | 2. Is the armor relatively clean and free of dirt and debris? |
| ____ | ____ | 3. Are closure devices securely attached to the vest and operating properly? |
| ____ | ____ | 4. If protective element is encased in a nonremovable cover, is any material (fabric) exposed? |
| ____ | ____ | 5. If protective element is not encased in a nonremovable cover, is the material frayed? |
| ____ | ____ | 6. Are there creases in the armor? |
| ____ | ____ | 7. Is the armor free from odor? |

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

Yes        No

                C.    Care and Maintenance

_____    _____        1. Does the officer responsible for the vest understand and follow the manufacturer's care and cleaning instructions?

_____    _____        2. Does the officer responsible for the vest understand and follow department policy regarding care, maintenance, and wearing of vest (if applicable)?

                D. Size/Fit

_____    _____        1. Does the vest fit the officer properly and securely?

                E. Overall Evaluation:

                    _____ Excellent/New _____ Good _____ Fair _____ Poor

Comments:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# Appendix F. Law Enforcement and Corrections Technology Advisory Council

*Chair: Carl R. Baker*

*Vice Chair: Michael Maloney*

*Vice Chair: Kenneth Bayless*

**Francisco J. Alarcon**
Deputy Secretary
Florida Department of
    Juvenile Justice
Tallahassee, Florida

**Joseph Anderson**
Director of Metropolitan Public
    School Security
Nashville, Tennessee

**Col. Carl R. Baker**
Chief of Police
Chesterfield County Police
    Department
Chesterfield, Virginia

**Jim T. Barbee**
Correctional Programs
    Specialist
Jails Division
National Institute of
    Corrections
Longmont, Colorado

**Chief Kenneth Bayless**
Field Operations Region III
Los Angeles County Sheriff's
    Department
Monterey Park, California

**Maj. Bob Beach**
Director
Fairfax Criminal Justice
    Academy
Chantilly, Virginia

**Simon J. Beardsley**
Technology Review
    Coordinator
Texas Department of Criminal
    Justice
Huntsville, Texas

**Claire F. Bee, Jr.**
Assistant Commissioner
New York State Department
    of Correctional Services
Albany, New York

**Joseph P. Bonino**
Commanding Officer
Jail Division
Los Angeles Police
    Department
Los Angeles, California

**James Brock**
Director
Southeastern Public Safety
    Institute
St. Petersburg, Florida

**Bob Brown**
Chief
National Institute of
    Corrections Academy Division
Longmont, Colorado

**G.C. "Buck" Buchanan**
Sheriff
Yavapai County Sheriff's Office
Prescott, Arizona

**Tom Burgoyne**
Ohio County Sheriff
Wheeling, West Virginia

**Sam Cabral**
President
International Union of Police
    Associations
AFL–CIO
Alexandria, Virginia

**Robert E. Cansler**
Staff Attorney
City of Concord
Concord, North Carolina

**Nick Cartwright**
Director
Explosive Detection Systems
    Implementation Program
Transport Canada
Ottawa, Ontario
Canada

**Steve Chianesi**
Assistant Director
Rhode Island Judicial
    Systems and Sciences
Rhode Island Supreme Court
The Rhode Island Traffic
    Tribunal
Providence, Rhode Island

**Chief Merino Ciccone**
Rome Police Department
Rome, New York

**Brian Coleman, OBE**
Director
Police Scientific Development
    Branch
Woodcock Hill, Sandridge
St. Albans, United Kingdom

**Larry Cothran**
Executive Officer
California Department of
    Corrections
Technology Transfer
    Committee
Sacramento, California

**Chief Gregory G. Cowart**
Millbrae Police Department
Millbrae, California

**David R. Crist**
Warden
Minnesota Department of
    Corrections
Bayport, Minnesota

**Steven F. Cumoletti**
Staff Inspector
New York State Police
Planning and Research
    Section
Albany, New York

**Capt. Michael Czerwinsky**
El Paso Police Department
El Paso, Texas

**Patrick J. Devlin**
Assistant Chief
Criminal Justice Bureau
New York City Police
    Department
New York, New York

**Lt. Kirk DiLorenzo**
St. Louis Park Police
    Department
St. Louis Park, Minnesota

**Chief Lee Doehring**
Leavenworth Police
    Department
Leavenworth, Kansas

**Chris Donnellan**
Legislative Director
International Brotherhood of
    Police Officers
Alexandria, Virginia

**George Drake**
Region Manager
Adult Probation and Parole
    Division
New Mexico Corrections
    Department
Albuquerque, New Mexico

**Chief Richard D. Easley**
Kansas City, Missouri, Police
    Department
Kansas City, Missouri

**Chief Richard Emerson**
Chula Vista Police
    Department
Chula Vista, California

**Larry Erikson**
Executive Director
Washington Association/Sheriffs
    and Police Chiefs
Olympia, Washington

**Chief Joseph G. Estey**
Hartford Police Department
White River Junction, Vermont

**Chief Charlie Fannon**
Wasilla Police Department
Wasilla, Alaska

**James Fortner**
Administrative Lieutenant
Tennessee Department of
    Correction
Nashville, Tennessee

**Sheriff Charles Foti**
Orleans Parish Criminal
    Sheriff's Office
New Orleans, Louisiana

**Wendell M. "Pete" France**
Assistant Warden
Baltimore Central Booking
    and Intake Center
Baltimore, Maryland

**Steve Gaffigan, Sr.**
Executive Director
Quality Assurance
Metropolitan Police
    Department
Washington, D.C.

**Gilbert Gallegos**
National President
Fraternal Order of Police
Albuquerque, New Mexico

**Gerald M. Gasko**
Deputy Director
Colorado Department of
    Corrections
Colorado Springs, Colorado

**Doreen Geiger**
Assistant to the Secretary for
    Facility Siting and Policy
Washington State Department
    of Corrections
Olympia, Washington

**James A. Gondles, Jr.**
Executive Director
American Correctional
    Association
Lanham, Maryland

**Chief Reuben M. Greenberg**
Charleston Police Department
Charleston, South Carolina

**Mel Grieshaber**
Legislative Director
Michigan Corrections
    Organization/SEIU
Lansing, Michigan

**Chief Timothy Grimmond**
El Segundo Police
    Department
El Segundo, California

**Capt. Mike Grossman**
Emergency Operations Bureau
Los Angeles County Sheriff's
    Department
Los Angeles, California

**Earl Hardy**
Highway Safety Specialist
National Highway Traffic
    Safety Administration
Washington, D.C.

**Ben Hathcock**
Supervisory Special Agent
FBI Academy
Quantico, Virginia

**Capt. Sid Heal**
Special Enforcement Bureau
Los Angeles Sheriff's
    Department
Los Angeles, California

**Jaime Herrera**
Security Coordinator
Idaho State Department of
    Corrections
Boise, Idaho

**Joan Higgins**
Assistant Commissioner
Office of Detention and
    Deportation
Immigration and
    Naturalization Service
Washington, D.C.

**Chief James E. Hill**
Port Authority Transit Police
    Department
Camden, New Jersey

**F. M. Hite**
Manager
Operations and Training
Virginia Department of
    Corrections
Roanoke, Virginia

**Irving Hodnett**
Chief Engineer
FBI Engineering Research
    Facility
Quantico, Virginia

**Chief Stanley Hook**
Smyrna Police Department
Smyrna, Georgia

**Capt. Geoffrey C. Hunter**
Metro Transit Police
    Department
Washington Metropolitan Area
    Transit Authority
Washington, D.C.

**Stephen Ingley**
Executive Director
American Jail Association
Hagerstown, Maryland

**Maris Jaunakais**
Head
Forensic Sciences Division
Naval Criminal Investigative
    Service
Washington, D.C.

**Jim Jones**
Executive Assistant to the Director
Virginia Department of
    Corrections
Richmond, Virginia

**Sheriff Aaron D. Kennard**
Salt Lake County Sheriff's
    Department
Salt Lake City, Utah

**Chief R. Gil Kerlikowske**
Seattle Police Department
Seattle, Washington

**Andrew Keyser**
Chief Information Officer
Pennsylvania Department of
    Corrections
Camp Hill, Pennsylvania

**James Klein**
Houston Police Department
Inspection Division
Houston, Texas

**Chief Robert E. Langston**
U.S. Park Police
Washington, D.C.

**Henry C. Lee, M.D.**
Henry C. Lee Institute of Forensic
    Science
University of New Haven
West Haven, Connecticut

**Calvin Lightfoot**
Warden
Allegheny County Jail
Pittsburgh, Pennsylvania

**Kevin Lothridge**
Director of Strategic
    Development
National Forensic Science
    Technology Center
Largo, Florida

**James Mahan**
Senior Technologist
Office of Security Technology
Federal Bureau of Prisons
Washington, D.C.

**Michael T. Maloney**
Commissioner
Massachusetts Department of
    Corrections
Milford, Massachusetts

**Edward McDonough, M.D.**
Deputy Chief Medical Examiner
Office of the Chief Medical
    Examiner
Farmington, Connecticut

**Harlin McEwen**
Ithaca, New York

**Donald McLellan, Ph.D.**
Executive Lieutenant
Oakland County Sheriff's
    Office
Pontiac, Michigan

**Maj. Rob Miller**
Kentucky State Police
Frankfort, Kentucky

**Col. David B. Mitchell**
Maryland State Police
Pikesville, Maryland

**Ron Morell**
Training Administrator
Vermont Criminal Justice
    Training Council
Pittsford, Vermont

**Roger L. Payne**
Chief Deputy
New Mexico State Police
Santa Fe, New Mexico

**John J. Pennella**
Director
Applied Technology Division
U.S. Customs Service
Washington, D.C.

**Charles S. Petty, M.D.**
Transplant Services
University of Texas
Southwestern Medical Center
Dallas, Texas

**Dimitria D. Pope**
Assistant to the Executive
    Director
Community Justice Assistance
    Division
Texas Department of Criminal
    Justice
Austin, Texas

**Sgt. John S. Powell**
Communications Coordinator
University of California Police
    Department
Berkeley, California

**Janet Quist**
Business Director
Public Technology Inc.
Washington, D.C.

**Rex J. Rakow**
Director
University of Notre Dame
    Campus Police
Notre Dame, Indiana

**Sheriff Dave Reichart**
King County Sheriff's Office
Seattle, Washington

**Col. Michael D. Robinson**
Michigan State Police
East Lansing, Michigan

**Chief Thomas J. Roche**
Gates Police Department
Rochester, New York

**Daniel N. Rosenblatt**
Executive Director
International Association of
    Chiefs of Police
Alexandria, Virginia

**Tibby Roth**
Chief Inspector
Special Technologies Officer
Research and Development
    Division
Israel Police
Israel

**Raul Russi**
Commissioner
City of New York Department
    of Probation
Brooklyn, New York

**Charles L. Ryan**
Deputy Director of Prison
    Operations
Arizona Department of
    Corrections
Phoenix, Arizona

**Stephen Schroffel**
Director
Technology Development
U.S. Immigration and
    Naturalization Service
Washington, D.C.

**Wayne Scott**
Executive Director
Texas Department of
    Criminal Justice
Huntsville, Texas

**Lawrence Seligman**
Chief, Tribal Police
Tohono O'odham Nation Police
Sells, Arizona

**Charles E. Simmons**
Secretary
Kansas Department of Corrections
Topeka, Kansas

**Capt. Kathryn Stevens**
Allen County Sheriff's Department
Fort Wayne, Indiana

**Brad Stimson**
National Research Council of
    Canada
ICPET
Ottawa, Ontario
Canada

**Richard Stroker**
General Counsel
South Carolina Department of
    Corrections
Columbia, South Carolina

**George M. Taft, Jr.**
Director
Alaska Department of Public
    Safety
Scientific Crime Detection
    Laboratory
Anchorage, Alaska

**Morris Thigpen**
Director
National Institute of Corrections
Washington, D.C.

**Tim Thomas**
Assistant Division Chief
Technology Security Division
U.S. Secret Service
Washington, D.C.

**Dennis Tucker**
Fleet Manager
Illinois State Police
Springfield, Illinois

**Richard Turner**
Director
Correctional Services
Vermont Department of
    Corrections
Waterbury, Vermont

**James Upchurch**
Chief
Bureau of Security Operations
Florida Department of
    Corrections
Tallahassee, Florida

**Judith Uphoff**
Director
Wyoming Department of
    Corrections
Cheyenne, Wyoming

**Gerald D. Weinzatl**
Assistant Superintendent
Milwaukee County House of
    Corrections
Franklin, Wisconsin

**Carl A. Wicklund**
Executive Director
American Probation and
    Parole Association
Lexington, Kentucky

**Reginald A. Wilkinson, Ed.D.**
Director
Ohio Department of Rehabilitation
    and Correction
Columbus, Ohio

**David Williams**
Deputy Superintendent for
    Correctional Services
Coxsackie Correctional Facility
West Coxsackie, New York

# Appendix G. National Armor Advisory Board Member List

*Chair: R. Gil Kerlikowske*

**Col. Carl R. Baker**
Chief of Police
Chesterfield County Police
    Department
Chesterfield, Virginia

**David Boyd, Ph.D.**
Director
Office of Science and
    Technology
National Institute of Justice
Washington, D.C.

**Sgt. Dan Callahan**
Arlington County Sheriff's
    Office
Arlington, Virginia

**Larry Cothran**
Executive Officer
California Department of
    Corrections
Technology Transfer
    Committee
Sacramento, California

**Chris Donnellan**
Legislative Director
International Brotherhood of
    Police Officers
Arlington, Virginia

**John Dottore**
Business Manager
Civilian Ballistics
DuPont Company
Spruance Plant
Richmond, Virginia

**David Hand**
Sales Account Manager
Twaron Products
Conyers, Georgia

**Ben Hathcock**
Supervisory Special Agent
Federal Bureau of
    Investigation
Firearms Training Unit
Quantico, Virginia

**Sid Heal**
Los Angeles County Sheriff's
    Office
Los Angeles, California

**R. Gil Kerlikowske**
Chief of Police
Seattle Police Department
Seattle, Washington

**Harold Kunz**
3rd Vice President
Fraternal Order of Police
Chicago, Illinois

**Jim Murray**
DHB Armor Group
Norris, Tennessee

**Linn Murray**
Ballistic Engineer
Honeywell
Colonial Heights, Virginia

**Kevin Neal**
Armor Marketing Leader
Honeywell
Colonial Heights, Virginia

**Chief Darrell L. Sanders**
Frankfort Police Department
Frankfort, Illinois

**Robert Scully**
Executive Director
National Association of Police
    Organizations
Washington, D.C.

**Dale Taylor**
American Body Armor &
    Equipment Co.
Jacksonville, Florida

**Navin Tejani**
Senior Research Associate
DuPont Advanced Fiber
    Systems
Richmond, Virginia

**Dieter Wachter**
Vice President, High
    Performance Fabrics
Hexcel Schwebel, Inc.
Anderson, South Carolina

# Appendix H. About the National Institute of Justice

NIJ is the research and development agency of the U.S. Department of Justice and is the only Federal agency solely dedicated to researching crime control and justice issues. NIJ provides objective, independent, nonpartisan, evidence-based knowledge and tools to meet the challenges of crime and justice, particularly at the State and local levels. NIJ's principal authorities are derived from the Omnibus Crime Control and Safe Streets Act of 1968, as amended (42 U.S.C. §§ 3721–3722).

## NIJ's Mission

In partnership with others, NIJ's mission is to prevent and reduce crime, improve law enforcement and the administration of justice, and promote public safety. By applying the disciplines of the social and physical sciences, NIJ—

- **Researches** the nature and impact of crime and delinquency.

- **Develops** applied technologies, standards, and tools for criminal justice practitioners.

- **Evaluates** existing programs and responses to crime.

- **Tests** innovative concepts and program models in the field.

- **Assists** policymakers, program partners, and justice agencies.

- **Disseminates** knowledge to many audiences.

## NIJ's Strategic Direction and Program Areas

NIJ is committed to five challenges as part of its strategic plan: 1) **rethinking justice** and the processes that create just communities; 2) **understanding the nexus** between social conditions and crime; 3) **breaking the cycle** of crime by testing research-based interventions; 4) **creating the tools** and technologies that meet the needs of practitioners; and 5) **expanding horizons** through interdisciplinary and international perspectives. In addressing these strategic challenges, the Institute is involved in the following program areas: crime control and prevention, drugs and crime, justice systems and offender behavior, violence and victimization, communications and information technologies, critical incident response, investigative and forensic sciences (including DNA), less-than-lethal technologies, officer protection, education and training technologies, testing and standards, technology assistance to law enforcement and corrections agencies, field testing of promising programs, and international crime control. NIJ communicates its findings through conferences and print and electronic media.

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

## NIJ's Structure

The NIJ Director is appointed by the President and confirmed by the Senate. The NIJ Director establishes the Institute's objectives, guided by the priorities of the Office of Justice Programs, the U.S. Department of Justice, and the needs of the field. NIJ actively solicits the views of criminal justice and other professionals and researchers to inform its search for the knowledge and tools to guide policy and practice.

NIJ has three operating units. The Office of Research and Evaluation manages social science research and evaluation and crime mapping research. The Office of Science and Technology manages technology research and development, standards development, and technology assistance to State and local law enforcement and corrections agencies. The Office of Development and Communications manages field tests of model programs, international research, and knowledge dissemination programs. NIJ is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.

To find out more about the National Institute of Justice, please contact:
National Criminal Justice Reference Service
P.O. Box 6000
Rockville, MD 20849–6000
800–851–3420
E-mail: askncjrs@ncjrs.org

To obtain an electronic version of this document, access the NIJ Web site (http://www.ojp.usdoj.gov/nij).
If you have questions, call or e-mail NCJRS.

# Appendix I. About the Law Enforcement and Corrections Standards and Testing Program

The Law Enforcement and Corrections Standards and Testing Program is sponsored by the Office of Science and Technology of the National Institute of Justice (NIJ), U.S. Department of Justice. The program responds to the mandate of the Justice System Improvement Act of 1979, which directed NIJ to encourage research and development to improve the criminal justice system and to disseminate the results to Federal, State, and local agencies.

The Law Enforcement and Corrections Standards and Testing Program is an applied research effort that determines the technological needs of justice system agencies, sets minimum performance standards for specific devices, tests commercially available equipment against those standards, and disseminates the standards and the test results to criminal justice agencies nationwide and internationally.

The program operates through the following:

- The **Law Enforcement and Corrections Technology Advisory Council** (LECTAC), consisting of nationally recognized criminal justice practitioners from Federal, State, and local agencies, assesses technological needs and sets priorities for research programs and items to be evaluated and tested.

- The **Office of Law Enforcement Standards** (OLES) at the National Institute of Standards and Technology develops voluntary national performance standards for compliance testing to ensure that individual items of equipment are suitable for use by criminal justice agencies. The equipment standards developed by OLES are based on laboratory evaluation of commercially available products in order to devise precise test methods that can be universally applied by any qualified testing laboratory and to establish minimum performance requirements for each attribute of a piece of equipment that is essential to how it functions. OLES-developed standards can serve as design criteria for manufacturers or as the basis for equipment evaluation. The application of the standards, which are highly technical in nature, is augmented through the publication of equipment performance reports and user guides. Individual jurisdictions may use the standards in their own laboratories to test equipment, have equipment tested on their behalf using the standards, or cite the standards in procurement specifications.

- The **National Law Enforcement and Corrections Technology Center** (NLECTC), operated by a grantee, supervises a national compliance testing program conducted by independent laboratories. The standards developed by OLES serve as performance benchmarks against which commercial equipment is measured. The facilities, personnel, and testing capabilities of the independent laboratories are evaluated by OLES prior to testing each item of equipment. In addition, OLES helps NLECTC staff review and analyze data. Test results are published

## SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

in consumer product reports designed to help justice system procurement officials make informed purchasing decisions.

Publications are available at no charge through NLECTC. Some documents are also available online through the Justice Technology Information Network (JUSTNET), the center's Internet/World Wide Web site. To request a document or additional information, call 800–248–2742 or 301–519–5060, or write:

**National Law Enforcement and Corrections Technology Center**
P.O. Box 1160
Rockville, MD 20849–1160
E-mail: asknlectc@nlectc.org
World Wide Web address: http://www.justnet.org

# Appendix J. About the National Law Enforcement and Corrections Technology Center System

The National Law Enforcement and Corrections Technology Center (NLECTC) system exists to support the Nation's structure of State and local law enforcement and corrections. The United States has more than 18,000 law enforcement agencies, 50 State correctional systems, and thousands of prisons and jails. The fragmented nature of law enforcement and corrections impedes the dissemination of valuable new information, fosters a patchwork marketplace that discourages the commercialization of new technologies, and underscores the need for uniform performance standards for equipment and technologies.

The National Institute of Justice's (NIJ's) Office of Science and Technology (OS&T) created NLECTC in 1994 as a national system of technology centers that are clearinghouses of information and sources of technology assistance and that also attend to special needs, including technology commercialization and standards development.

The NLECTC system's purpose is to determine the needs of the law enforcement and corrections communities and assist them in understanding, using, and benefitting from new and existing technologies that, increasingly, are vital levers of progress in criminal justice. NIJ/OS&T and the NLECTC system are the only current programs developed by the Federal Government that focus solely on the development and transfer of technologies to State and local law enforcement and corrections.

NLECTC is a program of NIJ, the research and development arm of the U.S. Department of Justice. The system currently consists of a national center, five regional centers, and several speciality offices. Also contributing to the initiatives of the center system is the Office of Law Enforcement Standards. The centers are colocated with a host organization or agency that specializes in one or more areas of technology research and development.

The National Center, located in Rockville, Maryland, is the system's information hub. Regional centers are currently located in Alaska, California, Colorado, New York, and South Carolina. Speciality centers located around the country deal with border matters (California), commercialization of law enforcement and corrections technologies (West Virginia), rural law enforcement issues (Kentucky), and standards and testing (Maryland).

Each center shares roles with the other centers and has distinctive characteristics. All are focused on helping law enforcement and corrections take full advantage of technology's rapidly growing capacity to serve the purposes of crime control and the criminal justice system.

A national body of criminal justice professionals, the Law Enforcement and Corrections Technology Advisory Council (LECTAC), helps identify research and development priorities, thereby influencing the work of the NLECTC system. In addition, each NLECTC center has a regional advisory council of law enforcement and corrections officials. Together, LECTAC and the advisory councils help to keep the NLECTC system attentive to technological priorities and

the needs of law enforcement and corrections. They help to link the end user with the developer to create technologies that adequately meet operational requirements and establish which potential technologies should be pursued for development.

All of the current regional centers have distinctive roles or focus areas, that, in many cases, are aligned with the expertise of host organizations and agencies. The centers are currently operated under cooperative agreements or interagency agreements with host organizations and agencies whose employees staff the centers.

To receive more information or to add your name to the NLECTC mailing list, call 800–248–2742 or 301–519–5060, or write:

**National Law Enforcement and Corrections Technology Center**
P.O. Box 1160
Rockville, MD 20849–1160
E-mail: asknlectc@nlectc.org
World Wide Web address: http://www.justnet.org

The following is a list of NLECTC regional and affiliated facilities that assist NIJ in fulfilling its mission.

**NLECTC–Northeast**
26 Electronic Parkway
Rome, NY 13441–4514
(p) 888–338–0584
(f) 315–330–4315
E-mail: nlectc_ne@rl.af.mil

**NLECTC–Southeast**
5300 International Boulevard
North Charleston, SC 29418
(p) 800–292–4385
(f) 843–760–4611
E-mail: nlectc-se@nlectc-se.org

**NLECTC–Rocky Mountain**
2050 East Iliff Avenue
Denver, CO 80208
(p) 800–416–8086
(f) 303–871–2500
E-mail: nlectc@du.edu

**NLECTC–West**
c/o The Aerospace Corporation
2350 East El Segundo Boulevard
El Segundo, CA 90245–4691
(p) 888–548–1618
(f) 310–336–2227
E-mail: nlectc@law-west.org

**NLECTC–Northwest**
4000 Old Seward Highway
Suite 301
Anchorage, AK 99503–6068
(p) 866–569–2969
(f) 907–569–6939
E-mail: nlectc_nw@ctsc.net

**Border Research and Technology Center**
1010 Second Avenue
Suite 1920
San Diego, CA 92101
(p) 888–656–2782
(f) 888–660–2782
E-mail: brtcchrisa@aol.com

SELECTION AND APPLICATION GUIDE TO PERSONAL BODY ARMOR

**Rural Law Enforcement Technology Center (RULETC)**
1908 North Main Street
Suite 115
Hazard, KY 41701
(p) 866–787–2553
(f) 606–436–6758
E-mail: ruletc@aol.com

**Office of Law Enforcement Standards**
100 Bureau Drive
Stop 8102
Gaithersburg, MD 20899–8102
(p) 301–975–2757
(f) 301–948–0978
E-mail: oles@nist.gov

**Office of Law Enforcement Technology Commercialization**
2001 Main Street
Suite 500
Wheeling, WV 26003
(p) 888–306–5382
(f) 304–231–2310
E-mail: oletc@oletc.org

# Appendix K. About the Office of Law Enforcement Standards

The Office of Law Enforcement Standards (OLES) was established as a matrix management organization in 1971 through a Memorandum of Understanding between the U.S. Departments of Justice and Commerce based on the recommendations of the President's Commission on Crime. OLES' mission is to apply science and technology to the needs of the criminal justice community, including law enforcement, corrections, forensic science, and the fire service. While its major objective is to develop minimum performance standards, which are promulgated as voluntary national standards, OLES also undertakes studies leading to the publication of technical reports and user guides.

The areas of research investigated by OLES include clothing, communication systems, emergency equipment, investigative aids, protective equipment, security systems, vehicles, weapons, and analytical techniques and standard reference materials used by the forensic science community. The composition of OLES' projects varies depending on priorities of the criminal justice community at any given time and, as necessary, draws on the resources of the National Institute of Standards and Technology.

OLES assists law enforcement and criminal justice agencies in acquiring, on a cost-effective basis, the high-quality resources they need to do their jobs. To accomplish this, OLES:

• Develops methods for testing equipment performance and examining evidentiary materials.

• Develops standards for equipment and operating procedures.

• Develops standard reference materials.

• Performs other scientific and engineering research as required.

Since the program began in 1971, OLES has coordinated the development of nearly 200 standards, user guides, and advisory reports. Topics range from performance parameters of police patrol vehicles, to performance reports on various speed-measuring devices, to soft body armor testing, to analytical procedures for developing DNA profiles.

The application of technology to enhance the efficiency and effectiveness of the criminal justice community continues to increase. The proper adoption of the products resulting from emerging technologies and the assessment of equipment performance, systems, methodologies, etc., used by criminal justice practitioners constitute critical issues having safety and legal ramifications. The consequences of inadequate equipment performance or inadequate test methods can range from inconvenient to catastrophic. In addition, these deficiencies can adversely affect the general population when they increase public safety costs, preclude arrest, or result in evidence found to be inadmissible in court.

For more information on the National Institute of Justice, please contact:

**National Criminal Justice Reference Service**
Box 6000
Rockville, MD 20849–6000
800–851–3420
e-mail: askncjrs@ncjrs.org

To access the World Wide Web site, go to
http://www.ncjrs.org

If you have questions, call or e-mail NCJRS.



COMPANY CONFIDENTIAL

HW0139555

## I. INTRODUCTION

At **American Body Armor™ (ABA)**, we've devoted ourselves to protecting dedicated law enforcement officers like you. Decades of experience have gone into the development and production of body armor designed to do just one thing: **save lives**.

But no body armor can protect you if you don't wear it. Even on the quietest of shifts, a routine call can quickly turn into a life-threatening situation.

That's why we urge you to wear your Xtreme® armor every duty shift. Our engineers have broken new ground in creating the remarkable comfort you'll notice immediately when you put on your Xtreme® vest. We think you'll agree that this "no-xcuses" level of all-day wearability represents a true breakthrough in protection and performance.

Our Xtreme® models: **Xtreme® ZX**, **Xtreme® X**, **Xtreme® XS** and the **Xtreme®**, represent the state of the art in concealable body armor. Each model offers an unprecedented level of comfort and performance in its category.









This limited warranty does not cover anything resulting from misuse, abuse, neglect, alteration, breakage, interruption, damage, improper fit, failure to perform care and maintenance as instructed or unauthorized sale, repair or service.

This limited warranty does not cover any representation or warranty made by dealers beyond the provision of this warranty. No representative or person is authorized to assume liability on behalf of ABA in connection with the sale or use of this product.

You must establish proof of issue to obtain warranty service or replacement.

This limited warranty gives you specific legal rights, and you also have other rights that vary from state to state and country to country.

If you have any questions about your ABA product, please contact us at:

**American Body Armor™**
1 (800) 347-1200 • (909) 923-7300
FAX: 1 (800) 366-1669 • (909) 923-7400
www.xtremearmor.com

## X. WARNING!

**LIMITED IMPACT PROTECTION:** ABA body armor may reduce or prevent injuries. ABA body armor is not bullet proof and can not protect against all threats. Impact forces can result in serious injury or death.

**ABA BALLISTIC PANELS CAN'T PROTECT WHAT THEY DON'T COVER:** ABA ballistic panels offer protection to only those areas that they cover. Ballistic panels do not protect the neck or any area it does not cover.

**ABA CONCEALABLE CARRIER DOES NOT PROVIDE ANY BALLISTIC PROTECTION:** The concealable carrier is designed to carry specific ABA ballistic panel packages. The fabric carrier itself provides no independent ballistic protection.

COMPANY CONFIDENTIAL

HW0139556

## IX.   WARRANTY

### LIMITED WARRANTY INFORMATION:

Subject to the warning limitations set forth in this Use and Care Manual, **American Body Armor™ (ABA)** extends the following Express Limited Warranty to the original retail purchaser of the ABA ballistic panel package and the removable fabric outer shell carrier when purchased from an authorized ABA dealer.

### XTREME® CONCEALABLE CARRIER:

Any ABA concealable carrier determined by ABA to be defective in its materials or workmanship **within one (1) year from the date of issue** will be repaired or replaced, at ABA's option, free of charge when received at the factory freight prepaid, together with proof of issue and a letter indicating the specific reason you are returning the concealable carrier.

### BALLISTIC PANELS:

Any ABA ballistic panels determined by ABA to be defective in workmanship **within five (5) years after the original retail purchase** will be repaired or replaced at ABA's option, free of charge when received at the factory freight prepaid, together with proof of issue and a letter indicating the specific reason you are returning the panels. Should the ballistic panels be broken, interrupted, or damaged in any way, *CEASE USING THE ABA ARMOR IMMEDIATELY* and return it to ABA for inspection in order to ensure proper performance.

### GENERAL:

This limited warranty is expressly in lieu of all agreements and warranties, general or special, express or implied. Any implied warranties of merchantability or fitness for a particular purpose are limited to the same duration as this express limited warranty. ABA reserves the right, in its sole and absolute discretion, to refund all or a portion of the purchase price rather than repair or replace any ballistic panel package or removable fabric outer shell carrier.

ABA shall not be liable for any incidental or consequential damages. Some states and countries do not allow the exclusion or limitation of implied warranties, incidental or consequential damages, so the above limitations and exclusions may not apply to you.

8

## TABLE OF CONTENTS

I.      Introduction ..................................................Inside Front Cover

II.     Inspection ..............................................................................2

III.    Donning the Xtreme® Concealable Vest ...........................2

IV.     Removing the Xtreme® Concealable Vest ........................4

V.      Caring for your Xtreme® Body Armor ..............................4
    A.  Cleaning the Xtreme® Concealable Carrier ..................4
    B.  Cleaning the Flexible Ballistic Panels and Trauma Plate.............4

VI.     Reassembling the Xtreme® Concealable Vest ................5

VII.    Storing your Xtreme® Concealable Vest .........................7

VIII.   When to retire your Xtreme® Concealable Vest .............7

IX.     Warranty ................................................................................8

X.      Warning! ..............................................Inside Back Cover

1

**COMPANY CONFIDENTIAL**

HW0139557

## II. INSPECTION

Your Xtreme® Vest comes preassembled from the factory. When you receive your Xtreme® Vest System from your local ABA dealer, please review and inspect all components. Your inspection should verify the following:

- Correct style and color carrier
- Correct size vest
- Correct ballistic model
- Ballistic panels are in place and properly oriented **(NIJ certification label faces towards the body)**

If, upon inspection, you find the vest system complete and acceptable, please register your warranty online at **www.xtremearmor.com**. If you have found any discrepancy during your inspection, contact your local ABA dealer.

Vest systems, like any life-saving or life-protection equipment, should be inspected periodically. We recommend a semi-annual inspection program for your armor.

Armor materials, like clothing, are subject to wear and tear. **Although there is evidence of some degradation in ballistic performance as a result of wear, armor that is properly cared for will continue to work beyond the ABA warranty period.**

## III. DONNING THE XTREME® CONCEALABLE VEST



1. Put the vest on over your head. Position vest so that the neckline of the front panel falls just below the clavicle depression (or minimum one inch below the collarbone). Next, center the vest from front to back on your body.



2. Reach around grabbing the side strapping system and fasten them loosely to the vest. We will adjust them further later.

2

## VII. STORING YOUR XTREME® CONCEALABLE VEST, QUILTED OUTER VEST, OR MESH T-SHIRT VEST

Always store the vests in the following conditions:

- **CLEAN** and dry.
- **FLAT**, not on edge.
- **OUT** of direct sunlight.
- **ON TOP** of other equipment, **NEVER UNDERNEATH**, and
- **DO NOT HANG by straps** when not in use.

When not in use, avoid storing your vest in places where it is exposed to persistent high temperatures (120°F and above) in combination with high humidity (50% and above) for long uninterrupted periods of time (two weeks or more). Ordinary daily temperature and humidity conditions experienced while wearing your vest during the routine shifts will not have an adverse effect on your Xtreme® vest's performance. Your armor should never be folded or bent.

## VIII. WHEN TO RETIRE YOUR XTREME® CONCEALABLE VEST, QUILTED OUTER VEST, OR MESH T-SHIRT VEST

- Flexible ballistic panel, the trauma plate cover, or seams are damaged or torn, exposing any portion of the ballistic panels.
- Vest is severely bunched; lumps or bunching cannot be removed.
- Any Velcro® closure is damaged or unserviceable.
- Vest and/or flexible ballistic panels have been ballistically hit, punctured, puckered or damaged.

**Categories of Wear Over Time**

| Category 1<br>Light wear | Vest shows wear with no set wrinkles, no breaks in the ballistic cover, and no unusual stains on the cover. |
| --- | --- |
| Category 2<br>Moderate wear | Vest has some minor set wrinkles at the bottom waist line of the panel, no breaks in the ballistic cover, staining or wear visible on the cover. |
| Category 3<br>Heavy wear | Vest has some minor set wrinkles in the middle of the panel, moderate to heavy set wrinkles on the edges, minor open breaks in ballistic panel cover, and stains on the cover. |
| Category 4<br>Very heavy wear | Vest has moderate-to-heavy set wrinkles in the ballistic panels, open breaks in the ballistic panel cover, and stained or heavy wear on the panel cover. |

7

place. Once the panels are inserted, press firmly to ensure that the Velcro® creates a secure attachment.

**For WOMEN:** Unzip the zipper on the inside front of the vest. INSERT the front flexible ballistic panel into the vest through the zippered opening, matching the rounded neck edge shape of the panel to the vest neck edge, taking care to place the labels on the ballistic panel toward the body side of vest. Once the panel is inserted, press firmly to ensure that the Velcro® creates a secure attachment. 

 

*Insert Trauma Plate - Male*    *Insert Trauma Plate - Female*

Next, insert the flexible trauma plate. After positioning the front ballistic panel, open the front vest to expose the interior of the vest. Locate the black inner pocket. This is where the soft ballistic trauma plate goes. Insert it into the pocket, being sure flaps of pockets secure plate. Now close the zipper.

**To insert the back ballistic panel:** First, unzip the zipper on the back of the carrier. INSERT the back flexible ballistic panel (has squared neck) through the zippered opening. Match the neck edge shape of the panel to vest neck edge, taking care to place the labels on the ballistic panel toward the body side of vest. The Xtreme® carrier incorporates a suspension system that keeps the ballistic panels in place. After the panel is inserted, press firmly to ensure that the Velcro® creates a secure attachment. The final step is to close the zipper. 

Now take the vest strap and attach the Velcro® strip to the front of the panel ensuring that the panel tab is flat. Press firmly to ensure that the Velcro® creates a secure attachment. You are now ready to repeat this process for the other shoulder. 

6



3. Next, make sure the bottom edges of the vest are aligned. The base of the front panel <u>should ride above the belt line.</u>



4. The base of the back panel <u>should also ride above the belt line with the top of the panel riding at shoulder tip level.</u>



5. Close the side openings so that the vest is in full contact with the torso, the bottom side closures align, and the front and rear panels meet or overlap on each side for continuous ballistic protection. Tightly secure the two side flaps. Attach the waist straps and adjust to a degree where the vest is secure, yet comfortable.



6. If necessary, adjust the shoulder straps to the length required to achieve correct panel positioning. The Velcro® tab at each shoulder strap end should be positioned completely within the patch of Velcro® at the front shoulders, and should not extend beyond. All strap adjustments are to be made at each front shoulder. *Note that panels do not butt at the shoulders.*

*Properly Donned Xtreme® Concealable Vest*

   

*Male Front View*    *Male Back View*    *Female Front View*    *Female Back View*

**Donning the Vest correctly will provide maximum comfort and protection.**

3

**COMPANY CONFIDENTIAL**

HW0139559

## IV. REMOVING THE XTREME® CONCEALABLE VEST

1. Locate the Velcro® straps on the right or left side of the vest and pull to release.
2. Undo right and left side.
3. Take the vest off over your head.

## V. CARING FOR THE XTREME® CONCEALABLE VEST

**A. Cleaning the Xtreme® Concealable Carrier**
1. Remove all ballistic panels and the trauma plate from the carrier.
2. Close all Velcro® fasteners. It is important that you engage all Velcro® fasteners to reduce damage to the carrier during the washing and drying cycles. A failure to exercise this step properly will void the vest warranty.
3. Machine wash carrier in warm water using mild soap or detergent.
4. Rinse thoroughly in clean, warm water.
5. Line dry or machine dry at low temperature.
6. DO NOT USE CHLORINE BLEACH, STARCH OR FABRIC SOFTENERS.
7. NEVER IRON CARRIER.

**B. Cleaning the ballistic panels & trauma plate**
1. Remove the panels from the vest.
2. DO NOT LAUNDER.
3. Remove loose dirt from the cover of the flexible ballistic panels with a damp cloth or soft brush.
4. DO NOT submerge in water, bleach, machine wash, dry clean, or apply solvents.
5. DO NOT EXPOSE FLEXIBLE BALLISTIC PANELS TO DIRECT SUNLIGHT AS IT MAY AFFECT THE BALLISTIC PERFORMANCE.
6. NEVER IRON BALLISTIC PANELS OR FLEXIBLE TRAUMA PAD.

4

**COMPANY CONFIDENTIAL**

## VI. REASSEMBLING THE XTREME® CONCEALABLE VEST

**Inserting the Xtreme® Ballistic Panel into the Concealable Carrier:**



Place the carrier on a flat surface, Xtreme® logo side up.



Your Xtreme® vest utilizes an internal suspension system to keep the ballistic panels positioned properly. To make use of the suspension system, make sure the round Velcro® discs on the back of both ballistic panels are being engaged inside the carrier up in the shoulders.

The front and back ballistic panels are shaped differently. The front flexible ballistic panel has a curvature for the neck. The back flexible ballistic panel is squared off at the top and more square on the sides. LOOK for the "THIS SIDE TO FACE BODY" label on ballistic panels.

### LABEL FACES BODY




*Front Ballistic Panel*      *Back Ballistic Panel*

**For MEN:** Unzip the zipper on the front of the vest. INSERT the front flexible ballistic panel into the vest through the zippered opening, matching the rounded neck edge shape of the panel to the vest neck edge, taking care to place the labels on the panel toward the body side of vest. The Xtreme® carrier incorporates a suspension system that keeps the ballistic panels in



5

HW0139560

*U.S. Department of Justice*
Office of Justice Programs
National Institute of Justice



# National Institute of Justice

## Law Enforcement and Corrections Standards and Testing Program

**Ballistic Resistance of
Personal Body Armor**

**NIJ Standard–0101.04**

# ABOUT THE LAW ENFORCEMENT AND CORRECTIONS STANDARDS AND TESTING PROGRAM

The Law Enforcement and Corrections Standards and Testing Program is sponsored by the Office of Science and Technology of the National Institute of Justice (NIJ), U.S. Department of Justice. The program responds to the mandate of the Justice System Improvement Act of 1979, which directed NIJ to encourage research and development to improve the criminal justice system and to disseminate the results to Federal, State, and local agencies.

The Law Enforcement and Corrections Standards and Testing Program is an applied research effort that determines the technological needs of justice system agencies, sets minimum performance standards for specific devices, tests commercially available equipment against those standards, and disseminates the standards and the test results to criminal justice agencies nationally and internationally.

The program operates through:

The *Law Enforcement and Corrections Technology Advisory Council* (LECTAC), consisting of nationally recognized criminal justice practitioners from Federal, State, and local agencies, which assesses technological needs and sets priorities for research programs and items to be evaluated and tested.

The *Office of Law Enforcement Standards* (OLES) at the National Institute of Standards and Technology, which develops voluntary national performance standards for compliance testing to ensure that individual items of equipment are suitable for use by criminal justice agencies. The standards are based upon laboratory testing and evaluation of representative samples of each item of equipment to determine the key attributes, develop test methods, and establish minimum performance requirements for each essential attribute. In addition to the highly technical standards, OLES also produces technical reports and user guidelines that explain in nontechnical terms the capabilities of available equipment.

The *National Law Enforcement and Corrections Technology Center (NLECTC),* operated by a grantee, which supervises a national compliance testing program conducted by independent laboratories. The standards developed by OLES serve as performance benchmarks against which commercial equipment is measured. The facilities, personnel, and testing capabilities of the independent laboratories are evaluated by OLES prior to testing each item of equipment, and OLES helps the NLECTC staff review and analyze data. Test results are published in Equipment Performance Reports designed to help justice system procurement officials make informed purchasing decisions.

Publications are available at no charge through the National Law Enforcement and Corrections Technology Center. Some documents are also available online through the Internet/World Wide Web. To request a document or additional information, call 800–248–2742 or 301–519–5060, or write:

National Law Enforcement and Corrections Technology Center
P.O. Box 1160
Rockville, MD 20849–1160
E-Mail: *asknlectc@nlectc.org*
World Wide Web address: *http://www.nlectc.org*

The National Institute of Justice is a component of the Office
of Justice Programs, which also includes the Bureau of Justice
Assistance, the Bureau of Justice Statistics, the Office of
Juvenile Justice and Delinquency Prevention, and the Office for
Victims of Crime.

**U.S. Department of Justice**
Office of Justice Programs
National Institute of Justice

# Ballistic Resistance of Personal Body Armor

## NIJ Standard–0101.04
## Revision A
*Supersedes NIJ Standard–0101.03, Ballistic Resistance*
*of Police Body Armor dated April 1987*
*Also supersedes NIJ Standard–0101.04, Ballistic Resistance*
*of Personal Body Armor dated September 2000*

Coordination by:
Office of Law Enforcement Standards
National Institute of Standards and Technology
Gaithersburg, MD 20899–8102

Prepared for:
National Institute of Justice
Office of Science and Technology
Washington, DC 20531

June 2001

NCJ      211680

# National Institute of Justice

The technical effort to develop this standard was conducted
under Interagency Agreement 94–IJ–R–004,
Project No. 98–001CTT.


This standard was formulated by the Office of Law Enforcement Standards (OLES)
of the National Institute of Standards and Technology (NIST),
Kathleen M. Higgins, Director.  The participants in the research
and revision of this standard were:  Carter K. Lord,
Former Test Coordinator and Ballistics Range Manager, OLES,
Steven L. Lightsey, President, The Tekne Group, Inc.,
Ken Malley, National Technical Systems (NTS), Fredericksburg, VA,
Nathaniel E. Waters, Engineering Technician, OLES,
and the Staff of National Technical Systems (NTS), Camden, AR.
The preparation of this standard was sponsored by the National Institute of Justice,
Dr. David G. Boyd, Director, Office of Science and Technology.

# FOREWORD

This document, NIJ Standard–0101.04, "Ballistic Resistance of Personal Body Armor," is an equipment standard developed by the Office of Law Enforcement Standards (OLES) of the National Institute of Standards and Technology (NIST).  It is produced as part of the Law Enforcement and Corrections Standards and Testing Program of the National Institute of Justice (NIJ).

This standard is a technical document that specifies the performance requirements that equipment should meet to satisfy the needs of criminal justice agencies for high quality service.  While purchasers can use the test methods described in this standard to determine whether a particular piece of equipment meets the essential requirements, users are encouraged to have this testing conducted only in properly accredited laboratories.  Procurement officials may also refer to this standard in their purchasing documents and require that equipment offered for purchase meet its requirements.  Compliance with the requirements of this standard may be attested to by an independent laboratory or guaranteed by the vendor.

Because this standard is designed as a procurement aid, it provides precise and detailed test methods.  For those who seek general guidance concerning the selection and application of law enforcement and corrections equipment, user guides have also been published.  The guides explain in nontechnical language how to select equipment capable of the level of performance required by a purchasing agency.

**NIJ STANDARD–0101.04 IS NOT INTENDED TO RESTRICT OR OTHERWISE INFLUENCE THE PROCUREMENT AND USE OF NIJ STANDARD–0101.03 COMPLIANT BODY ARMORS.  THE PUBLICATION AND USE OF THIS REVISION FOR NEW MODEL COMPLIANCE TESTING DOES NOT INVALIDATE OR RENDER UNSUITABLE ANY BODY ARMOR MODELS PREVIOUSLY DETERMINED TO BE COMPLIANT USING NIJ STANDARD–0101.03 REQUIREMENTS.**

NIJ standards are subjected to continuing research, development, testing, change, and review.  This standard and its successors will be reevaluated annually for success in achieving the technical goals of this revision.  These reviews will be based on data collected through the Compliance Testing Program and its certified test laboratories, as well as from valid comments from the user and manufacturing communities.  Technical comments and recommended revisions are welcome.  Please send all written comments and suggestions to the Director, Office of Science and Technology, National Institute of Justice, U.S. Department of Justice, 810 7th St., NW, Washington, DC 20531.

Before citing this or any other NIJ standard in a contract document, users should verify that the most recent edition of the standard is used.  Write to the Director, Office of Law Enforcement Standards, National Institute of Standards and Technology, 100 Bureau Drive, Stop 8102, Gaithersburg, MD 20899–8102.

Dr. David G. Boyd, Director
Office of Science and Technology
National Institute of Justice

# ACKNOWLEDGMENTS

This standard has been reviewed and approved by the Weapons and Protective Systems Subcommittee and the Executive Committee of the Law Enforcement and Corrections Technology Advisory Council (LECTAC) and also by the National Armor Advisory Board (NAAB), currently comprised of representatives from:

Accordis Fibers, Inc.
American Body Armor and Equipment Co.
California Department of Corrections
Chesterfield County Police Department, Virginia
Department of Justice
DHB Armor Group
DuPont Advanced Fiber Systems
Federal Bureau of Investigation
Fraternal Order of Police
Guardian Technologies, International
Hexcel Schwebel High Performance Fibers
Honeywell/Allied Signal, Inc.
International Association of Chiefs of Police
International Brotherhood of Police Officers
National Association of Police Organizations
National Sheriff's Association
Office of Community Oriented Policing Services
Protective Apparel Corporation of America
Safariland Ltd., Inc.
U.S. Armor Corporation
U.S. Secret Service, TSD/P&D

# CONTENTS

Page

FOREWORD ...................................................................................................... iii
ACKNOWLEDGMENTS ...................................................................................... v
SYMBOLS AND ABBREVIATIONS ................................................................... ix
1. PURPOSE AND SCOPE ...............................................................................1
2. NIJ BODY ARMOR CLASSIFICATION ......................................................1
    2.1  Type I (22 LR; 380 ACP) ......................................................................2
    2.2  Type IIA (9 mm; 40 S&W) .....................................................................2
    2.3  Type II (9 mm; 357 Magnum) ................................................................2
    2.4  Type IIIA (High Velocity 9 mm; 44 Magnum) ......................................2
    2.5  Type III (Rifles) .....................................................................................2
    2.6  Type IV (Armor Piercing Rifle) .............................................................3
    2.7  Special Type ...........................................................................................3
3. DEFINITIONS ..............................................................................................3
4. REQUIREMENTS .........................................................................................8
    4.1  Acceptance Criteria ...............................................................................8
    4.2  Test Sequence ........................................................................................8
    4.3  Workmanship ..........................................................................................8
    4.4  Traceability ............................................................................................8
    4.5  Labeling ..................................................................................................8
    4.6  Ballistic Penetration and Backface Signature Criteria..........................13
    4.7  Sampling ...............................................................................................14
    4.8  Armor Backing Material .......................................................................14
    4.9  Test Surveillance ..................................................................................15
    4.10 Compliance Test Documentation..........................................................15
5. TEST METHODS .........................................................................................16
    5.1  Purpose .................................................................................................16
    5.2  Sampling ...............................................................................................16
    5.3  References .............................................................................................16
    5.4  Ballistic Penetration and Backface Signature Test (P-BFS)................17
    5.5  Velocity Measurement Equipment .......................................................19
    5.6  Wet Conditioning..................................................................................20
    5.7  Backing Material Fixture Preparation...................................................21
    5.8  Workmanship Examination ...................................................................23
    5.9  Armor Conditioning..............................................................................24
    5.10 Range Configuration.............................................................................24
    5.11 Test Preparation ...................................................................................26
    5.12 Firing Sequence for Type I, IIA, II, and IIIA Armor...........................28
    5.13 Firing Sequence for Type III Armor.....................................................32
    5.14 Firing Sequence for Type IV Armor.....................................................33

5.15  P-BFS Test (Special Type) .......................................................35
5.16  P-BFS Test for Groin and Coccyx Protectors...........................35
5.17  Baseline Ballistic Limit Determination Test ............................35
5.18  Ballistic Limit Testing Equipment...........................................36
5.19  Ballistic Limit Test Preparation ..............................................37
5.20  Ballistic Limit Firing Sequence ..............................................38
5.21  Ballistic Limit Determination ..................................................39
5.22  Ballistic Limit Retesting of Compliant Armor .........................39
6.    DATA COLLECTION AND REPORTING ....................................40
APPENDIX A–Compliance Test Report Form ....................................41
APPENDIX B–Modified Langlie Method of Ballistic Limit Firing .............42
APPENDIX C–Body Armor Selection...................................................44
APPENDIX D–Acceptable Bullets for Handloading ...........................45

# TABLES

Table 1.  NIJ Standard–0101.04 P-BFS performance test summary ...............................18
Table 2.  NIJ baseline Ballistic Limit determination test summary ................................36

# FIGURES

Figure 1.  Angle of incidence...............................................................................3
Figure 2.  Sample pretest and post test ballistic panel labels............................................10
Figure 3.  Sample carrier label...........................................................................12
Figure 4.  Sample label locations.........................................................................13
Figure 5.  General pretest drop locations.................................................................22
Figure 6.  Test range configuration........................................................................25
Figure 7.  General armor panel impact locations (front and back) ....................................27
Figure 8.  Acceptable strapping methods..................................................................28
Figure 9.  Impact locations for baseline BL determination testing – Type I
           through IIIA ..................................................................................37

# STANDARD SPECIFIC ABBREVIATIONS

| | | | |
|---|---|---|---|
| ACP = | Automatic Colt Pistol | LR = | Long Rifle |
| ANSI = | American National Standards Institute | LRN = | Lead Round Nose |
| AP = | Armor Piercing | NLECTC = | National Law Enforcement and Corrections |
| BFS = | Backface Signature | | Technology Center |
| BL = | Ballistic Limit | P-BFS = | Penetration and Backface Signature |
| CP = | Complete Penetration | PP = | Partial Penetration |
| CPO = | Compliance Program Office | RN = | Round Nose |
| CTP = | Compliance Testing Program | S&W = | Smith & Wesson |
| CTR = | Compliance Test Report | SAAMI = | Sporting Arms and Ammunition |
| FMJ = | Full Metal Jacket | | Manufacturers Institute |
| JHP = | Jacketed Hollow Point | SJHP = | Semi Jacketed Hollow Point |
| JSP = | Jacketed Soft Point | SJSP = | Semi Jacketed Soft Point |

# COMMONLY USED SYMBOLS AND ABBREVIATIONS

| | | | | | |
|---|---|---|---|---|---|
| A | ampere | H | henry | nm | nanometer |
| ac | alternating current | h | hour | No. | number |
| AM | amplitude modulation | hf | high frequency | o.d. | outside diameter |
| cd | candela | Hz | hertz | $\Omega$ | ohm |
| cm | centimeter | i.d. | inside diameter | p. | page |
| CP | chemically pure | in | inch | Pa | pascal |
| c/s | cycle per second | IR | infrared | pe | probable error |
| d | day | J | joule | pp. | pages |
| dB | decibel | L | lambert | ppm | parts per million |
| dc | direct current | L | liter | qt | quart |
| °C | degree Celsius | lb | pound | rad | radian |
| °F | degree Fahrenheit | lbf | pound-force | rf | radio frequency |
| diam | diameter | lbf·in | pound-force inch | rh | relative humidity |
| emf | electromotive force | lm | lumen | s | second |
| eq | equation | ln | logarithm (base e) | SD | standard deviation |
| F | farad | log | logarithm (base 10) | sec. | section |
| fc | footcandle | M | molar | SWR | standing wave ratio |
| fig. | figure | m | meter | uhf | ultrahigh frequency |
| FM | frequency modulation | min. | minute | UV | ultraviolet |
| ft | foot | mm | millimeter | V | volt |
| ft/s | foot per second | mph | miles per hour | vhf | very high frequency |
| *g* | acceleration | m/s | meter per second | W | watt |
| g | gram | N | newton | $\lambda$ | wavelength |
| gr | grain | N·m | newton meter | wt | weight |

area=unit$^2$ (e.g., ft$^2$, in$^2$, etc.); volume=unit$^3$ (e.g., ft$^3$, m$^3$, etc.)

<table>
<tr><th colspan="4" align="center">PREFIXES</th><th colspan="2" align="center">COMMON CONVERSIONS<br>(See ASTM E380)</th></tr>
<tr><td>d</td><td>deci (10$^{-1}$)</td><td>da</td><td>deka (10)</td><td>0.30480 m = 1 ft</td><td>4.448222 N = 1 lbf</td></tr>
<tr><td>c</td><td>centi (10$^{-2}$)</td><td>h</td><td>hecto (10$^2$)</td><td>2.54 cm = 1 in</td><td>1.355818 J = 1 ft·lbf</td></tr>
<tr><td>m</td><td>milli (10$^{-3}$)</td><td>k</td><td>kilo (10$^3$)</td><td>0.4535924 kg = 1 lb</td><td>0.1129848 N m = 1 lbf·in</td></tr>
<tr><td>$\mu$</td><td>micro (10$^{-6}$)</td><td>M</td><td>mega (10$^6$)</td><td>0.06479891g = 1 gr</td><td>14.59390 N/m = 1 lbf/ft</td></tr>
<tr><td>n</td><td>nano (10$^{-9}$)</td><td>G</td><td>giga (10$^9$)</td><td>0.9463529 L = 1 qt</td><td>6894.757 Pa = 1 lbf/in$^2$</td></tr>
<tr><td>p</td><td>pico (10$^{-12}$)</td><td>T</td><td>tera (10$^{12}$)</td><td>3600000 J = 1 kW·hr</td><td>1.609344 km/h = 1 mph</td></tr>
</table>

Temperature: $T_{°C} = (T_{°F}-32) \times 5/9$

Temperature: $T_{°F} = (T_{°C} \times 9/5)+32$

x

# NIJ STANDARD
# FOR
# BALLISTIC RESISTANCE OF PERSONAL BODY ARMOR

## 1. PURPOSE AND SCOPE

The purpose of this standard is to establish minimum performance requirements and test methods for the ballistic resistance of personal body armor intended to protect the torso against gunfire. This standard is a general revision of NIJ Standard–0101.03, dated April 1987, updating the labeling requirements, acceptance criteria, test ammunition, procedures, and other items throughout the standard. Revision A of NIJ Standard–0101.04, dated June 2001, provides clarification to the text, methodology and test procedures of NIJ Standard–0101.04.

The scope of the standard is limited to ballistic resistance only; this standard does not address threats from knives and sharply pointed instruments, which are different types of threat.

## 2. NIJ BODY ARMOR CLASSIFICATION

Personal body armors covered by this standard are classified into seven classes, or types, by level of ballistic performance. The ballistic threat posed by a bullet depends, among other things, on its composition, shape, caliber, mass, angle of incidence, and impact velocity. Because of the wide variety of bullets and cartridges available in a given caliber and because of the existence of handloaded ammunition, armors that will defeat a standard test round may not defeat other loadings in the same caliber. For example, an armor that prevents complete penetration by a 40 S&W test round may or may not defeat a 40 S&W round with higher velocity. In general, an armor that defeats a given lead bullet may not resist complete penetration by other bullets of the same caliber of different construction or configuration. The test ammunition specified in this standard represent general, common threats to law enforcement officers.

As of the year 2000, ballistic resistant body armor suitable for full time wear throughout an entire shift of duty is available in classification Types I, IIA, II, and IIIA, which provide increasing levels of protection from handgun threats. Type I body armor, which was first issued during the NIJ demonstration project in 1975, is the minimum level of protection that any officer should have. Officers seeking protection from lower velocity 9 mm and 40 S&W ammunition typically wear Type IIA body armor. For protection against high velocity 357 Magnum and higher velocity 9 mm ammunition, officers traditionally select Type II body armor. Type IIIA body armor provides the highest level of protection available in concealable body armor and provides protection from high velocity 9 mm and 44 Magnum ammunition.

Type IIIA armor is suitable for routine wear in many situations; however, departments located in hot, humid climates may need to carefully evaluate their use of Type IIIA body armor

for their officers.  Types III and IV armor, which protect against high powered rifle rounds, are clearly intended for use only in tactical situations when the threat warrants such protection (see app. C).

The classification of an armor panel that provides two or more levels of NIJ ballistic protection at different locations on the ballistic panel shall be that of the minimum ballistic protection provided at any location on the panel.

## 2.1    Type I (22 LR; 380 ACP)

This armor protects against .22 caliber Long Rifle Lead Round Nose (LR LRN) bullets, with nominal masses of 2.6 g (40 gr) impacting at a minimum velocity of 320 m/s (1050 ft/s) or less, and 380 ACP Full Metal Jacketed Round Nose (FMJ RN) bullets, with nominal masses of 6.2 g (95 gr) impacting at a minimum velocity of 312 m/s (1025 ft/s) or less.

## 2.2    Type IIA (9 mm; 40 S&W)

This armor protects against 9 mm Full Metal Jacketed Round Nose (FMJ RN) bullets, with nominal masses of 8.0 g (124 gr) impacting at a minimum velocity of 332 m/s (1090 ft/s) or less, and 40 S&W caliber Full Metal Jacketed (FMJ) bullets, with nominal masses of 11.7 g (180 gr) impacting at a minimum velocity of 312 m/s (1025 ft/s) or less.  It also provides protection against the threats mentioned in section 2.1.

## 2.3    Type II (9 mm; 357 Magnum)

This armor protects against 9 mm Full Metal Jacketed Round Nose (FMJ RN) bullets, with nominal masses of 8.0 g (124 gr) impacting at a minimum velocity of 358 m/s (1175 ft/s) or less, and 357 Magnum Jacketed Soft Point (JSP) bullets, with nominal masses of 10.2 g (158 gr) impacting at a minimum velocity of 427 m/s (1400 ft/s) or less.  It also provides protection against the threats mentioned in sections 2.1 and 2.2.

## 2.4    Type IIIA (High Velocity 9 mm; 44 Magnum)

This armor protects against 9 mm Full Metal Jacketed Round Nose (FMJ RN) bullets, with nominal masses of 8.0 g (124 gr) impacting at a minimum velocity of 427 m/s (1400 ft/s) or less, and 44 Magnum Semi Jacketed Hollow Point (SJHP) bullets, with nominal masses of 15.6 g (240 gr) impacting at a minimum velocity of 427 m/s (1400 ft/s) or less.  It also provides protection against most handgun threats, as well as the threats mentioned in sections 2.1, 2.2, and 2.3.

## 2.5    Type III (Rifles)

This armor protects against 7.62 mm Full Metal Jacketed (FMJ) bullets (U.S. Military designation M80), with nominal masses of 9.6 g (148 gr) impacting at a minimum velocity of 838 m/s (2750 ft/s) or less.  It also provides protection against the threats mentioned in sections 2.1, 2.2, 2.3, and 2.4.

2

**2.6     Type IV (Armor Piercing Rifle)**

This armor protects against .30 caliber armor piercing (AP) bullets (U.S. Military designation M2 AP), with nominal masses of 10.8 g (166 gr) impacting at a minimum velocity of 869 m/s (2850 ft/s) or less.  It also provides at least single hit protection against the threats mentioned in sections 2.1, 2.2, 2.3, 2.4, and 2.5.

**2.7     Special Type**

A purchaser having a special requirement for a level of protection other than one of the above standard types and threat levels should specify the exact test round(s) and minimum reference impact velocities to be used, and indicate that this standard shall govern in all other aspects.

# 3.  DEFINITIONS

**3.1     Angle of Incidence**

The angle between the line of flight of the bullet and the perpendicular to the front surface of the backing material fixture as shown in figure 1.



*Figure 1.  Angle of incidence*

**3.2     Armor Carrier**

A component of the armor sample or armor panel whose primary purpose is to retain the ballistic panel and provide a means of supporting and securing the armor garment to the user. These carriers are not generally ballistic resistant.

**3.3     Armor Panel**

The portion of an armor sample that generally consists of an external carrier and its internal ballistic protective component(s) (e.g., the front and back panels).

**3.4    Armor Sample**

One complete armor garment comprised of a single wraparound style jacket, or a set (two) of front and back armor panels.

**3.5    Backface Signature (BFS)**

The depth of the depression made in the backing material, created by a nonpenetrating projectile impact, measured from the plane defined by the front edge of the backing material fixture.  For armor tested on built up or curved backing material, the BFS is measured from the plane defined by the top edges of the depression or crater formed by the impact.

**3.6    Backing Material**

A homogenous block of nonhardening, oil base modeling clay, placed in contact with the back of the armor panel during ballistic testing.

**3.7    Backing Material Fixture**

A box fixture containing the backing material, typically comprised of a rigid frame constructed of wood or metal with a removable wooden back.  The wooden back is not used during Ballistic Limit testing.

**3.8    Baseline Ballistic Limit**

The experimentally derived, statistically calculated impact velocity at which a projectile is expected to completely penetrate an armor component (sample, panel or ballistic panel) 50 % of the time ($V_{50}$).  This velocity is also the velocity at which a projectile is expected to be stopped by the armor 50 % of the time ($V_{50}$).

**3.9    Ballistic Panel**

The protective component of an armor sample or panel, primarily consisting of ballistic resistant materials, usually enclosed in a nonremovable cover.  The ballistic panel is normally retained within the armor sample or panel by a separate fabric carrier, and may be removable from the carrier.

**3.10    Certification of Compliance**

Manufacturer's affidavit (certification) that a production unit of body armor meets (complies with) all of the requirements of this standard (sec. 4.0) for the labeled protection classification (sec. 2.0).

**3.11    Compliance**

NIJ approval, after successful ballistic performance testing to this standard, of a body armor model submitted to the NIJ Compliance Testing Program (CTP).

### 3.12    Compliance Test Group

A group of armor samples, either six, four, or nine complete garments, submitted to the NIJ CTP for testing according to this standard (sec. 4.7).

### 3.13    Deformation

The maximum momentary displacement of the rear surface of an armor panel, caused by a fair hit that does not penetrate the armor, when the armor is in initial contact with the backing material.

### 3.14    Fair Hit

A bullet that impacts the armor sample or panel at an angle of incidence no greater than $\pm 5°$ from the intended angle of incidence, no closer to the edge of the ballistic panel than 76 mm (3.0 in) and no closer to a prior hit than 51 mm (2.0 in), at an impact velocity within $\pm 9.1$ m/s (30 ft/s) of the required reference test velocity.

A bullet that impacts the armor sample or panel at an angle of incidence no greater than $\pm 5°$ from the intended angle of incidence, no closer to the edge of the ballistic panel than 76 mm (3.0 in) and no closer to a prior hit than 51 mm (2.0 in), at an impact velocity <u>less than</u> 9.1 m/s (30 ft/s) <u>below</u> the required reference test velocity <u>which produces</u> a penetration or an excessive backface signature.

A bullet that impacts the armor sample or panel at an angle of incidence no greater than $\pm 5°$ from the intended angle of incidence, no closer to the edge of the ballistic panel than 76 mm (3.0 in) and no closer to a prior hit than 51 mm (2.0 in), at an impact velocity <u>more than</u> 9.1 m/s (30 ft/s) <u>above</u> the required reference test velocity <u>which does not produce</u> a penetration or an excessive backface signature.

### 3.15    Full Metal Jacketed Bullet (FMJ)

A bullet consisting of a lead core completely covered, except for the base, with copper alloy (approximately 90 % copper and 10 % zinc).  "Total Metal Jacket (TMJ)," "Totally Enclosed Metal Case (TEMC)," and other commercial terminology for bullets with electro deposited copper and copper alloy coatings have been tested and are considered comparable to Full Metal Jacketed (FMJ) bullets for this standard.

### 3.16    Insert

A removable or nonremovable unit of ballistic material which can be part of either the armor or ballistic panel, which is utilized to enhance the ballistic performance of an armor in a specific area (also known as "trauma packs" or "trauma plates").

**3.17    Jacketed Hollow Point Bullet (JHP)**

A bullet consisting of a lead core which has a hollow cavity or hole located in the nose of the bullet and is completely covered except for the hollow point with a copper alloy (approximately 90 % copper and 10 % zinc) jacket.

**3.18    Jacketed Soft Point Bullet (JSP)**

A lead bullet, also known as a Semi Jacketed Soft Point (SJSP), completely covered, except for the point, with copper alloy (approximately 90 % copper and 10 % zinc) jacket.

**3.19    Lead Bullet**

A bullet made entirely of lead, which may be alloyed with hardening agents.

**3.20    Minimum Velocity**

The designated NIJ Standard–0101.04 reference impact velocity (sec.5.4, table 1) less 9.1 m/s (30 ft/s).

**3.21    Model**

A manufacturer's designation (name, number, or other description) that serves to uniquely identify a specific configuration of body armor based upon the details of the ballistic panel construction (i.e., the number of layers of one or more types of ballistic resistant material assembled in a specific manner or the manner in which the armor is held in place upon the torso).

NIJ verifies the ballistic resistance of a **model** based on ballistic testing of **model** samples in accordance with this standard.  As an example, differences in stitching (e.g., box stitch versus quilt stitch) would make the ballistic panels different **models.**  If a **model** of armor fails compliance testing, the manufacturer may never resubmit any armor under that model designation.

**3.22    Obliquity**

The same determination of striking condition as "angle of incidence" (sec. 3.1).

**3.23    Penetration**

Complete Penetration (CP):  The complete perforation of an armor sample or panel by a test bullet or by a fragment of the bullet or armor sample itself, as evidenced by the presence of that bullet or fragment (armor or bullet) in the backing material, or by a hole which passes through the armor and/or backing material.

Partial Penetration (PP):  Any impact that is not a complete penetration is considered a partial penetration.

**3.24    Reference Bullet Velocity**

The designated impact velocity of NIJ Standard–0101.04 test threat ammunition (sec. 5.4, table 1), obtained using specified ANSI/SAAMI unvented velocity test barrels.

**3.25    Retest**

The NIJ CTP procedure for resolving ballistic performance issues with NIJ Standard–0101.04 compliant body armor models (sec. 5.22).

**3.26    Round Nose Bullet (RN)**

A bullet with a blunt or rounded nose.  A bullet with a generally blunt or rounded nose or tip, which possesses a small flat surface at the tip of the bullet shall also be considered a round nose bullet for this standard.

**3.27    Semi Jacketed Hollow Point Bullet (SJHP)**

A bullet consisting of a lead core with a copper alloy (approximately 90 % copper and 10 % zinc) jacket covering the base and bore riding surface (major diameter), which leaves some portion of the lead core exposed, thus forming a lead nose or tip, which has a hollow cavity or hole located in the nose or tip of the bullet.

**3.28    Semi Jacketed Soft Point Bullet (SJSP)**

A bullet, also known as a Jacketed Soft Point (JSP), consisting of a lead core with a copper alloy (approximately 90 % copper and 10 % zinc) jacket covering the base and bore riding surface (major diameter), which leaves some portion of the lead core exposed, thus forming a lead nose or tip.

**3.29    Strike Face**

The surface of an armor sample or panel, designated by the manufacturer, as the surface that should face the incoming ballistic threat.

**3.30    Wear Face**

The surface of an armor sample or panel, designated by the manufacturer, as the surface that should be worn against the body.

**3.31    Yaw**

The angular deviation of the longitudinal axis of the projectile from its line of flight, measured as close to the target as practical.

# 4.  REQUIREMENTS

## 4.1    Acceptance Criteria

An armor model satisfies the requirements of this standard if all six armor samples (sec. 4.7) meet workmanship (sec. 4.3) and labeling (sec. 4.5) requirements and, when tested in accordance with section 5.0, each component part of the armor sample (front, back, side, groin and coccyx) meets the penetration and backface signature (P-BFS) requirements of sections 4.6, 5.4, and table 1.

Each submitted armor sample that has successfully met the P-BFS requirements of sections 4.6, 5.4, and table 1, will also be tested to determine a baseline Ballistic Limit velocity (sec. 5.17), to be used for any future NIJ retest examination of that armor model (sec. 5.22). After P-BFS testing, if the sample's construction is found inconsistent, then the baseline Ballistic Limit test will not be performed and the P-BFS test results will be declared inconclusive.

## 4.2    Test Sequence

Tests shall be conducted in the order presented in section 5.0 of this standard.  The Compliance Test Report (CTR), found in appendix A, shall be used to record and document the results of the tests.

## 4.3    Workmanship

Each armor sample shall be free from wrinkles, blisters, cracks or fabric tears, crazing, chipped or sharp corners and edges, or other evidence of inferior workmanship.  Additionally, all samples shall be identical in appearance, size, and manner of construction.

## 4.4    Traceability

Manufacturers will submit along with their samples, or have on file with NIJ's CTP Office, documentation of the method(s) they use to assure configuration control, uniformity of production methods, and materials traceability.

## 4.5    Labeling

Each set or sample of ballistic resistant armor submitted for compliance testing shall be durably and clearly marked (labeled), in a readable type and font size, with a pretest label in accordance with the requirements set forth below.  A separate, unattached post test production label containing the compliance statement (sec. 4.5.1 (m)) will be submitted as part of the armor sample's initial compliance documentation.  Examples are shown in figure 2.  Pretest and post test production label formats may consist of:

(a) A separate, secondary label containing the compliance statement in sec. 4.5.1 (m) may be added separately to the pretest label on the panel, to produce a post test production label.
(b) Post test production labels with the compliance statement completely and permanently obliterated may be used for one time pretest labels.

(c) Post test production labels with the compliance statement placed at the top or bottom of the label may be used for pretest labels when the compliance statement section is removed (cut) away.

### 4.5.1   Ballistic Panels

Every ballistic panel shall have a label.  The label shall be permanently attached to either exterior surface of the panel.  The label shall contain the following information, written in the English language (fig. 2.):

(a) Name, logo or other identification of the manufacturer.
(b) The rated level of protection, according to section 2.0 of this standard, and referenced to this edition of the standard (i.e., Type II in accordance with NIJ Standard–0101.04).
(c) Size (if custom fitted, provision for the name of the individual for whom it is made).
(d) Lot number.
(e) Date of manufacture.
(f) Date of issue line (to be filled in by user).
(g) A model designation that uniquely identifies the panel for purchasing purposes (panels designed to fit the male and female torsos shall have separate model designations).
(h) Strike face or wear face - the surface of the garment that is to face the threat or to be worn next to the body must be identified.
(i) Serial number.
(j) Care instructions for the ballistic material in accordance with 16 CFR 423 (Part 423, Care Labeling of Textile Wearing Apparel and Certain Piece Goods, as amended effective January 2, 1984; Federal Trade Commission Regulation Rule).
(k) For Type I through Type IIIA armor, a warning in type at least <u>twice</u> the size of the rest of the type on the label, exclusive of the information required in "a" above, stating that the armor is not intended to protect the wearer from rifle fire and, if applicable, that the armor is not intended to protect the wearer from sharp edged or pointed instruments. (Note: printing color changes are acceptable but cannot be substituted for the type size requirement herein).
(l) For armor that has been successfully tested for compliance to this standard through NIJ's voluntary CTP at an NIJ-approved testing facility, the following statement shall be included on the post test production label:   *"The Manufacturer certifies that this model of armor has been tested through NLECTC and has been found to comply with Type (insert appropriate type designation) Performance for NIJ  Standard–0101.04."*
(m) **THE COMPLIANCE STATEMENT ABOVE SHALL NOT APPEAR ON ARMOR THAT HAS FAILED NIJ COMPLIANCE TESTING, OR ON ARMOR THAT HAS NOT BEEN TESTED FOR COMPLIANCE AS SPECIFIED BY THIS STANDARD.  ONCE AUTHORIZED TO PLACE THIS STATEMENT ON A MODEL OF ARMOR, THE MANUFACTURER SHALL NOT ALTER OR MODIFY THIS STATEMENT IN ANY WAY.**
(n) Acceptable formats for pretest and post test production labels may be obtained by contacting the NIJ CTO.

**MANUFACTURER'S NAME**
**MANUFACTURER'S ADDRESS**
(Logo may be used)

**PERSONAL BODY ARMOR**

**MODEL:** _____
**SIZE:** _____
**DATE OF MFG:** _____
**SERIAL NO.:** _____
**DATE OF ISSUE:** _____
**LOT NO.:** _____

**Threat Level (NIJ STD-0101.04): ___**

# *WARNING!*

## *This Garment Is Rated ONLY for the Ballistic Threat Level Stated Above. It Is NOT Intended To Protect against Rifle Fire, or Sharp Edged or Pointed Instruments.*

***\*\*WEAR FACE\*\****
*THIS SIDE TO BE WORN AGAINST BODY*

Care Instructions for Ballistic Panel:
*(Sample Instructions Shown)*
1)     Do Not Wash Or Dry Clean
2)     Wipe With A Damp Cloth

---

**MANUFACTURER'S NAME**
**MANUFACTURER'S ADDRESS**
(Logo may be used)

**PERSONAL BODY ARMOR**

**MODEL:** _____
**SIZE:** _____
**DATE OF MFG:** _____
**SERIAL NO.:** _____
**DATE OF ISSUE:** _____
**LOT NO.:** _____

**Threat Level (NIJ STD-0101.04): ___**

*The Manufacturer certifies that this model of armor has been tested through NLECTC and has been found to comply with Type [  ] Performance in accordance with NIJ Standard-0101.04.*

# *WARNING!*

## *This Garment Is Rated ONLY for the Ballistic Threat Level Stated Above. It Is NOT Intended To Protect against Rifle Fire, or Sharp Edged or Pointed Instruments.*

***\*\*WEAR FACE\*\****
*THIS SIDE TO BE WORN AGAINST BODY*

Care Instructions for Ballistic Panel:
*(Sample Instructions Shown)*
1)  Do Not Wash Or Dry Clean
2)  Wipe With A Damp Cloth

*Figure 2.  Sample pretest and post test ballistic panel labels*

10

**4.5.2    Armor Carriers with Nonremovable Ballistic Panels**

Armor with ballistic panels that are nonremovable shall, in addition to the label required for the ballistic panel, have a label on the carrier (fig.3) that is in conformance with the requirements for the ballistic panels (sec. 4.5.1) unless the armor is so constructed that the ballistic panel label is not covered by the carrier.

**4.5.3    Armor Carriers with Removable Ballistic Panels**

Armor carriers with removable ballistic panels shall have label(s) on either exterior surface of the carrier.  If the carrier is one piece (i.e., all parts are sewn together into one garment) one label in conformance with the requirements of this section is sufficient.  If the front and back of the carrier are separable, the front and back parts shall each be labeled.  The label shall contain the following information (fig. 3):

(a) Name, logo or other identification of the manufacturer.
(b) A statement telling the user to look at the ballistic panels to determine the level of ballistic protection.
(c) Size (if custom fitted, provision for the name of the individual for whom it is made to be filled in by user).
(d) Date of issue line (to be filled in by user).
(e) A model designation that uniquely identifies the garment for purchasing purposes (armor designed to fit the male and female torso shall have separate model designations).
(f) For armors where the carrier extends beyond the ballistic panel more than 40 mm (1.5 in), the edge of the panel shall be clearly identified on the carrier by a label stating: "NO BALLISTIC PROTECTION BEYOND THIS POINT" (fig.4), and a stitch line through both sides of the carrier at this location to keep the ballistic panel from shifting within the carrier.
(g) Care instructions for the armor carrier in accordance with 16 CFR 423.

**MANUFACTURERS NAME**
**MANUFACTURER'S ADDRESS**
(Logo may be used)

**PERSONAL BODY ARMOR**

NAME: _____

SIZE: _____     MODEL: _____

DATE OF MFG: _____     SERIAL NO.: _____

DATE OF ISSUE: _____     LOT NO.: _____

*This carrier offers no ballistic protection without ballistic panels being inserted.*
*See ballistic panel labels for protection level provided in accordance with*
*NIJ  Standard–0101.04.*

**CARE INSTRUCTIONS FOR CARRIER:**
*(sample instructions shown – to be provided by Manufacturer)*

1) **Remove Ballistic Panels from Front and Back of Outer Shell Vest (Carrier).**
2) **Ensure Hook and Pile Fasteners are in Closed Position during Washing Cycle.**
3) **Automatic Machine Wash the Outer Shell Vest (Carrier) Only, Using the Permanent Press Cycle and Warm Water Settings (Approximately 120 ˚F).**
4) **Use Low Sudsing Detergent According to Detergent Manufacturer's Directions.**
5) **DO NOT USE BLEACH.**
6) **Carrier Only may be Tumble Dried at Medium Temperature Setting or may be Line Dried.**
7) **Carrier Only may be Dry Cleaned.**
8) **Carrier Must be Completely Dry Before Inserting Ballistic Panels.**

*Figure 3.  Sample carrier label*



*Figure 4. Sample label locations*

### 4.5.4   Armors with Built In Trauma Packs

For armor models that contain built in inserts or trauma packs, manufacturers must submit a detailed diagram of the location of each trauma pack.  If a manufacturer fails to notify the NIJ CTP Office of the existence of a built in insert or trauma pack and it is discovered during testing, the test results for that model will be invalidated.  The manufacturer may resubmit the model for testing under the same model designation after resolving the lack of documentation concerning the location of the insert or trauma pack.

### 4.6      Ballistic Penetration and Backface Signature Criteria

Each part of one complete body armor sample shall be tested for resistance to ballistic penetration and backface signature (depth of depression in backing material) after wet conditioning in accordance with the procedures in section 5.0.  Complete penetration or any designated depth measurement of BFS in the backing material greater than 44 mm (1.73 in) by any fair hit (as defined in sec. 3.14) shall constitute a failure.

If any armor sample part fails at any time during compliance testing, data for that shot shall be recorded and the testing continued until all required testing is completed. The detailed test requirements are summarized in section 5.4, table 1.  Type I, IIA, II, or IIIA armor designed to include a removable insert for additional penetration or BFS protection over a localized area of the armor sample or panel shall be tested without the insert.

## 4.7    Sampling

### 4.7.1    Types I, IIA, II, and IIIA

Six complete armors, sized to fit a 117 cm (46 in) to 122 cm (48 in) chest circumference for males and a 107 cm (42 in) to 112 cm (44 in) chest circumference for females, shall constitute the compliance test group. Five of these armor samples shall be selected at random from the group and used for ballistic testing. Four armor samples will be used for Penetration and Backface Signature testing (sec. 5.4), and one armor sample will be used for baseline Ballistic Limit determination (sec. 5.17).  The remaining armor sample will be returned to the manufacturer if not used in the ballistic testing.

### 4.7.2    Type III

Four complete armor samples, or panels, no smaller than 254 mm x 305 mm (10.0 in x 12.0 in) shall constitute a compliance test group.  Two of these armor samples shall be selected at random from the group and used for the testing.  Two armors will be used for Penetration and Backface Signature testing, and at least one armor sample will be used for baseline Ballistic Limit determination (sec. 5.17).  Any remaining armor samples will be returned to the manufacturer if not used in the ballistic testing.

### 4.7.3    Type IV

Nine complete armor samples/panels/inserts, no smaller than 203 mm x 254 mm (8.0 in x 10.0 in) shall constitute a compliance test group.  Eight of these armor samples shall be selected at random and used for the testing.  Two armor samples will be used for Penetration and Backface Signature testing, and at least six complete armor samples will be used for baseline Ballistic Limit determination (sec. 5.17).  Any remaining armor samples will be returned to the manufacturer if not used in the testing.

## 4.8    Armor Backing Material

### 4.8.1    Backing Material Fixture

A minimum of three backing material fixtures filled with appropriate backing material are required.  The inside dimensions of the backing material fixture shall be 610 mm x 610 mm x 140 mm ± 2 mm (24.0 in x 24.0 in x 5.5 in ± 0.06 in) deep.  The tolerance on all dimensions will be ± 2 mm (0.06 in).

The back of the fixture shall be removable and constructed of 19.1 mm (0.75 in) thick wood or plywood.

### 4.8.2    Fixture Construction

The sides of the box fixture shall be constructed of rigid wood or metal, preferably with a metal front edge to reliably guide the preparation of the flat front surface of the backing material. The backing material shall be worked into the fixture (box) with as few voids as possible.  The backing material surface shall be cut, "struck," or otherwise manipulated to result in a smooth, flat front surface even with the front edges of the box fixture.

### 4.8.3    Backing Material

It has been determined that Roma Plastilina No.1[1] oil-based modeling clay is acceptable for the backing material application.  In the interest of conformity only, it is being specified as the designated backing material for all NIJ  Standard–0101.04 Body Armor Compliance Testing. This material is available from art supply stores.

### 4.8.4    Backing Material Replacement and Identification

Clay used as backing material in NIJ Compliance Testing shall be replaced on an annual basis as a minimum, and the replacement date shall be recorded on the backing material fixture.

### 4.9    Test Surveillance

NIJ representatives may witness compliance testing at any time.  NIJ or its designated representatives shall be afforded the opportunity to examine the range and test setup before beginning any new series of compliance testing.  The manufacturer shall inform NIJ CTP personnel of the intent to test at least two weeks before the start of testing.

### 4.10    Compliance Test Documentation

All NIJ compliance testing will be formally documented using the CTR found in appendix A.  Submission of this form will be made to the NIJ CTP Office within 10 working days following the completion of testing.

---

[1]The use of brand names in this standard does not constitute endorsement by the U.S. Department of Justice; National Institute of Justice; U.S. Department of Commerce; National Institute of Standards and Technology; Office of Law Enforcement Standards; or any other agency of the United States Federal Government, nor does it imply that the product is best suited for its intended applications.

# 5.  TEST METHODS

## 5.1    Purpose

This section constitutes the formal test procedure for Penetration and Backface Signature (P-BFS) and baseline Ballistic Limit (BL) determination testing of personal body armor intended for use by Law Enforcement and Corrections personnel.  It specifies the equipment and techniques to be used by NIJ-approved and certified testing agents to qualify voluntarily submitted body armor models for P-BFS compliance and baseline ballistic limit determination.

To achieve NIJ compliance to this standard, each submitted armor model must successfully complete a two-part performance test series.  The first test series, P-BFS, is designed to measure the overall ballistic performance of the armor according to pass/fail criteria (sec. 4.6).  The second test series, baseline BL determination, is a test to penetration failure and is designed to statistically measure penetration performance (sec. 5.17).  No pass/fail criteria are attached to the BL portion of the testing.

## 5.2    Sampling

Five armor samples will be selected at random from the compliance test group for ballistic testing.

## 5.3    References

The following references form a basis for and support the procedures described in this section:

[1] National Institute of Justice. NIJ Standard–0101.03, *Ballistic Resistance of Police Body Armor* (1987).

[2] American National Standards Institute.  "SAAMI Z299.1–1992:  *Voluntary Industry Standards for Pressure & Velocity of Rimfire Sporting Ammunition for the Use of Commercial Manufacturers,*" 1992.

[3] American National Standards Institute.  "SAAMI Z299.3–1993:  *Voluntary Industry Standards for Pressure and Velocity of Centerfire Pistol and Revolver Ammunition for the Use of Commercial Manufacturers,*" 1993.

[4] American National Standards Institute.  "SAAMI Z299.4–1992:  *Voluntary Industry Standards for Pressure & Velocity of Centerfire Rifle Sporting Ammunition for the Use of Commercial Manufacturers,*" 1992.

[5] Department of Defense. MIL−STD−662F, *DoD Test Method Standard, V50 Ballistic Test for Armor.*  (1997).

[6] U.S. Army Test and Evaluation Command. TOP 2−2−710, *Test Operations Procedure, Ballistic Tests of Armor Materials.*  (1984), or latest version.

## 5.4    Ballistic Penetration and Backface Signature Test (P-BFS)

All armor models submitted to NIJ for compliance testing will undergo a series of ballistic impact tests using the ammunition (threat rounds) specified in section 5.4, table 1. These impact tests measure two Backface Signatures (BFS) and demonstrate the armor's pass/fail penetration capability. This test series requires the use of a plastically deforming witness media (clay backing material) held in direct contact with the back surface of the armor panel. This configuration is used to capture and measure the BFS depression produced in the backing material during nonperforating threat round impacts.

The use of clay backing material and the subsequent BFS depth measurement does not reflect, represent, replicate, or duplicate the physical characteristics of the human torso or its physical response to this type of stimulus.

### 5.4.1    Handloads

With the exception of the .22 caliber Long Rifle threat round, handloads may be used in P-BFS tests. The bullets shall be as specified in appendix D. Verification of the handload velocity for each threat round will require firing at least 10 shots per threat caliber <u>prior to each compliance test series</u>. The arithmetic mean of the 10 shot handload series shall be within ± 3 m/s (10 ft/s) of the reference velocities specified in section 5.4, table 1. Individual shots within the 10 shot group may vary up to ± 9 m/s (30 ft/s) from the reference velocity. The results of the handload velocity tests shall be recorded where indicated in the CTR.

### 5.4.2    Test Weapons

The test weapons shall be ANSI/SAAMI unvented velocity test barrels. No firearms will be used (with the possible exception of Type Special).

### 5.4.3    Test Weapon Fixtures

The ANSI/SAAMI test barrels will be mounted in an ANSI/SAAMI Universal Receiver (sec. 5.3, Ref. [2]) or in an alternative NIJ-approved substitute mounting fixture. The receiver/mount will be attached to a table or other fixture having sufficient mass and restraint to ensure accurate targeting of repetitively fired rounds. Test barrels may be fabricated without the Universal Receiver collar to permit use of alternative mounting devices.

### 5.4.4   P-BFS Test Requirements

*Table 1.  NIJ Standard–0101.04 P-BFS performance test summary*

| Test Variables | | | | | Performance Requirements | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Armor Type | Test Round | Test Bullet | Bullet Weight | Reference Velocity (± 30 ft/s) | Hits Per Armor Part at 0° Angle of Incidence | BFS Depth Maximum | Hits Per Armor Part at 30° Angle of Incidence | Shots Per Panel | Shots Per Sample | Shots Per Threat | Total Shots Req'd |
| I | 1 | .22 caliber LR LRN | 2.6 g 40 gr. | 329 m/s (1080 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | 48 |
| | 2 | .380 ACP FMJ RN | 6.2 g 95 gr. | 322 m/s (1055 ft/s) | 4 | 44mm (1.73 in) | 2 | 6 | 12 | 24 | |
| IIA | 1 | 9 mm FMJ RN | 8.0 g 124 gr. | 341 m/s (1120 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | 48 |
| | 2 | 40 S&W FMJ | 11.7 g 180 gr. | 322 m/s (1055 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | |
| II | 1 | 9 mm FMJ RN | 8.0 g 124 gr. | 367 m/s (1205 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | 48 |
| | 2 | 357 Mag JSP | 10.2 g 158 gr. | 436 m/s (1430 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | |
| IIIA | 1 | 9 mm FMJ RN | 8.2 g 124 gr. | 436 m/s (1430 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | 48 |
| | 2 | 44 Mag SJHP | 15.6 g 240 gr. | 436 m/s (1430 ft/s) | 4 | 44 mm (1.73 in) | 2 | 6 | 12 | 24 | |
| III | 1 | 7.62 mm NATO FMJ | 9.6 g 148 gr. | 847 m/s (2780 ft/s) | 6 | 44 mm (1.73 in) | 0 | 6 | 12 | 12 | 12 |
| IV | 1 | .30 caliber M2 AP | 10.8 g 166 gr. | 878 m/s (2880 ft/s) | 1 | 44 mm (1.73 in) | 0 | 1 | 2 | 2 | 2 |
| Special | * | * | * | * | * | 44 mm (1.73 in) | * | * | * | * | * |

*User Specified

Panel   = Front or back component of typical armor sample.

Sample  = Full armor garment, including all component panels (F & B).

Threat   = Test  ammunition round by caliber.

18

## 5.5    Velocity Measurement Equipment

### 5.5.1    Requirements

Test round velocities will be determined using two independent sets of instrumentation. Velocities from each set of instrumentation will be recorded, and the arithmetic mean of the two velocities will be calculated and recorded.  The measured individual test velocities recorded from each set shall be within 3 m/s (10 ft/s) of each other to be considered a fair velocity.  If the specified correlation is not achieved, the test velocity shall be that obtained from the widest instrument spacing (as applicable).

### 5.5.2    Equipment

Recommended types of equipment for velocity measurement are:

(a) Photo electric light screens.
(b) Printed make circuit screens.
(c) Printed break circuit screens.
(d) Ballistic radar.

Independent sets of velocity measurement may be obtained using two pairs of photo electric light screens, two sets of make screens, two sets of break screens, or any paired set combination.  Chronographs, A→B counters, storage scopes, or other digital instruments used to record the measurement equipment's signals will, as a minimum, be capable of recording to 0.3 m/s (1.0 ft/s), or one tenth (0.1) of one $\mu$s ($10^{-6}$ s).

### 5.5.3    Configuration

The first chronograph start trigger screen will be placed at either 2 m (6.5 ft) or 12.2 m (40 ft) from the muzzle of the test barrel (fig. 6).  The screens will be arranged so that they define vertical planes perpendicular to the line of flight of the bullet.  The screens will be securely mounted to maintain their required position and spacing (measurement accuracy of $\pm$ 1 mm ($\pm$ 0.04 in)).

### 5.5.4    Calibration

Velocity measuring instrumentation will be calibrated according to the manufacturer's instructions.  Calibration shall be accomplished at the following intervals:

(a) Prior to any NIJ laboratory certification for compliance testing.
(b) Prior to any NIJ recertification of the testing laboratory.
(c) As recommended by the equipment manufacturer.
(d) Annually.

### 5.5.5   Calibration Records

Test instrumentation calibration records will be maintained and made available to the NIJ CTO upon request.  When applicable, all calibration procedures and values will be traceable to NIST requirements.

### 5.6   Wet Conditioning

### 5.6.1   Environmental Condition

Body armor undergoing P-BFS performance testing will be tested in a wet condition. This condition will be produced by exposing the armor panel under test to a specified flow and distribution of water prior to beginning the ballistic testing (sec. 5.6.2).

### 5.6.2   Spray Conditioning Equipment

The minimum conditioning surface area of the spray enclosure will be 762 mm x 762 mm (30.0 in x 30.0 in).  This surface should be constructed of a material that will permit the unobstructed flow of water through it, without allowing build-up on the spray facing surface. The enclosure will be constructed in such a manner that the flow of water cannot accumulate, to prevent complete immersion of the armor panel.  A single spray nozzle will be mounted in the top of the enclosure.

### 5.6.3   Conditioning Requirements

The average flow rate from the spray nozzle shall be 100 mm/h ± 20 mm/h (4.0 in/h ± 0.8 in/h), determined by calculating the arithmetic mean of five rain gauges symmetrically arranged within the prescribed conditioning surface area (sec. 5.6.4, b).  The source water temperature will be 10 $^{\circ}$C to 21 $^{\circ}$C (50 $^{\circ}$F to 70 $^{\circ}$F).

### 5.6.4   Spray Conditioning Calibration

The spray conditioning system will be calibrated once daily during all compliance test series.  Calibration will be completed prior to beginning any armor sample conditioning, using the methodology and equipment described below.  Spray calibration results will be recorded in the CTR (app. A).

(a) Divide the conditioning surface area (sec. 5.6.2) into four equal quadrants, permanently marking the center of each quadrant, and the center of all four quadrants.
(b) In the center of each quadrant, and at the center of the four quadrants, place a rain gauge capable of measuring increments of 2.5 mm (0.1 in) or better (five gauges total).  A one piece design consisting of five gauges attached to a metal cross frame has been shown to work well.
(c) Time the conditioning event using a stopwatch capable of 1 s measurement intervals.  A minimum duration of 15 min will be used to establish the flow rate, measured using the five rain gauges.
(d) Inspect the gauges and record the level of water at each location.  Calculate the arithmetic mean of the five water levels.  The calibration results will be recorded on the CTR.

(e) If the calculated arithmetic mean flow rate, measured in each quadrant and at the center of the quadrants, is not within specified tolerances, the calibration process must be repeated until the specifications are met.

## 5.7    Backing Material Fixture Preparation

### 5.7.1    Backing Material Fixture

The fixtures will conform to the requirements in section 4.8.

### 5.7.2    Surface Preparation

The clay in each backing material fixture will be manipulated to produce a block free of voids, and with a smooth, flat front surface for the accurate and consistent measurement of depression depths. The front surface of the backing material shall be even with the reference surface plane defined by the fixture edges. Striking devices of sufficient length shall be used to ensure the reference surface is established using the edges of the clay block fixture as index points.

### 5.7.3    Backing Material Conditioning

The clay backing material shall be conditioned in its fixture, using a heated chamber or enclosure. Conditioning time, temperature, and corresponding drop test performance may change as a function of backing material age and usage. Actual conditioning temperature and recovery time between uses will be determined by drop test results (sec. 5.7.5). Additional clay, conditioned to the same initial temperature as the fixture, shall be used to fill voids and restore the front surface of the backing material as needed.

### 5.7.4    Conditioning Chamber

The conditioning chamber shall be constructed such that the backing material fixture(s) are positioned with adequate (152 mm (6.0 in)) spacing between them to permit even temperature soaking. The chamber shall be convective in design, with provision for continuous air circulation within the chamber during conditioning cycles. Backing material temperatures will be measured using a thermometer or thermocouple with a measurement accuracy of $1^\circ$. Temperature readings will be taken prior to pre and post test drop testing at a minimum of 254 mm x 254 mm (10.0 in x 10.0 in) from any two fixture edges at a minimum depth of 25 mm (1.0 in) and a maximum depth of 51 mm (2.0 in) from the backing material surface.

### 5.7.5    Backing Material Calibration

Calibration of the Roma Plastilina #1 clay backing material will be accomplished before (pretest), and after (post test) each six shot firing sequence (sec. 5.4, table 1). Calibration will be accomplished using the equipment and techniques specified below:

(a) Drop weight:          Steel Sphere.[2]
(b) Drop weight size:     63.5 mm ± 0.05 mm (2.5 in ± 0.001 in) in diameter.
(c) Drop weight mass:     1043 g ± 5 g  (2.29 lb ± 0.01 lb).
(d) Drop height:          2.0 m (6.56 ft).
(e) Drop spacing:         Minimum of 76 mm (3.0 in) from fixture edge to indent edge and a
                          minimum of 152 mm (6.0 in) between indent centers.

Each calibration drop will consist of a free release, targeted fall of the steel sphere onto the conditioned backing material.  It is recommended that an aiming device, such as a pointing laser, be used to indicate the intended drop point on the backing material fixture.  Five drops will be completed; the pretest drop locations will be located according to figure 5 and item (e) above.



*Figure 5.  General pretest drop locations*

The arithmetic mean of the five indentation depth measurements shall be 19 mm ± 2 mm (0.748 in ± 0.08 in).  Each depth of indentation will be measured after striking the surface flush with the edges of the fixture to restore the original flat surface of the backing material (sec. 5.7.2).  All drop test and BFS depth of indentation measurements will use the original flat surface as the measurement reference.  Depth of indentation measurements shall utilize measurement devices (± 1 mm accuracy) incorporating a fixed reference "base" that rests evenly on the undisturbed reference surface, or a reference "guide" that is long enough to rest solidly upon two edges of the fixture, establishing the reference plane across the diameter of the indentation.

### 5.7.6   Female Body Armor Backing Material

For body armor sized and shaped for females, the bust cups shall be built up and supported with backing material conditioned to the same temperature as the main body of the backing material and in the same manner as referenced in section 5.7.4; however, calibration drop testing <u>does not</u> have to be performed in the built up area.

---

[2]A sphere, reference P/N 3606, supplied by Salem Specialty Ball Co., Inc., P.O. Box 145, West Simsbury, CT 06092, has been found to be satisfactory, although any steel sphere meeting the requirements listed in this section is acceptable.

### 5.7.7    Backing Material Fixture Rotation

A newly conditioned and drop test calibrated backing material fixture will be used whenever calibration drop test results dictate.  Failure to meet post test drop depth requirements (sec. 5.7.5) will result in the invalidation of the previous six shot series.  All drop test calibration results will be recorded in the CTR.  It is recommended that a minimum of two fixtures be rotated among the test and conditioning cycles to ensure meeting these requirements.

### 5.8    Workmanship Examination

### 5.8.1    Armor Carriers

All armor sample carriers and ballistic panel coverings received for compliance testing will be individually inspected for damage, material flaws, or poor workmanship as defined in section 4.3.  All tears, fraying, holes, loose stitching, or other identified flaw(s) will be noted on the CTR form; documentary photographs will be taken for use in deficiency notification reporting (sec. 5.8.4).

### 5.8.2    Ballistic Panels

Pretest – Before testing, all armor sample ballistic panels and inserts received for compliance testing will be individually inspected for damage, material flaws, or poor workmanship as defined in section 4.3.  All tears, fraying, holes, loose stitching, or other identified flaw(s) will be noted on the CTR form, and documentary photographs will be taken for use in deficiency notification reporting.

Post Test - Each armor sample's ballistic components (e.g., front and back panels) will be physically inspected immediately after testing and their respective configuration reported in the CTR for submission to the NIJ CTP (layers, weave, stitching, material, etc.).

### 5.8.3    Label Examination

The complete armor sample and each part (carrier and ballistic panels) will be examined for conformance to the labeling requirements of section 4.5.  Note any deviations from requirements in the CTR.

### 5.8.4    Inspection Deficiency Notification

The NIJ CTP and the armor manufacturer will be notified within 24 h of discovery of any shipping damage, major product flaws, or poor quality workmanship, or label inconsistency.  Notification will consist of a summary letter and documentary photographs.  Such discoveries and notices will result in suspension of the compliance test until NIJ CTP resolution or approval to proceed is received by the testing laboratory.

**5.9    Armor Conditioning**

**5.9.1    Temperature/Humidity Conditioning**

All armor samples received for compliance testing shall be stored and conditioned for a minimum of 12 h at ambient range conditions (sec. 5.10.1).

**5.9.2    Inserts**

All armor samples will be tested in their final design and end use configuration, including all system components (e.g., carriers and straps), with the exception of removable trauma inserts/packs, which will be removed before conditioning.

**5.9.3    Wet Conditioning**

The complete armor panel (including removable carriers) shall be conditioned for wet armor testing by exposing it to a 6 min cycle of water spray, using the equipment and conditions specified in section 5.6.  Each face of the armor panel will be laid flat upon the conditioning surface (sec. 5.6.2) and exposed to the spray for 3 min, with the strike face of the panel conditioned last.  Ballistic testing shall begin immediately after the armor panel is removed from the wet conditioning chamber.  If the armor is equipped with waterproof bladders or covers, they shall not be modified or altered in any way.

**5.9.4    Test Duration**

After wet conditioning, the duration of the six shot firing sequence for each armor panel, front or back, will be no longer than 30 min, with the first round fired within 10 min after completion of the wet conditioning cycle.  If testing has not been completed in the time permitted, the test data shall be discarded and testing must begin again with a new wet conditioned armor panel.  Test start and stop times will be recorded in the CTR.

**5.10    Range Configuration**

**5.10.1    Ambient Test Conditions**

Unless otherwise specified, the ambient conditions of the test range shall be:

(a)  Temperature:  21 $^{\circ}$C $\pm$ 2.9 $^{\circ}$C (70 $^{\circ}$F $\pm$ 5 $^{\circ}$F).
(b)  Relative humidity:  50 % $\pm$ 20 %.
(c)  Range conditions will be recorded in the CTR before and after each armor sample firing sequence (12 shots).

**5.10.2    Range Preparation**

Set up the test equipment as shown in figure 6.  Use a test barrel appropriate for the ammunition required to test the armor (sec. 5.4, table 1), mounted in an appropriate fixture with the barrel horizontal.  Dimensions A and B shall be determined from the barrel muzzle.  The

24

backing material fixture will be rigidly held by a suitable (metal) test stand, which shall permit the entire armor and backing material assembly to be shifted vertically and horizontally such that the entire assembly can be targeted by the test barrel.

### 5.10.3  Measurement Tolerances

Range configuration measurements A and B (fig. 6) are to be made within a tolerance of ± 25 mm (± 1.0 in).

### 5.10.4  Instrumentation

All electronic equipment will be turned on and allowed to warm up until stability is achieved.



A -  5 m for Type I, II-A, II, and III-A armors; 15 m for Type III and IV armors

B -  2 m minimum for Type I, II-A, II, and III-A armors; 12 m minimum for Type III and IV armors

C -  Approximately 1.5 ± 6 mm

*Figure 6.  Test range configuration*

**5.11    Test Preparation**

**5.11.1    Test Barrel Conditioning**

Select the required test bullet for the armor type as specified in section 5.4, table 1. Beginning with threat round number one, fire a minimum of three pretest rounds to ensure that the first test round fired will strike the target as aimed, using a suitable targeting device (e.g., a pointing laser).  These pretest rounds will also serve to "warm" or stabilize the temperature of the barrel before further testing.

**5.11.2    Handload Verification**

Before the first armor panel test sequence, fire the 10 shot handload series (sec. 5.4.1) and record the result in the CTR.  After successful completion of the handload series, the three shot pretest series (sec. 5.11.1) may be used during the 48 shot compliance test to verify handload performance (as necessary).  Small variations from verified handload charge weights are acceptable during testing.

**5.11.3    Shot Location Marking**

Clearly mark the shot locations directly on the sample (fig. 7) following the spacing criteria of section 3.14.



*Figure 7.  General armor panel impact locations (front and back)*

### 5.11.4  Armor Strapping

Armor samples or panels will be secured to the backing material fixture using 51 mm (2.0 in) wide elastic straps, held together using Velcro® attachments.  Figure 8, diagram 1 details the type and location of the strapping devices.  The placement of the straps will be such that they do not interfere with the impact points on the panels.

Using a pencil or other appropriate tool, lightly trace the outline of the sample onto the backing material to document the original position of the sample.



*Figure 8.  Acceptable strapping methods*

## 5.12    Firing Sequence for Type I, IIA, II, and IIIA Armor

### 5.12.1    Requirements

(a) Four complete armor samples, consisting of either a front and back set of armor panels or one full jacket; two samples per test threat.

(b) Six fair hit impacts per armor panel or jacket front and back surface, four armor panels (two front and two back) or two armor jackets for each test threat, for a total of 24 impacts per test threat; and 48 total impacts per compliance test.

(c) BFS of two normal obliquity impacts in each armor panel, a total of 16 measurements per compliance test sequence.  A BFS measurement shall be taken at shot location No. 1 for each panel.  The remaining BFS shall be taken at the shot location having the highest fair hit velocity of shot locations No. 2 and 3.

### 5.12.2    Acceptance Criteria for Penetration and BFS Compliance

(a) No perforation through the panel, either by the bullet or by any fragment of the bullet or armor.
(b) No measured BFS depression depth greater than 44 mm (1.73 in).

### 5.12.3    Test Range Configuration

Position the front face of the backing material 5 m ± 25 mm (16.4 ft ± 1.0 in) from the muzzle of the test barrel (fig. 6).  Position the velocity measurement instrumentation according to figure 6, item B.  Prepare the required test round as specified in section 5.4, table 1.  Complete the handload verification requirement (sec. 5.11.2), or fire a sufficient number of pretest rounds (minimum of three) to ensure that the handloaded test round will strike the armor with a velocity within the specified velocity range.  Use an appropriate aiming system to ensure proper placement of the test bullet.

### 5.12.4    Sample Preparation, Mounting and Firing

**5.12.4.1**    For armor panels sized and shaped for females, the bust cups shall be filled with backing material conditioned in the same manner as referenced in section 5.7; however, the drop test for consistency does not have to be performed in this area.  Further, impact locations four or five of the shot sequence shall be such that at least one of the $30^°$ angle of incidence shots impact on a bust cup.  If the bust cup contains one or more seams, the manufacturer shall submit a detailed diagram to identify the location of each seam, and one shot shall impact a seam.

**5.12.4.2**    For armor employing a front opening system, shot location one shall be adjusted, if necessary, to prevent the shot from impacting a double or overlapping layer of ballistic material.  Further, impact locations four and five of the shot sequence shall be adjusted such that at least one of the $30^°$ angle of incidence shots shall impact the closure seam.

**5.12.4.3**    Start with the wet conditioned (sec. 5.9) front panel of armor sample 1.  Place the exposed surface of the calibrated backing material in intimate contact with the backface of the armor panel under test and restrict the movement of the panel from its original position by securing it with two vertical and three horizontal elastic straps, 51 mm (2.0 in) wide with Velcro$^®$ closures, supplied by the testing laboratory (fig. 8, diagram 1).  Using a pencil or other appropriate tool, lightly trace the outline of the sample onto the backing material to document the original position of the sample.

**5.12.4.4**    The straps shall be positioned to restrict the movement of the panel from its original position, leaving the strike face impact area(s) exposed.  If the strapping is an integral part of the armor panel, the manufacturer may supply sample panels with extended strapping devices to allow the armor, as a unit, to be mounted on the backing material fixture (fig. 8, diagram 2).  The laboratory shall indicate in the CTR which strapping arrangement was used.

**5.12.4.5**    Position the backing material fixture to assure proper impact placement and angle of incidence (0°) of the test round at location one, as shown in figure 7.

**5.12.4.6**    Fire Shot No. 1:  Fire the first test round against the armor panel at location one (fig. 7), and record the velocity.  Examine the armor panel and the backing material to determine whether the bullet made a fair hit and whether complete penetration occurred. If no complete penetration (CP) occurred and the bullet made a fair hit, measure and record the BFS depression depth after "striking" the surface of the clay to reestablish the original surface reference plane (sec. 5.7.5).  Record the BFS on the CTR, and proceed to section 5.12.4.8.

**5.12.4.7**    If no complete penetration occurred and the bullet made an unfair hit, a second attempt will be made to attain a fair hit.  This second attempt will be made to impact the same general area of the armor as the first shot but more than 51 mm (2.0 in) from the previous shot and more than 76 mm (3.0 in) from any edge of the panel.  If a fair hit is still not attained, the firing sequence will be terminated and a new armor panel prepared in accordance with section 5.9.  The firing sequence will then be repeated using the newly conditioned panel of armor.  No more than a total of eight impacts is permitted on any armor panel.

**5.12.4.8**    Remount Armor Sample:  Adjust the armor panel back to its original condition (i.e., smooth and manipulate the ballistic material to return it to its original configuration) and replace it on the backing material in its original position using the traced outline in the backing material as a guide.  Do not recondition the backing material; do not repair the BFS depression in the backing material; do not remove the test bullet if it is trapped in the panel.  When conducting the remaining firing sequence, inspect the armor panel following each impact to verify that the impact was a fair hit with no complete penetration, and smooth out the panel in preparation for the next shot.

**5.12.4.9**    Fire Shot No. 2:  Reposition the backing material fixture with the armor panel in position so that the shot will impact the panel at location two (fig. 7).  Fire the test round. Do not change the position of the armor panel on the backing material, but adjust the panel and mounting straps as necessary to restore its original condition.  Do not remove any trapped bullets from the panel and do not disturb the BFS depressions in the backing material.

**5.12.4.10**    Fire Shot No. 3:  Reposition the backing material fixture with the armor panel in position so that the shot will impact the panel at location three (fig. 7).  Fire the test round.  Do not change the position of the armor panel on the backing material, but adjust the panel and mounting straps as necessary to restore its original condition.  Do not remove any trapped bullets from the panel and do not disturb the BFS depressions in the backing material.

**5.12.4.11**    Fire Shot No. 4:  Reposition the backing material fixture so that the defined angle of incidence between the perpendicular to the armor panel and the line of flight of the test round is 30° (fig. 1), ensuring the bullet will be directed toward the center of the armor panel, such that the bullet will impact the armor at location four (fig. 7).  Fire the

30

test round.  Do not change the position of the armor panel on the backing material, but adjust the panel and mounting straps as necessary to restore its original condition.  Do not remove any trapped bullets from the panel and do not disturb the BFS depressions in the backing material.

**5.12.4.12**    Fire Shot No. 5:  Reposition the backing material fixture so that the defined angle of incidence between the perpendicular to the armor panel and the line of flight of the test round is $30^{°}$ (fig. 1), ensuring the bullet will be directed toward the center of the armor panel, such that the bullet will impact the armor at location five (fig. 7).  Fire the test round.  Do not change the position of the armor panel on the backing material, but adjust the panel and mounting straps as necessary to restore its original condition.  Do not remove any trapped bullets from the panel and do not disturb the BFS depressions in the backing material.

**5.12.4.13**    Fire Shot No. 6:  Reposition the backing material fixture with the armor panel in position so that the defined angle of incidence between the perpendicular to the armor and the line of flight of the test round is $0^{°}$ (fig. 1) and the bullet will impact the armor at location six (fig. 7).  Fire the test round.  Remove and thoroughly examine the armor panel and backing material for complete penetrations by bullets or fragments.

**5.12.4.14**    Measure Second BFS:  Identify the highest velocity fair hit impact of shots two and three.  "Strike" the backing material surface to reestablish the original surface reference plane and measure the BFS indentation depth of the selected highest velocity fair hit impact using a depth measuring tool (sec. 5.7.5).  Record this BFS on the CTR.

**5.12.4.15**    Post Test Drop Calibration:  Without repairing the BFS depressions from the firing sequence, perform five drop tests on the backing material in the general areas of figure 5.  Post test drop locations shall be at least 51 mm (2.0 in) away from any BFS depression or other drop impact.  Record all measurements on the CTR and determine compliance with drop calibration criteria.  Failure to meet clay backing material calibration specifications invalidates the previous six shots.  If the backing material meets post test drop specifications, repair the backing material and repeat the pretest drop calibration.  If the repaired backing material fixture passes the pretest calibration, it may be reused for the second panel firing sequence, subject to passing another post test drop upon conclusion of the firings.

**5.12.4.16**    Test Second Armor Panel:  Mount the rear panel of the armor sample to a pretest drop calibrated backing material fixture, and repeat the test sequence above using the same test round from section 5.4, table 1 as required for the armor type being tested.  Record all results on the CTR.

**5.12.4.17**    Test Second Armor Sample:  Repeat the sequence above for armor sample 2, using the same test round as used for armor sample 1.  Record all results on the CTR.

**5.12.4.18**    Test Third Armor Sample:  Replace the backing material fixture with a newly conditioned and drop test calibrated fixture (if necessary).  Repeat the test sequence

above using test round two from section 5.4, table 1 against armor sample three.  Record all results on the CTR.

**5.12.4.19**    Test Fourth Armor Sample:  Repeat the sequence above for armor sample four, using the same test round as used for armor sample three.  Record all results in the CTR.

**5.12.4.20**    Record Results:  Record the results of all testing in the CTR (app. A).

## 5.13    Firing Sequence for Type III Armor

### 5.13.1    Requirements

(a) One complete armor sample, or two to six primary ballistic panels, plates or inserts, if removable from the armor sample (e.g., front panel protection only).
(b) Six fair hit impacts against each primary ballistic panel, plate(s), or insert(s), a total of 12 impacts per armor sample.
(c) BFS of shot one and the highest remaining velocity shot for each armor panel, plate, or insert.

### 5.13.2    Acceptance Criteria for Penetration and BFS Compliance

(a) No perforation by the bullet, fragment of the bullet, or fragment from the plate/insert through the armor.
(b) No measured BFS depression depth greater than 44 mm (1.73 in).

### 5.13.3    Test Range Configuration

Position the front face of the backing material 15 m ± 25 mm (50 ft ± 1.0 in) from the muzzle of the test barrel (fig. 6).  Position the velocity measurement instrumentation according to figure 6, item B.  Prepare the required test round as specified in section 5.4, table 1.  Complete the handload verification requirement (sec. 5.11.2), or fire a sufficient number of pretest rounds (minimum of three) to ensure that the handloaded test round will strike the armor with a velocity within the specified velocity range.  Use an appropriate aiming system to ensure proper placement of the test bullet.

### 5.13.4    Sample Preparation, Mounting, and Firing

**5.13.4.1**    For armor panels sized and shaped for females, the bust cups shall be filled with backing material conditioned in the same manner as referenced in section 5.7; however, the drop test for consistency does not have to be performed in this area.  If the bust cup contains one or more seams, the manufacturer shall submit a detailed diagram to identify the location of each seam, and one shot shall impact a seam.

**5.13.4.2**    For armor that utilizes a rigid plate or plates such that the armor panel does not make full contact with the backing material surface, the backing material will be built up in a manner that conforms to the armor panel's shape.  This buildup will use

32

additional clay backing material conditioned in the same manner as the backing material fixture.

**5.13.4.3**        Mark the front armor panel, plate, or insert for six impacts, evenly spaced on the panel according to the spacing criteria of a minimum of 76 mm (3.0 in) from any edge to center and 51 mm (2.0 in) from any previous impact (center to center).  Wet condition the armor panel, plate, or insert per the requirements of section 5.9.3.

**5.13.4.4**        Place the exposed surface of the conditioned and drop test calibrated backing material in intimate contact with the backface of the armor panel, plate, or insert and secure it with two vertical and three horizontal elastic straps, 51 mm (2.0 in) wide with Velcro® closures, supplied by the testing laboratory (fig. 8, diagram 1).

**5.13.4.5**        The straps shall be positioned to leave the strike face impact areas exposed while not permitting the armor to shift on the backing material when impacted.  Alternatively, if the strapping is an integral part of the ballistic panel, the manufacturer may supply samples with extended strapping devices to allow the armor as a unit to be mounted on the backing material fixture (fig. 8, diagram 2).  The laboratory shall indicate in the CTR which strapping arrangement was used.

**5.13.4.6**        <u>Firing Sequence</u>:  Conduct all six of the firings in accordance with the sequence specified in sections 5.12.4.5 through 5.12.4.14 except for the oblique impacts in items 5.12.4.11, and 5.12.4.12.  All shots for Type III armor samples will be at $0^\circ$ obliquity.

**5.13.4.7**        <u>Second Panel Testing</u>:  Repeat sections 5.13.4.2 through 5.13.4.6 for the second primary ballistic panel, plate, or insert of the sample.

**5.13.4.8**        <u>Record Test Results</u>:  Record the result of all testing in the CTR (app. A).

## 5.14    Firing Sequence for Type IV Armor

### 5.14.1    Requirements

(a) One complete armor sample, including at least two primary ballistic panels, plates, or inserts, if removable from complete armor unit (e.g., front panel protection only).
(b) One fair hit impact against the primary ballistic panels, plates, or inserts, a total of two impacts per armor sample.
(c) BFS of each impact.

### 5.14.2    Acceptance Criteria for Penetration and BFS Compliance

(a) No perforation of the projectile, fragment of the projectile, or fragment of the plate/insert through the armor.
(b) No measured BFS depression depth greater than 44 mm (1.73 in).

33

### 5.14.3    Test Range Configuration

Position the front face of the backing material 15 m ± 25 mm (50 ft ± 1.0 in) from the muzzle of the test barrel (fig. 6).  Position the velocity measurement instrumentation according to figure 6, item B.  Prepare the required test round as specified in section 5.4, table 1.  Complete the handload verification requirement (sec. 5.11.2), or fire a sufficient number of pretest rounds (minimum of three) to ensure that the handloaded test round will strike the armor with a velocity within the specified velocity range.  Use an appropriate aiming system to ensure proper placement of the test bullet.

### 5.14.4    Sample Preparation, Mounting, and Firing

**5.14.4.1**    For armor panels sized and shaped for females, the bust cups shall be filled with backing material conditioned in the same manner as referenced in section 5.7; however, the drop test for consistency does not have to be performed in this area.  If the bust cup contains one or more seams, the manufacturer shall submit a detailed diagram to identify the location of each seam, and the shot shall impact a seam.

**5.14.4.2**    For armor that utilizes a rigid insert, plate or plates such that the armor panel does not make full contact with the backing material surface, the backing material will be built up in a manner that conforms to the armor panel's shape.  This buildup will use clay backing material conditioned in the same manner as the backing material fixture.

**5.14.4.3**    Mark the center of the front armor panel, plate, or insert for one impact, with a minimum of 76 mm (3.0 in) from any edge.  Wet condition the armor panel, plate, or insert per the requirements of section 5.9.3.

**5.14.4.4**    Place the exposed surface of the conditioned and drop test calibrated backing material in intimate contact with the backface of the armor panel, plate, or insert and secure it with at least two vertical and horizontal elastic straps, 51 mm (2.0 in) wide with Velcro® closures, supplied by the testing laboratory (fig. 8, diagram 1).

**5.14.4.5**    Firing Sequence:  Fire one shot at the center of the plate/insert and record the velocity.  Examine the plate/insert and the backing material to determine whether the bullet made a fair hit and whether complete penetration occurred.  If the bullet failed to make a fair hit as defined by section 3.8, the test must be repeated with another plate/insert sample.  If no complete penetration occurred and the bullet made a fair hit, measure the BFS depth of depression using a depth measurement tool (sec. 5.7.5).  If the depth of the indentation complies with the requirement of section 5.14.2, proceed to section 5.14.4.6.

**5.14.4.6**    Second Plate/Insert Testing:  Repeat sections 5.14.4.1 through 5.14.4.5 for the second plate/insert of the sample.

**5.14.4.7**    Record Test Results:  Record the results of all testing in the CTR (app. A).

**5.15    P-BFS Test (Special Type)**

If the armor is principally made of soft materials (e.g., fabric), use the test procedure defined in section 5.12.  If the armor is principally nonfabric, rigid, or "hard" (metal plates or ceramic with a small amount of fabric to act as a trauma shield or to catch backface fragments from the main ballistic resistance element), use the test procedure defined in section 5.13 or 5.14, depending on the NIJ type classification claimed.

**5.16    P-BFS Test for Groin and Coccyx Protectors**

Groin and coccyx protectors shall each be impacted with three fair hits, evenly spaced not less than 51 mm (2.0 in) apart, and not less than 76 mm (3.0 in) from an edge, at $0°$ obliquity. The BFS due to the first fair hit shall be measured to determine compliance.  No fair hit bullet as defined by section 3.14 shall completely penetrate the armor.  Baseline Ballistic Limit testing will not be performed for groin and coccyx protectors.

**5.17    Baseline Ballistic Limit Determination Test**

All NIJ compliance testing for body armor baseline BL assessment will be conducted in accordance with the following procedures.

**5.17.1    Types I, IIA, II, and IIIA**

Ballistic Limit testing will be conducted against complete armor samples (e.g., ballistic fabric panels, covers, carriers, and strapping).  Removable trauma inserts/packs will not be included as part of the complete armor sample used for BL determination.

**5.17.2    Types III and IV**

Testing will be conducted against complete armor samples, <u>except</u> when the armor's NIJ Type III or IV protection is provided <u>entirely</u> by rigid panels, plates, or inserts.  In those instances, <u>only</u> the rigid panels, plates, or inserts will be tested for baseline Ballistic Limit probability.

**5.17.3    Test Sample and Shot Requirements**

All NIJ baseline Ballistic Limit testing will be conducted against dry condition armor panels.

*Table 2. NIJ baseline Ballistic Limit determination test summary*

| Armor Samples Required | Ballistic Panels Required | Test Threat | Minimum Shots Required | Minimum Penetration Results |
|---|---|---|---|---|
| Type I through IIIA One Full Armor | Front | 9 mm 124 gr. FMJ | 12 | 5 Complete, 5 Partial, Complete at Highest Velocity |
| | Rear | | 12 | 5 Complete, 5 Partial, Complete at Highest Velocity |
| Type III One Full Armor | 2 – 6* | 7.62 mm M80 FMJ | 6 | 3 Complete, 3 Partial, Velocity Range of 27 m/s (90 ft/s) |
| Type IV One Full Armor | 2 – 6* | .30 caliber M2 AP | 6 | 3 Complete, 3 Partial, Velocity Range of 27 m/s (90 ft/s) |
| Special* | TBD* | TBD* | TBD* | TBD Complete, TBD Partial, Complete at Highest Velocity |

*Quantity determined by section 5.17.2 and panel, plate, or insert size and ability to withstand multiple impacts.

## 5.17.4    Test Range

The ambient conditions and configuration of the test range shall conform to section 5.10 and figure 6 of this document.

## 5.17.5    Test Rounds

All threat ammunition will be handloaded to achieve the desired velocities.

## 5.18    Ballistic Limit Testing Equipment

## 5.18.1    Calibration

All testing equipment shall be calibrated as required by section 5.5.4.

## 5.18.2    Backing Material Fixture

All NIJ compliance tests for BL testing will use the Backing Material Fixture and Roma Plastilina No. 1 clay backing material as specified in section 4.8, <u>except that the removable wooden back will be removed</u>.

## 5.18.3    Armor Strapping

The armor panels will be secured to the Backing Material Fixtures in accordance with section 5.11.4.

## 5.18.4    Test Barrels

All handloaded test rounds will be fired from unvented ANSI/SAAMI velocity test barrels, according to section 5.4.2. All ammunition handling and firing procedures will follow applicable SAAMI specifications and guidelines.

**5.18.5  Velocity Measurement**

Velocities will be measured in accordance with section 5.5 and figure 6 of this document.

**5.19    Ballistic Limit Test Preparation**

**5.19.1    Shot Location Marking**

Types I, IIA, II, and IIIA: The front and rear armor panels will be marked for impact aim points according to figure 9.  Types III, IV, and Special: In the case of rigid plates/inserts, the six test round impacts will be evenly distributed over the surface area of the samples according to the spacing criteria in section 3.14.

**5.19.2    Sample Conditioning**

The armor samples will be conditioned for a minimum of 12 h at the ambient range conditions specified in section 5.10.

**5.19.3    Backing Material Conditioning**

The backing material fixtures will be prepared and conditioned to the same temperatures as those used to conduct the P-BFS tests for that armor model.  Drop test calibration will not be required; however, backing material temperature (sec. 5.7.4) will be recorded before and after each 12 shot series of firings (one armor panel).



Front/Rear Panel          3.0" Edge and 2.0" Impact Spacing          Rear Panel
12 Impacts                                                            12 Impacts

*Figure 9.  Impact locations for baseline BL determination testing - Type I through IIIA*

**5.20    Ballistic Limit Firing Sequence**

All Ballistic Limit determination testing for NIJ compliance armors will follow the general guidelines and procedures of MIL–STD–662F and TOP 2–2–710 with inclusion and adherence to the following modifications:

(a) All Type I through IIIA test samples will be tested in their final design and end use configuration, including all system components (e.g., carriers, straps), with the exception of trauma inserts/packs, which will be removed.  Type III and IV test samples will be tested according to the relevant requirements of section 5.17.2, determined by NIJ CTP personnel upon receipt of the armor for compliance testing.

(b) Impact locations for all shots will be permanently marked on the armor panel impact face according to the pattern requirements of figure 9 and section 5.19.1.

(c) The minimum aim point spacing between the edges of the ballistic panel insert, not the external carrier, will be 76 mm (3.0 in), and the minimum spacing between each impact will be 51 mm (2.0 in).

(d) The armor panel shall be rigidly supported across the entire rear face area by the backing material fixture specified in section 4.8 of this document, except that the removable wooden back shall be removed from the backing material fixture.

(e) The armor panel shall be positioned and maintained in intimate contact with the backing material prior to and during the impact event, using the strapping devices specified in section 5.11.4 and figure 8 of this document.

(f) The armor panel will be adjusted between shots as required to maintain a consistent armor panel surface, original condition, alignment of the ballistic panels/layers, and intimate contact with the backing material.

(g) A modified Langlie Method of test firing (app. B, TOP 2–2–710, Ref. [6]) should be used as a guideline for acquiring the 12 shot data set for Types I, IIA, II, and IIIA Ballistic Limit evaluations (app. B).  The "up and down" method of firing (MIL–STD–662F, Ref. [5]) will be utilized for Types III and IV testing.

(h) The lower velocity limit to begin the firing sequence should be supplied by the manufacturer to the NIJ CTO as part of the submission request.  If the lower velocity is not provided by the manufacturer, the lower velocity limit shall be the highest of the two NIJ Standard–0101.04 Type ammunition reference velocities plus 69 m/s (225 ft/s).  The lower velocity limit should produce a partial penetration.

(i) The upper velocity limit for the firing sequence shall be the lower velocity limit plus 45 m/s (150 ft/s).

(j) A minimum of 12 shots will be fired against each armor panel, with a maximum of 15 shots per panel fired.  The highest velocity impact obtained should be a complete penetration.

(k) If after 12 shots the highest velocity obtained is a partial penetration and the range established by the existing lower and upper velocity limits is less than 45 m/s (150 ft/s), firing within the 45 m/s (150 ft/s) range will continue until a single complete penetration is achieved, or the maximum number of shots are fired.  If a complete penetration cannot be obtained as the highest velocity shot, a ballistic limit with the highest partial penetration as the highest velocity will be accepted.

**5.21    Ballistic Limit Determination**

**5.21.1  Minimum Number of Data Points**

a) <u>Levels I, IIA, II, and IIIA</u>:  A minimum of 12 data points are required, including at least five partial and five complete penetration results.

b) <u>Levels III and IV</u>:  A minimum of six data points are required, consisting of three partial and three complete penetration results.

c) <u>Special</u>:  The minimum number of data points will be determined by user specification and NIJ approval, and shall require an equal number of partial and complete penetrations for the BL calculation.

**5.21.2  Data Set Tabulation**

The data set will be tabulated and sorted according to velocity and penetration results. The sorted data must include the lowest complete penetration (CP) velocity result and the highest partial penetration (PP) velocity result.

**5.21.3  Ballistic Limit Calculation**

<u>Levels I, IIA, II, and IIIA</u>:  The arithmetic mean of 10 qualified (5 CP, 5 PP) velocities is calculated, producing the armor panel's 10 shot baseline BL.  The standard deviation ($\sigma$) of the 10 shot group of velocities will also be determined and recorded along with the model's baseline BL in the CTR.

<u>Levels III and IV</u>: The arithmetic mean of six qualified (3 CP, 3 PP) velocities is calculated, producing the armor sample's six shot baseline BL.  The standard deviation ($\sigma$) of the six shot group of velocities will also be determined and recorded along with the model's baseline BL in the CTR.

<u>Special</u>: The arithmetic mean of either six or 10 qualified velocities is calculated, producing the armor panel's six or 10 shot baseline BL.  The standard deviation ($\sigma$) of the six or 10 shot group of velocities will also be determined and recorded along with the model's baseline BL in the CTR.

**5.22    Ballistic Limit Retesting of Compliant Armor**

When compliant body armor models are submitted to NIJ for BL retest, two complete sets or samples will be required according to section 4.7, section 5.17.2, and table 2.  The samples will be the same size as originally submitted.  The BL and standard deviation of each sample/panel from one of the retest armor samples will be determined in accordance with sections 5.17 through 5.21.  The remaining armor sample will be retained for use as needed, should the armor sample fail to meet the retest criteria.

Retested armor will continue to be compliant if the BL of the retested sample is $\pm 3\,\sigma$ from each of the baseline BL determined during its original compliance testing. Armor found noncompliant with its baseline Ballistic Limits will undergo additional discretionary investigation by the NIJ CTP. Compliance determinations using NIJ Standard–0101.04 BL procedures and retest criteria apply to new, unworn, manufacturer supplied body armor samples only.

# 6. DATA COLLECTION AND REPORTING

## 6.1    Test Documentation

### 6.1.1    Data Recording

The results of each armor test performed will be recorded on the CTR (app. A). All test data and activities shall be recorded in sufficient detail such that a reconstruction of the test based on the information contained in the CTR can be performed.

### 6.1.2    Data Certification

When completed, the responsible test laboratory representative shall sign the CTR and any attachments.

### 6.1.3    Data Storage

All CTRs and accompanying data will be archived, in either digital or hardcopy form, by the test laboratory for a minimum of five years following the completion of each compliance test series.

## 6.2    Test Report

### 6.2.1    Requirements

A summary report will be submitted to the NIJ CTP Office within 10 working days of the completion of testing. Inclusion of the following minimum support documentations will be required:

(a) Submission letter stating the outcome of the testing.
(b) Compliance Test Report (signed).
(c) Failure documentation (if applicable).
(d) At least one photograph showing the strike face(s) of a representative armor sample (e.g., front and back) before testing, with scale and identification sign.
(e) At least one photograph showing the strike face(s) of the tested armor sample (e.g., front and back panels), with scale and identification sign.

# APPENDIX A

## COMPLIANCE TEST REPORT FORM

The Compliance Test Report (CTR) form shall be used in conjunction with NIJ Standard–0101.04, <u>Ballistic Resistance of Personal Body Armor</u>, and shall become a part of the official records of the compliance testing of each armor model submitted for testing.  All sections of the form shall be completed.

An electronic file of this report form is available from the NIJ Compliance Test Program Office, National Law Enforcement and Corrections Technology Center - National (NLECTC-National).  Requests for this file can be sent to, NLECTC-National, NIJ Body Armor Compliance Test Program,  P.O. Box 1160, Rockville, MD  20849–1160,  Attn:  Compliance Test Program Manager, or to: E-mail:  <u>asknlectc@nlectc.org</u>.

# APPENDIX B

# MODIFIED
# LANGLIE METHOD OF BALLISTIC LIMIT FIRING

## 1.  VELOCITY DETERMINATION

### 1.1    Velocities

Identify the lower, upper, and first shot projectile velocities.  The lower velocity should produce a partial penetration.  The upper velocity should produce a complete penetration.  The first shot velocity may produce either a partial or complete penetration.

 (a) The lower velocity should be provided by the NIJ CTO, if not, the lower velocity limit shall be the highest of the two NIJ Standard–0101.04 Type ammunition reference velocities plus 69 m/s (225 ft/s).

 (b) The upper velocity will be determined by adding 46 m/s (150 ft/s) to the lower velocity limit.

 (c) The first shot velocity is the midway point of the lower and upper velocities.

## 2.  PROCEDURE

### 2.1    Firing Sequence

 (a) Attempt to fire the first shot at a velocity midway between the lower and upper limit velocities.

 (b) If the first round results in a complete penetration, then attempt to reduce the velocity of the second shot halfway between the first round velocity and the lower limit velocity; if a partial penetration, then attempt to raise the velocity of the second round halfway between the first shot and the upper limit velocity.

 (c) If the first two rounds result in a reversal (one partial, one complete penetration), attempt to fire the third round halfway between the velocity of the first two rounds.

 (d) If the first two rounds result in two partial penetrations, attempt to fire the third round at a velocity halfway between the second round velocity and the upper velocity limit.

 (e) If the first two rounds result in two complete penetrations, attempt to fire the third round halfway between the second round velocity and the lower velocity limit.

Fire the remaining rounds using the following rules:

 (f) If the preceding pair of rounds resulted in a reversal (one partial, one complete penetration), attempt to fire at a velocity halfway between the two velocities.

42

(g) If the last two rounds did not produce a reversal, look at the last four rounds.  If the number of partial and complete penetrations is equal, attempt to fire the next round halfway between the velocity of the first and last round of the group.

(h) If the last four rounds did not produce an equal number of partial and complete penetrations, look at the last six, eight, etc., until the number of partial and complete penetrations are equal.  Attempt to fire the next round halfway between the lower and upper velocities of that group.

(i) Always attempt to fire at a velocity halfway between the lower and upper velocity of the group examined.

(j) If after 12 shots an equal number of partial and complete penetrations is not achieved and the last round fired resulted in a complete penetration, attempt to fire the next round at a velocity halfway between the last round and the lower velocity limit; otherwise, if the last round was a partial penetration, attempt to fire halfway between the last round and the upper velocity limit.

(k) Continue on in the manner above until the requirement for an equal number of penetrations has been satisfied, i.e., at least five partial and five complete penetrations, or until the maximum number of 15 shots has been achieved.

## 2.2    Lower Velocity Adjustment

In cases where it becomes rapidly obvious that the lower velocity limit is too high or too low, adjustment of the velocity range can be made by selecting a new lower velocity limit and adjusting the upper limit to be 46 m/s (150 ft/s) higher than the new lower limit.

# APPENDIX C

# BODY ARMOR SELECTION

Police administrators should make every effort to encourage their officers to wear body armor throughout each duty shift.  Although designed primarily to provide protection against handgun assault, body armor has prevented serious and potentially fatal injuries in traffic accidents (both in automobiles and while operating motorcycles), from physical assault with improvised clubs, and to some extent from knives.  Law enforcement officer fatality statistics are compiled annually by the Federal Bureau of Investigation.  Analysis of the statistics suggests that a large percentage of the officer fatalities reported each year could have been prevented if the officer had been wearing armor.  Before purchasing body armor one should read NIJ Guide 100 –98, "Selection and Application Guide to Personal Body Armor," which discusses armor in depth.

The fundamental considerations in selecting body armor are the threat to which officers are exposed and the nature of their service weapons.  Knowledge of the street weapons in the local area (confiscated weapons are a good indicator) is essential, for the armor should be selected to protect against the street threat and the department's service weapons.  Throughout the last decade, one in six officers killed with a firearm was shot with his or her duty weapon.  Full coverage of the torso is critical because fatalities among officers wearing body armor have resulted from bullets having entered an officer's side through the opening between front and rear panels.  NIJ Standard–0101.04 classifies body armor into seven different threat levels that, in order from lowest to highest level of protection, are Type I, Type IIA, Type II, Type IIIA, Type III, Type IV, and Special.

As of the year 2000, ballistic resistant body armor suitable for full time wear throughout an entire shift of duty is available in classification Types I, IIA, II, and IIIA, which provide increasing levels of protection from handgun threats.  Type I body armor, which was first issued during the NIJ demonstration project in 1975, is the minimum level of protection that any officer should have.  Officers seeking protection from lower velocity 9 mm and 40 S&W ammunition should wear Type IIA body armor.  For protection against high velocity 357 Magnum and higher velocity 9 mm ammunition, officers traditionally select Type II body armor.  Type IIIA body armor provides the highest level of protection available in concealable body armor and provides protection from high velocity 9 mm and 44 Magnum ammunition.

As noted above, while 100 % protection in all circumstances is impossible, the routine use of appropriate body armor significantly reduces the likelihood of fatal injury.  Body armor selection is to some extent a tradeoff between ballistic protection and wearability.  The weight and bulk of body armor are inversely proportional to the level of ballistic protection it provides; therefore, comfort decreases as the protection level increases.  All departments should strive to select body armor that their officers will wear, consistent with their ballistic protection requirements.  Agencies should ensure that each officer knows and understands the protection that it affords, as well as its limitations.  Body armor that is not worn provides *no* protection.

44

# APPENDIX D

## ACCEPTABLE BULLETS FOR HANDLOADING

All jacket materials shall be of copper or copper alloy (approximately 90 % copper and 10 % zinc), with the exception of Type III, which shall be steel.

Totally Enclosed Metal Case (TEMC), Total Metal Jacket (TMJ), Total Metal Case (TMC), and any other nomenclature for electro-deposited copper or cupro-nickel jackets are acceptable for use in testing when FMJ is specified.

| THREAT LEVEL | CALIBER | BULLET WT. (g/gr.) | BULLET DESCRIPTION | BULLET DIA. (nominal) |
|---|---|---|---|---|
| | 22 LR* | 2.6/40 | LRN | 5.6 mm (.222 in) |
| I | 380 ACP | 6.2/95 | FMJ RN | 9 mm (.355 in) |
| IIA | 9 mm | 8.0/124 | FMJ RN | 9 mm (.355 in) |
| | 40 S&W | 11.7/180 | FMJ | 10 mm (.400 in) |
| II | 9 mm | 8.0/124 | FMJ RN | 9 mm (.355 in) |
| | 357 Mag | 10.2/158 | JSP | 9.1 mm (.357 in) |
| IIIA | 9 mm | 8.0/124 | FMJ RN | 9 mm (.355 in) |
| | 44 Mag | 15.6/240 | SJHP | 10.9 mm (.429 in) |
| III | 7.62 mm NATO | 9.6/147 | FMJ- SPIRE  PT BT** | 7.62 mm (.308 in) |
| IV | 30.06 M2 AP | 10.8/166 | FMJ – SPIRE PT AP*** | 7.62 mm (.308 in) |

\* Commercially loaded ammunition may be used—handloading of this round is not required.  See section 5.4.1.
\*\* Verify that jacket is ferrous (use of a magnet is acceptable).
\*\*\* Obtained from U.S. Military M2 AP ammunition.

**U.S. Department of Justice**
**National Institute of Justice**

☒ DOJ
Seal

National Institute of Justice
Technology Assessment Program

# Ballistic Resistance of Police Body Armor

## NIJ Standard 0101.03

### April 1987

---

## ABOUT THE TECHNOLOGY ASSESSMENT PROGRAM

The Technology Assessment Program is sponsored by the Office of Development, Testing, and Dissemination of the National Institute of Justice (NIJ), U.S. Department of Justice. The program responds to the mandate of the Justice System Improvement Act of 1979, which created NIJ and directed it to encourage research and development to improve the criminal justice system and to disseminate the results to Federal, State, and local agencies.

The Technology Assessment Program is an applied research effort that determines the technological needs of justice system agencies, sets minimum performance standards for specific devices, tests commercially available equipment against those standards, and disseminates the standards and the test results to criminal justice agencies nationwide and internationally.

The program operates through:

The *Technology Assessment Program Advisory Council* (TAPAC) consisting of nationally recognized criminal justice practitioners from Federal, State, and local agencies, which assesses technological needs and sets priorities for research programs and items to be evaluated and tested.

The *Law Enforcement Standards Laboratory* (LESL) at the National Bureau of Standards, which develops voluntary national

performance standards for compliance testing to ensure that individual items of equipment are suitable for use by criminal justice agencies. The standards are based upon laboratory testing and evaluation of representative samples of each item of equipment to determine the key attributes, develop test methods, and establish minimum performance requirements for each essential attribute. In addition to the highly technical standards, LESL also produces user guides that explain in nontechnical terms the capabilities of available equipment.

The *Technology Assessment Program Information Center* (TAPIC) operated by a grantee, which supervises a national compliance testing program conducted by independent agencies. The standards developed by LESL serve as performance benchmarks against which commercial equipment is measured. The facilities, personnel, and testing capabilities of the independent laboratories are evaluated by LESL prior to testing each item of equipment, and LESL helps the Information Center staff review and analyze data. Teat results are published in Consumer Product Reports designed to help justice system procurement officials make informed purchasing decisions.

Publications issued by the National Institute of Justice, including those of the Technology Assessment Program, are available from the National Criminal Justice Reference Service (NCJRS), which serves as a central information and reference source for the Nation's criminal justice community. For further information, or to register with NCJRS, write to the National Institute of Justice, National Criminal Justice Reference Service, Washington, DC 20531.

James K. Stewart, Director

National Institute of Justice

---

# COMMONLY USED SYMBOLS AND ABBREVIATIONS

| | | | | | |
|---|---|---|---|---|---|
| A | ampere | H | henry | nm | nanometer |
| ac | alternating current | h | hour | No. | number |
| AM | amplitude modulation | hf | high frequency | o.d. | outside diameter |
| cd | candela | Hz | hertz (c/s) | Ω | ohm |
| cm | centimeter | i.d. | inside diameter | p. | page |
| CP | chemically pure | in | inch | Pa | pascal |
| c/s | cycle per second | ir | infrared | pe | probable error |
| d | day | J | joule | pp. | pages |
| dB | decibel | L | lambert | ppm | part per million |
| dc | direct current | L | liter | qt | quart |
| °C | degree Celsius | lb | pound | rad | radian |
| °F | degree Fahrenheit | lbf | pound-force | rf | radio frequency |
| diam | diameter | lbf•in | pound-force inch | rh | relative humidity |
| emf | electromotive force | lm | lumen | s | second |
| eq | equation | ln | logarithm (natural) | SD | standard deviation |

| F | farad | log | logarithm (common) | sec. | section |
| fc | footcandle | M | molar | SWR | standing wave radio |
| fig. | figure | m | meter | uhf | ultrahigh frequency |
| FM | frequency modulation | min | minute | uv | ultraviolet |
| ft | foot | mm | millimeter | V | volt |
| ft/s | foot per second | mph | mile per hour | vhf | very high frequency |
| g | acceleration | m/s | meter per second | W | watt |
| g | gram | N | newton | λ | wavelength |
| gr | grain | N•m | newton meter | wt | weight |

area = unit$^2$ (e.g., ft$^2$, in$^2$, etc.); volume = unit$^3$ (e.g., ft$^3$, m$^3$, etc.)

## PREFIXES

| d | deci (10$^{-1}$) | da | deka (10) |
| c | centi (10$^{-2}$) | h | hecto (10$^2$) |
| m | milli (10$^{-3}$) | k | kilo (10$^3$) |
| μ | micro (10$^{-6}$) | M | mega (10$^6$) |
| n | nano (10$^{-9}$) | G | giga (10$^9$) |
| p | pico (10$^{-12}$) | T | tera (10$^{12}$) |

## COMMON CONVERSIONS

### (See ASTM E380)

ft/s x 0.03048000 = m/s

ft x 0.3048 = m

ft•lbf x 1.355818 = J

gr x 0.06479891 = g

in x 2.54 = cm

kWh x 3,6000,000 = J

lb x 0.4535924 = kg

lbf x 4.448222 = N

lbf/ft x 14.59390 = N/m

lbf•in x 0.1129848 = N•m

lbf/in$^2$ x 6894.757 = Pa

mph x 1.609344 = km/h

qt x 0.9463529 = L

Temperature: (T ° F-32) x 5/9 = T ° C

Temperature: (T ° C x 9/5)+32 = T ° F

vi

# NIJ STANDARD
# FOR THE
# BALLISTIC RESISTANCE OF
# POLICE BODY ARMOR

## CONTENTS

|  | Page |
|---|---|
|  |  |
| Foreword | iii |
| 1. Purpose and Scope | 1 |
| 2. Classification | 1 |
| 3. Definitions | 2 |
| 4. Requirements | 4 |
|    4.1 Acceptance Criteria | 4 |
|    4.2 Test Sequence | 4 |
|    4.3 Workmanship | 4 |
|    4.4 Labeling | 4 |
|    4.5 Ballistic Penetration and Deformation | 6 |
| 5. Test Methods | 6 |
|    5.1 Sampling | 6 |
|    5.2 Test Equipment and Setup | 6 |
|    5.3 Workmanship Examination | 9 |
|    5.4 Label Examination | 9 |

| 5.5 Ballistic Tests | 10 |
| Appendix A - Body Armor Selection | 13 |

v

---

# FOREWORD

This document, NIJ standard-0101.03, Ballistic Resistance of Police Body Armor, is an equipment Standard developed by the Law Enforcement Standards Laboratory of the National Bureau of Standards. It is produced as part of the Technology Assessment Program of the National Institute of Justice (NIJ). A brief description of the program appears on the inside front cover.

This standard is a technical document that specifies performance and other requirements equipment should meet to satisfy the needs of criminal justice agencies for high quality service. Purchasers may use the test methods described in this standard to determine whether a particular piece of equipment meets the essential requirements, or they may have the tests conducted on their behalf by a qualified testing laboratory. Procurement officials may also refer to this standard in their purchasing documents and require that equipment offered for purchase meet the requirements. Compliance with the requirements of the standard may be attested to by an independent laboratory or guaranteed by the vendor.

Because this NIJ standard is designed as a procurement aid, it is necessarily highly technical. For those who seek general guidance concerning the selection and application of law enforcement equipment, user guides have also been published. The guides explain in nontechnical language how to select equipment capable of performance required by an agency.

NIJ standards are subjected to continuing review. Technical comments and recommended revisions are welcome. Please send suggestions to the Program Manager for Standards, National Institute of Justice, U.S. Department of Justice, Washington DC 20531.

Before citing this or any other NIJ standard in a contract document, users should verify that the most recent edition of the standard is used. Write to: Chief, Law Enforcement Standards Laboratory, National Bureau of Standards, Gaithersburg, MD 20899.

Lester D. Shubin

Program Manager for Standards

National Institute of Justice

iii

Case 1:08-cv-00961-RWR    Document 10-7    Filed 07/10/2008    Page 6 of 21

# U.S. DEPARTMENT OF JUSTICE

## National Institute Of Justice

### James K. Stewart, Director

The technical effort to develop this standard was conducted under Interagency Agreement LEAA-J-IAA-021-3, Project Number 8006.

### ACKNOWLEDGMENTS

This standard was formulated by the Law Enforcement Standards Laboratory of the National Bureau of Standards under the direction of Daniel E. Frank, Manager, Protective Equipment Program and Lawrence K. Eliason, Chief of LESL. The technical research was performed by Russell N. Prather, Chemical Systems Laboratory, Aberdeen Proving Grounds, U.S. Army, and Daniel E. Frank.

# NIJ STANDARD

# FOR THE

# BALLISTIC RESISTANCE OF

# POLICE BODY ARMOR

## 1. PURPOSE AND SCOPE

The purpose of this standard is to establish minimum performance requirements and methods of test for the ballistic resistance of police body armor intended to protect the torso against gunfire. This standard is a revision of NIJ Standard-0101.02, dated March 1985, clarifying the labeling requirements, acceptance criteria, and backface signature measurement procedure. The scope of the standard is limited to ballistic resistance only; the standard does not address threats from knives and sharply pointed instruments, which are different types of threat. In addition, the standard does not address armor that

Case 1:08-cv-00961-RWR   Document 10-7   Filed 07/10/2008   Page 7 of 21

incorporates inserts, or variations in construction of the ballistic panel over small areas of the torso, for the purposes of increasing the basic level of protection of the armor (whether ballistic or blunt trauma) on localized areas.

# 2. CLASSIFICATION

Police body armors covered by this standard are classified into seven types, by level of ballistic protection performance.[1] The classification of an armor panel that provides two or more levels of ballistic protection at different locations on the ballistic panel shall be that of the minimum ballistic protection provided at any location on the panel.

As of 1987, ballistic-resistant body armor suitable for routine full-time wear throughout an entire shift of duty is available in types I, II-A, and to a limited extent type II (depending largely upon the climate) which will provide protection from common handgun threats. Type III-A, which will provide protection from 9 mm submachine guns and 44 Magnum handguns using the test rounds, and types III and IV, which will protect against high-powered rifles, are normally considered to be special purpose armor most appropriate for use during tactical operations. See appendix A.

## 2.1 Type I (22 LR; 38 Special)

This armor protects against 22 Long Rifle High Velocity lead bullets, with nominal masses of 2.6 g (40 gr) impacting at a velocity of 320 m (1050 ft) per second or less, and 38 Special round nose lead bullets, with nominal masses of 10.2 g (158 gr) impacting at a velocity of 259 m (850 ft) per second or less. It also provides protection against most handgun rounds in calibers 25 and 32.

## 2.2 Type II-A (Lower Velocity 357 Magnum; 9 mm)

This armor protects against 357 Magnum jacketed soft point bullets, with nominal masses of 10.2 g (158 gr) impacting at a velocity of 381 m (1250 ft) per second or less, and 9 mm full metal jacketed bullets, with nominal masses of 8.0 g (124 gr) impacting at a velocity of 332 m (1090 ft) per second or less. It also provides protection against threats such as 45 Auto., 38 Special +P and some other factory loads in caliber 357 Magnum and 9 mm, as well as the threats mentioned in section 2.1.

---

[1] The ballistic threat posed by a bullet depends, among other things, on its composition, shape, caliber, mass, angle of incidence, and impact velocity. Because of the wide variety of cartridges available in a given caliber, and because of the existence of hand loads, armors that will defeat a standard test round may not defeat other loadings in the same caliber. For example, an armor that prevents penetration by a 357 Magnum test round may or may not defeat a 357 Magnum round with higher velocity. In general, an armor that defeats a given lead bullet may not resist penetration by other rounds of the same caliber of different construction or configuration. The test ammunition specified in this standard represent common threats to law enforcement officers.

1

---

## 2.3 Type II (Higher Velocity 357 Magnum; 9 mm)

This armor protects against 357 Magnum jacketed soft point bullets, with nominal masses of 10.2 g (158 gr) impacting at a velocity of 425 m (1395 ft) per second or less, and 9 mm full jacketed bullets, with nominal masses of 8.0 g (124 gr) impacting at a velocity of 358 m (1175 ft) per second or less. It also provides protection against most other factory loads in caliber 357 Magnum and 9 mm, as well as the threats mentioned in sections 2.1 and 2.2.

## 2.4 Type III-A (44 Magnum; Submachine Gun 9 mm)

This armor protects against 44 Magnum, lead semi-wadcutter bullets with gas checks, nominal masses of 15.55 g (240 gr)

and impacting at a velocity of 426 m (1400 ft) per second or less, and 9 mm full metal jacketed bullets, with nominal masses of 8.0 g (124 gr) impacting at a velocity of 426 m (1400 ft) per second or less. It also provides protection against most handgun threats, as well as the threats mentioned in sections 2.1 through 2.3.

## 2.5 Type III ( High-Powered Rifle)

This armor protects against 7.62 mm full metal jacketed bullets (U.S. military designation M80), with nominal masses of 9.7 g (150 gr) impacting at a velocity of 838 m (2750 ft) per second or less. It also provides protection against threats such as 223 Remington (5.56 mm FMJ), 30 Carbine FMJ, and 12 gauge rifled slug, as well as the threats mentioned in sections 2.1 through 2.4.

## 2.6 Type IV (Armor-Piercing Rifle)

This armor protects against 30 caliber armor-piercing bullets (U.S. military designation APM2), with nominal masses of 10.8 g (166 gr) impacting at a velocity of 868 m (2850 ft) per second or less. It also provides at least single hit protection against the threats mentioned in sections 2.1 through 2.5.

## 2.7 Special Type

A purchaser having a special requirement for a level of protection other than one of the above standard threat levels should specify the exact test rounds and minimum impact velocities to be used, and indicate that this standard shall govern in all other respects.

## 3. DEFINITIONS

## 3.1 Angle of Incidence

The angle between the line of flight of the bullet and the perpendicular to the plane tangent to the point of impact, also known as the angle of obliquity (see fig. 1).



Bullet Line of Flight

Angle of Incidence

Perpendicular to Plane

Tangent to Plane

Armor

FIGURE 1. Angle of Incidence

2

## 3.2 Backing Material

A block of nonhardening, oil-base modeling clay placed in contact with the back of the armor test specimen during ballistic

testing.

### 3.3 Certification of Compliance

Manufacturer's affidavit (certification) that a production unit of body armor meets or exceeds (complies with) all of the requirements of this standard (sec. 4) for the labeled protection classification (sec. 2).

### 3.4 Deformation

The maximum momentary displacement of the back surface of the armor test specimen caused by a fair hit that does not penetrate the armor when the armor is in initial contact with the backing material.

### 3.5 Fair Hit

A bullet that impacts the armor at an angle of incidence no greater than ± 5° from the intended angle of incidence, no closer to the edge of the armor part than 7.6 cm (3 in) and no closer to a prior hit than 5 cm (2 in), at an impact velocity no more than 50 ft (15 m) per second greater than the minimum required test velocity.

### 3.6 Full Metal Jacketed Bullet (FMJ)

A bullet made of lead completely covered, except for the base, with copper alloy (approximately 90 copper-10 zinc).

### 3.7 Jacketed Soft Point (JSP)

A bullet made of lead completely covered, except for the point, with copper alloy (approximately 90 copper-10 zinc).

### 3.8 Lead Bullet

A bullet made of lead, which may be alloyed with hardening agents.

### 3.9 Penetration

Complete perforation of an armor test sample by a test bullet or by a fragment of the bullet or armor, as evidenced by the presence of that bullet or a fragment in the backing material, or by a hole which passes through the backing material.

### 3.10 Semi-Wadcutter

A bullet shape characterized by a flat nose and a tapered section leading to a cylindrical bullet body with a sharp break where the taper meets the body.

### 3.11 Strike Face

The surface of an armor designated by the manufacturer as the surface that should face the ballistic threat.

### 3.12 Wear Face

The surface of an armor designated by the manufacturer as the surface that should be worn toward the body.

3

# 4. REQUIREMENTS

## 4.1 Acceptance Criteria

An armor style satisfies the requirements of this standard if all four sample items (see sec. 5.1) meet the workmanship (see sec. 4.3) and labeling (see sec. 4.4) requirements and when tested in accordance with section 5.5, each part of the armor (torso, front, back, side, groin and coccyx) meets the penetration and deformation requirements (see sec. 4.5) both wet and dry.

## 4.2 Test Sequence

Tests shall be conducted in the order presented in sections 5.3 through 5.5 of this standard.

## 4.3 Workmanship

Each armor shall be free from wrinkles, blisters, cracks or fabric tears, crazing, chipped or sharp corners and other evidences of inferior workmanship.

## 4.4 Labeling

Each set of ballistic-resistant armor shall be clearly and durably marked (labeled) in a readable type size in accordance with the requirements set forth below.

### 4.4.1 Ballistic Panels

Every ballistic panel shall have a label. The label shall be applied (attached) to either exterior surface of the panel. The label shall contain the following information:

a) name, logo or other identification of the manufacturer

b) the rated level of protection, according to section 2 of this standard, and referenced to this edition of the standard (i.e., type II in accordance with NIJ Standard-0101.03)

c) size (if custom fitted, provision for the name of the individual for whom it is made)

d) lot number

e) date of issue line

f) a model or style designation that uniquely identifies the panel for purchasing purposes (panels designed to fit the male and female torso shall have separate model/style designations)

g) strike face or wear face - the surface of the garment that is to face the threat or to be worn next to the body must be identified

h) serial number

i) care instructions for the ballistic material in accordance with 16 CFR 423[2]

j) for type I through type III-A armor, a warning in type at least 1.5 times the size of the rest of the type on the label (exclusive of the information required in "a" above) stating that the armor is not intended to protect the wearer from rifle fire and, if applicable, that the armor is not intended to protect the wearer from sharp edged or pointed instruments. (Note: Printing color changes are acceptable but cannot be substituted for the type size requirement herein.)

k) certification of compliance with NIJ Standard-0101.03.

**4.4.2 Armor Carriers with Nonremovable Ballistic Panels**

Armor with ballistic panels that are nonremovable shall, in addition to the label required for the ballistic element, have a label on the carrier that is in conformance with the requirements for the ballistic panels (sec. 4.4.1) unless the armor is so constructed that the ballistic panel label is not covered by the carrier.

**4.4.3 Armor Carriers with Removable Ballistic Panels**

Armor carriers with removable ballistic panels shall have label(s) on either exterior surface of the carrier. If the carrier is one piece (i.e., all parts are sewn together into one garment) one (1) label in conformance with the requirements of this section is sufficient. If the front and the back of the carrier are separable, the front and back parts shall each be labeled. The label shall contain the following information:

a) name, logo or other identification of the manufacturer

b) a statement telling the user to look at the ballistic panels to determine the protection provided

c) size (if custom fitted, provision for the name of the individual for whom it is made)

d) date of issue line

e) a model or style designation that uniquely identifies the garment for purchasing purposes (armor designed to fit the male and female torso shall have separate model/style designations)

f) care instructions for the armor carrier in accordance with 16 CFR 423[2]

g) certification of compliance with NIJ Standard-0101.03.

---

[2]Part 423, Care Labeling of Textile Wearing Apparel and Certain Piece Goods, as amended effective January 2, 1984; Federal Trade Commission Regulation Rule.

4

---

## 4.5 Ballistic Penetration and Deformation

One complete armor (each part) shall be tested for resistance to ballistic penetration and ballistic deformation in accordance with section 5.5 after wet conditioning in accordance with section 5.2.10. A second complete armor shall be tested in accordance with section 5.5 in the dry condition. Penetration by any fair hit, deformation to a depth greater than 44 mm (1.73 in), or penetration by a bullet at a velocity lower than the minimum required impact velocity in either test, shall constitute failure. A bullet that impacts too close to the edge or to a prior hit and/or at too high a velocity, but does not penetrate, shall be considered a fair hit for penetration purposes. A bullet that impacts at too high a velocity, but is otherwise a fair hit that produces a backface signature less than 44 mm (1.73 in) deep, shall be considered a fair hit for the determination of deformation. The detailed requirements are summarized in table 1.

At the option of the tester, a type I, II-A, II or III-A armor part which has successfully withstood six fair hits with one test ammunition may thereupon be tested with the second test ammunition. However, if failure occurs with the second test ammunition a retest shall be conducted. A second specimen of that armor part shall be tested with the second test ammunition and the results of that test shall govern.

Type I, II-A, II or III-A armor designated to include a removable insert for additional ballistic or blunt trauma protection over a localized area of the panel shall be tested without the insert.

# 5. TEST METHODS

## 5.1 Sampling

Four complete armors, selected at random and sized to fit a 117 cm (46 in) to 122 cm (48 in) chest circumference, shall constitute a test sample. (Note: The larger the size, the more likelihood that all ballistic testing will fit on just two complete armors.)

## 5.2 Test Equipment and Setup

It should be noted that hand-loaded ammunition may be required to achieve some of the bullet velocities required in the following sections. The test weapon may be a handgun, rifle, or test barrel chambered as appropriate for the test bullet required by the type of armor that is being tested.

### 5.2.1 Type I Test Weapons and Ammunition

*5.2.1.1 22 LR*

Test bullets shall be 22 Long Rifle High Velocity lead, with nominal masses of 2.6 g (40 gr) and a minimum measured velocity of 320 m (1050 ft) per second.

*5.2.1.2 38 Special*

Test bullets shall be 38 Special round nose lead, with nominal masses of 10.2 g (158 gr) and a minimum measured velocity of 259 m (850 ft) per second.

5

# Table 1. *Test Summary*

| Armor Type | Test Round | Test Ammunition | Nominal Bullet Mass | Minimum Required Bullet Velocity | Required Fair Hits Per Armor Part at 0° Angle of Incidence | Maximum Depth of Deformation | Required Fair Hits Per Armor Part at 30° Angle of Incidence |
|---|---|---|---|---|---|---|---|
| | | **Test Variables** | | | **Performance Requirements** | | |
| I | 1 | 38 Special RN Lead | 10.2 g 158 gr | 259 m/s (850 ft/s) | 4 | 44 mm (1.73 in) | 2 |
| | 2 | 22 LRHV Lead | 2.6 g 40 gr | 320 m/s (1050 ft/s) | 4 | 44 mm (1.73 in) | 2 |
| | 1 | 357 Magnum JSP | 10.2 g 158 gr | 381 m/s (1250 ft/s) | 4 | 44 mm (1.73 in) | 2 |

| II-A | 2 | 9 mm<br>FMJ | 8.0 g<br>124 gr | 332 m/s<br>(1090 ft/s) | 4 | 44 mm<br>(1.73 in) | 2 |
| II | 1 | 357 Magnum<br>JSP | 10.2 g<br>158 gr | 425 m/s<br>(1395 ft/s) | 4 | 44 mm<br>(1.73 in) | 2 |
| | 2 | 9 mm<br>FMJ | 8.0 g<br>124 gr | 358 m/s<br>(1175 ft/s) | 4 | 44 mm<br>(1.73 in) | 2 |
| III-A | 1 | 44 Magnum<br>Lead SWC Gas<br>Checked | 15.55 g<br>240 gr | 426 m/s<br>(1400 ft/s) | 4 | 44 mm<br>(1.73 in) | 2 |
| | 2 | 9 mm<br>FMJ | 8.0 g<br>124 gr | 426 m/s<br>(1400 ft/s) | 4 | 44 mm<br>(1.73 in) | 2 |
| III | | 7.62 mm<br>(308 Winchester)<br>FMJ | 9.7 g<br>150 gr | 838 m/s<br>(2750 ft/s) | 6 | 44 mm<br>(1.73 in) | 0 |
| IV | | 30-06<br>AP | 10.8 g<br>166 gr | 868 m/s<br>(2850 ft/s) | 1 | 44 mm<br>(1.73 in) | 0 |
| Special<br>Requirement<br>(see sec. 2.2.7)* | | * | * | * | * | 44 mm<br>(1.73 in) | * |

\* These items must be specified by the user. All of the items must be specified.

Notes: Armor parts covering the torso front and torso back, with or without side coverage, shall each be impacted with the indicated number of fair hits. Armor parts covering the groin and coccyx shall each be impacted with three fair hits at 0° angle of incidence. The deformation due to the first fair hit shall be measured to determine compliance. No fair hit bullet or one impacting at a velocity lower than the minimum required bullet velocity shall penetrate the armor.

Abbreviations: AP - Armor Piercing

FMJ - Full Metal Jacket

JSP - Jacketed Soft Point

LRHV - Long Rifle High Velocity

RN - Round Nose

SWC - Semi-Wadcutter

### 5.2.2 Type II-A Test Bullets

*5.2.2.1 Lower Velocity 357 Magnum*

Test bullets shall be 357 Magnum jacketed soft point, with nominal masses of 10.2 g (158 gr) and a minimum measured velocity of 381 m (1250 ft) per second.

*5.2.2.2 Lower Velocity 9 mm*

Test bullets shall be 9 mm full metal jacketed, with nominal masses of 8.0 g (124 gr) and a minimum measured velocity of 332 m (1090 ft) per second.

6

Case 1:03-cv-00951-RWR  Document 40-7  Filed 07/10/2008  Page 14 of 21

### 5.2.3 Type II Bullets

*5.2.3.1 Higher Velocity 357 Magnum*

Test bullets shall be 357 Magnum jacketed soft point, with nominal masses of 10.2 g (158 gr) and a minimum measured velocity of 425 m (1395 ft) per second.

*5.2.3.2 Higher Velocity 9 mm*

Test bullets shall be 9 mm full metal jacketed, with nominal masses of 8.0 g (124 gr) and a minimum measured velocity of 358 m (1175 ft) per second.

### 5.2.4 Type III-A Test Bullets

*5.2.4.1 44 Magnum*

Test bullets shall be 44 Magnum, lead semi-wadcutter with gas checks, nominal masses of 15.55 g ( 240 gr), and a minimum measured velocity of 426 m (1400 ft) per second.

*5.2.4.2 Submachine Gun 9 mm*

Test bullets shall be 9 mm full metal jacketed, with nominal masses of 8.0 g (124 gr) and a minimum measured velocity of 426 m (1400 ft) per second.

### 5.2.5 Type III Test Bullets

Test bullets shall be 7.62 mm full metal jacketed (U.S. military designation M80), with nominal masses of 9.7 g (150 gr) and a minimum measured velocity of 838 m (2750 ft) per second.

### 5.2.6 Type IV Test Bullets

Test bullets shall be 30 caliber armor-piercing (U.S. military designation APM2), with nominal masses of 10.8 g (166 gr) and a minimum measured velocity of 868 m (2850 ft) per second.

### 5.2.7 Special Type Test Bullets

The cartridge type, bullet construction, bullet caliber, bullets mass, and bullet minimum striking velocity must all be specified by the user.

### 5.2.8 Chronograph

The chronograph shall have a precision of $1\mu$ s and an accuracy of $2 \mu$ s. Its triggering devices shall be of either the photoelectric or conductive screen type.

### 5.2.9 Armor Backing Material

The backing material shall be in the form of a single block at least 10.2 cm (4 in) thick and of sufficient length and width [approximately 61 x 61 cm (24 x 24 in)] to completely back the armor part to be tested.

The armor backing material shall be conditioned for at least 3 h at a temperature between 15 and 30° C (59 and 95 ° F), and shall be worked thoroughly to eliminate any voids. Its consistency shall be such that a depression of $25 \pm 3$ mm ($1 \pm 0.1$ in) in depth is obtained when a 1 kg $\pm$ 10 gm (2.2 lb $\pm$ 0.35 oz) cylindrical steel mass, $44.5 \pm 0.5$ mm ($1.75 \pm 0.02$ in) in diameter and having a hemispherical striking end, is dropped from a height of 2 m $\pm$ 2 cm (6.5 $\pm$ 0.07 in) onto one of its square faces. Three drop tests shall be made, and the center of each impact site shall be at least 76 mm (3 in) from a previous impact site and from any edge. A guide tube or other means may be used as required to assure that the striking end of the cylindrical

mass impacts the backing material squarely. The backing material may be maintained at any temperature in the above range that will give it the required consistency when conducting the tests described in section 5.5.

A backing material found to be suitable is Roma Plastilina No. 1 modeling clay, available from Sculpture House, Inc., East 30th St., New York, NY 10016, and other artist supply centers.[3]

---

[3]The use of brand names in this standard does not constitute endorsement by the National Bureau of Standards, the National Institute of Justice, or any other agency of the Federal Government, nor does it imply that the product is best suited for its intended application.

7

---

### 5.2.10 Wet Armor Conditioning

The complete armor shall be conditioned by subjected both sides of each armor part to a water spray under the following conditions:

> The spray nozzles shall be of such size and so spaced that $10 \pm 2$ L ($2.5 \pm 0.5$ gal) of water per hour falls uniformly distributed on each $0.1$ m$^2$ ($1$ ft$^2$) of spray booth floor area. Orient the nozzles so that when the droplets strike the armor surface they fall from gravitational force.

> Each surface of each armor part shall be sprayed for 3 min. Spray the strike face last. Ballistic testing shall begin immediately after the armor is removed from the spray. The armor must be completely tested within 30 min of the moment the armor is removed from the spray; if the testing has not been completed in the time permitted, the test data shall be discarded and wet testing must begin with new armor.

### 5.2.11 Test Preparation

Set up the test equipment as shown in figure 2. Use a test barrel or weapon appropriate for the ammunition required to test the armor (table 1) and firmly clamp it in place with the barrel horizontal.

Allow all electronic equipment to warm up until stability is achieved. During testing, maintain the ambient temperature at 20-28 ° C (68-82 ° F) and the relative humidity at 30 to 70 percent.

Condition the armor backing material and test it for consistency in accordance with section 5.2.9. Reshape and smooth the backing material to find its defined dimensions, and maintain it at the temperature required to maintain the required consistency.

Place the chronograph start trigger screen a minimum of 2 m (6.6 ft), from the muzzle of the test weapon and the stop trigger screen a suitable distance from it [approximately 1/2 to 1.5 m (1.6 to 4.9 ft)]. Arrange the screens so that they define planes perpendicular to the line of flight of the bullet. Measure the distance between the triggering planes with an accuracy of 1 mm (0.04 in).



A - 5 m for type I, II-A, II,
and III-A armors; 15 m
for type III and IV armors

B - 2 m minimum

C - Approximately 0.5 to 1.5 m

Figure 2. *Ballistic test setup.*

8

## 5.3 Workmanship Examination

Examine the complete armor. Note any evidence of inferior workmanship in accordance with the requirements of section 4.3.

## 5.4 Label Examination

Examine the complete armor and each part for conformance to the labeling requirement of section 4.4. Note and deviations from the requirements.

## 5.5 Ballistic Tests

### 5.5.1 Penetration and Backface Signature Tests Types I, II-A, II, and III-A Armor

Select the required test bullet as appropriate for the armor type as specified in sections 5.2.1 through 5.2.4. Use test bullet number 1 as specified for the armor type in table 1. Fire a sufficient number of pretest rounds to have a reasonable assurance that the first test round fired at the armor will strike the armor with a velocity no more than 15 m/s (50 ft/s) above the minimum required test round velocity. Position a sheet of cardboard 5 m (16 ft) from the muzzle of the test weapon. Fire the last pretest round through the cardboard to determine the line of flight and point of impact of the bullet; alternatively, use an aiming light or other suitable means for positioning.

Remove all removable inserts. Precondition one complete armor in accordance with section 5.2.10. Place one of the square faces of the armor backing materials in intimate contact with the back face of the armor specimen under test and secure it with tape, straps or other means which leave the strike face impact area exposed, but will not permit the armor to shift on the backing material when impacted. Place this assembly in back of the sheet of cardboard with the armor front face perpendicular to the line of flight of the bullet (0° angle of incidence) so that the desired point of impact touches the bullet hole in the cardboard made by the pretest round, then remove the cardboard. The desired points of impact for the six test hits required by this procedure are shown in figure 3.

Case 1:03-cv-00961-RWR    Document 16-7    Filed 07/10/2008    Page 17 of 21

Fire the first test round at the armor at location no. 1 in figure 3, using the chronograph to determine the bullet velocity. Examine the armor and the backing material to determine if the bullet made a fair hit and whether penetration occurred. If no penetration occurred and the bullet made a fair hit, measure and record the depth of the depression made in the armor and the backing material. The depth of the depression is the distance from the original undisturbed surface of the backing material to the lowest point of the depression. If the depth of the depression complies with the requirement of section 4.5, the armor meets the requirements of section 4.5. If the depth of depression is greater than permitted, and the velocity exceeds the minimum test velocity by more than 15 m/s (50 ft/s), the backing material shall be reconditioned, the armor smoothed and another attempt made to obtain a fair hit. This second attempt will be made to impact the same general area of the armor as the first shot but more than 2 in from the previous shot and more than 3 in from any edge of the armor. This process is repeated until a fair hit for backface signature is obtained, following which the depth of depression shall be measured to determine compliance with the requirements of section 4.5.

If no failure has occurred, replace the armor on the backing material in its original position without reconditioning the backing material (do not smooth the dent) and without removing the first test bullet if it is trapped in the armor. The velocity of the remaining rounds in the test sequence that follows shall meet the requirements shown in table 1, as appropriate for the test ammunition. When conducting the following firing sequence, inspect the armor following each test round to verify that the impact was a fair hit. If not, repeat the test at that general location on the armor until a fair hit is obtained before proceeding to the next test location.

Reposition the armor and backing material so that the test shot will impact the armor at location number 2 shown in figure 3. Fire the test round. Without disturbing the relationship between the armor and the backing material (do not remove any trapped bullets from the armor and do not smooth it), reposition the assembly so that the test round will impact the armor at location 3 shown in figure 3. Fire the test round. Without disturbing the relationship between the armor and the backing material, reposition the assembly so that the defined angle of incidence between the perpendicular to the armor and the line of flight of the test round is 30° and so that the bullet will be directed towards the center of the armor part and so the bullet will impact the armor at location no. 4 of figure 3. Fire the test round. Without disturbing the relationship between the armor and the backing material, reposition the assembly so that the angle of incidence for the test round is 30° and so that the bullet will be directed towards the center of the armor part and so the bullet will impact the armor at location no. 5 of figure 3. Fire the test round. Without disturbing the relationship between the armor and the backing material, reposition the assembly so that the angle of incidence for the test round is 0° and so that the bullet will impact the armor at location no. 6 of figure 3. Examine the armor and backing material for penetrations.

For body armor sized and shaped for female officers, the bust cups shall be filled with backing material conditioned at the same time as the main body of the backing material and in the same manner; however, the drop test for consistency does not have to be performed. Further, impact locations 4 and/or 5 of the above test sequence shall be such that at least one of the 30° angle of incidence shots shall impact on a bust cup. If the bust cup contains one or more seams, the shot shall impact a seam.

Recondition the backing material. Repeat the test sequence described above using the test round number 2 from table 1 as required for the armor type that is being tested. If there is room on the armor part, it may be turned upside-down and the second test sequence may be performed. If there is no room on the armor part, repeat the above test sequence with a new armor part using the second ammunition type.

If no failure has occurred (see sec. 4.5), repeat the entire test procedure as described with both test rounds using dry armor.

9



All shots at least 7.6 cm (3 in) from any edge
and at least 5 cm (2 in) from another shot

**A. Test ammunition shot series**



All shots at least 7.6 cm (3 in) from any edge
and at least 5 cm (2 in) from another shot

**B. Optional second ammunition shot series**

**Figure 3.** *Test pattern*

10

### 5.5.2 Penetration and Backface Signature Tests Type III Armor

Position a sheet of cardboard 15 m (50 ft) from the muzzle of the test weapon. Fire a pretest round on the bullet specified in section 5.2.6 through the cardboard to locate the bullet impact point so that the armor can be correctly positioned; alternatively, use an aiming light or other suitable means.

Precondition one complete armor in accordance with section 5.2.10. Place one of the square faces of the armor backing material in intimate contact with the back face of the armor specimen under test and secure it with tape, straps or other means which leave the strike face impact area exposed. If the armor is rigid and contoured to fit a human torso, such that the back surface of the armor does not come into contact with the surface of the backing material, build up the front surface of the backing material to achieve contact with the back surface of the armor. The backing material used for this shall be conditioned at the same time as the main body of the backing material and in the same manner; however, the drop test for consistency does not have to be performed on the built-up section. Place this assembly in back of the sheet of cardboard with the armor front face perpendicular to the line of flight of the bullet so that the center area of the armor is aligned with the bullet hole in the cardboard made by the pretest round, then remove the cardboard.

Fire a test round at the armor using the chronograph to determine the bullet velocity. Examine the armor and the backing material to determine if the bullet made a fair hit and whether penetration or spalling occurred.

If no failure has occurred, reposition the armor so as to space five additional impacts evenly over its surface at 0° obliquity for a total of six fair hits. Place each successive fair hit as far as possible from the center of each armor part. Reposition the backing material (as required) to avoid any overlap of depressions. If there are seams in the ballistic material, place the required number of fair hits so as to include at least on impact directly on a seam.

If no penetration has occurred, measure and record the depth of the depression made in the armor backing material for the two highest velocity fair hits. The depth of the depression is the distance from the original undisturbed surface of the backing material to the lowest point of the depression. Note whether the depth of the depression is in compliance with the requirements of section 4.5.

If no failure has occurred, repeat the entire test procedure as specified above using the dry armor.

### 5.5.3 Penetration and Backface Signature Test Type IV Armor

Position a sheet of cardboard 15 m (50 ft) from the muzzle of the test weapon. Fire a pretest round on the bullet specified in section 5.2.7 through the cardboard to locate the bullet impact point so that the armor can be correctly positioned; alternatively, use an aiming light or other suitable means.

Precondition one complete armor in accordance with section 5.2.10. Place one of the square faces of the armor backing material in intimate contact with the back face of the armor specimen under test and secure it with tape, straps or other means which leave the strike face impact area exposed. If the armor is rigid and contoured to fit a human torso, such that the back surface of the armor does not come into contact with the surface of the backing material, build up the front surface of the backing material to achieve contact with the back surface of the armor. The backing material used for this shall be conditioned at the same time as the main body of the backing material and in the same manner; however, the drop test for consistency does not have to be performed on the built-up section. Place this assembly in back of the sheet of cardboard with the armor front face perpendicular to the line of flight of the bullet so that the center area of the armor is aligned with the bullet hole in the cardboard made by the pretest round, then remove the cardboard.

Fire a test round at the armor using the chronograph to determine the bullet velocity. Examine the armor and the backing material to determine if the bullet made a fair hit and whether penetration or spalling occurred.

If no penetration has occurred, measure and record the depth of the depression made in the armor backing material. The depth of the depression is the distance from the original undisturbed surface of the backing material to the lowest point of the depression. Note whether the depth of the penetration is in compliance with the requirements of section 4.5.

If no failure has occurred, repeat the entire test procedure as specified above using the dry armor.

11

**5.5.4 Penetration and Backface Signature Test (Special Type)**

If the armor is principally made of fabric, use the test procedure of section 5.5.1.

If the armor is principally nonfabric, rigid, or "hard" (metal plates or ceramic with a small amount of fabric to act as a trauma shield or to catch backface fragments from the main ballistic resistance element) use the test procedure of section 5.5.2 or 5.5.3 depending upon the armor type.

12

# APPENDIX A-BODY ARMOR SELECTION

Police administrators should make every effort to encourage their officers to wear body armor throughout each duty shift. Although designed primarily to provide protection against handgun assault, soft body armor has prevented serious and potentially fatal injuries in traffic accidents (both in automobiles and while operating motorcycles), from physical assault with improvised clubs, and to some extent from knives. If the officers cited in the fatality statistics in the Federal Bureau of Investigation report, "Law Enforcement Officers Killed and Assaulted," are representative of all police, it would appear that only about 20 percent of all officers wear their armor. A large percentage of the officer fatalities could have been prevented in the officer had been wearing armor at the time of the assault.

Before purchasing body armor one should read NIJ Guide 100-87, "Selection and Application Guide to Police Body Armor," which discusses armor in depth.

The fundamental considerations are the threat to which officers are exposed and their own service weapons. A knowledge of the street weapons in the local area (confiscated weapons are a good indicator) is essential, for the armor should be selected to protect against street threat, or service weapons, whichever is the greater threat. Throughout the last decade, one in five officers killed was shot with his or her own weapon. Full coverage of the torso is critical since fatalities among officers wearing armor resulting from bullets entering the side of an officer through the opening between front and rear panels are common.

Type I body armor, which was issued during the NIJ demonstration project, is the minimum level of protection that any officer should have, and is totally suitable for full-time wear. A number of departments desiring more than minimum protection wear type II-A armor, which has been found sufficiently comfortable for full-time wear where the threat warrants it, particularly for those departments that use lower velocity 357 Magnum service weapons. Type II armor, heavier and more bulky than type II-A, is worn full time by some departments, but may not be considered suitable for full-time use in hot, humid climates. Type III-A armor, which provided the highest level of protection available as soft body armor, is generally considered to be unsuitable for routine wear, however, individuals confronted with a terrorist threat nay be willing to tolerate the weight and bulk of such armor while on duty. Type III and IV armor are clearly intended for use only in tactical situations when the threat warrants such protection.

It is absolutely essential that those who select body armor and each officer who wears it realize that there is no such thing as a *bulletproof* vest. The routine use of appropriate soft body armor *significantly* reduces the likelihood of fatal injury, but 100-percent protection in all circumstances is impossible. Body armor selection is to some extent a tradeoff between ballistic protection and wearability. The weight and comfort of soft body armor is inversely proportional to the level of ballistic protection that it provides.

All departments should strive to select armor that their officers will wear, consistent with their ballistic protection requirements, and should insure that each officer knows and understands the protection that it affords, as well as its

Case 1:08-cv-00096-RWR    Document 10-7    Filed 07/10/2008    Page 21 of 21

limitations. Body armor that is not worn provides *no* protection.

13



## BODY ARMOR PRODUCT STORAGE ADVISORY
### July 9, 2001

Dear Distributor:

Please be advised that in order to maintain and protect optimal ballistic performance of **Xtreme ZX, Xtreme Z, Xtreme X, PROTECH Stealth Elite and Safariland Platinum** model body armor products, they should be stored in a dry cool place. Do not store these products at temperatures above 120°F and 50% humidity. Recent laboratory "accelerated aging" tests of the Zylon fiber used in the above products, indicate that the ballistic performance of such material can be adversely affected if it is stored in a manner that exposes the material to extreme temperatures (158°F and above) and excessive humidity (80% and above) for a continuous period of two (2) weeks or more. While the extreme conditions created in the laboratory tests do not mimic the actual conditions in which our products are likely stored, this Product Storage Advisory supplements the care and maintenance instructions set forth in the **Xtreme ZX, Xtreme Z, Xtreme X, PROTECH Stealth Elite and Safariland Platinum** model body armor product Owner's Manual. The Manual should be read carefully and all instructions followed completely.

If you have any questions about the storage conditions of your inventory or the storage concerns of any end user customers, please do not hesitate to call Jeff Nelson at 800-347-1200 x-3705.

**Please issue the following Body Armor Product Storage Advisory to your customer end users:**

- **Xtreme ZX, Xtreme Z, Xtreme X, PROTECH Stealth Elite or Safariland Platinum** model body armor vests are sophisticated high-tech garments, designed to provide you with an NIJ certified level of ballistic protection, and as such they merit your special attention. These garments should be worn, handled, inspected, cared for, maintained and stored in strict conformance with the simple requirements and instructions set forth in the Owner's Manual included with each such product and as set forth in this Product Storage Advisory. These garments are unlike any other garment that you own.

- Ordinary daily temperature and humidity conditions experienced while wearing your vest during routine shifts will not have an adverse affect on the vest's ballistic performance. But the way you consistently care for and store your vest when it is not in use could adversely affect its ballistic performance.

- In order to *maintain* and *protect* optimal ballistic performance of your Xtreme ZX, XtremeZ, Xtreme X, **PROTECH Stealth Elite and Safariland Platinum** model body armor vest, it should be *stored* at normal room temperature in a dry place. When not in use, avoid storing your vest in places where it is exposed to persistent high temperatures (120°F and above) in combination with high humidity (50% and above) for long uninterrupted periods of time (two weeks or more).

- This Product Storage Advisory supplements the care and maintenance instructions set forth in the Xtreme ZX, Xtreme Z, Xtreme X, PROTECH Stealth Elite and Safariland Platinum model body armor product Owner's Manual. The Manual should be read carefully and all instructions followed completely.

- If you have any questions about the storage conditions of your body armor, please do not hesitate to call Jeff Nelson at 800-347-1200 x-3705.

**COMPANY CONFIDENTIAL**

HW0000291

**EXHIBIT F WITHHELD**
**PENDING NEGOTIATION OF PROTECTIVE ORDER**