# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff.<br><br>v.<br><br>HONEYWELL INTERNATIONAL INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No.: 1:08-cv-00961 (RWR)<br>)<br>)<br>)<br>)<br>) |

## UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT HONEYWELL INTERNATIONAL INC.'S MOTION TO DISMISS

Dated: August 15, 2008

Michael D. Granston
Alan E. Kleinburd
Alicia J. Bentley
A. Thomas Morris
Callie R. Owen
Jullia F. Callahan
United States Department of Justice
Commercial Division
Patrick Henry Bldg.
601 D Street, N.W.
Washington, D.C. 20004
202/514-6314

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT ............................................................. 1

II.     RESPONSE TO HONEYWELL'S FACTUAL BACKGROUND ............................ 3

        A.      Honeywell's Substantial Involvement With Z Shield Vests ........................ 4

        B.      The Five Year Warranty On Z Shield Vests ...................................... 4

        C.      Honeywell Misrepresented, Selective Disclosed, and Suppressed
                Material Information About Z Shield's Defects ................................ 6

        D.      Testing By NIJ And Exponent Confirm The Defective Nature
                Of Z Shield ................................................................. 10

        E.      Honeywell Knowingly Caused False Statements To Be Presented
                To The United States And Knowingly Made False Statements To
                Get False Claims Paid By The United States .................................. 10

III.    LEGAL STANDARDS FOR THIS MOTION TO DISMISS ................................ 11

IV.     ARGUMENT ................................................................. 13

        A.      Basic Principles ............................................................. 13

                1.      The False Claims Act ................................................. 13

                2.      Allison Engine ...................................................... 15

        B.      The Complaint Pleads *Prima Facie* Claims Against Honeywell Under
                Sections 3729(a)(1) And 3729(a)(2) Of The False Claims Act .................... 16

                1.      The Complaint Satisfies Rule 9(b) .................................... 16

                2.      The Complaint's Allegations Satisfy the False Claims Act's
                        Falsity Requirement ................................................. 19

                        a.      The Complaint identifies objective falsehoods by
                                Honeywell ................................................. 19

        b.     The United States has identified material falsehoods
               by Honeywell that affected the Government's decision
               to purchase defective Z Shield vests ...................................... 26

C.    The Complaint Satisfies The Pleading Requirements Of Section
       3729(a)(2) By Identifying False Statements That Honeywell Made Or
       Caused To Be Made To Get False Claims Paid By The Government ............. 31

D.    The Complaint Has Pled Sufficient Knowledge And Intent By
       Honeywell To State Claims Under Sections 3729(a)(1) And
       Section 3729(a)(2) Of The False Claims Act ................................................ 36

      1.     The Complaint Alleges That Honeywell Knowingly Caused
             The Presentment Of False Claims under Section 3729(a)(1) .............. 37

      2.     The Complaint Satisfies The Pleading Requirements of
             Allison Engine By Alleging That Honeywell Knowingly Made
             False Statements To Get The Government To Pay False Claims . ..... 40

E.    The Complaint Pleads A *Prima Facie* Claim Of Unjust Enrichment
       Against Honeywell ....................................................................... 42

V.     CONCLUSION ........................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Aktieselskabet AF 21 v. Fame Jeans, Inc.,
    525 F.3d 8 (D.C. Cir. 2008) .................................................................. 11, 13

Allison Engine Co. v. United States *ex rel.* Sanders,
    __ U.S. __, 128 S. Ct. 2123 (2008) ................................. 3, 14, 15, 16, 40, 41

Bell Atlantic Corp. v. Twombly,
    __ U.S. __, 127 S. Ct. 1955 (2007) ...................................................... 13, 29

BMY Combat Sys., Div. of Harsco Corp. v. United States,
    26 Cl. Ct. 846 (Cl. Ct. 1992) ....................................................................... 20

Boisjoly v. Morton Thiokol, Inc.,
    706 F. Supp. 795 (D. Utah 1988) .......................................................... 33, 34

Cahill v. Curtiss-Wright Corp.,
    57 F. Supp. 614 (W.D. Ky. 1944) ............................................................... 39

City of Moundridge v. Exxon Mobil Corp.,
    250 F.R.D. 1 (D.D.C. 2008) ........................................................................ 13

Cook County v. United States *ex rel.* Chandler,
    538 U.S. 119 (2003) ............................................................................. 14, 39

Crane Helicopter Servs., Inc. v. United States,
    45 Fed. Cl. 410 (Ct. Cl. 1999) .................................................................... 39

EEOC v. St. Francis Xavier Parochial School,
    117 F.3d 621 (D.C. Cir. 1997) ................................................................... 11

Elemary v. Phillipp Holzmann A.G.,
    533 F. Supp.2d 116 (D.D.C. 2008) ............................................................ 35

Erickson v. Pardus,
    __ U.S. __, 127 S. Ct. 2197 (2007) ........................................................... 13

Harrison v. Westinghouse Savannah River Co.,
176 F.3d 776 (4th Cir. 1999) .................................................. 12, 21, 30, 39, 40

Hopper v. Anton,
91 F.3d 1261 (9th Cir. 1996), cert. denied, 519 U.S. 1115 (1997) ............................... 33

In re Cardizem CD Antitrust Litig.,
105 F. Supp.2d 618 (E.D. Mich. 2000), app. denied, 332 F.3d 896
(6th Cir. 2002), cert. denied, 543 U.S. 939 (2004) .................................................. 43, 44

In re Lorazepam & Clorazepate Antitrust Litig.,
295 F. Supp.2d 30 (D.D.C. 2003) ........................................................ 43, 44

In re Patch,
526 F.3d 1176 (8th Cir. 2008) ...................................................... 41

In re XM Satellite Radio Holdings Sec. Litig.,
479 F. Supp.2d 165 (D.D.C. 2007) ................................................. 18

Moncrief v. Wilkinson,
93 Ala. 373, 9 So. 159 (Ala. 1891) ................................................ 21

Personnel Adm'r of Massachusetts v. Fenney,
442 U.S. 256 (1979) ................................................................. 41

Reno v. Bossier Parrish School Bd.,
520 U.S. 471 (1997) ................................................................. 41

Shaw v. AAA Eng'g Drafting, Inc.,
213 F.3d 519 (10th Cir. 2000) ...................................................... 39

Tyger Constr. Co. v. United States,
28 Fed. Cl. 35 (Ct. Cl. 1993) ..................................................... 23, 34

United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.,
251 F. Supp.2d 28 (D.D.C. 2003) .................................................. 12

United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,
297 F. Supp.2d 272 (D.D.C. 2004), aff'd, 393 F.3d 1321 (D.C. Cir. 2005) ............... 25

United States ex rel. DRC, Inc v. Custer Battles, LLC,
472 F. Supp.2d 787 (E.D. Va. 2007) ............................................... 25

iv

United States *ex rel.* Ervin & Assocs. v. Hamilton Secs. Group, Inc.,
    298 F. Supp.2d 91 (D.D.C. 2004) ................................................................. 25

United States *ex rel.* Franklin v. Parke-Davis, Div. of Warner-Lambert Co.,
    147 F. Supp.2d 39 (D. Mass. 2001) ............................................................ 15

United States *ex rel.* Gudur v. Deloitte Consulting LLP,
    512 F. Supp.2d 920 (S.D. Tex. 2007), aff'd,
    2008 U.S. App. LEXIS 17038 (5th Cir. August 7, 2008) ............................ 33

United States *ex rel.* Hagood v. Sonoma County Water Agency,
    929 F.2d 1416 (9th Cir. 1991) ..................................................................... 34

United States *ex rel.* Hockett v. Columbia/HCA Healthcare Corp.,
    498 F. Supp.2d 25 (D.D.C. 2007) ........................................................... 26, 27

United States *ex rel.* Joseph v. Cannon,
    642 F.2d 1373 (D.C. Cir. 1981), cert. denied, 455 U.S. 999 (1982) ..................... 12, 18

United States *ex rel.* K& R Ltd. Part. v. Massachusetts Housing Fin. Agency,
    530 F.3d 980 (D.C. Cir. 2008) ..................................................................... 40

United States *ex rel.* Kreindler & Kreindler v. United Technologies Corp.,
    985 F.2d 1148 (2d Cir.), cert. denied, 508 U.S. 973 (1993) ........................ 34

United States *ex rel.* Lamers v. City of Green Bay,
    168 F.3d 1013 (7th Cir. 1999) ..................................................................... 25

United States *ex rel.* Lee v. Smithkline Beecham, Inc.,
    245 F.3d 1048 (9th Cir. 2001) ............................................................... 20, 26

United States *ex rel.* Luckey v. Baxter Healthcare Corp.,
    183 F.3d 730 (7th Cir.), cert. denied, 528 U.S. 1038 (1999) ............................ 25, 32, 35

United States *ex rel.* McCready v. Columbia/HCA Healthcare Corp.,
    251 F. Supp.2d 114 (D.D.C. 2003) ........................................................ 12, 16

United States *ex rel.* Mikes v. Straus,
    274 F.3d 687 (2d Cir. 2001) ........................................................................ 30

United States *ex rel.* Pogue v. Diabetes Treatment Centers of America, Inc.,
    2008 WL 2791687 (D.D.C. July 21, 2008) ............................................. 14, 19, 39

United States *ex rel.* Pogue v. Diabetes Treatment Centers of America, Inc.,
    238 F. Supp.2d 258 (D.D.C. 2002) ................................................................. 18, 30

United States *ex rel.* Purcell v. MWI Corp.,
    254 F. Supp.2d 69 (D.D.C. 2003) ............................................................................. 36

United States *ex rel.* Roby v. Boeing Co.,
    100 F. Supp.2d 619 (S.D. Ohio 1999), aff'd, 302 F.3d 637 6th Cir. 2002),
    cert. denied, 539 U.S. 969 (2003) ..................................................................... 26, 33

United States *ex rel.* Schmidt v. Zimmer,
    386 F.3d 235 (3d Cir. 2004) ............................................................................... 14, 15

United States *ex rel.* Siewick v. Jamieson Sci. & Eng'g, Inc.,
    214 F.3d 1372 (D.C. Cir. 2000) ........................................................................ 30, 32

United States *ex rel.* Stebner v. Seward & Stevenson Servs., Inc.,
    305 F. Supp.2d 694 (S.D. Tex. 2004) ...................................................... 28, 29, 31

United States *ex rel.* Totten v. Bombadier Corp.,
    286 F.3d 542 (D.C. Cir. 2002) ..................................................................................... 18

United States *ex rel.* Wang v. FMC Corp.,
    975 F.2d 1412 (9th Cir. 1992) ...................................................................................... 39

United States v. Aerodex, Inc.,
    469 F.2d. 1003 (5th Cir. 1972) .................................................................................... 27

United States v. Bornstein,
    423 U.S. 303 (1976) ..................................................................................... 14, 35

United States v. Hydroaire, Inc.,
    1997 WL 160761 (N.D. Ill. 1997) .............................................................................. 20

United States v. Neifert White Co.,
    390 U.S. 228 (1968) ........................................................................................... 14

United States v. Prabhu,
    442 F. Supp.2d 1008 (D. Nev. 2006) ....................................................................... 25

United States v. President and Fellows of Harvard College,
    323 F. Supp.2d 151 (D. Mass. 2004) .............................................................. 30, 36

United States v. Rogan,
     517 F.3d 449 (7th Cir. 2008) ......................................................... 14

United States v. Scientific Applications Int'l Corp.,
     2008 WL 2060602 (D.D.C. May 15, 2008) .................................... 21, 22, 26

United States v. Southland Mgmt. Corp.,
     326 F.3d 669 (5th Cir. 2003) ......................................................... 30

United States v. TDC Mgmt. Corp.,
     288 F.3d 421 (D.C. Cir.), cert. denied, 537 U.S. 1048 (2002) .................................... 35

**Statutes and Rules**

15 U.S.C. § 78u-4 ......................................................................... 18

31 U.S.C. § 3729 ........................................................................... 1

31 U.S.C. § 3729(a)(1) ................................................... 13, 16, 23, 29, 36, 37, 38, 41

31 U.S.C. § 3729(a)(2) ...................................... 3, 13, 14, 15, 16, 23, 29, 31, 35, 36, 40, 41, 42

31 U.S.C. § 3729(b) ...................................................................... 14

Fed. R. Civ. P. 9(b) ........................................... 3, 11, 12, 13, 16, 17, 18, 36, 41, 44

Fed. R. Civ. P. 12(b)(6) .................................................... 3, 11, 13, 44

Local Civil Rule 5.1(g) ................................................................... 18

## I.    PRELIMINARY STATEMENT

Honeywell International Inc.'s (Honeywell) Motion to Dismiss (Motion) depends on this Court finding, as a matter of law, that knowingly causing a contractor to present claims for defective bullet-proof vests and knowingly causing the United States to pay those claims does not state causes of action under the False Claims Act, 31 U.S.C. § 3729 *et seq*. (FCA). As alleged by the Complaint, at the time the United States purchased bullet-proof vests containing Zylon Shield (Z Shield vests), Honeywell's ballistic-resistant product, the United States reasonably expected to receive vests that would provide adequate ballistic protection for at least five years, the length of the vests' warranty issued by the manufacturer, Armor Holdings, Inc. (Armor Holdings). Honeywell reinforced these expectations by publicly stating that it anticipated no significant changes in ballistic performance over the five year suggested life span of Z Shield vests.

Instead, due to critical latent defects in Z Shield, the United States received defective vests that quickly degraded. This degradation negatively impacted the ballistic integrity of Z Shield vests after a short period of time and resulted in these vests failing to stop bullets after a short time period. Indeed, in ballistics testing performed at the National Institute of Justice (NIJ) in August 2005, every used Z Shield vest failed, with 15 of the 18 Z Shield vests suffering bullet penetrations. On the same day that NIJ published these test results, NIJ halted all sales of vests containing Zylon, including Z Shield, in the United States based on NIJ's finding that vests containing Zylon were defective.

Well before NIJ halted the sale of Z Shield vests and other vests containing Zylon, Honeywell knew about Z Shield's critical latent defects, specifically degradation in conditions of heat and humidity, and knew that these defects sharply reduced the ballistic integrity of Z Shield vests so that they would not provide adequate ballistic protection for anywhere near five years.

Yet, instead of placing safety first and informing Armor Holdings, the United States, and the general public about these defects, Honeywell engaged in a campaign of false statements and deception to cover up the risks of Z Shield. The Complaint alleges that Honeywell did so by affirmatively misrepresenting the risks, selectively disclosing favorable data about Z Shield while suppressing unfavorable data, and failing to disclose critical information, including an internal draft report that detailed the defective nature of Z Shield and the steps needed (but never undertaken due to Honeywell's deception) to make Z Shield vests safer. Honeywell's campaign caused Armor Holdings, who relied on Honeywell's technical expertise regarding Z Shield, to present to the United States false claims for defective bullet-proof vests and caused the United States to purchase these vests. Had the United States known about the critical latent defects with Z Shield it would not have purchased these vests.

All of the above allegations have been set forth in detail in the United States' 35 page Complaint (Complaint) against Honeywell, which also describes the underlying facts supporting these allegations and sets forth claims against Honeywell under the FCA and the common law of unjust enrichment. Yet, notwithstanding these detailed pleadings, Honeywell's Motion asks this Court to dismiss the Complaint as a matter of law, claiming that the FCA insulates Honeywell from liability for knowingly selling a defective product that Honeywell knew would be utilized as the key ballistic component in tens of thousands of bullet-proof vests purchased by the United States. Honeywell's arguments lack merit, and its misconduct falls well within the ambit of the FCA, which protects the Government from companies who knowingly sell or cause the United States to purchase defective products.

Nothing in the Supreme Court's recent decision in Allison Engine Co. v. United States *ex rel.* Sanders, __ U.S. __, 128 S. Ct. 2123 (2008) warrants a different conclusion. Although the Supreme Court published this decision four days after the United States filed its Complaint, the allegations contained in the Complaint satisfy the pleading requirements set forth in Allison Engine. That decision held that § 3729(a)(2) requires proof that the defendant intended its false statement or record to result in payment of claims by the United States and not just by a private party. Because Allison Engine addresses intent, it does not assist Honeywell's Motion because issues of knowledge, intent, and other conditions of a person's mind may be pled generally under Rule 9(b). But the Complaint goes well beyond such general allegations and specifically alleges in great factual detail how Honeywell's intentional campaign of false statements and deception was aimed, at least in part, to ensure that the United States kept purchasing Z Shield vests from Armor Holdings so that Honeywell could continue selling Z Shield to Armor Holdings. (Compl. ¶¶ 3-5, 11, 23, 34-83, 87-88, 91-92.)

Finally, Honeywell's Motion raises a host of disputed factual issues that are inappropriate for this Court to resolve on a motion to dismiss. Notably, the vast majority of cases cited by Honeywell do not involve a motion to dismiss, but instead stand in much later procedural postures. For all of these reasons and as detailed below, Honeywell's Motion lacks merit and the Court should deny this dismissal motion under Rules 9(b) and 12(b)(6) with prejudice.

## II.    RESPONSE TO HONEYWELL'S FACTUAL BACKGROUND

The United States' 35 page Complaint has pled valid FCA and unjust enrichment claims against Honeywell. The Complaint has also given Honeywell detailed notice of these claims. Although not seeking to convert its Motion into a summary judgment motion, Honeywell has

raised a number of factual issues regarding the Complaint. In doing so, Honeywell has not construed the facts alleged in the Complaint liberally nor given the United States the benefit of all reasonable inferences from those facts. Accordingly, the United States will hereby provide an overview of the allegations, as pled in the Complaint.

A.    **Honeywell's Substantial Involvement with Z Shield Vests**

Honeywell patented, manufactured, and sold Z Shield, the "key" ballistic resistant component in certain bullet-proof vests manufactured by Armor Holdings. (Compl. ¶¶ 21-23); Honeywell Motion at p. 5. Honeywell understood that Armor Holdings relied on it for technical advice about Z Shield, and Honeywell assisted in the marketing of Armor Holdings Z Shield vests to the general public. (Compl. ¶¶ 33, 64-66, 70.) Honeywell sold more than $15 million worth of Z Shield to Armor Holdings, who in turn sold over $20 million of Z Shield vests to the United States and to states, localities, and tribal authorities who relied in part on federal funding. (Compl. ¶¶ 12-18, 23.) All of the new Z Shield vests sold by Armor Holdings were certified by NIJ, whose standards covered just new vests. (Compl. ¶¶ 30.)

B.    **The Five Year Warranty on Z Shield Vests**

Honeywell understood that most Armor Holdings Z Shield vests carried a five-year warranty. (Compl. ¶¶ 31-32.) The typical warranty language included in Armor Holdings specifications for Z Shield vests stated, in total, that:

> Warranty. Ballistic Panels. For five (5) years after date of purchase the manufacturer warrants the ballistic panels against defects in materials and workmanship. The alteration of ballistic panels in any way shall render the warranty void.

4

(Compl. ¶ 32.) Honeywell reinforced the marketplace's expectations that Z Shield vests would

last for at least five years, stating, for example, in a public technical bulletin published by

Honeywell that:

> Based on the data and from experience with other ballistic
> materials, there is no significant anticipated change in the
> ballistic performance response of the Z Shield material for
> the five year suggested life span of most ballistic resistant
> vests assuming proper use and care.

(Compl. 70.)

Honeywell's Motion (at pp. 8-9) acknowledges that the United States did not plead a

breach of warranty claim against Honeywell, but nevertheless takes issue with the Complaint's

citation to the Armor Holdings five year warranty.[1] In light of Honeywell's challenges to the

warranty language, see Motion at pp. 1-3, 8-9, attached are several specifications for Armor

Holdings Z Shield vests.[2] This is the warranty language cited as "typical" in the Complaint.

---

[1]      The Complaint cited the five year warranty for two reasons: (1) to show the
materiality of Honeywell's failure to disclose that it knew Z Shield vests would not remain fit for
ballistic protection for anywhere near five years, notwithstanding the reasonable expectations in
the marketplace created by this warranty and reinforced by Honeywell's public statements
supporting Z Shield's ballistic performance; and (2) to support claims for express and implied
false certifications based on Honeywell's false statements to Armor Holdings about Z Shield's
life span that caused Armor Holdings to provide this warranty.

[2]      See Ex. A, E-mail from Dawn Flynn of Armor Holdings to the Armor Holdings
sales force, dated January 8, 2001, attaching specifications for several Z Shield vest models with
warranty language at para. 24 of each specification (same warranty language cited in Complaint);
Ex. B, E-mail string ending with an e-mail from Roger Cox of Armor Holdings to J. Cantrell,
Captain, Washington County Sheriff's Office, dated August 5, 2004, attaching specifications for
a Z Shield vest with warranty language at para. 16 (same warranty language cited in Complaint);
Ex. C, E-mail string ending with e-mail from Dawn Flynn of Armor Holdings to Paul Larkin of
Armor Holdings and Bob Nicholls, president of a Canadian distributor of body armor, dated
August 22, 2005, attaching specifications for several Z Shield vest models with warranty
language at para. 24 of the first warranty (Xtreme X Series) (same warranty language cited in
Complaint).

(Compl. ¶ 32.)  This warranty language is broad, not limited to a repair or replacement remedy, and does not contain any of the warnings about temperature or storage cited in Honeywell's Motion (at pp. 8-9).  DOJ's review of the documents produced by Armor Holdings showed this same language in specifications for many different Z Shield vest models.  This is why the United States termed  the language "typical."

The undated Use and Care Manual--Attachment B to the Motion and cited by Honeywell (at p. 2) as the "typical warranty" for Z Shield vests--appears to be a very late form of American Body Armor's (ABA)[3] Use and Care Manual and is situated in Honeywell's document production to DOJ between two documents dated May 9, 2006 and April 11, 2005 respectively.  Earlier ABA Owners' Manuals (used from 2001 to 2004) contained different warranty language that did not include any temperature or storage advisories and did not limit the remedy to repair or replacement.[4]  Unlike the warranty language in the various manuals, the warranty in Armor Holdings specifications did not materially change during the period that Armor Holdings sold Z Shield vests.

### C.    Honeywell Misrepresented, Selectively Disclosed, and Suppressed Material Information about Z Shield's Defects

As early as 2000, Honeywell became concerned about Z Shield's defects, in terms of excessive degradation after exposure to humidity, sweat, rain, and light, but Honeywell did not

---

[3]    ABA is the largest, but not the only subsidiary of Armor Holdings that sold Z Shield vests.

[4]    See, e.g., Exhibit D, ABA Xtreme Armor Owner's Manual, AHI026-0033, undated, but before a class action against Armor Holdings in 2004.  This Owner's Manual warranted materials (like Z Shield) for five years and did not limit the warranty to repair or replacement. Instead, it noted this remedy solely for cases where the "ballistic panel package [is] broken, interrupted, or damaged . . ." and contained no warnings about temperature or storage.

disclose these defects or its concerns to Armor Holdings or the United States. (Compl. ¶¶ 34-37.) After Z Shield failed in ballistics testing in Germany in early July 2001, DSM Inc., which had assisted Honeywell in manufacturing Z Shield, issued an "urgent" letter to Honeywell, among others, warning of Z Shield's defects. (Compl. ¶ 39.) Yet, Honeywell "downplayed" the importance of the DSM data to Armor Holdings, claimed that the test conditions did not "mimic" real world conditions, and failed to disclose the concerns of Honeywell scientists about Z Shield's defects. (Compl. ¶¶ 37-39, 42.)

Nevertheless, on July 9, 2001, Armor Holdings issued a storage advisory for its Z Shield vests that told customers to store these vests in a dry and cool place, at temperatures below 120° F and 50% relative humidity. (Compl. ¶ 41.) In response to DSM's warnings, Toyobo, the manufacturer of Zylon fiber, began to mail periodic degradation data to vest manufacturers and Honeywell, among others (but not to the United States at that time), showing Zylon's declining strength in high temperature and humidity conditions. (See, e.g., Compl. ¶¶ 40, 43, 45-47.) Toyobo also indicated initially that the degradation problem might be a "unique characteristic" of Z Shield not applicable to woven Zylon. Honeywell, however, continued to defend Z Shield by expressing "disappointment" at Toyobo having singled out Z Shield for concern and by "minimiz[ing] the risks" of Z Shield to Armor Holdings. (Compl. ¶¶ 40, 43, 47.)

Shortly after Toyobo and DSM issued degradation data, Honeywell began its own accelerated age testing under hot and humid conditions in an attempt to accelerate Z Shield's aging process to mimic how it would perform over a period of years. (Compl. ¶ 48.) In this testing, Z Shield showed sharp declines in ballistic integrity (ranging as high as 15%) after a short exposure to the accelerated aging process. (Compl. ¶¶ 49, 52, 54-55.) Honeywell conducted this

testing at a variety of temperatures and humidity conditions, and the testing showed sharp declines

(as high as 10% to 13.3%) in Z Shield's ballistic integrity at a temperature as low as 104° F, which

was substantially lower than the 120° F cited in the storage advisory, and approximates the

temperature of a bullet-proof vest worn by an officer in a hot climate. (Compl. ¶ 55.) Honeywell,

however, misrepresented the test results that it provided to Armor Holdings by emphasizing

"more favorable preliminary data," failing to disclose internal concern at Honeywell about Z

Shield degradation, and "downplay[ing]" the test results as being "under extreme conditions."

(Compl. ¶¶ 50-51, 53-55.) As a result, Armor Holdings never revised its storage advisory.

    Honeywell also suppressed critical information about Z Shield's defects. In September

2003, Honeywell authored a confidential, draft report providing both visual and quantitative

assessments of Z Shield's defects. (Compl. ¶56.) The draft report described plain signs of Z

Shield degradation, such as "darkening," "blistering," and "delamination" after a short period of

exposure to elevated levels of heat and humidity. (Compl. ¶ 57.) On the quantitative side, the

report stated that Z Shield demonstrated the largest loss in ballistic integrity of all the materials

sampled in Honeywell's testing. (Compl. ¶ 58.) The draft report noted the materiality of these

results, stating that even a 2% loss in ballistic integrity would likely take Z Shield vests outside of

the NIJ specifications for new vests.[5] (Compl. ¶ 59.) The draft report also noted that, in the event

of a 5% decline in a vest's ballistic integrity, to continue meeting NIJ specifications would require

adding enough Z Shield layers to the vest to achieve "10-20% higher" aerial density. (Id.) Yet,

---

[5]    This 2% figure is much lower than the 6% to 12% losses of ballistic integrity
cited in the draft report (Table IV) or the 10-15% losses found in Honeywell's earlier accelerated
aging tests. See Compl. ¶¶ 49, 52, 54-55, 60.

Honeywell never shared the draft report with Armor Holdings or the United States and never recommended that Armor Holdings add any layers to its Z Shield vests. (Compl. ¶¶ 60, 69.)

In meetings and other communications with Armor Holdings, Honeywell also emphasized the more favorable warehouse data about Z Shield, while downplaying and ignoring the unfavorable results of its accelerated aging tests. (Compl. ¶¶ 61, 63.) Indeed, before a January 2003 meeting, Honeywell went so far as to devise a strategy to downplay the risks of Z Shield to Armor Holdings. (Compl. ¶ 62.) Honeywell also drafted sales literature, research papers, and technical bulletins, aimed at promoting Z Shield to the general public, that selectively disclosed the warehouse data but not the accelerated aging data. (Compl. ¶¶ 64-66, 70.) While it emphasized the warehouse data, Honeywell never disclosed the findings of the draft report that even "small reductions" in ballistic integrity, such as those found in the warehouse data, posed a "'significant' degradation issue." (Compl. ¶¶ 61, 65-66, 69.)

Also, the sales literature and technical papers drafted by Honeywell represented a concerted strategy to defend Z Shield in the marketplace while looking ". . . like we are paying attention to what is published" regarding degradation. (Compl. ¶ 66.) At times, this sales literature contained actual misrepresentations, such as stating (notwithstanding the negative accelerated age data) that Honeywell anticipated that Z Shield vests would maintain their ballistic performance for at least five years. (Compl. ¶¶ 70.) Other times, the Honeywell sales literature made material omissions such as misleadingly claiming that "[i]n the case of our Z Shield material, no loss of ballistic performance has been observed based on V-50 testing of material stored in an uncontrolled warehouse environment" or that "Z Shield has remained at the same high level of ballistic protection," without mentioning the substantial loss of ballistic performance

9

in the accelerated aging tests. (Compl. ¶¶ 65, 68.) Indeed, as late as July 2005, Honeywell

misrepresented to Armor Holdings that it had no Z Shield data supporting "a catastrophic loss of

tensile strength." (Compl. ¶ 73.) Honeywell also never disclosed to Armor Holdings that FMS, a

company that assisted Honeywell with the laminate process for its shield products (called a toller),

had suggested "halting its Z Shield tolling services" due to manufacturing problems related to

Z Shield degradation or that Honeywell had reached a substantial financial settlement with

Toyobo regarding "potential liabilities" for Z Shield. (Compl. ¶¶ 76-77.)

**D.     Testing by NIJ and Exponent Confirms the Defective Nature of Z Shield**

In mid-2004, a consultant for Armor Holdings, Exponent, found substantial declines in the

strength of used Z Shield vests compared with new ones and, for one Z Shield vest model,

Exponent calculated a "failure probability" of 10% after 30 months, 29% after 36 months, and

85% after 48 months. (Compl. ¶ 71.) As with other negative data regarding Z Shield, Honeywell

minimized the Exponent data and unsuccessfully attempted to discourage Armor Holdings from

decreasing its warranty on some Z Shield vest models. (Compl. ¶¶ 71-72.) NIJ data, in August

2005, proved even more problematic as every one of the 18 Armor Holdings Z Shield vests failed

in ballistics testing, with 15 of those vests suffering bullet penetrations. (Compl. ¶ 84.) This

marked the worst performance of any Zylon vest tested by NIJ. (Compl. ¶ 85.)

**E.     Honeywell Knowingly Caused False Claims to be Presented to the United
        States and Knowingly Made False Statements To Get False Claims Paid by
        the United States**

The Complaint alleges that Honeywell knew that Z Shield suffered from critical latent

defects, that Armor Holdings relied on Honeywell for technical expertise, that Honeywell did not

disclose Z Shield's defective nature to Armor Holdings or the Government, and that Honeywell

10

engaged in a campaign of false statements and deception to protect the Z Shield market. The

Complaint also alleges that, due to this misconduct, Honeywell caused Armor Holdings to

present false claims to, and made false statements to get false claims paid by, the United States,

which was the largest purchaser of Z Shield vests.  (Compl. ¶¶ 23-24, 33, 82-83, 87-88, 91-92.)

## III.    LEGAL STANDARDS FOR THIS MOTION TO DISMISS

In evaluating a motion to dismiss under Rule 12(b)(6), this Court should construe "'the

complaint liberally in the plaintiff's favor,' 'accept[ing] as true all of the factual allegations

contained in the complaint,' . . . with the benefit of all reasonable inferences derived from the

facts alleged . . .".  Aktieselskabet AF 21 v. Fame Jeans, Inc., 525 F.3d 8, 15 (D.C. Cir. 2008)

(numerous quotations and citations omitted).   Under narrow circumstances, a court may consider

matters outside of the pleadings in resolving a Rule 12(b)(6) motion, such as documents

incorporated in a complaint or matters susceptible to judicial notice.  See EEOC v. St. Francis

Xavier Parochial School, 117 F.3d 621, 624-25 (D.C. Cir. 1997).  But Honeywell goes well

beyond these narrow purposes in inviting this Court to consider a small subset of documents that

it has selectively attached to its Motion addressing issues of intent, Government knowledge, and

the Armor Holdings warranty.  The United States submits that the Court should decline

Honeywell's invitation to resolve this complex case on that basis and instead confine its analysis

to the allegations pled in the Complaint.

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity

the circumstances constituting fraud or mistake."  But Rule 9(b) expressly permits *scienter*, like,

"[m]alice, intent, knowledge, and other conditions of a person's mind," to be "alleged generally."

In the FCA context, Rule 9(b)'s particularity requirement normally "means that the pleader must

11

state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." United States *ex rel.* Joseph v. Cannon, 642 F.2d 1373, 1385 (D.C. Cir. 1981), cert. denied, 455 U.S. 999 (1982).  This requirement has not been rigidly applied in the D.C. Circuit.  Indeed, in Cannon, this Circuit stated that Rule 9(b) ". . . should be harmonized with the general directives in . . . Rule 8 that the pleadings should contain 'a short and plain statement of the claim or defense' and that each averment should be 'simple, concise and direct.'" Id. at 1386 (quotation omitted).  Attempting to harmonize Rules 8 and 9(b), a court has noted that FCA complaints covering "a multi-year period may not be required by Rule 9(b) to contain a detailed allegation of all facts supporting each and every instance of submission of a false claim." United States *ex rel.* Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp.2d 28, 35 (D.D.C. 2003).

Courts in this Circuit have applied Rule 9(b) consistent with its underlying purposes "to discourage the initiation of suits brought solely for their nuisance value" and "to ensure that defendants have adequate notice of the charges against them to prepare a defense." Cannon, 642 F.2d at 1385 (noting first purpose); United States *ex rel.* McCready v. Columbia/HCA Healthcare Corp., 251 F. Supp.2d 114, 116 (D.D.C. 2003) (noting second purpose and citing Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)).  Thus, "'[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial pre-discovery evidence of those facts.'" McCready, 251 F. Supp.2d at 116 (quoting Harrison, 176 F.3d at 784).

12

The Supreme Court did not change these well established principles in <u>Bell Atlantic Corp</u> <u>v. Twombly</u>, __ U.S. __, 127 S. Ct. 1955 (2007), in which the Supreme Court reversed an appellate court in a non-FCA case and agreed with a district court's decision to dismiss a complaint (under Rule 12(b)(6), not Rule 9(b)) that "failed *in toto* to render plaintiffs' entitlement to relief plausible." 127 S. Ct. at 1973 & n. 14. The Supreme Court stated that "[i]n reaching this conclusion, we do not apply any 'heightened' pleading standard . . ." and we require " . . . only enough facts to state a claim to relief that is plausible on its face." <u>Id</u>.; <u>see also</u> <u>Aktieselskabet AF</u> <u>21</u>, 525 F.3d at 15 ("[w]e conclude that <u>Twombly</u> leaves the long-standing fundamentals of notice pleading intact"). Indeed, just a few weeks later, the Supreme Court cited <u>Twombley</u> for the proposition that a complaint need only "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Erickson v. Pardus</u>, __ U.S. __, 127 S. Ct. 2197, 2200 (2007); <u>see also</u> <u>City of Moundridge v. Exxon Mobil Corp.</u>, 250 F.R.D. 1, 3-6 (D.D.C. 2008) (denying motion to reconsider denial of a motion to dismiss in light of <u>Twombly</u>).

## IV.    ARGUMENT

### A.    Basic Principles

#### 1.    The False Claims Act

Sections 3729(a)(1) and (a) (2) of the FCA reach "[a]ny person who:  (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," or "(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." To plead a *prima facie* claim under Section 3729(a)(1), the Government must allege that: "'(1) the defendant presented or caused to be presented to an agent of the United

States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.'" See United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004) (quotation omitted) . To plead a *prima facie* claim under Section 3729(a)(2), the Government must allege that: (1) a defendant made or caused another to make a statement or record for the purpose of getting the Government to pay a false or fraudulent claim; (2) the statement or record was false and material;; and (3) the defendant did so knowingly. See Allison Engine, 128 S. Ct. at 2128-30. A false statement or record is material if it has a natural tendency to influence, or is capable of influencing, the Government's decision to pay a claim. See United States v. Rogan, 517 F.3d 449, 452 (7th Cir. 2008) (citations omitted).

The FCA defines "knowingly" broadly to include "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information" and does not require "specific intent to defraud." 31 U.S.C. § 3729(b). In drafting the FCA, ". . . Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"[6]

The FCA does not require privity of contract with the Government and reaches a defendant whose fraud causes the Government to pay a claim that would not have been paid had it known the truth. See, e.g., United States v. Bornstein, 423 U.S. 303, 309 (1976) ("It is settled that the [FCA] . . . gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to the Government."). Traditional principles of causation

---

[6] Cook County v. United States ex rel. Chandler, 538 U.S. 119, 129 (2003) (affirming appellate court's reversal of motion to dismiss) (quoting United States v. Neifert White Co., 390 U.S. 228 (1968)). Courts have recently affirmed the FCA's breadth. See e.g., United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc., 2008 WL 2791687 * 2 (D.D.C. July 21, 2008)) (citing Cook County and Neifert White).

apply under the FCA so that causation is satisfied if the defendant's misconduct represented a "substantial factor" in a third party either presenting a false claim to the Government or using a false statement or record to get a false claim paid by the Government. See Schmidt, 386 F.3d at 244; see also United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co., 147 F. Supp.2d 39, 52-53 (D. Mass. 2001) (denying motion to dismiss in part and holding that drug manufacturer's campaign of off label promotion of drugs to physicians, who then submitted false claims to Medicaid, stated a viable FCA claim).

### 2.    Allison Engine

In Allison Engine, the Supreme Court vacated an appellate court's ruling that FCA claims pursuant to § 3729(a)(2) did not require proof of intent to cause a false claim to be paid by the Government, and remanded the case for further proceedings. See 128 S. Ct. at 2131. In reaching this decision, the Court indicated that a plaintiff asserting a § 3729(a)(2) claim must prove that the defendant intended that its conduct would "be material to the Government's decision to pay or approve a false claim." Id. at 2126. The Court also indicated that its ruling did not alter the standard for showing that the defendant knew that it had made or caused a false statement, which remains actual knowledge, deliberate ignorance, or reckless disregard. See id. at 2130 & n.2. The Court noted that this knowledge requirement ensures "'a defendant is not answerable for anything beyond the natural, ordinary and reasonable consequences of its conduct.'" Id. at 2130 (quotation omitted). In addition, the Court reiterated that an FCA case does not require privity of contract between the Government and the defendant. See id. at 2130 (". . . a subcontractor violates § 3729 (a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim"). Finally,

15

<u>Allison Engine</u> did not purport to address § 3729(a)(1), and Honeywell does not contend otherwise.

**B.    The Complaint Pleads *Prima Facie* Claims Against Honeywell Under Sections 3729(a)(1) And 3729(a)(2) Of The False Claims Act**

    **1.    The Complaint Satisfies Rule 9(b)**

The United States' 35 page Complaint states in detail the time, place, and content of Honeywell's misrepresentations, the facts misrepresented, and the monies paid by the United States for defective Z Shield vests due to these misrepresentations. The Complaint also identifies a specific individual, Honeywell's lead Z Shield scientist, Dr. Lori Wagner, who led the fraud, and cites numerous documents identifying additional Honeywell employees involved in the fraud and specific misrepresentations, material omissions, and selective disclosures made by Honeywell personnel. (Compl. ¶¶ 34-37, 42-44, 50-51, 53-60, 62-70.)   Moreover, the Complaint alleges that Honeywell's misrepresentations caused Armor Holdings to present false claims to the United States and the United States to pay those claims. (Compl. ¶¶ 3-5, 11, 23, 33, 62-63, 72, 82-83, 87, 91.) Thus, the Complaint gives Honeywell more than sufficient notice of the claims against it, and, accordingly, the Complaint satisfies Rule 9(b). <u>See</u>, <u>e.g.</u>, <u>McCready</u>, 251 F. Supp.2d at 116 (denying a Rule 9(b) motion to dismiss in an FCA case and noting that a court should "'. . . hesitate to dismiss a complaint under Rule 9(b)'" that makes defendants aware of the circumstances at issue and cites factual evidence of those circumstances) (quotation omitted).

Interestingly, Honeywell's Rule 9(b) arguments do not focus on the FCA and unjust enrichment claims pled in the Complaint, but on a claim that the United States <u>did not plead</u> against Honeywell relating to the Armor Holdings five year warranty. Honeywell argues that the

warranty allegations are too vague to satisfy Rule 9(b).  See Motion at pp. 10-12.  The United

States cited the Armor Holdings warranty as an important piece of evidence supporting express

and implied false certification claims and highlighting the materiality of Honeywell's

misrepresentations.  In short, Honeywell knew that the marketplace, including the United States,

believed Z Shield vests would last for at least five years due to the Armor Holdings warranty and,

indeed, Honeywell's campaign of deception and false statements helped to create those

expectations in an effort to promote sales of Z Shield vests to the United States, among other

customers.  (Compl. ¶¶ 11, 32, 70, 87, 91.)  All the while, Honeywell knew of critical latent

defects in Z Shield that would cause these vests to fail well before the five year warranty expired,

but misrepresented these risks to Armor Holdings and the United States so that it could keep

selling Z Shield to Armor Holdings.  (Compl. ¶¶ 2-5, 11, 32, 82-83, 87, 91.)  As it is this

misconduct by Honeywell that gives rise to FCA claims, not a claim against Honeywell for breach

of warranty, Honeywell's Rule 9(b) arguments, which contest the sufficiency of pleading a

warranty claim, miss the point.

      Honeywell also challenges whether the warranty language cited in the Complaint is

"typical."  See Motion at p.11.  This argument is a red herring not only because the United States

has not pled a breach of warranty claim against Honeywell, but also because even the warranty

language Honeywell cited (at p. 2) provides for a five year warranty and it is the length of the

warranty period, not other warranty language, that provides the strongest evidence of the

marketplace's reasonable expectations about the future performance of Z Shield vests.

Furthermore, citing warranty language for dozens of vest models, as Honeywell suggests (see

Motion at p. 11), would run afoul of Rule 8(a)'s requirement of "short and plain" pleadings,

especially because the warranty language in the specifications for these vest models does not vary materially. Nor does Rule 9(b) require the United States to attach a copy of the warranty to the Complaint, as Honeywell claims (at p. 11).[7] Moreover, although it appears that Honeywell may contest the scope of the warranty and what documents comprise the warranty, this represents an issue of fact provides no reason to dismiss the Complaint under Rule 9(b).

Honeywell's Motion (at p. 10) also cites the case of *In re* XM Satellite Radio Holdings Sec. Litig., 479 F. Supp.2d 165 (D.D.C. 2007) (dismissing securities fraud claim based on pleading failures) for the dubious proposition that to survive a Rule 9(b) challenge a plaintiff must "explain why the statements were fraudulent." Id. at 183. XM Satellite, however, appears to be a unique application of Rule 9(b) in the specific context of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, which ". . . heightened the requirement for pleading scienter . . ." and requires the pleading of "'sufficient facts to support [plaintiffs'] beliefs as to why defendants' statements were misleading.'" Id. at 175, 183 (quotation omitted). In contrast, the FCA allows for the general pleading of scienter and contains no heightened pleading requirements beyond Rule 9(b). See United States *ex rel*. Totten v. Bombardier Corp., 286 F.3d 542, 552 (D.C. Cir. 2002) (general averments of scienter satisfy Rule 9(b)); Cannon, 642 F.2d at 1385-86 (cautioning against "strictly constru[ing]" Rule 9(b)). In any event, as the Complaint details how and why Honeywell misrepresented the risks of Z Shield vests, it satisfies the pleading requirements of XM Satellite. (Compl. ¶¶ 2-5, 11, 32, 82-83, 87, 91.)

---

[7]    See, e.g., United States *ex rel*. Pogue v. Diabetes Treatment Centers of America, Inc., 238 F. Supp.2d, 258, 269 (D.D.C. 2002) (Rule 9(b) does not require affixing claims for payment to a complaint, as this would require "not particularity, but proof" ). Also, the Local Rules of this Court discourage the practice of attaching materials to a Complaint. See LCvR. 5.1(g).

18

**2.    The Complaint's Allegations Satisfy The False Claims Act's Falsity Requirement**

Under the FCA,"[a] claim can meet the falsity requirement if it is either factually false or legally false." <u>Pogue</u>, 2008 WL 2791687 * 2.  In substantial detail, the Complaint alleges claims of factual and legal falsity against Honeywell – specifically that Honeywell made false statements causing Armor Holdings to present, and the Government to pay, false claims for defective Z Shield vests and that Honeywell caused Armor Holdings to represent falsely that these vests had a five year life span.  (Compl. ¶¶ 3-5, 11, 34-73, 87-88, 91-92.)

In particular, the Complaint alleges that Honeywell misrepresented facts (Compl. ¶¶ 65, 68, 73), selectively disclosed favorable data and suppressed unfavorable data, including the critical draft report (Compl. ¶¶ 56-73), misled Armor Holdings about the risks of Z Shield (Compl. ¶¶ 36, 42-43, 47, 50-51, 53-55), and failed to share internal concerns at Honeywell about Z Shield's risks.  (Compl. ¶¶ 36-37, 51, 56-60.)  Honeywell made false representations directly to the marketplace and others via sales literature and technical bulletins that Honeywell authored for the use of the Armor Holdings sales force in promoting Z Shield vests.  (Compl. ¶¶ 64-66, 68, 70, 73.)  Honeywell's purpose in doing so was to keep Armor Holdings selling, and the Government buying, Z Shield vests so that Honeywell could continue selling Z Shield.

**a.    The Complaint identifies objective falsehoods by Honeywell**

Honeywell told Armor Holdings and the marketplace that Z Shield was "state of the art" technology that was reasonably anticipated to maintain adequate ballistic performance for at least five years when, in reality, Honeywell knew that Z Shield was defective and had engaged in a

19

campaign to cover up Z Shield's risks. (Compl. ¶¶ 3-5, 11, 24, 34-73, 82-83.) These are objective and factually false statements that satisfy the FCA's falsity requirement.[8]

In response, Honeywell raises factual arguments about Z Shield vests meeting NIJ requirements and the Armor Holdings five year warranty. See Motion at pp. 12-16. Although beyond the scope of a motion to dismiss, the United States does not dispute that Z Shield vests met the NIJ certification standards for new vests and pled this in the Complaint. (Compl. ¶ 30.) But these NIJ standards do not constitute the totality of the Armor Holdings specifications, which identify what the Government contracted to receive with respect to Z Shield vests. The Armor Holdings specifications included the five-year warranty that Honeywell knew Z Shield vests would not meet. (Compl. ¶¶ 32, 83.) Because the vests did not meet this warranty, the Government did not receive the benefit of its bargain with Armor Holdings. Consequently, Honeywell is simply wrong in contending that Z Shield vests met all of the specifications.

Furthermore, even assuming *arguendo* (and contrary to the allegations of the Complaint) that Honeywell could somehow read the warranty specifications out of the Government's bargain with Armor Holdings, the United States would still have FCA claims against Honeywell for knowingly failing to disclose a critical latent defect going to the core of a product's performance. Factually, Honeywell's failure to disclose Z Shield's latent defects hampered NIJ's ability to

---

[8]    See, e.g., United States ex rel. Lee v. Smithkline Beecham, Inc., 245 F.3d 1048, 1053 (9th Cir. 2001) (reversing dismissal of FCA complaint relating to worthless medical tests and noting that "[n]either false certification nor a showing of Government reliance on false certification for payment need be proven if the fraud claim asserts fraud in the provision of goods and services"); United States v. Hydroaire, Inc., 1997 WL 160761 ** 10-11 (N.D. Ill. 1997) (denying summary judgment in FCA case where Government had accepted cylinders for use in nuclear submarines without knowing of latent defect); BMY Combat Sys. Div. of Harsco Corp. v. United States, 26 Cl. Ct. 846, 849-50 (Cl. Ct. 1992) (denying summary judgment in part in FCA case and finding that latent defects nullified Army's acceptance of howitzers).

regulate these vests, as Honeywell withheld from NIJ the very information that would have made a change in specifications and testing protocol more likely. Indeed, once NIJ learned of Z Shield's defects through its own testing, it acted to halt the sale of Zylon vests in the United States. (Compl. ¶¶ 5, 84-85.)

In addition, this argument is wrong legally. Honeywell fails to cite even a single case supporting the broad proposition that if a product met an initial certification, then this would preempt, as a matter of law, any FCA case regardless of other false statements. To the contrary, a long line of case law indicates that simply meeting contract specifications does not preempt an FCA case based on other actionable fraud, such as fraud in the inducement. This principle originated long ago in the common law of fraud. See Moncrief v. Wilkinson, 93 Ala. 373, 9 So. 159, 159-60 (Ala. 1891) (affirming judgment in favor of plaintiff for deceit in connection with the sale of a mule where defendant had falsely represented that the mule was "all right" despite knowing that the animal had bad eyesight).

Since then, courts have affirmed the principle that meeting contract specifications does not preempt an FCA claim based on fraudulent inducement. See, e.g., Harrison, 176 F.3d at 787-88 (reversing in part dismissal of FCA claims and citing numerous cases supporting principle that FCA "liability attached," even though work was performed to specifications and at the agreed upon price, "because of the fraud surrounding the effort to obtain the contract or benefit status, or the payments thereunder"). Other examples include contracts obtained by kickbacks, bid rigging, fraudulent pricing, and fraudulent information. See id. Indeed, the SAIC case, currently before this Court, provides an example of where the Government stated FCA claims based on a contractor's organizational conflicts of interest even though the quality of the work was not

21

an issue. <u>See</u> <u>United States v. Scientific Applications Int'l Corp.</u>, 2008 WL 2060602 (D.D.C.

May 15, 2008). Here, the Complaint alleges that Honeywell fraudulently induced Armor

Holdings to present claims for, and the Government to buy, defective Z Shield vests. (Compl. ¶¶

3-5, 11, 34-83, 87-88, 91-92.) These allegations satisfy the FCA's falsity requirement.

     Honeywell also argues about the legal significance of repair and replacement warranties

and contests the factual issue of the marketplace's reasonable expectations about the life span of Z

Shield vests. <u>See</u> Motion at pp. 14-17. Yet, the legal significance of repair and replacement

warranties is immaterial because the United States has not pled a breach of warranty claim against

Honeywell. Rather, the Complaint cites Armor Holdings five year warranty as evidence showing

the materiality of Honeywell's misrepresentations and in support of express and implied false

certification theories of liability. Honeywell caused Armor Holdings to market Z Shield vests

with a warranty that created reasonable expectations in the marketplace that Z Shield vests would

provide adequate ballistic protection for law enforcement officers for at least five years even

though Honeywell knew that was not the case. In addition, as noted above, a factual dispute

exists about the applicable warranty language. The Armor Holdings specifications for Z Shield

vests do not limit the warranty to repair and replacement or contain any warnings about proper

storage conditions, while ABA's various product manuals contain different warranty language.

This differing language illustrates why the Court should refrain from addressing warranty issues at

this preliminary stage of the proceedings.

     As for the factual issue of the marketplace's reasonable expectations of Z Shield's ballistic

performance based on the Armor Holdings five year warranty, Honeywell cites a purported

admission by NIJ that end users should not view a warranty as a guarantee of future performance.

<div align="center">22</div>

See Motion at p. 15.  Honeywell, however, selectively cites to this NIJ report and omits to disclose that in the very next paragraph (at p. 62) NIJ sets forth its belief that bullet-proof vests will likely last for longer than five years if given proper use and care.  See Exhibit A to Honeywell's Motion.  In other words, NIJ made this statement about warranties and future performance to reassure agencies that many of their bullet-proof vests would provide adequate ballistic protection for longer than the warranty period (i.e., "[f]or agencies that determine that it is not feasible to replace armor in accordance with a manufacturer's warranty cycle, the continued use of serviceable units of armor is definitely better than the alternative – to not wear the armor and have no protection").

Even if Honeywell had cited an actual admission from NIJ, its argument would involve government knowledge, and the Court should not decide a *scienter* issue on a motion to dismiss. See Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 60 (Ct. Cl. 1993) (denying motion to dismiss a counterclaim and criticizing another case for deciding factual issues relating to government knowledge on a motion to dismiss).  Further, given that Honeywell knew that Z Shield would not provide adequate ballistic protection for anywhere near five years, but nevertheless falsely represented Z Shield as state-of-the-art technology, (Compl. ¶¶ 34-83), Honeywell's citation to a single NIJ report does not, as a matter of law, alter Honeywell's FCA liability based on its false statements and deception.  See 31 U.S.C. §§ 3729(a)(1) & (a)(2).

Moreover, the NIJ citation does not relate specifically to the Armor Holdings five year warranty.  Yet, specificity is important because, due to Honeywell's campaign of false statements and deception, ABA warranted to the marketplace that Z Shield vests would meet NIJ specifications for new vests for five years:

23

> <u>Ballistic Panels</u>.  For five years after date of purchase American Body
> Armor warrants that the ballistic panels will pass the NIJ protocol
> for ballistic intervention and their NIJ designated velocities during
> an actual occurrence, not necessarily during an NIJ independent
> laboratory retest procedure.[9]

The ABA Owners' Manual, <u>see</u> Exhibit D, contained similar language, stating in the section on

"Body Armor Replacement Guidelines" (AHI026-0034) that:

> Most manufacturers, including American Body Armor, warrant the
> body armor they sell for a period of five years.  This is a reasonable
> period of time for a manufacturer to stand behind a ballistic product
> that has been in use for five years.  The end of the warranty period
> does not mean the armor will not work anymore.  It simply means
> the warranty is over.

Armor Holdings executives and sales representatives also assured customers that Z Shield vests

remained fit for performance for five years.  For example, Scott O'Brien, then president of

Safariland (another subsidiary of Armor Holdings) and the general manager of ABA, represented

to Mr. Jim Moody of the Los Angeles Police Department, in a letter dated October 20, 2003

(Exhibit F), that:

> I am writing in response to your request of Stan Ferer regarding
> the warranty and life expectancy of our Xtreme XS ballistic
> package.  Armor Holdings, Incorporated warranties all body
> armor ballistics for five years from the date of delivery.  Our
> warranty ensures all AHI ballistic panels meet and will remain
> within tolerance as established by the NIJ-STD-010104 standard
> for the life of the warranty period.

Not only did Armor Holdings make such false statements as the result of Honeywell's

campaign to mislead it about Z Shield's risks, so too did Honeywell.  Specifically, the Complaint

alleges (¶ 70) that Honeywell misrepresented to the marketplace that it anticipated no significant

---

[9]     <u>See</u> Exhibit E, American Body Armor: Limited Warranty, undated, at AHI026-
0047.

change in Z Shield's ballistic performance over a five year life span.[10]  This Honeywell Technical

Bulletin also misrepresented (at p. 1) that:

> Typical life expectancy based on the body armor manufacturer's
> warranties . . . for a maintained ballistic garment is 5 years.
> Hence, a testing program is established to monitor the performance
> of the ballistic material up to and beyond five years of shelf life.

Thus, Honeywell created expectations in the marketplace about the five year "life span" that Z

Shield vests would remain fit for ballistic protection.  At a minimum, even crediting the vague

NIJ statement as an admission, the misrepresentations made by Honeywell and Armor Holdings

(who relied on Honeywell) create a disputed issue of material fact about the marketplace's

expectations regarding the life span of Z Shield vests.

Indeed, this factual dispute highlights the basic problem with Honeywell's entire

Motion – it seeks to resolve disputed factual issues at the pleadings stage.  Indeed, all of the cases

the Motion (at pp. 12-13) cites in support of the objective falsity argument were decided at the

summary judgment stage or later.[11]  Because Honeywell's objective falsity argument hinges on the

---

[10]    See Exhibit G for a copy of this Honeywell Technical Bulletin on Z Shield
Material: Ballistic Performance After Aging, at p. 2, which Honeywell provided to the Armor
Holdings sales force in October 2003.

[11]See, e.g., United States ex rel. Lamers v. City of Green Bay 168 F.3d 1013 (7th Cir.
1999) (affirming grant of summary judgment for defendant); United States ex rel. Luckey v.
Baxter Healthcare Corp., 183 F.3d 730 (7th Cir.) (affirming grant of summary judgment for
defendant), cert. denied, 528 U.S. 1038 (1999); United States ex rel. DRC, Inc. v. Custer Battles,
LLC, 472 F. Supp.2d 787 (E.D. Va. 2007) (following a trial ending in a jury verdict for the
relator, the court partially granted judgment as a matter of law and then later granted summary
judgment); United States v. Prabhu, 442 F. Supp.2d 1008 (D. Nev. 2006) (granting defendant's
summary judgment motion); United States ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Group,
Inc., 298 F. Supp.2d 91 (D.D.C. 2004) (motion for judgment on partial findings granted after
four days of trial); United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc., 297 F.
Supp.2d 272 (D.D.C. 2004) (summary judgment granted for defendant), aff'd, 393 F.3d 1321
(D.C. Cir. 2005).

resolution of factual issues, summary judgment, not a motion to dismiss, represents the first

appropriate stage for this Court to consider if sufficient evidence exists of objective falsity. See,

e.g., United States ex rel. Roby v. Boeing Co., 100 F. Supp.2d 619 (S.D. Ohio 1999) (denying

summary judgment motion in an FCA case involving defective helicopter gears and noting that

issues relating to scientific judgment have at times been decided at summary judgment when

plaintiff "fails to adduce enough evidence" of objective falsity), aff'd, 302 F.3d 637 (6th Cir.

2002), cert. denied, 539 U.S. 969 (2003).

> **b.    The United States has identified material falsehoods by
> Honeywell that affected the Government's decision to purchase
> defective Z Shield vests**

Honeywell argues that the Government has not identified any material falsehood that was

a condition of payment for Z Shield vests and that, consequently, the Government has not

identified a false claim. See Motion at pp. 17-20. Honeywell concedes, however, that claims

alleging factual falsity or express and implied false certifications satisfy the FCA's falsity

requirement. See Motion at 17 (citing this Court's recent decision in SAIC).

In SAIC, this Court found three types of false claims under the FCA – factually false

claims, claims based on express false certifications, and claims based on implied false

certifications. Id. (citing United States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F.

Supp.2d 25, 64 (D.D.C. 2007)).[12] Here, the Complaint alleges that Honeywell knowingly caused

---

[12]    The court in Hockett identified these three categories of false claims in the context
of a medical claim involving so-called UB-92 invoices. See id. ("[t]he Court conceives of three
ways in which a UB-92 in this case could have been a false claim"). The court in Hockett,
however, did not rule out other types of false claims, such as those relating to defective goods,
where one contractor, like Honeywell, has knowingly caused another contractor to bill the
Government for defective Z Shield vests. See e.g., Lee, 245 F.3d at 1053 ("knowingly billing
for worthless services or recklessly doing so with deliberate ignorance may be actionable . . .

Armor Holdings to present false claims to the Government relating to a defective product and that Honeywell also knowingly made false statements for the purpose of getting the Government to pay these false claims. (Compl. ¶¶ 87, 91.) These allegations sufficiently plead factual falsity under the FCA. In particular, the Complaint alleges that the Government bargained for Z Shield vests that represented state-of-the-art technology and would last for at least five years. (Compl. ¶¶ 3-5, 11, 82-83, 87, 91.) But instead, the Government received defective vests that Honeywell knew would not provide adequate ballistic protection for anywhere close to five years. (Compl. ¶¶ 84-85.)

In addition, the Complaint alleges that Honeywell caused Armor Holdings to make both express and implied false certifications to the United States. Specifically, Honeywell caused Armor Holdings to make an express false certification to the United States regarding the five year warranty for Z Shield vests. (Compl. ¶¶ 3-5, 11, 33, 87, 91.) The Complaint alleges that Honeywell knew that Z Shield vests would not last for five years, but nevertheless that Honeywell misled Armor Holdings and the Government about the life span of these vests to ensure a market for Z Shield. (Compl. ¶¶ 33-73, 82-83.) The Complaint also alleges an implied false certification claim – that Honeywell caused Armor Holdings to represent to the United States that Z Shield vests were fit for the purposes for which they were sold and would last for at least a reasonable period of time (even putting aside the warranty). (Compl. ¶¶ 4, 11, 82-88, 91-92.) As noted above, Honeywell knew this was not the case, but nevertheless engaged in a campaign of false statements and deception regarding Z Shield.

---

regardless of any false certification conduct") (citing United States v. Aerodex, Inc., 469 F.2d 1003, 1007-08 (5th Cir. 1972)).

In response, Honeywell argues that, even if its statements caused Armor Holdings to present claims to the Government for Z Shield vests with critical latent defects and caused the Government to pay those claims, there was no falsity because the Government received the benefit of its bargain as the payment invoices submitted by Armor Holdings did not condition payment on the absence of latent defects and Armor Holdings had agreed to repair any defective vests, thereby rendering any vest failures immaterial. See Motion at pp. 18-19. As noted earlier, this argument ignores the five year warranty specification, which goes to the very core of the Government's bargain for an expensive, life-and-death product.

But even putting aside this specification in the Government's contract with Armor Holdings, Honeywell's position lacks merit. Honeywell contends that because there were no NIJ certification standards for used vests no FCA liability can attach if Z Shield vests provided adequate ballistic protection on their first day of service, even if the vests failed on day two. See Motion at pp. 18-19. As noted above, the United States bargained for bullet-proof vests that would protect federal and local law enforcement officers and reasonably expected that this protection would last more than one day based, not just on the nature of the product, but on representations made by Armor Holdings and Honeywell that the vests would continue to meet specifications for at least five years. (Compl. ¶¶ 32, 70.)

One of the cases cited by Honeywell is instructive on this point. See United States ex rel. Stebner v. Seward & Stevenson Servs., Inc., 305 F. Supp.2d 694 (S.D. Tex. 2004). In Stebner, the trial court compared the materiality of the Government receiving vehicles that may experience corrosion, which the defendant had agreed to repair, to the materiality of the Government receiving howitzers that had not been adequately tested. See id. at 701. The court in Stebner

28

noted that the materiality of failing to test howitzers was self evident because "[i]t is an understatement to suggest that personnel would be in danger if any cannon exploded on the battlefield." Id. Similarly, the materiality of bullet-proof vests that fail to provide adequate ballistic protection for more than one day is equally self-evident. Simply offering to repair or replace a defective bullet-proof vest would provide little comfort to a law enforcement officer who has been injured or killed due to the failure of a defective vest.

Moreover, the Complaint specifically alleges materiality for both the § 3729(a)(1) and (a)(2) claims, stating that:

> Had the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers. But Honeywell did not inform the United States of the defects in Z Shield and instead took affirmative steps to cover up those risks.

(Compl. ¶¶ 88, 92.) Recognizing that its argument lacks merit in light of this specific allegation of materiality, Honeywell claims, without any supporting legal authority, that this allegation does not satisfy Twombly. See Motion at p. 20. Yet, this Court should decline Honeywell's invitation to conclude, as a matter of law, that the United States would have continued to purchase Z Shield vests had it known that the vests would not provide adequate ballistic protection for anywhere close to five years. Also, contrary to Honeywell's narrow reading, the Complaint goes well beyond this specific allegation of materiality and also alleges how the United States acted to halt sales of Z Shield vests, and other vests containing Zylon, once it understood the defective nature of these products. Indeed, on the very same day that NIJ published data showing that every used Z Shield vest had failed in testing (August 24, 2005), NIJ halted the sale of any vests containing Zylon, including Z Shield vests. (Compl. ¶¶ 5, 84-85.)

29

Finally, Honeywell's arguments on materiality depend on disputed facts concerning, among others, the nature and scope of the five year warranty. See Motion at pp. 18-19. "The question of materiality is a mixed question of law and fact," and disputed factual issues are precisely the type of issues that this Court should refrain from deciding on a motion to dismiss. United States v. President and Fellows of Harvard College, 323 F. Supp.2d 151, 182 (D. Mass. 2004) (citing Harrison, 352 F.3d at 914). As with many of Honeywell's other arguments, the cases that Honeywell cites in support of its falsity and materiality arguments (see Motion at pp. 18-19) highlight that these arguments are not appropriately considered on a motion to dismiss, as all of these cases were decided at the summary judgment stage. For example, in United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372 (D.C. Cir. 2000), the D.C. Circuit affirmed a grant of summary judgment regarding the falsity of claims alleging "revolving door" abuses and noted that the trial court had examined the sufficiency of the evidence. See Id. at 1375. In Siewick, the "revolving door" issue had not even been mentioned in the contract at issue and had no impact on the quality of work performed under the contract, thereby showing this issue's lack of materiality, while, in this case, the five year warranty and the adequacy of the vests' ballistic performance went to the core of the Government's bargain. See also Pogue, 238 F. Supp.2d at 265 (distinguishing Siewick as a case where the alleged violation "was not so material to the contract that the Government would not have paid the claim had it known the true circumstances").[13]

_____

[13] See also United States v. Southland Mgmt. Corp., 326 F.3d 669 (5th Cir. 2003) (affirming trial court's grant of summary judgment after trial court had reviewed the contract at issue and the course of conduct between the parties before determining that there had been no false claims); United States ex rel. Mikes v. Straus, 274 F.3d 687 (2d Cir. 2001) (affirming trial court's grant of summary judgment after trial court had examined the proffered evidence of

C.    **The Complaint Satisfies The Pleading Requirements Of Section 3729(a)(2) By Identifying False Statements That Honeywell Made Or Caused To Be Made To Get False Claims Paid By The Government**

Honeywell's argument that the United States has not alleged any false statements made by Honeywell (see Motion at pp. 20-23) ignores the Complaint's detailed allegations concerning Honeywell's campaign of falsehoods and deception. (Compl. ¶¶ 34-83.) Among other false statements and material omissions, the Complaint alleges that Honeywell: (1) failed to disclose material information about the problems and risks of Z Shield, including information about Z Shield's adverse reaction to light, sweat, rain, and humidity and a critical draft report in which Honeywell admitted that even a small amount of degradation would render Z Shield vests unfit for their purpose (Compl. ¶¶ 35-36, 56-60); (2) affirmatively misled Armor Holdings about the problems and risks of Z Shield, including the accelerated aging test data from Honeywell showing sharp drops in Z Shield's ballistic performance after short periods of exposure to heat and humidity, the degradation test data from Toyobo and DSM showing similar sharp declines in ballistic performance, the data from Toyobo about Zylon with "red thread" being even weaker than regular Zylon, and the warnings of Honeywell's own Z Shield toller, FMS, about dramatic reductions in the strength of Zylon fiber received from Toyobo that led FMS to suggest that Honeywell stop manufacturing Z Shield (Compl. ¶¶ 42-43, 47, 51, 62-63, 76-77, 79-81); and (3) misrepresented the risks of Z Shield to Armor Holdings, the United States, and the public (as well as causing Armor Holdings to do so), including by issuing misleading public statements and technical bulletins about Z Shield that selectively disclosed favorable data while ignoring

---

falsity and materiality); Stebner, 305 F. Supp.2d at 701-02 (trial court granted summary judgment after reviewing the factual record and determining that the Government had received the benefit of its bargain).

31

unfavorable data, drafting sales literature for Armor Holdings that misrepresented the risks and

benefits of Z Shield, and falsely telling the marketplace that Honeywell anticipated Z Shield vests

would provide adequate ballistic protection for at least five years. (Compl. ¶¶ 64-70.) The

Complaint also alleges that Armor Holdings relied on Honeywell's technical expertise regarding Z

Shield and that Honeywell's false statements caused Armor Holdings to present false claims to the

United States and caused the United States to pay these claims. (Compl. ¶¶ 3-5, 11, 91-92.)

Faced with such detailed allegations of false statements, Honeywell resorts to a host of

factual arguments seeking to explain away the false statements or diminish their materiality,

which this Court should refrain from considering on a motion to dismiss. See Motion at pp. 21-

23. For example, Honeywell contends that this dispute simply relates to the good faith scientific

opinions of Honeywell scientists (see Motion at pp. 22-23) without acknowledging that the

Complaint alleges that Honeywell misrepresented facts in bad faith, selectively disclosed facts in a

deceptive manner, and failed to disclose facts to protect Honeywell's ability to continue to sell Z

Shield. (Compl. ¶¶ 3-5, 11, 34-73, 82-83, 91.) The question of Honeywell's scientific judgment

plainly depends on whether Honeywell exercised that judgment in good or bad faith, and the

Complaint alleges that Honeywell did so in bad faith and cites both direct and inferential evidence

in support. (Compl. ¶¶ 34-83.) Honeywell also cites numerous summary judgment cases (see

Motion at pp. 21-22), which highlight that its argument hinges on facts inappropriate for

consideration on a motion to dismiss.[14]

---

[14]     See Siewick, 214 F.3d 1372 (D.C. Cir. 2000) (discussed supra at p. 30); Luckey,
183 F.3d at 732 (noting that "a claim can be false or fraudulent if the speaker offers a misleading
half-truth" intending to deceive, which is precisely what the Complaint alleges that Honeywell
did); Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996) (affirming in part trial court's grant of
summary judgment based on trial court's examination of the factual record, while noting

The only motion to dismiss case cited by Honeywell is <u>Boisjoly v. Morton Thiokol, Inc.</u>, 706 F. Supp. 795 (D. Utah 1988), which is distinguishable on its facts and has been criticized by other cases. In <u>Boisjoly</u>, the trial court dismissed FCA claims after finding that "the complaint itself alleges [the federal agency's] knowledge of the claimed defects in the same sentences in which those defects are identified" and, thus, no falsity existed that could support an FCA claim. <u>Id</u>. at 809. Emphasizing the narrowness of its holding, the trial court stated that:

> The court does not hold that it is necessary to allege a lack of
> government knowledge in order to state a FCA claim; rather, it
> holds that if the complaint itself alleges that the government knew
> of those very facts or circumstances which allegedly make the
> claim false, no claim has been stated.

<u>Id</u>. at 810. Here, the Complaint against Honeywell alleges exactly the opposite – that Honeywell engaged in a campaign of false statements and deception to hide critical latent defects in Z Shield from Armor Holdings, the United States, and the general public and that had the United States known of these defects it would not have purchased Z Shield vests. (Compl. ¶¶ 3-5, 11, 34-73, 82-83, 87-88, 91-92.)

Notwithstanding its limited holding, <u>Boisjoly</u> has been criticized by the Second and Ninth Circuits, as well as by the Court of Federal Claims, and, thus, this case provides an "unreliable guide" to the Court in resolving Honeywell's Motion. <u>See</u> <u>United States *ex rel*. Kreindler &</u>

---

numerous instances in which "FCA actions have . . . been sustained under theories of supplying substandard products or services"), <u>cert</u>. <u>denied</u>, 519 U.S. 1115 (1997); <u>United States *ex rel*.</u> <u>Gudur v. Deloitte Consulting LLP</u>, 512 F. Supp.2d 920 (S.D. Tex.2007) (granting summary judgment for defendant after detailed review of the factual record, <u>aff'd</u>, 2008 U.S. App. LEXIS 17038 (5th Cir. August. 7, 2008); <u>Roby</u>, 100 F. Supp.2d 619 (denying summary judgment motion notwithstanding defendant's argument that the issues surrounding defective helicopter gears could not state an FCA claim because defendant alleged it had made decisions in good faith and based on the opinions of engineers).

Kreindler v. United Technologies Corp., 985 F.2d 1148, (2d Cir.) (affirming dismissal of FCA

claims on statute of limitations grounds, but disagreeing with Boisjoly's interpretation of the FCA

and agreeing with the Ninth Circuit that Boisjoly presents an "unreliable guide" to the FCA), cert.

denied, 508 U.S. 973 (1993); United States ex rel. Hagood v. Sonoma County Water Agency, 929

F.2d 1416, 1421 (9th Cir. 1991) (reversing dismissal of FCA case for failure to state a claim  and

stating that although "Boisjoly may be defensible on its facts; its dicta are an unreliable guide");

Tyger Constr. Co., 28 Fed. Cl. at 60 (criticizing Boisjoly for deciding factual issues relating to

government knowledge on a motion to dismiss).

   Honeywell also attempts to downplay the significance of the critical draft report (see

Motion at p. 22), in which Honeywell detailed the myriad problems and defects with Z Shield,

made it clear that even a small reduction in ballistic performance would take Z Shield vests

outside the NIJ specifications, and noted that additional layers should be added to these vests as a

safety measure.  (Compl. ¶¶ 56-60.)  At this preliminary motion to dismiss stage, the Court should

decline to accept Honeywell's self-serving characterization of the report as merely providing

"scientifically inconclusive data," based on a vague reference at the end of the report to "statistical

confidence intervals" preventing "hard conclusions."  See Motion at p. 23.  Indeed,

the data, opinions, and conclusions cited in the Complaint are presented with few caveats in the

report until this final proviso.[15]

---

[15]  See Honeywell's Supplemental Filing, dated July 17, 2008 (Dkt. No. 12),
enclosing the draft report at bates numbers HW 839-41, 843-44 (among other things, noting that
the ballistic data had "95% confidence intervals on these numbers," with a deviation on the order
of just "+/- 3 to 4%; providing quantitative assessments showing the sharpest declines in Z
Shield's ballistic integrity among all of the materials sampled; quantitative assessments showing
(even taking the deviation rate into account) declines in ballistic integrity well above the level
that Honeywell "considered significant" and well above the level that Honeywell believed

In addition, Honeywell claims that it did nothing wrong by not providing data to the Government, with whom it was not in privity. <u>See</u> Motion at p. 23. But the FCA reaches defendants like Honeywell not in privity with the United States who knowingly cause others to present false statements to the United States and knowingly cause the United States to pay false claims. <u>See</u> 31 U.S.C. §§ 3729(a)(2); <u>Bornstein</u>, 423 U.S. at 309.

Further, Honeywell made public statements, wrote public research papers, and drafted sales literature for the marketing use of Armor Holdings sales representatives. (Compl. ¶¶ 64-70.) Thus, having spoken publicly about the benefits of Z Shield, Honeywell did, indeed, have a duty not to present half truths, much less misrepresentations, about Z Shield, which is precisely what the Complaint alleges that Honeywell did. <u>See</u> <u>United States v. TDC Mgmt. Corp.</u>, 288 F.3d 421, 426 (D.C. Cir.) (affirming grant of summary judgment for the United States in FCA case and stating that "'[t]he withholding of such information – information critical to the decision to pay – is the essence of a false claim'") (quotation omitted), <u>cert</u>. <u>denied</u>, 537 U.S. 1048 (2002).[16]

Finally, Honeywell cites the storage advisory and claims that this public disclosure, issued by Armor Holdings and not Honeywell, somehow excuses any false statements made by Honeywell. <u>See</u> Motion at p. 23. Honeywell, however, fails to explain how a storage advisory

---

required adding "anywhere between 10-20% higher solution aerial density" to the Z Shield vests; and providing qualitative assessments indicating that Z Shield exhibited obvious signs of degradation (such as delamination and blistering) much more quickly than the other materials being tested).

[16]    <u>See also</u> <u>Luckey</u>, 183 F.3d at 732 (an FCA claim "can be false or fraudulent if the speaker offers a misleading half-truth"); <u>Elemary v. Philipp Holzmann A.G.</u>, 533 F. Supp.2d 116, 137 (D.D.C. 2008) (dismissing fraud claims in part, but noting, based on District of Columbia law, that "'actionable fraud' may also lie in 'the concealment of a fact which should have been disclosed'") (quotation omitted).

warning end users not to store Z Shield vests above 120° F could insulate Honeywell from liability when its own accelerated aging data showed sharp reductions in Z Shield's ballistic performance at temperatures as low as 104° F. (Compl. ¶¶ 54-55.)  Furthermore, the limited disclosures in this generic storage advisory are a far cry from the troubling information in the draft report or the accelerated aging data  and in no way could justify Honeywell's campaign of false statements and deception. (Compl.¶¶ 56-60, 70.)  In any event, as with many of Honeywell's other arguments, the storage advisory's impact on falsity is a mixed question of law and fact that this Court should not attempt to resolve on a motion to dismiss.[17]

### D.    The Complaint Has Pled Sufficient Knowledge and Intent By Honeywell to State Claims Under Sections 3729(a)(1) And 3729(a)(2) Of The FCA

Honeywell's argument about the Complaint's alleged failure to plead intent lacks merit because the Complaint specifically pleads Honeywell's bad faith and intentional  misconduct. (Compl. ¶¶ 3, 11, 82-83, 87, 91.)  These allegations satisfy the pleading requirements, as knowledge and intent may be pled generally under Rule 9(b).  But the allegations in the Complaint about Honeywell's bad faith go much further than general pleadings and provide both direct and inferential evidence of Honeywell's efforts to protect the Z Shield market.  (Compl. ¶¶ 34-83.)

---

[17]    See President and Fellows of Harvard College, 323 F. Supp.2d at 182 (discussed supra at p. 30); see also United States ex rel. Purcell v. MWI Corp., 254 F. Supp.2d 69, 78 (D.D.C. 2003) (denying motion to dismiss FCA and unjust enrichment claims and noting that "[a]nalyzing when the responsible government official knew or should have known facts material to the FCA or equity claims" is "'a complex, factual determination'" that the court declined to make on a motion to dismiss because "there simply are not enough facts in the record") (quotation omitted).

36

1.    **The Complaint Alleges That Honeywell Knowingly Caused The Presentment Of False Claims Under Section 3729(a)(1)**

The Complaint satisfies the pleading requirements of § 3729(a)(1) as it specifically alleges that "Honeywell knowingly caused to be presented false or fraudulent claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729(a)(1)." (Compl. ¶ 87.) Honeywell's argument that the Complaint does not allege that it knowingly caused the submission of a false claim is contradicted by this plain language. See Motion at pp. 24-27.

The Complaint, however, goes far beyond the pleading requirements and cites both direct and inferential evidence about how Honeywell influenced Armor Holdings to present false claims to the Government. Specifically, Armor Holdings served as the "exclusive distributor" of vests using Honeywell's Z Shield product in the United States and purchased over $15 million worth of Z Shield from Honeywell. (Compl. ¶ 23.) Armor Holdings used a "substantial portion" of this Z Shield on vests purchased by the United States. (Compl. ¶¶ 12-18, 23.) Armor Holdings relied on Honeywell for technical expertise regarding Z Shield, and Honeywell knew that Armor Holdings did so and promoted its technical expertise about Z Shield to Armor Holdings. (Compl. ¶ 33.) Honeywell feared that if Armor Holdings understood the risks it would not continue to sell Z Shield vests and, to avoid this, Honeywell engaged in a campaign of misrepresentations, selective disclosures, and material omissions to cover up the risks from Armor Holdings. (Compl. ¶¶ 34-83.)

Toward this end, Honeywell drafted false and misleading sales literature, research papers, and technical bulletins concerning Z Shield for the purposes of hiding Z Shield's risks and promoting sales of Z Shield vests. (Compl. ¶¶ 64-66, 70.) For example, Honeywell misleadingly

37

told Armor Holdings that it ". . . had not seen any data that should cause Armor Holdings to reconsider marketing or selling Z Shield." (Compl. ¶ 62.)  The sales literature and technical bulletins that Honeywell drafted for use by Armor Holdings sales force also played an integral role in Honeywell's strategy of promoting Z Shield and represented direct communications that Honeywell made to the marketplace about Z Shield, albeit at times under confidentiality provisions designed to hide Honeywell's involvement with this promotion. (Compl. ¶¶ 64-66, 70.) In addition, Honeywell published a misleading research paper and made false public statements defending Z Shield against "attacks."  (Compl. ¶¶ 65, 68.)

Furthermore, Honeywell developed a strategy to withhold material information from Armor Holdings about Z Shield's risks.  (Compl. ¶¶ 62-63.)  As part of this strategy, Honeywell consistently minimized the risks of negative Z Shield data, emphasized the little favorable data that existed, and withheld from Armor Holdings a critical internal draft report in which Honeywell frankly admitted Z Shield's numerous problems.  (Compl. ¶¶ 34-83.)  Honeywell even tried unsuccessfully to discourage Armor Holdings from decreasing the warranty on several Z Shield vest models to avoid "negatively impact[ing] the Z Shield market."  (Compl. ¶ 72.)

Thus, for purposes of Section 3729(a)(1), the Complaint cites both direct and inferential evidence that Honeywell caused Armor Holdings to present false claims to the United States.  The direct evidence includes research papers and public statements by Armor Holdings, as well as "talking point" memoranda authored by Honeywell for use by the Armor Holdings sales force, all in an effort to promote Z Shield.  Honeywell's campaign of misrepresentations, selective disclosures, and suppression of critical information about Z Shield's risks provides further

38

inferential evidence of Honeywell's intent to prevent Armor Holdings and the Government from finding out about Z Shield's latent defects.

In response to these detailed allegations in the Complaint, Honeywell yet again raises a host of factual arguments inappropriate for consideration on a motion to dismiss. See Motion at pp. 24-27. As noted above, Honeywell's arguments about the company's scientific judgment, the Armor Holdings five-year warranty and storage advisory, and the materiality of meeting NIJ specifications, all hinge on factual disputes going well beyond the scope of a motion to dismiss.

Further, with the exception of the Harrison case discussed below, the cases Honeywell cites supporting these arguments stand in far different procedural postures from a motion to dismiss.[18] For example, in United States ex rel. K&R Ltd. Part. v. Massachusetts Housing Fin. Agency, 530 F.3d 980 (D.C. Cir. 2008), the D.C. Circuit conducted a de novo review of the evidence prior to affirming a trial court's grant of summary judgment. The D.C. Circuit noted that the opposing parties "simply disagree about how to interpret ambiguous contract language" and, thus, could

---

[18]    For example, the defense judgment in Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl. 410 (Ct. Cl. 1999) came after a bench trial (conducted in five phases and lasting 35 court days) in which the court gave ". . . full consideration and reconsideration of the voluminous and technical record developed during the trial of this case . . .". Id. at 411, 414 & n.7. Similarly, the decisions in Cahill v. Curtiss-Wright Corp., 57 F. Supp. 614 (W.D. Ky. 1944) and United States ex rel. Wang v. FMC Corp., 975 F.2d 1412 (9th Cir. 1992) dismissing FCA claims came at summary judgment. Also, this Court should use caution in relying upon the 64 year old Cahill case, as it was decided in a period when courts strictly construed the FCA as a penal statute. See 57 F. Supp. at 616. In contrast, courts in recent times have interpreted the FCA broadly. See Cook County and Pogue, cited supra at p. 14. In Wang, the Ninth Circuit emphasized the facts by noting that "[h]aving searched through thousands of documents and conducted extensive discovery," the relator could not support an inference of fraud. 975 F.2d at 1420. Also, the Tenth Circuit has distinguished Wang as a case where ". . . the defendant had an ongoing dialogue with the Government about problems" as opposed to the case before the Tenth Circuit where, just like with Honeywell, none of the defendants informed the Government about any problems. See Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000).

find no evidence that the defendant "at least recklessly disregarded the falsity of its claims." Id. at 983-84. In contrast, the Complaint alleges that Honeywell knowingly caused the presentment of false claims to the United States and, as detailed above, cites direct and inferential evidence in support. Thus, K&R Ltd. provides no basis for dismissing the Complaint.

As for the single motion to dismiss case cited by Honeywell, in Harrison, 176 F.3d 776, the Fourth Circuit affirmed in part and reversed in part a trial court's dismissal of an FCA action. Honeywell (see Motion at p. 25) cites the part of the case stating that "[e]xpressions of opinion are not actionable as fraud," without noting the corollary, cited in the very same paragraph, that ". . . an opinion or estimate carries with it 'an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it.'" Id. at 792 (quotation omitted). Here, the Complaint contains detailed allegations about numerous facts known by Honeywell that would preclude a good faith scientific opinion that Z Shield was suitable as the key ballistic resistant component in bullet-proof vests. (Compl. ¶¶ 34-83.)

> **2.    The Complaint Satisfies The Pleading Requirements Of Allison Engine By Alleging That Honeywell Knowingly Made False Statements To Get The Government To Pay False Claims**

In Allison Engine, the Supreme Court, interpreting § 3729(a)(2), stated that "a plaintiff asserting a claim must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve a false claim." Id. at 2126. The Supreme Court also made clear that no per se rule precludes FCA claims under § 3729(a)(2) against defendants who did not deal directly with the Government. Indeed, the Supreme Court stated that such claims can be established so long as the requisite intent exists. Id. at 2130.

The Court did not address what is required to establish the requisite intent under § 3729(a)(2). But there is a well established presumption that a defendant intends the natural consequences of its actions. See, e.g., Reno v. Bossier Parish School Bd., 520 U.S. 471, 487 (1997) ("people usually intend the natural consequences of their actions"); Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 278 (1979) (recognizing "the presumption common to the criminal and civil law, that a person intends the natural and foreseeable consequences of his voluntary actions"); In re Patch, 526 F.3d 1176, 1182 (8th Cir. 2008) ("[t]he law of torts permits a fact finder to conclude that an actor intends the natural consequences of his actions"). Consistent with this principle, the Supreme Court observed in Allison Engine that the language of § 3729(a)(2) was designed to ensure that defendants remain "answerable" for the "natural, ordinary, and reasonable consequences" of their misconduct. 128 S. Ct. at 1130.

As with Honeywell's argument under Section 3729(a)(1), the argument for dismissal based on Allison Engine, see Motion at pp. 28-29, lacks merit because intent and knowledge need only be pled generally under Rule 9(b). The Complaint satisfies Rule 9(b) by alleging that "Honeywell knowingly made or caused to be made false statements in order to get false claims paid by the United States in violation of the FCA, 31 U.S.C. § 3729(a)(2)." (Compl. ¶ 91.)

But again the Complaint goes well beyond this general allegation of intent. Here, the natural and intended consequences of Honeywell's false statements about Z Shield (pled in detail, Compl. ¶¶ 34-83) were to ensure that the United States continued purchasing defective Z Shield vests. As the Complaint alleges, Honeywell knowingly undertook a campaign to cover up the risks of Z Shield from Armor Holdings and the United States so that Armor Holdings would continue selling and the United States would continue buying Z Shield vests. (Compl. ¶¶ 3-5, 11,

41

23, 33, 62, 82-83, 91-92.)  The Complaint also alleges that Honeywell's campaign succeeded in causing the United States to pay over $20 million for defective Z Shield vests and that "[h]ad the United States known of the defective nature of the Z Shield vests it would not have purchased them for use in the ballistic protection of law enforcement officers." (Compl. ¶¶ 23, 92.)

Honeywell's other arguments for dismissal under Section 3729(a)(2), relating to NIJ standards, scientific judgment, the warranty, and the storage advisory,  repeat Honeywell's earlier arguments for dismissal.  <u>Compare</u> Motion at pp. 12-17, 24-27 <u>with</u> Motion at pp. 27, 29.  These arguments lack merit and have been addressed elsewhere in the brief.  <u>See</u> <u>supra</u> at pp. 20-26, 36.

### E.    The Complaint Pleads A *Prima Facie* Claim Of Unjust Enrichment Against Honeywell

The elements of an unjust enrichment claim are three-fold:  (1) plaintiff conferred a legally cognizable benefit on defendant; (2) defendant knew about the benefit; and (3) defendant retained the benefit under unjust circumstances.  <u>See</u> <u>In re</u> <u>Lorazepam & Clorazepate Antitrust Litig.</u>, 295 F. Supp.2d 30, 50 (D.D.C. 2003) (denying motion to dismiss an unjust enrichment claim, among others).  This is an equitable claim, and, consequently, "'[a] plaintiff alleging unjust enrichment may be seeking to recover a benefit which he gave directly to the defendant, or one which was transferred to the defendant by a third party.'" <u>Id.</u> at 51 (<u>quotation omitted</u>).[19]

Here, the United States has alleged that it paid the vest manufacturer, Amor Holdings, for defective Z Shield vests.  (Compl. ¶¶ 12-18.)  Part of these payments compensated Armor

---

[19]    <u>See also</u> <u>In re</u> <u>Cardizem CD Antitrust Litig.</u>, 105 F. Supp.2d 618, 670-71 (E.D. Mich. 2000) (denying motion to dismiss unjust enrichment claim brought by indirect purchasers of heart medication against medication manufacturers and stating that an unjust enrichment claim does not require the passing of a direct benefit from plaintiff to defendant), <u>app.</u> <u>denied</u>, 332 F.3d 896 (6th Cir. 2003), <u>cert.</u> <u>denied</u>, 543 U.S. 939 (2004).

Holdings for the Z Shield in the vests, for which Armor Holdings had already paid Honeywell.  In this manner, the United States' payments for defective Z Shield vests were indirectly paid to Honeywell.  Additionally, these payments enabled Armor Holdings to purchase additional Z Shield from Honeywell, and the Complaint specifically alleges that Honeywell made numerous false statements so that Armor Holdings would continue purchasing Z Shield from Honeywell. (Compl. ¶¶ 3-5, 11, 23, 33, 62, 82-83, 91-92.)

In response, Honeywell argues that the United States received the benefit of its bargain regarding Z Shield vests and so there was no unjust enrichment.  See Motion at pp. 30-31.  At the motion to dismiss stage, however, the Court should refrain from deciding this factual issue and limit its review to what the United States alleged in the Complaint.[20]  Contrary to Honeywell's assertions, the Complaint alleges that the United States did not receive the benefit of its bargain regarding Z Shield vests.  The United States expected to receive high quality vests providing adequate ballistic protection for at least five years and, instead, it received defective vests that degraded quickly in heat and humidity.  (Compl. ¶¶ 2-3, 11, 84-85, 88, 92.)  These allegations state a *prima facie* unjust enrichment claim  against Honeywell.

---

[20]     See *In re* Lorazepam, 295 F. Supp.2d at 51 ("'[e]very unjust enrichment case is factually unique'") (quotation omitted); In re Cardizem, 105 F. Supp.2d at 671 (defendants' arguments in moving to dismiss an unjust enrichment claim "raise factual questions" inappropriate to decide at this stage of the proceedings).

## V.     CONCLUSION

For the foregoing reasons, the Court should deny with prejudice Honeywell's Motion

seeking dismissal under Rules 9(b) and 12(b)(6).

<div style="margin-left: 40%;">

GREGORY G. KATSAS
Assistant Attorney General

By:   /s/ A. Thomas Morris
        MICHAEL D. GRANSTON
        ALAN E. KLEINBURD
        ALICIA J. BENTLEY
        A. THOMAS MORRIS
        CALLIE R. OWEN
        JULLIA F. CALLAHAN
        ATTORNEYS
        U.S. Department of Justice
        Commercial Litigation Branch
        P.O. Box 261
        Ben Franklin Station
        Washington, D.C. 20044
        Tel:    202-307-1086
        Fax:    202-305-7797

</div>

Dated: August 15, 2008

**CERTIFICATE OF SERVICE**

This is to certify that on this 15th day of August, 2008, I electronically filed a true and correct copy of the foregoing United States' Memorandum Of Points And Authorities In Opposition To Defendant Honeywell International Inc.'s Motion To Dismiss, the exhibits thereto and the supporting declaration, and the Proposed Order by using the CM/ECF system, which will send a notice of electronic filing to Craig S. Primis, P.C., and Jennifer Hardy, counsel for the Defendant.

/s/ A. Thomas Morris
A. Thomas Morris
Trial Attorney
U.S. Department of Justice

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) |
| | ) Case No.: 1:08-cv-00961 (RWR) |
| HONEYWELL INTERNATIONAL INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

## PROPOSED ORDER

Upon consideration of Defendant's Motion to Dismiss, the memoranda in support and

opposition thereto, and the arguments of the parties, it is this ___ day of _____, 2008:

**ORDERED** that Defendant's Motion to Dismiss is **DENIED WITH PREJUDICE**.


_____
Richard W. Roberts
Untied States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) |
| | ) Case No.: 1:08-cv-00961 (RWR) |
| HONEYWELL INTERNATIONAL INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**DECLARATION OF A. THOMAS MORRIS IN SUPPORT**
**OF UNITED STATES' OPPOSITION TO HONEYWELL**
**INTERNATIONAL INC.'S MOTION TO DISMISS**

I, A. Thomas Morris, hereby declare:

1.      I am a trial attorney with the United States Department of Justice and am admitted to practice before this Court.  I submit this declaration in support of certain documentary evidence cited in the United States' Memorandum of Points and Authorities in Opposition to Defendant Honeywell International Inc.'s Motion to Dismiss (the Opposition).

2.      Exhibit A to the Opposition is a true and correct copy of an e-mail from Dawn Flynn of Armor Holdings to the Armor Holdings' sales force, dated January 8, 2001, attaching specifications for the XTX3A-1, XTZX2-1, and 3AXTZX bullet-proof vest models containing Z Shield.

3.      Exhibit B to the Opposition is a true and correct copy of an e-mail string ending with an e-mail from Roger Cox of Armor Holdings to J. Cantrell, Captain, Washington County Sheriff's Office, dated August 5, 2004, attaching specifications for the XTX2-2 bullet-proof vest model containing Z Shield.

4.      Exhibit C to the Opposition is a true and correct copy of an e-mail string ending with an e-mail from Dawn Flynn of Armor Holdings to Paul Larkin of Armor Holdings and Bob Nicholls, president of R. Nicholls Distributors, Inc., dated August 22, 2005, attaching specifications for the XTX2A-2, XTX2-2, XTX3A-2, XTZX-1, and XTZX3A-2 bullet-proof vest models containing Z Shield.

5.      Exhibit D to the Opposition is a true and correct copy of an undated American Body Armor Xtreme Armor Owner's Manual.

6.      Exhibit E to the Opposition is a true and correct copy of an undated American Body Armor Limited Warranty.

7.      Exhibit F to the Opposition is a true and correct copy of a letter from Scott O'Brien, president of Safariland and general manager of American Body Armor to Jim Moody of the Los Angeles Police Department, dated October 20, 2003.

8.      Exhibit G to the Opposition is a true and correct copy of a Honeywell Technical Bulletin on Z Shield Material: Ballistic Performance After Aging, copyrighted by Honeywell International Inc. in 2003.

I declare, under penalty of perjury, under the laws of the United States that the foregoing is true and correct.

Dated: August 15, 2008


/s/ A. Thomas Morris
A. Thomas Morris


2

**From:**    Dawn Flynn

**Sent:**    Monday, January 8, 2001 9:56 AM

**To:**    Bill Burns (E-mail) <billb@safariland.com>; Dale Wise <dwise@armor holdings, inc..com>; Darrell Peetz (E-mail) <darrellp@safariland.com>; Dave Hedlund (E-mail) <dhedlund@erols.com>; Frank Cappo (E-mail) <fcappo@armorgroup.com>; Fred Grimm (E-mail) <fgrimm@armorholdings.com>; Howard Johnson (E-mail) <hjohnson@armorholdings.com>; Jerry Peludat (E-mail) <jerryp@safariland.com>; Joe Joyce (E-mail) <jjoyce@armorholdings.com>; Keith Fahl (E-mail) <keithf@safariland.com>; Paul Rooth (E-mail) <paulrooth@mindspring.com>; Rick Armellino (E-mail) <rarmellino@armorgroup.com>; Rick Beaman (E-mail) <rbeaman@rmmccarthy.com>; Rick Thompson (E-mail) <rick.thompson@erols.com>; Roger Cox <rcox@armor holdings, inc..com>; Ron McCarthy (E-mail) <mccarthy@rmmccarthy.com>; Stan Ferer (E-mail) <sferer@armorholdings.com>; Terry Riccardi (E-mail) <terryriccardi@ultrasys.net>; Todd Mackler (E-mail) <t.mac@ix.netcom.com>; Bowen Johnson (E-mail) <bowenj@safariland.com>; David Strum (E-mail) <davids@safariland.com>; Mike Hanks <mhanks@armor holdings, inc..com>; Sam White <swhite@armor holdings, inc..com>; Vicki Mathia <vmathia@armor holdings, inc..com>; Jason Brown <jbrown@armor holdings, inc..com>; Renee DiCini (E-mail) <reneed@safariland.com>; Stephanie Crutcher <scrutcher@armor holdings, inc..com>; Bob Weber (E-mail) <bobw@safariland.com>; Larry Whiteley <larryw@armor holdings, inc..com>; Paul Larkin (E-mail) <paull@safariland.com>

**Cc:**    Gary Owensby <gowensby@armor holdings, inc..com>; Larry Bieller <lbieller@armor holdings, inc..com>; Tom Dragone <tdragone@armor holdings, inc..com>; Dale Taylor <dtaylor@armor holdings, inc..com>; Mary DeBrunner <mdebrunner@armor holdings, inc..com>; Bettina Swinson <bswinson@armor holdings, inc..com>; Richard Bistrong <rbistrong@armor holdings, inc..com>; Kathy Lang <klang@armor holdings, inc..com>

**Subject:**    Xtreme, Xtreme X, Xtreme ZX Specifications

**Attach:**    Xtreme Level II XT2-2 12-4-00.doc;Xtreme Level IIA XT2A-2 1-5-01.doc;Xtreme Level IIIA XT3A-2 12-4-00.doc;Xtreme X Level II XTX2-1 12-4-00.doc;Xtreme X Level II XTX3A-1 1-4-01.doc;Xtreme ZX Level II XTZX2-1 12-3-00.doc;Xtreme ZX Level IIIA 3AXTZX 1-2-01.doc

---

Here are **ALL** the specs with the exception of Xtreme X 2A, and Xtreme ZX 2A (which are not .04 certified as of yet).

I have reduced the size of the files considerably (due to use of logos).

Please replace any copies you may have with these. (The documents are dated so it should be easy for you to distinguish the newest from oldest)

Any Questions, please give me a call.

Dawn

AZE 00154864
AHI068-8192

SPECIFICATIONS

### For Purchase of Soft Body Armor



NIJ 0101.04
## Level IIIA

## 1.  SCOPE

This product specification details the style and quality of concealable soft body armor vests intended for use by male or female members of this agency.  The vests shall be worn comfortably while being concealed under a shirt.  All vests shall provide protection against labeled projectile penetration while reducing resultant blunt trauma and vest distortion to acceptable levels.  The successful vendor shall be required to supply the individual vests with applicable options and colors as ordered for male or female personnel.

The concealable body armor shall be the American Body Armor Xtreme™ X Series Model XTX3A-1 for NIJ 0101.04 Threat Level IIIA.  Bids based on body armor models made by manufacturers other than American Body Armor must be clearly identified as such, and bidders must include full product description, a complete bid sample, male and female, drawings and/or photographs, technical specifications.

Where the apparent low bidder has proposed an alternate product, that bidder shall demonstrate product equivalency to the satisfaction of the department.  Evidence of equivalency shall be presented for each requirement of this specification, and the burden of such equivalency in entirely on the vendor. Any bidder may be required, at any time during the procurement process, to provide documentation proving compliance with any or all the terms of this specification.

Only body armor models which have been tested by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC), and found to comply with the requirements of NIJ Standard 0101.04, <u>Ballistic Resistance of Police Body Armor</u>, April 1987, for Type IIIA armor shall be submitted under this specification, **no exceptions.**

Bids with multiple models, as alternates will be rejected.

## 2.  SILENCE OF SPECIFICATIONS

Commercially accepted practices shall apply to any detail not covered in this specification and to any omission of this specification.  Any omission or question of interpretation of the specification which affects the ballistic performance or integrity of the soft body armor being offered shall be addressed in writing and submitted with the bid.

-1-

## 3.  PROTEST

Any protest based on the selection and performance criteria of this specification will be disregarded.

## 4.  APPLICABLE DOCUMENTS

The following list of standards and specifications in effect on the date of this solicitation shall form a part of this specification.

1.  National Institute of Justice, Standard NIJ-STD-0101.04, <u>Ballistic Resistance of Police Body Armor</u>

2.  MIL-STD-662, <u>V50 Ballistic Test For Armor</u>

3.  Federal Standard No. 751, <u>Stitches, Seams & Stitching</u>

4.  ISO 9001 Quality Assurance Certification

5.  ANSI/ASQC - Q9000 Quality Standard, dated August 1, 1994

Requirements of this specification shall take precedence over the above referenced standards and specifications.

## 5.  PURCHASE REQUIREMENTS

The successful bidder must be a recognized wholesaler/retailer which maintains a convenient location for measurement, fitting and service during regular business hours Monday through Friday. Any manufacturers which bid direct must include a service proposal as to how measuring, re-works, and customer service will be maintained without local distribution.  Direct bids from manufacturers which do not contain a detailed service proposal will be rejected.

## 6.  SPECIFIC QUANTITY

The agency has the right to determine quantity, if not otherwise specified in the procurement document. Of the total quantity purchased, both male and female products will be represented. The department retains the right to adjust the total quantities, while maintaining the accepted bid price, without notification to vendor. The term of the contract, including extensions, and/or escalation clauses, shall be stated in the bid document.

## 7.  DESIGN REQUIREMENTS

The Intended use of the soft body armor detailed herein is intended to be standard issue armor.  It is intended for routine daily wear as an undergarment.

The soft body armor shall be designed to provide:

1.  Light and thin NIJ 0101.04 certified armor in Level IIIA.

2.  A high degree of concealment and comfort.

3.  Minimum restriction of motion or mobility.

-2-

AZE 00154911
AHI068-8239

4.   Optional carriers to allow for laundering and color changes.

5.   Provide protection against the labeled projectiles in accordance with the NIJ Standard 0101.04.

## 8.   GENERAL DESIGN

The ballistic panels of soft body armor meeting this specification shall provide thin, flexible, lightweight comfort utilizing a matrix of Z Shield ™ and Gold Flex™ High Performance shield materials, QuadraLink™ woven Zylon® and Dyneema SB-31 UD. The soft body armor shall be designed for regular daily wear as an undergarment. Therefore, vests shall be designed and constructed to provide (1) light and thin NIJ 0101.04 certified armor in Level IIIA, (2) durability, (3) ease of cleaning, (4) minimum restriction of motion or mobility, and (5) the greatest amount of ballistic coverage consistent with comfort and concealment.

The general configuration shall be the slipover vest type that covers the majority of the upper torso, including side coverage. Four elastic straps with hook and pile fasteners shall provide proper positioning and comfort. The entire vest perimeter shall be curved. No sharp corners or straight edges shall be allowed.

The front ballistic panel shall cover the chest approximately up to the collar bone, have a scooped neck sufficient to maintain concealability when wearing an open collar shirt, extend downward to the waist but not far enough to "push up into the throat" when the wearer is seated, and extend around the sides to provide side protection. The biceps/chest region shall be cut with sufficient space to minimize irritation and restriction of arm movement during common duties such as the operation of motor vehicles.

The rear ballistic panel shall cover the back of the torso from just above the shoulder blades down to a position above the waist belt.

The sides of the torso shall be covered by having side coverage from both the front and rear panels, as the department has determined that such a configuration maximizes both coverage and comfort. Accordingly, armor which maintains side coverage from only the front or rear panels shall be rejected. In addition, unless otherwise stated, the maximum gap at each side shall be two inches.

Panels shall be equipped with shoulder-strap suspension system which prevents ballistic panels from sagging, ensuring full protection.

Each piece of soft body armor shall include the following:

1.   One (1) set of ballistic panels (1 front, 1 rear).
2.   One (1) complete Xtreme 2001 Akwadyne® Comfort Mesh washable carrier.
3.   One (1) trauma reduction insert.

## 9.   OPTIONS

1.   Cool Max® Tee Shirt.
2.   Replaceable adjustable straps.
3.   Additional Xtreme 2001 Akwadyne® Comfort Mesh removable outer carrier.
4.   Quilted outer carrier.

-3-

5.  Tactical outer carrier.

## 10. BALLISTIC PANEL MATERIALS

All materials shall be new, unused and without flaws that affect appearance, durability and function.

The ballistic panels shall be constructed of a matrix of Z Shield ™. and Gold Flex™ High Performance shield materials, QuadraLink™ woven Zylon® and Dyneema SB-31 UD.

As the department has selected these materials, any bids which represent products manufactured from other materials, shall be rejected.  Accordingly, all bidders shall include a letter from the manufacturer stating that the products being submitted for consideration are manufactured from 100% first quality Z Shield ™. and Gold Flex™ High Performance shield materials, QuadraLink™ woven Zylon®, and Dyneema SB-31 UD.

## 11. PANEL CONSTRUCTION

The ballistic panels shall be constructed of a matrix of Z Shield ™. and Gold Flex™ High Performance shield materials, QuadraLink™ woven Zylon® and Dyneema SB-31 UD.   There shall be no stitching through the ballistic panel other than tacks at the panel edge.

All vests which are submitted shall represent armor which in layer count, is uniform throughout the ballistic panel. Accordingly, any ballistic panel which is not uniform, in layer count, throughout the entire ballistic package, shall be rejected. If the manufacturer contends that such feathering of the armor is advantageous, than the armor shall be tested utilizing the least number of layers which exist in any part of the ballistic package. Failure to submit such testing shall be cause for rejection.

Each layer of ballistic material, in order to retain flexibility, shall not be laminated to any other layer of ballistic material.  Accordingly, any armor which contains such lamination shall be rejected.

It is the intent of the agency to procure the lightest weight, best performing personal armor available in relation to areal density, therefore, a vest section of 12" x 12" (one square foot) [30.5cm x 30.5cm], must not exceed 11.7 oz. (.73 lbs.) per square foot [3.56 kg/m2] for NIJ level IIIA.

## 12. BALLISTIC PANEL PERFORMANCE

### V50 Performance

Each bidder shall submit V50 test reports for the vest being offered.  The V50 test shall be performed in accordance with MIL-STD-662F using NIJ Standard 0101.04 9mm 124 grain FMJ test projectiles.  The test must be performed by an independent laboratory approved by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC) for testing in accordance with NIJ Standard 0101.04.  The V 50 test shall be against clay backing. V 50 reports which represent testing without clay backing shall be rejected.  Vendor shall provide written certification that all V 50 testing is accomplished with clay backing; failure to provide certification shall be cause for rejection.

Test reports submitted by the bidder shall reflect the following minimum test results for an 9.3 oz. (.58 lbs.) per square foot [2.83 kg/m2] test sample.

-4-

Bullet                               9mm V50
                                     1668 fps [508 m/s]

Bid submissions which do not include required V50 reports shall be rejected.


## Relative Performance Index (RPI)

It has been determined that the **relative strength to weight ratio** of a ballistic design is important in determining its **comfort/performance characteristics.** *The strength to weight ratio is calculated by dividing the areal weight (lbs. per square foot) into the performance V50 value.* A high **strength to weight ratio** or **Relative Performance Index (RPI)** indicates a high degree of comfort & performance. Therefore, the minimum RPI shall be no lower than:

*Bullet*                             9mm.
*RPI*                                **2285**

## Trauma Performance  (BFS)

Blunt trauma reduction is an important aspect of armor design. Low back face signature (BFS) should result in reduced blunt trauma injury.  Therefore, the back face signature (BFS) results of the **NIJ 1010.04 certification test reports** shall reflect BFS no higher than:

| *Bullet* | 9mm | 44 Mag. |
|---|---|---|
| Average | **31.1 mm** | **42.2 mm** |

Bid submissions which do not meet this requirement will be rejected.

## 13. LABELING

Label material shall withstand normal wear and cleaning and remain readable during the entire warranted life of the armor or carrier.

All soft body armor shall be labeled in strict adherence to the labeling requirement set forth in NIJ Standard 0101.04. The ballistic panel labeling shall include, but not be limited to the following:

1. Name of Manufacture
2. Level of Protection
3. NIJ-STD-0101.04
4. Date of Fabrication
5. Size
6. Serial Number
7. Model of Vest
8. Care Instructions
9. Lot Number

## 14. BALLISTIC PANEL COVER MATERIAL

-5-

AZE 00154914
AHI068-8242

Each ballistic panel shall be covered in 100% anti microbial Olefin treated for water repellency. Construction 70 denier and sized 110" X 85" [279cm x 215cm].  Inner cover material must be stain-resistant, odor and mildew resistant. Material shall have no visible fabric or color flaws.


## 15. VEST OUTER CARRIER MATERIAL

**Removable Carrier- Xtreme 2001 Akwadyne® Comfort Mesh**

The outer machine washable carrier shall be removable from the ballistic panels for laundering by way of zippers integrated into the outside of the garment. All closure attachments shall be Ultra Mate® Velcro®. The carrier shall consist of Akwadyne® Comfort Mesh on the body side. The Comfort Mesh shall be 28 gauge, 100-denier warp knit. The percent of moisture regain must be less than 1% into fiber and must have high moisture transport properties. Fabric must be capable of releasing moisture without absorption, allowing for higher evaporative cooling and faster drying to take place, resulting in a less clammy feel to wearer. The body side cover material must not weigh over .52 oz. per sq. ft [.15 kg/m2].  All fabrics shall have no visible fabric or color flaws.

## 16. SPECTRA SHIELD TRAUMA INSERT

A trauma reduction insert constructed of fifteen (15) layers of Spectra Shield™ bullet resistant material cut five inch by eight inch (5" x 8") [12.7 x 20.3cm] shall be provided.  The Spectra Shield™shall be placed in a nylon cover, which shall be tucked in to one end of the Spectra Shield™ and sewn shut through the Spectra Shield™ to hold it in place.

## 17. QUALITY CONTROL

The manufacturer must maintain a quality program certified under the *ISO 9001* certification program by an accredited registrar under the accreditation of the Registrar Accreditation Board (US) and the Raad voor de Certificatie (Dutch).  The scope of the certification must include the Design and Manufacturing of technologically advanced personal safety equipment including concealable and tactical bullet resistant vests, custom body armor, composite armor, explosive ordinance protection, ballistic face and head protection, ballistic shields and other police and military apparel, and narcotic identification systems.

The documented quality control system must be designed to insure the integrity and quality of the manufactured products.  The quality control system shall control all manufacturing process and incoming raw materials. *The manufacturer must have an in-house ballistic laboratory capable of performing ballistic testing of incoming raw materials and in-process samples.* The manufacturer must have the capability of performing testing in accordance with MIL-STD-662 and NIJ Standard 0101.04.  Procedures for lot testing of incoming raw materials and in-process samples must be incorporated into the quality control system.  All incoming ballistic material shall undergo V50 ballistic lot tests in accordance with MIL-STD-662.   Every vest panel manufactured shall be inspected for material defects and proper ply counts.  Every vest panel manufactured shall be subsequently inspected for proper ballistic panel stitching.  Covers and accessories shall be re inspected during manufacturing for defects at selected points during manufacturing to assure the absence of hidden defects in the final item.

In addition, each vest shall receive a final inspection prior to shipment.  This inspection shall include a review of the

-6-

quality control check sheet and confirm the product against the customer's order.

A copy of the Certificate of Accreditation, as well as the manufacturers quality control program must be submitted with bid documents.

## 18. SERIAL NUMBERS

Each unit of soft body armor delivered shall have an individual serial number. Each serialized soft body armor shall be traceable to its original ballistic material lot number and ballistic material mill roll number. Additionally the soft body armor serial number shall be traceable to an incoming material lot test and ballistic panel lay-up lot test. The vendor must have the ability to trace serial numbers.

## 19. LOT TESTING

All incoming ballistic material shall undergo V50 ballistic lot test in accordance with MIL-STD-662F except that the test will be conducted on clay backing which meets the requirements of NIJ Standard 0101.04 for backing material.

## 20. MEASUREMENT AND FITTING

### Custom Measuring
Unless otherwise stated, individual measurements will be taken of each user. Each delivered vest shall fit in accordance with the following guidelines:

1.  The side edges of the front and back ballistic panels shall be fit for within a two-inch (2") [5cm] gap between panels during the initial custom fitting.

2.  The bottom edge of the front ballistic panel shall be within inch (1") [2.5cm] of the highest waist belt (usually the duty belt) measurement when the wearer is in a relaxed seated position.

3.  The bottom edge of the back panel shall be within one-inch (1") [2.5cm] of the highest waist belt (usually the duty belt) measurement when the wearer is in the standing position.

It is the department's intention to purchase armor, which contains maximum ballistic coverage. Accordingly, the minimum acceptable square inches for the front and back panel of each vest, per size, is as follows:

Small (34/36)      -      310.49 square inches [.20 m2]

Medium (38/40)    -      370.44 square inches [.24 m2]

Large (42/44)       -      434.64 square inches [.28 m2]

X-Large (46/48)    -      503.38 square inches [.33 m2]

XX-Large (50/54)  -      560.49 square inches [.36 m2]

Female sizes are determined based on individual measurements, including bust size.

AZE 00154916
AHI068-8244

## 21. FIT AND ALTERATION POLICY

The manufacturer shall perform all required alterations of more than one inch within 30 days after original shipment of the product at no charge. Adjustments of an inch or less than an inch can be accomplished by utilizing the adjustable strap feature on the vest.

## 22. PRE-AWARD AND RETEST POLICY

Bid submissions that appear to conform to these specifications will be considered as prospective vendors. However, the purchaser reserves the right to perform laboratory testing on any and all armor submitted to verify strict compliance with these specifications. The purchaser may perform V50 Ballistic Limit Testing in strict accordance with MIL-STD-662F. An American Body Armor representative shall witness all testing.

American Body Armor & Equipment, Inc. (ABA) encourages valid body armor testing for the purpose of acceptance testing, confirmation of required performance, and used body armor evaluations. For these purposes, ABA *will only recognize properly performed V50 Ballistic Limit Testing* in strict accordance with MIL-STD-662F. Testing shall be performed at an NIJ approved ballistic test laboratory. The test projectiles shall be 9mm 124 grain FMJ as those used in the NIJ Standard 0101.04.

The Probable Ballistic Limit (V50) test shall be conducted on a complete vest. The V50 shall be calculated on ten fair hits, with five shots on the front panel and five shots on the back panel. If required, up to 12 shots, 6 in each panel may be used to obtain the V50 value. If the range of mixed results exceeds 125 feet per second [38 meters per second] or if the V50 cannot be determined in 12 shots, the test will be considered invalid. Shot placement shall be in accordance with MIL-STD-662F except that no shot may be within three (3) inches [7.6cm] of any edge nor two (2) inches [5cm] from any other ballistic impact. Panels shall be shot against clay armor backing material, which has been conditioned in accordance with NIJ Standard 0101.04.

Prior to each shot, the panel will be placed flat against the clay backing material. The sample size shall be no smaller than size 46/48 or equal for male vest and size 42/44 or equal for female vest. Vest samples used in testing must be wearable and in suitable condition, free from abuse.

For each particular level, the V50 Ballistic Limits shall be no lower than the allowable <u>highest</u> 9mm NIJ test velocity. In addition, there shall be no complete penetration lower than the <u>highest</u> 9mm NIJ test velocity.

## 23. PRODUCT LIABILITY INSURANCE

Vest manufacturer shall agree to provide a minimum of $20,000,000 product liability insurance coverage on delivered vests.

## 24. WARRANTY

Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels *against defects in materials and workmanship.*

The alteration of ballistic panels in any way shall render the warranty void.

## 25. REMOVABLE COVERS

-8-

Removable machine washable covers shall be fully warranted for twelve (12) months after the date of purchase against any defects in the material and/or workmanship.

## 26. PACKAGING

All soft body armor shall be packaged and shipped consistent with good commercial practices.

Plastic Bags: Each set of armor, along with its optional equipment, shall be placed in an individual plastic bag.

Shipping Cartons: The soft body armor shall be packed into suitable corrugated cardboard box. The box shall allow for normal shipping without damage to the soft body armor.

## 27. FINANCIAL DATA

All vendors are required to provide a certified financial statement, for 1999, which represents the manufacturer(s) of which they are bidding. Failure to provide a certified financial statement shall be cause for rejection.

## 28. DOCUMENTATION

The following documents, certifications, test-reports and samples must be included with the vendor's bid. Where one manufacturer is bidding through multiple vendors, the manufacturer may submit the appropriate paperwork on behalf of all vendors. Failure to submit the following shall be cause for rejection:

1.  Models made by manufacturers other than American Body Armor must be clearly identified and shall include the following:
    a.  Full product description.
    b.  Complete bid sample, male and female.
    c.  Drawings and/or photographs.
    d.  Technical specifications.

2.  Manufacturers bidding direct must include a service proposal as to how measuring, alterations and customer service will be maintained without local distribution.

3.  NIJ 0101.04 Certification and test reports from an accredited laboratory for the vest being certified.

4.  V50 test reports performed in accordance with MIL-STD-662F. V50 testing must be accomplished with clay backing.

    a. Test reports must be submitted for the entire ballistic package.

    b. Test reports must be submitted for incoming materials which are utilized in the ballistic package.

5.  Chemical test reports certifying use of Akwadyne® fabric treatment.

6.  The ability to trace serial numbers.

AZE 00154918
AHI068-8246

7.    The layer count of the vest must be uniform throughout the entire ballistic package.  If not, test reports must be submitted for the vest utilizing the least amount of layers.

8.    Quality Control Procedures.

   a.   Incoming materials
   b.   Lay-up configuration
   c.   In-process configuration
   d.   Testing verification
   e.   Inspection of ballistic panel stitching
   f.    Random final product inspection and continuous in-process surveillance
   g.   Quality Assurance training and indoctrination

9.    Product Liability Insurance providing a minimum coverage of $20,000,000.

10.   Documentation stating a 5-year ballistic package warranty.

11.   Documentation stating a 12-month cover warranty.

12.   Certified financial statement for 1999.

13.   ISO-9001 Certificate.

Revised: January 5, 2001                                              Printed:  January 5, 2001

AZE 00154919
AHI068-8247

## Technical Specifications



### NIJ 0101.04
## Level IIIA
### Concealable Armor

| | |
|---|---|
| **Model** | XTX3A-1 |
| **Ballistic Material** | Gold Flex™/ Z Shield ™/QuadraLink™ woven Zylon® and Dyneema SB-31 UD |
| **NIJ Level** | IIIA |
| **Weight** | 11.7 Oz. / .73 lbs. Sq. Ft. [3.56 kg/m2] |
| **Thinness** | .15 inches [3.8 mm] |
| **V50 9mm** | 1668 fps [508 m/s] |
| **Relative Performance Index – 9mm** | 2285 |
| **Certification BFS Avg. - 9mm** | 31.1 mm |
| **Certification BFS Avg. - 44 mag.** | 42.2 mm |

AZE 00154920
AHI068-8248

SPECIFICATIONS

**For Purchase of Soft Body Armor**



**NIJ 0101.04**
**Level II**

## 1.  SCOPE

This product specification details the style and quality of concealable soft body armor vests intended for use by male or female members of this agency.  The vests shall be worn comfortably while being concealed under a shirt.  All vests shall provide protection against labeled projectile penetration while reducing resultant blunt trauma and vest distortion to acceptable levels.  The successful vendor shall be required to supply the individual vests with applicable options and colors as ordered for male or female personnel.

The concealable body armor shall be the American Body Armor Xtreme™ ZX Series Model XTZX2-1 for NIJ 0101.04 Threat Level II.  Bids based on body armor models made by manufacturers other than American Body Armor must be clearly identified as such, and bidders must include full product description, a complete bid sample, male and female, drawings and/or photographs, technical specifications.

Where the apparent low bidder has proposed an alternate product, that bidder shall demonstrate product equivalency to the satisfaction of the department.  Evidence of equivalency shall be presented for each requirement of this specification, and the burden of such equivalency in entirely on the vendor. Any bidder may be required, at any time during the procurement process, to provide documentation proving compliance with any or all the terms of this specification.

Only body armor models which have been tested by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC), and found to comply with the requirements of NIJ Standard 0101.04, <u>Ballistic Resistance of Police Body Armor</u>, April 1987, for Type II armor shall be submitted under this specification, **no exceptions.**

Bids with multiple models, as alternates will be rejected.

## 2.   SILENCE OF SPECIFICATIONS

Commercially accepted practices shall apply to any detail not covered in this specification and to any omission of this specification.  Any omission or question of interpretation of the specification which affects the ballistic performance or integrity of the soft body armor being offered shall be addressed in writing and submitted with the bid.

## 3.  PROTEST

Any protest based on the selection and performance criteria of this specification will be disregarded.

AZE 00154921
AHI068-8249

## 4.  APPLICABLE DOCUMENTS

The following list of standards and specifications in effect on the date of this solicitation shall form a part of this specification.

1.  National Institute of Justice, Standard NIJ-STD-0101.04, <u>Ballistic Resistance of Police Body Armor</u>

2.  MIL-STD-662, <u>V50 Ballistic Test For Armor</u>

3.  Federal Standard No. 751, <u>Stitches, Seams & Stitching</u>

4.  ISO 9001 Quality Assurance Certification

5.  ANSI/ASQC - Q9000 Quality Standard, dated August 1, 1994

Requirements of this specification shall take precedence over the above referenced standards and specifications.

## 5.  PURCHASE REQUIREMENTS

The successful bidder must be a recognized wholesaler/retailer which maintains a convenient location for measurement, fitting and service during regular business hours Monday through Friday. Any manufacturers which bid direct must include a service proposal as to how measuring, re-works, and customer service will be maintained without local distribution.  Direct bids from manufacturers which do not contain a detailed service proposal will be rejected.

## 6.  SPECIFIC QUANTITY

The agency has the right to determine quantity, if not otherwise specified in the procurement document. Of the total quantity purchased, both male and female products will be represented. The department retains the right to adjust the total quantities, while maintaining the accepted bid price, without notification to vendor. The term of the contract, including extensions, and/or escalation clauses, shall be stated in the bid document.

## 7.  DESIGN REQUIREMENTS

The Intended use of the soft body armor detailed herein is intended to be standard issue armor.  It is intended for routine daily wear as an undergarment.

The soft body armor shall be designed to provide:

1.  Light and thin NIJ-0101.04 certified armor in Level II.

2.  A high degree of concealment and comfort.

3.  Minimum restriction of motion or mobility.

4.  Optional carriers to allow for laundering and color changes.

AZE 00154922
AHI068-8250

5.  Provide protection against the labeled projectiles in accordance with the NIJ Standard 0101.04.

## 8.  GENERAL DESIGN

The ballistic panels of soft body armor meeting this specification shall provide thin, flexible, lightweight protection. The ballistic panels shall be constructed of a matrix of Z Shield ™ High Performance shield materials, QuadraLink™ woven Zylon® and Dyneema SB-31 UD.  The soft body armor shall be designed for regular daily wear as an undergarment.  Therefore, vests shall be designed and constructed to provide (1) light and thin NIJ 0101.04 certified armor in Level II, (2) durability, (3) ease of cleaning, (4) minimum restriction of motion or mobility, and (5) the greatest amount of ballistic coverage consistent with comfort and concealment.

The general configuration shall be the slipover vest type that covers the majority of the upper torso, including side coverage.  Four elastic straps with hook and pile fasteners shall provide proper positioning and comfort.  The entire vest perimeter shall be curved.  No sharp corners or straight edges shall be allowed.

The front ballistic panel shall cover the chest approximately up to the collar bone, have a scooped neck sufficient to maintain concealability when wearing an open collar shirt, extend downward to the waist but not far enough to "push up into the throat" when the wearer is seated, and extend around the sides to provide side protection.  The biceps/chest region shall be cut with sufficient space to minimize irritation and restriction of arm movement during common duties such as the operation of motor vehicles.

The rear ballistic panel shall cover the back of the torso from just above the shoulder blades down to a position above the waist belt.

The sides of the torso shall be covered by having side coverage from both the front and rear panels, as the department has determined that such a configuration maximizes both coverage and comfort. Accordingly, armor which maintains side coverage from only the front or rear panels shall be rejected. In addition, unless otherwise stated, the maximum gap at each side shall be two inches.

Panels shall be equipped with shoulder-strap suspension system which prevents ballistic panels from sagging, ensuring full protection.

Each piece of soft body armor shall include the following:

1.  One (1) set of ballistic panels (1 front, 1 rear).
2.  One (2) complete Xtreme 2001 Akwadyne® Comfort Mesh washable carrier.
3.  One (1) trauma reduction insert.

## 9.  OPTIONS

1.  Cool Max® Tee Shirt.
2.  Replaceable adjustable straps.
3.  Additional Xtreme 2001 Akwadyne® Comfort Mesh removable outer carrier.
4.  Quilted outer carrier.
5.  Tactical outer carrier.

## 10. BALLISTIC PANEL MATERIALS

-3-

AZE 00154923
AHI068-8251

All materials shall be new, unused and without flaws that affect appearance, durability and function.

The ballistic panels shall be constructed of a matrix of Z Shield ™ High Performance shield materials, QuadraLink™ woven Zylon® and Dyneema SB-31 UD.

As the department has selected these materials, any bids which represent products manufactured from other materials, shall be rejected. Accordingly, all bidders shall include a letter from the manufacturer stating that the products being submitted for consideration are manufactured from 100% first quality Z Shield ™ QuadraLink™ woven Zylon® and Dyneema SB-31 UD.

## 11. PANEL CONSTRUCTION

The ballistic panels shall be constructed of a matrix of Z Shield ™ High Performance shield materials, QuadraLink™ woven Zylon® and Dyneema SB-31 UD. There shall be no stitching through the ballistic panel other than tacks at the panel edge.

All vests which are submitted shall represent armor which in layer count, is uniform throughout the ballistic panel. Accordingly, any ballistic panel which is not uniform, in layer count, throughout the entire ballistic package, shall be rejected. If the manufacturer contends that such feathering of the armor is advantageous, than the armor shall be tested utilizing the least number of layers which exist in any part of the ballistic package. Failure to submit such testing shall be cause for rejection.

Each layer of ballistic material, in order to retain flexibility, shall not be laminated to any other layer of ballistic material. Accordingly, any armor which contains such lamination shall be rejected.

It is the intent of the agency to procure the lightest weight, best performing personal armor available in relation to areal density, therefore, a vest section of 12" x 12" (one square foot) [30.5cm x 30.5cm], must not exceed 8.3 oz. (.52 lbs.) per square foot [2.54 kg/m2] for NIJ level II.

## 12. BALLISTIC PANEL PERFORMANCE

### V50 Performance

Each bidder shall submit V50 test reports for the vest being offered. The V50 test shall be performed in accordance with MIL-STD-662F using NIJ Standard 0101.04 9mm 124 grain FMJ test projectiles. The test must be performed by an independent laboratory approved by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC) for testing in accordance with NIJ Standard 0101.04. The V 50 test shall be against clay backing. V 50 reports which represent testing without clay backing shall be rejected. Vendor shall provide written certification that all V 50 testing is accomplished with clay backing; failure to provide certification shall be cause for rejection.

Test reports submitted by the bidder shall reflect the following minimum test results for an 8.3 oz. (.52 lbs.) per square foot [2.54 kg/m2] test sample.

| Bullet | 9mm V50 |
|--------|---------|
| | 1578 fps [480 m/s] |

Bid submissions which do not include required V50 reports shall be rejected.

-4-

AZE 00154924
AHI068-8252

## Relative Performance Index (RPI)

It has been determined that the **relative strength to weight ratio** of a ballistic design is important in determining its **comfort/performance characteristics**. *The strength to weight ratio is calculated by dividing the areal weight (lbs. per square foot) into the performance V50 value. A high* **strength to weight ratio** *or* **Relative Performance Index (RPI)** indicates a high degree of comfort & performance. Therefore, the minimum RPI shall be no lower than:

| Bullet | *9mm.* |
|--------|--------|
| RPI    | **3031** |

## Trauma Performance (BFS)

Blunt trauma reduction is an important aspect of armor design. Low back face signature (BFS) should result in reduced blunt trauma injury.  Therefore, the back face signature (BFS) results of the **NIJ 1010.04 certification test reports** shall reflect BFS no higher than:

| Bullet | *9mm* | *357 Mag.* |
|--------|-------|------------|
| Average | **28 mm** | **39 mm** |

Bid submissions which do not meet this requirement will be rejected.

## 13. LABELING

Label material shall withstand normal wear and cleaning and remain readable during the entire warranted life of the armor or carrier.

All soft body armor shall be labeled in strict adherence to the labeling requirement set forth in NIJ Standard 0101.04. The ballistic panel labeling shall include, but not be limited to the following:

1. Name of Manufacture
2. Level of Protection
3. NIJ-STD-0101.04
4. Date of Fabrication
5. Size
6. Serial Number
7. Model of Vest
8. Care Instructions
9. Lot Number

## 14. BALLISTIC PANEL COVER MATERIAL

Each ballistic panel shall be covered in 100% anti microbial Olefin treated for water repellency. Construction 70 denier and sized 110" X 85" [279cm x 215cm].  Inner cover material must be stain-resistant, odor and mildew resistant. Material shall have no visible fabric or color flaws.

## 15. VEST OUTER CARRIER MATERIAL

AZE 00154925
AHI068-8253

**Removable Carrier- Xtreme 2001 Akwadyne® Comfort Mesh**

The outer machine washable carrier shall be removable from the ballistic panels for laundering by way of zippers integrated into the outside of the garment. All closure attachments shall be Ultra Mate® Velcro®. The carrier shall consist of Akwadyne® Comfort Mesh on the body side. The Comfort Mesh shall be 28 gauge, 100-denier warp knit. The percent of moisture regain must be less than 1% into fiber and must have high moisture transport properties. Fabric must be capable of releasing moisture without absorption, allowing for higher evaporative cooling and faster drying to take place, resulting in a less clammy feel to wearer. The body side cover material must not weigh over .52 oz. per sq. ft [.15 kg/m2]. All fabrics shall have no visible fabric or color flaws.

## 16. SPECTRA SHIELD TRAUMA INSERT

A trauma reduction insert constructed of fifteen (15) layers of Spectra Shield™ bullet resistant material cut five inch by eight inch (5" x 8") [12.7 x 20.3cm] shall be provided. The Spectra Shield™shall be placed in a nylon cover, which shall be tucked in to one end of the Spectra Shield™ and sewn shut through the Spectra Shield™ to hold it in place.

## 17. QUALITY CONTROL

The manufacturer must maintain a quality program certified under the *ISO 9001* certification program by an accredited registrar under the accreditation of the Registrar Accreditation Board (US) and the Raad voor de Certificatie (Dutch). The scope of the certification must include the Design and Manufacturing of technologically advanced personal safety equipment including concealable and tactical bullet resistant vests, custom body armor, composite armor, explosive ordinance protection, ballistic face and head protection, ballistic shields and other police and military apparel, and narcotic identification systems.

The documented quality control system must be designed to insure the integrity and quality of the manufactured products. The quality control system shall control all manufacturing process and incoming raw materials. *The manufacturer must have an in-house ballistic laboratory capable of performing ballistic testing of incoming raw materials and in-process samples.* The manufacturer must have the capability of performing testing in accordance with MIL-STD-662 and NIJ Standard 0101.04. Procedures for lot testing of incoming raw materials and in-process samples must be incorporated into the quality control system. All incoming ballistic material shall undergo V50 ballistic lot tests in accordance with MIL-STD-662. Every vest panel manufactured shall be inspected for material defects and proper ply counts. Every vest panel manufactured shall be subsequently inspected for proper ballistic panel stitching. Covers and accessories shall be re inspected during manufacturing for defects at selected points during manufacturing to assure the absence of hidden defects in the final item.

In addition, each vest shall receive a final inspection prior to shipment. This inspection shall include a review of the quality control check sheet and confirm the product against the customer's order.

A copy of the Certificate of Accreditation, as well as the manufacturers quality control program must be submitted with bid documents.

## 18. SERIAL NUMBERS

Each unit of soft body armor delivered shall have an individual serial number. Each serialized soft body armor shall be traceable to its original ballistic material lot number and ballistic material mill roll number. Additionally the soft

AZE 00154926
AHI068-8254

body armor serial number shall be traceable to an incoming material lot test and ballistic panel lay-up lot test. The vendor must have the ability to trace serial numbers.

## 19. LOT TESTING

All incoming ballistic material shall undergo V50 ballistic lot test in accordance with MIL-STD-662F except that the test will be conducted on clay backing which meets the requirements of NIJ Standard 0101.04 for backing material.

## 20. MEASUREMENT AND FITTING

### Custom Measuring

Unless otherwise stated, individual measurements will be taken of each user. Each delivered vest shall fit in accordance with the following guidelines:

1.  The side edges of the front and back ballistic panels shall be fit for within a two-inch (2") [5cm] gap between panels during the initial custom fitting.

2.  The bottom edge of the front ballistic panel shall be within inch (1") [2.5cm] of the highest waist belt (usually the duty belt) measurement when the wearer is in a relaxed seated position.

3.  The bottom edge of the back panel shall be within one-inch (1") [2.5cm] of the highest waist belt (usually the duty belt) measurement when the wearer is in the standing position.

It is the department's intention to purchase armor, which contains maximum ballistic coverage. Accordingly, the minimum acceptable square inches for the front and back panel of each vest, per size, is as follows:

Small (34/36)      -      310.49 square inches [.20 m2]

Medium (38/40)   -      370.44 square inches [.24 m2]

Large (42/44)       -      434.64 square inches [.28 m2]

X-Large (46/48)    -      503.38 square inches [.33 m2]

XX-Large (50/54) -      560.49 square inches [.36 m2]

Female sizes are determined based on individual measurements, including bust size.

## 21. FIT AND ALTERATION POLICY

The manufacturer shall perform all required alterations of more than one inch within 30 days after original shipment of the product at no charge. Adjustments of an inch or less than an inch can be accomplished by utilizing the adjustable strap feature on the vest.

## 22. PRE-AWARD AND RETEST POLICY

Bid submissions that appear to conform to these specifications will be considered as prospective vendors. However,

AZE 00154927
AHI068-8255

the purchaser reserves the right to perform laboratory testing on any and all armor submitted to verify strict compliance with these specifications. The purchaser may perform V50 Ballistic Limit Testing in strict accordance with MIL-STD-662F. An American Body Armor representative shall witness all testing.

American Body Armor & Equipment, Inc. (ABA) encourages valid body armor testing for the purpose of acceptance testing, confirmation of required performance, and used body armor evaluations. For these purposes, ABA *will only recognize properly performed V50 Ballistic Limit Testing* in strict accordance with MIL-STD-662F. Testing shall be performed at an NIJ approved ballistic test laboratory. The test projectiles shall be 9mm 124 grain FMJ as those used in the NIJ Standard 0101.04.

The Probable Ballistic Limit (V50) test shall be conducted on a complete vest. The V50 shall be calculated on ten fair hits, with five shots on the front panel and five shots on the back panel. If required, up to 12 shots, 6 in each panel may be used to obtain the V50 value. If the range of mixed results exceeds 125 feet per second [38 meters per second] or if the V50 cannot be determined in 12 shots, the test will be considered invalid. Shot placement shall be in accordance with MIL-STD-662F except that no shot may be within three (3) inches [7.6cm] of any edge nor two (2) inches [5cm] from any other ballistic impact. Panels shall be shot against clay armor backing material, which has been conditioned in accordance with NIJ Standard 0101.04.

Prior to each shot, the panel will be placed flat against the clay backing material. The sample size shall be no smaller than size 46/48 or equal for male vest and size 42/44 or equal for female vest. Vest samples used in testing must be wearable and in suitable condition, free from abuse.

For each particular level, the V50 Ballistic Limits shall be no lower than the allowable <u>highest</u> 9mm NIJ test velocity. In addition, there shall be no complete penetration lower than the <u>highest</u> 9mm NIJ test velocity.

## 23. PRODUCT LIABILITY INSURANCE

Vest manufacturer shall agree to provide a minimum of $20,000,000 product liability insurance coverage on delivered vests.

## 24. WARRANTY

Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels *against defects in materials and workmanship.*

The alteration of ballistic panels in any way shall render the warranty void.

## 25. REMOVABLE COVERS

Removable machine washable covers shall be fully warranted for twelve (12) months after the date of purchase against any defects in the material and/or workmanship.

## 26. PACKAGING

All soft body armor shall be packaged and shipped consistent with good commercial practices.

-8-

AZE 00154928
AHI068-8256

Plastic Bags: Each set of armor, along with its optional equipment, shall be placed in an individual plastic bag.

Shipping Cartons: The soft body armor shall be packed into suitable corrugated cardboard box. The box shall allow for normal shipping without damage to the soft body armor.

## 27. FINANCIAL DATA

All vendors are required to provide a certified financial statement, for 1999, which represents the manufacturer(s) of which they are bidding. Failure to provide a certified financial statement shall be cause for rejection.

## 28. DOCUMENTATION

The following documents, certifications, test-reports and samples must be included with the vendor's bid. Where one manufacturer is bidding through multiple vendors, the manufacturer may submit the appropriate paperwork on behalf of all vendors. Failure to submit the following shall be cause for rejection:

1. Models made by manufacturers other than American Body Armor must be clearly identified and shall include the following:
    a. Full product description.
    b. Complete bid sample, male and female.
    c. Drawings and/or photographs.
    d. Technical specifications.

2. Manufacturers bidding direct must include a service proposal as to how measuring, alterations and customer service will be maintained without local distribution.

3. NIJ 0101.04 Certification and test reports from an accredited laboratory for the vest being certified.

4. V50 test reports performed in accordance with MIL-STD-662F. V50 testing must be accomplished with clay backing.

    a. Test reports must be submitted for the entire ballistic package.

    b. Test reports must be submitted for incoming materials which are utilized in the ballistic package.

5. Chemical test reports certifying use of Akwadyne® fabric treatment.

6. The ability to trace serial numbers.

7. The layer count of the vest must be uniform throughout the entire ballistic package. If not, test reports must be submitted for the vest utilizing the least amount of layers.

8. Quality Control Procedures.

    a. Incoming materials
    b. Lay-up configuration
    c. In-process configuration
    d. Testing verification
    e. Inspection of ballistic panel stitching

-9-

AZE 00154929
AHI068-8257

      f.   Random final product inspection and continuous in-process surveillance

      g.   Quality Assurance training and indoctrination

9.     Product Liability Insurance providing a minimum coverage of $20,000,000.

10.    Documentation stating a 5-year ballistic package warranty.

11.    Documentation stating a 12-month cover warranty.

12.    Certified financial statement for 1999.

13.    ISO-9001 Certificate.

Revised: December 5, 2000

Printed: December 4, 2000

-10-

AZE 00154930
AHI068-8258

## Technical Specifications



**NIJ 0101.04**
## Level II
### Concealable Armor

| | |
|---|---|
| **Model** | XTZX2-2 |
| **Ballistic Material** | Z Shield™/QuadraLink™ Zylon®/Dyneema SB-31 |
| **NIJ Level** | II |
| **Weight** | 8.3 Oz. / .52 lbs. Sq. Ft. [2.54 kg/m2] |
| **Thinness** | .11 inches [2.8 mm] |
| **V50 9mm** | 1578 fps [480 m/s] |
| **Relative Performance Index – 9mm** | 3031 |
| **Certification BFS Avg. - 9mm** | 28 mm |
| **Certification BFS Avg. - 357 mag.** | 39 mm |

-11-

AZE 00154931
AHI068-8259

<center>SPECIFICATIONS</center>

<center>### For Purchase of Soft Body Armor</center>



<center>NIJ 0101.04</center>

<center>## Level IIIA</center>

## 1. SCOPE

This product specification details the style and quality of concealable soft body armor vests intended for use by male or female members of this agency. The vests shall be worn comfortably while being concealed under a shirt. All vests shall provide protection against labeled projectile penetration while reducing resultant blunt trauma and vest distortion to acceptable levels. The successful vendor shall be required to supply the individual vests with applicable options and colors as ordered for male or female personnel.

The concealable body armor shall be the American Body Armor Xtreme™ ZX Series Model 3AXTZX for NIJ 0101.04 Threat Level IIIAIA. Bids based on body armor models made by manufacturers other than American Body Armor must be clearly identified as such, and bidders must include full product description, a complete bid sample, male and female, drawings and/or photographs, technical specifications.

Where the apparent low bidder has proposed an alternate product, that bidder shall demonstrate product equivalency to the satisfaction of the department. Evidence of equivalency shall be presented for each requirement of this specification, and the burden of such equivalency in entirely on the vendor. Any bidder may be required, at any time during the procurement process, to provide documentation proving compliance with any or all the terms of this specification.

Only body armor models which have been tested by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC), and found to comply with the requirements of NIJ Standard 0101.04, <u>Ballistic Resistance of Police Body Armor</u>, April 1987, for Type IIIA armor shall be submitted under this specification, **no exceptions.**

Bids with multiple models, as alternates will be rejected.

## 2. SILENCE OF SPECIFICATIONS

Commercially accepted practices shall apply to any detail not covered in this specification and to any omission of this specification. Any omission or question of interpretation of the specification, which affects the ballistic performance, or integrity of the soft body armor being offered shall be addressed in writing and submitted with the bid.

## 3. PROTEST

<center>-1-</center>

Any protest based on the selection and performance criteria of this specification will be disregarded.

## 4.  APPLICABLE DOCUMENTS

The following list of standards and specifications in effect on the date of this solicitation shall form a part of this specification.

1.  National Institute of Justice, Standard NIJ-STD-0101.04, <u>Ballistic Resistance of Police Body Armor</u>

2.  MIL-STD-662, <u>V50 Ballistic Test For Armor</u>

.3.  Federal Standard No. 751, <u>Stitches, Seams & Stitching</u>

4.  ISO 9001 Quality Assurance Certification

5.  ANSI/ASQC - Q9000 Quality Standard, dated August 1, 1994

Requirements of this specification shall take precedence over the above referenced standards and specifications.

## 5.  PURCHASE REQUIREMENTS

The successful bidder must be a recognized wholesaler/retailer, which maintains a convenient location for measurement, fitting and service during regular business hours Monday through Friday. Any manufacturers, which bid direct, must include a service proposal as to how measuring, re-works, and customer service will be maintained without local distribution.  Direct bids from manufacturers, which do not contain a detailed service proposal, will be rejected.

## 6.  SPECIFIC QUANTITY

The agency has the right to determine quantity, if not otherwise specified in the procurement document. Of the total quantity purchased, both male and female products will be represented. The department retains the right to adjust the total quantities, while maintaining the accepted bid price, without notification to vendor. The term of the contract, including extensions, and/or escalation clauses, shall be stated in the bid document.

## 7.  DESIGN REQUIREMENTS

The Intended use of the soft body armor detailed herein is intended to be standard issue armor.  It is intended for routine daily wear as an undergarment.

The soft body armor shall be designed to provide:

1.  Light and thin NIJ 0101.04 certified armor in Level IIIA.

2.  A high degree of concealment and comfort.

3.  Minimum restriction of motion or mobility.

4.  Optional carriers to allow for laundering and color changes.

5.  Provide protection against the labeled projectiles in accordance with the NIJ Standard 0101.04.

-2-

AZE 00154933
AHI068-8261

## 8.  GENERAL DESIGN

The ballistic panels of soft body armor meeting this specification shall provide thin, flexible, lightweight protection. The ballistic panels shall be constructed of a matrix of Z Shield ™ High Performance shield materials, QuadraLink™ woven Zylon®, Gold Flex™ and Dyneema SB-31 UD.  The soft body armor shall be designed for regular daily wear as an undergarment.  Therefore, vests shall be designed and constructed to provide (1) light and thin NIJ 0101.04 certified armor in Level IIIA, (2) durability, (3) ease of cleaning, (4) minimum restriction of motion or mobility, and (5) the greatest amount of ballistic coverage consistent with comfort and concealment.

The general configuration shall be the slipover vest type that covers the majority of the upper torso, including side coverage.  Four elastic straps with hook and pile fasteners shall provide proper positioning and comfort.  The entire vest perimeter shall be curved.  No sharp corners or straight edges shall be allowed.

The front ballistic panel shall cover the chest approximately up to the collar bone, have a scooped neck sufficient to maintain concealability when wearing an open collar shirt, extend downward to the waist but not far enough to "push up into the throat" when the wearer is seated, and extend around the sides to provide side protection.  The biceps/chest region shall be cut with sufficient space to minimize irritation and restriction of arm movement during common duties such as the operation of motor vehicles.

The rear ballistic panel shall cover the back of the torso from just above the shoulder blades down to a position above the waist belt.

The sides of the torso shall be covered by having side coverage from both the front and rear panels, as the department has determined that such a configuration maximizes both coverage and comfort. Accordingly, armor which maintains side coverage from only the front or rear panels shall be rejected. In addition, unless otherwise stated, the maximum gap at each side shall be two inches.

Panels shall be equipped with shoulder-strap suspension system, which prevents ballistic panels from sagging, ensuring full protection.

Each piece of soft body armor shall include the following:

1.   One (1) set of ballistic panels (1 front, 1 rear).
2.   Two (2) complete Xtreme 2001 Akwadyne® Comfort Mesh washable carrier.
3.   One (1) trauma reduction insert.

## 9.  OPTIONS

1.   Cool Max® Tee Shirt.
2.   Replaceable adjustable straps.
3.   Additional Xtreme 2001 Akwadyne® Comfort Mesh removable outer carrier.
4.   Quilted outer carrier.
5.   Tactical outer carrier.

-3-

AZE 00154934
AHI068-8262

## 10. BALLISTIC PANEL MATERIALS

All materials shall be new, unused and without flaws that affect appearance, durability and function.

The ballistic panels shall be constructed of a matrix of Z Shield ™ High Performance shield materials, QuadraLink™ woven Zylon®, Gold Flex™ and Dyneema SB-31 UD.

As the department has selected these materials, any bids, which represent products manufactured from other materials, shall be rejected. Accordingly, all bidders shall include a letter from the manufacturer stating that the products being submitted for consideration are manufactured from 100% first quality Z Shield ™ QuadraLink™ woven Zylon®, Gold Flex™ and Dyneema SB-31 UD.

## 11. PANEL CONSTRUCTION

The ballistic panels shall be constructed of a matrix of Z Shield ™ High Performance shield materials, QuadraLink™ woven Zylon®, Gold Flex™ and Dyneema SB-31 UD. There shall be no stitching through the ballistic panel other than tacks at the panel edge.

All vests, which are submitted, shall represent armor, which in layer count is uniform throughout the ballistic panel. Accordingly, any ballistic panel, which is not uniform, in layer count, throughout the entire ballistic package, shall be rejected. If the manufacturer contends that such feathering of the armor is advantageous, than the armor shall be tested utilizing the least number of layers which exist in any part of the ballistic package. Failure to submit such testing shall be cause for rejection.

Each layer of ballistic material, in order to retain flexibility, shall not be laminated to any other layer of ballistic material. Accordingly, any armor, which contains such lamination, shall be rejected.

It is the intent of the agency to procure the lightest weight, best performing personal armor available in relation to areal density, therefore, a vest section of 12" x 12" (one square foot) [30.5cm x 30.5cm], must not exceed 10.9 oz. (.68 lbs.) per square foot [3.32 kg/m2] for NIJ level IIIA.

## 12. BALLISTIC PANEL PERFORMANCE

### V50 Performance

Each bidder shall submit V50 test reports for the vest being offered. The V50 test shall be performed in accordance with MIL-STD-662F using NIJ Standard 0101.04 9mm 124 grain FMJ test projectiles. The test must be performed by an independent laboratory approved by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC) for testing in accordance with NIJ Standard 0101.04. The V 50 test shall be against clay backing. V 50 reports, which represent testing without clay backing, shall be rejected. Vendor shall provide written certification that all V 50 testing is accomplished with clay backing; failure to provide certification shall be cause for rejection.

Test reports submitted by the bidder shall reflect the following minimum test results for an 10.9 oz. (.68 lbs.) per square foot [3.32 kg/m2] test sample.

-4-

AZE 00154935
AHI068-8263

| | |
|---|---|
| Bullet | <u>9mm V50</u> |
| | 1710 fps [521 m/s] |

Bid submissions, which do not include required V50 reports, shall be rejected.

## Relative Performance Index (RPI)

It has been determined that the **_relative strength to weight ratio_** of a ballistic design is important in determining its **_comfort/performance characteristics_**. _The strength to weight ratio is calculated by dividing the areal weight (lbs. per square foot) into the performance V50 value._ A high **_strength to weight ratio_** or **Relative Performance Index (RPI)** indicates a high degree of comfort & performance. Therefore, the minimum RPI shall be no lower than:

| | |
|---|---|
| _Bullet_ | <u>9mm.</u> |
| _RPI_ | 2514 |

## Trauma Performance (BFS)

Blunt trauma reduction is an important aspect of armor design. Low back face signature (BFS) should result in reduced blunt trauma injury. Therefore, the back face signature (BFS) results of the **_NIJ 1010.04 certification test reports_** shall reflect BFS no higher than:

| Bullet | <u>9mm</u> | <u>44 Mag.</u> |
|---|---|---|
| Average | 30.3 mm | 41.8 mm |

Bid submissions, which do not meet this requirement, will be rejected.

## 13. LABELING

Label material shall withstand normal wear and cleaning and remain readable during the entire warranted life of the armor or carrier.

All soft body armor shall be labeled in strict adherence to the labeling requirement set forth in NIJ Standard 0101.04. The ballistic panel labeling shall include, but not be limited to the following:

1. Name of Manufacture
2. Level of Protection
3. NIJ-STD-0101.04
4. Date of Fabrication
5. Size
6. Serial Number
7. Model of Vest
8. Care Instructions
9. Lot Number

## 14. BALLISTIC PANEL COVER MATERIAL

Each ballistic panel shall be covered in 100% anti microbial Olefin treated for water repellency. Construction 70

-5-

AZE 00154936
AHI068-8264

denier and sized 110" X 85" [279cm x 215cm]. Inner cover material must be stain-resistant, odor and mildew resistant. Material shall have no visible fabric or color flaws.


## 15. VEST OUTER CARRIER MATERIAL

**Removable Carrier- Xtreme 2001 Akwadyne® Comfort Mesh**

The outer machine washable carrier shall be removable from the ballistic panels for laundering by way of zippers integrated into the outside of the garment. All closure attachments shall be Ultra Mate® Velcro®. The carrier shall consist of Akwadyne® Comfort Mesh on the body side. The Comfort Mesh shall be 28 gauge, 100-denier warp knit. The percent of moisture regain must be less than 1% into fiber and must have high moisture transport properties. Fabric must be capable of releasing moisture without absorption, allowing for higher evaporative cooling and faster drying to take place, resulting in a less clammy feel to wearer. The body side cover material must not weigh over .52 oz. per sq. ft [.15 kg/m2]. All fabrics shall have no visible fabric or color flaws.


## 16. SPECTRA SHIELD TRAUMA INSERT

A trauma reduction insert constructed of fifteen (15) layers of Spectra Shield™ bullet resistant material cut five inch by eight inch (5" x 8") [12.7 x 20.3cm] shall be provided. The Spectra Shield™shall be placed in a nylon cover, which shall be tucked in to one end of the Spectra Shield™ and sewn shut through the Spectra Shield™ to hold it in place.


## 17. QUALITY CONTROL

The manufacturer must maintain a quality program certified under the *ISO 9001* certification program by an accredited registrar under the accreditation of the Registrar Accreditation Board (US) and the Raad voor de Certificatie (Dutch). The scope of the certification must include the Design and Manufacturing of technologically advanced personal safety equipment including concealable and tactical bullet resistant vests, custom body armor, composite armor, explosive ordinance protection, ballistic face and head protection, ballistic shields and other police and military apparel, and narcotic identification systems.

The documented quality control system must be designed to insure the integrity and quality of the manufactured products. The quality control system shall control all manufacturing process and incoming raw materials. *The manufacturer must have an in-house ballistic laboratory capable of performing ballistic testing of incoming raw materials and in-process samples.* The manufacturer must have the capability of performing testing in accordance with MIL-STD-662 and NIJ Standard 0101.04. Procedures for lot testing of incoming raw materials and in-process samples must be incorporated into the quality control system. All incoming ballistic material shall undergo V50 ballistic lot tests in accordance with MIL-STD-662. Every vest panel manufactured shall be inspected for material defects and proper ply counts. Every vest panel manufactured shall be subsequently inspected for proper ballistic panel stitching. Covers and accessories shall be re inspected during manufacturing for defects at selected points during manufacturing to assure the absence of hidden defects in the final item.

In addition, each vest shall receive a final inspection prior to shipment. This inspection shall include a review of the quality control check sheet and confirm the product against the customer's order.

-6-

AZE 00154937
AHI068-8265

A copy of the Certificate of Accreditation, as well as the manufacturers quality control program must be submitted with bid documents.

## 18. SERIAL NUMBERS

Each unit of soft body armor delivered shall have an individual serial number. Each serialized soft body armor shall be traceable to its original ballistic material lot number and ballistic material mill roll number. Additionally the soft body armor serial number shall be traceable to an incoming material lot test and ballistic panel lay-up lot test. The vendor must have the ability to trace serial numbers.

## 19. LOT TESTING

All incoming ballistic material shall undergo V50 ballistic lot test in accordance with MIL-STD-662F except that the test will be conducted on clay backing which meets the requirements of NIJ Standard 0101.04 for backing material.

## 20. MEASUREMENT AND FITTING

### Custom Measuring

Unless otherwise stated, individual measurements will be taken of each user. Each delivered vest shall fit in accordance with the following guidelines:

1. The side edges of the front and back ballistic panels shall be fit for within a two-inch (2") [5cm] gap between panels during the initial custom fitting.

2. The bottom edge of the front ballistic panel shall be within inch (1") [2.5cm] of the highest waist belt (usually the duty belt) measurement when the wearer is in a relaxed seated position.

3. The bottom edge of the back panel shall be within one-inch (1") [2.5cm] of the highest waist belt (usually the duty belt) measurement when the wearer is in the standing position.

It is the department's intention to purchase armor, which contains maximum ballistic coverage. Accordingly, the minimum acceptable square inches for the front and back panel of each vest, per size, is as follows:

Small (34/36)      -      310.49 square inches [.20 m2]

Medium (38/40)    -      370.44 square inches [.24 m2]

Large (42/44)        -      434.64 square inches [.28 m2]

X-Large (46/48)    -      503.38 square inches [.33 m2]

XX-Large (50/54)  -      560.49 square inches [.36 m2]

Female sizes are determined based on individual measurements, including bust size.

-7-

AZE 00154938
AHI068-8266

## 21. FIT AND ALTERATION POLICY

The manufacturer shall perform all required alterations of more than one inch within 30 days after original shipment of the product at no charge. Adjustments of an inch or less than an inch can be accomplished by utilizing the adjustable strap feature on the vest.

## 22. PRE-AWARD AND RETEST POLICY

Bid submissions that appear to conform to these specifications will be considered as prospective vendors. However, the purchaser reserves the right to perform laboratory testing on any and all armor submitted to verify strict compliance with these specifications. The purchaser may perform V50 Ballistic Limit Testing in strict accordance with MIL-STD-662F. An American Body Armor representative shall witness all testing.

American Body Armor & Equipment, Inc. (ABA) encourages valid body armor testing for the purpose of acceptance testing, confirmation of required performance, and used body armor evaluations. For these purposes, ABA *will only recognize properly performed V50 Ballistic Limit Testing* in strict accordance with MIL-STD-662F. Testing shall be performed at an NIJ approved ballistic test laboratory. The test projectiles shall be 9mm 124 grain FMJ as those used in the NIJ Standard 0101.04.

The Probable Ballistic Limit (V50) test shall be conducted on a complete vest. The V50 shall be calculated on ten fair hits, with five shots on the front panel and five shots on the back panel. If required, up to 12 shots, 6 in each panel may be used to obtain the V50 value. If the range of mixed results exceeds 125 feet per second [38 meters per second] or if the V50 cannot be determined in 12 shots, the test will be considered invalid. Shot placement shall be in accordance with MIL-STD-662F except that no shot may be within three (3) inches [7.6cm] of any edge nor two (2) inches [5cm] from any other ballistic impact. Panels shall be shot against clay armor backing material, which has been conditioned in accordance with NIJ Standard 0101.04.

Prior to each shot, the panel will be placed flat against the clay backing material. The sample size shall be no smaller than size 46/48 or equal for male vest and size 42/44 or equal for female vest. Vest samples used in testing must be wearable and in suitable condition, free from abuse.

For each particular level, the V50 Ballistic Limits shall be no lower than the allowable highest 9mm NIJ test velocity. In addition, there shall be no complete penetration lower than the highest 9mm NIJ test velocity.

## 23. PRODUCT LIABILITY INSURANCE

Vest manufacturer shall agree to provide a minimum of $20,000,000 product liability insurance coverage on delivered vests.

## 24. WARRANTY

Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels *against defects in materials and workmanship.*

The alteration of ballistic panels in any way shall render the warranty void.

-8-

## 25. REMOVABLE COVERS

Removable machine washable covers shall be fully warranted for twelve (12) months after the date of purchase against any defects in the material and/or workmanship.

## 26. PACKAGING

All soft body armor shall be packaged and shipped consistent with good commercial practices.

Plastic Bags: Each set of armor, along with its optional equipment, shall be placed in an individual plastic bag.

Shipping Cartons: The soft body armor shall be packed into suitable corrugated cardboard box. The box shall allow for normal shipping without damage to the soft body armor.

## 27. FINANCIAL DATA

All vendors are required to provide a certified financial statement, for 1999, which represents the manufacturer(s) of which they are bidding. Failure to provide a certified financial statement shall be cause for rejection.

## 28. DOCUMENTATION

The following documents, certifications, test-reports and samples must be included with the vendor's bid. Where one manufacturer is bidding through multiple vendors, the manufacturer may submit the appropriate paperwork on behalf of all vendors. Failure to submit the following shall be cause for rejection:

1. Models made by manufacturers other than American Body Armor must be clearly identified and shall include the following:
   a. Full product description.
   b. Complete bid sample, male and female.
   c. Drawings and/or photographs.
   d. Technical specifications.

2. Manufacturers bidding direct must include a service proposal as to how measuring, alterations and customer service will be maintained without local distribution.

3. NIJ 0101.04 Certification and test reports from an accredited laboratory for the vest being certified.

4. V50 test reports performed in accordance with MIL-STD-662F. V50 testing must be accomplished with clay backing.

   a. Test reports must be submitted for the entire ballistic package.

   b. Test reports must be submitted for incoming materials, which are utilized in the ballistic package.

5. Chemical test reports certifying use of Akwadyne® fabric treatment.

6. The ability to trace serial numbers.

-9-

AZE 00154940
AHI068-8268

7. The layer count of the vest must be uniform throughout the entire ballistic package. If not, test reports must be submitted for the vest utilizing the least amount of layers.

8. Quality Control Procedures.

   a. Incoming materials
   b. Lay-up configuration
   c. In-process configuration
   d. Testing verification
   e. Inspection of ballistic panel stitching
   f. Random final product inspection and continuous in-process surveillance
   g. Quality Assurance training and indoctrination

9. Product Liability Insurance providing a minimum coverage of $20,000,000.

10. Documentation stating a 5-year ballistic package warranty.

11. Documentation stating a 12-month cover warranty.

12. Certified financial statement for 1999.

13. ISO-9001 Certificate.

Revised: January 5, 2001

Printed: January 5, 2001

-10-

AZE 00154941
AHI068-8269

## Technical Specifications



**NIJ 0101.04**
## Level IIIA
**Concealable Armor**

| | |
|---|---|
| **Model** | 3AXTZX |
| **Ballistic Material** | Z Shield™/QuadraLink™ Zylon®/ Gold Flex™/Dyneema SB-31 |
| **NIJ Level** | IIIA |
| **Weight** | 10.9  oz. / .68 lbs. Sq. Ft. [3.32 kg/m2] |
| **Thinness** | .121 inches [3 mm] |
| **V50 9mm** | 1710 fps [521 m/s] |
| **Relative Performance Index – 9mm** | 2514 |
| **Certification BFS Avg. - 9mm** | 30.3 mm |
| **Certification BFS Avg. - 44 mag.** | 41.8 mm |

-11-

AZE 00154942
AHI068-8270

**From:**     Roger Cox
**Sent:**     Thursday, August 5, 2004 2:53 PM
**To:**     'JCantrell@co.washington.ar.us'
**Cc:**     Craig Clark <cclark@armor holdings, inc..com>
**Subject:**     FW: Vest specs
**Attach:**     Washington Co Specs.doc

Sorry for the delay Captain. Here are the specs.

Thanks,
Roger Cox

-----Original Message-----
From: Craig Clark
Sent: Wednesday, August 04, 2004 8:54 AM
To: Roger Cox
Subject: RE: Vest specs

I finally got back on mine about 45minutes ago! I will tell him.

-----Original Message-----
From: Roger Cox
Sent: Wednesday, August 04, 2004 7:53 AM
To: Craig Clark
Subject: Re: Vest specs

As soon as I get my email working again. Tell him that they are working on it now.
-------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Craig Clark <cclark@armorholdings.com>
To: Roger Cox <RCox@armorholdings.com>
Sent: Wed Aug 04 08:24:44 2004
Subject: FW: Vest specs

Roger, can you send him the XtremeX specs?

From: Jay Cantrell [mailto:JCantrell@co.washington.ar.us]
Sent: Tuesday, August 03, 2004 2:49 PM
To: Craig Clark
Subject: Vest specs

Craig,

I have not received the specs with just the Xtreme level II.

Thanks

Jay Cantrell

AZE 00205186

# Washington County Sheriffs Office

### SPECIFICATIONS

### For Purchase of Soft Body Armor

### NIJ 0101.04
## Level 2

## 1.  SCOPE

This product specification details the style and quality of concealable soft body armor vests intended for use by male or female members of this agency.  The vests shall be worn comfortably while being concealed under a shirt.  All vests shall provide protection against labeled projectile penetration while reducing resultant blunt trauma and vest distortion to acceptable levels.  The successful vendor shall be required to supply the individual vests with applicable options and colors as ordered for male or female personnel.

The concealable body armor shall be the American Body Armor Xtreme™ X Series for NIJ 0101.04 Threat Level 2.  Bids based on body armor models made by manufacturers other than American Body Armor must be clearly identified as such; those bidders must include: a male and female sample, full product descriptions, drawings and/or photos, technical specifications, as well as a list of at least ten (10) law enforcement agencies currently using that model armor for reference with their bid.  **Bidders failing to submit this supporting documentation will be rejected from the bid.**

Where the apparent low bidder has proposed an alternate product, that bidder shall demonstrate product equivalency to the satisfaction of the department.  Evidence of equivalency shall be presented for each requirement of this specification, and the burden of such equivalency in entirely on the vendor. Any bidder may be required, at any time during the procurement process, to provide documentation proving compliance with any or all the terms of this specification.

## 2.  APPLICABLE DOCUMENTS

The following list of standards and specifications in effect on the date of this solicitation shall form a part of this specification.

1.  National Institute of Justice, Standard NIJ-STD-0101.04, <u>Ballistic Resistance of Police Body Armor</u>

2.  MIL-STD-662, <u>V50 Ballistic Test For Armor</u>

3.  Federal Standard No. 751, <u>Stitches, Seams & Stitching</u>

4.  ISO 9001 Quality Assurance Certification

5.  ANSI/ASQC - Q9000 Quality Standard, dated August 1, 1994

6.  Additional test reports of "Special Threat Testing" from a Certified NIJ Laboratory are required

-1-

AZE 00205187

### 3. PURCHASE REQUIREMENTS

The successful bidder must be a recognized wholesaler/retailer, which maintains a convenient location for measurement, fitting and service during regular business hours Monday through Friday. Any manufacturers, which bid direct, must include a service proposal as to how measuring, re-works, and customer service will be maintained without local distribution. Direct bids from manufacturers which do not contain a detailed service proposal will be rejected.

### 4. DESIGN REQUIREMENTS

The Intended use of the soft body armor detailed herein is intended to be standard issue armor. It is intended for routine daily wear as an undergarment.

The soft body armor shall be designed to provide:

1.  Light and thin NIJ 0101.04 certified armor in Level 2

2.  A high degree of concealment and comfort.

3.  Minimum restriction of motion or mobility.

4.  Optional carriers to allow for laundering and color changes.

5.  Provide protection against the labeled projectiles in accordance with the NIJ Standard 0101.04.

### 5. GENERAL DESIGN

The ballistic panels of soft body armor meeting this specification shall provide thin, flexible, lightweight comfort utilizing a matrix of two or more of the following: ZShield™, woven microlaminate Zylon®, Gold Flex™, and unidirectional Polyethylene. There shall be no stitching completely through the entire ballistic panel (s), with exception to tacks at the panels' edges, **no exceptions**. The soft body armor shall be designed for regular daily wear as an undergarment. Therefore, vests shall be designed and constructed to provide (1) light and thin NIJ 0101.04 certified armor in Level 2 (2) durability, (3) ease of cleaning, (4) minimum restriction of motion or mobility, and (5) the greatest amount of ballistic coverage consistent with comfort and concealment.

The general configuration shall be the slipover vest type that covers the majority of the upper torso, including side coverage. Availability for four or six elastic straps with hook and pile fasteners shall provide proper positioning and comfort. The entire vest perimeter shall be curved. No sharp corners or straight edges shall be allowed.

The front ballistic panel shall cover the chest approximately up to the collar bone, have a scooped neck sufficient to maintain concealability when wearing an open collar shirt, extend downward to the waist but not far enough to "push up into the throat" when the wearer is seated, and extend around the sides to provide side protection. The biceps/chest region shall be cut with sufficient space to minimize irritation and restriction of arm movement during common duties such as the operation of motor vehicles.

The rear ballistic panel shall cover the back of the torso from just above the shoulder blades down to a position above the waist belt. The sides of the torso shall be covered by having side coverage from both the front and rear panels, as the department have determined that such a configuration maximizes both coverage and comfort.

AZE 00205188

Accordingly, armor which maintains side coverage from only the front or rear panels shall be rejected.

Panels and carriers shall be equipped with an internal suspension system, which prevents ballistic panels from sagging, ensuring full protection.

Each piece of soft body armor shall include the following:

1. One (1) set of ballistic panels (1 front, 1 rear).
2. One (1) complete Akwadyne® Comfort Mesh washable carrier.
3. One (1) trauma reduction insert.

## 6. OPTIONS

1. Additional Akwadyne® Comfort Mesh removable outer carrier.

## 7. BALLISTIC PANEL MATERIALS

All materials shall be new, unused and without flaws that affect appearance, durability and function. The ballistic panels shall be constructed of a matrix of two or more of the following: ZShield™, woven microlaminate Zylon®, Gold Flex™, and unidirectional Polyethylene. As the department has selected these materials, any bids, which represent products manufactured from other materials, **shall be rejected.**

## 8. PANEL CONSTRUCTION

The ballistic panels shall be constructed of a matrix of two or more of the following: ZShield™, woven microlaminate Zylon®, Gold Flex™, and unidirectional Polyethylene. There shall be no stitching completely through the entire ballistic panel (s), with exception to tacks at the panels' edges, **no exceptions**.

All vests, which are submitted, shall represent armor, which in layer count, is uniform throughout the ballistic panel. Accordingly, any ballistic panel, which is not uniform, in layer count, throughout the entire ballistic package, shall be rejected. If the manufacturer contends that such feathering of the armor is advantageous, than the armor shall be tested utilizing the least number of layers, which exist in any part of the ballistic package. Failure to submit such testing shall be cause for rejection.

It is the intent of the agency to procure the lightest weight, best performing personal armor available in relation to areal density, therefore, a vest section of 12" x 12" (one square foot) [30.5cm x 30.5cm], must not exceed the following:

| Threat Level | Maximum Weight | Maximum Thickness |
|:---:|:---:|:---:|
| 2 [XTX2-2] | 9.0 oz / .56 lbs.sq.ft | .14 inches |

AZE 00205189

## 9. BALLISTIC PANEL PERFORMANCE

### V50 Performance

Each bidder shall submit V50 test reports for the vest being offered.  The V50 test shall be performed in accordance with MIL-STD-662F using NIJ Standard 0101.04 9mm 124 grain FMJ test projectiles.  The test must be performed by an independent laboratory approved by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC) for testing in accordance with NIJ Standard 0101.04.  The V 50 test shall be against clay backing. V 50 reports which represent testing without clay backing shall be rejected.  Vendor shall provide written certification that all V 50 testing is accomplished with clay backing; failure to provide certification shall be cause for rejection.

Test reports submitted by the bidder shall reflect the following <u>minimum test results</u>:

| Threat Level | Bullet Description | V50 Velocity [Minimum] |
|---|---|---|
| 2 [XTX2-2] | 9mm, 124-grain FMJRN | 1549 fps |

Bid submissions not including NIJ required baseline V50 reported **shall be rejected**.  In addition to the NIJ 0101.04 required 9mm / V50 test report, each bidder other than American Body Armor must provide NIJ Base Line Test Reports on the following minimum test results:

| Threat Level | Bullet Description | V50 Velocity [Minimum] |
|---|---|---|
| 2 [XTX2-2] | 357 mag. 158-grain FMJRN | 1516 fps |

### Relative Performance Index (RPI)

It has been determined that the *relative strength to weight ratio* of a ballistic design is important in determining its *comfort/performance characteristics. The strength to weight ratio is calculated by dividing the areal weight (lbs. per square foot) into the performance V50 value. A high strength to weight ratio* or **Relative Performance Index (RPI)** indicates a high degree of comfort & performance. Therefore, the minimum RPI shall be no lower than:

| Threat Level | Bullet Description | Relative Performance Index [RPI Minimum] |
|---|---|---|
| 2 [XTX2-2] | 9mm, 124-grain FMJRN | 2766 fps |
| 2 [XTX2-2] | 357 mag. 158-grain FMJRN | 2707 fps |

### Trauma Performance  (BFS)

Blunt trauma reduction is an important aspect of armor design. Low back face signature (BFS) should result in reduced blunt trauma injury.  Therefore, the back face signature (BFS) results of the *NIJ 1010.04 certification test reports* shall reflect BFS no higher than:

| Threat Level | Bullet Description | Back Face Signature [BFS Maximum] |
|---|---|---|

AZE 00205190

| 2 [XTX2-2] | 9mm, 124-grain FMJRN | 31 mm |
| 2 [XTX2-2] | 357 Mag. 158-grain FMJRN | 37 mm |

Bid submissions which do not meet this requirement **will be rejected**.

## 10. LABELING

Label material shall withstand normal wear and cleaning and remain readable during the entire warranted life of the armor or carrier.

All soft body armor shall be labeled in strict adherence to the labeling requirement set forth in NIJ Standard 0101.04. The ballistic panel labeling shall include, but not be limited to the following:

1. Name of Manufacture
2. Level of Protection
3. NIJ-STD-0101.04
4. Date of Fabrication
5. Size
6. Serial Number
7. Model of Vest
8. Care Instructions
9. Lot Number

## 11. BALLISTIC PANEL COVER MATERIAL

Each ballistic panel shall be covered in 100% anti microbial Olefin treated for water repellency. Construction 70 denier and sized 110" X 85" [279cm x 215cm]. Inner cover material must be stain-resistant, odor and mildew resistant. Material shall have no visible fabric or color flaws.

## 12. VEST OUTER CARRIER MATERIAL

**Removable Carrier- Akwadyne® Comfort Mesh**

The outer machine washable carrier shall be removable from the ballistic panels for laundering by way of zippers integrated into the outside of the garment. All closure attachments shall be Ultra Mate® Velcro®. The carrier shall consist of Akwadyne® Comfort Mesh on the body side. The Comfort Mesh shall be 28 gauge, 100-denier warp knit. The percent of moisture regain must be less than 1% into fiber and must have high moisture transport properties. Fabric must be capable of releasing moisture without absorption, allowing for higher evaporative cooling and faster drying to take place, resulting in a less clammy feel to wearer. The body side cover material must not weigh over .52 oz. per sq. ft [.15 kg/m2]. All fabrics shall have no visible fabric or color flaws.

## 13. TRAUMA INSERT

A trauma reduction insert constructed of bullet resistant material cut five inch by eight inch (5" x 8") [12.7 x 20.3cm] shall be provided. The trauma reduction insert shall be placed in a nylon cover, which shall be tucked into one end of the ballistic material and sewn shut through to hold it in place.

## 14. SERIAL NUMBERS

Each unit of soft body armor delivered shall have an individual serial number. Each serialized soft body armor shall

AZE 00205191

be traceable to its original ballistic material lot number and ballistic material mill roll number. Additionally the soft body armor serial number shall be traceable to an incoming material lot test and ballistic panel lay-up lot test. The vendor must have the ability to trace serial numbers.

## 15. PRODUCT LIABILITY INSURANCE

Vest manufacturer shall agree to provide a minimum of $20,000,000 product liability insurance coverage on delivered vests.

## 16. WARRANTY

Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels *against defects in materials and workmanship.*

The alteration of ballistic panels in any way shall render the warranty void.

## 17. REMOVABLE COVERS

Removable machine washable covers shall be fully warranted for twelve (12) months after the date of purchase against any defects in the material and/or workmanship.

## 18. FINANCIAL DATA

All vendors are required to provide a certified financial statement, for 2002, which represents the manufacturer(s) of which they are bidding. Failure to provide a certified financial statement shall be cause for rejection.

## 19. DOCUMENTATION

The following documents, certifications, test-reports and samples must be included with the vendor's bid. Where one manufacturer is bidding through multiple vendors, the manufacturer may submit the appropriate paperwork on behalf of all vendors. Failure to submit the following shall be cause for rejection:

1. Models made by manufacturers <u>other than American Body Armor</u> must be clearly identified and shall include the following:
   a. Full product description.
   b. Complete bid sample, male and female.
   c. Drawings and/or photographs.
   d. Technical specifications.

1. Manufacturers bidding direct must include a service proposal as to how measuring, alterations and customer service will be maintained without local distribution.

2. NIJ 0101.04 Certification and test reports from an accredited laboratory for the vest being certified.

   a. <u>Any ballistic rounds tested above and beyond the required NIJ 0101.04 standard for requested threat level, requires a report from a NIJ Certified Laboratory. Any bidder that does not provide such documentation at the time of the bid **will be rejected.**</u>

-6-

AZE 00305193

4.    V50 test reports performed in accordance with MIL-STD-662F.  V50 testing must be accomplished with clay backing.

    a.  Test reports must be submitted for the entire ballistic package.

    b. Test reports must be submitted for incoming materials, which are utilized in the ballistic package.

5.    Chemical test reports certifying use of Akwadyne® fabric treatment.

6.    The ability to trace serial numbers.

7.    The layer count of the vest must be uniform throughout the entire ballistic package.  If not, test reports must be submitted for the vest utilizing the least amount of layers.

8.    Quality Control Procedures.

    a.   Incoming materials
    b.   Lay-up configuration
    c.   In-process configuration
    d.   Testing verification
    e.   Inspection of ballistic panel stitching
    f.   Random final product inspection and continuous in-process surveillance
    g.   Quality Assurance training and indoctrination

9.    Product Liability Insurance providing a minimum coverage of $20,000,000.

10.   Documentation stating a 5-year ballistic package warranty.

11.   Documentation stating a 12-month cover warranty.

12.   Certified financial statement for 2002.

13.   ISO-9001 Certificate.

AZE 00205193

Technical Specifications

# XTREME X

### NIJ 0101.04
## Level 2
### Concealable Armor

| Model | XTX2-2 |
|---|---|
| Ballistic Material | ZShield™, woven microlaminate Zylon®, Gold Flex™, and unidirectional Polyethylene |
| NIJ Level | 2 |
| Weight [lbs. per sq. ft] | .56 |
| Thinness [inches] | .14 |
| V50-9mm [fps] | 1549 |
| V50 [fps] | 1516 [357 mag] |
| RPI-9mm [fps] | 2766 |
| RPI [fps] | 2707 [357 mag] |
| Cert BFS Average-9mm [mm] | 31 |
| Cert BFS Average [mm] | 37 [357 mag.] |
| Abbreviated NIJ Testing of additional Threats | |
| NIJ Level | 2 |
| Threat | Winchester Ranger 9mm/127 grain SXZT HP Speer Gold Dot 357 Sig / 125 Grain GDHP |

AZE 00205194

| From: | Dawn Flynn |
|---|---|
| Sent: | Monday, August 22, 2005 6:39 AM |
| To: | Paul Larkin <plarkin@armor holdings, inc..com>; 'Bob Nicholls' <bob@rnicholls.com> |
| Subject: | RE: ABA body armor |
| Attach: | Xtreme X Level 2A23A.doc;Xtreme ZX Level 23A.doc |

Dawn T. Flynn
National Sales Support Manager
Armor Holdings Products Division
904-485-1809 phone
904-741-4792 fax

---

**From:** Paul Larkin
**Sent:** Monday, August 22, 2005 10:32 AM
**To:** Bob Nicholls; Dawn Flynn
**Subject:** RE: ABA body armor

To all:

Yes we are still manufacturing and selling the Xtreme ZX, however under a 30 month warranty and not a 60 month. My suggestion is that the agency look at the Xtreme X (XTX-2). It is just a slight heavier and thicker, but they will not be able to tell the difference. The big difference is that the Xtreme X-2 has been special threat tested to stop the Winchester 127 grain +P+ and the Speer Gold Dot 357 Sig 125 grain bullet and is warranted for 5 years.

Dawn, can you please forward to Bob the specifications for the Xtreme ZX and the Xtreme X. Thanks

Paul Larkin

---

**From:** Sylvie Breault [mailto:sbreault@rnicholls.com] **On Behalf Of** Bob Nicholls
**Sent:** Friday, August 19, 2005 10:33 AM
**To:** Paul Larkin; Dawn Flynn
**Subject:** FW: ABA body armour
**Importance:** High

Paul / Dawn:

Can you review this e-mail from the RCMP?
Can you confirm availability of the Extreme ZX for RCMP sampling and testing?
Do you still produce this vest with Zylon or another fabric?

Advise. Urgent.

*Bob Nicholls*
President



Les Distributeurs
**R. Nicholls**
Distributors Inc.

2475 de la Province
Longueuil, Quebec  J4G 1G3
Canada
Tel: (450) 442-9215
Fax: (450) 442-9581
Email:  bob@rnicholls.com
Website:  www.rnicholls.com

-----Original Message-----
From: Andrew Wardroper [mailto:Andrew.Wardroper@rcmp-grc.gc.ca]
Sent: Wednesday, July 20, 2005 11:47 AM
To: bob@rnicholls.com
Subject: ABA body armour

Hello, Bob,

I'm trying to order some ABA XtremeZX armour for one of our people here, also a second set for testing purposes.

Our member's dimensions are:

Chest at armpit, =   45 "
Stomach above waist (i.e. largest part of stomach - and let us know how high above the natural waist this is)  =  39 1/2 "
Waist = 40 "
top of belt to notch of neck when sitting down:
- front length =  15 "
- Back length = 14 1/2 "
Height = 6' 3/4"
neck size = 17 "

I was quoted a price of $893 or so, by Bernie O'Brien.  Could you let me know what size our member shoudl get?  Also, is this body armour still available?  We are in an urgent situation here, this testing may result in a fair sized unit being equipped with this body armour, and if it's not available due to Zylon concerns at ABA, then I need to know.

If the ordering info could be sent to me ASAP, that would be much appreciated.  I'm under the gun for this one, was supposed to have had the armour tested over a month ago.

Thanks for giving this your attention.


Andrew Wardroper
Technical Writer
Materiel Design & Specifications Unit
440 Coventry Rd. (Warehouse)
Ottawa, Ont.
K1A 0R2
tel.: (613) 993-3256
fax.: (613) 993-6334
e-mail:  Andrew.Wardroper@rcmp-grc.gc.ca

AZE 00220838

SPECIFICATIONS

## For Purchase of Soft Body Armor

# XTREME X

### NIJ 0101.04
### Level 2A, 2 & 3A

## 1. SCOPE

This product specification details the style and quality of concealable soft body armor vests intended for use by male or female members of this agency. The vests shall be worn comfortably while being concealed under a shirt. All vests shall provide protection against labeled projectile penetration while reducing resultant blunt trauma and vest distortion to acceptable levels. The successful vendor shall be required to supply the individual vests with applicable options and colors as ordered for male or female personnel.

The concealable body armor shall be the American Body Armor Xtreme™ X Series for NIJ 0101.04 Threat Levels 2A, 2 or 3A. Bids based on body armor models made by manufacturers other than American Body Armor must be clearly identified as such; those bidders must include: a male and female sample, full product descriptions, drawings and/or photos, technical specifications, as well as a list of at least ten (10) law enforcement agencies currently using that model armor for reference with their bid. **Bidders failing to submit this supporting documentation will be rejected from the bid.**

Where the apparent low bidder has proposed an alternate product, that bidder shall demonstrate product equivalency to the satisfaction of the department. Evidence of equivalency shall be presented for each requirement of this specification, and the burden of such equivalency in entirely on the vendor. Any bidder may be required, at any time during the procurement process, to provide documentation proving compliance with any or all the terms of this specification.

Only body armor models which have been tested by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC), and found to comply with the requirements of NIJ Standard 0101.04, Ballistic Resistance of Police Body Armor, September 2000, for Type 2A [XTX2A-2], 2 [XTX2-2] or 3A [XTX3A-2] armor shall be submitted under this specification, **no exceptions.**

Bidders other than American Body Armor with multiple models as alternates **will be rejected**. Those bidders other than American Body Armor must provide test results of any and all rounds that exceed NIJ 0101.04 standard. This NIJ abbreviated testing is commonly known as "Special Threat" testing; testing of such rounds must be conducted by an NIJ approved laboratory. Failure to provide such documentation at time of the bid **will be cause for rejection.**

AZE 00220839

## 2.  SILENCE OF SPECIFICATIONS

Commercially accepted practices shall apply to any detail not covered in this specification and to any omission of this specification.  Any omission or question of interpretation of the specification which affects the ballistic performance or integrity of the soft body armor being offered shall be addressed in writing and submitted with the bid.

## 3.  PROTEST

Any protest based on the selection and performance criteria of this specification will be disregarded.

## 4.  APPLICABLE DOCUMENTS

The following list of standards and specifications in effect on the date of this solicitation shall form a part of this specification.

1.  National Institute of Justice, Standard NIJ-STD-0101.04, <u>Ballistic Resistance of Police Body Armor</u>

2.  MIL-STD-662, <u>V50 Ballistic Test For Armor</u>

3.  Federal Standard No. 751, <u>Stitches, Seams & Stitching</u>

4.  ISO 9001 Quality Assurance Certification

5.  ANSI/ASQC - Q9000 Quality Standard, dated August 1, 1994

6.  Additional test reports of "Special Threat Testing" from a Certified NIJ Laboratory are required

## 5.  PURCHASE REQUIREMENTS

The successful bidder must be a recognized wholesaler/retailer, which maintains a convenient location for measurement, fitting and service during regular business hours Monday through Friday. Any manufacturers, which bid direct, must include a service proposal as to how measuring, re-works, and customer service will be maintained without local distribution.  Direct bids from manufacturers which do not contain a detailed service proposal will be rejected.

## 6.  SPECIFIC QUANTITY

The agency has the right to determine quantity, if not otherwise specified in the procurement document. Of the total quantity purchased, both male and female products will be represented. The department retains the right to adjust the total quantities, while maintaining the accepted bid price, without notification to vendor. The term of the contract, including extensions, and/or escalation clauses, shall be stated in the bid document.

## 7.  DESIGN REQUIREMENTS

The Intended use of the soft body armor detailed herein is intended to be standard issue armor.  It is intended for routine daily wear as an undergarment.

AZE 00220840

The soft body armor shall be designed to provide:

1.  Light and thin NIJ 0101.04 certified armor in Level 2A, 2 or 3A

2.  A high degree of concealment and comfort.

3.  Minimum restriction of motion or mobility.

4.  Optional carriers to allow for laundering and color changes.

5.  Provide protection against the labeled projectiles in accordance with the NIJ Standard 0101.04.

## 8. GENERAL DESIGN

The ballistic panels of soft body armor meeting this specification shall provide thin, flexible, lightweight comfort utilizing a matrix of two or more of the following: ZShield™ , woven microlaminate Zylon®, Gold Flex™, and unidirectional Polyethylene. There shall be no stitching completely through the entire ballistic panel (s), with exception to tacks at the panels' edges, **no exceptions**. The soft body armor shall be designed for regular daily wear as an undergarment. Therefore, vests shall be designed and constructed to provide (1) light and thin NIJ 0101.04 certified armor in Level 2A, 2 and 3A, (2) durability, (3) ease of cleaning, (4) minimum restriction of motion or mobility, and (5) the greatest amount of ballistic coverage consistent with comfort and concealment.

The general configuration shall be the slipover vest type that covers the majority of the upper torso, including side coverage. Availability for four or six elastic straps with hook and pile fasteners shall provide proper positioning and comfort. The entire vest perimeter shall be curved. No sharp corners or straight edges shall be allowed.

The front ballistic panel shall cover the chest approximately up to the collar bone, have a scooped neck sufficient to maintain concealability when wearing an open collar shirt, extend downward to the waist but not far enough to "push up into the throat" when the wearer is seated, and extend around the sides to provide side protection. The biceps/chest region shall be cut with sufficient space to minimize irritation and restriction of arm movement during common duties such as the operation of motor vehicles.

The rear ballistic panel shall cover the back of the torso from just above the shoulder blades down to a position above the waist belt. The sides of the torso shall be covered by having side coverage from both the front and rear panels, as the department has determined that such a configuration maximizes both coverage and comfort. Accordingly, armor which maintains side coverage from only the front or rear panels shall be rejected.

Panels and carriers shall be equipped with an internal suspension system, which prevents ballistic panels from sagging, ensuring full protection.

Each piece of soft body armor shall include the following:

1.  One (1) set of ballistic panels (1 front, 1 rear).
2.  One (1) complete Akwadyne® Comfort Mesh washable carrier.
3.  One (1) trauma reduction insert.

AZE 00220841

## 9.  OPTIONS

1. Cool Max® Tee Shirt.
2. Additional Akwadyne® Comfort Mesh removable outer carrier.
3. Quilted outer carrier.
4. Tactical outer carrier.

## 10. BALLISTIC PANEL MATERIALS

All materials shall be new, unused and without flaws that affect appearance, durability and function. The ballistic panels shall be constructed of a matrix of two or more of the following: ZShield™, woven microlaminate Zylon®, Gold Flex™, and unidirectional Polyethylene. As the department has selected these materials, any bids, which represent products manufactured from other materials, **shall be rejected.**

## 11. PANEL CONSTRUCTION

The ballistic panels shall be constructed of a matrix of two or more of the following: ZShield™, woven microlaminate Zylon®, Gold Flex™, and unidirectional Polyethylene. There shall be no stitching completely through the entire ballistic panel (s), with exception to tacks at the panels' edges, **no exceptions**.

All vests, which are submitted, shall represent armor, which in layer count, is uniform throughout the ballistic panel. Accordingly, any ballistic panel, which is not uniform, in layer count, throughout the entire ballistic package, shall be rejected. If the manufacturer contends that such feathering of the armor is advantageous, than the armor shall be tested utilizing the least number of layers, which exist in any part of the ballistic package. Failure to submit such testing shall be cause for rejection.

It is the intent of the agency to procure the lightest weight, best performing personal armor available in relation to areal density, therefore, a vest section of 12" x 12" (one square foot) [30.5cm x 30.5cm], must not exceed the following:

| Threat Level | Maximum Weight | Maximum Thickness |
|---|---|---|
| | | |
| 2A *[XTX2A-2]* | 6.9 oz / .43 lbs.sq.ft | .08 inches |
| 2 *[XTX2-2]* | 9.0 oz / .56 lbs.sq.ft | .14 inches |
| 3A *[XTX3A-2]* | 11.1 oz / .70 lbs.sq.ft | .15 inches |

## 12. BALLISTIC PANEL PERFORMANCE

### V50 Performance

Each bidder shall submit V50 test reports for the vest being offered. The V50 test shall be performed in accordance with MIL-STD-662F using NIJ Standard 0101.04 9mm 124 grain FMJ test projectiles. The test must be performed by an independent laboratory approved by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC) for testing in accordance with NIJ Standard 0101.04. The V 50 test shall be against clay backing. V 50 reports which represent testing without clay backing shall be rejected. Vendor shall provide written certification

-4-

AZE 00220842

that all V 50 testing is accomplished with clay backing; failure to provide certification shall be cause for rejection.

Test reports submitted by the bidder shall reflect the following <u>minimum test results</u>:

| Threat Level | Bullet Description | V50 Velocity [Minimum] |
|---|---|---|
| 2A *[XTX2A-2]* | 9mm, 124-grain FMJRN | 1417 fps |
| 2 *[XTX2-2]* | 9mm, 124-grain FMJRN | 1549 fps |
| 3A *[XTX3A-2]* | 9mm, 124-grain FMJRN | 1594 fps |

Bid submissions not including NIJ required baseline V50 reported **shall be rejected**. In addition to the NIJ 0101.04 required 9mm / V50 test report, each bidder <u>other than American Body Armor</u> must provide <u>NIJ Base Line Test Reports on the following minimum test results</u>:

| Threat Level | Bullet Description | V50 Velocity [Minimum] |
|---|---|---|
| 2A *[XTX2A-2]* | 40 cal. S&W 180-grain FMTJ | 1403 fps |
| 2 *[XTX2-2]* | 357 mag. 158-grain FMJRN | 1516 fps |
| 3A *[XTX3A-2]* | 44 mag. 240-grain JHP | 1638 fps |

## Relative Performance Index (RPI)

It has been determined that the **relative strength to weight ratio** of a ballistic design is important in determining its *comfort/performance characteristics*. *The strength to weight ratio is calculated by dividing the areal weight (lbs. per square foot) into the performance V50 value.* A high **strength to weight ratio** or **Relative Performance Index (RPI)** indicates a high degree of comfort & performance. Therefore, the minimum RPI shall be <u>no lower than</u>:

| Threat Level | Bullet Description | Relative Performance Index [RPI Minimum] |
|---|---|---|
| 2A *[XTX2A-2]* | 9mm, 124-grain FMJRN | 3295 fps |
| 2A *[XTX2A-2]* | 40 cal. S&W 180-grain FMTJ | 3262 fps |
| 2 *[XTX2-2]* | 9mm, 124-grain FMJRN | 2766 fps |
| 2 *[XTX2-2]* | 357 mag. 158-grain FMJRN | 2707 fps |
| 3A *[XTX3A-2]* | 9mm, 124-grain FMJRN | 2277 fps |
| 3A *[XTX3A-2]* | 44 mag. 240-grain JHP | 2340 fps |

## Trauma Performance (BFS)

Blunt trauma reduction is an important aspect of armor design. Low back face signature (BFS) should result in reduced blunt trauma injury. Therefore, the back face signature (BFS) results of the **NIJ 1010.04 certification test reports** shall reflect BFS <u>no higher than</u>:

| Threat Level | Bullet Description | Back Face Signature [BFS Maximum] |
|---|---|---|
| 2A *[XTX2A-2]* | 9mm, 124-grain FMJRN | 33 mm |
| 2A *[XTX2A-2]* | 40 CAL. S&W 180-grain FMTJ | 39 mm |
| 2 *[XTX2-2]* | 9mm, 124-grain FMJRN | 31 mm |

-5-

AZE 00220843

| 2 [XTX2-2] | 357 Mag. 158-grain FMJRN | 37 mm |
| 3A [XTX3A-2] | 9mm, 124-grain FMJRN | 31 mm |
| 3A [XTX3A-2] | 44 Mag. 240-grain JHP | 42 mm |

Bid submissions which do not meet this requirement **will be rejected**.

## 13. LABELING

Label material shall withstand normal wear and cleaning and remain readable during the entire warranted life of the armor or carrier.

All soft body armor shall be labeled in strict adherence to the labeling requirement set forth in NIJ Standard 0101.04. The ballistic panel labeling shall include, but not be limited to the following:

1. Name of Manufacture
2. Level of Protection
3. NIJ-STD-0101.04
4. Date of Fabrication
5. Size
6. Serial Number
7. Model of Vest
8. Care Instructions
9. Lot Number

## 14. BALLISTIC PANEL COVER MATERIAL

Each ballistic panel shall be covered in 100% anti microbial Olefin treated for water repellency. Construction 70 denier and sized 110" X 85" [279cm x 215cm]. Inner cover material must be stain-resistant, odor and mildew resistant. Material shall have no visible fabric or color flaws.

## 15. VEST OUTER CARRIER MATERIAL

**Removable Carrier- Akwadyne® Comfort Mesh**

The outer machine washable carrier shall be removable from the ballistic panels for laundering by way of zippers integrated into the outside of the garment. All closure attachments shall be Ultra Mate® Velcro®. The carrier shall consist of Akwadyne® Comfort Mesh on the body side. The Comfort Mesh shall be 28 gauge, 100-denier warp knit. The percent of moisture regain must be less than 1% into fiber and must have high moisture transport properties. Fabric must be capable of releasing moisture without absorption, allowing for higher evaporative cooling and faster drying to take place, resulting in a less clammy feel to wearer. The body side cover material must not weigh over .52 oz. per sq. ft [.15 kg/m2]. All fabrics shall have no visible fabric or color flaws.

## 16. TRAUMA INSERT

A trauma reduction insert constructed of bullet resistant material cut five inch by eight inch (5" x 8") [12.7 x 20.3cm] shall be provided. The trauma reduction insert shall be placed in a nylon cover, which shall be tucked into one end of the ballistic material and sewn shut through to hold it in place.

## 17. QUALITY CONTROL

-6-

AZE 00220844

The manufacturer must maintain a quality program certified under the *ISO 9001* certification program by an accredited registrar under the accreditation of the Registrar Accreditation Board (US) and the Raad voor de Certificatie (Dutch). The scope of the certification must include the Design and Manufacturing of technologically advanced personal safety equipment including concealable and tactical bullet resistant vests, custom body armor, composite armor, explosive ordinance protection, ballistic face and head protection, ballistic shields and other police and military apparel, and narcotic identification systems.

The documented quality control system must be designed to insure the integrity and quality of the manufactured products. The quality control system shall control all manufacturing process and incoming raw materials. *The manufacturer must have an in-house ballistic laboratory capable of performing ballistic testing of incoming raw materials and in-process samples.* The manufacturer must have the capability of performing testing in accordance with MIL-STD-662 and NIJ Standard 0101.04. Procedures for lot testing of incoming raw materials and in-process samples must be incorporated into the quality control system. All incoming ballistic material shall undergo V50 ballistic lot tests in accordance with MIL-STD-662. Every vest panel manufactured shall be inspected for material defects and proper ply counts. Every vest panel manufactured shall be subsequently inspected for proper ballistic panel stitching. Covers and accessories shall be re inspected during manufacturing for defects at selected points during manufacturing to assure the absence of hidden defects in the final item.

In addition, each vest shall receive a final inspection prior to shipment. This inspection shall include a review of the quality control check sheet and confirm the product against the customer's order.

A copy of the Certificate of Accreditation, as well as the manufacturers quality control program must be submitted with bid documents.

## 18. SERIAL NUMBERS

Each unit of soft body armor delivered shall have an individual serial number. Each serialized soft body armor shall be traceable to its original ballistic material lot number and ballistic material mill roll number. Additionally the soft body armor serial number shall be traceable to an incoming material lot test and ballistic panel lay-up lot test. The vendor must have the ability to trace serial numbers.

## 19. LOT TESTING

All incoming ballistic material shall undergo V50 ballistic lot test in accordance with MIL-STD-662F except that the test will be conducted on clay backing which meets the requirements of NIJ Standard 0101.04 for backing material.

## 20. MEASUREMENT AND FITTING

### Custom Measuring

Unless otherwise stated, individual measurements will be taken of each user. Each delivered vest shall fit in accordance with the following guidelines:

1. The side edges of the front and back ballistic panels shall meet or overlap

2. The bottom edge of the front ballistic panel shall be within inch (1") of the highest waist belt (usually the duty belt) measurement when the wearer is in a relaxed seated position.

3. The bottom edge of the back panel shall be within one-inch (1") of the highest waist belt (usually the duty

-7-

AZE 00220845

belt) measurement when the wearer is in the standing position.

4. Female sizes are determined based on individual measurements including bust size and are confirmed through the use of sizing/fit samples in conjunction with a tape measure, and a certified Size Right™ Program.

**The selected bidder must have a manufacturer armor-sizing program (Size Right™) that utilizes certified factory representatives and distribution-trained personnel to properly size armor.**
The Size Right™ program shall consist of a structured course of study that includes classroom training and hands-on demonstration of product knowledge. Individuals participating in a Size Right™ Program will be tested on product knowledge with both a written and practical examination. Only students who demonstrate competency in sizing armored vests shall be awarded "Certified Size Right™ Technician" status. **Any bidder other that American Body Armor must show proof of such a program at time of the bid. Those bidders without a certified sizing program will be rejected.**

## 21. FIT AND ALTERATION POLICY

The manufacturer shall perform all required alterations of more than one inch within 30 days after original shipment of the product at no charge. Adjustments of an inch or less than an inch can be accomplished by utilizing the adjustable strap feature on the vest.

## 22. PRE-AWARD AND RETEST POLICY

Bid submissions that appear to conform to these specifications will be considered as prospective vendors. However, the purchaser reserves the right to perform laboratory testing on any and all armor submitted to verify strict compliance with these specifications. The purchaser may perform V50 Ballistic Limit Testing in strict accordance with MIL-STD-662F at the department's expense. An American Body Armor representative shall witness all testing.

American Body Armor & Equipment, Inc. (ABA) encourages valid body armor testing for the purpose of acceptance testing, confirmation of required performance, and used body armor evaluations. For these purposes, ABA *will only recognize properly performed V50 Ballistic Limit Testing* in strict accordance with MIL-STD-662F. Testing shall be performed at an NIJ approved ballistic test laboratory. The test projectiles shall be 9mm 124 grain FMJ as those used in the NIJ Standard 0101.04.

The Probable Ballistic Limit (V50) test shall be conducted on a complete vest. The V50 shall be calculated on ten fair hits, with five shots on the front panel and five shots on the back panel. If required, up to 12 shots, 6 in each panel may be used to obtain the V50 value. If the range of mixed results exceeds 125 feet per second [38 meters per second] or if the V50 cannot be determined in 12 shots, the test will be considered invalid. Shot placement shall be in accordance with MIL-STD-662F except that no shot may be within three (3) inches [7.6cm] of any edge nor two (2) inches [5cm] from any other ballistic impact. Panels shall be shot against clay armor backing material, which has been conditioned in accordance with NIJ Standard 0101.04.

The sample shall be of the same construction and size as submitted by the manufacturer during the initial NIJ Certification process. Prior to each shot, the panel will be placed flat against the clay backing material. Vest samples used in testing must be wearable and in suitable condition free from abuse.

For each particular level, the V50 Ballistic Limits shall be no lower than the allowable highest 9mm NIJ test velocity. In addition, there shall be no complete penetration lower than the highest 9mm NIJ test velocity.

-8-

## 23. PRODUCT LIABILITY INSURANCE

Vest manufacturer shall agree to provide a minimum of $20,000,000 product liability insurance coverage on delivered vests.

## 24. WARRANTY

Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels *against defects in materials and workmanship*.

The alteration of ballistic panels in any way shall render the warranty void.

## 25. REMOVABLE COVERS

Removable machine washable covers shall be fully warranted for twelve (12) months after the date of purchase against any defects in the material and/or workmanship.

## 26. PACKAGING

All soft body armor shall be packaged and shipped consistent with good commercial practices.

Plastic Bags: Each set of armor, along with its optional equipment, shall be placed in an individual plastic bag.

Shipping Cartons: The soft body armor shall be packed into suitable corrugated cardboard box. The box shall allow for normal shipping without damage to the soft body armor.

## 27. FINANCIAL DATA

All vendors are required to provide a certified financial statement, for 2002, which represents the manufacturer(s) of which they are bidding. Failure to provide a certified financial statement shall be cause for rejection.

## 28. DOCUMENTATION

The following documents, certifications, test-reports and samples must be included with the vendor's bid. Where one manufacturer is bidding through multiple vendors, the manufacturer may submit the appropriate paperwork on behalf of all vendors. Failure to submit the following shall be cause for rejection:

1.  Models made by manufacturers <u>other than American Body Armor</u> must be clearly identified and shall include the following:
    a.  Full product description.
    b.  Complete bid sample, male and female.
    c.  Drawings and/or photographs.
    d.  Technical specifications.

2.  Manufacturers bidding direct must include a service proposal as to how measuring, alterations and customer service will be maintained without local distribution.

-9-

AZE 00220847

3. NIJ 0101.04 Certification and test reports from an accredited laboratory for the vest being certified.

   a. Any ballistic rounds tested above and beyond the required NIJ 0101.04 standard for requested threat level, requires a report from a NIJ Certified Laboratory. Any bidder that does not provide such documentation at the time of the bid **will be rejected**.

4. V50 test reports performed in accordance with MIL-STD-662F. V50 testing must be accomplished with clay backing.

   a. Test reports must be submitted for the entire ballistic package.

   b. Test reports must be submitted for incoming materials, which are utilized in the ballistic package.

5. Chemical test reports certifying use of Akwadyne® fabric treatment.

6. The ability to trace serial numbers.

7. The layer count of the vest must be uniform throughout the entire ballistic package. If not, test reports must be submitted for the vest utilizing the least amount of layers.

8. Quality Control Procedures.

   a. Incoming materials
   b. Lay-up configuration
   c. In-process configuration
   d. Testing verification
   e. Inspection of ballistic panel stitching
   f. Random final product inspection and continuous in-process surveillance
   g. Quality Assurance training and indoctrination

9. Product Liability Insurance providing a minimum coverage of $20,000,000.

10. Documentation stating a 5-year ballistic package warranty.

11. Documentation stating a 12-month cover warranty.

12. Certified financial statement for 2002.

13. ISO-9001 Certificate.

AZE 00220848

Technical Specifications

# XTREME X

**NIJ 0101.04**
## Level 2A, 2 & 3A
**Concealable Armor**

| Model | XTX2A-2 | XTX2-2 | XTX3A-2 |
|---|---|---|---|
| Ballistic Material | a matrix of two or more of the following: ZShield™, woven microlaminate Zylon®, Gold Flex™, and unidirectional Polyethylene | | |
| NIJ Level | 2A | 2 | 3A |
| Weight [lbs. per sq. ft] | .43 | .56 | .70 |
| Thinness [inches] | .08 | .14 | .15 |
| V50-9mm [fps] | 1417 | 1549 | 1594 |
| V50 [fps] | 1403 [40 cal] | 1516 [357 mag] | 1638 [44 mag] |
| RPI-9mm [fps] | 3295 | 2766 | 2247 |
| RPI [fps] | 3262 [40 cal] | 2707 [357 mag] | 2340 [44 mag] |
| Cert BFS Average-9mm [mm] | 33 | 31 | 31 |
| Cert BFS Average [mm] | 39 [40 cal.] | 37 [357 mag.] | 42 [44 mag.] |
| **Abbreviated NIJ Testing of additional Threats** | | | |
| NIJ Level | 2A | 2 | 3A |
| Threat | N/a | Winchester Ranger 9mm/127 grain SXZT HP<br><br>Speer Gold Dot 357 Sig / 125 Grain GDHP | Winchester Ranger 9mm/127 grain SXZT HP<br><br>Speer Gold Dot 357 Sig / 125 Grain GDHP |

-11-

AZE 00220849

SPECIFICATIONS

## For Purchase of Soft Body Armor

# XTREME ZX

### NIJ 0101.04
### Level 2 & 3A

## 1. SCOPE

This product specification details the style and quality of concealable soft body armor vests intended for use by male or female members of this agency. The vests shall be worn comfortably while being concealed under a shirt. All vests shall provide protection against labeled projectile penetration while reducing resultant blunt trauma and vest distortion to acceptable levels. The successful vendor shall be required to supply the individual vests with applicable options and colors as ordered for male or female personnel.

The concealable body armor shall be the American Body Armor Xtreme™ ZX Series for NIJ 0101.04 Threat Levels 2 or 3A. Bids based on body armor models made by manufacturers <u>other than American Body Armor</u> must be clearly identified as such; those bidders must include: a male and female sample, full product descriptions, drawings and/or photos, technical specifications, as well as a list of at least ten (10) law enforcement agencies currently using that model armor for reference with their bid. **<u>Bidders failing to submit this supporting documentation will be rejected from the bid.</u>**

Where the apparent low bidder has proposed an alternate product, that bidder shall demonstrate product equivalency to the satisfaction of the department. Evidence of equivalency shall be presented for each requirement of this specification, and the burden of such equivalency in entirely on the vendor. Any bidder may be required, at any time during the procurement process, to provide documentation proving compliance with any or all the terms of this specification.

Only body armor models which have been tested by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC), and found to comply with the requirements of NIJ Standard 0101.04, <u>Ballistic Resistance of Police Body Armor</u>, September 2000, for Type 2 *[XTZX2-1]* or 3A *[3AXTZX]* armor shall be submitted under this specification, **no exceptions.**

Bidders <u>other than American Body Armor</u> with multiple models as alternates **will be rejected**. Those bidders <u>other than American Body Armor</u> must provide test results of any and all rounds that exceed NIJ 0101.04 standard. This NIJ abbreviated testing is commonly known as "Special Threat" testing; testing of such rounds must be conducted by an NIJ approved laboratory. Failure to provide such documentation at time of the bid **will be cause for rejection.**

## 2. SILENCE OF SPECIFICATIONS

Commercially accepted practices shall apply to any detail not covered in this specification and to any omission of this specification. Any omission or question of interpretation of the specification which affects the ballistic performance or integrity of the soft body armor being offered shall be addressed in writing and submitted with the bid.

August 23, 2004                                                                                   American Body Armor

## 3. PROTEST

Any protest based on the selection and performance criteria of this specification will be disregarded.

## 4. APPLICABLE DOCUMENTS

The following list of standards and specifications in effect on the date of this solicitation shall form a part of this specification.

1.  National Institute of Justice, Standard NIJ-STD-0101.04, <u>Ballistic Resistance of Police Body Armor</u>

2.  MIL-STD-662, <u>V50 Ballistic Test For Armor</u>

3.  Federal Standard No. 751, <u>Stitches, Seams & Stitching</u>

4.  ISO 9001 Quality Assurance Certification

5.  ANSI/ASQC - Q9000 Quality Standard, dated August 1, 1994

6.  Additional test reports of "Special Threat Testing" from a Certified NIJ Laboratory are required

## 5. PURCHASE REQUIREMENTS

The successful bidder must be a recognized wholesaler/retailer, which maintains a convenient location for measurement, fitting and service during regular business hours Monday through Friday. Any manufacturers, which bid direct, must include a service proposal as to how measuring, re-works, and customer service will be maintained without local distribution.  Direct bids from manufacturers which do not contain a detailed service proposal will be rejected.

## 6. SPECIFIC QUANTITY

The agency has the right to determine quantity, if not otherwise specified in the procurement document. Of the total quantity purchased, both male and female products will be represented. The department retains the right to adjust the total quantities, while maintaining the accepted bid price, without notification to vendor. The term of the contract, including extensions, and/or escalation clauses, shall be stated in the bid document.

## 7. DESIGN REQUIREMENTS

The Intended use of the soft body armor detailed herein is intended to be standard issue armor.  It is intended for routine daily wear as an undergarment.

The soft body armor shall be designed to provide:

1.  Light and thin NIJ 0101.04 certified armor in Level 2 or 3A

2.  A high degree of concealment and comfort.

3.  Minimum restriction of motion or mobility.

4.  Optional carriers to allow for laundering and color changes.

AZE 00220851

5.   Provide protection against the labeled projectiles in accordance with the NIJ Standard 0101.04.

## 8.   GENERAL DESIGN

The ballistic panels of soft body armor meeting this specification shall provide thin, flexible, lightweight comfort utilizing a matrix of two or more of the following:   ZShield™ , Quadralink woven Zylon®, Gold Flex™, and unidirectional Polyethylene. There shall be no stitching completely through the entire ballistic panel (s), with exception to tacks at the panels' edges, **no exceptions**.  The soft body armor shall be designed for regular daily wear as an undergarment.  Therefore, vests shall be designed and constructed to provide (1) light and thin NIJ 0101.04 certified armor in Level 2 and 3A, (2) durability, (3) ease of cleaning, (4) minimum restriction of motion or mobility, and (5) the greatest amount of ballistic coverage consistent with comfort and concealment.

The general configuration shall be the slipover vest type that covers the majority of the upper torso, including side coverage.  Availability for four or six elastic straps with hook and pile fasteners shall provide proper positioning and comfort.  The entire vest perimeter shall be curved.  No sharp corners or straight edges <u>shall be allowed</u>.

The front ballistic panel shall cover the chest approximately up to the collar bone, have a scooped neck sufficient to maintain concealability when wearing an open collar shirt, extend downward to the waist but not far enough to "push up into the throat" when the wearer is seated, and extend around the sides to provide side protection.   The biceps/chest region shall be cut with sufficient space to minimize irritation and restriction of arm movement during common duties such as the operation of motor vehicles.

The rear ballistic panel shall cover the back of the torso from just above the shoulder blades down to a position above the waist belt.   The sides of the torso shall be covered by having side coverage from both the front and rear panels, as the department has determined that such a configuration maximizes both coverage and comfort. Accordingly, armor which maintains side coverage from only the front or rear panels shall be rejected.

Panels and carriers shall be equipped with an internal suspension system, which prevents ballistic panels from sagging, ensuring full protection.

Each piece of soft body armor shall include the following:

1.   One (1) set of ballistic panels (1 front, 1 rear).
2.   One (1) complete Akwadyne® Comfort Mesh washable carrier.
3.   One (1) trauma reduction insert.

## 9.   OPTIONS

1.   Cool Max® Tee Shirt.
2.   Additional Akwadyne® Comfort Mesh removable outer carrier.
3.   Quilted outer carrier.
4.   Tactical outer carrier.

## 10. BALLISTIC PANEL MATERIALS

All materials shall be new, unused and without flaws that affect appearance, durability and function.  The ballistic panels shall be constructed of a matrix of two or more of the following: ZShield™, Quadralink woven Zylon®, Gold Flex™, and unidirectional Polyethylene.  As the department has selected these materials, any bids, which represent products manufactured from other materials, **shall be rejected.**

August 23, 2004                                                                              American Body Armor

## 11. PANEL CONSTRUCTION

The ballistic panels shall be constructed of a matrix of two or more of the following: ZShield™, Quadralink woven Zylon®, Gold Flex™, and unidirectional Polyethylene.  There shall be no stitching completely through the entire ballistic panel (s), with exception to tacks at the panels' edges, **no exceptions**.

All vests, which are submitted, shall represent armor, which in layer count, is uniform throughout the ballistic panel. Accordingly, any ballistic panel, which is not uniform, in layer count, throughout the entire ballistic package, shall be rejected. If the manufacturer contends that such feathering of the armor is advantageous, than the armor shall be tested utilizing the least number of layers, which exist in any part of the ballistic package. Failure to submit such testing shall be cause for rejection.

It is the intent of the agency to procure the lightest weight, best performing personal armor available in relation to areal density, therefore, a vest section of 12" x 12" (one square foot) [30.5cm x 30.5cm], must not exceed the following:

| Threat Level | Maximum Weight | Maximum Thickness |
|---|---|---|
| 2 [XTZX2-1] | 8.3 oz / .52 lbs.sq.ft | .11 inches |
| 3A [3AXTZX] | 10.9 oz / .68 lbs.sq.ft | .12 inches |

## 12. BALLISTIC PANEL PERFORMANCE

### V50 Performance

Each bidder shall submit V50 test reports for the vest being offered.  The V50 test shall be performed in accordance with MIL-STD-662F using NIJ Standard 0101.04 9mm 124 grain FMJ test projectiles.  The test must be performed by an independent laboratory approved by the National Institute of Justice (NIJ) National Law Enforcement Technology Center (NLETC) for testing in accordance with NIJ Standard 0101.04.  The V 50 test is to be against clay backing. V 50 reports, which represent testing without clay backing, shall be rejected.  Vendor shall provide written certification that all V 50 testing is accomplished with clay backing; failure to provide certification shall be cause for rejection.

Test reports submitted by the bidder shall reflect the following minimum test results:

| Threat Level | Bullet Description | V50 Velocity [Minimum] |
|---|---|---|
| 2 [XTZX2-1] | 9mm, 124-grain FMJRN | 1576 fps |
| 3A [3AXTZX] | 9mm, 124-grain FMJRN | 1710 fps |

### Relative Performance Index (RPI)

It has been determined that the *relative strength to weight ratio* of a ballistic design is important in determining its *comfort/performance characteristics. The strength to weight ratio is calculated by dividing the areal weight (lbs. per square foot) into the performance V50 value.* A high *strength to weight ratio* or **Relative Performance Index (RPI)** indicates a high degree of comfort & performance. Therefore, the minimum RPI shall be no lower than:

AZE 00220853

| Threat Level | Bullet Description | Relative Performance Index [RPI Minimum] |
|---|---|---|
| 2 *[XTZX2-1]* | 9mm, 124-grain FMJRN | 3030 fps |
| 3A *[3AXTZX]* | 9mm, 124-grain FMJRN | 2514 fps |

### Trauma Performance (BFS)

Blunt trauma reduction is an important aspect of armor design. Low back face signature (BFS) should result in reduced blunt trauma injury. Therefore, the back face signature (BFS) results of the *NIJ 1010.04 certification test reports* shall reflect BFS <u>no higher than:</u>

| Threat Level | Bullet Description | Back Face Signature [BFS Maximum] |
|---|---|---|
| 2 *[XTZX2-1]* | 9mm, 124-grain FMJRN | 29 mm |
| 2 *[XTZX2-1]* | 357 Mag. 158-grain FMJRN | 39 mm |
| 3A *[3AXTZX]* | 9mm, 124-grain FMJRN | 30 mm |
| 3A *[3AXTZX]* | 44 Mag. 240-grain JHP | 42 mm |

Bid submissions, which do not meet this requirement, **will be rejected**.

## 13. LABELING

Label material shall withstand normal wear and cleaning and remain readable during the entire warranted life of the armor or carrier.

All soft body armor shall be labeled in strict adherence to the labeling requirement set forth in NIJ Standard 0101.04. The ballistic panel labeling shall include, but not be limited to the following:

1. Name of Manufacture
2. Level of Protection
3. NIJ-STD-0101.04
4. Date of Fabrication
5. Size
6. Serial Number
7. Model of Vest
8. Care Instructions
9. Lot Number

## 14. BALLISTIC PANEL COVER MATERIAL

Each ballistic panel shall be covered in 100% anti microbial Olefin treated for water repellency. Construction 70 denier and sized 110" X 85" [279cm x 215cm]. Inner cover material must be stain-resistant, odor and mildew resistant. Material shall have no visible fabric or color flaws.

AZE 00220854

## 15. VEST OUTER CARRIER MATERIAL

**Removable Carrier- Akwadyne® Comfort Mesh**

The outer machine washable carrier shall be removable from the ballistic panels for laundering by way of zippers integrated into the outside of the garment. All closure attachments shall be Ultra Mate® Velcro®. The carrier shall consist of Akwadyne® Comfort Mesh on the body side. The Comfort Mesh shall be 28 gauge, 100-denier warp knit. The percent of moisture regain must be less than 1% into fiber and must have high moisture transport properties. Fabric must be capable of releasing moisture without absorption, allowing for higher evaporative cooling and faster drying to take place, resulting in a less clammy feel to wearer. The body side cover material must not weigh over .52 oz. per sq. ft [.15 kg/m2]. All fabrics shall have no visible fabric or color flaws.

## 16. TRAUMA INSERT

A trauma reduction insert constructed of bullet resistant material cut five inch by eight inch (5" x 8") [12.7 x 20.3cm] shall be provided. The trauma reduction insert shall be placed in a nylon cover, which shall be tucked into one end of the ballistic material and sewn shut through to hold it in place.

## 17. QUALITY CONTROL

The manufacturer must maintain a quality program certified under the *ISO 9001* certification program by an accredited registrar under the accreditation of the Registrar Accreditation Board (US) and the Raad voor de Certificatie (Dutch). The scope of the certification must include the Design and Manufacturing of technologically advanced personal safety equipment including concealable and tactical bullet resistant vests, custom body armor, composite armor, explosive ordinance protection, ballistic face and head protection, ballistic shields and other police and military apparel, and narcotic identification systems.

The documented quality control system must be designed to insure the integrity and quality of the manufactured products. The quality control system shall control all manufacturing process and incoming raw materials. *The manufacturer must have an in-house ballistic laboratory capable of performing ballistic testing of incoming raw materials and in-process samples.* The manufacturer must have the capability of performing testing in accordance with MIL-STD-662 and NIJ Standard 0101.04. Procedures for lot testing of incoming raw materials and in-process samples must be incorporated into the quality control system. All incoming ballistic material shall undergo V50 ballistic lot tests in accordance with MIL-STD-662. Every vest panel manufactured shall be inspected for material defects and proper ply counts. Every vest panel manufactured shall be subsequently inspected for proper ballistic panel stitching. Covers and accessories shall be re inspected during manufacturing for defects at selected points during manufacturing to assure the absence of hidden defects in the final item.

In addition, each vest shall receive a final inspection prior to shipment. This inspection shall include a review of the quality control check sheet and confirm the product against the customer's order.

A copy of the Certificate of Accreditation, as well as the manufacturers quality control program must be submitted with bid documents.

## 18. SERIAL NUMBERS

August 23, 2004                                                                                    American Body Armor

Each unit of soft body armor delivered shall have an individual serial number. Each serialized soft body armor shall be traceable to its original ballistic material lot number and ballistic material mill roll number. Additionally the soft body armor serial number shall be traceable to an incoming material lot test and ballistic panel lay-up lot test. The vendor must have the ability to trace serial numbers.

## 19. LOT TESTING

All incoming ballistic material shall undergo V50 ballistic lot test in accordance with MIL-STD-662F except that the test will be conducted on clay backing which meets the requirements of NIJ Standard 0101.04 for backing material.

## 20. MEASUREMENT AND FITTING

### Custom Measuring

Unless otherwise stated, individual measurements will be taken of each user. Each delivered vest shall fit in accordance with the following guidelines:

1. The side edges of the front and back ballistic panels shall meet or overlap

2. The bottom edge of the front ballistic panel shall be within inch (1") of the highest waist belt (usually the duty belt) measurement when the wearer is in a relaxed seated position.

3. The bottom edge of the back panel shall be within one-inch (1") of the highest waist belt (usually the duty belt) measurement when the wearer is in the standing position.

4. Female sizes are determined based on individual measurements including bust size and are confirmed through the use of sizing/fit samples in conjunction with a tape measure, and a certified Size Right™ Program.

**The selected bidder must have a manufacturer armor-sizing program (Size Right™) that utilizes certified factory representatives and distribution-trained personnel to properly size armor.** The Size Right™ program shall consist of a structured course of study that includes classroom training and hands-on demonstration of product knowledge. Individuals participating in a Size Right™ Program will be tested on product knowledge with both a written and practical examination. Only students who demonstrate competency in sizing armored vests shall be awarded "Certified Size Right™ Technician" status. **Any bidder other that American Body Armor must show proof of such a program at time of the bid. Those bidders without a certified sizing program will be rejected.**

## 21. FIT AND ALTERATION POLICY

The manufacturer shall perform all required alterations of more than one inch within 30 days after original shipment of the product at no charge. Adjustments of an inch or less than an inch can be accomplished by utilizing the adjustable strap feature on the vest.

## 22. PRE-AWARD AND RETEST POLICY

Bid submissions that appear to conform to these specifications will be considered as prospective vendors. However, the purchaser reserves the right to perform laboratory testing on any and all armor submitted to verify strict compliance with these specifications. The purchaser may perform V50 Ballistic Limit Testing in strict accordance with MIL-STD-662F at the department's expense. An American Body Armor representative shall witness all testing.

American Body Armor & Equipment, Inc. (ABA) encourages valid body armor testing for the purpose of acceptance testing, confirmation of required performance, and used body armor evaluations. For these purposes, ABA *will only*

AZE 00220856

recognize properly performed V50 Ballistic Limit Testing in strict accordance with MIL-STD-662F. Testing shall be performed at an NIJ approved ballistic test laboratory. The test projectiles shall be 9mm 124 grain FMJ as those used in the NIJ Standard 0101.04.

The Probable Ballistic Limit (V50) test shall be conducted on a complete vest. The V50 shall be calculated on ten fair hits, with five shots on the front panel and five shots on the back panel. If required, up to 12 shots, 6 in each panel may be used to obtain the V50 value. If the range of mixed results exceeds 125 feet per second [38 meters per second] or if the V50 cannot be determined in 12 shots, the test will be considered invalid. Shot placement shall be in accordance with MIL-STD-662F except that no shot may be within three (3) inches [7.6cm] of any edge nor two (2) inches [5cm] from any other ballistic impact. Panels shall be shot against clay armor backing material, which has been conditioned in accordance with NIJ Standard 0101.04.

The sample shall be of the same construction and size as submitted by the manufacturer during the initial NIJ Certification process. Prior to each shot, the panel will be placed flat against the clay backing material. Vest samples used in testing must be wearable and in suitable condition free from abuse.

For each particular level, the V50 Ballistic Limits shall be no lower than the allowable <u>highest</u> 9mm NIJ test velocity. In addition, there shall be no complete penetration lower than the <u>highest</u> 9mm NIJ test velocity.

## 23. PRODUCT LIABILITY INSURANCE

Vest manufacturer shall agree to provide a minimum of $20,000,000 product liability insurance coverage on delivered vests.

## 24. WARRANTY

Ballistic Panels: For 30 months (two-and-a-half-years) after date of purchase the manufacturer warrants the ballistic panels *against defects in materials and workmanship*.

The alteration of ballistic panels in any way shall render the warranty void.

## 25. REMOVABLE COVERS

Removable machine washable covers shall be fully warranted for twelve (12) months after the date of purchase against any defects in the material and/or workmanship.

## 26. PACKAGING

All soft body armor shall be packaged and shipped consistent with good commercial practices.

Plastic Bags: Each set of armor, along with its optional equipment, shall be placed in an individual plastic bag.

Shipping Cartons: The soft body armor shall be packed into suitable corrugated cardboard box. The box shall allow for normal shipping without damage to the soft body armor.

## 27. FINANCIAL DATA

All vendors are required to provide a certified financial statement, for 2002, which represents the manufacturer(s) of which they are bidding. Failure to provide a certified financial statement shall be cause for rejection.

August 23, 2004                                                                    American Body Armor

AZE 00220857

## 28. DOCUMENTATION

The following documents, certifications, test-reports and samples must be included with the vendor's bid. Where one manufacturer is bidding through multiple vendors, the manufacturer may submit the appropriate paperwork on behalf of all vendors. Failure to submit the following shall be cause for rejection:

1. Models made by manufacturers <u>other than American Body Armor</u> must be clearly identified and shall include the following:
   a. Full product description.
   b. Complete bid sample, male and female.
   c. Drawings and/or photographs.
   d. Technical specifications.

2. Manufacturers bidding direct must include a service proposal as to how measuring, alterations and customer service will be maintained without local distribution.

3. NIJ 0101.04 Certification and test reports from an accredited laboratory for the vest being certified.

   a. <u>Any ballistic rounds tested above and beyond the required NIJ 0101.04 standard for requested threat level, requires a report from a NIJ Certified Laboratory. Any bidder that does not provide such documentation at the time of the bid **will be rejected**.</u>

4. V50 test reports performed in accordance with MIL-STD-662F. V50 testing must be accomplished with clay backing.

   a. Test reports must be submitted for the entire ballistic package.

   b. Test reports must be submitted for incoming materials, which are utilized in the ballistic package.

5. Chemical test reports certifying use of Akwadyne® fabric treatment.

6. The ability to trace serial numbers.

7. The layer count of the vest must be uniform throughout the entire ballistic package. If not, test reports must be submitted for the vest utilizing the least amount of layers.

8. Quality Control Procedures.

   a. Incoming materials
   b. Lay-up configuration
   c. In-process configuration
   d. Testing verification
   e. Inspection of ballistic panel stitching
   f. Random final product inspection and continuous in-process surveillance
   g. Quality Assurance training and indoctrination

AZE 00220858

9.    Product Liability Insurance providing a minimum coverage of $20,000,000.

10.   Documentation stating a 30 month (two-and-a-half year) ballistic package warranty.

11.   Documentation stating a 12-month cover warranty.

12.   Certified financial statement for 2002.

13.   ISO-9001 Certificate.

AZE 00220859

Technical Specifications

# XTREME ZX

NIJ 0101.04

## Level 2 & 3A
Concealable Armor

| Model | XTZX-1 | XTZX3A-2 |
|---|---|---|
| Ballistic Material | a matrix of two or more of the following:  ZShield™, Quadralink woven Zylon®, Gold Flex™, and unidirectional Polyethylene | |
| NIJ Level | 2 | 3A |
| Weight [lbs. per sq. ft] | .52 | .68 |
| Thinness [inches] | .11 | .12 |
| V50-9mm [fps] | 1576 | 1710 |
| RPI-9mm [fps] | 3030 | 2514 |
| Cert BFS Average-9mm [mm] | 29 | 30 |
| Cert BFS Average    [mm] | 39 [357 mag.] | 42 [44 mag.] |
| **Abbreviated NIJ Testing of additional Threats** | | |
| NIJ Level | 2 | 3A |
| Threat | N/a | N/a |

August 23, 2004

American Body Armor

AZE 00220860



SAY GOODBYE TO ALL YOUR EXCUSES

# YOU NOW OWN THE BEST-PERFORMING BODY ARMOR EVER CREATED:

## OUR PRODUCTS SAVE LIVES— BUT ONLY IF YOU WEAR THEM.

At American Body Armor, we've devoted ourselves to protecting dedicated law-enforcement officers like you. Decades of experience have gone into the design and production of body armor designed to do just one thing: save lives.

But no body armor can protect you if you don't wear it. Even on the quietest of shifts, a routine call can quickly turn into a life-threatening situation.

That's why we urge you to wear your Xtreme armor day-in and day-out. Our engineers have broken new ground in creating the remarkable comfort you'll notice immediately when you put on your Xtreme vest. We think you'll agree that this no-xcuses level of all-day wearability represents a true breakthrough in protection and performance.

Our three Xtreme models represent the state of the art in concealable body armor. Each one offers you an unprecedented level of performance in its category.

## THE XTREME ADVANTAGE

### Z SHIELD™

ZShield™ is Honeywell's newest Shield Technology. The strength of Honeywell's patented Shield Technology, combined with Zylon, the strongest fiber known to science, produces the most revolutionary ballistic material in history.

### QUADRALINK™

Quadralink™ is an interwoven system made up of Zylon or Kevlar® with thousands of tiny "pockets" that dramatically improve the rate of energy transfer. The design optimizes fiber diameter with fiber-to-fiber surface area, and the result is remarkably effective stopping power.

### GOLDFLEX™

This aramid ballistic solution from Honeywell uses a patented non-woven Shield technology to create material that is softer and thinner than traditional ballistic materials. At the same time, it offers the maximum in multihit and angled-shot capabilities.

### SPECTRASHIELD PLUS FLEX

A product of Honeywell's advanced ballistic technology, SpectraShield® is an advanced non-woven composite with enhanced Spectra Fiber processing and a restructured Shield technology that yields the highest performance and comfort values.

### THE AKWADYNE® COMFORT MANAGEMENT SYSTEM

The revolutionary Akwadyne® Comfort Management System features a technology that alters a fabric's molecular and chemical components, allowing it to adjust automatically to environmental conditions and user needs.

In cooler conditions, the Akwadyne® mesh lining traps heat close to your body while channeling moisture away. And in warm environments, it transfers moisture and heat away from your body. The result is that you will experience the optimum level of comfort regardless of conditions.

CONGRATULATIONS ON OWNING THE BEST-PERFORMING BODY ARMOR EVER CREATED. WHEN YOU OPENED THE PACKAGE CONTAINING YOUR XTREME CONCEALABLE VEST, YOU OPENED A NEW AGE OF BALLISTIC PERFORMANCE ALONG WITH AN EXTRAORDINARY LEVEL OF WEARABLE COMFORT. IT'S A COMBINATION SO REVOLUTIONARY THAT, STARTING TODAY, YOU NO LONGER HAVE ANY EXCUSES FOR NOT WEARING YOUR BODY ARMOR.

AHJX00032972
AHI026-0031



# FROM AMERICAN BODY ARMOR.



The Xtreme ZX is the world's most advanced body armor. Its unique level of comfort and protection is made possible by a combination of advanced ballistic materials: ZShield™ and Quadralink™ Zylon,* which represent a new landmark in ballistic performance and comfort.

The Xtreme ZX also features the lightest carrier ever developed. It includes the remarkable Akwadyne® Comfort Management System. And a new shoulder-strap suspension system prevents ballistic panels from sagging, ensuring full protection.



Like the Xtreme ZX, the new Xtreme X ballistic technology incorporates the exclusive ZShield™ and Quadralink™ Zylon*. The result is truly superior ballistic performance and long-term wearability.

To enhance comfort even further, the Xtreme X carrier includes the same Akwadyne® Comfort Management System found in the Xtreme ZX.

The Xtreme vest offers no-xcuses performance coupled with extraordinary value. It combines three ballistic technologies that take comfort and performance to an extreme of their own: Quadralink™ Kevlar*, GoldFlex™ and SpectraShield* Plus Flex.

The carrier design of the Xtreme vest includes the extraordinary Akwadyne® Comfort Management System.



With its adjustable, flexible ballistic panels, the Xtreme for women style represents a dramatic breakthrough in comfort for women. The design eliminates the discomfort caused by rigid ballistics and chafing seams. The new style is designed with adjustable cups and a unique multi-point fastening system. These unique features allow the Xtreme for women to be personally fitted for maximum comfort and protection.

AHJX00032973
AHI026-0032

# WARNINGS: PLEASE READ CAREFULLY.

For your protection and safety, the following warnings must be read, understood, and adhered to prior to the use of any American Body Armor (ABA) product.

It is the responsibility of the user or users of this product to read this guide and understand all features and functions of this product. Failure to read and understand the contents of this guide may result in misuse, leading to injury or permanent damage to this product.

ABA armor is designed to offer ballistic or stab protection or both under specific circumstances against specific threats. ABA armor is not "bulletproof" and cannot make the wearer immune to all potential threats. Always exercise extreme caution and follow standard safety procedures at all times. Each model of ABA armor is designed to stop specified projectiles at specific speeds under guidelines established by specific standards, such as, but not limited to, those of the National Institute of Justice. Refer to the label placed on the body side of each ballistic panel for listed projectiles relating to the specific ABA armor model. Independent laboratory test results shown in the catalog, on the ballistic panel label, or on any other ABA printed materials were obtained on sealed and undamaged armor panels. Projectiles not specifically listed may penetrate ABA armor. Rounds that achieve higher-than-standard factory speeds, including, in many cases, rounds fired from modified or non-standard handguns, may penetrate armor. ABA armor will not stop rifle projectiles, and may or may not defeat special-purpose or armor-piercing projectiles, or sharp, pointed instruments such as arrows, ice picks or knives dependent upon the specific armor design.

No ballistic protection is possible where the ballistic panel does not exist. It is the responsibility of the wearer to understand the limitations of the coverage area of the specific vest. Vest protective coverage will vary according to vest size, style, fit and your own body configuration.

Do NOT alter or modify your ABA armor.

Use ONLY the outer garments recommended and manufactured by ABA as panel carriers

Do NOT use this vest system if the seal of the ballistic panel package has been broken, damaged, or otherwise interrupted, or if the ballistic package itself has been damaged in any way.

Do NOT expose this vest system to chemicals.

Do NOT expose ballistic panels alone to direct sunlight.

**ISO 9001 Certification: Why is ISO 9001 certification so important? Because ABA certifies that every vest manufactured and purchased follows the quality-control protocol of international quality and standards.**

**NIJ Certified: All ballistic vests marketed in the U.S. are certified under the NIJ Standard. Independent lab testing is performed at an NIJ-certified laboratory. For current model numbers, full test results, warranty or other product information, please contact American Body Armor.**

# INSPECTION



Upon delivery of this product from ABA or your local ABA dealer, please review and inspect all components. Your inspection should verify the following:

- Correct style vest
- Correct ballistic model
- Ballistic panels are in place and properly oriented (certification label faces body side)
- Correct size vest
- Correct color or carrier
- Optional features, if applicable, are present and correct.

If upon conclusion of your inspection, you find the vest system to be complete and acceptable, please register your warranty online at xtremearmor.com. If, however, you have found any discrepancy during your inspection, contact your local ABA dealer or contact ABA directly.

Periodic Inspections: Vest systems, like any life-saving or life-protection equipment, should be subjected to periodic inspections.

AHJX00032974
AHI026-0033

## BALLISTIC PANEL— FRONT AND REAR:

Inspect the impact side and body side of each panel for:

- Holes, tears, rips or damage to the ballistic covering
- Creases, wrinkles or unintended contours
- Soiled appearance
- Presence of moisture

## CARRIER—FRONT AND REAR:

Inspect the impact side and body side of each carrier component for:

- Holes, tears, rips, or damage to any component
- Damage or excessive wear on the fasteners
- Damage or excessive wear on the side fastener components
- Damage to stitches or seams

If you discover any excessive wear or damage during your detailed inspection, contact your local ABA dealer or contact ABA directly.

## IF YOU OBSERVE DAMAGE TO YOUR VEST:

Any damage to a ballistic panel should be brought to the attention of American Body Armor immediately. This includes, but is not limited to, tears in the ballistic covering, ballistic impacts, and cuts or tears to the ballistic panel. Under no circumstances should anyone repair or alter any ABA ballistic component other than American Body Armor. The act of repairing or altering a ballistic component shall void the warranty.

Damage to the outershell carrier should be brought to the attention of ABA immediately. This includes, but is not limited to, tears, cuts, holes, damaged fasteners, etc. Under no circumstances should anyone repair or alter any ABA ballistic component other than American Body Armor, Inc. The act of repairing or altering an outershell carrier shall void the warranty.

## IF YOUR VEST DOESN'T FIT:

In the event your vest does not fit, American Body Armor can perform alterations. Please contact your local distributor for details.

## BODY ARMOR REPLACEMENT GUIDELINES

To assist you with your decision about when to replace body armor, American Body Armor has put together some points you may want to consider in the evaluation process.

Most manufacturers, including American Body Armor, warrant the body armor they sell for a period of five years. This is a reasonable period of time for a manufacturer to stand behind a ballistic product that has been in use for five years. The end of the warranty period does not mean the armor will not work anymore. It simply means the warranty is over.

Like clothing, soft body armor materials are subject to wear. Although there is evidence of some degradation in ballistic performance as a result of wear, armor that is properly cared for will continue to work well beyond the manufacturer's warranty period.

Here are some things you may want to consider when making a decision to replace your body armor:

- Is the armor excessively worn? Does it have to be replaced because it is visually worn out?
- Hygiene—Even with proper care, is there mildew and staining of the ballistic element?
- Does the armor still fit? Has your body size changed since your armor was issued or purchased?
- Have the threats in the street changed? Are there different types of weapons being confiscated on the streets?
- Has your service weapon or ammunition changed? The armor you wear should be capable of stopping the ammunition you carry.
- Have the body armor standards changed to meet the new threats? Does the agency require their armor to be certified to the latest body armor standard?
- New technology in ballistic fibers and engineering—New fibers and design technology has made armor lighter and more comfortable to wear.
- Always remember that armor that is not worn cannot save lives.

AHJX00032975
AHI026-0034



# CARING FOR YOUR
# XTREME
## BODY ARMOR

Your ABA armor should be properly stored when not in use. Vests should be stored flat in individual bags or storage devices separate from other vests or equipment. Vests stored together with other vests, or not separated from other similar equipment, are prone to damage caused by:

- Fasteners unintentionally engaging.
- Sharp edges on metal equipment, which can tear fabric.
- Components becoming entangled with other components.
- Abrasion with other equipment, which can damage coatings or surfaces of fasteners.

### TO CLEAN THE BALLISTIC PANELS, FOLLOW THESE INSTRUCTIONS:

1. Remove the ballistic panels from the outershell carrier.
2. Gently hand wash the panels with a sponge or wash cloth using mild detergent. Wipe off any excess detergent with clean water using the same procedure.
3. Wipe dry.
4. Ensure ballistic panels are completely dry before re-inserting into outershell carrier.
5. DO NOT DRY CLEAN.
6. DO NOT LAUNDER COMMERCIALLY.
7. DO NOT EXPOSE THE BALLISTIC PANELS TO BLEACH (LIQUID OR VAPOR).
8. DO NOT SUBMERSE BALLISTIC PANELS.

### TO CLEAN THE OUTERSHELL CARRIER, FOLLOW THESE INSTRUCTIONS:

1. Remove all equipment from the outershell carrier.
2. Remove the ballistic panels from the outershell carrier.
3. Engage all fasteners to reduce damage during the washing and drying cycles.
4. Machine wash the outershell carrier using "durable press" (warm) cycle at medium/warm water temperature (approximately 105°F).
5. Use low-sudsing detergent according to the detergent manufacturer's directions.
6. Outershell carrier may be tumble-dried at medium (warm) temperature setting or may be line-dried.
7. Outershell carrier may be commercially laundered following similar directions.
8. Outershell carrier must be completely dry prior to re-inserting the ballistic panels.
9. DO NOT USE BLEACH.
10. DO NOT DRY CLEAN.

(Please see Assembly Instruction Card for visuals of equipment pieces and parts.)

# THE LEGION OF LIFE

Through the Legion of Life, American Body Armor is proud to supply a vest replacement for any officer whose life is saved by one of our ballistic products. The Legion of Life survivor program was established in 1991 and now covers products manufactured by three Armor Holdings, Inc. companies: ABA, Safariland and PROTECH. The procedures for product replacement are as follows:

1. Notify Armor Holdings of the save at 800-733-3832.
2. A Legion of Life application and supporting documentation is completed by the survivor and his or her agency.
3. Upon approval of the application, a Save Serial Number is assigned to each case for replacement.
4. Replacement of vests will be coordinated with local distributors.

For further information, please contact the Legion of Life Assistant at 800-733-3832.

AHJX00032976
AHI026-0035



# THE XTREME WARRANTY

**LIMITED WARRANTY INFORMATION:**
Subject to the warning limitations set forth in this Owner's Manual, American Body Armor, Inc. (ABA) extends the following Limited Warranty to the original purchaser of ABA armor and the removable outershell carrier, in place of all other warranties, expressed or implied and excluding incidental or consequential damages from the ABA armor or use of the ABA armor.

Some states and countries do not allow limitations on how long an implied warranty lasts and/or do not allow the exclusion or limitation of incidental or consequential damages. As to purchases governed by the laws of those states and countries, the limitations herein set forth may not apply to you. The following express warranty gives you specific legal rights, and you may also have other rights that vary from state to state and country to country.

**SOFT ARMOR AND BALLISTICS:**
The ballistic panels are warranted to be free from defects in workmanship and materials for a period of five (5) years from the date of manufacture shown on the ballistic panel label.

Should the ballistic panel package be broken, interrupted, or damaged in any way, cease using the ABA armor immediately and return it to American Body Armor, Jacksonville, Florida, USA, for inspection and repair in order to ensure proper functioning. In the event that the damage or interruption of the package has not been caused, as determined solely by American Body Armor, by neglect or abuse, the panel will be inspected and repaired at no charge, provided that all postage and mailing/shipping costs are paid by the original purchaser. If the damage or interruption of the panel is determined to be caused by neglect or abuse, then ABA will advise the owner of recommended repair or replacement and the cost.

The Warranty for the ABA armor shall be immediately terminated and of no effect should the ABA armor (including the ballistic package) be damaged through neglect or abuse, or worn or used with damaged or interrupted panel packages, or should any part of the ABA armor be altered, modified, or repaired by anyone other than American Body Armor.

**FABRIC OUTERSHELL CARRIER:**
The ABA Outershell Carrier is warranted to be free from defects in workmanship and materials for a period of one (1) year from the date of purchase. The Warranty is forthwith terminated should the Outershell Carrier be abused or if the laundry instructions located on the care label attached to the garment and within this document are not complied with.

**GENERAL:**
All claims under the above Limited Warranty shall be made in writing, postage pre-paid, to American Body Armor, Inc., 13386 International Parkway, Jacksonville, Florida, 32218, USA, Attention: Servicing Department. Any and all consequential damages are expressly limited to either (i) the replacement of any defective Ballistic Panel or Outershell Carrier, or (ii) a refund of the original purchase price to the original purchaser, the choice of (i) or (ii) to be at the sole option and discretion of American Body Armor.

## REGISTER ONLINE FOR A CHANCE TO WIN PRIZES.

To register your warranty coverage quickly and conveniently, we urge you to visit www.xtremearmor.com today. When you do, you will be eligible to win weekly drawings for one of the following prizes:


WATCH


LEATHERMAN


STEEL THERMOS


TOTE BAG WITH T-SHIRT AND HAT

See the enclosed Warranty Registration Postcard for more details

AHJX00032977
AHI026-0036



AHJX00032978
AHI026-0037



1. Open the zipper on front carrier. Bend front ballistic panel and insert it into the front carrier. Please note the "This Side To Body" label on panel.

2. Feed left and right front ballistic panel Velcro* strips through the left and right front carrier shoulder channels.

Leave approximately one inch of the front ballistic panel Velcro* strips exposed.

3. Make sure the upper edge of the front ballistic panel fits snugly against the inner top of the front carrier. Press down to secure Velcro* strips inside the front carrier shoulder channels. Close front carrier zipper.

4. Affix shoulder straps to the Velcro* panel on the back ballistic panel. *

5. Fold shoulder straps back temporarily.

6. Bend back ballistic panel and insert it into the back carrier through the zippered opening. Make sure the top edge of the back ballistic panel fits snugly against the inner top of the back carrier. Close back carrier zipper.

7. Reach into the left and right back carrier shoulder channels and feed the unattached ends of each shoulder strap through the channels.

8. Place the front carrier on top of the back carrier, with the zippered sides of each carrier facing outward.

9. Feed the shoulder straps through the left and right elastic shoulder loops of the front carrier.

10. Affix the Velcro* panels of both shoulder straps to the matching Velcro™ panels of the front carrier. *

11A. Slip the attached front carrier and back carrier assembly over your head, as you would a sweater.

11B. Adjust and affix side straps to a comfortable fit.

12A. Slip the attached front carrier and back carrier assembly over your head, as you would a sweater.

12B&C. Adjust and affix the shoulder straps and contour adjustment tabs to a comfortable fit. Adjust and affix side straps to a comfortable fit.

* The placement of shoulder straps on the velcro pads on both the back ballistic panel and the front carrier will dictate the length of the vest.

AHJX00032979
AHI026-0038



WE CAN BE

X TREMELY HELPFUL

If you have any questions about the use of your Xtreme vest, please contact American Body Armor.
Our customer service representatives will be happy to offer complete assistance.

Phone: (904) 741-5400
Toll-Free: 800-428-0588
Fax: 800-432-7019

To register your vest warranty: www.xtremearmor.com and
for additional product information: www.xtremearmor.com



ABA
AMERICAN BODY ARMOR
An Armor Holdings Company

13386 INTERNATIONAL PARKWAY • JACKSONVILLE, FLORIDA, 32218
(904) 741-5400 • 1-800-428-0588 • FAX: 800-432-7019
WWW.XTREMEARMOR.COM • WWW.AMERICANBODYARMOR.COM



ZShield™ is a trademark of Honeywell, Inc.
Quadralink™ is a trademark of American Body Armor.
Kevlar® is a registered trademark of the DuPont
Company for its Aramid fibers.
Akwadyne® is a registered trademark of Comfort Technologies, Inc.
GoldFlex® is a trademark of Honeywell, Inc.
SpectraShield® Plus Flex is a registered trademark of Honeywell, Inc.

Honeywell

 ARMOR HOLDINGS, INC.

XT-OM-1209

AHJX00032980
AHI026-0039



**IMPORTANT INFORMATION
PLEASE READ**

## AMERICAN BODY ARMOR LIMITED WARRANTY

Thank you for selecting a quality product from **American Body Armor**. Please read the attached information carefully. We at **American Body Armor** are confident that you will be pleased with your purchase. Your **American Body Armor** vest is warranted to the original purchaser against defects in materials and workmanship. To validate your warranty, you must complete the attached warranty card and mail it within ten days of purchase.

**Ballistic Panels**
For five years after date of purchase **American Body Armor** warrants that the ballistic panels will pass the N.I.J. protocol for ballistic intervention and their N.I.J. designated velocities during an actual occurrence, not necessarily during an N.I.J. independent laboratory retest procedure. This warranty is null and void if the water resistant covering is torn, or if the armor is subject to any in-service abuse and misuse. The intentional alteration of ballistic panels or the placement of the ballistic panels in any cover other that that provided for the vest by **American Body Armor** will also render this warranty null and void.

**Covers**
Covers are fully warranted for twelve (12) months after the date of manufacture against defects in materials or workmanship. Simply return the vest, (if removable style, panels must accompany the covers) to place of purchase or send direct to **American Body Armor** with attached Return Authorization Card.

**Replacement Policy**
Should you be protected by your vest from serious injury or death during an on-duty confrontation from a firearm projectile, automobile accident, sharp and/or blunt instrument, **American Body Armor** will replace your vest at no charge. Simply contact **American Body Armor** for a **"Legion of Life"** application, send your vest to **American Body Armor** , along with departmental certification of how the incident occurred. A new vest will be sent out as soon possible.

**Alterations**
The alteration or repair of any portion of your vest by anyone other than **American Body Armor** or its authorized dealers will void this warranty. Contact **American Body Armor** for the fee schedule on alterations.

**Service**
For warranty service, contact any **American Body Armor** dealer. The return of your vest, and evidence of the date of purchase (receipt) will be required. For location of the nearest dealer, write or call **American Body Armor**, Customer Service Department.

**For Your Records**

Date Purchased _____ Model # _____ Serial # _____

**LIMITED WARRANTY**
AMERICAN BODY ARMOR DISCLAIMS ALL LIABILITY FOR CONSEQUENTIAL DAMAGES FOR BREACH OF THIS LIMITED WARRANTY. THE WARRANTY PROVIDED HEREIN IS THE SOLE WARRANTY AND IN LIEU OF ALL OTHER WARRANTIES, INCLUDING , WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY. SOME STATES DO NOT ALLOW THE EXCLUSION OF LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES. IF YOU LIVE IN ONE OF THESE STATES, THESE EXCLUSIONS MAY NOT APPLY TO YOU. THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.



**ABA**
AMERICAN BODY ARMOR
An Armor Holdings, Inc. Company

**Shipping Address:
13386 International Pkwy.
Jacksonville, FL 32218**



AHJX00032988
AHI026-0047

## IMPORTANT INFORMATION
## PLEASE READ

YOUR **AMERICAN BODY ARMOR** VEST IS NOT KNIFE AND ICEPICK PROOF! DURING ANY ATTACK FROM A SHARP WEAPON, THE POSSIBILITY EXISTS FOR PENETRATION WHICH COULD RESULT IN DEATH OR SERIOUS INJURY!

### BREAK-IN AND CARE PROCEDURES

VEST BREAK-IN PERIOD. **Your American Body Armor** vest is designed to mold and conform to every curve of your body. To enable the vest to take the shape of your torso, it is necessary to wear the vest slightly tighter than normal during the two to four week break-in time period.

DO NOT WEAR THE VEST TIGHT! After the two to four week break-in period, wear the vest with no tension on the straps. It is only necessary to take the slack out of the elastic straps. This is the most comfortable way to wear the vest in any climate.

### PERMANENT COVERS

1.   WEAR AN ABA COOLMAX® T-SHIRT (OPTIONAL WITH REMOVABLE COVER) UNDER YOUR **AMERICAN BODY ARMOR** VEST! This type of soft body armor is designed similar to athletic equipment - not underwear! You must wear your ABA absorbent Coolmax® T-shirt (see your dealer) or your own absorbent T-shirt to remain comfortable while wearing your **American Body Armor** vest.

2.   RINSE YOUR VEST OFF FREQUENTLY! The general rule is, "IF YOU SWEAT UNDER THE VEST – THEN RINSE IT". Water and mild soaps and detergents will not damage this vest. Rinse the vest off in the shower or sink frequently. On about every fifth rinse, place a small amount of mild soap or detergent on your hand and scrub the body side of the vest, as well as the elastic straps. Then rinse with fresh water and towel dry.

### REMOVABLE COVER CLEANING INSTRUCTIONS

1.   IMPORTANT - Remove ballistic pads from outer cover (carrier). Clean pads separately (see instructions on pads).
2.   Close all velcro fasteners on cover.
3.   Machine wash cover in warm water - **no bleach or fabric softener.**
4.   Line dry.
5.   Re-insert ballistic pads properly. **NOTICE:** "This Side Towards Body" warning.

**STORE YOUR AMERICAN BODY ARMOR VEST FLAT AND IN A DRY LOCATION WHEN NOT IN USE. DO NOT HANG VEST BY THE STRAPS AS THIS CAN LEAD TO PREMATURE FAILURE OF THE ELASTIC!**

By following the above recommendations, you will receive many years of dependable service from your **American Body Armor** vest. If you have any questions please contact your local dealer and they will be glad to assist you. If you are involved in a shooting, contact your dealer for a **free replacement vest.**

BEND YOUR PLATE TO CONTOUR YOUR CHEST. Your "Shok Plate" has a small amount of bend applied to it at the factory. Since very few people are built alike, you will probably have to adjust your plate as follows:

A.   Remove the plate from its pocket and hold it up to the curvature of your chest as closely as possible. You must bend the plate to follow the curvature of your chest as closely as possible.

B.   The standard "Shok Plate" is easy to hand bend over the edge of a desk or table. The "Super Shok Plate" should be bent in a vise.

C.   If the plate causes discomfort, it is bent too much. If the outline of the plate is noticeable under your shirt (by pushing your shirt outward) then the plate is not bent enough.

AHJX00032989
AHI026-0048

***CONGRATULATIONS! YOU HAVE PURCHASED THE BEST BUILT BODY ARMOR IN THE WORLD.***

LAST NAME (Please Print)          FIRST NAME          MIDDLE INITIAL          DATE

HOME ADDRESS _____

STREET          CITY          STATE          ZIP

NAME OF DEPARTMENT                                        SHIELD #

VEST MODEL #                                        VEST SERIAL #

**American Body Armor's Factory Trained Dealer** _____

Store Name

**and Salesman** _____, **have explained in full the following important information:**

☐ 1. Vest capabilities          ☐ 4. How to shape Shok Plate
☐ 2. How to wear               ☐ 5. Warranty
☐ 3. How to clean              ☐ 6. Rewarranty

**How did you hear about AMERICAN BODY ARMOR?**

☐ Dealer                ☐ Trade Show
☐ Fellow Officer        ☐ Other _____
☐ Magazine Ad

CUSTOMER SIGNATURE _____

AHJX00032990
AHI026-0049

PLACE
STAMP
HERE

AMERICAN BODY ARMOR & EQUIPMENT, INC.
ATTN: WARRANTY DEPT.
13386 INTERNATIONAL PARKWAY
JACKSONVILLE, FL 32218

FROM

AHJX00032991
AHI026-0050



When you do, you get entered into our weekly†
drawing for one of the following Xtreme items.

- Alladin Steel Thermos
- Black Leather Band Watch
- Leatherman Multi-tool
- An Xtreme Tote Bag, T-shirt and Hat.

Each week, one registrant will be randomly selected to receive
one of the above gifts. It's our way of saying THANK YOU
for choosing Xtreme Armor.

Follow these directions.

1. Go to www.xtremearmor.com

2. Click on the "Warranty Registration" icon on the home page.

3. You will be asked to enter your Xtreme Registration Number,
which is:

**OHWSGKR364**

4. Fill out the form and that's it.

*See your Owner's Manual for more details about your vest warranty.
†Go to www.xtremearmor.com for official drawing rules and disclaimers.



**ARMOR HOLDINGS, INC.**

October 20, 2003

Mr. Jim Moody
Los Angeles Police Department
Metro SWAT
251 East 6th St.
Los Angeles, Ca. 90014

Dear Mr. Moody:

I am writing in response to your request of Stan Ferer regarding the warranty
and life expectancy of our Xtreme XS ballistic package. Armor Holdings,
Incorporated warranties all body armor ballistics for five years from the date of
delivery. Our warranty ensures all AHI ballistic panels meet and will remain
within tolerance as established by the NIJ-STD-0101-04 standard for the life
of the warranty period.

If you have any questions regarding design or performance of our products, I
would encourage you to contact Mr. Bob Weber, Director of Ballistic
Engineering at 909-923-7300 x3214, or Gary Lemanski General Manager –
Body Armor Division at 909-923-7300 x3207.

We appreciate this opportunity to work with you and the L.A.P.D. Metro
S.W.A.T. We pride ourselves on developing solutions that work for the needs
of the law enforcement community and strongly believe the body armor you
are considering to purchase is the best in its category.

Sincerely,

Scott O'Brien
President of Safariland, Inc. and
General Manager of American Body Armor

13386 International Pkwy.     Jacksonville, Florida 32218     904.741.5400     Fax 904.741.5403

 

# Technical Bulletin

## Z Shield® Material: Ballistic Performance After Aging

### Z Shield® Material

Z Shield® ballistic material is a non-woven, unidirectional composite cross-plied in a 0/90 degree orientation, and sandwiched in a thermoplastic film to form a laminated continuous roll. The composite is comprised of PBO [poly(p-phenylene-2,6-benzobisoxazole)] high performance fiber, known as Zylon® fiber, impregnated with a resin matrix. Z Shield® material is one of the highest performing ballistic materials for soft armor on a weight to performance basis.

Honeywell Spectra Technologies is an ISO 9000 registered business. Because of those requirements, Honeywell follows design protocols during the development of new materials. This includes evaluation of the material for its performance and quality as well as the steps for commercialization prescribed by the DFSS (Design for Six Sigma) program.

In addition to the performance and quality standards that are established at the commercialization of a new product and adhered to during production of the material, supplementary testing programs are implemented to document other material properties. One material property investigated on an on-going basis is normal aging of the material. This testing protocol examines the performance of the material over time.

### Test Protocol

Typical life expectancy based on the body armor manufacturer's warranties in industry, for a maintained ballistic garment is 5 years. Hence, a testing program is established to monitor the performance of the ballistic material from initial production up to and beyond five years of shelf life. The V50 of the material is used as the indicator for performance and measured over time. The performance of the 'aged' material is then compared to the original material to observe the performance retention of the product.

Significant effort has been spent in the development of a robust test protocol. The influence of variability in testing is minimized through a series of DOE's (design of experiments) which eliminate the noise of testing associated with bullet type, sample configuration, shot pattern, sample preparation, testing fixture etc. Standard V50 testing follows the general guidelines and procedures of MIL-STD-662E.

Z Shield® material has been a commercial product since year 2000. Since its introduction, V50 testing has been performed and recorded to establish the performance of the material over time. The following is the data to date:

Although Honeywell International Inc. believes that the suggestions regarding the possible uses of the products as well as the other statements contained in this publication are accurate and reliable, they are presented without guarantee or responsibility of any kind and are not representations or warranties of Honeywell International Inc, either express or implied. Information provided herein does not relieve the user from the responsibility of carrying out its own tests and experiments and the user assumes all risks and liability (including, but not limited to, risks relating to results, patent infringement and health, safety and the environment) for the results obtained by the use of the products and the suggestions contained herein.

Spectra, Spectra Shield, and Z Shield are registered trademarks of Honeywell International Inc.
Zylon is a registered trademark of Toyobo.
©2003 Honeywell International Inc.

AHON00029255



# Honeywell Spectra®



*Z Shield® material stored in cardboard boxes in an uncontrolled warehouse in Petersburg, VA. Temperature and humidity levels were recorded by thermometer/ hygrometer readings with highs and lows of 95° F to 55° F and 90% - 20% relative humidity respectively.*

## Conclusion

The data presented regarding Z Shield® materials demonstrates that there has been no loss of ballistic performance over a three-year time period when stored in an uncontrolled warehouse environment. Based on the data, and from experience with other ballistic materials, there is no significant anticipated change in the ballistic performance response of the Z Shield® material for the five year suggested lifespan of most ballistic resistant vests assuming proper care and use.

*In 1998, the National Institute of Justice published the Selection and Application Guide to Police Body Armor. Revised and renamed in November of 2001, the Selection and Application Guide to Personal Body Armor states, "Age alone does not cause body armor's ballistic resistance to deteriorate. The care and maintenance of a garment - or the lack thereof – have been shown to have a greater impact than age on the length of service life of a unit of body armor. Armor that is 10 years old and has never been issued may be perfectly acceptable for use, provided that the rated level of protection is still appropriate for the typical threats faced. Conversely, 2- or 3-year-old-armor that has been worn regularly and improperly cared for may not be serviceable."*

On September 30, 2003, the National Institute of Justice reiterated the critical importance of properly caring for body armor in their release, NATIONAL INSTITUTE OF JUSTICE STATEMENT REGARDING SECOND CHANCE, INC. BODY ARMOR "UPGRADE" OFFER: "Proper care, storage, and cleaning of the armor are critical to maximizing its useful life. Storage of the armor in extreme environmental conditions or non-temperature-controlled environments (e.g., automobile trunks, non-climate-controlled storage rooms or areas) is not recommended under any circumstances."

For more information about Honeywell's ballistic materials, please visit our Web site: www.spectrafiber.com, where you can also find information about our partnership with the National Tactical Officers Association (NTOA) and the Safe Today, Alive Tomorrow safety awareness program.

**For more information, please contact:**

Toll Free: +1-800-695-5969
Europe: +33 3 82 44 80 00
Asia: +662 631 1969
Web site: www.spectrafiber.com

Although Honeywell International Inc. believes that the suggestions regarding the possible uses of the products as well as the other statements contained in this publication are accurate and reliable, they are presented without guarantee or responsibility of any kind and are not representations or warranties of Honeywell International Inc. either express or implied. Information provided herein does not relieve the user from the responsibility of carrying out its own tests and experiments and the user assumes all risks and liability (including, but not limited to, risks relating to results, patent infringement and health, safety and the environment) for the use of the products and for the suggestions contained herein.

Spectra, Spectra Shield, and Z Shield are registered trademarks of Honeywell International Inc.
Zylon is a registered trademark of Toyobo.
©2003 Honeywell International Inc.

AHON00029256