# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:08-cv-00961 (RWR)** |
| | ) | |
| **HONEYWELL INTERNATIONAL INC.,** | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT HONEYWELL INTERNATIONAL INC.'S
## REPLY MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO DISMISS

Date:   August 29, 2008

Eugene F. Assaf, P.C. (D.C. Bar No. 449778)
Craig S. Primis, P.C. (D.C. Bar No. 454796)
Jennifer W. Cowen (D.C. Bar No. 974412)
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Attorneys for Defendant
Honeywell International Inc.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT ........................................................................................................................3

I.     THE GOVERNMENT STILL FAILS TO IDENTIFY A FALSE CLAIM. .......................3

       A.     The Government's "Latent Defect" Theory Fails....................................................4

       B.     The Government's "Warranty" Theory Fails. ........................................................9

              1.     There Was No False Certification of Service Life....................................10

              2.     Alleged "Reasonable Expectations" Of The "Marketplace" Are
                     Legally Irrelevant In Light Of Specific NIJ And Industry
                     Disclosures. ..............................................................................................15

II.    THE GOVERNMENT STILL FAILS TO IDENTIFY A FALSE STATEMENT
       OR RECORD UNDER SECTION 3729(a)(2). ...............................................................17

III.   THE GOVERNMENT HAS NOT ADEQUATELY PLEADED THE
       REQUISITE LEVELS OF SCIENTER............................................................................21

IV.    THE GOVERNMENT STILL FAILS TO IDENTIFY ANY UNJUST
       ENRICHMENT. ..............................................................................................................24

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allison Engine Co. v. U.S. ex rel. Sanders,*
128 S. Ct. 2123 (2008) ........................................................................................ 3, 23

*Anderson v. USAA Cas. Ins. Co.,*
221 F.R.D. 250 (D.D.C. 2004) ................................................................................ 19

*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.,*
297 F. Supp. 2d 165 (D.D.C. 2003) ........................................................................ 11

*Bell Atl. Corp. v. Twombly,*
127 S. Ct. 1955 (2007) ................................................................................ 3, 23, 24

*BMY--Combat Systems Division of Harsco Corp. v. United States,*
38 Fed. Cl. 109 (1997) ......................................................................................... 8, 9

*Boisjoly v. Morton Thiokol, Inc.,*
706 F. Supp. 795 (D. Utah 1988) ........................................................................... 17

*City of Moundridge v. Exxon Mobil Corp.,*
471 F. Supp. 2d 20 (D.D.C. 2007) ......................................................................... 23

*Cosman v. Ford Motor Co.,*
285 Ill. App. 3d 250 (Ill. App. Ct. 1996) ............................................................... 13

*Denny v. Barber,*
576 F.2d 465 (2d Cir. 1978) ..................................................................................... 8

*Elemary v. Philipp Holzmann A.G.,*
533 F. Supp. 2d 116 (D.D.C. 2008) ....................................................................... 21

*Garst v. Lockheed-Martin Corp.,*
328 F.3d 374 (7th Cir. 2003) ................................................................................ 4, 8

*Jung v. Assoc. of Am. Med. Colleges,*
300 F. Supp. 2d 119 (D.D.C. 2004) ....................................................................... 11

*Kowal v. MCI Commc'ns Corp.,*
16 F.3d 1271 (D.C. Cir. 1994) ................................................................................. 6

*Krooth & Altman v. N. Am. Life Assurance Co.,*
134 F. Supp. 2d 96 (D.D.C. 2001) ......................................................................... 16

*Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001).................................................................. 7

*Nebraska Popcorn, Inc. v. Wing*,
    602 N.W.2d 18 (Neb. 1999)............................................................... 13

*Robins Printing Co. v. Crosfield Elecs., Inc.*,
    No. 92-2446, 1994 WL 284105 (6th Cir. June 23, 1994)................................ 21

*Roy v. Armco, Union Wire Rope Division*,
    636 F. Supp. 839 (E.D. Tex. 1986)....................................................... 13

*S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*,
    410 A.2d 1359 (Vt. 1980)................................................................. 13

*Sellon v. Gen. Motors Corp.*,
    571 F. Supp. 1094 (D. Del. 1983)......................................................... 13

*Shenandoah Assocs. Ltd. P'ship v. Tirana*,
    182 F. Supp. 2d 14 (D.D.C. 2001)........................................................ 24

*Stebner v. Seward & Stevenson Servs., Inc.*,
    305 F. Supp. 2d 694 (S.D. Tex. 2004)................................................. 8, 9

*Tittle v. Steel City Oldsmobile GMC Truck, Inc.*,
    544 So. 2d 883 (Ala. 1989)............................................................... 13

*U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*,
    251 F. Supp. 2d 28 (D.D.C. 2003)......................................................... 3

*U.S. ex rel. Bettis v. Odebrecht Contractors of Cal. Inc.*,
    297 F. Supp. 2d 272 (D.D.C. 2004)...................................................... 22

*U.S. ex rel. Joseph v. Cannon*,
    642 F.2d 1373 (D.C. Cir. 1981)........................................................... 11

*U.S. ex rel. K&R Ltd. Part. v. Mass. Housing Fin. Agency*,
    530 F.3d 980 (D.C. Cir. 2008)............................................................ 14

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.*,
    245 F.3d 1048 (9th Cir. 2001)............................................................. 7

*U.S. ex rel. Roby v. Boeing Co.*,
    100 F. Supp. 2d 619 (S.D. Ohio 2000).................................................... 17

*U.S. ex rel. Siewick v. Jamieson Science & Eng'g, Inc.*,
    214 F.3d 1372 (D.C. Cir. 2000)........................................................... 17

*U.S. v. Basin Elec. Power Coop.*,
   248 F.3d 781 (8th Cir. 2001) ........................................................................... 14

*United States v. Bornstein*,
   423 U.S. 303 (1976)......................................................................................... 20

*United States v. Scientific Applications Int'l Corp.*,
   555 F. Supp. 2d 40 (D.D.C. May 15, 2008)...................................................... 9

**Other Authorities**

Fed. R. Civ. P. 9(b) ...................................................................................................... 21

*Williston on Contracts* 4th, § 52:46 .......................................................................... 13

## PRELIMINARY STATEMENT

The False Claims Act does not authorize claims for buyer's remorse, but the Government has now made clear that buyer's remorse is what this case is all about.  The Government apparently wishes it had required body armor suppliers to provide durability certifications, and now seeks to retroactively impose that requirement through the False Claims Act.  Indeed, the Government's entire case appears to hinge on the notion that Honeywell caused Armor Holdings to falsely guarantee the durability of vests containing Z Shield.  But the Government concedes, as it must, that vests containing Honeywell's Z Shield product satisfied the ***only*** applicable government standards, which were set by the Department of Justice's own National Institute of Justice ("NIJ"), and which included no durability requirement whatsoever.  Without such an NIJ requirement, the Government tries to piece together a new basis for alleging that Z Shield vests were required to last for five years with no degradation and regardless of use and care.  This is where the Government's case falls apart.

The Complaint relies repeatedly on an alleged five-year warranty to provide the durability requirement that DOJ wishes it had included in the NIJ requirements.  But as the Government now admits, the "typical warranty" alleged in the Complaint is, in fact, not a warranty, but merely a specification in a bid proposal form.  Faced with the fact that the Government's alleged warranty is not a warranty, and the fact that "typical" warranties like the one Honeywell attached to its brief were limited repair-or-replace warranties, the Government appears unable to decide which way to go with its evolving theory.  At times, the Government actually argues that the "legal significance" of the warranty is "immaterial" (Opp. at 22), while at other times (in the very same brief) it claims that the warranty went to the "very core of its bargain" (Opp. at 28).  Still other times, the Government picks and chooses the parts of the warranty it likes, making the extraordinary claim that "it is the length of the warranty period, ***not***

*other warranty language*," that gives rise to the false claim.  (Opp. at 17 (emphasis added).)  If the Government can simply ignore "other language" that fundamentally alters the meaning and scope of what it claims was the "core of its bargain," then the Government could state an FCA claim whenever it wished—all it has to do is leave out the language that undermines its case, and tell the Court it is precluded from considering it.

Realizing the low likelihood of success on that strategy, the Government next improperly tries to amend its Complaint by introducing for the first time documents it claims are "warranties" but that differ from the "typical" warranty language alleged in the Complaint.  This effort fails on numerous levels.  The two warranty documents the Government attaches to its brief are undated, of unknown origin, and unaccompanied by any of the specific facts required by Rule 9(b) as to what they are, who sent them (and to whom), or where they came from.  Moreover, the Government can hardly seek to state a claim against Honeywell for *thousands* of allegedly false claims made over a five-year period by attaching two undated warranties applicable to some unspecified number of unidentified products.  Nor can the Government rely on its refrain that there are "factual disputes" that preclude dismissal.  Honeywell bases its arguments for dismissal on the facts alleged in the Complaint, and the Complaint is devoid of a factual basis for an actionable false claim.  To the extent the Government now claims that its own factual allegations are unclear or in dispute, that only confirms dismissal of this fraud case is warranted under Rule 9(b). Both this Court and Honeywell deserve better from the Government, particularly where it has had the opportunity to conduct a two-year investigation into these facts.

As a final retreat, the Government's moving theory of liability tries to premise falsity on what it terms the "marketplace's reasonable expectations" about Z-Shield's vest performance.

But this entirely unprecedented theory of liability has no logical boundaries. Indeed, the Government does not cite a single case embracing this or any other of the Government's theories, nor a case finding liability on facts remotely similar to those alleged in the Complaint. Just last Term the Supreme Court warned against expansive interpretations of the FCA that "threaten to transform [it] into an all-purpose antifraud statute." *Allison Engine Co. v. U.S. ex rel. Sanders*, 128 S. Ct. 2123, 2130 (2008). The Government asks this Court to ignore the Supreme Court's warning and become the first court in the Nation's history to embrace its novel theories. For the reasons discussed here and in Honeywell's opening brief, the Government's Complaint should be dismissed in its entirety.

## ARGUMENT

## I.     THE GOVERNMENT STILL FAILS TO IDENTIFY A FALSE CLAIM.

For all of the new facts and theories the Government introduces in its opposition brief, it still does not identify a false claim. The Government cannot escape its obligation to do so by claiming that it is too burdensome to allege all facts supporting every alleged false claim where the Government has not even alleged *some* facts identifying at least *one* false claim. *See U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003). Though it now appears to have fashioned two different theories of "falsity"—one of allegedly "latent defects" and another based on the five-year Armor Holdings warranty—neither one alleges a false claim.

Nor can the Government hide behind the proposition that *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), requires notice pleading. (Opp. at 13.) This is a fraud case governed by Rule 9(b), which requires heightened specificity. And in any event, the whole point of *Twombly* is that plaintiffs may not, even under Rule 8(a), state a claim by quoting the legal standard and alleging facts (even a lot of them) that do not give rise to a plausible claim for relief. *Twombly*,

127 S. Ct. at 1965.  Although the Government refers on numerous occasions to its "35-page" Complaint as if the sheer volume of allegations somehow increases their effectiveness (*see* Opp. at 2, 3, 16), it has never been the case that pages alone can save an inadequate pleading.  *See, e.g.*, *Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376-77 (7th Cir. 2003) (dismissing FCA action where third amended complaint and accompanying documents included 155 pages, 400 numbered paragraphs, and 99 attachments but still failed to identify a single "false claim").  In the end, despite a 35-page Complaint, 43-page opposition brief, and two "theories" of liability, the Government still has not adequately pleaded *any* false claim—either factually false or legally false—to support an FCA action here.

## A.    The Government's "Latent Defect" Theory Fails.

Shifting its strategy to oppose Honeywell's motion, the Government distances itself from the Complaint's emphasis on the Armor Holdings warranty—apparently having changed its mind on its "underlying theory of liability"—and focuses on a new theory of so-called "critical latent defects." (Opp. at 1-2, 10-11, 20-21.)  This is problematic for two reasons.

First, the allegation of "latent defects" cannot be divorced from the Government's warranty theory.  The Government does not and cannot contend that Z Shield vests ever had unacceptable levels of ballistic performance at delivery.  To the contrary, the Government concedes that all new vests satisfied the applicable NIJ Standards (Opp. at 4; Compl. ¶ 30), which by definition meant they exhibited the requisite level of performance.  (Honeywell Ex. C, NIJ Standard-0101.04, at iii.)  Instead, the Government's claim refers generically to "quick" degradation from exposure to conditions that might or might not occur at some undefined point in the future.  This "defect" theory is therefore conditioned on there first being some guarantee of a particular service life (which, as discussed in Honeywell's opening brief and below, the Government's warranty theory unsuccessfully posits).  (*See, e.g.*, Opp. at 22.)  But there is no

allegation that NIJ required a guarantee of a five-year service life or incorporated any kind of durability component into the then-applicable standards, that any government contract included a durability requirement, or that the Government conditioned reimbursement under the Bulletproof Vest Grant Program Act ("BPVGPA") on such a requirement.  (*See* Honeywell Br. at 6-7.)  In the end, the Government's "latent defect" theory relies on the warranty just as much as the warranty theory relies on the warranty, yet the "typical warranty" the Complaint identified is actually not a warranty.  (Opp. at 5 (noting that "the warranty language cited as 'typical' in the Complaint" came from "specifications").)

Second, even if the Government could extricate its "latent defect" theory from the warranty, the only so-called "defects" the Government identifies were ***disclosed*** to all customers, including the Government itself, as early as 2001.  (Compl. ¶¶ 41, 12-15.)  The crux of the Government's new "defect" theory is that Z Shield degraded in high heat and humidity, and had the Government known it would not have purchased the vests.  (Opp. at 1-2.)  The central flaw in these contentions, however, is that the ***Government's own Complaint,*** replete with allegations of disclosures of the so-called "critical latent defects," directly contradicts them.

The July 2001 storage advisory referenced in the Government's Complaint (¶ 41) had expressly warned all distributors and customers (including the Government itself (*see* Compl. ¶¶ 12-15)) not to expose a Z Shield vest to "persistent high temperatures (120º F and above) in combination with high humidity (50% and above)" for "two weeks or more" because such exposure could "adversely affect its ballistic performance."  (Honeywell Ex. E.)  The Government's newfound attempts to downplay the significance of this advisory are unavailing. The Government argues that the advisory was insufficient because certain test data showed decreases in ballistic integrity after storage in temperatures of 104º F, but it ignores that its own

Complaint alleges such decreases resulted from **combined** conditions of 104º F and extreme relative humidity of 70-80%, and continuous exposure for periods of four, twelve, and twenty-four weeks at a time.  (Compl. ¶¶ 45, 54-55.)  The storage advisory, in contrast, highlighted the potential for problems in 50% relative humidity and after two weeks' exposure, and it specifically advised customers to store their vests in a "cool, dry place."  (Honeywell Ex. E.)

In the absence of any allegation in the Complaint that conditions of 120º F, 50% humidity, and two weeks' exposure are meaningfully different than 104º F, 70-80% humidity, and at least four weeks of exposure, the Government's implication that the July 2001 storage advisory was somehow insufficient—especially where it also warned users to store vests in a "cool, dry place" (Honeywell Ex. E)—is entirely baseless.  Though the Government assumes that the difference was meaningful, it has not alleged any facts to support such an inference.  *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (A court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.").  Moreover, the Government has also failed to address the insufficiency of the other public disclosures it references in its Complaint, including one published on September 28, 2001 (less than three months after the storage advisory was issued) in which Toyobo specifically disclosed a loss of tensile strength under conditions of 104º F and 80% humidity.  (Compl. ¶ 45.)

The Government's alternative attack on the storage advisory—arguing that it raises a mixed question of law and fact (Opp. at 36)—simply makes no sense.  Honeywell is relying on the **Government's own allegations** and taking them at face value in noting that all customers received the storage advisory (*see* Compl. ¶ 41) and that testing at 104º F was accompanied by humidity of 70-80% and exposure greater than the amount of time referenced in the storage advisory (*see id*. ¶¶ 45, 54-55).  The Court is required, for purposes of a motion to dismiss, to

accept the Government's factual allegations as true, and this is exactly what Honeywell is doing here. The Government cannot urge the Court to "'accept as true all of the factual allegations contained in the complaint'" (Opp. at 11), but then cherry-pick the allegations it wants the Court to actually acknowledge. Indeed, the Government's own alleged facts, taken as true for purposes of this motion, indicate that the alleged "critical latent defects" were specifically disclosed to all of Armor Holdings' customers as early as July 2001. (*See* Compl. ¶ 41.) Any theory of fraud based on these same "latent defects" is incoherent.

The Government makes passing reference to the principle that FCA liability can extend to the delivery of "worthless" goods (*see* Opp. at 20 n.8), but that is not the case the Government has alleged, and it is not the case the Government could ever allege here. As the Second Circuit has described it, a worthlessness claim is "effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided. In a worthless services claim, ***the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all***." *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001) (emphasis added and internal citation omitted); *see also U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001). The Government's actual allegations come nowhere close to alleging—nor could they—that the Z Shield vests provided by Armor Holdings were the "equivalent of no [vests] at all." And while the Government somehow attempts to compare this case to one in which the "Z Shield vests provided adequate ballistic protection on their first day of service" but "failed on day two" (Opp. at 28), nothing in its Complaint remotely supports this straw-man analogy. Indeed, it is telling that the Government has not alleged that a single vest containing Z Shield ever failed in the field or that anyone was ever injured by a bullet while wearing a vest containing Z-Shield.

To the contrary, NIJ-certified vests were exactly what the Government required, and NIJ-certified vests were exactly what the Government received. As the Government pleads in its Complaint and notes again in its opposition brief, "All of the new Z Shield vests sold by Armor Holdings were certified by NIJ." (Opp. at 4 (citing Compl. ¶ 30).) Nevertheless, the Government would have FCA liability extend to any situation where the Government wishes *after the fact* that it had demanded more. Only beginning in August 2005 with the Interim NIJ Standard, and as later incorporated into a new permanent NIJ Standard effective July 2008, did NIJ impose a durability requirement of any kind. *See* NIJ, *New Body Armor Standard*, available at http://www.ojp.usdoj.gov/nij/topics/technology/body-armor/welcome.htm (last visited Aug. 29, 2008). The Government's theory of FCA liability would require both retroactive application of the 2005 Interim Standard and Honeywell's clairvoyant knowledge of the 2005 Interim Standard four years before its existence. As a matter of law and of common sense, there can be no "fraud by hindsight." *See, e.g.*, *Garst*, 328 F.3d at 378; *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

Nor does the Government's discussion of *Stebner v. Seward & Stevenson Servs., Inc.*, 305 F. Supp. 2d 694 (S.D. Tex. 2004), advance its argument. To the contrary, both *Stebner* and the "howitzer" case it describes, *id.* at 699-702 (discussing *BMY--Combat Systems Division of Harsco Corp. v. United States*, 38 Fed. Cl. 109 (1997)), highlight just how unprecedented the Government's theory is here. The *BMY* court did not identify a false claim merely because the defendant had sold "inherently dangerous" products that had not been adequately tested, but because (a) the underlying contract specifically required certain testing; and (b) each invoice submitted for payment specifically required an express certification that there were no "contractual deficiencies or nonconformance areas." *BMY-Combat*, 38 Fed. Cl. at 117. As the

*Stebner* court recognized in distinguishing *BMY*, "in contrast to the contractor in *BMY--Combats*, [defendant] submitted no invoice with a requirement that it disclose all deficiencies and nonconformance areas.  This prong was the bridge that the *BMY--Combat* court used to access its theory of implied certification. Without it, the issue of misrepresenting a material fact never matures."  *Stebner*, 305 F. Supp. 2d at 700.  Similarly, here, there is no "bridge" between the alleged defects and the government's contractual requirements, and thus no material falsehood as required under the FCA.[1]  The Government's "critical latent defects" theory must therefore fail.

### B.    The Government's "Warranty" Theory Fails.

The Government's theory of liability based on the alleged five-year warranty, which was feeble enough in the Complaint itself, has now deteriorated into an incoherent assortment of contradictions.  On the one hand, presumably recognizing its obligation to identify an objective falsehood *somewhere*, the Government continues to rely specifically on the warranty as supporting a theory of "false certification" regarding a service-life guarantee.  (Opp. at 27, 5 n.1.) The Government points to no other specific representation as forming the basis of any false claim, and all of its references to "false" representations ultimately come back to the warranty. (Opp. at 19 (citing Compl. ¶¶ 3-5, 11, 34-73, 87-88, 91-92 ).)  In addition, the Complaint's actual Counts refer specifically to the warranty as the basis for FCA liability.  (Compl. ¶¶ 87, 91.)  For

---

[1]    The Government also fails to help its case with comparisons to *United States v. Scientific Applications International Corp.*, 555 F. Supp. 2d 40 (D.D.C. May 15, 2008) ("*SAIC*"), which, like *BMY*, only accentuates the novelty of the Government's case here.  In *SAIC*, the government alleged that defendant SAIC had violated specific provisions of its two contracts with the Nuclear Regulatory Commission ("NRC"), including violations of NRC regulations that were incorporated into those contracts, and thus had made implied false certifications when it submitted invoices under those contracts.  Here, the Government fails to identify any actual contract, much less a specific contractual provision that was violated and then implicitly falsely certified.  Even more inapposite are the Government's references to cases involving "bid-rigging" and "kickbacks" (Opp. Br. at 21), where the Government has not alleged that Honeywell or Armor Holdings ever engaged in any such activities.

this version of its theory, the Government refers to the warranty as going to "the very core of [its] bargain." (Opp. at 28.)

On the other hand, however, presumably in light of examples like the Armor Holdings warranty attached to Honeywell's motion (Honeywell Ex. B),[2] the Government argues that the actual language of the warranty does not matter because its only relevance is the five-year period, which led to a "reasonable expectation" in the marketplace that the vests would last five years. (Opp. at 17.) For this theory of the warranty, the Government contends that the "legal significance" of the warranty language is "immaterial." (*Id*. at 22.) Beyond the fact that the Government cannot have it both ways—it makes no sense for specific language relating to the "core" of one's bargain to have no "legal significance"—neither way states an FCA claim.

### 1.     There Was No False Certification of Service Life.

In moving to dismiss, Honeywell took issue with the Government's allegation of "typical" warranty language not because it believed the Government was pleading a breach of warranty claim (Opp. at 17), but because the entire Complaint relied upon the "five-year warranty" that the vests allegedly "would not meet" (*see, e.g.*, Compl. ¶¶ 87, 91), yet failed to provide any specifics. The opposition brief suffers the same shortcomings, conceding that the allegedly "typical" warranty language referenced in the Complaint came from a specification in a bid proposal form, not an actual warranty. (Opp. at 5.) If some warranty forms the basis of an alleged "false certification," which the Government continues to be suggesting (*see* Opp. at 5 n.1), Rule 9(b) entitles Honeywell to notice of, among other things, the "time, place and content"

---

[2] The warranty attached as an exhibit to Honeywell's motion was one provided by American Body Armor, a subsidiary of Armor Holdings.

of that false certification.  *See U.S. ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981).

Though the Government attaches several new documents to its brief, including two undated documents alleged to be warranties from Armor Holdings' subsidiary American Body Armor, the Government has given no notice as to which government entities allegedly received such warranties, which specific warranty or warranties the *federal* government relied upon (either in its direct purchases or in its BPVGPA reimbursements), when those particular warranties were in effect, or where they came from.  In addition, the Government offers no justification for ignoring the well-settled principle that new factual allegations cannot be introduced in an opposition brief.  *See, e.g.*, *Jung v. Assoc. of Am. Med. Colleges*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004); *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003).  Most troubling, however, the Government misrepresents what the warranty at Exhibit D actually says (*see* Opp. at 6 n.4), citing a different section of the Owner's Manual (AHI026-0033) and failing to acknowledge the section labeled "Warranty" that specifically limits the remedy to refund or replacement.  (*See* Opp. Ex. D at AHI0026-0036.)  As for the other two exhibits, the warranty language at Exhibit C is illogical on its face, containing two clauses that directly contradict each other (*see* Opp. Ex. E at AHI026-0047); and the Government never alleges that the letter at Exhibit E was authored by or copied to anyone at Honeywell, nor does it allege that the federal government ever received or relied on it.  (Opp. at 24.)  When faced with a warranty from Honeywell's files, the Government offers only conjecture as to why it is unrepresentative of the "typical" warranty, pointing only to the warranty's physical location in Honeywell's document production to suggest when Armor Holdings used the warranty.  (Opp. at 6.)

Similarly, though the Government attaches bid specifications to its brief, these documents shed no light on the government contracts underlying the transactions at issue. As an initial matter that is so because these are not actual contracts. The exhibits, which contain **sample** bid specifications transmitted **by** Armor Holdings, presumably to be used by government entities preparing a formal Request For Proposal (RFP), do not reflect (a) which bid specifications were ever actually incorporated into an RFP, and by which government entities; or (b) which bid specifications, even if incorporated into a government RFP, were included in any final contract. Moreover, each of the specifications the Government attaches includes a specific clause requiring the bidding vendor to provide "documentation stating a 5-year ballistic package warranty," with no requirement that it provide a five-year performance guarantee. (*See*, *e.g.*, Opp. Ex. A at AHI068-8247.) At the very least the Government should be alleging the contents of that "documentation," not the specifications that requested it. But it is certainly no solution to bring new allegations that refer in passing to a five-year warranty specification as something "the Government" had "contracted to receive" (Opp. at 20), but with no specific reference to any actual contract between any specific parties. In essence, the Government attempts to create a factual dispute by withholding the specific contract information that it is uniquely positioned— not to mention legally **obligated** under Rule 9(b)—to provide. The Government has been investigating and conducting discovery on this matter for nearly two years; it should have determined by now where these so-called "false certifications" actually appeared and made its factual allegations accordingly.

The Government also fails in its brief to make any distinction as to Armor Holdings' contracts with the federal government directly (Compl. ¶¶ 12-15), versus with state and local governments that were subsequently reimbursed through the BPVGPA program. (Compl. ¶¶ 16-

18 .)  For the latter, the governing federal statute and regulations make plain that NIJ certification was the *only* condition for reimbursement by the federal government.  (*See* Honeywell Br. at 6.) The Government fails to allege that a five-year warranty was ever a condition of payment under the BPVGPA program.  The brief makes the bold, conclusory assertion that the warranty went to the "core of the Government's bargain" (Opp. at 30) but then offers up no specifics as to how or why this is so, or which government entities were even the parties to such a bargain.  By no stretch of the imagination does this comply with Rule 9(b).

Moreover, even assuming for the sake of argument that some government contract exists somewhere with language identical to the bid specifications quoted in the Complaint and attached to the Government's brief, the Government *still* fails to allege that anyone ever guaranteed a five-year service life.  As the Government itself recognizes, the language referencing a warranty in the bid specification is "broad."  (Opp. at 6.)  With nothing more specific, the default interpretation under the law is that this language provides a repair-or-replace warranty, not a guarantee of future performance. *See Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So. 2d 883, 890-91 (Ala. 1989) (discussing significance of warranting "against"); *see also Nebraska Popcorn, Inc. v. Wing*, 602 N.W.2d 18, 23-24 (Neb. 1999); *Cosman v. Ford Motor Co.*, 285 Ill. App. 3d 250, 257 (Ill. App. Ct. 1996); *Williston on Contracts* 4th, § 52:46.  It is well-established that warranties for future performance are the exception rather than the rule, and courts have made clear that any ambiguities in language are resolved in favor of finding that a warranty offers only repair or replacement. *See Sellon v. Gen. Motors Corp.*, 571 F. Supp. 1094, 1098 (D. Del. 1983); *Roy v. Armco, Union Wire Rope Division*, 636 F. Supp. 839, 840 (E.D. Tex. 1986); *S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*, 410 A.2d 1359, 1366 (Vt. 1980).  The same conclusion is necessary here.

Equally important, even if the Government had interpreted the language as a guarantee of service life and Armor Holdings or Honeywell had interpreted it as a repair-or-replace warranty, the law is clear that such a difference in expectations does not support a theory of "false" certification with respect to the warranty.  Courts have established that an interpretation of an ambiguous contract, like a reasonable scientific judgment, cannot be "false" as a matter of law. *See U.S. v. Basin Elec. Power Coop.*, 248 F.3d 781, 792 (8th Cir. 2001) ("The improper interpretation of a contract … does not constitute a false claim for payment."); *see also U.S. ex rel. K&R Ltd. Part. v. Mass. Housing Fin. Agency*, 530 F.3d 980, 983-84 (D.C. Cir. 2008) (finding no FCA liability where the parties "simply disagree about how to interpret ambiguous contract language").  Nowhere has the Government alleged that Honeywell's interpretation of the generic warranty specification language would have been unreasonable.

Finally, and most relevant here, Honeywell's conclusion that the Government's warranty specification language provided no guarantee of service life is also entirely consistent with NIJ's own public position in 2001.  In its November 2001 publication *Selection and Application Guide to Personal Body Armor*, NIJ expressly stated that a body armor warranty was "***not a reflection of the anticipated service life of the product*" and "*should not be interpreted as a benchmark for service life*."  (Honeywell Ex. A., NIJ Guide 100-01 (Nov. 2001), at 62 (emphasis added).) Though the Government is correct that NIJ did not mention Armor Holdings or any other manufacturer specifically by name (Opp. at 23), the NIJ Guide expressly contemplates the industry as a whole when it notes that "many body armor manufacturers currently offer a five-year warranty on the products they sell to criminal justice agencies." (Honeywell Ex. A, at 62.) The Government's further response that the contents of the NIJ Guide raise an issue of the Government's "knowledge" with respect to the warranty that cannot be decided on a motion to

dismiss (Opp. at 25) is nonsensical.  It pushes the bounds of reason to suggest that NIJ would not have "known" about the contents of a government report *authored by NIJ*.  In the end, nowhere does the Government rebut the idea that this unambiguous NIJ statement—which refutes any notion of a service-life guarantee—is ultimately dispositive.

### 2.    Alleged "Reasonable Expectations" Of The "Marketplace" Are Legally Irrelevant In Light Of Specific NIJ And Industry Disclosures.

In another bid to save the Complaint, the Government tries to make something of the so-called "reasonable expectations" of the marketplace as an independent basis for FCA liability, wholly apart from what was actually contracted for or certified to the Government.  Attempting to gloss over its inability to pin down exactly what "false certification" it relied upon as a "condition for payment" and the "core of [its] bargain" (Opp. at 28, 30), the Government responds that such specifics are unnecessary because "it is the length of the warranty period, not other warranty language, that provides the strongest evidence of the marketplace's reasonable expectations about the future performance of Z Shield vests" (Opp. at 17).  Even putting to one side the failure to cite a single case supporting such a theory, it also makes no sense, as the length of the warranty cannot logically or legally be divorced from the substance of the warranty or the specified remedy.

The theory is also undermined by the Government's own public statements during the relevant time period about what the marketplace, and the Government, actually expected.  Indeed, NIJ told "the marketplace," as early as 2001, that the service life of body armor could not be accurately predicted—much less guaranteed—given the wide range of use, care and maintenance practices by end-users.  NIJ had publicly discussed this very issue in the "Body Armor Life Expectancy" section of its 2001 NIJ Guide 100-01 when it stated that "[t]he care and maintenance of a garment—or the lack thereof—have been shown to have a greater impact than

15

age on the length of service life of a unit of body armor. … *2- or 3-year-old armor that has been worn regularly and improperly cared for may not be serviceable*." (Honeywell Ex. A, at 61 (emphasis added).)  Similarly, the report informed readers of a DuPont study indicating that "[s]ome vests with marginal performance had been in use for only 3 to 5 years" and that "regardless of age, use and abuse can cause ballistic decay." (*Id.*)  Perhaps the best indicator, however, of the absence of "reasonable marketplace expectations" of a five-year guarantee (or any expectation at all) is the lead paragraph to the "Body Armor Life Expectancy" guidelines, which notes that "[o]ne of the most frequently asked questions the National Law Enforcement and Corrections Technology Center (NLECTC) receives is, '*How long does body armor last?*'" (*Id.* at 60 (emphasis added).)  The answer from NIJ: "*Unfortunately, no definitive answer can be given to this question*." (*Id.*)

Although the Government makes much of Honeywell's technical bulletin, that bulletin is consistent with NIJ's position described above.  Once again ignoring the legal standard under which a court considers all facts alleged and documents incorporated into a Complaint, *see Krooth & Altman v. N. Am. Life Assurance Co.*, 134 F. Supp. 2d 96, 99 (D.D.C. 2001), the Government would have the Court look only to its cherry-picked quotations.  But Honeywell's October 2003 bulletin included the clear qualifier that a "suggested" life span of five years "*assume[ed] proper care and use*," and that five years could be considered "typical" only for a "*maintained*" ballistic garment.  (Gov. Ex. G, at AHON00029256, referenced at Compl. ¶ 70.) As the Government's exhibit makes clear, Honeywell then proceeded to quote extensively from NIJ's own reports, including its warning that "*2- or 3- year-old armor that has been worn regularly and improperly cared for may not be serviceable*." (Gov. Ex. G, at AHON00029256.) This technical bulletin also quoted extensively from NIJ's September 2003 release, which

emphasized that, "Proper care, storage, and cleaning of the armor are ***critical to maximizing its useful life***.  Storage of the armor in extreme environmental conditions or non-temperature-controlled environments (e.g., automobile trunks, non-climate-controlled storage rooms or areas) is not recommended under any circumstances."  (*Id*. (emphasis added).)  It is inexplicable how this bulletin could be construed as "reinforcing" the notion of an unqualified guarantee of service life.

## II.    THE GOVERNMENT STILL FAILS TO IDENTIFY A FALSE STATEMENT OR RECORD UNDER SECTION 3729(a)(2).

Although the Government refers no fewer than 11 times to Honeywell's "campaign of false statements and deception" (*see, e.g.*, Opp. at 2, 11, 17), it still fails to identify a single specific example of an ***objective falsehood***.  *See, e.g.*, *U.S. ex rel. Siewick v. Jamieson Science & Eng'g, Inc.,* 214 F.3d 1372, 1378 (D.C. Cir. 2000) (requiring underlying "facts" that "the speaking party could reasonably classify as true or false").  In arguing the point, the Government grossly overstates its actual allegations, ignores many of the allegations in the Complaint that are inconsistent with its "partial disclosure" theory, and fails to refute the basic principle that matters of reasonable scientific judgment cannot be "false" as a matter of law.  *See*, *e.g.*, *U.S. ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds can differ ***cannot be false*.**"); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 810 (D. Utah 1988).

The Government's attempt to discredit *Boisjoly*, which correctly recognized that a document reflecting engineering judgment was "clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim," *id*. at 810, is misleading.  Though another aspect of *Boisjoly* may have been called into question by other courts (although none, notably, in this Circuit), the straightforward principle for which Honeywell cites it—that a

scientific judgment cannot be "false" under the FCA—has never been in doubt.  At bottom, notwithstanding the well-established case law to the contrary, the Government's theory is that Honeywell's scientific judgment was "false" because the Government disagrees with it.

The Government tries to excuse its failure to respond to Honeywell's brief on this point by suggesting that Honeywell's legal arguments about scientific judgment are "factual" and therefore inappropriate for a motion to dismiss.  (Opp. at 32.)  This mechanical response, a variant on the Government's general answer to so many of Honeywell's legal arguments, is particularly egregious here.  Among other things, it misses the fundamental point that falsity is a threshold element of an FCA action, and it is therefore the Government's *legal* obligation as plaintiff in an FCA action to allege a falsehood *somewhere*.  Where (as here) the Government has tried to plead falsity by pleading only statements that cannot be false as a matter of law, an invocation of "factual dispute" makes no sense.  Indeed, the Government cannot escape the fact that the only issues it identifies as alleged "falsehoods" are matters of scientific judgment, and it does not allege *anything*—either in its Complaint or its brief—to suggest that these scientific judgments were unreasonable.  All that the Government offers to refute this is a characterization that Honeywell exercised its scientific judgment in "bad faith" (Opp. at 32) and a generalized reference to the "direct and inferential evidence" of that bad faith by citing almost the entire Complaint (*id.*).  The Government's wishful thinking about what its Complaint alleges cannot change the fact that the Complaint alleges no such thing.

In the end, the Government never provides the factual allegations necessary to draw its desired inference that Honeywell's "downplaying" of one dataset and "emphasizing" of another dataset that it deemed more relevant was "fraudulent."  The Government does not dispute that Honeywell shared with Armor Holdings the results from both the accelerated aging testing and

the warehouse testing, nor does it dispute that the warehouse results were favorable to Honeywell. (Compl. ¶¶ 50, 53, 55, 62-65.) But it jumps to the conclusion that "emphasizing" the warehouse data was "fraudulent" without ever alleging the real-world conditions to which vests would be exposed that would make it scientifically impossible for the warehouse data to be accurate. The Government never offers facts to refute Honeywell's conclusion that the warehouse data better approximated real-world conditions and therefore was entitled to "emphasizing" (*See* Honeywell Br. at 22.) Neither the Complaint nor the opposition brief venture into these critical factual allegations of why, based on real-world use, sensitivity to a particular level of heat and humidity would be more important than sensitivity to another level of heat and humidity. Though the Government quibbles with its legal obligation to articulate "why" something was false under Rule 9(b) (notwithstanding the Rule's clear requirement of alleging the "***circumstances constituting fraud***," and the case law's repeated recitation of "who, what, when, where, and how," *see, e.g.*, *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004)), its failure to do so is dispositive under Rule 8(a) as well. Without such facts, there is no false statement.

Similarly, the Government's discussion of the September 2003 "internal draft report"— still its ***only*** example of Honeywell's alleged failure to provide information to Armor Holdings— fails to articulate why Honeywell was legally obligated to publicly disclose an internal draft report that on its face indicated that "statistical confidence intervals" prevented "hard conclusions." (Honeywell Ex. F, at HW0061242.) The Government's self-serving dismissal of this unambiguous statement as a "vague reference" does not advance its case. The document is self-described as inconclusive, and the Government offers no specific allegations to dispute that. More important, any theory of FCA liability based on a failure to disclose such an intermediary

and inconclusive "internal draft" document has no stopping point. It would impose on a company an unfettered duty to publish—both to its customers and the Government itself—every report it generates, regardless of how preliminary, unsubstantiated or inconclusive.

Finally, the Government provides no legal authority for the proposition that Honeywell was ever obligated to provide information directly to the Government, a party with whom it had no privity of contract. The Government's reference on this point to *United States v. Bornstein*, 423 U.S. 303, 309 (1976), completely misses the mark. (Opp. at 35.) Though it is true, as *Bornstein* holds, that the absence of privity is not a bar to FCA liability, that lack of privity still means—and *Bornstein* does not say otherwise—that the Government had no basis to expect and Honeywell had no duty to provide any information directly to the Government. The opposition brief emphasizes that it was Armor Holdings (and not Honeywell) who issued the July 2001 storage advisory to its customers (including the Government) as if this distinction is relevant (Opp. at 35), but in fact the argument only bolsters Honeywell's point. Not only would it have made no sense for Honeywell to communicate directly with Armor Holdings' customers (including the Government), with whom it had no contracts or direct contacts, but it is not and cannot be fraud to fail to disclose information that had already been disclosed to all relevant parties by someone else. The Government cites no precedent for imposing such a duty of disclosure on a subcontractor when the subcontractor disclosed everything directly to the prime contractor.

Moreover, the Government itself alleges that Honeywell **was** actually publicly reiterating the key information about proper care and storage that had had already been disclosed both by Armor Holdings and NIJ. As the Government's own Exhibit G reveals, and as discussed above, Honeywell wrote in its October 2003 technical bulletin, quoting NIJ:

On September 30, 2003, the National Institute of Justice reiterated the critical importance of properly caring for body armor … : 'Proper care, storage, and cleaning of the armor are critical to maximizing its useful life. Storage of the armor in extreme environmental conditions or non-temperature-controlled environments (e.g., automobile trunks, non-climate-controlled storage rooms or areas) is not recommended under any circumstances.'

(Opp. Ex. G, at AHON00029256). Thus, the Government concedes that Honeywell disclosed to Armor Holdings its test data, both favorable and unfavorable (Compl. ¶¶ 50, 53, 55, 62-65), reiterated in technical bulletins the connection between high heat and humidity and ballistic performance (Opp. Ex. G), and made clear that any "suggested" lifespan of five years assumed "proper care and use" (*id.*). In light of Z Shield's satisfaction of all NIJ Standards (Compl. ¶ 30) and increased wearability due to lighter than average weight, Honeywell's opinion that Z Shield vests were "state of the art" cannot possibly provide the objective falsehood necessary to state an FCA claim. *See, e.g.*, *Robins Printing Co. v. Crosfield Elecs., Inc.*, No. 92-2446, 1994 WL 284105, at *2 (6th Cir. June 23, 1994).

## III.    THE GOVERNMENT HAS NOT ADEQUATELY PLEADED THE REQUISITE LEVELS OF SCIENTER.

Although this case begins and ends with the Government's failure to identify any objective falsehood—either in a claim submitted to the Government or a statement or record by Honeywell—the Government has also failed to adequately plead the intent required under the FCA. The Government grossly overstates the degree to which it can escape pleading scienter. As a recent district court opinion observed, "The Federal Rules provide that knowledge and other conditions of mind may be 'averred generally.' Fed. R. Civ. P. 9(b). But this nod to the practical difficulties of proving scienter ***does not absolve plaintiffs of their duty to plead some facts from which the court may reasonably infer knowledge or another mental state***." *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 132 (D.D.C. 2008) (emphasis added). Here, any "facts" to support its conclusory allegations of Honeywell's "knowledge" with respect to any false claim or

false statement are conspicuously absent. The Government's conclusory and unhelpful citation to "(Compl. ¶¶ 34-83)" as providing the basis of Honeywell's alleged bad faith cannot change this pleading deficiency. (Opp. at 36.)

For the "knowledge" required under Section 3729(a)(1), the Complaint lacks the inference that Honeywell was acting even "recklessly" with respect to Armor Holdings' promises, because the Government has failed to identify the government contract or actual warranty it was allegedly relying upon as "guaranteeing" five years of service. Moreover, the Government fails to discredit the principle that the law favors an interpretation of an ambiguous warranty as one for repair or replacement, not a guarantee of service life. As a result, even if the language of the bid proposal form were governing, Honeywell's interpretation was still the most reasonable *as a matter of law*. *See* Part I.B.1, *infra*. And as discussed above, there can be no issue of fact regarding the Government's "knowledge" that a five-year warranty was not a guarantee of service life when NIJ itself authored a report stating precisely that. (Honeywell Ex. A, at 62.) Nor does the Government dispute the applicable case law holding that government knowledge cuts against any allegation that a defendant "knowingly" presented a false claim. *See U.S. ex rel. Bettis v. Odebrecht Contractors of Cal. Inc.*, 297 F. Supp. 2d 272, 285 n.22 (D.D.C. 2004).

As for the two-pronged scienter requirement of Section 3729(a)(2), the Government has not satisfied the first prong—"knowledge" with respect to Honeywell's alleged "false statements and records"—for the same reason it has not identified any "falsity." Every statement it identifies was a matter of scientific judgment, and it has not alleged any facts to support an inference that Honeywell acted in bad faith.

For the second prong, the Government concedes that it requires a showing that "a defendant made or caused another to make a statement or record *for the purpose of* getting the Government to pay a false or fraudulent claim." (Opp. at 14.) Yet it then proceeds to ignore its own statement, mischaracterize the key holding of *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008), which articulates a clear requirement of *specific* intent, *id.* at 2128, and dwell on inapposite cases discussing principles of *general* intent. (Opp. at 41.) Any discussion of whether defendants are "answerable" for the "natural, ordinary, and reasonable consequences" of their misconduct (*see* Opp. at 41) is irrelevant here, as *Allison Engine* expressly requires something more than that. *Id.* at 2128. As the Supreme Court specifically articulated, "If a subcontractor or another defendant makes a false statement to a private entity and does not *intend the Government to rely on that false statement as a condition of payment*, the statement is not made with the purpose of inducing payment of a false claim 'by the Government.'" *Id.* at 2130 (emphasis added).

Dismissal is warranted where, as here, there is no factual assertion to support an inference of specific intent. *See, e.g.*, *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 42-43 (D.D.C. 2007) (dismissing claim after noting that "[i]f plaintiffs' claim is not supported by a factual assertion . . . specific intent is not sufficiently pled"). The Government has alleged no basis for concluding that Honeywell acted with such purpose even with respect to the federal government's direct contracts with Armor Holdings, to say nothing of the much more attenuated sales to states and localities that would only indirectly impact the federal government through the BPVGPA program if any reimbursement was even sought. Contrary to the Government's misguided assertion, it does *not* satisfy Rule 9(b) to parrot the statutory language. (*See* Opp. at 41 (quoting Compl. ¶ 91).) If *Twombly* did nothing else, it made clear that, even under Rule

8(a), to say nothing of Rule 9(b), a "formulaic recitation of a cause of action's elements will not do." *Twombly*, 127 S. Ct. at 1965. Here the Government has offered no factual basis for concluding that Honeywell was acting with specific intent to defraud anyone, much less the federal government.

## IV.    THE GOVERNMENT STILL FAILS TO IDENTIFY ANY UNJUST ENRICHMENT.

Reciting the elements of unjust enrichment and rehashing its theory of FCA liability, the Government still fails to escape the reality that what the Government demanded were NIJ-certified vests and what the Government received were NIJ-certified vests, along with a host of disclosures and disclaimers about the avoidance of heat and humidity and the potential for degradation in ballistic performance if such warnings were ignored. Contrary to the Government's blanket assertions (Opp. at 43), and as discussed above (*see* Part I, *infra*), the Complaint does ***not*** adequately allege that the Government failed to receive the benefit of its bargain. Where Armor Holdings provided to the Government exactly what was promised, and where Honeywell provided to Armor Holdings exactly what was promised, there can be no "unjust" retention of benefits. *Shenandoah Assocs. Ltd. P'ship v. Tirana*, 182 F. Supp. 2d 14, 24-25 (D.D.C. 2001). The Government's tired refrain that the Court should "refrain from deciding this factual issue" (Opp. at 43) is again unavailing. As with Counts I and II, the law alone provides sufficient grounds for dismissal of Count III as well.

24

## CONCLUSION

For the foregoing reasons, and those set forth in Honeywell's opening brief, the Court should grant Honeywell's motion to dismiss.


Date:   August 29, 2008                Respectfully submitted,


                                       /s/ Craig S. Primis
                                       Eugene F. Assaf, P.C. (D.C. Bar No. 449778)
                                       Craig S. Primis, P.C. (D.C. Bar No. 454796)
                                       Jennifer W. Cowen (D.C. Bar No. 974412)
                                       KIRKLAND & ELLIS LLP
                                       655 15th Street, N.W.
                                       Washington, D.C. 20005
                                       (202) 879-5000


                                       Attorneys for Defendant
                                       Honeywell International Inc.

**CERTIFICATE OF SERVICE**

This is to certify that on this 29th day of August, 2008, I electronically filed a true and correct copy of the foregoing Defendant's Reply Memorandum Of Points And Authorities In Support Of Motion To Dismiss by using the CM/ECF system, which will send a notice of electronic filing to Albert Thomas Morris, Alicia J. Bentley, and Callie R. Owen, counsel for the Plaintiff.

/s/ Craig S. Primis

Craig S. Primis, P.C.