_____
                              )
UNITED STATES OF AMERICA,      )
                              )
            Plaintiff,         )
                              )
      v.                       )      Civil Action No. 08-961 (RWR)
                              )
HONEYWELL INTERNATIONAL INC.,  )
                              )
            Defendant.         )
_____)


## MEMORANDUM OPINION AND ORDER

The government filed a complaint against defendant Honeywell International Inc., alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, as well as a common law unjust enrichment claim in connection with the sale of Zylon body armor shields. Honeywell has moved to dismiss the complaint for failure to state a claim and sufficiently plead fraud. Because the government has sufficiently alleged its FCA and unjust enrichment claims and pled fraud with sufficient particularity, Honeywell's motion to dismiss will be denied.

### BACKGROUND

The complaint alleges the following facts. Honeywell purchased the synthetic fiber "Zylon" for use in the manufacture of Z Shields, panels of laminated fibers that are incorporated into bulletproof vests. (Compl. ¶¶ 2, 21-22.) Armor Holdings, Inc. paid more than fifteen million dollars for more than one

hundred thousand pounds of Z Shield, which it used to manufacture bulletproof vests. (<u>Id.</u> ¶ 23.) "Honeywell and Armor Holdings marketed Z Shield vests as 'groundbreaking' technology that offered the highest levels of ballistic protection and represented the state of the art in ballistic performance." (<u>Id.</u> ¶ 24.) Armor Holdings sold vests to federal agencies and to state, local, and tribal law enforcement authorities under the Bullet Proof Vest Grant Partnership Act Program, under which the federal government reimbursed these authorities for up to fifty percent of the costs of the body armor. (<u>Id.</u> ¶¶ 13-16.) The National Institute of Justice ("NIJ"), which tests bulletproof materials, certified that all Z Shield vests that Armor Holdings sold met NIJ's minimum ballistic standards. (<u>Id.</u> ¶ 30.) Armor Holdings initially offered a five-year warranty on its vests. (<u>Id.</u> ¶ 32.) The federal government paid Armor Holdings more than twenty million dollars for Z Shield vests. (<u>Id.</u> ¶ 23.)

The government alleges that "Honeywell knew that Armor Holdings relied on Honeywell's technical expertise regarding Z Shield," and Honeywell tested the tensile strength of the Z Shield, interpreting the data for Armor Holdings. (<u>Id.</u> ¶ 33.) Beginning in April 2000, Honeywell learned from the company that manufactured Zylon that the fiber's strength deteriorated when exposed to light. (<u>Id.</u> ¶ 35.) While Honeywell did not share with Armor Holdings these findings, which showed a thirty-five to

fifty percent drop in tensile strength, Honeywell did share data from a test it performed which revealed a three percent drop in strength after a shorter period of exposure to light. (<u>Id.</u> ¶ 36.)

Honeywell became concerned with other potential sources of degradation, and it began testing Z Shield's reaction to moisture. (<u>Id.</u> ¶ 37.) After another producer of Zylon body armor reported that one of its shield vests had failed and expressed misgivings about using Zylon in bulletproof vests, Armor Holdings –– without Honeywell's input –– "issued a body armor storage advisory warning its customers to store body armor containing woven Zylon or Z Shield in a dry and cool place and not to store it at temperatures above 120 degree F and 50% humidity." (<u>Id.</u> ¶¶ 38-39, 41.) Honeywell received additional data from other producers of Zylon products suggesting Zylon was not suitable for use in bulletproof armor (<u>id.</u> ¶¶ 43-47), but it "continued to represent Z Shield as a safe and effective material suitable for body armor." (<u>Id.</u> ¶ 44.)

Additionally, Honeywell began performing its own environmental exposure and ballistics tests on Z Shields. This included "accelerated aging" testing, which would determine "whether Z shield would lose tensile strength over time" under non-extreme, foreseeable conditions. (<u>Id.</u> ¶¶ 33, 48.) Honeywell's initial testing "showed a 13.3% decline in the

ballistic integrity of Z Shield when exposed to 90 degrees C
(about 234 F) for one week.  The same testing showed that the
non-Zylon shield products of Honeywell that were tested as
controls lost little, if any, of their ballistic integrity."
(Id. ¶ 49.)  However, Honeywell "emphasized other, more favorable
preliminary data" to Armor Holdings.  (Id. ¶ 50.)  Honeywell
tested Z Shield's ballistic integrity in other hot and humid
environmental conditions, and these tests revealed substantial
declines in ballistic integrity as compared to that of control
products.  (Id. ¶¶ 51-52.)  In a conference call, Honeywell
"downplayed" the results to Armor Holdings.  (Id. ¶ 53.)
Honeywell conducted additional accelerated aging tests that also
revealed degradation in the fiber.  (Id. ¶¶ 54-55.)  A Honeywell
employee drafted a report accurately summarizing the negative
results of its accelerating aging tests, but Honeywell never
shared the report with Armor Holdings.  (Id. ¶¶ 56-60.)

Representatives of Armor Holdings met with representatives
of Honeywell in January 2003.  At that meeting, Honeywell
informed Armor Holdings that none of its data should cause Armor
Holdings to reconsider marketing or selling Z Shield vests.  (Id.
¶ 62.)  At an internal Honeywell meeting prior to the meeting
with Armor Holdings, Honeywell instructed its personnel to
"provide some of the test data, but not the conclusions" to Armor
Holdings.  (Id. ¶ 63.)  In April 2003, Honeywell published a

technical paper that disclosed some favorable test data but omitted all of the negative accelerated aging data.  (<u>Id.</u> ¶ 65.)

In 2004, Armor Holdings performed its own testing on used vests, which revealed a substantial decline in the strength of used Z Shields as compared to new Z Shields.  (<u>Id.</u> ¶ 71.)  After evaluating these data, Armor Holdings reduced the length of its warranty from five years to thirty months.  However, Honeywell expressed disagreement with Armor Holdings' decision.  (<u>Id.</u> ¶ 72.)  After the NIJ performed its own ballistic testing, which confirmed that Zylon quickly lost ballistics integrity, it decertified all Zylon products in August 2005.  (<u>Id.</u> ¶¶ 78, 84-85.)

The government filed a complaint asserting claims against Honeywell for FCA violations involving presenting fraudulent claims and making false statements, and for common law unjust enrichment.  (<u>Id.</u> ¶¶ 86-89, 90-93, 94-97.)  Honeywell has filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the government failed to plead fraud with the specificity required by Rule 9(b), failed to plead factual allegations that Honeywell presented a false claim for payment or made a false statement to the United States, and failed to plead factual allegations that support its unjust enrichment claim.

## DISCUSSION

In evaluating a Rule 12(b)(6) motion, a court "'may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice.'" <u>Trudeau v. FTC</u>, 456 F.3d 178, 183 (D.C. Cir. 2006) (quoting <u>EEOC v. St. Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624 (D.C. Cir. 1997)). A court considering a Rule 12(b)(6) challenge must accept as true any facts alleged by the plaintiff and grant all reasonable inferences drawn from those facts. <u>Browning v. Clinton</u>, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>

Rule 9(b) applies to FCA actions. <u>United States ex rel. Totten v. Bombardier Corp.</u>, 286 F.3d 542, 551-52 (D.C. Cir. 2002) (noting that every circuit to consider the issue has held that Rule 9(b) applies to FCA complaints). It provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b) to "ensure that defendants have adequate notice of the charges against them to prepare a defense[,]" United States ex rel. McCready v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 114, 116 (D.D.C. 2003), discourage "suits brought solely for their nuisance value" or as "frivolous accusations of moral turpitude[,]" United States ex rel. Joseph v. Cannon, 642 F.2d 1373, 1385 (D.C. Cir. 1981), and "'protect reputations of . . . professionals from scurrilous and baseless allegations of fraud[.]'" Id. at 1385 n.103 (alteration in original) (quoting Felton v. Walston & Co., Inc., 508 F.2d 577, 581 (2d Cir. 1974)).

Rule 9(b) does not abrogate Rule 8, and must be read in light of Rule 8's requirement that allegations be simple, concise, and direct, and short and plain statements of each claim. Joseph, 642 F.2d at 1386; see also United States ex rel. Poque v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 258, 269 (D.D.C. 2002) ("While . . . Rule 9(b) requires more particularity than Rule 8, . . . Rule 9(b) does not completely vitiate the liberality of Rule 8."). In an FCA action, Rule 9(b) requires that the pleader "'state the time, place and content of the false misrepresentations, the fact misrepresented and what

was retained or given up as a consequence of the fraud[,]' . . . [and] individuals allegedly involved in the fraud."[1] <u>United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.</u>, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting <u>Kowal v. MCI Communic'ns Corp.</u>, 16 F.3d 1271, 1278 (D.C. Cir. 1994)). "In sum, although Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years, defendants must be able to 'defend against the charge and not just deny that they have done anything wrong.'" <u>Id.</u> at 1259 (quoting <u>United States ex rel. Lee v. SmithKline Beecham, Inc.</u>, 245 F.3d 1048, 1052 (9th Cir. 2001)); <u>accord</u> <u>McCready</u>, 251 F. Supp. 2d at 116 (reasoning that a court "'should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a

---

[1] Honeywell argues, citing <u>In re XM Satellite Radio Holdings Sec. Litig.</u>, 479 F. Supp. 2d 165, 183 (D.D.C. 2007), that Rule 9(b) requires a plaintiff to explain in its complaint why a particular statement is fraudulent to survive a motion to dismiss. (Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss at 10.) However, <u>XM Satellite</u> involved a claim under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which "heightened the requirement for pleading scienter so that plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" <u>Id.</u> at 175 (quoting 15 U.S.C. § 78u-4(b)(2)). The FCA contains no such heightened pleading requirement. <u>See</u> <u>Joseph</u>, 642 F.2d at 1385-86; <u>see also</u> <u>McCready</u>, 251 F. Supp. 2d at 118 (noting in an FCA case that "a plaintiff need not plead his legal theory of fraud in the complaint; the complaint must plead only the facts that form the basis for the fraud").

defense at trial, and (2) that plaintiff has substantial
prediscovery evidence of those facts'" (quoting <u>Harrison v.
Westinghouse Savannah River Co.</u>, 176 F.3d 776, 784 (4th Cir.
1999))).

I.   PRESENTING FALSE CLAIMS

The FCA created a cause of action against anyone who
"knowingly presents, or causes to be presented, to an officer or
employee of the United States Government . . . a false or
fraudulent claim for payment or approval[.]"  31 U.S.C.
§ 3729(a)(1) (2000).[2]  <u>See also</u> <u>United States ex rel. Siewick v.
Jamieson Sci. & Eng'g, Inc.</u>, 214 F.3d 1372, 1374 (D.C. Cir.
2000).  "[T]he elements of section 3729(a)(1) are (1) the
defendant submitted a claim to the government, (2) the claim was
false, and (3) the defendant knew the claim was false."  <u>United
States ex rel. Harris v. Bernad</u>, 275 F. Supp. 2d 1, 6 (D.D.C.
2003).  A subcontractor may be liable under § 3729(a)(1) even
when it did not itself present any false claims to the government
if it engaged in a fraudulent scheme that induced the government
to pay claims submitted by the contractor.  <u>See</u> <u>United States ex</u>

---

[2] Congress amended the FCA in the Fraud Enforcement and
Recovery Act of 2009 ("FERA"), altering slightly the language in
the presentment provision.  The amendment of the presentment
provision took "effect on the date of enactment of this Act and
shall apply to conduct on or after the date of enactment[.]"
P.L. 111-21, § 4 at 1625.  Since the alleged conduct here
occurred before 2009, the provision as amended in 2009 does not
apply here, and references in this opinion to § 3729(a)(1) are to
the pre-amendment version.

rel. Westrick v. Second Chance Body Armor, Inc., 685 F. Supp. 2d
129, 136 (D.D.C. 2010); Pogue, 238 F. Supp. 2d at 266 ("An
argument that the presentation of the claims was the work of
another is unavailing as a means to avoid liability under
[§ 3729(a)(1)].").

   A.   Falsity

   Honeywell argues that the government has not alleged
sufficiently the falsity of any claim that Armor Holdings
submitted to the government for payment.  (Def.'s Mem. of P. & A.
in Supp. of Mot. to Dismiss ("Def.'s Mem.") at 10.)  A claim may
be false under the FCA if it is either factually or legally
false.  United States v. Sci. Applications Int'l Corp., 555 F.
Supp. 2d 40, 49 (D.D.C. 2008).  A claim can be "factually false
if it invoices for services that were not rendered" or
incorrectly describes goods or services provided.  United States
ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d
25, 64 (D.D.C. 2007).  Alternatively, a claim is legally false if
it contains an express false certification -- that is, "a claim
that falsely certifies compliance with a particular statute,
regulation or contractual terms, where compliance is a
prerequisite for payment."  Id. (internal quotations marks
omitted).  A claim also may be legally false under an implied
certification theory.  Id.  One way to plead a false claim under
this theory is to plead "that the contractor withheld information

about its noncompliance with material contractual requirements."[3]
United States v. Sci. Applications Int'l Corp., 626 F.3d 1257,
1269 (D.C. Cir. 2010).  A contractual requirement can be
considered material if "both parties to the contract understood
that payment was conditional on compliance with the requirement
at issue."  Id.; see also United States v. TDC Mgmt. Corp., Inc.,
288 F.3d 421, 426 (D.C. Cir. 2002) (noting that withholding
"'information critical to the decision to pay'" is a false claim
(quoting Ab-Tech Constr., Inc. v. United States, 31 Fed. Cl. 429,
434 (Fed. Cl. 1994))).

The government alleges that it believed it was purchasing
vests that met the industry-standard five-year warranty against
defects (see Compl. ¶¶ 18, 31-32), and that Honeywell failed to
disclose or selectively disclosed information to Armor Holdings
and to the public that revealed that the vests were defective and
that cast doubt on the vests' ability to satisfy the warranty.
(See id. ¶¶ 3-5, 36, 50-51, 53, 55-60, 65.)  "Honeywell
understood that [Z Shield] degradation would negatively impact
the ballistic performance of bullet proof vests containing Z
Shield so that over a short period of time these vests would no

_____

[3] Another way is to plead that the government would not have
paid funds to a party had it known of a violation of a law or
regulation, and "the claim submitted for those funds contained an
implied certification of compliance with the law or regulation
and was fraudulent."  United States ex rel. Barrett v.
Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 28, 33 (D.D.C.
2003).

longer be fit for use as body armor." (Compl. ¶ 4.) Further, "[h]ad the United States known of the defective nature of the Z Shield Vests, it would not have purchased them for use in the ballistic protection of law enforcement officers. But Honeywell did not inform the United States of the defects in Z Shield and instead took affirmative steps to cover up those risks." (<u>Id.</u> ¶ 88.) Because the government does not allege in the complaint that Armor Holdings or Honeywell invoiced for services not rendered or described incorrectly the goods Armor Holdings or Honeywell provided, the government has not pled that Honeywell submitted a factually false claim. Nor has the government pled an express false certification claim, since the complaint does not allege that any of the relevant contracts contained express provisions requiring five-year warranties against defects.

Rather, the government has pled that it understood to be a condition of payment the requirement that the vests satisfy the five-year industry standard warranty by remaining fit for use as body armor for five years. (<u>Id.</u> ¶¶ 14, 87.) Although the government does not state directly in its complaint that Honeywell also understood such requirements to be conditions of payment, when construed in the light most favorable to the government, the allegations that Honeywell took affirmative steps to conceal from Armor Holdings and the United States the available data on the vests' performance are sufficient to plead

that Honeywell also understood payment to be conditioned upon
compliance with these requirements.  Thus, these allegations are
sufficient to state an implied certification claim with respect
to a contractual condition.  The government sets out in detail
the time, place, and content of the false representations and
identifies individuals allegedly involved in the fraud, such that
its allegations satisfy the requirements of Rule 9(b).

Honeywell argues that the government has misconstrued the
relevant warranty as one that guaranteed service for five years
and that Armor Holdings warranted only that it would replace or
repair a defective shield within five years of its retail
purchase.  (Def.'s Mem. at 14.)  Honeywell cites in support of
its argument a warranty that it claims was standard for the sales
of all Armor Holdings' vests.  (Id., Ex. B.)  The government did
not attach this warranty to its complaint.  See St. Francis
Xavier Parochial Sch., 117 F.3d at 624 n.3 (refusing to consider
materials not attached to the pleadings when reviewing district
court ruling on a motion to dismiss).  Moreover, Honeywell's
argument raises questions of fact that are more appropriately
resolved after discovery closes, such as the scope of the
warranty and whether Armor Holdings issued that precise warranty
upon each sale of a Z Shield.  See Thompson v. Fathom Creative,
Inc., 626 F. Supp. 2d 48, 52-53 (D.D.C. 2009) (noting that pre-
discovery summary judgment motions are disfavored).  Cf. Benoit

v. U.S. Dep't of Agric., 577 F. Supp. 2d 12, 22 (D.D.C. 2008)
(choosing not to exclude materials outside the pleadings and
converting a motion to dismiss to one for summary judgment under
Fed. R. Civ. P. 12(d) where both parties had an opportunity to
present all materials pertinent to a motion for summary
judgment).  Thus, these factual issues will not be resolved at
the motion to dismiss stage of the litigation, where the
plaintiff's factual allegations are accepted as true.[4]

Honeywell also argues that the complaint alleges that Armor
Holdings disclosed the defects to the government when it issued a
storage advisory in July 2001.  (Def.'s Mem. at 15-16.)  That
storage advisory warned the purchasers of Z Shields not to store
the armor in conditions above 120 degrees Fahrenheit and fifty
percent humidity.  (Compl. ¶ 41.)  Honeywell argues that this
storage advisory "disclosed the facts the Government now claims
were hidden."  (Def.'s Mem. at 15 (emphasis omitted).)

Evidence of the storage advisory on a motion for summary
judgment might be relevant to establishing the government's
knowledge of "how Z Shield's tensile strength reacted in hot and

_____

[4] Honeywell also cites an admission from the NIJ warning law
enforcement agencies that warranties from the manufacturers of
bullet-proof vests do not reflect the anticipated service life of
the product.  (Def.'s Mem. at 15 (citing NIJ Guide 100-01 (Nov.
2001).)  While such an admission may bear upon whether both
parties understood that payment was conditional on compliance
with a five-year warranty, here again Honeywell raises a factual
issue that is not resolved appropriately on a motion to dismiss.

humid conditions." (Compl. ¶ 33.) However, Honeywell's argument
fails to account for the multiple types of tests that Honeywell
performed on its Z Shields. Honeywell also conducted
"accelerated aging" tests to determine "whether Z Shield would
lose tensile strength over time" under non-extreme, foreseeable
conditions. (Id. ¶¶ 33, 48 (noting that a Honeywell technical
bulletin stated that "data taken at higher temperatures on a
rapid time scale can be used to determine data at lower
temperatures on a much slower time scale").) These test results,
which Honeywell either failed to disclose or obscured, suggested
that Z Shields would quickly lose tensile strength even under
typical use conditions and with proper storage. (Id. ¶¶ 35-36,
43-73.) Z Shield vests could not satisfy five-year warranties
because in typical conditions, their ballistic integrity
deteriorated much more quickly than did the ballistic integrity
of body armor made with other materials. (Id. ¶ 49.) The
storage advisory does not address such a defect. Thus,
acknowledging the storage advisory does not void this claim
brought under an implied certification theory of falsity. Cf.
Boisjoly v. Morton Thiokol, Inc., 706 F. Supp. 795, 809 (D. Utah
1988) (noting that the government's complaint failed to satisfy
the falsity element under the FCA when "the complaint itself
[alleged the government's] knowledge of the claimed defects in
the same sentences in which those defects [were] identified").

B.   Fraudulent inducement

"[E]ven in the absence of evidence that the claims were
fraudulent in themselves," claims that were submitted under a
contract procured by fraud can be actionable.  United States ex
rel. Bettis v. Odebrecht Contractors of Cal., Inc., 393 F.3d
1321, 1326 (D.C. Cir. 2005) (further stating that Congress
intended that "'each and every claim submitted under a contract
. . . or other agreement which was originally obtained by means
of false statements or other corrupt or fraudulent conduct . . .
constitutes a false claim" under § 3729(a) (quoting S. Rep. No.
99-345, at 9 (1986))).  In United States ex rel. Schwedt v.
Planning Research Corp., 59 F.3d 196, 197 (D.C. Cir. 1995), the
defendant contracted to design software for an agency within the
Department of Labor.  The court of appeals noted that the
plaintiff could have pled a § 3729(a)(1) claim by alleging that
the defendant "made an initial misrepresentation about its
capability to perform the contract in order to induce the
government to enter into the contract[,] and . . . this original
misrepresentation tainted every subsequent claim made in relation
to the contract[.]"  Id. at 199.  The government's complaint here
alleges -- just as the court in Schwedt hypothesized that a
complaint could -- that Honeywell's misrepresentations about
Zylon's accelerated deterioration induced Armor Holdings to sell
Z Shields to the government (see Compl. ¶ 33 ("Honeywell knew

that Armor Holdings relied on Honeywell's technical expertise

regarding Z shield[.]"); id. ¶ 36 ("Honeywell knew that Armor

Holdings lacked the technical expertise to assess" test results

Honeywell shared with Armor Holdings)), and these

misrepresentations tainted all of Armor Holdings' claims for

payment from the government.  Thus, the complaint also states a

§ 3729(a)(1) claim under a fraudulent inducement theory.

C.  Knowledge

A person acts knowingly if he "(1) has actual knowledge of

the information; (2) acts in deliberate ignorance of the truth or

falsity of the information; or (3) acts in reckless disregard of

the truth or falsity of the information[.]"[5] 31 U.S.C. § 3729(b)

(2000).[6]  Because Rule 9(b) permits knowledge to be pled

generally, there is no basis for dismissal for failure to plead

knowledge with particularity.  However, "the practical

difficulties of proving *scienter* do[] not absolve plaintiffs of

their duty to plead *some* facts from which the court may

reasonably infer knowledge[.]"  Elemary v. Philipp Holzmann A.G.,

533 F. Supp. 2d 116, 132 (D.D.C. 2008).  The government's

---

[5] The FCA does not require proof of a specific intent to
deceive when a defendant presents false or fraudulent claims to
the government.  31 U.S.C. § 3729(b) (2000); United States v. TDC
Mgmt. Corp., Inc., 24 F.3d 292, 296 (D.C. Cir. 1994).

[6] FERA amended this provision, altering the definition of
knowledge in a fashion not material here.  In any event, the
amended provision does not apply to the conduct at issue.  See
supra n.2.

awareness at the time it paid a claim of the circumstances it
later pleads as a basis for asserting a false claim is relevant
to determining the defendant's scienter on a motion for summary
judgment, see <u>United States ex rel. Bettis v. Odebrecht
Contractors of Cal., Inc.</u>, 297 F. Supp. 2d 272, 285 n.22 (D.D.C.
2004), but not on a motion to dismiss. <u>See United States ex rel.
Hagood v. Sonoma Cnty. Water Agency</u>, 929 F.2d 1416, 1421 (9th
Cir. 1991).

Honeywell argues that the complaint does not plead
sufficiently that Honeywell knew the claims Armor Holdings was
submitting were false because "the sum of the Government's
allegations that might pertain to knowledge reduce to a
disagreement with Honeywell's scientific judgment about which
. . . datasets . . . best predicted Z Shield's real-world
performance." (Def.'s Mem. at 25.) "[M]ere disagreements over
scientific opinion, methodology, and judgments do not amount to
claims under the FCA." <u>Harris</u>, 275 F. Supp. 2d at 6. However,
the complaint alleges that "at the time Honeywell manufactured
and sold Z Shield, it possessed a wealth of scientific data
showing that Z Shield degraded quickly over time in hot and humid
environmental conditions" and that "Honeywell understood that
this degradation would negatively impact the ballistic
performance of bullet proof vests containing Z Shield[.]"
(Compl. ¶ 4.) Moreover, "Honeywell discouraged Armor Holdings

from taking steps to notify the end users about problems with Z

Shield or to mitigate the risk . . . due to a concern with the

negative market impact[.]" (Id. ¶ 5.)  No matter how Honeywell

chooses to characterize these allegations, the government has

pled that Honeywell intentionally obscured its Z Shield data, as

it "understood" that the negative data could have a detrimental

impact upon its market share.  These allegations allow for the

reasonable inference that Honeywell had actual knowledge of the

falsity of its representations.

## II.  FALSE STATEMENTS

The government alternatively pleads a claim under 31 U.S.C.

§ 3729(a)(2) (2000), which created a cause of action against

anyone who "knowingly makes, uses, or causes to be made or used,

a false record or statement to get a false or fraudulent claim

paid or approved by the Government."  Section 3729(a)(2) attaches

FCA liability to a defendant who prepares in support of a claim a

statement it knows to be a misrepresentation, even if that

defendant did not actually submit either the claims or the

statement to the government.[7]  United States ex rel. Totten v.

---

[7] FERA amended § 3729(a)(2).  The amended provision, 31
U.S.C.A. § 3729(a)(1)(B) (West 2011), creates a cause of action
against anyone who "knowingly makes, uses, or causes to be made
or used, a false record or statement material to a false or
fraudulent claim[.]"  FERA provided for § 3729(a)(1)(B)'s
retroactive application "to all claims under the False Claims Act
. . . that are pending on or after" June 7, 2008.  P.L. 111-21,
§ 4 at 1625.  The word "claims," as it applies in the relevant
provision, refers to "a defendant's request for payment" and not

Bombardier Corp., 380 F.3d 488, 501 (D.C. Cir. 2004) (noting that "(a)(2) is complementary to (a)(1), designed to prevent those who make false records or statements . . . from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval"); see also Harris, 275 F. Supp. at 6 (noting that "the main purpose of section 3729(a)(2) is to remove any defense that the defendants themselves did not submit false claims to the government").  To prove a violation of the false statements provision, "a plaintiff must show that (1) the defendant created a record and used this record to get the government[] to pay its claim, (2) the record was false, and (3) the defendants knew that the record was false." Harris, 275 F. Supp. 2d at 6.

A.  Falsity

Honeywell argues that the government has not alleged a false record or statement that Honeywell made to get the government to pay a false or fraudulent claim; the complaint pleads merely the existence of scientific disagreement as to the efficacy of the Z Shield.  (Def.'s Mem. at 20-21.)  In many instances, a court cannot determine whether the false statements alleged in a complaint constitute a non-actionable scientific disagreement or

_____

to "civil actions for FCA violations." United States v. Sci. Applications Int'l Corp., 653 F. Supp. 2d 87, 107 (D.D.C. 2009). Because the complaint does not allege that any requests for payment were pending after August 2005, the unamended false statements provision applies.

difference in interpretation without also considering the
complaint's allegations regarding the defendant's knowledge of
the falsity.  See <u>United States ex rel. Lamers v. City of Green
Bay</u>, 998 F. Supp. 971, 986 (E.D. Wis. 1998) (noting that
"[a]lthough discussing 'falsity' as a distinct element in an FCA
violation has a certain heuristic appeal, in practice courts have
found it impossible to give meaning to the term without also
implicating the third element, the requirement that the defendant
had 'knowledge' of the alleged falsity").  Here, the complaint
alleges that Honeywell cherry-picked the data it disclosed to
Armor Holdings and to the public so that it could continue to
sell Z Shields.  (Compl. ¶¶ 4-5.)  Thus, the complaint alleges
not merely objective scientific disagreement as to the findings
of the various tests Honeywell conducted, but Honeywell's bad
faith in selectively disclosing those findings.  See supra I(C).
Moreover, the complaint alleges that Honeywell did so
"knowingly."  (Compl. ¶ 91.)  Pleading that a defendant
"knowingly misrepresented and concealed facts" satisfies the
falsity requirement under 29 U.S.C. § 3729(a)(2).[8]  <u>United States</u>

---

[8] To the extent that Honeywell argues that the data did not
establish conclusively that the Zylon fiber degraded more quickly
than expected, this is a factual issue inappropriate for
resolution at this stage of the litigation, before either of the
parties has moved for summary judgment.  When the complaint is
construed in the light most favorable to the plaintiff, the
government's allegations that the concealed data show that the
Zylon degraded more quickly than expected pleads sufficient
falsity to survive a motion to dismiss.

ex rel. Westrick v. Second Chance Body Armor, Inc., 709 F. Supp.
2d 52, 56 (D.D.C. 2010) (holding that the complaint pled a claim
under the unamended § 3729(a)(2) in part because it tracked the
language of the statute); see also Fed. R. Civ. P. 9(b)
(providing that knowledge may be "alleged generally").

        B.    Intent

     In Allison Engine Co., Inc. v. United States ex rel.
Sanders, 553 U.S. 662, 668-69 (2008), the Supreme Court held that
the phrase "to get" requires that a person has the "purpose of
getting a false or fraudulent claim 'paid or approved by the
Government' in order to be liable under § 3729(a)(2)."  "[A]
subcontractor violates § 3729(a)(2) if the subcontractor submits
a false statement to the prime contractor intending for the
statement to be used by the prime contractor to get the
government to pay its claim."  Id. at 671.  The Court interpreted
the provision to make a defendant "'answerable for . . . the
natural, ordinary and reasonable consequences of his conduct'"
but not more.  Id. at 672 (quoting Anza v. Ideal Steel Supply
Corp., 547 U.S. 451, 470 (2006)).

     Honeywell argues that "the Complaint fails to allege that
Honeywell's express purpose in making any alleged false statement
or record was to obtain payment from the . . . Government itself"
(Def.'s Mem. at 28 (internal quotation marks omitted)), and that
"the Complaint nowhere alleges and could not allege that

Honeywell intended for the Government to rely on any statement or record." (<u>Id.</u> at 29 (emphasis omitted).)  The first argument incorrectly assumes that a complaint must allege that the defendant's express purpose in making a false statement is for the defendant to obtain payment directly from the government itself.  However, it is sufficient to allege that a subcontractor intended for the prime contractor to receive payment from the government.  <u>See</u> <u>Sanders</u>, 553 U.S. at 671.  The second argument misconstrues the government's theory of § 3729(a)(2) liability, which rests on Honeywell manipulating the data it communicated to Armor Holdings so that the government would rely on the lack of available definitive data about Zylon's loss of fiber strength when determining whether to continue purchasing Z Shield vests. (<u>See</u> Compl. ¶ 92 ("Had the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers.").) <u>Cf.</u> <u>Sanders</u>, 553 U.S. at 671-72 ("If a subcontractor . . . makes a false statement to a private entity and does not intend the Government to rely on that false statement as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim 'by the Government.'").  Thus, the government has alleged adequately that the natural consequences of Honeywell misrepresenting and concealing unfavorable data about Zylon's degradation caused Armor Holdings to submit to the

government false claims for payment.  See <u>Westrick</u>, 709 F. Supp.
2d at 56.

III. UNJUST ENRICHMENT

To state a claim for unjust enrichment, a plaintiff must
allege that a benefit was conferred upon a defendant, the
defendant accepted the benefit, and it would be unjust for the
defendant not to pay the plaintiff the value of the benefit.
<u>Miller v. Holzmann</u>, Civil Action No. 95-1231 (RCL), 2007 WL
710134, at *7 (D.D.C. Mar. 6, 2007).  "[U]njust enrichment must
be determined by the nature of the dealings between the recipient
of the benefit and the party seeking restitution, and those
dealings will necessarily vary from one case to the next."  <u>4934,
Inc. v. D.C. Dep't of Employment Servs.</u>, 605 A.2d 50, 56 (D.C.
1992); <u>see also</u> <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>,
295 F. Supp. 2d 30, 51 (D.D.C. 2003).  The <u>In re Lorazepam</u> court
refused to dismiss a claim for unjust enrichment brought by a
group of plaintiffs, including insurance companies, against drug
manufacturers for payments made to reimburse subscribers for
prescriptions.  295 F. Supp. 2d at 51.  The court held that the
theory of unjust enrichment could apply to indirect payments
because plaintiffs had properly alleged defendants' enrichment to
the plaintiffs' own detriment and not just to the detriment of
plaintiffs' subscribers.  <u>Id.</u>

Honeywell argues that the government has not stated an unjust enrichment claim because "Armor Holdings received the benefit of its bargain with Honeywell, and the Government received the benefit of its bargain with Armor Holdings." (Def.'s Mem. at 30.)  However, the government alleges that "the United States paid for defective Z Shield vests due to false statements and omissions by Honeywell" and that Honeywell "received money, . . . indirectly, to which they were not entitled."  (Compl. ¶¶ 95, 97.)  Honeywell does not dispute that it retained all the monies from its sales to Armor Holdings, and the government amply has stated a claim for unjust enrichment. See Westrick, 685 F. Supp. 2d at 142.  Whether Honeywell actually performed its contract in full, such that Armor Holdings and the government each received the benefit of their bargains, is a question of fact that is inappropriate for resolution at the motion to dismiss stage.

## CONCLUSION AND ORDER

The government has stated FCA and common law unjust enrichment claims, and it has pled its allegations regarding fraud with sufficient particularity to meet the standards articulated under Rule 9(b).  Accordingly, it is hereby

ORDERED that Honeywell's motion [10] to dismiss be, and hereby is, DENIED.

SIGNED this 8th day of July, 2011.

```
_____/s/_____
RICHARD W. ROBERTS
United States District Judge
```