UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>United States Department of Justice<br>Commercial Litigation Branch<br>P.O. Box 261<br>Ben Franklin Station<br>Washington, D.C. 20044<br><br>Plaintiff,<br><br>v.<br><br>HONEYWELL INTERNATIONAL, INC.,<br>101 Columbia Road<br>Morristown, NJ 07962<br><br>Defendant. | CV No. 08-0961 (RWR, DAR)<br><br>FIRST AMENDED COMPLAINT OF THE<br>UNITED STATES OF AMERICA<br><br>1.  VIOLATIONS OF THE FALSE<br>     CLAIMS ACT, 31 U.S.C.<br>     § 3729(a)(l);<br><br>2.  VIOLATIONS OF THE FALSE<br>     CLAIMS ACT, 31 U.S.C.<br>     § 3729(a)(2);<br><br>3.  UNJUST ENRICHMENT<br><br>Related cases: CV No. 04-0280 (Judge Roberts)<br>                      CV No. 07-1144 (Judge Roberts) |

Plaintiff, the United States of America, alleges for its First Amended Complaint

as follows:

**I.**
**OVERVIEW**

1.       This is an action brought by the United States to recover damages and

civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and to recover

damages for unjust enrichment. All of these claims are premised upon the misconduct of

Honeywell International, Inc. (Honeywell) in causing to be submitted false claims (*i.e.,*

invoices, electronic claims, and other proof of payments) for payment and false

statements and records in connection with the sale of defective body armor, primarily

ballistic resistant vests, to the United States and to state, local, and tribal law enforcement

agencies funded in part by federal funds. These defective vests contained a Honeywell

product known as Zylon Shield (Z Shield) that was patented and trademarked by

Honeywell and sold to Armor Holdings, Inc., and its subsidiaries (Armor Holdings).
Armor Holdings subsequently used Z Shield as the primary ballistic resistant material in
ballistic resistant vests sold to the United States and to state, local, and tribal law
enforcement agencies. The model numbers of these defective Z Shield vests include, but
are not limited to: XTZX2-l , XTX3A-l, XTX3A-2, XTX2-l, XTX2-2, XTX2A-1,
XTX2A-2, SE3A-5, SE2-6, PIIIA-4.5, PIIA-6.1, PIIA-4.1, PIl-6.0, PII-4.4, IR3A-0,
FYR3A-1, FEDAGNT-1, CBIIA/3-4.6, CBIIA/3-4.l, CBIIA/3-4.0, 3AXTZX, and
3AXTZX-1 (hereinafter Z Shield Vests).

2.      Honeywell obtained the Zylon fiber used in Z Shield from Toyobo Co.
Ltd. and Toyobo America, Inc. (collectively Toyobo), the fiber maker of Zylon. The Z
Shield product specifications, dated September 2000, explain that Z Shield is composed
"from unidirectional [meaning that all of the fibers are oriented in the same direction]
PBO [Zylon] fiber impregnated in a resin matrix, cross-plied in a (0/90) degree
orientation, sandwiched in thermoplastic film."

3.      Honeywell used its patented shield technology process to convert Zylon
into Z Shield, but the actual Z Shield manufacturing was done on behalf of Honeywell by
two foreign tolling companies, Dutch State Mines High Performance Fibers (DSM), from
2000 through 2001, and FMS Enterprises Migun Ltd. (FMS), from 2002 through 2005.
FMS began Z Shield tolling operations for Honeywell after DSM told Honeywell that it
would no longer continue tolling Z Shield because DSM believed that Z Shield lacked
suitability for ballistic applications due to the degradation and decreased ballistic
performance in heat and humidity, as shown by DSM's research.

4.     Honeywell placed its name and trademark on Z Shield. Honeywell then marketed Z Shield to Armor Holdings as "groundbreaking" technology, offering superior ballistic protection to competitive products containing woven Zylon and other aramids used in body armor. Relying on Honeywell's technical prowess, Armor Holdings purchased Z Shield from Honeywell, incorporated Z Shield into many of its most expensive body armor models as the primary ballistic resistant material, and then marketed and sold the Z Shield Vests to the Government as state-of-the-art ballistics technology. Despite its development of and representations about Z Shield, Honeywell has claimed in discovery that it did not know exactly how DSM or FMS manufactured Z Shield, did not know all of the ingredients used in the Z Shield manufacturing process by either of those companies, and did not (and does not) possess or control all of the manufacturing schematics and other manufacturing and ingredient documents relating to Z Shield.

5.     Honeywell knew, within the meaning of the FCA, that the Z Shield it sold to Armor Holdings for use in body armor was defective in at least three respects. First, due to the inherent characteristics of Zylon fiber used therein, Z Shield degraded more quickly than represented by Honeywell in heat and humidity close to field-use conditions. Second, Honeywell knew that the commercial Z Shield manufacturing process exacerbated Z Shield's degradation because of the water-based coating process used to apply the resin during Z Shield manufacturing. Honeywell experimented with other processes to try and lessen Z Shield degradation, but did not change, or even attempt to work with its tollers to change, the commercial manufacturing process for Z Shield. Third, Honeywell's design and test development of the shield part of Z Shield resulted in

a fragile shield that was insufficient to prevent the exposure of Zylon fibers inside the shield to environmental conditions that worsened Z Shield's degradation problems. As a result of this misconduct, the United States paid for defective Z Shield Vests.

6.      Honeywell knew about these defects, but nevertheless continued to sell Z Shield to Armor Holdings for use in ballistic applications without disclosing the risks. In particular, at the time that Honeywell sold Z Shield to Armor Holdings, it possessed a wealth of scientific test data showing that Z Shield degraded quickly over time at elevated levels of heat and humidity (referred to internally at Honeywell as "accelerated aging" testing or "environmental exposure or conditioning" testing) designed to try and approximate the aging process of materials. Honeywell also possessed test data measuring the ballistic performance of Z Shield that it exposed to uncontrolled temperatures and humidity levels in a warehouse in Petersburg, Virginia. This warehouse data showed declines in Z Shield's ballistic performance over time. Further, Honeywell possessed research showing that the water-based coating process used to apply the resin during the manufacturing process worsened Z Shield's degradation problems. Honeywell understood that this degradation would negatively impact the ballistic performance of body armor containing Z Shield so that over a relatively short period of time these vests could no longer be depended upon by the user to be fit for use as body armor. Additionally, Honeywell's quality control personnel identified problems with the shield purportedly protecting the Zylon fibers inside the shield, especially after FMS began tolling Z Shield for Honeywell in 2002.

7.      In particular, by July 2000, Honeywell scientists had identified sweat and rain as significant threats to Z Shield's long-term ballistic performance. Also, by

4

September 2001, Honeywell scientists had expressed concern about Z Shield's degradation in heat and humidity in conditions close to those in the field and about the water-based coating process for resin that worsened Z Shield's degradation. Furthermore, in 2002, Honeywell quality control personnel identified problems impacting the protection the shield provided to the Zylon fiber. Moreover, in September 2003, Honeywell's ballistics lab manager authored a draft report (the Honeywell Draft Report) that explicitly made the connection between Z Shield's degradation and ballistic performance. Also, the Honeywell Draft Report, and other Honeywell research materials, corroborated the problems with Z Shield after exposure to heat and humidity that Honeywell had identified earlier, including the lack of protection of the Zylon fibers inside the shield that contributed to degradation. Indeed, the Honeywell Draft Report included the Honeywell accelerated aging research data, developed in August 2003, showing Z Shield performing worse in terms of retention of ballistic performance after short-term exposure to elevated levels of heat and humidity than any of Honeywell's other ballistic resistant materials. Honeywell did not provide Armor Holdings with this August 2003 data.

8.     Honeywell knew that Armor Holdings sold Z Shield Vests to the United States and to state, local, and tribal authorities, who paid for vests in part with federal grant funds, that Armor Holdings offered their customers warranties on all of the Z Shield Vests (the vast majority of which were for five years, until the Summer of 2004, when Armor Holdings decreased the warranty to thirty months on several Z Shield Vest models due to its own internal concerns about Z Shield degradation that arose from Armor Holdings' in-house test data and test data from its outside consultant, Exponent),

that, due to the degradation problems, the Z Shield Vests could not be depended upon to protect the end user for five years from rounds the Z Shield Vests were certified to stop, and that the Government considered the warranty and Z Shield's fitness for use and ballistic performance material to its purchasing decisions.

9.      Yet, Honeywell did not provide the United States, or any state, local, or tribal authorities, with its negative Z Shield data or the Honeywell Draft Report highlighting the environmental degradation problems with Z Shield.  Honeywell also did not share all of its Z Shield data or the Honeywell Draft Report with Armor Holdings.

10.     Instead, Honeywell downplayed the risks associated with the Z Shield degradation data that Honeywell did disclose to Armor Holdings even though Honeywell knew that Armor Holdings relied upon it for scientific expertise regarding Z Shield.  For example, at a mid-January 2003 internal meeting, Honeywell discussed a strategy to hide the risks of Z Shield from Armor Holdings, and Honeywell subsequently followed through on this strategy in its dealings with Armor Holdings.

11.     Additionally, Honeywell publicly reported warehouse data that purportedly showed no degradation of its Z Shield material or decrease in ballistic performance, when, in actuality, Honeywell knew that the actual warehouse data showed both problems.  This warehouse data purportedly measured Z Shield's ballistic performance after three years of exposure to uncontrolled heat and humidity conditions in a Petersburg, Virginia warehouse.  Honeywell relied on this data in publicly defending Z Shield's safety and suitability as a ballistic resistant material.  The actual warehouse data for Z Shield in Honeywell's possession showed significant decreases in ballistic

performance over time.  But Honeywell manipulated the warehouse data that it publicly reported to make Z Shield's ballistic performance appear better than in actuality.

12.     Honeywell included this manipulated warehouse data in an October 2003 Z Shield technical bulletin for Armor Holdings that Honeywell understood Armor Holdings would use with its customers to promote sales.  Honeywell also omitted any risk disclosure language from this technical bulletin.  In particular, Honeywell's Marketing Department removed from this bulletin Honeywell's accelerated aging research illustrating Z Shield's degradation problems in heat and humidity levels approximating field-use conditions of 40° C (104° F) and 70% relative humidity (RH) and also removed the risk disclosure language about this problem, both of which had been included in the drafts from Honeywell's chief scientist respecting Z Shield, Dr. Lori Wagner.  Instead, at the insistence of Honeywell's Marketing Department, the final Z Shield technical bulletin that Honeywell provided to Armor Holdings emphasized Z Shield's safety.  Also, contrary to Honeywell's actual accelerated aging and warehouse test data for Z Shield, the Z Shield technical bulletin wrongly claimed that this data "demonstrates that there has been no loss of ballistic performance over a three-year time period" and that "there is no significant anticipated change in the ballistic performance response of the Z Shield material" over "the five year suggested lifespan of most ballistic resistant vests " (*i.e.*, the typical Armor Holdings warranty period) assuming proper use and care.

13.     Honeywell took all of these actions to reassure Armor Holdings, the Government, and the public about Z Shield's safety and to induce Armor Holdings to

7

continue purchasing Z Shield for use in its vests, many of which Honeywell knew would be purchased by the United States.

14.     Honeywell also discouraged Armor Holdings from taking steps to notify the end users about problems with Z Shield or to mitigate the risk. For example, Honeywell attempted to discourage Armor Holdings from shortening the warranty period on Z Shield Vests due to a concern with the negative market impact of such a step. Honeywell also consistently encouraged Armor Holdings to utilize Z Shield in its ballistic resistant vests up to the time, in August 2005, when the National Institute of Justice (NIJ) effectively decertified Zylon from use in body armor due to degradation problems with Zylon uncovered by Government researchers at the National Institute of Standards and Technology (NIST). The NIST researchers were then studying the ballistic performance of Zylon over time at the request of the Attorney General in response to the penetration of a Zylon-containing vest in the field (not a Z Shield Vest, or a Honeywell product), as detailed further below. Both before and after the NIJ took this action based on NIST's research, Honeywell failed to share its Z Shield technical data with the NIST researchers (and also with Government contractors studying body armor) despite several requests to do so.

## II.
## JURISDICTION

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331. Defendant Honeywell is doing and/or previously did business within this District. Additionally, claims for payment for Z Shield Vests purchased under the Bullet Proof Vest Grant Partnership Act (BPVGPA) were submitted to the Office of Justice Programs (OJP) of the Department of Justice (DOJ). The OJP is located within this

District.  From 2000 to 2005, Armor Holdings sold over 1500 vests containing the

Honeywell Z Shield to federal agencies in this District.  The United States paid over

$1.26 million for these vests. In addition, all of the Z Shield Vests sold through the

BPVGPA were sold in this District. The United States paid for, in whole or in part, over

14,000 vests containing Honeywell's Z Shield through the BPVGPA and paid nearly $5.1

million for Z Shield Vests.

16.    Venue is proper within this District pursuant to 28 U.S.C. § 1391 and 31

U.S.C. § 3732(a).  Defendant Honeywell is doing and/or previously did business within

this District.

## III.
## PARTIES

17.    The plaintiff is the United States of America   The United States brings

this lawsuit on behalf of its agencies, including, but not limited to, DOJ, GSA, the

Department of Defense (DOD), the Department of the Treasury, the Department of

Homeland Security (DHS), and other federal agencies which purchased, or provided

funds for the purchase of, ballistic vests made in whole or in part with Z Shield

manufactured by Honeywell.

18.    Defendant Honeywell is a United States corporation doing business in this

District.  Honeywell's business address is 101 Columbia Road, Morristown, NJ 07962.

## IV.
## BACKGROUND

A.    **The False Claims Act**

19.    The pre-amendment version of the FCA (circa June 2008) provides, in

pertinent part, that:

9

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

\* \* \*

is liable to the United States Government . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

20.     As explained in more detail above in the Overview and below in the factual pleadings, the United States' underlying theories of liability against Honeywell are that Honeywell knew, and failed to disclose to Armor Holdings and the United States, that Z Shield had latent defects in that it degraded quickly over time in hot and humid conditions due to the inherent characteristics of Zylon fiber, that the Z Shield manufacturing process worsened Z Shield's degradation problems due to a water-based coating process used to apply the resin during Z Shield manufacturing, and that Honeywell's inadequate Z Shield design and test development contributed to a fragile shield and additional degradation.  Honeywell also knew from its warehouse data and accelerated aging research that Z Shield's degradation in heat and humidity negatively impacted ballistic performance, that Armor Holdings warranted most of its Z Shield Vests against defects in materials for five years (until the Summer of 2004, as detailed

above), and that because of these latent defects the Z Shield Vests were unfit for use in that they could not be relied upon to protect the end user, through the five year warranty period, against rounds the Z Shield Vests were certified to stop. Yet, to induce continued sales of Z Shield, Honeywell did not disclose these degradation problems to Armor Holdings or the United States, manipulated the Z Shield warehouse data, and intentionally failed to disclose other Z Shield research to cover up the risks of Z Shield. As a result, Honeywell knowingly caused Armor Holdings to submit false claims for defective Z Shield vests to the United States, and to the state, local, and tribal agencies using federal funds, in whole or in part.

## B.   The Federal Programs for Body Armor

### 1.   The GSA Program

21.   GSA is the agency of the Federal Government responsible for administering the Multiple Award Schedule (MAS) contracting program (also known as the Federal Supply Schedule (FSS)).

22.   Under the MAS program, GSA negotiates contracts for commonly used commercial off-the-shelf items with contractors. Federal agencies can then purchase products under MAS contracts directly from contractors at pre-negotiated prices, terms and conditions. Products are grouped under pre-designated Special Item Numbers (SINs), which connote broad categories of commercial products or services.

23.   The GSA Schedule included ballistic resistant vests from Armor Holdings containing the Honeywell Z Shield. Until the Summer of 2004, the vast majority all of these vests sold to the United States carried a five year warranty. The claims for payment (including invoices, electronic claims, and other proof of payments) for each and every Z

11

Shield Vest sold to the United States under the GSA schedule were false claims in that the Z Shield in those vests was defective, unfit for use as body armor, and degraded substantially and quickly in hot and humid conditions well before the expiration of the five year warranty.

### 2.    Other Federal Purchases

24.    Other federal agencies purchased vests directly from Armor Holdings containing Z Shield apart from the GSA Schedule. The claims for payment (including invoices, electronic claims, and other proof of payments) for each and every Z Shield Vest sold to the United States under federal contracts by Armor Holdings were false claims in that the Zylon in those vests was defective, unfit for use as body armor, and degraded substantially and quickly in hot and humid conditions well before the expiration of the five year warranty.

### 3.    The Bullet Proof Vest Grant Partnership Act Program

25.    In late 1997, after the shooting deaths of two state troopers who lacked body armor due to inadequate funding in their jurisdictions, Congress created a grant program called the BPVGPA, 42 U.S.C. § 379611, *et seq.* Under the BPVGPA, the United States reimburses eligible state, local, and tribal agencies for up to fifty percent of the cost of body armor. The exact amount state, local, and tribal law enforcement agencies are reimbursed for any specific vest depends on the entitlement cap for each such agency for that fiscal year. The BPVGPA grant program is administered by OJP.

26.    Purchasers under the BPVGPA grant program cannot present claims for reimbursement until they certify to OJP that they have paid for and received the vests.

State, local, and tribal agencies do not receive funds from the BPVGPA in advance of their purchases or in advance of their receipt of the vests.

27.     Armor Holdings sold numerous ballistic resistant vests containing Z Shield manufactured by Honeywell to state, local, and tribal law enforcement agencies under the BPVGPA.  After the presentment of these claims, the Federal Government reimbursed, in part, these state, local, and tribal law enforcement agencies for these Z Shield vests under the BPVGPA.  The claims for payment (including invoices, electronic claims, and other proof of payments) for each and every Z Shield Vest presented to the United States by state, local, and tribal law enforcement agencies pursuant to the BPVGPA were false claims in that the Z Shield in those vests was defective, unfit for use as body armor, and degraded substantially and quickly in hot and humid conditions well before the expiration of the five year warranty.

**C.     The Importance of Tensile Strength in Body Armor's Ballistic Performance**

28.     Early on in its commercial development, Toyobo identified ballistic applications in body armor as one of the most promising uses for Zylon fiber due to the high tensile strength of Zylon.  Tensile strength measures the force required to pull a material to the point where it breaks and is generally expressed in force per unit of a cross sectional area.  Put in terms of a formula, tensile strength measures the maximum load that a material can support without fracture or breakage divided by the original cross sectional area of the material.

29.     The relationship between tensile strength and ballistic performance has long been discussed in the scientific literature.  In the context of ballistic resistant vests

and other body armor, it is generally accepted that the higher the tensile strength of body armor the more protection it offers the wearer against bullets and other projectiles.

## D.     Ballistic Testing of Body Armor

30.     Body armor, and the fiber, woven fabric, and laminated materials used in body armor, undergo a variety of testing to help assess ballistic performance. The two most common tests are the V-50 and V-0 tests.

31.     The V-50 test attempts to measure the ballistic performance of a material by shooting a number of rounds into the material to find the velocity (as measured by feet or meters per second) at which half the rounds penetrate through the material and half the rounds do not penetrate it. Typically, the V-50 test is performed using a number of different rounds based on the threat levels faced by the likely end users. The higher the V-50 test results the better the ballistic performance.

32.     The V-0 test, on the other hand, attempts to measure whether a material can withstand the impact of a certain round at a certain velocity without penetration or excessive back face trauma, which measures the effect of a non-penetrating round on the rear face of a strike plate and is used to gauge a projectile's likely impact on internal organs. Even if body armor stops a bullet from penetrating the armor, the wearer can still be injured if the round propels ballistic material into the torso.

## E.     The Development and Manufacture of Z Shield Sold By Honeywell to Armor Holdings

### 1.     Z Shield Development

33.     PBO stands for poly-p-phenylenebezobisoxazole, a polymer which is spun into a high strength organic fiber. The United States Air Force, SRI International, Inc., and Southwest Research Labs jointly developed PBO fiber in the 1980s, but did not

14

attempt to commercialize this fiber. Instead, they sold the rights to PBO fiber to Dow

Chemical Company (Dow). In the early 1990s, Dow worked jointly with Toyobo on

production technology for PBO. In the mid-1990s, Toyobo obtained the rights to PBO

from Dow. Toyobo then commercialized PBO fiber under the trade name Zylon and, in

late 1998, body armor containing Zylon began being sold to law enforcement agencies in

the United States by a company called Second Chance Body Armor, Inc. (Second

Chance). Despite its high costs, Zylon body armor proved very popular with law

enforcement due to its light weight and within a few years after its introduction into the

United States, several body armor companies utilized Zylon, including Armor Holdings.

34.     Two basic processes converted Zylon fiber into body armor. In the first

and most common process, the Zylon fiber went to weavers who turned the Zylon into

woven fabric. The body armor manufacturers than obtained this woven Zylon fabric

from the weavers and used this fabric in their body armor. The body armor

manufacturers would put layers of this fabric (called panels) in their vests, with some

manufacturers selling vests containing nothing but Zylon as the ballistic resistant

material, while others produced so-called hybrid vests that consisted of panels of both

Zylon fabric and other ballistic resistant products.

35.     In the second process, Zylon fiber was laminated, rather than woven, to

create a shield product that could then be used for body armor. Honeywell (then Allied

Signal) entered into a non-disclosure agreement with Toyobo to develop a laminated

shield product out of Zylon fibers. Toyobo and Honeywell worked jointly on the

development of a viable commercial Z Shield product for the ballistics market in the

United States. This collaboration included sharing scientific data between the companies.

Honeywell had a team of scientists working on developing ballistics products, including Z Shield, led by Dr. Lori Wagner.  Honeywell obtained patents relating to the shield technology process converting Zylon into Z Shield.

### 2. Honeywell Employed Two Tollers, DSM and FMS, to Manufacture Z Shield

36.     Although Honeywell successfully developed a shield technology process for Z Shield, its attempts to manufacture at Honeywell facilities a commercially viable Zylon shield product failed.  So, Honeywell formed a business relationship with a Dutch ballistic materials manufacturer, DSM, to perform so-called "tolling services" (a manufacturing process that converts a raw material into a final product) on Honeywell's behalf.  In particular, DSM converted Zylon fiber into a shield product suitable for lamination.  DSM's tolling efforts succeeded, and, by at least 2000, Honeywell, with DSM's assistance, was able to sell to Armor Holdings a Zylon laminate, with the trade name Z Shield.

37.     As detailed further below, in July 2001, DSM told Honeywell that it would no longer toll Z Shield for Honeywell due to concerns about Z Shield's degradation in heat and humidity based on DSM's accelerated aging research that it shared with Honeywell.  Honeywell then began looking for another toller and ultimately chose FMS to continue manufacturing Z Shield.  Due to development and quality issues with the Z Shield made by FMS, Honeywell could not restart sales of Z Shield to Armor Holdings until 2002.  FMS manufactured Z Shield for Honeywell from 2002 through 2005.

### 3.     The Z Shield Manufacturing Process

38.     Z Shield is made with unidirectional layers of Zylon fiber, the ballistic resistant component of Z Shield. Despite putting its name and trademark on the Z Shield product and marketing Z Shield as state-of-the-art for ballistic protection based on Honeywell's technical sophistication, Honeywell has claimed in discovery that it did not know the exact Z Shield manufacturing process or ingredients used by DSM or FMS and did not possess or control their manufacturing schematics and associated documents.

39.     Nevertheless, it appears that the following general process was used to manufacture Z Shield. In particular, using a type of roll-to-roll process, rolls of Zylon fiber are supplied from a creel and passed through a combing station under tension to form a unidirectional feed stream. The fiber feed stream then passes over and under stationary bars to spread the fiber into thin layers followed by an impregnation process. The impregnation process involves carrying the fiber under a roll and immersing the fiber in a bath of a water-based dispersion of a sealant/matrix to coat the filaments. This coating process was used for applying resin. The coated fiber network then passes through a squeeze roll at the exit of the bath to remove excess sealant, followed by placement on a thin polyethylene film carrier. Next, the impregnated fiber and support film are passed through a heated oven to evaporate the water and encapsulate the fibers in the sealant/matrix material. The sealant/matrix material partially fills the volume between fibers and binds the fibers together to form a coherent fiber sheet. This binder coats the fibers but does not fill all of the space between the fibers. A nip roller is then used to pull the carrier web and fiber sheet through the machine. The fiber sheets are then wound on a roller in preparation for later construction of the laminated Z Shield.

**4.    Honeywell's Testing of Z Shield**

    **a.    Accelerated aging testing**

40.    Honeywell began its own environmental exposure testing of Z Shield under hot and humid conditions in a so-called "Florida room" at a Virginia facility in the Richmond area.  Honeywell called this Z Shield testing "accelerated aging," the purpose of which was to simulate aging conditions by exposing Z Shield to elevated levels of heat and humidity in the Florida room.  As noted in a Honeywell technical bulletin, from October 2003, "[a]ccelerated aging . . . seeks to determine the response of the material to normal-usage conditions over a relatively long time by subjecting the product, in a shorter time span, to stresses that are more severe . . . than that experienced under normal environmental or operational conditions.  For example, in one of the more common forms, data taken at higher temperatures on a rapid time scale can be used to determine data at lower temperatures on a much slower time scale."

41.    After subjecting Z Shield to accelerated aging, Honeywell performed ballistics testing, primarily V-50 testing, to see how much ballistic performance the Z Shield retained after exposure to elevated levels of heat and humidity.  Honeywell termed this "ballistic integrity."  To determine Z Shield's ballistic integrity, Honeywell would compare the ballistic performance in V-50 testing of new Z Shield with the ballistic performance of Z Shield after accelerated aging.  The difference between these two figures represented the loss of ballistic performance after accelerated aging and provided Honeywell with a rough measure of how used Z Shield Vests would perform over time. Honeywell's ballistics lab manager, David Hurst, performed and/or supervised most of this testing.

### b.   Warehouse testing

42.   Honeywell also conducted V-50 testing of Z Shield that had been exposed to an uncontrolled environment of heat and humidity at a warehouse in Petersburg, Virginia.  As detailed further below, Honeywell's scientists manipulated this warehouse V-50 data to make Z Shield's ballistic integrity appear more favorable than in actuality.

### 5.   The Sale of Z Shield by Honeywell to Armor Holdings

43.   Between 2000 and 2005, Honeywell sold Z Shield to Armor Holdings, which then used Z Shield as the primary ballistic material in ballistic resistant vests sold to the United States and to state, local, and tribal agencies.  Armor Holdings was the exclusive distributor in the United States of body armor containing Honeywell's Z Shield and purchased well over one hundred thousand pounds of Z Shield for more than $15 million.  A substantial portion of this Z Shield was used in Armor Holdings' vests paid for, in whole or in part, with federal funds.  Indeed, the Federal Government paid nearly $12 million for Z Shield Vests.

44.   Honeywell and Armor Holdings marketed Z Shield vests as "groundbreaking" technology that offered the highest levels of ballistic protection and represented the state-of-the-art in ballistic performance. As a result, the Z Shield Vests were substantially more expensive than other ballistic resistant vests.

### F.   NIJ Specifications for New Body Armor

45.   NIJ tests and certifies new body armor models to ensure that they meet minimum ballistic standards as determined by NIJ specifications.  This certification identifies the types of rounds (called "threat levels") that the body armor should be able to stop.  To develop these certifications, NIJ employs both V-50 and V-0 tests (since NIJ

standard 0101.04) and performs tests on new body armor models. During the period when Z Shield Vests were sold, the protocols for this testing were set forth in NIJ standard 0101.04, beginning in September 2000, and before that in NIJ standard 0101.03. NIJ certified all of the Z Shield Vests sold by Armor Holdings.

## G.   The Five Year Warranty on Most Z Shield Vests

46.   Like the rest of the industry, Armor Holdings offered a five year warranty on the vast majority of its Z Shield Vests through the Summer of 2004, when it reduced the warranty on several of its Z Shield Vest models to 30 months. The Armor Holdings five year warranty appeared in specifications for the Z Shield Vests provided to end users, and the typical language stated "Warranty. Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels against defects in materials and workmanship. The alteration of ballistic panels in any way shall render the warranty void." Honeywell knew that Armor Holdings sold numerous Z Shield Vests to the United States and to state, local, and tribal agencies, who paid for vests in part with federal funds, that Armor Holdings offered most of its customers five year warranties on Z Shield Vests, that, due to degradation problems, the Z Shield Vests could not be depended upon to protect the end user for five years from rounds the Z Shield Vests were certified to stop, and that the Government considered the warranty and Z Shield's fitness for use and ballistic performance material to its purchasing decisions.

## H.   Armor Holding's Reliance on Honeywell's Technical Expertise Regarding Z Shield

47.   Honeywell knew that Armor Holdings relied on Honeywell's technical expertise regarding Z Shield, even to the point of having Honeywell draft Z Shield fact sheets, technical bulletins, and other marketing materials that Armor Holdings distributed

to its sales force for use in selling Z Shield Vests. Honeywell performed a variety of testing on Z Shield and interpreted the results for Armor Holdings, including tests to determine how Z Shield's ballistic performance reacted in hot and humid conditions, as well as accelerated aging and warehouse testing, to help determine whether Z Shield would lose ballistic performance over time and, if so, the amount of that loss. As a result, Honeywell conducted ballistic testing on both new and used Z Shield Vests.

**V.**

**HONEYWELL'S MISCONDUCT RELATING TO DEFECTIVE Z SHIELD**

**A.     The Water Used In Z Shield's Coating Process During Manufacturing Exacerbated Degradation Problems**

48.     Honeywell knew that the Z Shield manufacturing process utilized a water-based process to apply the resin during the coating process and that this water exacerbated Z Shield's degradation problems beyond the already significant hydrolytic degradation inherent in Zylon fiber. As early as July 2000, Honeywell's research indicated that the exposure of even relatively small quantities of water negatively impacted Z Shield's ballistic performance, but nevertheless persisted in selling the Z Shield manufactured using this water-based process to Armor Holdings between 2000 and 2005.

49.     More particularly, on July 5, 2000, a Honeywell scientist, Dr. Madhu Ramoorthy, who assisted in the development of Z Shield, identified sweat and rain as significant threats to Z Shield's ballistic performance and expressed concern about the long-term damage from moisture to Z Shield. The next day, July 6, 2000, Honeywell's product development report for Z Shield, called a Gate Review and reviewed by the entire Z Shield team at Honeywell including Dr. Lori Wagner, Dr. Ashok Bhatnagar, and

21

Dr. Madhu Ramoorthy, among others, identified as one of Z Shield's two technical risks the long-term durability of the aqueous Z Shield system (*i.e.*, how long the Z Shield would perform in the field).

50.    As further detailed below, Honeywell's later environmental conditioning data showed Z Shield performing worse than ordinary Zylon fiber and Zylon fabric, including in Honeywell's initial Z Shield testing in late July 2001, performed in response to DSM's refusal to continue manufacturing Z Shield due to safety risks with degradation.

51.    In early August 2001, Honeywell's scientists experimented with a different type of Z Shield (called Z LCR by Honeywell) that used an anhydrous (no water) solvent-based process rather than a water-based process as part of the Z Shield manufacturing. With the Z Shield manufactured using this anhydrous solvent, Honeywell's scientists at that time found a negligible drop in ballistic performance in accelerated aging testing compared with substantial drops in ballistic performance in the Z Shield using the water-based process.

52.    By September 25, 2001, Dr. Lori Wagner indicated, after comparing the Z LCR data with the data for the ordinary Z Shield using water, that the presence of water in the Z Shield manufacturing process accelerated the degradation. Based on the Z LCR data and other Honeywell environmental data, Dr. Wagner, at this same time, noted her concern that extreme conditions significantly impacted Z Shield's ballistic performance, recommended issuing a warning statement to users of vests containing Z Shield "that prolonged exposure to high heat and humidity will compromise vest performance," and

identified a "maximum temperature" for Z Shield between an "expected range [of] 40° C; perhaps 50° C at the highest depending on humidity conditions."

53.     Additional accelerated aging testing by Honeywell, in 2001 and 2002, corroborated that Z Shield manufactured using an anhydrous solvent-based process retained its ballistic performance better in heat and humidity than Z Shield manufactured using a water-based process.  These test results led Honeywell to begin developing a patent application for an anhydrous solvent-based process for Z Shield.

54.     On May 22, 2002, Honeywell scientist, Dr. Ashok Bhatnagar, forwarded data to Honeywell's patent agent, Dr. Sheldon Kavesh, showing Z LCR's more favorable ballistic performance in heat and humidity testing compared with the ordinary Z Shield that Honeywell sold to Armor Holdings.  In particular, after four and six weeks of aging at 70° C and 80% RH, the anhydrous solvent-based Z Shield retained 90.3% and 89.2% of its ballistic performance compared with 85% and 83.5% for the water-based Z Shield.

55.     On December 29, 2004, Honeywell filed a patent application, signed as inventors by, among others, Dr. Lori Wagner, Dr. Ashok Bhatnagar, and Dr. Madhu Ramoorthy, entitled "Moisture-Resistant PBO Fiber and Articles, and Method of Making," claiming improved retention of ballistic properties after exposure to high humidity.  The data underlying this patent application came from Honeywell's Z LCR research showing the superior ballistic performance in heat and humidity of Z Shield manufactured using an anhydrous solvent over a water-based process.  Honeywell provided cash bonuses to the inventors.

56.     Due to technical issues, Honeywell never attempted to commercialize Z
LCR, but instead continued to sell to Armor Holdings Z Shield manufactured by its
tollers using the water-based process.

57.     Despite numerous opportunities, Honeywell never informed Armor
Holdings or the United States about any of the Z LCR data showing the anhydrous
solvent-based Z Shield's superior performance in heat and humidity compared to the
water-based Z Shield.   Nor did Honeywell inform Armor Holdings or the United States
about the concerns of its scientists regarding the threats of sweat and rain to Z Shield's
ballistic performance, the technical risks of the long-term durability of the aqueous Z
Shield system, or the internal concern of Honeywell's scientists, as early as September
2001, about Z Shield's performance at temperatures as low as 40° C and close to the
conditions encountered by vest users in the field.

**B.      The Shield Did Not Adequately Protect The Zylon Fiber In Z Shield From
Exposure To Heat And Humidity**

58.     Honeywell's design and test development of the shield portion of Z Shield
resulted in a fragile shield that was inherently susceptible to exposing the Zylon fibers
inside the shield to environmental conditions of heat and humidity.

59.     Several problems with the shield contributed to this fragility.   First, the
shield matrix around the Zylon fiber was dispersed improperly causing inadequate
protection of the fiber.   Second, the shield's fiber adhesive did not properly adhere to the
resin matrix as the result of inadequate fiber matrix interaction.   Third, the thin, low
density polyethylene membrane for the shield provided insufficient barrier properties to
protect the Zylon fiber inside the shield.   These all contributed to Z Shield's degradation
problems in heat and humidity.

60.     Honeywell's quality-control personnel identified several of these issues and complained about Z Shield's poor quality, especially after FMS began manufacturing Z Shield for Honeywell starting in 2002.   Nevertheless, Honeywell continued to sell Z Shield to Armor Holdings for use in body armor sold in the United States.

## C.     Honeywell Covered Up Z Shield's Problems Retaining Ballistic Performance In Heat And Humidity

### 1.     Honeywell Received Early Warning Signals of Degradation Problems with Z Shield

61.     In April 2000, Toyobo's scientists informed Honeywell that "the color of Zylon change[d] rapidly and after that the strength decrease[d] . . ." when Zylon fiber was exposed to light.  Toyobo sent Honeywell two charts showing Zylon fiber's degradation when exposed to light, and these charts showed a 35% drop in the fiber's tensile strength after just 100 hours of exposure to light.  Additional exposure to light resulted in continued diminished tensile strength.  This led to concern on Honeywell's part, especially after Toyobo's own data showed a 50% decrease in Zylon fiber's tensile strength after exposure to light for extended periods.

62.     Honeywell downplayed to Armor Holdings the impact of light on Z Shield, and this represented a pattern by Honeywell that would repeat itself, as detailed below.  In particular, in June 2000, Honeywell sent Armor Holdings testing data showing only a three percent drop in the performance of Z Shield after exposure to 40 hours of light.  Honeywell, however, failed to share with Armor Holdings the Toyobo data showing 35% and 50% drops in tensile strength after exposure to light.  Instead, Honeywell downplayed the light problems to Armor Holdings even though Honeywell

knew that Armor Holdings lacked the technical expertise to assess light's impact on ballistic performance. Honeywell also failed to share this data with the United States.

**2.    Honeywell Discounted the Failed German Vest Tender and the Toyobo Degradation Data**

63.    In June 2001, two body armor manufacturers, Mehler, a German company, and Second Chance were awarded a contract to supply Zylon vests to police departments in Germany. The Mehler vest was a so-called hybrid vest because it contained part Z Shield and part woven Zylon. The Z Shield for the Mehler vest came from DSM and, as detailed above, at that time DSM assisted Honeywell in the tolling process for Z Shield. During testing in connection with the German vest tender, DSM reported a failure of the Mehler Z Shield vest and, as a result of this incident, as well as DSM's negative accelerated aging research described above, DSM became extremely concerned about Z Shield's suitability for ballistic applications.

64.    On July 5, 2001, DSM sent a letter to many companies in the body armor industry, including Honeywell, Armor Holdings, and Toyobo, with the caption "URGENT***** URGENT*****  URGENT*****URGENT." The letter announced that DSM had "serious indications that the use of [PBO Shield] in bullet resistant vests is not justified" and that "the use of PBO-fiber in general may not be justified in bullet resistant vests." As a result of these findings, the letter made clear that "[b]ecause of the serious nature of these indications DSM HPF decided to put on hold the market introduction of its PBO-fiber containing product . . . ."

65.    The day after the DSM announcement, July 6, 2001, Toyobo issued its own letter to the body armor industry, including Honeywell and Armor Holdings, announcing that its own testing had not found "any serious indication[s]" relating to

26

Zylon fiber, as DSM's data had found. The letter from Toyobo, however, did state that the DSM data may highlight a specific problem with Z Shield that was not applicable to woven Zylon. The letter also stated that "Toyobo makes no warranty and assumes no liability whatsoever in connection with any use of Zylon fiber."

66.     In response to this data and of its own accord, without Honeywell's input, Armor Holdings, on July 9, 2001, issued a body armor storage advisory warning its customers to store body armor containing woven Zylon or Z Shield in a dry and cool place and not to store it at temperatures above 120° F (49° C) and 50% RH.

67.     Honeywell, however, downplayed the risks of the DSM data, telling the president of Armor Holdings, for example, in a letter dated July 6, 2001, from Honeywell's business director for high performance fibers, that "from the little information we have on DSM's testing, we [Honeywell] do not believe the [DSM] testing mimics conditions to which the PBO shield would be subjected."

68.     On July 19, 2001, Toyobo published a letter to its customers indicating that its own data showed that "the V-50 drop observed by DSM HPF may be a unique characteristic only for Zylon UD-SB 10 product . . ." (*i.e.*, Z Shield) and likely did not apply to all types of Zylon. That same day, Honeywell contacted Toyobo and expressed its disappointment with the July 19 Toyobo letter despite having none of the data upon which Toyobo based this conclusion.

69.     DSM continued testing Z Shield by exposing it to heat without additional humidity beyond that in the testing area (referred to as uncontrolled humidity). This testing showed substantial declines in Z Shield's ballistic performance. On September 3, 2001, DSM provided this Z Shield testing to Honeywell showing that, after two weeks

exposure at 70° C and uncontrolled humidity, Z Shield declined about 16% in ballistic

performance and, after 8 weeks exposure at 70 ° C and uncontrolled humidity, Z Shield

declined about 25%. Yet, Honeywell continued to represent Z Shield as a safe and

effective material suitable for body armor.

70.     Toyobo also continued to release some, but not all, of its own accelerated

aging data showing the negative impact of heat and humidity on Zylon fiber's tensile

strength. On August 28, 2001, a Toyobo letter to Honeywell admitted that Toyobo had

"found out a little bigger strength drop than we expected . . ." under conditions of 40° C

(about 104° F and just 5.4° above normal body resting temperature) and 80% RH. A

month later, on September 28, 2001, Toyobo published a technical bulletin that showed,

in less than 100 days of exposure to these conditions, Zylon fiber's tensile strength

declining by 10% at 40° C (about 104° F) and 80% RH, by 20% at 60° C (about 156° F)

and 80% RH, and by 37% at 80° C (about 208° F) and 80% RH.

71.     More degradation data came from Toyobo on a periodic basis, including

data in November 2001 showing a decline of 18% tensile strength of Zylon fiber when

exposed for 150 days to temperatures of 40° C (about 104° F) and 80% RH and also

showing a logarithmic, as opposed to a linear, decline in tensile strength, which raised the

possibility that further drops in tensile strength would accelerate over time.

72.     Toyobo later withdrew this November 2001 data, claiming on January 1,

2002, that this data was "statistically not correct and not reliable . . . ." In reality, Toyobo

had simply removed the bad data points that had been published in November 2001 and

republished its earlier test results without the offending data points. Notwithstanding this

data manipulation, Toyobo continued to publish periodically additional test results

showing declines in Zylon's tensile strength when exposed to heat and humidity. In the face of this Toyobo data and Honeywell's own data, Honeywell continued to minimize the risks of Z Shield and Armor Holdings continued to sell Z Shield vests.

**3.      Honeywell Selectively Disclosed Its Test Data to Hide the Degradation Problems with Z Shield**

**a.      Honeywell's initial environmental exposure testing of Z Shield**

73.      In response to the DSM and Toyobo testing, Honeywell began its own environmental exposure testing of Z Shield consisting of accelerated aging (elevated levels of heat and humidity) and warehouse testing (uncontrolled levels of heat and humidity). Within three weeks of the failure of the German vest tender, on July 25, 2001, Honeywell's initial accelerated aging data showed a 13.3% decline in the ballistic integrity of Z Shield when exposed to 90° C (about 234° F) for one week. The same testing showed that the non-Zylon shield products of Honeywell that were tested as controls lost little, if any, of their ballistic integrity.

74.      Notwithstanding this unfavorable data, in a Honeywell letter to Armor Holdings, dated August 9, 2001, Honeywell emphasized other, more favorable preliminary data, in which Honeywell had attempted to mimic DSM's testing and had found "no significant shift in V-50 values for the 2-week Z Shield test at 70° C [about 182° F]."

75.      After reviewing Honeywell's accelerated aging data, Dr. Lori Wagner worried about Z Shield's ballistic integrity in hot and humid environmental conditions. For example, in an internal Honeywell email, dated September 25, 2001, Wagner admitted that "Z Shield exhibited significant drop[s] . . ." in V-50 ballistic testing of 13% after two weeks and 17% after four weeks. She also admitted that the V-0 test results for

Z Shield "were not encouraging . . ." and termed the test results "perplexing to say the least." Indeed, in September 2001, Honeywell had performed V-0 testing, with a .357 Magnum, on four Armor Holdings' Z Shield Vests that had been exposed to conditions of 70° C (158° F) and 80% RH and also exposed to a wet spray prior to testing. In its ballistics testing, Honeywell observed penetrations with three of these vests. Based on these results and the other Z Shield research available to her, Dr. Wagner stated, in the September 25 email, that "[a]t this time, it appears extreme conditions as demonstrated in this testing are significantly detrimental to the Z Shield performance to warrant a[] statement issued to the effect that prolonged exposure to high heat and humidity will compromise vest performance." But Honeywell did not share these concerns with Armor Holdings.

76.     Honeywell continued accelerated aging testing at a variety of different temperatures and humidity levels and the test results continued to show substantial declines in Z Shield's ballistic performance, much larger than for the other materials being tested as controls. In early October 2001, Honeywell found a 13% decline in Z Shield's ballistic integrity in accelerated age tests for two weeks at 70° C (about 182° F) and 80% RH, 16.5% at four weeks under the same conditions, and 8% at four weeks at 70° C without controlled RH.

77.     On October 4, 2001, Honeywell provided these results to Armor Holdings, but downplayed them. In a conference call that day, Dr. Wagner stressed to Armor Holdings that this testing had been "under extreme conditions," claimed that the Armor Holdings' storage advisory addressed the issue, and did not recommend any changes in the sales or marketing tactics for the Z Shield Vests. That same day, Honeywell told

Armor Holdings that it planned more Z Shield testing, which Honeywell "believe[d] will confirm the continued viability of this product."

78.     Honeywell's optimism proved unfounded, however, as its additional accelerated age testing continued to show degradation problems with Z Shield. In late November 2001, Honeywell's ballistics testing after accelerated aging found a 6.9% decline in a used hybrid Z Shield Vest's ballistic integrity after four weeks exposure to 40° C (about 104° F) and 70% RH. Tests on new rolls of Z Shield also showed a 3% decline in ballistic integrity after four weeks exposure to the same conditions. Dr. Wagner, however, downplayed this data, telling Armor Holdings that 40° C and 70% RH represented "extreme condition[s]" unlikely to be encountered by a vest user in the field.

79.     As Honeywell's testing continued, the data got worse. On January 31, 2002, Honeywell found a decline in Z Shield's ballistic performance of nearly 10% after 12 weeks exposure at 40° C (about 104° F), which Wagner termed toward the "extremes of the potential real world conditions." In May 2002, Honeywell tested a one year old Z Shield Vest and found a sharp drop in ballistic performance even without any accelerated aging. After accelerated aging, Honeywell found a 14.8% drop in ballistic performance after exposure of this Z Shield Vest to 70° C (about 182° F) and 80% RH for 28 days. Then, in July 2002, Honeywell found a 13.6% decline in ballistic integrity of Z Shield in testing of Z Shield samples exposed for 24 weeks to 40° C (about 104° F) and 70% RH Also, in V-0 testing conducted by Honeywell in 2002, another Armor Holdings' Z Shield Vest experienced penetrations. By January 2003, Honeywell's testing showed an 11.5% decline in Z Shield's ballistics integrity after two weeks exposure to 70° C (about 182° F) and 80% RH and a 15% decline in Z Shield's ballistic integrity after four weeks at the

same conditions.  Honeywell shared the results of this testing with Armor Holdings, but continued to down play the risks of Z Shield in discussions between the companies.

### b.  Honeywell selectively disclosed its accelerated aging test data and manipulated its warehouse data to hide Z Shield's risks

#### 1.  Honeywell's internal meeting to discuss Z Shield strategy

80.     In mid-January 2003, Honeywell executives, including its vice president and general manager of the performance fibers business, David Knowles, other Honeywell executives, and Dr. Wagner, among others, met to discuss whether to continue selling Z Shield to Armor Holdings in light of the poor accelerated aging and other environmental exposure test data that raised concerns about the long-term ballistic performance of Z Shield Vests.

81.     At the meeting, Honeywell discussed a strategy to disclose this bad data to Armor Holdings, but not to explain it.  Handwritten notes from a meeting attendee describe a "Z Shield" plan to mitigate Honeywell's legal exposure, while convincing Armor Holdings to keep using Z Shield, as follows: (1) mark "all data Honeywell confidential (every page)"; (2) "show" the data but "don't draw conclusions"; (3) "keep our tone calm"; (4)  tell Armor Holdings we need to "continue to test & evaluate"; (5) formulate a "defense to attacks [on Z Shield] by industry"; and (6) involve the lawyers in the  Z Shield research.

#### 2.  The January 2003 meeting between Honeywell and Armor Holdings

82.     Honeywell thereafter held a meeting with Armor Holdings, on January 22, 2003, at which it followed this plan.  At this meeting, Honeywell provided Armor Holdings with the accelerated aging data from its Florida Room and warehouse testing

and emphasized the positive warehouse test results and the overall safety and suitability of Z Shield. Honeywell also represented to Armor Holdings at this meeting that the accelerated aging data did not reflect "real world" conditions encountered by users in the field. While Honeywell had compiled some temperature data reflecting heat and humidity conditions in the United States, among other places, it had not performed any research, or gathered any data from outside sources, on the heat and humidity conditions at the point where a vest touched the body during wear in the field. This meeting also marked the last time that Honeywell shared any of its written accelerated aging data with Armor Holdings.

83.     Furthermore, at the January 22 meeting Honeywell conditioned future sales of Z Shield to Armor Holdings on it signing a "Handling, Care, and Use Recommendations" letter that Honeywell believed would limit its legal exposure relating to Z Shield. Armor Holdings signed this letter on March 28, 2003.

84.     Moreover, Honeywell emphasized at the meeting that Armor Holdings must keep as confidential all of the data Honeywell provided to Armor Holdings. On March 4, 2003, Dr. Wagner wrote to Armor Holdings to remind them of the confidentiality "agreement and the requirements it carries for anyone in your company to keep all information provided to you by Honeywell as confidential."

### 3.     The Zylon vest failure in June 2003

85.     In June 2003, a Zylon vest manufactured by Second Chance (not Armor Holdings body armor, and not Honeywell's Z Shield material) failed in the field (near Pittsburgh, Pennsylvania) due to the penetration by a round that it should have stopped

based on its certification level.  The officer wearing the vest (Officer Limbacher) suffered severe injuries.

86.     This incident was widely publicized and led to many questions in the law enforcement community about the safety of Zylon.  In response, the Attorney General commissioned a study of Zylon's suitability as a ballistic resistant material.

### 4.     Honeywell's initial efforts to defend Z Shield publicly

87.     As discussed by Honeywell executives at the January 2003 internal meeting, Honeywell embarked on a public defense of Z Shield.  This effort intensified after the Zylon vest failures in June 2003, but Honeywell had begun these efforts before those incidents.

88.     In February 2003, Honeywell provided Armor Holdings with technical comments about a "ballistic fiber cheat sheet" to provide "talking points" for the Armor Holdings' sales force to defend the Z Shield Vests in the marketplace.  Honeywell stressed to Armor Holdings that Honeywell "would prefer that you not reference Honeywell as the author" and "will not take nor do we want any credit for the information supplied."

89.     Also, in the Spring of 2003, Honeywell began working on a technical paper for Armor Holdings to use with its customers that cited purportedly favorable warehouse test data, but failed to disclose any of Honeywell's unfavorable accelerated aging data.  Honeywell provided this paper to Armor Holdings in June 2003, shortly after the Officer Limbacher incident.  As further detailed below, Honeywell also drafted a Z Shield technical bulletin for Armor Holdings in October 2003 that relied on the favorable warehouse data and did not cite any of the negative accelerated aging or warehouse data

34

in Honeywell's possession. Honeywell understood that Armor Holdings would use these materials to reassure customers about the safety of Z Shield.

### 5.    Honeywell manipulation of its warehouse data

90.    A review of Honeywell's actual warehouse data for Z Shield reveals that the data Honeywell cited, in the June and October 2003 publications for Armor Holdings, had been manipulated to make Z Shield's ballistic performance appear better than it was in actuality. Indeed, none of the actual warehouse data or any other data produced by Honeywell in discovery matches the warehouse data cited in these publications.

91.    For instance, in June 2003 Honeywell provided a bulletin to Armor Holdings explaining that Honeywell performed periodic V-50 testing of its Z Shield in a warehouse and claiming that the V-50 performance at the end of three years was statistically equivalent to the V-50 performance at the time of production. In October 2003, Honeywell provided another bulletin to Armor Holding containing a graph, entitled "Z Shield Ballistic Performance Uncontrolled Warehouse Environment," wherein the V-50 retention of the Z Shield in the warehouse exhibited 100% V-50 retention at the three year time point (1095 days) compared to the first day of testing. This meant that the V-50 testing cited in these documents would necessarily have begun on Z Shield manufactured before Summer of 2000. Thus, this Z Shield would have been manufactured by DSM, the toller that refused to continue manufacturing Z Shield for Honeywell due to degradation and safety concerns, and not by Honeywell's then current toller, FMS. Yet, Honeywell did not disclose that the warehouse data cited in these two publications related to a toller that it no longer used to manufacture Z Shield.

92.     In addition, Honeywell did extensive V-50 testing on two particular rolls of Z Shield from DSM, only one of which was from a lot, Lot 1, manufactured before the Summer of 2000, and thus could have been used to establish the Honeywell claimed, 100% V-50 retention at three years. Rolls from Lots 2 through 5 of Z Shield would have been received from DSM too late to establish a V-50 retention point at three years. The second roll was from a lot, Lot 3, that was manufactured by DSM at the end of 2000 or beginning of 2001 when rolls from that lot were first V-50 tested by DSM. These two rolls of Z Shield material, and almost all of the others from Lots 1 through 5 from DSM, exhibited substantially higher ballistic performance than the Z Shield rolls manufactured by FMS. Yet, Honeywell did not disclose in these two publications that the Z Shield from DSM generally performed substantially better than that from FMS.

93.     Nevertheless, even the other Z Shield rolls from DSM showed significant degradation in the warehouse testing. Honeywell had available V-50 test data over time under warehouse conditions for several DSM manufactured rolls from Lots 1 through 5. These results showed V-50 degradation in ballistic performance over time contrary to the publicly-disclosed warehouse tests. Honeywell, however, did not publicly report that data.

94.     Instead, regarding some of the data points appearing in the October 2003 technical bulletin, Honeywell started measuring V-50 performance on the first (Lot 1) DSM manufactured Z Shield roll, not at a point in time close to time zero, right after its date of manufacture, but about 18 months after its manufacture when substantial degradation had already taken place. Also, Honeywell began measuring V-50 performance on the second (Lot 3) DSM manufactured Z Shield roll, not at time zero,

right after its date of manufacture, but about nine months after its manufacture when substantial degradation had already taken place. These values were used to establish the 100% V-50 retention point purportedly (but not actually) at time zero. When the Z Shield warehouse V-50 data that Honeywell had available is analyzed from time zero right after manufacture, the actual drop off in Z Shield ballistic performance after exposure to uncontrolled warehouse conditions was 6% or more approaching three years, even using the better performing rolls from DSM.

95.     For example, Z Shield warehouse data showed ballistic drop offs, measured in feet per second (fps) in V-50 testing, of around 100 fps or more after less than two years of warehouse exposure for DSM rolls 1300, 1301, 1-0407, and 1-1932, which amounts to no more than 94% V-50 retention. This does not match the 101% V-50 retention number for Z Shield at around 730 days (2 years) that Honeywell plotted in a figure in the October 2003 technical bulletin for Armor Holdings.

96.     As for the Z Shield from FMS, this production for sale to Armor Holdings began in the Spring of 2002. Thus, were it available to Honeywell and reported in the October 2003 technical bulletin, warehouse V-50 data for such FMS Z Shield rolls could cover only one year to 18 months. However, no data points for Z Shield from FMS were plotted at 18 months in the technical bulletin. Honeywell never publicly disclosed the warehouse data relating to the FMS manufactured material.

6.     **The Honeywell draft report further highlighted Honeywell's knowledge of Z Shield's degradation problems**

97.     As noted above, Honeywell performed accelerated age testing in addition to warehouse testing. This accelerated age testing identified degradation problems with Z Shield and the data worsened over time.

98.     By August 7, 2003, Honeywell's accelerated aging research showed that Z Shield performed worse, in terms of maintaining its ballistic performance even for short periods of time, at near field-use conditions of 40° C, 70% RH. On or about September 5, 2003, Honeywell's ballistics lab manager, David Hurst, drafted the Honeywell Draft Report describing this test data. This Report provided both visual and quantitative assessments of Z Shield's ballistic performance after accelerated age testing. Hurst's initial version of the Honeywell Draft Report had no caption at the top. But later the following caption, in all capital and bold letters, "**INTENDED ONLY FOR HONEYWELL CONFIDENTIAL REVIEW PURPOSES**" was added to this Report.

99.     Regarding visual assessment, the Honeywell Draft Report stated that the Z Shield samples "showed the most severe signs of deterioration out of all the Florida Room Samples" and described Z Shield "darkening" and "show[ing] increased loft" after four weeks exposure in the Florida Room, blistering of Z Shield after eight weeks exposure, and delamination beginning after 16 weeks exposure and becoming "significant" after 28 weeks exposure.

100.     On the quantitative side, the Honeywell Draft Report indicated that Z Shield performed poorly in near field-use conditions of 40° C, 70% RH, stating that Z Shield "demonstrated the largest loss in percent V-50-retention . . ." and that Z Shield

"demonstrated a significant loss in percent V-50 retention after just four weeks . . ." of exposure in the Florida room. The Honeywell Draft Report also noted that "no further reduction in performance was noted after 28 weeks of exposure," but explained this seeming anomaly, which is inconsistent with the other Honeywell data detailed above, by raising the prospect that "the ballistic performance loss was a result of fiber chemical and physical property changes" in the Z Shield. In other words, the physical properties of Z Shield changed after even a short exposure to accelerated aging.

101.    The Honeywell Draft Report stated that even a small reduction in ballistic performance made it likely that the Z Shield Vests would no longer be fit for use. Specifically, the Honeywell Draft Report opined that "a small reduction in V-50 capability may no longer meet NIJ specifications if adequate margins of safety were not used in the design criteria." The Report also opined that "a V-50 difference of only 5% could require anywhere between 10-20% higher solution aerial density to pass a given NIJ specification."

102.    These small V-50 reductions, identified in the Honeywell Draft Report as likely requiring heavier vests with additional layers of material, pale in comparison to the actual drops in ballistic performance found in Honeywell's own V-50 testing, as detailed above of between 10% and 15%.

103.    Yet, Honeywell never shared the Honeywell Draft Report, or the data and other information contained therein, with Armor Holdings. Honeywell also never advised Armor Holdings to add layers to any of its Z Shield Vest models or to shorten the warranty period for Z Shield Vests in light of the substantial declines found in the accelerated age testing of Z Shield. Honeywell also never disclosed the Honeywell Draft

Report or the underlying data therein to the United States or anyone outside of
Honeywell.

> **7.    Honeywell's compilation of the Fall 2003 technical
> bulletin illustrated its efforts to cover up Z Shield's
> risks**

104.    In mid-to-late September 2003, Dr. Wagner began drafting what became
the October 2003 Z Shield technical bulletin intended for Armor Holdings' use in
reassuring its customers about the safety of Z Shield Vests.  Her initial drafts were
intended for an internal audience at Honeywell, including the Marketing Department, and
did not go to Armor Holdings.

105.    On September 26, 2003, Dr. Wagner cited in one such draft Honeywell's
negative Z Shield accelerated aging test data at 40° C (104° F), 70% RH showing a
substantial drop off in Z Shield performance.  Emphasizing the importance of the Z
Shield data over the marketing descriptions, she stated in this draft, "[b]lah . . . blah . . .
blah . . . blah . . . blah . . . I can keep writing but this is the same stuff all over again from
the last publications we wrote.  I can make it sound different or outline/arrange it slightly
different[ly] but the issue is the data."  In addition, Dr. Wagner included the following
risk disclosure language in the early drafts of this bulletin:

> An accelerated aging study are tests in which materials are subjected
> to conditions which are designed to achieve conditions which would
> simulate long term aging of the material.  It is an accepted chemical
> relationship that the stresses that age materials can in some instances
> be simulated by temperature, moisture, or other environmental
> conditioning exposure.  Unexpected results were achieved . . . with
> higher than anticipated degradation in ballistic performance for this vest.

106.    A later draft of the Z Shield technical bulletin from Dr. Wagner, dated
September 29, 2003, used the same risk disclosure language.  It also included the

40

environmental conditioning test data at 40° C (104° F), 70% RH and cyclic data, in which

Z Shield's exposure to conditions of 40° C (104° F), 70% RH was cycled with exposure

to uncontrolled warehouse conditions. All of this data was negative and showed

substantial drop-offs in Z Shield's ballistic integrity.

107.   By this time, Dr. Wagner had become frustrated with Honeywell's

Marketing Department, stating that "I still do not know what you want out of this and

hence it is very frustrating" and that "[y]ou say you just want the data and you . . . will

fill in the rest." That same day, September 29, 2003, the Marketing Department gave Dr.

Wagner a detailed outline to follow in revising the Z Shield technical bulletin. This

outline made clear that the "[o]bjective" of the bulletin would be "[t]o write a document

that conveys to the industry the reasons and reasoning why Honeywell feels Z Shield is

safe for use in ballistic resistant vests."

108.   Honeywell's Marketing Department also rewrote the technical bulletin to

omit any of the 40° C, 70% RH accelerated aging or cyclic data and to stress the safety of

Z Shield. On October 11, 2003, Honeywell's Marketing Department consulted with JMC

Marketing Communications & PR, Honeywell's public relations firm, about the technical

bulletin.

109.   Honeywell provided the final version of the Z Shield technical bulletin,

entitled "Z Shield Material: Ballistic Performance After Aging," to Armor Holdings, and,

on October 28, 2003, Armor Holdings distributed this bulletin to sales representatives for

use with customers. As Honeywell's Marketing Department had directed, the Z Shield

technical bulletin emphasized the safety of Z Shield, stating that:

> The data presented regarding Z Shield materials demonstrates that
> there has been no loss of ballistic performance over a three year

period when stored in an uncontrolled warehouse environment.
Based on the data, and from experience with other ballistic
materials, there is no significant anticipated change in the ballistic
performance response of the Z Shield material for the five year
suggested lifespan of most ballistic resistant vests assuming proper
care and use.

110.     The bulletin also included the graph, discussed above, with the

manipulated warehouse data showing no drop off in Z Shield's ballistic performance after

three years.  Thus, in the span of a few weeks, Honeywell's Z Shield technical bulletin

for Armor Holdings and its customers went from Dr. Wagner's initial draft disclosing the

bad accelerated aging data at 40° C (104° F) and 70% RH, and noting the "higher than

anticipated degradation in ballistic performance" to a version authored by Honeywell's

Marketing Department omitting any risk disclosure language and emphasizing the

manipulated warehouse data.

111.     The final Z Shield technical bulletin also identified "the five year

suggested life span of most ballistic resistant vests assuming proper use and care,"

illustrating Honeywell's familiarity with the five year warranty provided by Armor

Holdings and Honeywell's understanding of the importance of long-term  ballistic

performance to vest users.

112.     Despite numerous opportunities, Honeywell never informed Armor

Holdings or the United States about the underlying accelerated aging test data circa

August 2003 described in the Draft Honeywell Report, its manipulation and "cherry

picking" of the warehouse data cited in the Armor Holdings' Z Shield publications

drafted by Honeywell for Armor Holdings in June and October 2003, or its lack of

disclosure of the FMS warehouse data or the negative DSM warehouse data showing Z

Shield's declining ballistic performance over time.

### 8. Honeywell advised Armor Holdings to retain the five year warranty even on its thinnest Z Shield Vests

113.    Honeywell evaluated Armor Holding's own test data on used Z Shield Vests that were within the five year warranty period. This used vest testing had been performed in mid-2004, by Armor Holdings' in-house ballistics expert (a former police officer with no scientific background) and by an outside consultant, Exponent, and showed substantial declines in the V-50 of used Z Shield Vests compared to new Z Shield Vests. Exponent also employed statistical modeling showing that one popular model of an Armor Holdings' Z Shield Vest (the XTZX2-1 model) had a "failure probability" of 10% after 30 months, 29% after 36 months of use, and 85% after 48 months of use. Exponent defined "failure" as the probability that this Z Shield Vest model would no longer stop rounds from penetrating that this model had been certified to stop.

114.    In response to this test data, Armor Holdings eventually decreased the warranty on several Z Shield Vest models to 30 months. Honeywell, however, noted its disagreement with Armor Holdings' decision to shorten the warranty on any Z Shield Vest models and Dr. Wagner protested to Armor Holdings that this step was unnecessary and would negatively impact the Z Shield market.

### 9. Honeywell continued to hide Z Shield's risks from Armor Holdings through 2005

115.    Honeywell continued, in 2005, to downplay the risks of Z Shield to Armor Holdings. On June 24, 2005, Armor Holdings' then president, Scott O'Brien, asked Honeywell about recent disclosures from Second Chance concerning "the hydrolytic stability of Zylon fiber" that Second Chance indicated could result in a sudden and

catastrophic loss of tensile strength. Mr. O'Brien emphasized that "[w]e are concerned

for the safety of those officers wearing one of our Zylon-based models, and we want to

be able to thoroughly investigate the issues and take the appropriate steps if necessary."

116.   A Honeywell business executive forwarded Mr. O'Brien's question to Dr.

Wagner for a response. On June 27, 2005, Dr. Wagner wrote a draft response, stating:

> Hydrolysis was always the mechanism purported to be the cause of
> the issues with Zylon fiber. As reported with the testing, increased
> heat in a humid environment accelerated the reaction – similarly,
> increased humidity . . . also increased the reaction. Catastrophic?
> Not aware of any data published to date that would support that
> statement – but certainly the results of the in-use testing could be
> catastrophic failure once the fiber tenacity was sufficiently affected
> that the in-use conditions surpassed the performance.

117.   Honeywell, however, did not forward Dr. Wagner's risk disclosure

language to Armor Holdings in response to Mr. O'Brien's question. Instead, the

Honeywell Marketing Department, among others, reviewed and vetted Dr. Wagner's

language.

118.   On July 13, 2005, almost three weeks after Mr. O'Brien asked Honeywell

this question about Second Chance's Zylon disclosures, Honeywell forwarded its

response to Mr. O'Brien. He forwarded this response to other Armor Holdings'

executives and noted "[f]inally, Honeywell's response to 2c [Second Chance]

announcement." In this response, Honeywell omitted any risk disclosure language and,

instead, falsely claimed that "we do not have any data that would suggest a change in

performance beyond the changes associated with data that we have shared in the past"

and that "Honeywell does not have any data that supports a catastrophic loss of tensile

strength . . . ."

### 10. Honeywell's failure to disclose its Z Shield research to the United States

119. At no point during the time that federal funds were used to purchase Armor Holdings' Z Shield Vests (late August 2005) did Honeywell disclose any of its Z Shield accelerated aging test data or all of its warehouse data to the United States, to any states, localities, or tribal agencies, or to the general public.

120. Also, despite numerous opportunities, Honeywell never informed the United States about any design or testing issues with Z Shield, the concern of its scientists with the water-based coating process for Z Shield, Honeywell's January 2003 strategy to continue selling Z Shield to Armor Holdings and its attempts to limit legal liability by conditioning future sales of Z Shield on Armor Holdings signing a limitation of liability provision, Honeywell's manipulation of the Z Shield warehouse data, its negative accelerated aging data, or Honeywell's internal concerns about Z Shield maintaining its long-term ballistic performance due to poor accelerated aging and other test data.

### 4. Additional Misconduct by Honeywell

#### a. Substandard Z Shield

121. As detailed above, after DSM would not continue tolling Z Shield for Honeywell due to concerns about Zylon degradation, Honeywell, in mid-2001, switched to another tolling company to assist it, FMS. From the beginning, FMS had difficulty producing the same quality of Z Shield as DSM. As a result, by February 2002, Honeywell had to convince Armor Holdings to accept lower specifications for the Z Shield that it purchased from Honeywell.

45

122.    By mid-2003, FMS could not reliably meet even these lower minimal quality control specifications, and much of the Z Shield from this period failed Honeywell's ballistics testing.  Honeywell responded to this problem by complaining to FMS about its tolling services and looking for markets abroad where it could sell the substandard Z Shield to countries that lacked ballistics testing requirements.

123.    In December 2003, FMS responded to Honeywell's complaints about substandard Z Shield by informing Honeywell that FMS had found a 10-15% decrease in the strength of the Zylon fiber that it received from Toyobo and that FMS believed the Zylon fiber was degrading over time.  FMS told Honeywell that the degrading Zylon fiber from Toyobo was the cause of its tolling problems and suggested halting its Z Shield tolling services because of this degradation problem.

124.    In response, that same month, Honeywell contacted Toyobo seeking a rebate on the basis of FMS's disclosures about substandard Zylon.  In February 2004, Honeywell reached a settlement with Toyobo in which Toyobo paid Honeywell $3 million in exchange for a release and indemnification from Honeywell relating to potential liabilities for Z Shield.  Honeywell did not share the information about FMS's concern or the Toyobo settlement with Armor Holdings, the United States, or the general public.

125.    Despite relying on FMS's concern about degraded Zylon fiber to seek compensation from Toyobo, Honeywell failed to resolve the Z Shield manufacturing problems with FMS.  Nevertheless, Honeywell demanded that FMS continue its tolling services because Armor Holdings still wanted to buy Z Shield.  Under pressure from Honeywell, FMS continued its tolling service and Honeywell continued to supply Z

Shield to Armor Holdings.  Not until January 2005 did Honeywell admit to Armor

Holdings that Honeywell "had no confidence in our ability to make shields that meet the

minimum ballistic spec required."  Even then, Honeywell continued to sell Z Shield to

Armor Holdings and did so up until the time that the NIJ effectively decertified all Zylon

products, including the Z Shield Vests, in August 2005.

> **b.     Red Thread**

126.     In May 2003, Hexcel Corporation (Hexcel), one of the weavers of Zylon

fabric, noticed large dark red discolored portions of Zylon (Red Thread) on its looms.

Hexcel informed Toyobo about this problem, and testing revealed that this Red Thread

Zylon fiber had tensile strength 10% to 30% lower than regular Zylon fiber.  In actuality,

Toyobo had a Red Thread problem with Zylon from the very beginning of its production.

But Toyobo had managed to keep this a secret until Hexcel's discovery, which marked

the first time that anyone outside of Toyobo had identified a Red Thread problem.

127.     Despite using a lamination rather than a weaving process, Red Thread still

represented a threat to Honeywell's Z Shield because it exacerbated the Zylon fiber's

(which was the ballistic resistant material in Z Shield) strength loss in heat and humidity.

Accordingly, in June 2003, Toyobo met with Honeywell, informed the company about

this Red Thread problem, and told Honeywell to inspect its Z Shield product for signs of

Red Thread.  A month later, in August 2003, Toyobo published a white paper released

widely in the body armor industry, including to Honeywell and Armor Holdings,

admitting that from October 2002 through February 2003, Zylon fiber had been

"contaminated by sodium hydroxide" and that the tensile strength of the Red Threat

decreased up to 20% compared to regular Zylon.  Toyobo later confirmed this 20% figure

in a private meeting with Honeywell, in February 2004, to discuss the Red Thread problem.

128.    Despite these warning signs, Honeywell downplayed the significance of Red Thread to Armor Holdings, continued to emphasize the safety and suitability of Z Shield in ballistic applications, and offered Armor Holdings a "retroactive rebate" of $165,000.

**D.    Honeywell Understood That Z Shield Was Defective, But Kept This From Armor Holdings And The United States**

129.    In short, Honeywell knew that Z Shield degraded quickly in hot and humid conditions and that this and the other latent defects (described above) rendered Z Shield unfit for ballistic use because they adversely impacted Z Shield's ballistic performance.  Yet, Honeywell emphasized the positive data to Armor Holdings, authored technical papers and bulletins supporting Z Shield's fitness for use in body armor, and consistently reassured Armor Holdings about Z Shield's safety.

130.    Honeywell also knew that Z Shield was a defective product that could not be depended upon to protect end users throughout the five year warranty period. Furthermore, Honeywell knew that Armor Holdings relied on it for technical expertise regarding Z Shield.  Yet, Honeywell did not disclose the defective nature of Z Shield to Armor Holdings.  As a result, Honeywell caused Armor Holdings to submit false claims to the United States in the sale of defective Z Shield Vests.  Moreover, despite numerous requests, by NIST scientists and other researchers working on Zylon-related research for the Government, seeking Honeywell's Z Shield accelerated aging data and its other Z Shield research, Honeywell never produced this research notwithstanding many opportunities to do so, including at meetings with NIST researchers.

48

# VI.
# THE AFTERMATH

**A.   The Ballistics Test Data, In A Technical Report Issued By NIJ In August 2005, Confirmed The Defective Nature Of Z Shield**

131.   Following the June 2003 officer shooting involving a Zylon vest described above, the Attorney General directed NIJ to begin a study of Zylon vests and NIJ received the assistance of Government researchers from NIST.  Honeywell, Toyobo, and the rest of the body armor industry publicly applauded this testing effort, but failed to provide their negative test results on Zylon or Z Shield to the Government.  The NIST researchers, among others, conducted V-0 testing on 18 Z Shield Vests and V-50 testing on six Z Shield Vests.  At least 15 of the Z Shield Vests that underwent V-0 testing were within the five year warranty period.  In this V-0 testing, all 18 of the Z Shield Vests failed ballistics testing, with 15 of them suffering bullet penetrations.  The V-50 testing also found that five of the six Z Shield Vests had lost at least 29% of their ballistic integrity, with losses running as high as 91% of ballistic integrity.

132.   The NIST researchers also tested numerous vests from other body armor companies that contained woven Zylon fabric as opposed to Z Shield. In this testing, the bulk of the woven Zylon vests also failed, with 58% of all Zylon vests being penetrated by at least one bullet and 91% having excessive back face deformation.  But no group of vests performed as poorly as the Z Shield Vests in this testing. NIJ documented this NIST research in a report, entitled the "Third Status Report to the Attorney General on Body Armor Safety Initiative Testing and Activities" (Third Status Report), dated August 24, 2005.  That same day NIJ issued "Body Armor Standard Advisory Notice #01-2005" advising that NIJ has identified Zylon "as a material that appears to create a risk of death

or serious bodily injury as a result of degraded ballistic performance when used in body armor."

**B.    Thereafter, The Government Ceased Buying Any Z Shield Or Other Zylon Vests**

133.    Following the Third Status Report, all body armor manufacturers in the United States stopped using Zylon, including Z Shield, and GSA removed all Zylon-containing body armor from all current GSA MAS contracts. Also, following this report, Zylon-containing body armor could no longer be ordered as part of the BVP program.

**COUNT 1**

**VIOLATIONS OF THE FALSE CLAIMS ACT,
31 U.S.C. § 3729(a)(l)**

134.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 133.

135.    Honeywell knowingly caused to be presented false or fraudulent claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729(a)(l). Specifically, Honeywell caused to be presented by state, local, and tribal law enforcement agencies false claims for payment to the United States under the BPVGPA for Armor Holdings' Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty. Additionally, Honeywell caused to be presented false claims for payment by Armor Holdings to the United States under the GSA FAS Schedule for the Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty. Moreover, Honeywell caused to be presented additional false claims for payment by Armor Holdings to the United States for purchases outside of the GSA contract for the Z Shield Vests, which Honeywell knew were defective and would not

50

meet the five year warranty. Each and every claim for payment for any Armor Holdings' Z Shield vest presented to the United States was false. All of these claims were knowingly false claims under the FCA.

136.     Had the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers. But Honeywell did not inform the United States of the defects in Z Shield and instead took affirmative steps to cover up those risks.

137.     By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT 2

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)

138.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 133.

139.     Honeywell knowingly made or caused to be made false statements and records in order to get false claims paid by the United States in violation of the FCA, 31 U.S.C. § 3729(a)(2). Specifically, Honeywell, made or caused to be made false statements and records in connection with false claims for payment by state, local, and tribal law enforcement agencies to the United States under the BPVGPA for Armor Holdings' Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty. Additionally, Honeywell made or caused to be made false statements and records in connection with false claims for payment by Armor Holdings to the United States under the GSA FAS Schedule for the Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty. Moreover, Honeywell made or

caused to be made false statements and records in connection with false claims for payment by Armor Holdings to the United States for purchases outside of the GSA contract for the Z Shield Vests, which Honeywell knew were defective and would not meet the five year warranty. All of these claims were knowingly false claims under the FCA.

140.   Had the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers. But Honeywell did not inform the United States of the defects in Z Shield and instead took affirmative steps to cover up those risks.

141.   By virtue of these false statements, the United States suffered damages in an amount to be determined at trial.

## COUNT 3

## UNJUST ENRICHMENT

142.   The United States re-alleges and incorporates by reference paragraphs 1 through 133.

143.   From 2001 through 2005, the United States paid for defective Z Shield vests due to false statements, records, and omissions by Honeywell.

144.   Had the United States known of the defective nature of the Z Shield Vests it would not have purchased them for use in the ballistic protection of law enforcement officers. But Honeywell did not inform the United States of the defects in Z Shield and instead took affirmative steps to cover up those risks.

145.   By reason of the above-described payments, Honeywell has received money, directly or indirectly, to which they were not entitled. Honeywell, therefore, has

been unjustly enriched in an amount to be established at trial. By virtue of its payments to Armor Holdings for Z Shield Vests, the United States is entitled to those proceeds.

## PRAYERS FOR RELIEF

### AS TO COUNT 1:

As against Honeywell, judgment in an amount equal to:

1. Statutory damages in an amount to be established at trial;

2. Civil penalties for each false claim or false statement as provided by law;

3. The costs of this action, plus interest, as provided by law; and

4. Any other relief that this Court deems appropriate.

### AS TO COUNT 2:

As against Honeywell, judgment in an amount equal to:

1. Statutory damages in an amount to be established at trial;

2. Civil penalties for each false claim or false statement as provided by law;

3. The costs of this action, plus interest, as provided by law; and

4. Any other relief that this Court deems appropriate.

### AS TO COUNT 3:

As against Honeywell, judgment in an amount equal to:

1. The money paid to or received by Honeywell, directly or indirectly,

   relating to the sale of Z Shield vests to the United States;

2.     The costs of this action, plus interest, as provided by law; and

3.     Any other relief that this Court deems appropriate.

Dated:  April 8, 2015

BENJAMIN C. MIZER
Acting Assistant Attorney General


MICHAEL D. GRANSTON
ALAN E. KLEINBURD
ALICIA J. BENTLEY
A. THOMAS MORRIS
JENNIFER CHORPENING
ATTORNEYS
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel: 202-307-1086
Fax: 202-305-7797

# EXHIBIT 2

1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

THE UNITED STATES OF            .   Case No. 1:08-CV-00961
                                .   (RWR/DAR)
AMERICA,                        .
                                .
              Plaintiff,        .   Washington, D.C.
                                .   March 12, 2015
      v.                        .
                                .
HONEYWELL INTERNATIONAL,        .
                                .
INC.,                           .
                                .
              Defendant.        .
. . . . . . . . . . . . . . .

MOTIONS HEARING
BEFORE THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      U.S. Department of Justice
                        By:  ALBERT T. MORRIS, AUSA
                             ALICIA J. BENTLEY, AUSA
                             JENNIFER CHORPENING, AUSA
                        601 D Street, N.W.
                        Room 9126
                        Washington, DC 20004

For the Defendant:      Kirkland & Ellis, LLP
                        By:  CRAIG S. PRIMIS, ESQ.
                             DANIEL A. BRESS, ESQ.
                             BETHANY HAMM, ESQ.
                        655 15th Street, N.W.
                        Washington, DC 20005

1          (Proceedings commenced at 2:27 p.m.)

2          THE CLERK:  The matter now pending before

3    this Court is <u>United States of America v. Honeywell</u>

4    <u>International, Incorporated</u>, in Civil Action Number 08-

5    961.

6          Thomas Morris, Alicia Bentley and Jennifer

7    Chorpening are representing the Plaintiffs.

8          Craig Primis, Daniel Bress and Bethany Hamm

9    is representing the Defendants, and we're here for the

10   purpose of a motions hearing.

11         THE COURT:  Good afternoon.

12         Now, this matter is on the calendar for a

13   hearing with respect to the pending motion to compel.

14         Before I took the bench I asked that you take

15   an opportunity to continue to confer in an effort to

16   attempt a resolution of even a single of the issues

17   that's presented by the motion.

18         I also asked that you consider an alternative

19   means of preceded with the hearing; that is, perhaps by

20   grouping categories of requests so that if there are

21   requests that can be meaningfully addressed at the same

22   time, you could do so.

23         Because I understand that you may have

24   reached an agreement about some aspect of this, I will

25   hear the agreement.

1           Mr. Morris, you are approaching so we will

2    hear from you first.

3           MR. MORRIS:  Good afternoon, Your Honor.

4           THE COURT:  Good afternoon, Mr. Morris.

5           MR. MORRIS:  I want to talk about the samples

6    first because I think that's where we're closest to the

7    agreement.  I think both sides took your instructions

8    at the end of the last hearing, to heart.

9           THE COURT:  I appreciate that.

10          MR. MORRIS:  Mr. Bress and I had at least

11   four phone calls talking about all of the issues.

12          Just sort of from a global perspective, I

13   think we were willing to sort of look at issues one-by-

14   one and independently, since -- well, Honeywell was

15   more interested in some sort of global discovery

16   resolution.

17          Now, what we, I think --

18          THE COURT:  When you say -- Just so our

19   record is clear, when you say "samples" are you

20   speaking of samples of both the material at issue as

21   well as whatever other materials were used for testing

22   purposes, shot packs for example?

23          MR. MORRIS:  Exactly.

24          And let me just briefly --

25          THE COURT:  Are you speaking of both --

1            MR. MORRIS:  Yes.

2            THE COURT:  -- types of documents?

3            MR. MORRIS:  Yes.

4            THE COURT:  Both types of materials, excuse

5    me.

6            MR. MORRIS:  And let me just explain, and I

7    actually looked --

8            THE COURT:  Please do.

9            MR. MORRIS:  -- this up on the Internet

10   because although I've been involved in this case for a

11   long time, I wasn't exactly sure, what exactly is a

12   "shot pack"?  So I looked it up at the Internet and

13   essentially it's a bunch of layers of the ballistic

14   material that's put together.  It sort of looks like a

15   hard, square, flat, very uncomfortable pillow, and you

16   shoot at it to test a ballistic material, and sometimes

17   you do what they call "environmentally conditioning"

18   it.

19           And the reason you would environmentally

20   condition something, there's some dispute in this case

21   about whether the environmental conditioning tells you

22   something or not, but in the product world, a lot of

23   times people expect the products to last for a while,

24   and in this particular case there are warranties that

25   the body armor manufacturer, Armor Holdings, had, that

1   said the product would last for 5 years.

2           So you could do it one of two ways.  You can

3   either wait for 5 years to market the product and then

4   do the testing, or you can do what a lot of companies

5   do, which is environmentally condition, expose the

6   material to heat and humidity to try to speed up the

7   aging process.

8           And so I think we reached an agreement just

9   on the shoot (phonetic) pack issue.  What we wanted was

10  shoot pack to inspect that it had been environmentally

11  conditioned from the DSM material, which was the

12  earlier Z Shield material, and the FMS material.

13          We had originally wanted it for testing, but

14  we've compromised on that, and we would agree to just a

15  visual inspection of it with our expert present with,

16  if they want to bring, their expert present, with our

17  expert being able to photograph it, and I think we

18  pretty -- we've reached an agreement on that, at least

19  that small piece of this puzzle.

20          THE COURT:  Did your agreement include

21  consideration of a time frame for the inspection, or a

22  deadline for the completion of the inspection?

23          MR. MORRIS:  We didn't address that

24  specifically, but certainly we would want to do it, I

25  think, within the next month, and again, if that

```
1    doesn't work out, Mr. Bress or Mr. Primis can tell us
2    that but, you know, certainly sooner the better.
3              THE COURT:  Do the parties have a common
4    understanding of where the materials are located?
5              MR. MORRIS:  I think so.  Yes.  I mean,
6    they're at Honeywell facilities, and if you looked at
7    Dr. Wagner's declaration, her first one, in paragraph
8    36, I think it specifically says they're in one of the
9    facilities.
10             THE COURT:  Very well.
11             Have you reached agreement regarding any of
12   the other categories of requests?
13             MR. MORRIS:  We've come close on the samples,
14   and I want to focus --
15             THE COURT:  Well, before you move on, --
16             MR. MORRIS:  Yes.
17             THE COURT:  -- let's see if we can tie this
18   agreement to the four categories that you enumerated in
19   the motion.
20             Do we agree that your agreement concerns the
21   second and fourth categories?
22             MR. MORRIS:  Well, the agreement considers
23   the fifth one.  The fifth one is Honeywell is asked to
24   produce within 14 days, for inspection, tested Zylon
25   containing shot packs, and what I'm looking at is
```

1    Document 97-12, which is our proposed order, and I have

2    an extra copy if you'd like.

3            THE COURT:  We have it.

4            MR. MORRIS:  Okay.

5            THE COURT:  Thank you.

6            MR. MORRIS:  You caught me last time.  I've

7    got the document list this time.

8            And Honeywell has represented, and we have no

9    reason to doubt them, that they don't have the vest, so

10   we're not going to do anything with the vest, that's

11   off the table, and so the agreement I just articulated

12   relates to Number 5, the shot packs.

13           THE COURT:  Very well.

14           MR. MORRIS:  Okay.

15           The other area, Your Honor, where I think

16   we're close, there was one --

17           THE COURT:  So shall we call that "2" and

18   "5"?

19           MR. MORRIS:  Well, for now I just call the

20   one where we had the agreement, "5."  I wouldn't call

21   it "2" quite yet, but we're going to go to 2 next.

22           THE COURT:  All right.

23           MR. MORRIS:  Well, because we don't have

24   quite an agreement on 2, and so I don't want someone to

25   think that we do, but we're -- I'm hopeful with the

1    Court's help we can reach this agreement because I

2    think the issue between the parties is very small.

3              THE COURT:   All right.   Please continue.

4              MR. MORRIS:   What we were interested in

5    there, is we wanted to get samples of the Z Shield

6    material, and there were three different types of it.

7              There's one in their pilot program that

8    Honeywell did when they were trying to develop it back

9    in the late '90s, and they eventually determined it

10   wasn't commercially feasible for Honeywell to do it

11   internally, and they did that at a facility called "Pre

12   Con."   Okay.   That's one, we want samples from that.

13             We'd like a sample from --

14             THE COURT:   Before you go on --

15             MR. MORRIS:   Yes.

16             THE COURT:   -- let me ask whether -- let me

17   ask you to articulate what your contention is with

18   regard to this other facility.

19             Is this a Honeywell facility to which you

20   refer when you identify it as "Pre Con"?   Is that a --

21             MR. MORRIS:   Yes, it's --

22             THE COURT:   -- subsidiary?

23             MR. MORRIS:   -- it's all a little murky

24   because in the pleadings Honeywell, at least from the

25   pleadings, doesn't actually own Pre Con, but in --

1            THE COURT:  That was my question.

2            MR. MORRIS:  -- our view they control it.

3     Their employees work there.  The machinery is actually

4     Honeywell machinery there, and Mr. Bress and Mr. Primis

5     can tell you more about that, but just from the

6     pleadings -- So it's just a little bit of a hybrid, but

7     I don't think -- Honeywell has not raised an issue

8     about access, you know, due to lack of ownership.

9     That's not one of the issues they've raised.

10            But getting back to the samples, so we wanted

11    to get a sample, and they do have control and ownership

12    of the sample, so we want one from the pilot program.

13            We want one or two samples from DSM.  One

14    from the year 2000; one from the year 2001.  And we

15    want samples from FMS for each year, 2002, 2003, 2004,

16    2005.

17            Now, it's my understanding, talking with Mr.

18    Bress during our meet and confer, that Honeywell's

19    biggest problem with the samples was simply the fact

20    that originally, and in the papers, we were not going

21    to give them access to the testing as it was happening,

22    and we weren't going to give them a protocol for the

23    testing, and we re-thought our position and we've

24    decided to try to reach an agreement.  We would give

25    them the protocol and we would give them access to the

1   testing done by our experts on those materials.

2          All right.  So, you think, "Okay, well why

3   don't we have an agreement?"  Here's the one issue.

4          The product, and this may be by both sides

5   thinking too much like lawyers, but the issue was if we

6   gave them the protocol for the testing, we wanted to

7   make sure we're actually going to get the samples.  In

8   other words, let's just hypothetically say Honeywell

9   looks at the protocol, and say, "Oh my, this is crazy.

10  This isn't going to tell you anything.  We're not going

11  to give you the samples."

12         My view is, first, I don't think our testing

13  would do that because our experts are pretty good in

14  knowing what they want, but more importantly, that's

15  the kind of thing that goes to weight or to

16  admissibility, if we ever tried to introduce this

17  stuff, not so much to relevancy.

18         So what I was hoping we could get the Court's

19  guidance on, is how we can bridge this narrow gap where

20  we're willing to give them access to the testing, we're

21  willing to give them the protocols.  We're willing to

22  give them the protocols before we get the samples.  We

23  just want to make sure that we get the samples.

24         THE COURT:  What would be the -- What is your

25  understanding of the basis of a concern that you would

1    not receive the samples, if there is an agreement

2    regarding the protocol?

3            MR. MORRIS:   Just when I asked Mr. Bress, you

4    know, "If we give you the protocol will we get the

5    samples?", he couldn't definitively say "Yes," you

6    know, but he indicated -- to be fair to him, he

7    indicated he had no reason to think that we wouldn't

8    get them, but he just -- he couldn't say "Yes," and so

9    that was the concern.

10           The other thing that I want to be clear, we're

11   not going to negotiate the protocol with Honeywell, so

12   I don't want you to think we're going to have an

13   agreed-upon protocol.  Our experts got some ideas of

14   the protocols they want for the sampling.  We're going

15   to give Honeywell the protocol, and I suppose if they

16   wanted to give us their comments on it, we would relay

17   it to our experts, but I don't want the Court to think

18   that we're agreeing to have like a joint testing

19   protocol with Honeywell.  That's not what we're going

20   to.

21           So, I wasn't quite sure why -- if we gave them

22   the protocol, why then, we wouldn't necessarily get the

23   samples.

24           Now, one thing Mr. Bress raised, to be fair,

25   he said, "Well, we don't know how much you need."

 1              THE COURT:  You may have anticipated the

 2     Court's question.

 3              Will the protocols provide for a mechanism to

 4     ensure that the supply of materials is not exhausted by

 5     your expert's testing?

 6              MR. MORRIS:  Yes, and the -- Let me put that

 7     first.  We don't need --

 8              THE COURT:  That seems to be -- I will

 9     certainly hear from you, Mr. Bress or Mr. Primis or Ms.

10     Hamm, but I -- while you're at the podium, I will ask

11     whether --

12              MR. MORRIS:  Sure.

13              THE COURT:  -- it was your understanding that

14     that is the objection, in other words, a concern --

15              MR. MORRIS:  No, that's not --

16              THE COURT:  -- the supply --

17              MR. MORRIS:  -- really it.

18              THE COURT:  -- could be exhausted by your

19     expert's --

20              MR. MORRIS:  They have a lot of this

21     material.  I mean, Dr. Wagner testified at her

22     deposition, that they have a lot of this material.

23     Now, whether they have a lot of it for each year that

24     we want, Mr. Bress indicated he wasn't sure about that,

25     so I don't want represent to the Court this couldn't be

1    an issue, but the amount of sample that we're looking

2    for is like, at most, 1 foot by 1 foot.  So it's a

3    small amount.  We're not looking for like a roll of

4    carpet, you know, bring it in and we're going to deal

5    with it.  We're looking at something relatively small,

6    no more than like 12 by 12 of each of the types that we

7    want.

8            And what I told him was that we would tell him

9    because he raised it, and I thought that was a valid

10   issue too, in the meet and confer, and I said, but if

11   you come -- you know, and I had -- I asked our expert,

12   or actually Ms. Chorpening asked our expert how much

13   they thought they needed for each sample before they

14   learned that it was after our call with Mr. Bress,

15   because I thought this issue might come up, and that --

16   that's the amount, and so if Mr. Bress then came back

17   to me and said, "Well, we can give you the foot by foot

18   for all except like one year," and he just didn't have

19   it, then I think we would probably accept that, but

20   given the fact we've got a limited amount that we want,

21   I don't expect supply to be an issue.  We're not

22   looking for a huge amount of the Z Shield.

23           THE COURT:  Very well.  Thank you very much,

24   Mr. Morris.

25           I will ask you to have a seat while I hear

1   from you -- Mr. Bress, is it you who will address the

2   issues?

3           MR. BRESS:   Yes, Your Honor.

4           THE COURT:   Good afternoon.

5           MR. BRESS:   Good afternoon, Your Honor.

6           THE COURT:   You may proceed in the order that

7   Mr. Morris did, if you don't mind, to confirm, at least

8   I imagine that that is what you will do, that there is

9   an agreement regarding shot packs?

10          MR. BRESS:   I'd be happy to, Your Honor, and

11  again, thank you for holding the hearing on behalf of

12  Honeywell.  We certainly do appreciate it.

13          We did have productive discussions with Mr.

14  Morris, as Your Honor instructed.  I think from our

15  perspective, we did feel that if there was an agreement

16  to be had here, it ought to be a global agreement,

17  because part of Honeywell's concern here is the amount

18  of time this case has dragged on.

19          I will say, on the issue of the inspections,

20  both visual -- a visual inspection and testing, I do

21  think that is one area that can be cleaved off and that

22  we have worked with Mr. Morris together on.

23          I think it makes sense to think of it as two

24  separate types of things.  One is a visual inspection.

25  We've never opposed that.  We've said we have the

1      materials, at least most of the materials they're

2      looking for, and we will just need to work with them

3      together on a very basic protocol for what this visual

4      inspection is supposed to look like, where it's going

5      to take place, who's going to be there.

6            So I think on the visual inspection, the

7      parties are able to reach agreement on that.

8            On the issue of testing, the Government wants

9      to test samples of Honeywell's Z Shield product.   What

10     we said was pretty standard in litigation, "Provide us

11     with a test protocol and allow us to be present during

12     the testing," and we did not think that was much of an

13     ask because again, that's something that happens all

14     the time in product liability type cases and, from our

15     perspective, we need to be able to know what's

16     happening to the material before it's destroyed, so

17     that if the experts need to battle over the validity of

18     the testing, everybody knows what was done.

19            Mr. --

20            THE COURT:   Is there a scenario in which

21     materials would not be provided for testing, depending

22     upon the protocol that was proposed?   That seemed to be

23     the concern of the United States, as expressed by Mr.

24     Morris.

25            MR. BRESS:   Yeah, and I don't, frankly, Your

1    Honor, understand that concern.  It seems to me

2    hypothetical.  They're asking us -- There's been no

3    protocol provided, so we haven't been put in the

4    position to look at a protocol and accept or reject it.

5    Our intention on this issue is to be reasonable.

6          The Government forced us to brief the issue

7    of whether they were even required to provide a

8    protocol, and to allow us to be present.  Now, they

9    seem to be agreeing on that point, and our position is

10   simply, we should be allowed to see the protocol.  Our

11   intention is not to come back here again on that

12   particular issue, but to work with Mr. Morris on it,

13   but frankly, we don't know what it is exactly, they

14   want to do.  We don't know where it will take place.

15   We don't know who's going to do it, and so those are

16   basic items I think that can probably be worked out

17   if --

18         So I would think, Your Honor, that if there

19   is a dispute about the protocol, it possibly could be

20   brought back to your attention, but it's not our

21   intention to make them provide us a protocol for us to

22   be able to then review and reject.  Our intention is --

23   But at the same time, I don't think it's fair to us to

24   say, "You must agree to something without having seen

25   the protocol."

1           So our ask on this, is to receive the

2      protocol.  If there's any issues that would need to be

3      worked out, we would do that.

4           THE COURT:  Do you agree that the record can

5      reflect that the parties have resolved issues with

6      respect to visual inspections, and will resolve issues

7      with regard to testing protocols?

8           MR. BRESS:  Your Honor, I'd think what we can

9      say is that we've agreed to agree.  I think that what

10     we need to have is a protocol, but we intend to agree

11     on those points, and to work with them, so --

12          THE COURT:  You will continue -- You and your

13     co-counsel, on behalf of your client, will continue to

14     confer with Mr. Morris and his co-counsel, with an eye

15     toward reaching an agreement?

16          MR. BRESS:  Absolutely.

17          THE COURT:  Very well.  Thank you very much,

18     Mr. Bress.

19          MR. BRESS:  Thank you, Your Honor.

20          MR. MORRIS:  May I just address that last

21     point, Your Honor?

22          THE COURT:  Yes.

23          MR. MORRIS:  What I hear Mr. Bress saying is

24     that he essentially wants to develop a joint protocol

25     and -- because he said even, well, we -- unless we know

1    what it is, we don't know if we accept or reject it,

2    and we believe our expert should be able to come up

3    with the protocol.  Whether or not Honeywell accepts or

4    rejects it should not prevent us from getting the

5    samples.  If they don't like our protocol, that's an

6    admissibility issue.  They can file something in

7    limine, but we don't want to negotiate a joint protocol

8    with Honeywell.

9           Our experts have a very clear idea of what

10   they want to do with this, and he's basically saying,

11   "Well, you know, we might reject this protocol."  He's

12   not saying, "We'll definitely give you the material."

13   He says, "Well, we'll be reasonable," but we don't know

14   what that means.

15          THE COURT:  I did not understand Mr. Bress'

16   qualification to be that there must be a joint protocol

17   in order for there to be an agreement.

18          May I ask you to return, Mr. Bress.

19          My understanding of your comment, please

20   correct me if I misinterpreted it, is that you wish to

21   see the protocol before you indicate that you agree.

22          MR. BRESS:  Your Honor, you picked up exactly

23   correctly.  We're not insisting on a joint protocol.

24   Frankly, we don't understand why they would want to

25   test this material anyway, because it's so old, but be

1   that as it may, they intend to have some protocols in

2   mind.   We need to at least know what they are so that

3   we can have our experts ready when they see this

4   testing conducted, but it's not our intention to

5   dispute with them, the particular test methods.   If

6   they think a method is valid and we disagree, that may

7   well happen.   That's not going to be our basis for

8   objecting to the testing.

9          The problem for us is that we have no idea

10  what they wanted to do, we have no -- and this is our

11  material.   It has a limited finite supply.   They're

12  asking to take our material and destroy it, and all

13  we're asking is that we be told what's going to happen

14  to it, who's going to do it, when is it going to take

15  place.

16         So, we're not asking for a joint testing

17  protocol.

18         THE COURT:   Very well.   Thank you very much,

19  Mr. Bress.

20         The record will indicate that the parties

21  have reached an agreement regarding visual inspection,

22  and that as to testing, they have agreed that a

23  protocol will be submitted, and that the testing will

24  take place pursuant to the protocol.

25         I am not prepared to contemplate, at this

1    point, because I do not believe it is necessary, any

2    objections to the protocol that can't be resolved by

3    the parties.  I have already shared with you, my view

4    that you should provide for a testing -- or your

5    testing protocol should include guarantees that the

6    entire supply of the material will not be destroyed.

7              Beyond that, it appears that Honeywell's only

8    request is that it had notice of the protocol, and

9    ensure that its own expert or experts can be present.

10             So with that, I believe we can turn our

11   attention to the issue regarding manufacturing

12   facilities in Petersburg, Virginia, unless that has

13   also been resolved.

14             Mr. Morris, have the parties resolved that

15   issue?

16             MR. MORRIS:  No, but this was one where we

17   were willing to delink it from some of the other

18   issues.

19             And essentially, on the inspections, there

20   are two facilities, and we only want to inspect one of

21   them, the Pre Con facility, which we talked about a

22   little bit earlier, and we're giving up our request on

23   the other one.  So that's a concession we admit.

24             Dan has also asked for a protocol on that,

25   and we've agreed to give him one.

 1          THE COURT:  Let me interrupt you just one

 2   moment to ask you, Mr. Bress, whether in view of that

 3   concession, the parties believe they have reached or

 4   will quickly reach an agreement?

 5          MR. BRESS:  Your Honor, I think on that issue

 6   the answer is "No."  I think that we view --

 7          THE COURT:  In other words, Honeywell opposes

 8   an inspection of the facility identified as the Pre Con

 9   facility?

10          MR. BRESS:  We do oppose it, Your Honor.

11          THE COURT:  Very well.  That's fine.  You may

12   have a seat.

13          Mr. Morris, I'll hear your argument regarding

14   your request for inspection of the Pre Con facility.

15          MR. MORRIS:  The Pre Con facility, what we

16   want to do, and we did this in the Toyobo case, as

17   well, or we didn't have -- we didn't have to appear

18   before the Court there, even though their facility is

19   in Japan, and we had an expert go there and observe

20   their -- what, to them, is the Zylon fiber-making

21   process, and we want to have an expert go to the Pre

22   Con facility while it's running, to observe the shield-

23   making process and to develop a videotape for that

24   process.

25          THE COURT:  Now, let me ask you a few

1    questions, please, before I turn my attention to you,

2    Mr. Bress.

3            Am I correct in my impression that any

4    material being manufactured at the Pre Con facility

5    now, is not the same material that was being

6    manufactured at times relevant to this lawsuit?

7            MR. MORRIS:  That is -- In terms of Z Shield,

8    that is true, and also, the Pre Con equipment is

9    generally used for research purposes, not for

10   commercial manufacturing, but we believe --

11           THE COURT:  Just one moment.

12           So the record should reflect that the

13   material is not the same, and the equipment and

14   facility is not the same, and when I say, "the same," I

15   mean the same as at the time relevant to the Complaint?

16           MR. MORRIS:  Well, we think the equipment is

17   the same, and the reason is Honeywell uses a patented

18   shield-making process, that it's our understanding was

19   used by DSM and FMS when they did their tolling.

20           We have testimony in the record from Brian

21   Arvidson, and Ashok Bhatnagar, people at Honeywell,

22   that the shield-making facility, when it's operational,

23   can make Z Shield, it can make Spectra, it can make a

24   variety of different things.

25           THE COURT:  So is it your contention that the

1    facility is the same as it was in 2000 -- at some point

2    before 2005?

3          MR. MORRIS:  It's our contention that the

4    equipment at the facility, for this process, is the

5    same.

6          Now, it's hard to know exactly, because

7    Honeywell has, what I would say, vaguely alleged

8    differences, but they've never spelled out specific

9    differences, but even if there were some differences,

10   we think that would go to weight.

11         And it's more -- It's very important, we

12   think, that the jury get a picture of how shield is

13   made, and from our perspective, it's not as important

14   if it's Z Shield or Spectra Shield, because the

15   operations are very similar.  It's more to videotape

16   the process so our experts can explain to the jury,

17   what a shield-making operation is like.

18         THE COURT:  And how is that relevant to the

19   claim of the United States concerning the manufacture

20   of a different material 10 years or more ago --

21         MR. MORRIS:  Well, it is --

22         THE COURT:  -- 10 or more years ago?

23         MR. MORRIS:  Well, because we have two issues

24   where we think a Z Shield is problematical, and one's

25   just the typical, it has Zylon in it, but the second

1   one is we believe there was a problem with the

2   manufacturing process, particularly the application of

3   water that was used in the resin application process,

4   which would lead to additional degradation of the

5   material, and we believe the inspection of that

6   facility will help our experts explain that to the jury

7   because the Spectra, when they make Spectra there for

8   research purposes, it's our understanding they use

9   water in that process, as well.

10          THE COURT:  Assuming that that is the case,

11  what is the relevance of that to the claims that are

12  pled by the United States in this action?

13          MR. MORRIS:  Because one of our issues is how

14  Z Shield was manufactured.  The application of water,

15  we believe, led to additional degradation and made the

16  Z Shield perform worse than typical Zylon fiber would

17  otherwise, and we want to illustrate that process to

18  the jury using the equipment in the facility.

19          THE COURT:  What has your expert said, if

20  anything, concerning whether the process being utilized

21  now, is this same process that was utilized a decade or

22  more ago?

23          MR. MORRIS:  Well, until the experts see,

24  they can't opine on that, and Honeywell really hasn't

25  explained any differences, and we would contend any

1    differences would go to weight because they have a

2    patented shield-making process that they use, you know,

3    that -- the idea is they have the patent on a shield-

4    making process and that people have testified in that

5    process you can make Z Shield, you can make Spectra,

6    and so it's the process, and we don't believe the fact

7    that they're not making Z Shield there now is relevant,

8    because that facility is still using the patented

9    shield-making process, and that's what our experts want

10    to understand and be able to illustrate to the jury.

11           THE COURT:  A few moments ago you introduced

12    the term "commercial" or "commercial use."

13           Am I correct in my recollection, that you did

14    that?

15           MR. MORRIS:  I did, and what I meant by that

16    is they never -- none of the Z Shield that was made at

17    Pre Con, even 10 years ago, was ever sold commercially.

18    That was the Z Shield that was tolled by FMS or DSM.

19           What they made at Pre Con was for commercial

20    -- was for development, as opposed to actual commercial

21    sale.  They ran into problems and so they had to use

22    tollers outside of Honeywell to do that.  So that's why

23    I used commercial to draw a distinction between their

24    pilot program, where they were making it for

25    development and research purposes verses for commercial

1 | sale.

2 | THE COURT:  What is your understanding of the

3 | purpose for which the -- for which a process is

4 | underway at Pre Con now?

5 | MR. MORRIS:  My understanding from their

6 | papers is that Pre Con is a research facility so they

7 | will make shield there, I think Spectra Shield there,

8 | for research purposes but not for commercial

9 | development, and my understanding is even for research

10 | purposes it's not used as much as it was, say 10 years

11 | ago, so the machines generally are not turned on, but

12 | as part of our discussions with them, I didn't -- they

13 | have some issues with us, but one of them, it didn't

14 | seem to me in the discussions, was actually turning on

15 | the machine and making Spectra Shield.  That -- I

16 | didn't understand that to be one of their problems.

17 | And what we want to do is just videotape it.

18 | We've agreed, you know, no handling of the equipment,

19 | no specific measurements of the equipment, just

20 | something we can illustrate to the jury, and one of the

21 | reasons we think this is important is because Honeywell

22 | really doesn't have schematic diagrams that they've

23 | produced, that illustrate this process, and that --

24 | that's one of the reasons it became important to us to

25 | try to get samples and inspections, because we just

 1    weren't finding the kind of manufacturing information
 2    our experts expected to find in this type of case.
 3              THE COURT:  Very well.  Thank you very much,
 4    Mr. Morris.
 5              Mr. Bress?
 6              MR. BRESS:  Thank you, Your Honor.  Dan Bress
 7    for Honeywell.
 8              I'd like to just pick up on some of the
 9    points and questions that Your Honor was asking of Mr.
10    Morris.
11              We've been litigating this case for 6 or so
12    years, a 2-year investigation prior to that time.  At
13    no point had the Government asked to view these
14    facilities, and so the request did come as a surprise
15    to us, and there's been a lot of give-and-take in
16    discovery in this case.  I'd think it's significant
17    that 6 to 7 years into the case, this is the first
18    motion to compel that the Government has filed, and
19    there have been endless letters and endless attempts to
20    compromise on items, but on this issue, I think Your
21    Honor really focused the issue by asking, "What
22    relevance does an inspection of Honeywell's facilities
23    have to this lawsuit?", and the answer is we don't
24    think there is any.
25              The facilities in question never made Z

1    Shield.   Honeywell didn't manufacture Z Shield on a
2    commercial basis.   Honeywell contracted out the
3    manufacture of that material to two other companies,
4    first, a company called "DSM" in the Netherlands, and
5    second, a company called "FMS" located in Israel.   So
6    Honeywell never made Z Shield using its own facilities.

7            And the question then is, "What purpose would
8    it serve to go and see facilities that never made Z
9    Shield?"   We've cited in our papers, cases that make
10   the point that when you're trying to go onto someone's
11   property, the burden is somewhat higher than just
12   simply asking for documents, because it's actually
13   physically going onto the property, and in this case
14   the Government is asking for Government attorneys and
15   experts to come onto Honeywell's property for reasons
16   that aren't apparent to us.

17           The cases that involve inspections involve
18   situations where the actual location matters to the
19   case, where something happened at that location that
20   makes the inspection necessary.   This facility never
21   made the product at issue in the case, and so it's not
22   apparent to us why it would be relevant to go there.

23           Your Honor asked questions about timing, "Is
24   what exists at the Pre Con facility today, what existed
25   there and 2001 to 2005?"   The equipment has changed

1   because, of course, over time, equipment gets updated,

2   and replaced, and changed, so it's not the same, and

3   that's in the declaration of Dr. Wagner, but even on

4   top of that, we don't, again, understand what basis

5   there would be to inspect a facility that didn't make

6   the product.

7         Mr. Morris asserted that these facilities

8   would be substantially similar to the facilities that

9   actually made the products.  I don't know what basis he

10  would have to say that, Your Honor.  Mr. Morris and the

11  Government haven't gone to the DSM or the FMS

12  facilities.  To our knowledge, they haven't tried to

13  gain access to those facilities.

14        It's not the case that shield manufacturing

15  facilities are simply a dime a dozen, and that when you

16  see one, you've seen them all, and we've brought

17  forward, we attached to our papers, the declaration --

18  actually, two declarations of our chief scientist, Dr.

19  Lori Wagner, and what she says in her declaration, this

20  is paragraph 13, which is the declaration we attached

21  to our opposition, she says:

22              "There are substantial differences in shield

23              manufacturing facilities, based on how the

24              equipment is configured, how the equipment is

25              calibrated, the condition used at the

1          facilities, and so forth."

2          And she goes on to say, in that same

3   declaration, that:

4          "Absent inspection of DSM or FMS' facilities,

5          there's no basis to know whether Honeywell's

6          equipment and the processes used to make

7          shield at the Virginia facilities, is the

8          same or similar to what DSM did in the

9          Netherlands, or what FMS did in Israel."

10         Your Honor was asking the Government

11  questions about, "How is this related to the

12  Government's theory of the case?"  Again, we have the

13  same question.

14         The case is about the alleged degradation of

15  Z Shield under conditions of high heat and humidity.

16  When you look at the Complaint, that's what's described

17  as the underlying theory of liability.  The theory of

18  liability in the Complaint is -- has nothing to do with

19  the manufacturing processes of Z Shield, but even if it

20  did, what would be relevant, possibly, would be an

21  inspection of the DSM and FMS facilities that actually

22  made this product, not a Honeywell facility that didn't

23  make the product, and that we have no basis to know has

24  any relationship in its processes, and configuration,

25  and equipment, to the facilities that actually made the

1    product.

2              THE COURT:  Now, what is your response to Mr.

3    Morris' contention that there is a claim concerning the

4    manufacture and the use of certain materials to make

5    the substance at issue?

6              MR. BRESS:  Your Honor, I think what Mr.

7    Morris was referring to was whether -- was the use of

8    what's known as a "water-based resin" in the Z Shield.

9    And just to explain what that means, when you're making

10   shield, what you're doing is you are arraying fibers in

11   basically a resin matrix, and what you're -- you're

12   basically encapsulating them, so when you -- if you

13   were to touch this, it would have an almost rubbery,

14   bendable type texture to it.

15             The idea that the Government has tried to

16   build up in discovery which, by the way, is not a

17   theory that appears anywhere in the Complaint, this is

18   a new theory that's been developed recently, is that

19   there was something about the resins system that

20   contributed to the degradation of Z Shield, that there

21   was a water inside -- that there was a water-based

22   resin, that that somehow contributed to the degradation

23   of Z Shield.

24             In our view, that's far outside the underlying

25   theory of the -- in our case, as the Government

 1    described it in its Complaint, but even if it was part

 2    of this case, we all agree that Z Shield was made with

 3    a water-based resins system.  If you -- If one were to

 4    try to make arguments about what that means for the

 5    degradation of the material, I don't see why you would

 6    need have an inspection, what would justify an

 7    inspection of a Honeywell facility that didn't actually

 8    make Z Shield.

 9          ·If there's a question about the application

10    of the water-based resin, that would be very facility

11    dependent.  I don't see why going to a Honeywell

12    facility that we have no idea if it bears any

13    similarity to the way DSM or FMS makes their products,

14    why that would be relevant, why that would justify the

15    burden of having the Government and its experts going

16    to an active manufacturing facility, and to take up the

17    time of Honeywell employees to host that event.  I

18    think if this is something that had a relevance to this

19    case, we would be hearing about it in the course of the

20    Government investigation and in the first couple of

21    years of litigation, not in year seven, after a 2-year

22    investigation.

23          THE COURT:  Now, what is your response to Mr.

24    Morris' contention that a trier of fact would be aided

25    by being able to visualize this videotape that would be

 1   generated, what a shield manufacturing operation looks

 2   like?

 3           MR. BRESS:  But again, I think the question,

 4   Your Honor, is, "A videotape of what?  A videotape of

 5   some facility that we don't know has any, looks at all,

 6   or does the same thing as a facility that DSM used or

 7   that FMS used?"

 8           Now, I should add, Your Honor, that this is

 9   not the only way the Government can learn about the

10   shield-making process in the course of discovery.  The

11   Government has had -- We've had a lot of depositions in

12   this case.  The shield-making process has come up in

13   many of them.

14           The Government actually deposed two witnesses

15   from DSM, the first company that made Z Shield.  Those

16   witnesses made themselves available in London for 2

17   days of depositions each, and so they were available

18   for the Government to ask questions about the shield-

19   making process.

20           And again, if the Government thinks a

21   videotape of how the Z Shield was actually made is

22   relevant, we haven't heard why they can't at least try

23   to pursue that relief of the actual -- from the actual

24   companies that made it.

25           And I think, again, the Government has

```
 1    described the shield-making process in its papers, in
 2    its Complaint.  I don't think it's wanting for a lack
 3    of understanding of how that process works.  So I think
 4    we're weighing that against the relevance of this
 5    overall, and the burden to Honeywell of having this
 6    kind of inspection for, I would say, "no relevance,"
 7    but at best, some very tangential relevance.
 8              THE COURT:  Very well.  Thank you very much,
 9    Mr. Bress.
10              MR. BRESS:  Thank you, Your Honor.
11              MR. MORRIS:  May I be heard, Your Honor?
12              THE COURT:  Yes.
13              MR. MORRIS:  Thank you.
14              There's a couple of points that I would like
15    to address that Mr. Bress raised.
16              First, this idea of the water-based resin
17    theory being outside of the Complaint.  The Complaint
18    itself doesn't specifically use the term, "water-based
19    resin," but it definitely talks about manufacturing
20    issues with Z Shield, and then on top of it --
21              THE COURT:  Well, before you go on, let me
22    ask whether you dispute or instead agree with the
23    proposition that the Z Shield at issue was made and
24    manufactured by DSM and FMS, in other words, companies
25    other than Honeywell?
```

1           MR. MORRIS:  They're called "tollers," and

2     yes, it's Honeywell's material, and Honeywell is active

3     in assisting them in the process, particularly with

4     FMS, but it -- the actual Z Shield that was sold

5     commercially was made first in the Netherlands at DSM,

6     and then in Israel at FMS.  It was not made at Pre Con.

7           THE COURT:  In other words, not at Pre Con?

8           MR. MORRIS:  Right.

9           THE COURT:  Very well.

10          MR. MORRIS:  But see, there -- I don't want

11    -- what's important is the shield-making process,

12    because in the shield-making process they're applying

13    water to the resin, whether you do you do it with

14    Spectra or Z Shield, in our view with the Z Shield,

15    what they call -- a scientific term called

16    "hydrolysis," that when PBO fiber is exposed to water,

17    it degrades at a significant rate --

18          THE COURT:  Where is this alleged in the

19    Complaint?

20          MR. MORRIS:  It's not specifically alleged in

21    the Complaint because it -- what we've been -- this

22    issue -- they've been on notice of this issue, Your

23    Honor, since 2009 when we deposed Dr. Wagner.

24          THE COURT:  But do you acknowledge that it is

25    not -- I am, for reasons I cannot explain, unable to

1    view the Complaint on this screen, but we may take a

2    recess so that I can attempt a determination of whether

3    this is a matter that was ever pled.

4            You've indicated, or you just indicated that

5    Honeywell has been on notice of it, but my question is

6    whether this is an allegation in the Complaint.

7            MR. MORRIS:  There's an allegation about

8    manufacturing issues, generally.

9            THE COURT:  Where does that appear in the

10   Complaint?

11           MR. MORRIS:  I don't have the Complaint in

12   front of me.  It would be towards the back.  It was a

13   40-page Complaint, somewhere between pages 35 and 38,

14   as I remember, but there's not a specific allegation

15   because we didn't know it until we got into discovery,

16   about the resin application process and the water.

17   Very early on we learned of it, and then we amended

18   very detailed interrogatory responses that laid out

19   this theory.  It's been part of the discovery in the

20   case since Dr. Wagner's deposition, and I think it was

21   in 2009 --

22           THE COURT:  At any point after that, did you

23   move to amend the Complaint to add that as a claim?

24           MR. MORRIS:  No.  No, because we felt that

25   under the notice pleading rules, just the allegations

 1    about manufacturing would be sufficient because what

 2    we're talking about is defective Z Shield, and we don't

 3    believe that the pleading rules require you listing in

 4    a Complaint, every defect in the Z Shield, but you're

 5    right, we could have amended, and what we tried to do

 6    to make sure the notice issue was taken care of, was to

 7    give very detailed interrogatory responses on that

 8    issue, but we did not amend.

 9            THE COURT:  May I suggest that at this time

10    we take a brief recess so that all of us, and I include

11    myself, can review the Complaint.  The answer to this

12    question -- I believe that a complete resolution of

13    this issue does require consideration of the Complaint.

14            MR. MORRIS:  Okay, Your Honor.

15            THE COURT:  I mean, there are certainly other

16    aspects to the issue, but I would like to ensure that

17    we have a common understanding of exactly what has been

18    alleged with respect to a defect in the manufacturing

19    process.

20            MR. MORRIS:  That's fair, and could I just

21    suggest, in addition to looking at the Complaint, Your

22    Honor, if you would also look at our reply, the last

23    couple of pages of the reply, and I can get you the

24    docket number.

25            THE COURT:  We have it.  It's only the

1    Complaint.

2            As I said, for reasons I cannot explain, --

3            MR. MORRIS:  Okay.  That's --

4            THE COURT:  -- that I can't seem to access

5    from this point.

6            MR. MORRIS:  Okay.

7            THE COURT:  Very well.

8            MR. MORRIS:  The docket number on the other

9    -- on our reply would be 104.

10            THE COURT:  Very well.  Thank you.  We'll

11    take a brief recess.

12        (Recess at 3:16 p.m., until 3:51 p.m.)

13                        AFTER RECESS

14            THE COURT:  Now, we are back on the record.

15            Is there something you wish to add, Mr.

16    Morris, before we conclude our discussion of the

17    requested inspection?

18            MR. MORRIS:  If it's okay, Your Honor, I

19    would.

20            THE COURT:  You may.

21            MR. MORRIS:  Thank you.

22            THE COURT:  I will note that during the

23    recess the Court did review the portions of the

24    Complaint to which you directed my attention.

25            MR. MORRIS:  Thank you, Your Honor, and also

1     I appreciate printing out the Complaint for me.  I did
2     -- It's not been my experience in other courts that
3     they do that, and so I appreciate it.
4               THE COURT:  You're quite welcome.
5               MR. MORRIS:  I took a look at the Complaint,
6     and look, I'm not going to tell you it was clearly pled
7     based on (unintelligible) and that -- it wasn't, but
8     what it did do is it pled defective product, it -- with
9     -- the Z Shield was defective because of its reactions
10    to heat and humidity.
11              It talked about, in paragraph 37, one of the
12    big problems that Honeywell researchers knew was how it
13    reacted to sweat and rain, in other words, to water, in
14    the process.
15              It also talked about, in paragraph 58, about
16    how in the draft report from Hurst, that the Z Shield
17    losses were larger than the Zylon losses, and then it
18    talked about, generally, later on, about such standard
19    manufacturing issues, but I will admit that those
20    issues don't apply so much to the water issue, as to
21    how FMS was later manufacturing it.
22              So was it perfect pleading?  No, but what I
23    would tell you is in a defective product case I don't
24    think you have to list every reason, precisely, why the
25    product is defective.  It's one thing if we wanted to

1   say -- Let's say we had a False Claims Act case and

2   suddenly we wanted to switch our theory to something

3   completely different, but what we allege is we have a

4   False Claims Act case because of the sale of a

5   defective product.  We allege some of the defects,

6   including exposure to heat and humidity, and the threat

7   of water that Honeywell knew, and in this manufacturing

8   process there's water added, which contributes to the

9   hydrolysis, and so I think from a notice pleading

10  standpoint, it's enough.

11          And then on top of it, it's an issue that

12  came up extensively in Dr. Wagner's deposition in 2009,

13  and our interrogatories dealt with this ad nauseam, and

14  so there's no notice issued to Honeywell, Your Honor.

15          THE COURT:  Very well.  Thank you, Mr.

16  Morris.

17          MR. MORRIS:  Were there other points you'd

18  like me to address on just some of the other points Mr.

19  Bress made, or have you heard enough?

20          THE COURT:  I believe you have responded to

21  the immediate concern regarding the Complaint.

22          MR. MORRIS:  Okay.

23          THE COURT:  If you wish to address only that

24  issue, Mr. Bress, you may.

25          MR. MORRIS:  What I wanted -- Yeah, I wanted

```
 1    to just --
 2              MR. BRESS:  (Inaudible.)
 3              MR. MORRIS:  Oh, I'm sorry.  Go ahead, Mr.
 4    Bress, my apologies.
 5              MR. BRESS:  Limited to the issue of the
 6    Complaint only, Your Honor, --
 7              THE COURT:  Yes.
 8              MR. BRESS:  -- there is no allegation in the
 9    Complaint, that there was something about the
10    manufacturing process of Z Shield, or the equipment
11    that made it, that caused Z Shield to be defective.
12              The allegation in the Complaint, this is from
13    the Complaint, paragraph 11, this is a quote:
14              "The underlying theory of liability against
15              Honeywell is that Honeywell knew that Z
16              Shield had a latent defect in that it
17              degraded quickly over time, in hot and humid
18              conditions."
19              That's what this case is about.  There's
20    nothing in the Complaint about the manufacturing
21    processes.
22              The two paragraphs of the Complaint that Mr.
23    Morris drew your attention to, which I believe he said
24    were paragraphs 37 and 58, don't say anything about the
25    manufacturing process, and this is a False Claims Act
```

1    case, this is rule -- this is not governed by notice

2    pleadings, it's governed by Rule 9.

3            And so this whole issue of an inspection of a

4    manufacturing facility relating to some manufacturing

5    defect is, I'd think, far outside of the allegations of

6    the Complaint.

7            THE COURT:  Very well.  Thank you very much,

8    Mr. Bress.

9            MR. BRESS:  Thank you, Your Honor.

10           MR. MORRIS:  May I just respond to one thing

11   that Mr. Bress said?

12           THE COURT:  Yes.

13           MR. MORRIS:  Thank you, Your Honor.

14           Mr. Bress did come to the key language, "had

15   a latent defect and that it degraded quickly over time

16   in hot and humid conditions," and one of the reasons it

17   did that was because of this issue with the water

18   application.

19           Now, the next sentence doesn't say that, but

20   again, I don't believe there's -- you have to plead

21   every defect, and we do say things in the Complaint

22   about water and the like.  The language he quotes is

23   just, "It had a latent defect because it degraded in

24   hot and humid conditions, and the water contributed to

25   that."  So I do think it's related.

 1           THE COURT:  Very well.  Thank you very much,
 2      Mr. Morris.
 3           I am prepared to rule now, orally, from the
 4      bench, regarding the request for inspection of
 5      manufacturing facilities.
 6           The record reflects that the Plaintiff has
 7      narrowed the request to a single facility, a facility
 8      known as "Pre Con."
 9           The Court, in preparing for the hearing, had
10      reviewed the parties' written submissions in support of
11      and in opposition to the motion to compel.  The Court
12      took a recess so that the Court could again review the
13      pertinent portions of the Complaint, and invited
14      counsel to do the same.
15           Having done that, the Court will deny the
16      portion of the motion to compel through which the
17      Plaintiff seeks to inspect a Honeywell -- Honeywell --
18      excuse me, a Honeywell facility.  The Court does so
19      largely for the reasons offered by Honeywell, both
20      orally and in writing.
21           More specifically, the Court finds that the
22      facility at issue, the Pre Con facility, is a research
23      facility at which Z Shield was never manufactured, and
24      as to which there has been no proffer that the
25      facility, the equipment in facility, or the processes

1  for the manufacture of any material under way now is of

2  any relevance whatsoever, to any claim concerning the

3  manufacture of Z Shield at times relevant to the

4  Complaint.

5       In making that determination, the Court has

6  also taken into account that the Plaintiff has

7  effectively conceded that there is no allegation at all

8  in the Complaint, concerning the manufacturing process.

9       Thus, while the Plaintiff suggests that a

10  trier of fact would be aided by a videotape of a

11  facility depicting the manufacturing processes, as the

12  Court has already noted, the process is not the same as

13  that at issue in this action, but more broadly, the

14  Court knows of no reason why the trier -- why the Trial

15  Court would even permit such evidence, since there is

16  no claim at this time concerning the manufacturing

17  process.

18       So for those reasons, those additional

19  reasons that I have just stated, in addition to the

20  further reasons offered both orally and in writing by

21  Honeywell, the motion to compel is denied as to that

22  request.

23       Now, are you ready to turn your attention to

24  the -- what I believe is the only remaining issue, the

25  issue concerning documents?

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Very well.

3          Mr. Morris?

4          MR. MORRIS:  What I want to -- There's really

5     a couple of document issues, and the first one I wanted

6     to deal with was the idea of the wanting to make sure

7     we get all of Honeywell's Z Shield and Zylon research,

8     whether it relates to ballistics or not, and they have

9     not told us, one way or the other, if there is any such

10    research.  They haven't looked.  One of the RFA's made

11    it plain that they hadn't looked.

12          Z Shield is, we've alleged, --

13          THE COURT:  When was that request for

14    admissions served?

15          MR. MORRIS:  It was -- They served -- I don't

16    remember when we served it, but they filed it on

17    January 15th, in response.  I have copies of it if

18    you'd like copies.

19          THE COURT:  No, I do not need this see it.

20          The further question was going to be whether

21    the response has been updated, in other words, is there

22    an ongoing search for the documents?

23          MR. MORRIS:  No.  They say they're not

24    searching for them.  They say it would be too

25    burdensome to look for -- I mean, I'll -- Let me read

1   it.

2           The request was Number 36.  It said:

3           "Admit that since August 24, 2005, Honeywell

4           has conducted research on Zylon or PBO, for

5           use in non-ballistic applications."

6           Their response, without answering it, is:

7           "Honeywell objects to this request as

8           irrelevant and unduly burdensome.  Honeywell

9           has approximately 132,000 employees

10          worldwide, including more than 22,000

11          engineers and scientists, in fields ranging

12          from aerospace and defense to automotive and

13          transportation, to consumer (unintelligible),

14          to performance materials, the latter of which

15          includes the specialty products division

16          involved in this litigation.  Any

17          investigation into whether any research on

18          Zylon or PBO has been conducted during the

19          last decade in any unit across the entire

20          company is irrelevant and unduly burdensome.

21          Honeywell has not, since August 24, 2005,

22          conducted research on Zylon or of PBO for use

23          in ballistic applications."

24          So they would not admit or deny.  It appears

25  they didn't even look.

1          They don't have a declaration from anyone
2    supporting the assertions that it's very unlikely that
3    all these employees would have Z Shield research.   It
4    would be likely, a very narrow spectrum.
5          They don't indicate that they wouldn't be
6    able to find that out, say by asking Dr. Wagner.
7          I mean, this is the key product in the case
8    and they've asked us for our Zylon research.   We
9    produced it.
10         And in the Toyobo case, some of Toyobo's
11   research relating to how Zylon reacted with a rope and
12   chord was very important to showing us what notice that
13   the company had about Zylon's properties and
14   degradation, and so we think it's very important that
15   we get this particular Zylon research.   I mean, that's
16   -- this is the product at issue.
17         So that's one of our issues.
18         Do you have questions or would you like to
19   hear about the other document ones?
20              THE COURT:   You may continue.
21              MR. MORRIS:   Thank you.
22         We also asked for a copy of -- This one we've
23   limited to ballistic products.   We've asked for a copy
24   of what they call "accelerated aging research" for the
25   non-Zylon ballistic materials, post-2005, and that was

1    in our request.  That was subpart (b) of Request Number

2    4 in 97.12, and they've represented to us that they

3    have produced all the Zylon or Z Shield accelerated

4    aging research, but we also want it for things like

5    Spectra, Spectra Shield and Gold Flex, which are other

6    Honeywell ballistic-resistant products, and the ones

7    that Dr. Wagner is working on.

8         And what makes that so important, from our

9    perspective, is one of their defenses is, "Even though

10   we may have had really bad accelerated aging data," and

11   if -- having just looked at the Complaint you could see

12   the focus on the Complaint on the problematic

13   accelerated aging data, Honeywell's position is, "Well,

14   accelerated aging data really doesn't tell you

15   anything, you have to look at warehouse testing," which

16   is not subjecting it to additional heat or exposure.

17   We believe that that is incorrect.  We believe

18   Honeywell doesn't believe that themselves.

19        We think if we get this data, as well as the

20   emails and the like, it will show that Honeywell does

21   rely on accelerated aging data in product development.

22   It will show they relied on it while they were selling

23   Z Shield, that they continue to rely on it, that

24   accelerated aging is not voodoo.

25        We have an accelerated aging expert who we've

1    retained, who thinks this is a very important material

2    to get, and so that's the reason why we want the

3    accelerated aging data and the related emails.

4            Now, one issue came up in our discussions that

5    we were not fully aware of, and that is Honeywell has

6    indicated that in its document gathering efforts it

7    imaged computers in 2006 when the first GSA subpoena,

8    which was back when we were just investigating this

9    case, and we didn't file the Complaint until 2008, and

10   that they say this would be burdensome because they've

11   never subsequently gone back to computers, including

12   Dr. Wagner's, the case scientist, to re-image those

13   computers, and that is of grave concern to us because

14   they have consistently asked for all of the Government

15   Zylon research, even after 2005.

16           They served a document request later in

17   discovery, asking for some Government research relating

18   to environmental conditioning and accelerated aging

19   that wasn't Zylon specific, that we gave to them, you

20   know.

21           And it concerns us because, one, there was no

22   attempt to secure these later documents, even what

23   appears to be after the filing of the Complaint; but --

24   and two, we're worried that any sort of documents the

25   Court orders, you know, we may not get them all because

1    they may not have been preserved, but that's why the

2    accelerated aging material is important for things like

3    Spectra and Gold Flex, beyond 2006, which is all -- we

4    understand they have it for our discussions in front of

5    them.

6              THE COURT:   What is the relevance of the last

7    category of documents, documents with respect to

8    materials other than the one at issue here?

9              MR. MORRIS:   Well, a lot of the material,

10   it's -- some of it -- Z Shield is a -- Zylon

11   (unintelligible) was a polymer-based material, and some

12   of these other materials have a similar chemical

13   makeup.

14             In addition, Honeywell is saying, "We don't

15   rely on accelerated aging at all," even though they

16   produce a lot of accelerated aging data, because they

17   want to undermine the bad debt (phonetic) against it by

18   saying, "Well, the accelerated aging data is horrible

19   here, but we were reasonably not relying on it."

20             And their point is, and it's horrible for

21   some reason, just relating to Zylon or Z Shield, they

22   claim it's just horrible generally for ballistics, and

23   we don't believe that's the case and we don't believe

24   they believe that's the case, and we believe if we get

25   the accelerated aging documents for the Spectra, and

1    the Gold Flex, and that emails, we're going to see

2    reliance on a -- product decisions made on that basis,

3    you know, to go forward or not to go forward.

4          There were two even Zylon products.  One was

5    called "Megaflex."  The other was "Zebraflex," that

6    Honeywell decided not to develop.  We suspect

7    accelerated aging research they did had reason to do

8    with that, and so this is very important to impeach

9    them when they say, you know, "You can't rely on

10   accelerated aging."

11         For a company that says, "We don't rely on

12   accelerated aging," they certainly do a lot of

13   accelerated aging testing, and indeed, in contracts

14   ·that they negotiate with their customers, sometimes in

15   the contracts are provisions for accelerated aging.

16         Now, if burden is the issue, part of the

17   problem is Honeywell -- it appears counsel hasn't

18   checked to see how many different sources of this

19   information there would be, and if there was a burden

20   issue, we'd be happy to work with them to try to narrow

21   it down to a specific focus or a number of custodians,

22   and that was one of the things even, we discussed in

23   the meet and confer, but to just close off our access

24   to their Zylon research and their accelerated aging

25   research, we think, is problematic for the reasons I

1    mentioned.

2             THE COURT:  What documents have you received

3    -- What documents has the United States received from

4    Honeywell pursuant to other requests for production of

5    documents?

6             MR. MORRIS:  We have -- In terms of

7    accelerated aging or just generally?

8             THE COURT:  Generally.

9             MR. MORRIS:  I mean, they've produced

10   hundreds of thousands of pages.  So on the Zylon, what

11   they've given us --

12            THE COURT:  What is your understanding of

13   what those documents concern?

14            MR. MORRIS:  Okay.  Generally, they concern

15   research that they did on Z Shield --

16            THE COURT:  At what time?

17            MR. MORRIS:  Through 2005.

18            In addition, they produced research that they

19   did on Spectra and Gold Flex.  They represented to us

20   that they produced all of that through 2005, as well,

21   and that would include accelerated aging as part of

22   that research, but also warehouse data, things like

23   that relating to those materials.

24            Now, we seem to have gaps where we're not sure

25   we've actually gotten all of the Zebraflex and the

1    Megaflex, which were two ballistic products Honeywell

2    was developing that included Zylon before 2005.  They

3    said we've got them all, but it doesn't appear to us

4    that we do, but essentially, their position is, "We've

5    given you all our accelerated aging research and our

6    Zylon research through 2005, and we're not going to

7    give you anymore than that."

8              THE COURT:  What other category or categories

9    of documents have been produced?

10             MR. MORRIS:  By Honeywell?

11             THE COURT:  Yes.

12             MR. MORRIS:  They've produced -- We

13   focused --

14             THE COURT:  You said, "Hundreds of thousands

15   of pages."

16             MR. MORRIS:  Yes.

17             THE COURT:  You identified research through

18   2005, documents reflecting research --

19             MR. MORRIS:  Right.

20             THE COURT:  -- research through 2005

21   concerning Z Shield and other products.

22             MR. MORRIS:  Right, ballistic material.  I

23   mean, they've produced a lot of other things, as well.

24             I mean, they produced like contracts with the

25   Government.  They produced technical bulletins that

1    they were working on.  They produced draft reports.
2    They produced -- I mean, I didn't come -- you know, I
3    could give you a better summary of their production.

4         I don't know, you know, a number, what the
5    research comprises, how much of the hundreds of
6    thousands of pages they produced relate to the
7    research, but the -- what's at issue is what's in our
8    motion to compel.  The other stuff, we're not
9    complaining about.

10        And then recently they produced the contract
11   showing agreements with DSM and FMS relating to the
12   control document issue, which is one we haven't talked
13   about yet.  So that's another category that they've
14   produced, but that was very recent.

15        THE COURT:  Do you believe the parties have
16   exhausted their efforts to reach a resolution
17   concerning the documents?

18        MR. MORRIS:  Well, let me -- As -- I think
19   the bottom line is on the three categories of the
20   documents, and there's one I haven't talked about yet,
21   but on the two we talked about, the Zylon research, I
22   did -- I don't -- unlike with the sampling, and even
23   with the inspections where we were trying to
24   compromise, I think Honeywell's position has been
25   essentially, you know, "2005 is the cutoff.  We're not

1    going to go beyond that," and we disagree with that.

2            Now, I don't know --

3            THE COURT:   What is the basis -- Let me ask

4    you to articulate now on the record, the basis of your

5    disagreement with that as a cutoff.

6            MR. MORRIS:   Well, they stopped selling --

7            THE COURT:   You do agree that that was the

8    date that manufacturing ceased?

9            MR. MORRIS:   Yes.  There was no commercial

10   sale of Zylon after like August of 2005, I would

11   concede that, but it's still relevant because the more

12   knowledge you have about Zylon, and some research later

13   can be based on earlier research, some accelerated

14   aging work can be based on earlier accelerated aging

15   work.  I mean, for the Zylon, this is the product at

16   issue, the -- and they've certainly requested all of

17   our Zylon research, and we've produced it and they've

18   certainly requested things that were happening, you

19   know, as late as 2011 and 2012, and they've actually

20   argued, based on research in 2008, that they claim

21   showed some -- how Zylon wasn't effective, that, you

22   know -- So they've utilized it.

23            It's a little hard because it's a black box

24   for us, because unlike us, who have been open and

25   produced these things that they've wanted, we don't

1     know exactly what they've got because they haven't done

2     the same, but I think having an '05 cutoff like that is

3     just unreasonable when you're talking about research on

4     the product in the case, or the fiber -- the Zylon

5     fiber in the case, and if they're not using it for

6     other materials, they could have said that in response

7     to the RFP, "We're not doing any other research."  They

8     could have said that but they didn't, and it doesn't

9     appear that they've even looked.

10          And so just -- some research discovery that

11    happens in 2008 might have a foundation earlier than

12    that, and remember, the relevant standard is just,

13    "Reasonably calculated to lead to admissible evidence."

14    It's not even an admissibility standard, it's a

15    discovery standard.

16          THE COURT:  Very well.  Thank you very much,

17    Mr. Morris.

18          MR. MORRIS:  Did you also what to hear on the

19    control, because we haven't talked about that.

20          THE COURT:  Yes.

21          MR. MORRIS:  Okay.

22          And the control documents, these are

23    documents, as the rules require, producing documents in

24    the possession, custody or control, and Honeywell has

25    taken the -- and we're interested in the manufacturing

1   documents, and that's why we had thought the samples

2   were important and the inspections were important,

3   because we wanted to get as much information as we

4   could for our experts, about manufacturing and the

5   manufacturing documents.

6          There's two basic types of manufacturing, and

7   in terms of manufacturing, how the process, how the

8   water is added, things like that, and we were

9   surprised.  I mean, Honeywell put their name on the

10  product, and they will generally say, you know, "We're

11  generally familiar with how DSM and FMS made it.  We

12  don't know how they made it," and that then leads us to

13  the issue of can we get -- "Does Honeywell control the

14  DSM and the FMS documents?", and there's two types.

15  There's the proprietary documents and the non-

16  proprietary documents.

17         And as far as non-proprietary documents go,

18  we think it's pretty clear from the contracts and the

19  agreements that we've recently received from Honeywell,

20  just during the discovery briefing, that Honeywell does

21  have control of those documents, and they've never

22  asked for them, they -- so it's not a situation where

23  they've asked and been rebuffed, they haven't asked,

24  and if you look at those agreements, we think it's

25  clear, the whole reason you enter into non-disclosure

1    agreements and joint development agreements is to share

2    that material.

3            And Dr. Wagner's testimony makes it very

4    clear that during the development stages there was a

5    lot of sharing of information, and yet, even if

6    Honeywell got that information, Dr. Wagner indicates

7    not all of it may have been produced because of

8    computer problems at Honeywell, and that was in our

9    brief and also in our deposition testimony we provided

10   the Court.

11           And so at a minimum, for the non-proprietary

12   documents, we want to get an order that, you know,

13   Honeywell will -- controls those documents and will

14   produce them.

15           On the --

16           THE COURT:  What is the basis of your

17   contention that, to use your phrase, "Honeywell

18   controls the documents"?

19           MR. MORRIS:  Well, the basis of our

20   contention is that they were able to access them in the

21   regular course of business, based on Dr. Wagner's

22   deposition testimony, and she even said she didn't know

23   of any instance where FMS, in particular, had ever

24   turned down a request for documents, and the contract

25   language that we showed the Court, that contemplate the

1    sharing of proprietary information, and that indicate

2    -- don't even treat non-proprietary information as

3    safeguarded.

4           So on the proprietary part, our position is a

5    little different.  We believe the --

6           THE COURT:  Do you acknowledge that there's

7    nothing in the agreement that suggests that Honeywell

8    has control of the documents?

9           MR. MORRIS:  No, I don't acknowledge that.  I

10   think --

11          THE COURT:  Is there language that so states?

12          MR. MORRIS:  No.  There's not language that

13   says they don't have control of the documents.  No,

14   there's not.

15          In fact, the opposite in --

16          THE COURT:  Or that they -- that Honeywell

17   does?

18          MR. MORRIS:  Does it say Honeywell does

19   control the documents?

20          THE COURT:  You referred to sharing of

21   proprietary data at the time that the contract was in

22   existence.  My question is a little different.

23          MR. MORRIS:  Sure.

24          THE COURT:  Do you acknowledge that there is

25   nothing in the agreement that indicates that Honeywell

1    has possession, custody and control of those documents?

2           MR. MORRIS:  Well, they don't have possession

3    or custody of them.  That's not the issue.  The issue

4    is just control.

5           THE COURT:  So your argument is that --

6           MR. MORRIS:  Just control.

7           THE COURT:  Control.

8           MR. MORRIS:  We're not claiming possession or

9    custody, we're claiming control, and yes.

10          And in the brief, particularly the one that

11   we filed in December 29th, cited numerous provisions

12   that we think show that, and that's for the non-

13   proprietary documents, you know, the ones that FMS

14   doesn't consider to be to trade secrets.

15          For the proprietary documents, our position

16   is a little different.  Our position is it's ambiguous

17   under the contracts, whether or not Honeywell does

18   possess control, and therefore we want discovery.

19   These documents were recently produced to us.  We want

20   to be able to depose somebody from Honeywell to talk

21   about what these provisions mean.

22          We asked Dr. Wagner and it was clear, despite

23   her two declarations, that she did not have knowledge

24   about the scope of these agreements.  She wasn't

25   negotiating these agreements.  She didn't talk to

1    anybody who did negotiate these agreements.

2        So for the proprietary documents, our

3    position is just we're entitled to discovery on that

4    control issue.

5        And then there's one small related issue, Your

6    Honor, which is in the late production of documents.

7    There's some documents held by Alston & Bird, and

8    they're not attorney-client privileged documents, but

9    Alston & Bird did some intellectual property work for

10    Honeywell, relating to Z Shield and FMS, and we had

11    subpoenaed Alston & Bird seeking those documents, but

12    Alston & Bird's position has been that, "We don't have

13    to respond to this subpoena because the discovery

14    period has expired," and so that's a little different

15    issue, but as long as we're here, we wanted to clean

16    that up too, and just be able to pursue that subpoena.

17        So those are the different issues, Your

18    Honor, the control issue on the non-proprietary

19    documents, the control issue on the proprietary

20    documents, the accelerated aging documents for non-

21    ballistic materials, and the Zylon and Z Shield

22    research that Honeywell has post-2005.

23        THE COURT:  Thank you very much, Mr. Morris.

24        MR. MORRIS:  Thank you, Your Honor.

25        THE COURT:  Mr. Bress?

1          MR. BRESS:   Thank you, Your Honor.

2          I think that the discussion that you just had

3     with opposing counsel is -- really underscores the

4     problem that Honeywell is having in this case because

5     we've been at this now, 6, 7 years litigation, 2 years

6     of an investigation, and we're talking about document

7     requests that are completely far afield of this case

8     and, as I mentioned to you at the beginning, this is

9     the first time we've had a motion to compel in this

10    case, and it's because throughout the course of these

11    proceedings, in this litigation, Honeywell has been

12    responding to supplemental requests where it can and

13    where it's reasonable, but at this point we hit a wall

14    because we think what we're being asked to do here is

15    unreasonable.

16         You asked Mr. Morris about the extent of

17    Honeywell's document production.   It has been

18    substantial.   Honeywell took extensive efforts to

19    preserve, search and produce documents from a wide

20    range of custodians.   The Government has extensive

21    documentation on Honeywell's Z Shield product, the

22    testing, the marketing, the product development, the

23    contractual relationships, and there has been

24    deposition testimony of approximately 20 current and

25    former Honeywell employees.

1        So I think that sort of sets the stage for

2    these three additional categories of information that

3    the Government is asking for, and I want to walk

4    through them carefully because I think what you heard

5    is leaving out some critical details, and also really

6    misrepresenting what was going on here.

7        The first is post-2005 research on Zylon and Z

8    Shield.  Honeywell used Z Shield, Honeywell sold Z

9    Shield from 2001 to 2005.

10        In 2005 the United States Government

11    effectively decertified Z Shield for us in body armor,

12    and Honeywell stopped selling it at that point, as did

13    others in the industry.  No one else made Z Shield, but

14    Zylon as a whole, people stopped selling it because the

15    Government said not to use it.

16        Honeywell has produced its research and

17    documents on Zylon and Z Shield from the time of

18    product development in the late 1990's, all the way up

19    until the time Honeywell stopped selling Z Shield.

20        After 2005, Honeywell did not conduct

21    research on Zylon or Z Shield for ballistic

22    applications, so what the Government -- and we've told

23    the Government that many times.

24        THE COURT:  In what fashion did Honeywell do

25    so?  Was this through deposition testimony, for

 1   example?  You indicated that "We," Honeywell,

 2   communicated this information to the Government.

 3            MR. BRESS:  Your Honor, it's --

 4            THE COURT:  When and how?

 5            MR. BRESS:  It's been through deposition

 6   testimony.  It's been through letters exchanged by the

 7   parties.  It's been conversations with the parties, and

 8   it's in the briefing here before Your Honor, where

 9   we've made clear that after 2005, Honeywell did not

10   engage in research of Zylon or Z Shield for use in body

11   armor applications and, of course, the reason for that

12   is because of the decertification of that product by

13   the United States Government.

14            And so what the Government is asking for,

15   apparently, is, "Did Honeywell, after 2005, use Zylon

16   or Z Shield for some other non-ballistic application?"

17            Your Honor, there's no evidence of that.  What

18   the Government brought to Your Honor in its briefing

19   were patent applications, that's what we briefed, and

20   what the Government said in its brief was, "We found

21   these patent applications publicly available.  They

22   reference Zylon.  That means you must have done

23   research on Zylon."

24            Then we went back and we checked and the

25   answer was, "No."  The patent applications reference

1   Zylon just like they reference many different

2   materials, but there was no additional research.

3         THE COURT:  When you indicate that the answer

4   was "No," do you mean no for research having to do with

5   applications for use in body armor?

6         MR. BRESS:  What the Government brought

7   forward in its motion to compel, were a series of

8   patents.  I believe most of them did relate to body

9   armor, and what they said in their motion to compel

10  was, "This Court should compel Honeywell to produce

11  research information about these patents concerning

12  Zylon or Z Shield."  That was on page 36 of their

13  brief.

14        We came back with the declaration of Dr.

15  Wagner, who explained there was no research relating to

16  Z Shield for those patent applications.  So that's the

17  only thing that's before the Court here.  There's no

18  other evidence that in the large company that is

19  Honeywell, that some other wing of the company was

20  working with Zylon or Z Shield for some other product.

21  The Government hasn't brought anything to Your Honor to

22  establish that.

23        What the Government appears to be asking us

24  to do is to canvas the entire company and to be able to

25  determine whether in some non-ballistic application,

1    Zylon or Z Shield was used.

2            THE COURT:  What is the basis, you refer to

3    the declaration, or the deposition, excuse me, of Dr.

4    Wagner, and perhaps someone else, but is -- what is

5    their basis -- the basis of their testimony that there

6    has been no research since 2005 concerning ballistics

7    applications for Z Shield or Zylon?

8            MR. BRESS:  Your Honor, I think Dr. Wagner

9    has testified to that.  I'd think that --

10           THE COURT:  How does she know?

11           MR. BRESS:  Because she's the chief scientist

12   at Honeywell that deals with ballistic applications,

13   and another scientist, Dr. Ashok Bhatnagar.  He was

14   deposed, I believe, on these issues.  He said there was

15   not research conducted on ballistic applications after

16   2005.

17           THE COURT:  Very well.  You may continue.

18           MR. BRESS:  And so what -- This is a case

19   about body armor.  What the Government appears to now

20   want are documents relating to Zylon and Z Shield

21   unrelated to body armor and, Your Honor, we think that

22   it's far afield of this lawsuit, and by the way, they

23   want this after 2005, after the period of time when

24   Honeywell stopped selling Z Shield.  The relevant

25   period of liability here is 2001 to 2005.  That's the

1  period of liability.  That's the period that's relevant

2  to Honeywell's scienter and knowledge.

3  　　　　And so 7 years into the case, to ask

4  Honeywell to go and find out whether some other wing of

5  the company was using Z Shield and Zylon after 2005,

6  we're not aware of one.

7  　　　　Your Honor, we have certainly asked the

8  witnesses we work with and they're not aware of them,

9  but at the same time it seems to us that we're now 5,

10  or 6, or 7 degrees away from the center of this case, 7

11  years into the case, and the only thing I would add

12  also, is that I don't even think this is properly

13  presented in the motion.

14  　　　　The motion brought over to Your Honor, patent

15  documents.  We responded to those patent documents by

16  saying there's no research connected to them.  I think

17  that should be the end of this matter, as far as this

18  motion is concerned.

19  　　　　Mr. Morris referenced requests for admissions.

20  Those are outside the scope of this record.  They're

21  not part of this motion to compel, but I still think

22  the point stands, that 7 years into the case we

23  shouldn't be looking into Zylon or Z Shield for non-

24  ballistic applications, after the period of liability,

25  after the Government decertified Zylon and Z Shield for

1    use in body armor.

2              THE COURT:  You may move on to the next

3    point.

4              MR. BRESS:  Your Honor, the next point that

5    Mr. Morris raised was post -- again, post-2005 aging

6    testing.

7              Again, -- Well first, let me just say the

8    Government devotes its opening brief, just over one

9    page, to this entire issue, and the issue has an

10   enormous burden associated with it on the back end for

11   Honeywell, but here's the issue.  Again, Honeywell

12   stopped selling Z Shield after 2005.  What the

13   Government wants is testing that Honeywell conducted on

14   other products which are -- Honeywell makes a variety

15   of different ballistic materials.  Mr. Morris mentioned

16   two of them, Spectra and Gold Flex, but there are many

17   others.

18             What the Government wants is for Honeywell to

19   go back and collect post-2005 research on other

20   products that are in issue in the case, from a period

21   of time that postdates Honeywell's sale of Z Shield.

22             THE COURT:  Has Honeywell already produced

23   documents concerning "aging testing" of the material at

24   issue, for the period at issue?

25             MR. BRESS:  Absolutely.  The material at

1    issue is Z Shield. We have produced the testing that

2    was conducted on Z Shield between 2001 and 2005, and

3    frankly, prior to 2001, and a lot of that testing was

4    sometimes done in conjunction with other materials, and

5    we produced those test results also, and Mr. Morris

6    agreed that they have test results on other products

7    from that period of time in the case, which is, of

8    course, the relevant period of time.

9            So here we are, almost 10 years into this for

10   Honeywell, almost 10 years into the Government

11   investigating this issue, and we're being asked to go

12   back and produce documents relating to products not at

13   issue in this case, for a period that postdates the

14   liability, in fact, for the period 2005 to the present

15   that -- that period of time is actually longer, in

16   years, than the periods of time that's actually

17   relevant to the case itself, which is sometime from the

18   late 1990's up until 2005.

19           And so I think -- And what would this entail?

20   By the way, what would this entail? It would entail

21   going back to Honeywell and doing a complete redo of a

22   document collection, 7 years into the case.

23           Mr. Morris raised issues with Honeywell's

24   collection and preservation of documents. I can tell

25   you that Honeywell has imaged the computers of the

1    relevant custodians.  Honeywell locked down those

2    documents.  What the Government now wants us to do is

3    to go back again, and to get documents related to other

4    products, and we think we're well past that point.

5    Frankly, we would have objected to this kind of request

6    had it been brought on day one of the case, but

7    certainly on year 8 of the case, or year 7 of the case,

8    I think it's -- it is far outside of this lawsuit.

9              THE COURT:  Very well.  You may continue.

10             MR. BRESS:  Your Honor, the -- and if I may

11   just make one last comment on that point before I move

12   on, --

13             THE COURT:  Yes.

14             MR. BRESS:  -- which I did want to make,

15   which is that Honeywell hasn't asked the Government for

16   post-2005 materials.  As we pointed out in our brief,

17   the Government has -- the Government produced those

18   documents to Toyobo.  They came to us and asked if we

19   want them.  We said, "Yes, if you're producing them to

20   Toyobo," and we didn't serve document requests asking

21   for that.  We did serve one document request that made

22   a very targeted request for an aging program.  The

23   Government produced 123 documents relating to that, and

24   what -- that -- if there were a target of requests on

25   the table, Honeywell would certainly consider that, but

1   what we're being faced with is going back and
2   collecting apparently 10 years worth of emails, 10
3   years worth of files, 10 years worth of documents on
4   all kinds of other products not at issue in the case,
5   so I don't think it's remotely comparable.
6             THE COURT:  Very well.  Please continue.
7             MR. BRESS:  Certainly, Your Honor.
8             The third issue that Mr. Morris raised was
9   this so-called issue of "control," and I think that the
10  the three issues, just to -- was, the post-2005
11  research on Z Shield and Zylon for non-ballistic
12  applications, did that one; and the post-2005 research,
13  that was the second one.  Now we're on this issue of
14  control.
15            Your Honor, I think this one really
16  underscores the overreach here.  Here's the problem.
17  DSM and FMS are two separate and independent companies.
18  They're two companies that are overseas.  That's where
19  they made Z Shield.  Honeywell doesn't own those
20  companies.  Those companies are (phonetic) affiliated
21  with Honeywell.  Actually, those companies are
22  competitors of Honeywell, even though Honeywell worked
23  with them on the Z Shield product.
24            Honeywell has produced the documents it has in
25  its possession, based on a reasonable search, and

1   showing manufacturing-related processes and

2   information, and we laid those out in our brief on page

3   21 of our opposition.  So we have provided that.  I

4   don't take the Government to be arguing that there's

5   anything else in Honeywell's own files that Honeywell

6   hasn't provided.  What they're saying is that we have

7   an affirmative obligation to go to these other

8   companies, that we some how control them.  Your Honor,

9   it's really out there, to be honest.

10      When you look at the arguments, they're

11  really twofold.

12      The first is there was a cooperative supply

13  relationship.  That's not the standard for Rule 34

14  control, and if it was, I think it would be very

15  surprising to American businesses, to realize that they

16  were somehow the document custodians and had Rule 34

17  control over each other whenever they did business with

18  each other.

19      Mr. Morris referenced and NDA.  Companies have

20  NDA's all the time.  That doesn't mean that companies

21  somehow have the legal obligation, in litigation, to

22  then go and get some other non-party's documents just

23  because the Plaintiff in the case might want them.

24      The case law on this, Your Honor, I think, is

25  fairly clear.  The key case from the D.C. Circuit is

1    the <u>ASAT</u> case.  That's 411 F.3d 245.  Rule 34 is

2    defined.  It's the legal right, authority or ability to

3    obtain documents on demand.

4            The <u>ASAT</u> case, Your Honor, involved

5    subsidiaries of the same company, and the D.C. Circuit

6    there said it wasn't even control in that situation.

7    Subsidiary didn't control its parent.  Well, here we're

8    talking about two completely different companies in

9    all, so I think this is even farther afield from <u>ASAT</u>,

10   which is a D.C. Circuit case finding no control.

11           The other argument that you see made is that

12   somehow the contract documents, the contractual

13   agreements between Honeywell and DSM and FMS gave

14   Honeywell control over these other companies'

15   proprietary information.  I think Your Honor asked Mr.

16   Morris the question, "Where does it say that in the

17   agreement?"  It doesn't say that in the agreement

18   anywhere and, in fact, if you look at the FMS

19   agreements, it says the exact opposite, and these are

20   quotes from the FMS agreements which we've provided to

21   Your Honor.

22           This is one that's attached as Exhibit 2 to

23   Docket 101.  It says:

24               "FMS and its affiliates shall not be

25               obligated to disclose to Honeywell, or

1        provide Honeywell access to any technical

2        information or know-how regarding its

3        production methods and processes which

4        constitute its proprietary information."

5        And we attached toll manufacturing agreements

6    that repeatedly say, in many places, that:

7        "FMS shall not be required to disclose any

8        proprietary process data to Honeywell."

9        So, what's happening in this case is that

10   there are other companies are making this material

11   from Honeywell.  Mr. Morris asserted that we don't know

12   or understand how the material is being made.  That's

13   not accurate.  The material is tested rigorously when

14   it comes back to Honeywell, but the point is that these

15   are other companies that use their own proprietary

16   processes.  Honeywell doesn't simply have a right of

17   access to companies overseas that had nothing to do

18   with Honeywell, in terms of the corporate relationship.

19       And this -- The Government is really taking a

20   very back road to these documents.  If the Government

21   wanted documents from companies overseas, it could have

22   done what every other litigant does, which is go

23   through The Hague Convention and try to get those

24   documents, rather than claiming that Honeywell has

25   control over companies that it really doesn't.

1              So I'm prepared, Your Honor, to answer any

2      other questions that you may have on these issues, but

3      I think the bottom line is we're talking about

4      discovery that is far afield of the merits of the case,

5      and the central issues in the case, and we to think

6      that it's -- really is time for discovery to stop, the

7      parties to be able to move forward, complete expert

8      discovery, and tee this case up for summary judgment.

9              THE COURT:   Thank you very much, Mr. Bress.

10             MR. BRESS:   Thank you, Your Honor.

11             THE COURT:   Is there anything further

12     regarding documents, Mr. Morris?

13             MR. MORRIS:   The provision Mr. Bress -- I

14     want to start with the control issue first, and just

15     say a few words, and then --

16             THE COURT:   Very well, you may.

17             MR. MORRIS:   -- deal with the other two.

18             The provision -- Mr. Bress said it's Section

19     13, an examination of records provision.   There's

20     another provision in that agreement on confidentiality.

21     Each party recognizes that it may receive proprietary

22     information from the other party in connection with the

23     alliance agreement and other performance thereof, and

24     when we asked Dr. Wagner at the deposition, "How do you

25     reconcile Section 8 with Section 13?", she didn't know.

1  That's why we want more discovery about this, because

2  she did not negotiate this agreement.  She has no

3  firsthand knowledge about what these agreements mean.

4          THE COURT:  Well, let me ask whether it is

5  your suggestion that the so-called "alliance agreement"

6  is the basis of your contention that Honeywell has

7  control --

8          MR. MORRIS:  It's a basis of my --

9          THE COURT:  -- of the documents --

10          MR. MORRIS:  It's one of the documents --

11          THE COURT:  -- not in Honeywell's possession

12  or custody?

13          MR. MORRIS:  It's one of the documents, yes,

14  Your Honor.  There's a number of them.  There's all

15  sorts of non-disclosure agreements.  There's a master

16  strategic alliance agreement.

17          And our basis on the non-proprietary

18  documents, because this --

19          THE COURT:  Are those not agreements that had

20  to do with the relationships among the corporations,

21  for purposes of the contract with the Government?

22          MR. MORRIS:  I'm not -- They had to do with

23  how -- the sharing of information relating to the

24  product that was being made, which was a Honeywell

25  product that had a Honeywell name on it.  That's what

1    makes this a little bit different, Your Honor, is we're

2    talking about -- So this is Honeywell's product.  This

3    is a product that Honeywell has a patented shield-

4    making process that we believe these companies are

5    using.

6           This isn't a situation where these companies

7    are making products unrelated to Honeywell.  We're

8    trying to get that discovery.  This is a Honeywell

9    product.  That's why companies enter into these kind of

10   agreements, so they can share proprietary information.

11   That's why you do that, and there's a couple of cases

12   we cite in our briefs about --

13          THE COURT:  What is the nexus between that

14   circumstance, if we assume for the moment that that is

15   an accurate statement, and the rules governing the

16   conduct of discovery, which provide that a party must

17   produce responsive documents in its possession,

18   custody, and control?

19          MR. MORRIS:  Right.  And according to the

20   ASAT case that Mr. Bress recognized, one way to do that

21   is to have the ability to obtain documents upon demand.

22   That's one of the prongs.

23          In the ASAT case it said the reason it found

24   no control there was because there was an indication

25   that the subsidiary, in the ordinary course of

1   business, had access to the subpoenaed documents, and

2   that's on page 279, and the test on <u>ASAT</u> is on 278.

3           Here, Dr. Wagner's testimony, which we cited

4   in the brief, is that FMS always provided documents

5   that Honeywell requested, that she didn't know of one

6   time when they hadn't provided documents.  So while she

7   doesn't know about the agreements, she does know the

8   course of dealings between the company, and that when

9   Honeywell requested documents relating to its product

10  that it was selling with its name, it received them.

11          THE COURT:  Very well.  You may continue.

12          MR. MORRIS:  Okay.

13          The other point on the control issue is

14  there's another group of documents which are not trade

15  secret or proprietary to FMS or DSM, and the agreements

16  there don't even appear to have --

17          THE COURT:  Well, before you move on let me

18  ask you to respond to a matter that Mr. Bress raised, I

19  apologize --

20          MR. MORRIS:  No, that's fine.

21          THE COURT:  -- concerning an option that the

22  United States might exercise, to seek documents from

23  the two corporations through The Hague Convention.

24          MR. MORRIS:  Yeah.  We were --

25          THE COURT:  I mean, do you -- is it not -- do

```
1    you disagree with the proposition that if you -- or if

2    any litigant wants documents in the possession of a --

3    of an entity outside the United States, that it has a

4    clear path by which to --

5              MR. MORRIS:  We do disagree --

6              THE COURT:  -- receive those?

7              MR. MORRIS:  -- that The Hague is a clear

8    path to anything, and then we did -- The Pain

9    Technologies case in 1980, from the D.C. Circuit,

10   talked about, and it was -- we cited it in our brief

11   but I don't have the cite off the top of my head,

12   talked about all the pitfalls with the Hague process,

13   and it's been our experience, and experience we've --

14             THE COURT:  That doesn't suggest that the

15   process is not available, does it?

16             MR. MORRIS:  No, we're not saying the process

17   is not available, but we're saying if Honeywell can

18   control -- if Honeywell can ask for these documents,

19   which they've never even done, and get them, that it's

20   a lot less burdensome for everybody to have that happen

21   than for us to have to go through the Hague process.

22             THE COURT:  So is that a concession, that the

23   Hague process is available to the United States?

24             MR. MORRIS:  We're not -- It's not a

25   mandatory process.  That's the Society National case,
```

1    but yes, it is available.  I mean, I can't deny that,

2    but we -- it's our view it would not bear fruit and

3    would be burdensome, but we don't deny that there is a

4    Hague process to get documents.

5             THE COURT:  Very well.

6             You may address the remaining --

7             MR. MORRIS:  Okay.

8             THE COURT:  -- matters.

9             MR. MORRIS:  On the post -- On the Zylon

10   research, okay, he's not even the indicated -- We

11   mentioned earlier about Megaflex and Zebraflex and not

12   thinking we have all those documents.  Those had Zylon

13   in it.  They weren't commercially developed, but they

14   had Zylon in it.  Mr. Bress didn't address that.

15             And in terms of discoverable --

16             THE COURT:  Is it correct that the documents

17   concerned research and testing prior to 2005?

18             MR. MORRIS:  Yes, those do.

19             THE COURT:  Very well.

20             MR. MORRIS:  Okay.

21             In addition, Your Honor, the -- for the post-

22   2005 testing that would be non-ballistic, it's still

23   important to understand the nature of the product, the

24   issues it might have, in terms of like in the Toyobo

25   case with the (unintelligible) type testing.  It gave

1    them, in our view, notice of problems with Z Shield,

2    and also, that's the sort of research that can build

3    upon a foundation that had been built earlier.

4         But the one point Mr. Bress made that I have

5    some sympathy for is in terms of a possible burden with

6    like (unintelligible) the entire company.  If they had

7    come to us and tried to give us some information about,

8    "Look, we found that we do Zylon research in three

9    other areas and we think, you know, they're not

10    relevant," at least then we would have some basis to

11    argue that, but they've been a complete black hole when

12    it comes to this.  They won't respond with any

13    information.  So it's like, "How are we to get

14    information that's uniquely in their own files?"

15         THE COURT:  Well now, Mr. Bress, if my

16    recollection is correct, indicated that Dr. Wagner and

17    another Honeywell scientist testified, I believe in

18    response to your questions or questions of one of your

19    co-counsel at a deposition, that there was no such

20    research.

21         MR. MORRIS:  Yeah.  Let me address that.

22         THE COURT:  Is that true?

23         MR. MORRIS:  Let me -- Partially.  What she

24    -- There's no --

25         THE COURT:  Does that -- If that is true, --

1          MR. MORRIS:  She has not --

2          THE COURT:  -- does that mean that we cannot

3     say that Honeywell has not responded to your inquiry?

4          MR. MORRIS:  No.  There's two types of

5     research for the Zylon.  There's the body armor related

6     research, which they have represented there was no

7     Zylon or Z Shield body armor research post-2005.

8     That's the deposition testimony that Mr. Bress is

9     referring to, and we question that because of all these

10    patent applications that talk about Zylon, and

11    generally when you filed a patent application, you

12    usually have some research to back it up, and when Your

13    Honor even asked Mr. Bress, "Do all these patent

14    applications apply to body armor?", he hedged.  He said

15    most of them do, but he didn't say every one of them

16    did.

17         So when -- we're concerned about that, but

18    more importantly, Dr. Wagner has never said that there

19    was no Zylon or Z Shield research for non-ballistic

20    products at all, and in response to the RFA, Honeywell

21    has made it clear they haven't looked.  They just say,

22    "It's too burdensome, we're not doing it."  So that's

23    why I gave that answer.  It depends.

24         For the ballistics, she said, "Yes, there's

25    no more research for Zylon or Z Shield."  For the non-

1   ballistics, no, she hasn't said that.

2         THE COURT:   What is your argument with

3   respect to why research for non-ballistic -- non-

4   ballistics applications would be relevant?

5         MR. MORRIS:   Because it tells you more about

6   the product.   It's a chemical, and so chemicals are

7   used -- Zylon is used because it tends have high

8   tensile strength.   It tends to be resistant for -- at

9   least in the short term, and so you use that type of

10   material.   You might use it in body armor for that

11   reason.   You might use it in electrical cords for that

12   reason.   You might use it in sailboat netting for that

13   reason.   You're looking for a durable product that will

14   last, but you're using -- even though it's a different

15   product, you're fundamentally using it because of its

16   inherent chemical components, and so this research will

17   disclose information about that, and that's relevant.

18         THE COURT:   You may continue.

19         MR. MORRIS:   Okay.

20         The other issue there is if we could get some

21   information, in terms of trying to sort of narrow the

22   scope of the request, in terms of the burden.   We're in

23   the dark about exactly how burdensome this would be on

24   Honeywell.   If we could get some information from

25   Honeywell about the type of research it's doing, we

1    could probably negotiate something that would lower

2    that burden.

3                 THE COURT:  On what basis do you believe that

4    the United States could inquire of Honeywell regarding

5    research it is -- in which it is currently engaged?

6                 MR. MORRIS:  Well, no, it would be engaged

7    in, in the past, before -- between 2005 and the

8    present.  Well, the basis is if they're researching

9    Zylon, it tells you about the constituents because

10   their defense is Zylon's still a perfectly good

11   ballistic material today.  That's going to be that

12   difference -- That's going to be what they want to tell

13   the jury, and the more information you have about Zylon

14   and PBO, you know, the more you can find out if the

15   company, as a whole, really believes that, but if Your

16   Honor doesn't want like current research because it

17   could be a trade secrets, we would be happy to limit

18   the request to like 2010, you know, and if we would get

19   some inkling from Honeywell what these various things

20   are, we might be able to narrow the request more, but

21   they refuse to tell us anything about it.

22                 THE COURT:  Do you have your copy of the

23   declaration of Dr. Wagner in front of you?

24                 MR. MORRIS:  Yes.

25                 THE COURT:  Document Number 101-1?

1          MR. MORRIS:   Now just a minute.

2          Is this the first one or the second one, Your

3    Honor?   The short one or the long -- the nine page or

4    three page?

5          THE COURT:   It is the lengthier --

6          MR. MORRIS:   Yes, I have it right now.

7          THE COURT:   -- one that concludes with a

8    signature line on page 11.

9          MR. MORRIS:   Yes.

10         THE COURT:   And I'm looking at paragraph 26

11   -- beginning at paragraph 26.

12         MR. MORRIS:   Yes.

13         THE COURT:   To what extent has the United

14   States sought to refute any of Dr. Wagner's assertions

15   in paragraphs 26 through 30?

16         MR. MORRIS:   Well, we sought to refute them

17   by pointing out in our papers, the nature of the patent

18   application.   She's not talking about every patent

19   application that was cited.   She's picked a few that

20   just relate to Zylon and Z Shield.   So she's not saying

21   that we haven't done any research on anything.

22         This goes back to the point, which I agreed

23   with Your Honor, that she's saying, "We haven't done

24   any research on Zylon or Z Shield relating to ballistic

25   applications," --

```
 1              THE COURT:  All right.  I'm looking now at --
 2              MR. MORRIS:  -- but even here she doesn't
 3    address every --
 4              THE COURT:  -- at the final sentence of
 5    paragraph 28, which reads:
 6                   "None of the patent documents DOJ identifies
 7                   in its motion to compel indicate research
 8                   being performed on Zylon or Z Shield."
 9              Is that -- What have you offered to dispute
10    that?
11              MR. MORRIS:  Well, we don't have the
12    documents from them, so nothing, but the --
13              THE COURT:  But you do have the patent --
14              MR. MORRIS:  Yes.
15              THE COURT:  You do have the patent documents
16    that you --
17              MR. MORRIS:  If the patent doesn't --
18              THE COURT:  -- included with your motion?
19              MR. MORRIS:  Generally, there's research
20    associated with patents, but we don't have any specific
21    patent research with these documents, but there could
22    be other research unrelated to patents, relating to PBO
23    or Zylon and Z Shield, and that -- she doesn't say, and
24    Honeywell makes clear in their request for admission,
25    that they didn't check, but we don't have anything
```

1   specific refuting that sentence.  I'm not sure how we

2   could get it without some additional discovery.

3            THE COURT:  My question is a little

4   different.

5            Do you acknowledge that the patent documents

6   that the Department of Justice identifies, include no

7   indication that any research is being performed on

8   Zylon or Z Shield?

9            MR. MORRIS:  Yeah, I don't dispute -- We

10  don't have anything beyond what's in the patent

11  documents, and the patent documents don't detail

12  specific research, but that's not to say that there's

13  not Zylon or Z Shield research relating to non-

14  ballistic applications that are not subject to the

15  patents that we fund.

16           THE COURT:  And assuming that that is true

17  and, of course, I do not know, but if we assume for the

18  moment, that that is true, why would that be relevant?

19           MR. MORRIS:  Because Z Shield and Zylon, the

20  chemical components and the chemical natures

21  important --

22           THE COURT:  If, for example, to take a far-

23  fetched application, the ballistics materials are being

24  researched for use --

25           MR. MORRIS:  Well, like Toyobo, for rope, for

1    chord, for other things where you want durable products

2    that --

3              THE COURT:  And of running shoes.

4              MR. MORRIS:  -- last for a long time because

5    they're all -- you do that because of the chemical

6    composition of the material.

7              THE COURT:  But why would that be relevant to

8    the claims --

9              MR. MORRIS:  Because the chemical --

10             THE COURT:  -- and defenses in this case?

11             MR. MORRIS:  My apologies, Your Honor.  I

12   didn't mean to interrupt you.

13             THE COURT:  That's all right.

14             MR. MORRIS:  Because the chemical composition

15   of the material goes directly to why it degrades, and

16   that's what our experts are going to say, when there's

17   a direct linkage between how the material is composed

18   chemically, and how the degradation happens, and so the

19   more you can find out about what Honeywell knows about

20   that, the more you can establish that direct linkage in

21   Honeywell's knowledge of it, because they're not just

22   going to say -- they're going to say it's still -- Z

23   Shield is still perfectly good for ballistic

24   application, even today, and that's what they've said

25   in pleadings, and some of the witnesses have testified

1   to that, as well.

2          And so, because it's primarily the chemical

3   composition that's important, and then you take that

4   chemical composition, you decide, "This product has

5   these attributes so it might be good for Product A,

6   body armor; Product B, sailboat netting; Product C,

7   rope or chord," you still do that because of the

8   fundamental chemical nature of the product.

9          THE COURT:  Very well.

10         Is there anything further regarding the

11  documents?

12         MR. MORRIS:  Yeah.  The last subset, Your

13  Honor, that I wanted to focus on, was the accelerated

14  aging documents, which I don't believe we've discussed

15  in the rebuttal yet.

16         And Mr. Bress indicated, and I want to --

17         THE COURT:  Please, continue.

18         MR. MORRIS:  Oh, sure.

19         First, he indicated that, you know, there's

20  only a few people in the ballistics department, earlier

21  in the argument, and now he's saying, "Well, there's a

22  lot of custodians who might have some ballistic

23  research."

24         We would be prepared to take accelerated

25  aging from Dr. Wagner or Brian Arvidson or Lynn Murray,

1    just those three custodians, which should narrow their

2    burden issue, and again, they're taking the position

3    that accelerated aging is essentially voodoo, but they

4    use it all the time in their product development

5    efforts, even today they do, and they say, "Well, it's

6    because the Government makes us," or "Our customers

7    make us," but that just goes to weight.  We want to

8    show that Honeywell believes in the accelerated aging

9    research, that it relies on it, and -- to impeach what

10   they're going to say about accelerated aging research

11   and -- but we would be willing to narrow it just to

12   those three custodians, Brian Arvidson, Dr. Wagner and

13   Lynn Murray.

14          And then the other point I wanted to make

15   there, Your Honor, is Mr. Bress said, in response to

16   one of your questions, "Well, in producing that

17   research, did you also produce during the 2001 to 2005

18   time frame, the Spectra and the Gold Flex research?",

19   and he said, "Well, if it was part of the same document

20   we did," but it's unclear to us, now that they've

21   produced it, whether -- if it's not happened to be part

22   of a document, but even if it's in that relevant time

23   period of '01 to '05, I don't hear Honeywell saying,

24   "We've produced all the Gold Flex accelerated aging

25   research.  We've produced all the Spectra accelerated

1    research.  We've produced the Megaflex accelerated

2    aging research.  We have produced the Zebraflex

3    accelerated aging research."

4            Those are all research that was going on

5    during that time period, and all he's saying is, "Well,

6    if it happened to be in a document that mentions Zylon,

7    well, we produced the whole document," but there could

8    be a whole host of research beyond that, that we don't

9    have, and we would certainly want that.

10           THE COURT:  Well, what is your response to

11   Dr. Wagner's assertion, in her declaration, that

12   Honeywell performs this type of testing, "because new

13   Government requirements instituted after 2005 require

14   it to do so"?

15           MR. MORRIS:  The response would be, one,

16   until we get the documents that explain that, we have

17   no basis to know whether she's saying that's correct or

18   not; and two, that goes --

19           THE COURT:  Do you dispute that --

20           MR. MORRIS:  -- to weight, not admissibility.

21           THE COURT:  -- that is a Government standard?

22           MR. MORRIS:  I'm sorry?  I didn't catch the

23   question.

24           THE COURT:  Do you dispute the proposition

25   that the standard which she cites, I'm looking at

1  paragraph 34, is an actual standard?

2          MR. MORRIS:  No, we do not dispute that.

3          THE COURT:  Is it a Government standard?

4          MR. MORRIS:  Yes, we do not dispute that.

5          THE COURT:  What then, is the basis of your

6  argument that Honeywell --

7          MR. MORRIS:  No, I think I --

8          THE COURT:  -- does not conduct it because

9  the Government requires it?

10         MR. MORRIS:  Well, I'm sure that's one reason

11 they do conduct it, but then they use it -- we don't

12 know how they used it in product development, if they

13 vetoed certain products because they have accelerated

14 aging research, which would contradict what they're

15 telling us.

16         THE COURT:  Are you speaking of a time after

17 2005?

18         MR. MORRIS:  Well, I'm speaking of

19 (unintelligible) because in the -- for the documents I

20 listed before, the Megaflex, the Zebraflex, the

21 Spectra, the Gold Flex, as I understand Mr. Bress'

22 argument, Honeywell is not even representing that they

23 produced all that data to us during the relevant time

24 frame, it's just if it happens to be in a document with

25 Zylon.

93

1            For the post-2005, yes, they -- the answer to

2    Your Honor's question is "Yes."

3            THE COURT:  Very well.

4            I will hear your conclusion concerning the

5    documents.

6            MR. MORRIS:  Okay.

7            I mean, this is a case about Z Shield, Your

8    Honor.  We've been trying to get the documents.  We

9    think these documents are very relevant.

10           One thing Mr. Bress keeps talking about is

11   the timing.  Well, we asked for these documents 8 years

12   ago and we thought we had them, and it wasn't until we

13   got into expert discovery that it became clear that

14   there were gaps in the production.  Then we came back

15   and asked again for them.  So it's not like we've been

16   sitting on our haunches.  We reasonably relied on

17   discovery responses that Honeywell made, and it was

18   only when we got additional information that questioned

19   those responses, that we came back, and we've tried

20   hard to work out these issues with them but, you know,

21   they have refused to compromise on them, and we think

22   this is important.  Our experts think it's important to

23   get this information, and that's why we moved to compel

24   it.

25           THE COURT:  Very well.  Thank you very much,

1    Mr. Morris.

2            MR. MORRIS:   Thank you, Your Honor.

3            THE COURT:   As was the case with the issue

4    regarding the inspection, the Court initially believed

5    it would be necessary to take the matter under

6    advisement and rule by way of written findings,

7    however, as to the question regarding documents, like

8    the question regarding the inspection, the Court finds

9    that the principal issue is actually one of relevance,

10   and it is to that concern or on the basis solely of

11   that concern, that the Court will rule.

12           The Court has carefully considered all of the

13   arguments made this afternoon, as well as those set

14   forth in writing, and having done so, will deny the

15   request for further production of documents largely for

16   the reasons offered by Honeywell, both orally and in

17   writing.

18           More specifically, the Court finds that all

19   of the responsive relevant documents have indeed been

20   produced.  As to those that have not, concerning

21   periods after 2005, the Court finds that there simply

22   has been no showing that those documents are relevant.

23           Perhaps of equal importance is the

24   observation that Honeywell has sought, with the

25   declaration of Dr. Wagner, to demonstrate that to the

1   extent that Honeywell has asserted that there are no
2   such documents, that that is not simply an assertion of
3   counsel, but is based upon the declaration of someone
4   with knowledge, and the Court notes that the United
5   States has not sought to rebut, in any fashion, any of
6   the factual assertions that, for example, after 2005
7   there has been no testing of Zylon or Z Shield for any
8   purpose related to ballistics.

9            To the extent that there may have been
10  testing, or may now be testing for some other purpose,
11  the Court has not been presented with any offer or
12  proffer of evidence which would tend to show that that
13  would be relevant to the issues presented in this case.

14           To the extent that there are responsive
15  documents in facilities of the two corporations outside
16  the United States, one in the Netherlands and one in
17  Israel, the Court is unable to find that Honeywell has
18  control of those documents.  It appears that the United
19  States concedes that Honeywell does not have possession
20  or custody, so the Court looks only to the issue of
21  control, and the Court is unable to find that Honeywell
22  has control of such documents, to the extent that any
23  such documents in the facilities of the other two
24  corporations would be relevant and responsive.

25           It appears that the United States relies

1    principally upon various disclosure agreements and

2    contract documents for the proposition that the two

3    corporations have responded to Honeywell requests in

4    the past.  The Court finds that even if we assume for

5    the moment, that that is true, that does not

6    demonstrate control or warrant a finding regarding

7    control, for discovery purposes.

8            For these reasons, the motion to compel is

9    denied as to the request for documents, and this will

10   be the extent of the finding of the Court regarding the

11   motion to compel.

12           So the ECF entry will indicate that the

13   parties have reached an agreement regarding inspection

14   and testing of materials, but in all other respects the

15   motion to compel is denied for the reasons set forth on

16   the record.

17           I believe that what we should do at this

18   point is set a date for a status hearing, by which time

19   you will have had a further opportunity to finalize

20   your agreement regarding inspection and testing, and

21   consider what further very limited discovery might be

22   needed to, for example, supplement prior responses, so

23   that you will be able to quickly turn your attention to

24   litigation of the merits.

25           Let me ask you to give us one moment while we

1    look at the calendar for the month of April, please.

2         (Pause.)

3              THE COURT:   I will suggest that we look at

4    the week of April 20th, which will give you about 4

5    weeks to finalize the agreement -- comply with the

6    agreement and consider what further very limited

7    discovery it is that you require.

8         (Pause.)

9              THE COURT:   May I suggest Thursday, April

10   23rd at 10 a.m.?

11             MR. BRESS:   That would be fine for Honeywell,

12   Your Honor.

13             THE COURT:   Very well.   Thank you, Mr. Bress.

14             Mr. Morris?

15             MR. MORRIS:   That would be fine for the

16   Unites States, as well, and I -- may I just -- I don't

17   want to -- I understand Your Honor's ruling and I'm not

18   talking about that, I promise you, but what I do want

19   to ask is we did have the outstanding issue of the

20   Alston & Bird subpoena, which is something we could

21   clear up but -- and I've raised it at the end, it's not

22   part of the motion to compel, but they've just taken

23   the position that the subpoena was out of time.

24             We're not trying to litigate the merits of

25   that subpoena now, but we'd just like to be able to

1   pursue it, so if you -- we could simply tell Alston &

2   Bird the discovery is ongoing, at least for the

3   purposes of that subpoena, it would allow us to

4   pursue --

5        THE COURT:  I don't know that that would be a

6   correct statement on the part of the Court, and my

7   suggestion, although I do not want to invite or suggest

8   that I'm inviting further motions regarding discovery,

9   is that all of you meet and confer in an effort to

10  resolve the issue, and if you cannot, I believe it

11  would be incumbent upon the United States to file a

12  motion, but I am not prepared to state that discovery

13  is ongoing, that that is not my impression, and at this

14  hour I don't know that we can go back through the prior

15  ECF entries and make that determination.

16       If that is your contention, then I assume

17  that is what you would advance in a motion.

18       MR. MORRIS:  Okay, Your Honor, we can present

19  it in a motion.

20       THE COURT:  As I said, my hope is that you

21  will resolve it, and that in the course of resolving

22  it, all of you will determine whether it is indeed the

23  case that the subpoena was untimely.  Perhaps you will

24  agree that it was and then there will be no reason to

25  file a motion.

1          MR. MORRIS:  Okay.  The subpoena wasn't to

2     Honeywell, so it would be conferring with Honeywell, it

3     would be conferring with Alston & Bird.

4          The reason we filed the subpoena late, Your

5     Honor, was because we got the documents that told us

6     their repository (phonetic) in November of 2014.  That

7     was the first time we learned.  We moved as quickly as

8     we could to get authority to get a subpoena, we did,

9     but the due date of the answer on that subpoena was

10    later.  So that's --

11         THE COURT:  I cannot address it now.  You

12    have acknowledged it was not a part of the motion to

13    compel.

14         MR. MORRIS:  Yes, that's true.

15         THE COURT:  I had not prepared to address it.

16    You have not had an opportunity to meet and confer with

17    anyone that would be a part of the discussion, in an

18    effort to try to resolve it, and that is what I

19    encourage you to do.

20         MR. MORRIS:  Okay.

21         THE COURT:  I am not able to state that

22    discovery is ongoing.

23         MR. MORRIS:  Okay.  Thank you.

24         THE COURT:  I recognize that there -- we've

25    resolved this motion to compel, but there will be some

1  further discovery based upon your agreement, and we

2  will consider what other very limited, narrowly

3  circumscribed discovery might be appropriate after all

4  of you have had the chance to meet and confer, and that

5  is what we will resolve on April 23rd, but regarding

6  the subpoena, I believed it would be incumbent upon the

7  United States to move for relief if the matter cannot

8  be resolved.

9           MR. MORRIS:  Thank you, Your Honor.

10          THE COURT:  Very well.  Thank you very much.

11          Is there anything further before we recess?

12          Mr. Morris, anything further on behalf of the

13  United States?

14          MR. MORRIS:  No, Your Honor.

15          THE COURT:  Mr. Bress, is there anything

16  further on behalf of Honeywell?

17          MR. BRESS:  No, Your Honor.

18          THE COURT:  Very well.  I thank all of you

19  very much.  Everyone have a good evening.

20          (Proceedings concluded at 5:16 p.m.)

21

22

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          March 20, 2015

STEPHEN C. BOWLES

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　)　　Case 1:08-cv-00961 (RWR)
　　　　　　　　　　　　　　　　)
HONEYWELL INTERNATIONAL INC.　　)
　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
────────────────────────────)

## THE UNITED STATES' FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO HONEYWELL INTERNATIONAL INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.), Plaintiff United States of America (United States or Government) hereby supplements its responses to Defendant Honeywell International Inc.'s (Honeywell) First Set of Interrogatories (Honeywell's Interrogatories). The United States provided Honeywell with its original responses on or about December 4, 2008. Each Specific Response set forth below is subject not only to the objections contained in the Specific Response, but also to the General Objections and Conditions.

## GENERAL OBJECTIONS AND CONDITIONS

The following General Objections and Conditions apply to each Specific Response set forth below. Each General Objection and Condition is hereby incorporated in the Specific Response to each individually numbered Interrogatory as if fully set forth herein.

1.     The United States has not yet completed its pretrial investigation, discovery, or preparation of its case for trial in this matter.  These responses are based on present knowledge and recollection and the information currently and reasonably available.  The United States will supplement or amend its answers as required by the Fed.R.Civ.P..

2.     In responding to Honeywell's Interrogatories, the United States does not waive any objection based on relevancy, materiality, confidentiality, privilege, or any other grounds.

3.     The United States objects to Honeywell's Instructions and Definitions and all Interrogatories to the extent that they call for responses protected by the attorney-client, deliberative process, investigatory files privileges or other governmental privileges, the joint prosecution/common interest privilege or the work product doctrine.  In objecting to and responding to Honeywell's Interrogatories, the fact that the United States provides responses should not be construed as a waiver of any of its objections with respect to other information requested.

4.     The United States objects to the Instructions and Definitions preceding Honeywell's Interrogatories to the extent that they seek to impose on the United States any obligation that is greater than that required by Rules 26 and 33 of the Fed.R.Civ.P.

5.     The United States objects to Honeywell's Interrogatories to the extent that they seek information not relevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence and/or not relevant to the claims or defenses of any party.

6.     The United States objects to Honeywell's Interrogatories to the extent that they seek information or documents that are in the possession, custody, or control of Honeywell or are

publicly available, and thus equally accessible to both parties. The United States also notes that prior to the beginning of discovery in this case, the United States voluntarily produced tens of thousands of documents to Honeywell that had been gathered during the course of the United States' investigation of the Zylon body armor industry from a variety of sources, including United States' agencies and the manufacturers, trading companies, weavers, and distributors of body armor containing Zylon. Since that time, the United States has produced tens of thousands of additional documents to Honeywell during the course of discovery in this case. In doing so, the United States has provided Honeywell with substantial information and documentation responsive to Honeywell's Interrogatories. In addition, the United States has provided Honeywell with voluminous Initial Disclosures, pursuant to Rule 26 of the Federal Rules of Civil Procedure, that also provided Honeywell with substantial information and documentation responsive to Honeywell's Interrogatories

7.     The United States objects to Honeywell's Interrogatories to the extent that they seek information or documents in the possession, custody, or control of parties other than the named Plaintiff in this case.

8.     The United States objects to Honeywell's Interrogatories to the extent that they seek evidence, including but not limited to, communications between and among the employees, officers, and agents of the United States Government, concerning any investigation that is protected by the work product doctrine, the Government investigative files privilege, the deliberative process privilege, the joint prosecution privilege, and the attorney client privilege.

9.     The United States objects to Honeywell's Interrogatories to the extent that they seek the discovery of the opinions of the United States' expert witness(es) at a date not in

3

accordance with the discovery stipulation agreed upon by the parties, or seek to impose an obligation on the United States beyond the requirements of the Fed.R.Civ.P. regarding expert discovery.

10.     The United States' agreement to provide information or documents in response or partial response to any of Honeywell's Interrogatories shall not be deemed a waiver of the United States' right to object to responding to the Request or to provide information or documents other than that which is expressly set forth in the Specific Responses.  Further, the United States' agreement to produce information or documents is not to be deemed a waiver of the United States' right to object to the competency, relevancy, materiality, confidentiality, privilege or admissibility as evidence, for any purpose, of any information or documents provided.

11.     The United States' Specific Responses to Honeywell's Interrogatories shall not be construed in any way as an admission that any Definition or Instruction provided by Honeywell is either factually or legally binding upon the United States.

12.     In providing information responsive to Honeywell's Interrogatories, the United States has and will continue to conduct a reasonable search of its records kept in the ordinary course of the Government's business, in the places where information, documents, or other things responsive to Honeywell's Interrogatories are most likely to be found.  Also, the United States has and will continue to seek information from those Government agencies who are most likely to know of information responsive to Honeywell's Interrogatories.  To the extent that Honeywell's Interrogatories ask for more, the United States objects on the grounds that the Requests are overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and would impose on the United States obligations beyond the Fed.R.Civ.P..

4

13.     The United States reserves its right to revise, correct, supplement, or clarify its Specific Responses to any of Honeywell's Interrogatories as its ongoing investigation of this matter may warrant, and to the extent allowed and/or required by the Fed.R.Civ.P.

14.     The United States objects to Instruction No. 1 to the extent that it seeks information protected by the attorney-client, deliberative process, investigatory files privileges or other governmental privilege, the joint prosecution/common interest privilege or the work product doctrine. The United States also objects to this Instruction as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. In addition, the United States objects to this Instruction as it seeks discovery of expert testimony well before the dates set forth in the discovery stipulation agreed upon by the parties. Moreover, the United States objects to this Instruction to the extent that it seeks information or documents in the possession, custody or control of parties other than the named Plaintiff in this case.

15.     The United States objects to Instruction No. 2 as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. The United States also objects to this Instruction to the extent that it seeks information protected by the attorney-client, deliberative process, investigatory files privileges or other governmental privilege, the joint prosecution/common interest privilege or the work product doctrine.

16.     The United States objects to Instruction No. 4 on the grounds that it is overly broad and unduly burdensome and would impose on the United States obligations beyond the requirements of the Fed.R.Civ.P. and/or this Court's Local Rules. The United States, however, will produce privilege logs in compliance with the Fed.R.Civ.P.

5

17.     The United States objects to Instruction Nos. 8, 9, 24, and 25 to the extent that they seek the production of materials protected by the attorney-client, deliberative process, investigatory files privileges or other governmental privilege, the joint prosecution/common interest privilege or the work product doctrine, and to the extent that these instructions seek to have the United States gather information or documents from third parties to this litigation, including outside consultants, law firms, and members of the body armor industry.

18.     The United States objects to Instruction No. 13 to the extent that it seeks the production of information or documents protected by the attorney-client, deliberative process, investigatory files privileges or other governmental privilege, the joint prosecution/common interest privilege or the work product doctrine.

19.     The United States objects to Instruction Nos. 14, 15, and 16 on the grounds that they are overly broad, unduly burdensome, and would impose on the United States obligations beyond the requirements of the Fed.R.Civ.P. and/or this Court's Local Rules.

## OBJECTIONS AND SUPPLEMENTAL RESPONSES

**INTERROGATORY NO. 1:**

Identify each and every false claim for payment in connection with the sale of body armor containing Z Shield that the United States contends Honeywell caused to be presented to the United States, and identify for each and every false claim the following: the date on which the false claim was caused to be presented; the persons or entities responsible for causing the false claim to be presented, the persons or entities who actually presented the false claim, the employee, agency or division of the United States that received the false claim for payment, the particular body armor

product that was the subject of the false claim, the Government's asserted basis for its falsity, and the amount paid for each claim.

**RESPONSE**:

The United States objects to this Interrogatory No. 1 as overly broad and unduly burdensome. The United States also objects to this contention Interrogatory as premature as discovery remains ongoing.

Subject to these objections and the General Objections, and without waiving any of these objections, the false claims that Honeywell caused to be presented by Armor Holdings to the United States and to the other recipients of federal funds, as well as the additional information sought by this Interrogatory, have been identified in the Armor Holdings' invoices (including those produced a few weeks ago, *see* AIN001-0001 to 9999, AIN002-0001 to 9998, and AIN003-0001 to 8011), the electronic claims data produced by Linda Hammond Deckard (the Policy Adviser, Bureau of Justice Assistance, Office of Justice Programs at DOJ), who administers the federal Bullet-Resistant Vests Partnership Grant Program (BVP), which uses federal funds to subsidize the purchases of body armor by state, local, and tribal authorities, and, in the additional sales and claims data that the United States has produced to Honeywell in discovery. In particular, the United States contends that each invoice that Armor Holdings presented to the United States (or to a state, local, or tribal authority receiving federal funds in the BVP Program) for Z Shield body armor represents a separate false claim, as defined by the False Claims Act, 31 U.S.C. § 3729 *et seq*. The United States also contends that each of the claims that Armor Holdings presented for Z Shield vests was false because Z Shield body armor was a defective product not fit for ballistics

7

purposes and also because Z Shield would not maintain its ballistics integrity for the five years

warranted by Armor Holdings or for a commercially reasonable period of time.

Z Shield was a defective product that would not maintain its ballistics integrity for three

reasons. First, Z Shield degraded in hot and humid conditions and, as detailed in the applied

research section of the National Institute of Justice's (NIJ) Third Status Report to the Attorney

General on Body Armor Safety Initiative Testing and Activities (Third Status Report), this

degradation negatively impacted Z Shield's ballistics performance by virtue of hydrolysis and did

so at a much faster rate than occurred with other aramid materials such as Kevlar (NIJ 2720 to

2766). Second, the resin used to laminate Z Shield was made using a water-based washing process

that Honeywell knew (1) accelerated the degradation process of Z Shield, (2) represented a

secondary failure mechanism for Z Shield beyond the ordinary hydrolysis experienced by Zylon

fiber, and (3) contributed to Z Shield performing more poorly in ballistics-performance retention

tests than ordinary Zylon fiber and fabric (HW 406791, HW 406939 to 41, HW 406518, HW

406931 to 35, HW 344248 to 51, HW 343990 to 4011, HW 403365 to 68, and HW402204 to 240).

Third, Z Shield contained, at all stages throughout its sale to Armor Holdings, small red threads

contained in the Zylon fiber used to make Z Shield and later circa 2003 longer red threads. These

red threads negatively impacted Z Shield's ballistics performance, and Honeywell's then chief

quality control inspector, Pete Chalifoux, indicated that red thread represented a defect in the Z

Shield specifications (*see, e.g.*, HW. 1593 to 96, HW 6997 to 7003).

Honeywell claims that Z Shield was not a defective product because at the time body armor

containing Z Shield was sold to federal, state, local, and tribal authorities, the body armor met the

required NIJ standards (the 0101.03 and 0101.04 standards), which standards applied only to new

8

body armor, and that no standards existed for the future performance of any body armor, including body armor containing Z Shield. In short, Honeywell contends that the Z Shield body armor never had to work and that, even if Z Shield vests became unsuitable for ballistics protection a day after passing the NIJ standards, there would be no false claims because no contractual specifications had been violated.

In response, the United States contends that Z Shield body armor was defective because it failed to maintain suitable ballistics performance for a commercially reasonable period of time and that the industry standard of commercial reasonableness was five years based on (1) the Armor Holdings' warranties associated with Z Shield vests (many of which were directly incorporated into the government contracts, *see also* the Responses to Interrogatory Nos. 3 and 4 below), (2) public statements, technical bulletins, and marketing literature issued by Armor Holdings and Honeywell (*see, e.g.*, HW 24446 to 47), and (3) the five-year "rationale replacement policy" touted by the body armor industry for many years, including at all times that Z Shield vests were sold (*see, e.g.*, AZE 747214 to 217).

The United States also contends that, due to the unpredictability of Z Shield's ballistics retention after being subject to heat and humidity conditions that Honeywell understood would be encountered by end users of Z Shield body armor, Z Shield represented a material without ballistics utility because any particular piece of Z Shield body armor could not be depended upon to offer ballistics protection for any reasonable period of service. For example, in NIJ ballistics testing associated with the Third Status Report, all but one Z Shield vest (out of 12 tested) failed the NIJ testing and incurred penetrations by threat rounds the vests had been certified to stop (NIJ021-2761 to 62). *See also* the Complaint at ¶ 84 summarizing the totality of NIJ's V0 and V50 test results on

Z Shield vests associated with the Body Armor Safety Initiative (all 18 Z Shield vests failed in the V0 testing, with 15 out of 18 suffering penetrations, while in the V0 testing five of the six Z Shield vests lost at least 30% of their tensile strength and 29% of their ballistics integrity). Furthermore, Honeywell has repeatedly acknowledged in deposition testimony from its witnesses that the Honeywell research scientists could not correlate their attempts at accelerated aging with actual ballistics performance in the field and thus did not know how long a service life could be expected from Z Shield body armor (*see* Wagner, Murray, and Bhatnagar testimony).

Moreover, the United States contends that Honeywell's lack of cooperation and disclosure regarding Z Shield research with the Tekne Group, who performed heat and humidity exposure research on Zylon, Z Shield, and other ballistics materials on behalf of the United States circa 2001 through 2006, and Honeywell's lack of openness about its Z Shield research with Government officials hampered the United States' ability to incorporate into the NIJ standards for body armor conditioning protocols to assess how factors like wear, environmental exposure, and aging would impact body armor performance in the field. One purpose of the Tekne Group's work was to help gather information that would assist the United States' creation of these conditioning protocols, and Honeywell understood this purpose (*see, e.g.*, HW 4518). In an effort to seek Honeywell's assistance, the Tekne Group repeatedly asked Honeywell orally and in writing for its accelerated aging and other environmental exposure records (Heat/Humidity Testing) relating to Z Shield and other ballistics materials (*see, e.g.*, LES002-5591 to 92, HW 4533 to 34). But Honeywell never provided any such records despite repeatedly promising cooperation and assistance with the Tekne Group's research efforts and despite receiving payment for Z Shield and the other ballistics

10

samples Honeywell provided to the Tekne Group, who thus became a Honeywell customer (*see* Lightsey and Murray testimony).

Both Steve Lightsey and Jon Lesko, the president of the Tekne Group and his principal researcher respectively, have testified that the Honeywell Heat/Humidity Testing data would have materially assisted the Tekne Group's research in a variety of ways, including but not limited to helping Tekne (1) understand the impact of hydrolysis on Z Shield, (2) identify the secondary failure mechanism of Z Shield (the water-based resin wash) (HTS001-0260 to 63), (3) make a more informed choice of the appropriate exposure and testing conditions, (4) "bracket" the upper and lower limits of Z Shield's degradation including providing information about the onset of Z Shield degradation at lower heat and humidity levels, and (5) improve the methodology and scope of Tekne's accelerated aging testing efforts. In material part as a result of Honeywell's lack of cooperation, the Tekne Group's research efforts floundered and their work did not assist the United States' development of conditioning protocol standards for body armor.

Honeywell claims that it would have provided at least some of the Heat/Humidity Testing to Government officials and/or the Tekne Group if they had met with Honeywell's research scientists to discuss the results. Yet, several meetings did take place between Honeywell and Government officials in charge of body armor safety standards without Honeywell ever disclosing any of the Heat/Humidity Testing data for Z Shield (*see, e.g.*, HW 116842 to 43, HW 118256, LES001-5773 to 74, and HW 62255 to 59). Indeed, Janet Ward, the Natick research manager who served as a member of the Technical Support Working Group (TSWG), which was the Government body overseeing the Tekne Group's research, testified that she frequently met in person with Honeywell's Z Shield researchers, including Dr. Lori Wagner, Dr. Ashok Bhatnagar,

and Lin Murray, throughout the time of the Tekne Group's research. Yet, Honeywell never provided any written Heat/Humidify Testing data to Ms. Ward and she did not recall Honeywell ever discussing the results of this data with her.

Honeywell's internal e-mails also clarify that Honeywell's real purpose for meeting with Government officials was to learn about the Government's research efforts, not to disclose Honeywell's own research efforts, and these communications highlight a jaded view by Honeywell of the Governments' methods and motives in testing body armor (*see, e.g.*, HW 26588, HW 28115, HW 25955 to 57, HW 21123, HW 12519, and HW 400600 to 603). Similarly, the Tekne Group asked to meet with Honeywell in connection with Honeywell's packaging of the ballistics samples that Honeywell had sold to the Tekne Group and Honeywell did not take this opportunity to present its Heat/Humidity Testing to the Tekne Group (*see, e.g.*, TEK 026-8694 to 96). Furthermore, Honeywell executives issued several directives emphasizing the need to keep all Z Shield data confidential and not to distribute this data outside Honeywell (*see, e.g.*, HW 12519, AHJX 9078 to 88, HW 4728 to 29, HW 343990 to 011, HW 405074 to 5079, HW 22848, HW 21887). *See also* the Response to Interrogatory No. 18 below, which is incorporated herein by reference.

Additionally, Honeywell witnesses have admitted that, even assuming *arguendo* there had been a meeting to discuss Z Shield research between Honeywell and Government officials or the Tekne Group, Honeywell would not have disclosed to the United States material information about Z Shield such as (1) the September 2003 Hurst draft report (Draft Report) and the associated exposure and visual assessment data, (2) test data relating to a patent application filed by Honeywell in late December 2004 seeking a patent for an anhydrous (non-water) resin wash that

improved Z Shield's ballistics performance over the water-based resin wash used for Z Shield, and (3) problems associated with FMS's Z Shield, circa 2002 through 2004, that caused Armor Holdings to lower the specifications for Z Shield and that FMS attributed to the degradation of Zylon fiber in travel and warehouse conditions (*see* Wagner, Murray, Chalifoux, Rowsey, and Herceg testimony). Honeywell's internal researchers also understood the confidentiality of the Heat/Humidity Testing data of Z Shield and Honeywell's business people emphasized this to them several times, making it very unlikely that Honeywell would have shared any such data with the United States (*see, e.g.*, HW 4728 to 29, HW 21887, HW 12519).

As a result of the foregoing, the United States contends that Honeywell caused all of the false claims presented to the Government by Armor Holdings, who was the exclusive manufacturer of body armor containing Z Shield. In particular, Honeywell was the exclusive supplier of Z Shield, which was a patented Honeywell product, and thus Armor Holdings could not have obtained Z Shield through any source other than Honeywell. But Honeywell's role in causing Armor Holdings to submit false claims to the Government went well beyond being the exclusive supplier of Z Shield.

Specifically, Honeywell downplayed the significance of the DSM test results to Armor Holdings that had led DSM (a European toller of Z Shield) to abandon tolling Zylon and Z Shield circa July 2001. On or about July 5, 2001, Greg Herceg, the Honeywell executive who at that time managed Honeywell's business relationship with Armor Holdings, told Steve Croskrey that "[i]n light of DSM's findings, Honeywell finds it prudent to cease shipping PBO shield to Armor Holdings until we have an opportunity to review DSM's results" (HW 344141). This response made Croskrey "irate," and he asked Herceg if Honeywell was suggesting a recall and/or halting

13

sales of Z Shield body armor. Croskrey then called Herceg on the phone and asked if Armor

Holdings needed to take these steps, and Herceg replied "no, no, no, that's not what I really mean."

The next day, on July 6, 2001, Herceg wrote to Croskrey "we do not believe the testing mimics

conditions to which the PBO shield would be subjected" and "at this time, Honeywell is not taking

any further action beyond the temporary suspension of sales of PBO shield and follow-up testing

and analysis of our product." (HW 344142)   These assurances from Honeywell gave Croskrey

comfort that Armor Holdings need not initiate a recall or halt sales of Z Shield body armor.

Without these oral and written assurances from Honeywell, Croskrey testified that he may have

initiated a Z Shield vest recall at the time. Croskrey also testified that he would have seriously

considered halting sales of Z Shield body armor and, at a minimum, would have gathered the

Armor Holdings' lawyers and business people to discuss taking this step.

Similarly, in later correspondence with Croskrey, dated August 9, 2001, Herceg represented

that "we found no statistically significant shift in V50 values for the 2-week Zylon shield test at

70° C" (AHJX 3347).  At this time, however, Honeywell failed to disclose its test results, from

July 25, 2001, showing an over 13% drop in ballistics retention in short-term testing at 90° C (HW

4268 to 72).  Honeywell did not disclose this data to Armor Holdings until several months later

after the crisis with DSM had passed when Honeywell presented this data, among a host of other

voluminous aging data, to Armor Holdings (AHJX 9078 to 88).

In addition, Honeywell misrepresented the risks associated with Z Shield body armor to

Armor Holdings, failed to disclose material information relating to Z Shield body armor to Armor

Holdings, and misstated the test data and other information about Z Shield that Honeywell did

disclose to Armor Holdings.  Specifically, in communications and other interactions with Armor

14

Holdings, Honeywell (1) misleadingly presented Z Shield as the best ballistics resistant material on

the market that "hand's down beat anything else" (which led Armor Holdings to position Z Shield

body armor as "the best out there," *see, e.g.*, AHHS 425) and charged a premium price for Z Shield

(*see* Herceg testimony) despite Honeywell knowing of the defects discussed above, (2) falsely

stated that Z Shield would maintain its ballistics integrity at exposure to conditions of 40° C and

70% relative humidity (Croskrey and Scott O'Brien testified that at 40° and 50° C, along with high

levels of humidity ranging from 50 to 70%, Honeywell told Armor Holdings that degradation was

not a problem for Z Shield, *see also* AHJX 3720), which Honeywell acknowledged approached the

limits of real world conditions, when Honeywell knew that this was not the case based on its

Heat/Humidity Testing data (*see, e.g.*, 342519 to 20, HW 26084 to 89, HW 26730 to 37), (3)

minimized the significance of the Honeywell Heat/Humidity Testing data at 70° C and 90° C and

elevated humidity, as well as similar data from DSM and Toyobo, by dismissing this data as not

relating to "real world" conditions while ignoring information about similar conditions in the

trunks of cars, which Honeywell knew were places where body armor was stored (*see* Herceg

testimony and HW 23510 to 27), (4) falsely stated in marketing literature misleadingly labeled by

Honeywell as "technical bulletins," *(see, e.g.*, JMC 108 to 112, 129 to 146, 184 to 185, 196 to 197,

highlighting that the technical bulletins represented a key part of Honeywell's communications

plan to defend Zylon and bolster the public's confidence in Z Shield's safety as a ballistic-resistant

material) that the Honeywell warehouse test data showed no declines over a three year-period when

the actual warehouse data showed declines of up to 5% during this period (and up to 10% in a little

over a five year period) and in the Fall of 2003 communicated these false warehouse results to the

general public via technical bulletins emphasizing the safety of body armor containing Z Shield

(HW 24443 to 51, HW 401127, HW 401178 to 224), (5) removed from the Fall 2003 technical

bulletins Heat/Humidity Testing data showing substantial declines in Z Shield ballistics retention

prior to showing the bulletins to Armor Holdings (HW 118141 to 147, HW 118148 to 153, HW

23157 to 58, HW 344269 to 270, HW 22831 to 833, HW 24443 to 51), (6) failed to communicate

to Armor Holdings the internal concerns at Honeywell about the poor ballistics performance of

FMS's Z Shield, the Honeywell FTIR spectroscopy analysis showing that the adhesion of the

Z Shield from FMS was not as good as that from DSM (HW 3415 to 3426), or the concerns of

FMS about the amount of degradation of the Toyobo fiber after travel from Japan to Israel and

warehouse storage and about the impact of hydrolysis on the ballistics performance of Z Shield, (7)

minimized the significance of red thread on ballistics performance and failed to tell Armor

Holdings that Honeywell's chief quality control inspector, Pete Chalifoux, considered red thread a

defect in Z Shield  (*see, e.g.*, HW. 1593 to 96, HW 6997 to 7003), (8) withheld from Armor

Holdings the internal Honeywell discussions about the possibility of Honeywell abandoning Z

Shield in late 2002 due to the Heat/Humidity Testing data (*see* Swinger testimony), (9) withheld

from Armor Holdings the water-based resin problem that contributed to Z Shield degrading even

faster than ordinary Zylon despite Honeywell identifying this as a "technical risk" in July 2000

(HW343865 to 73) and also withheld the filing of a Honeywell patent application, in December

2004, attempting to patent a superior anhydrous resin process for Z shield with better ballistics

performance in conditions of heat and humidity (HW 402204 to 240), (10) did not discuss or

provide Armor Holdings with the back up data for this patent (*see, e.g.*, HW 406518 to 26, HW

406791 to 794, HW 406939 to 941, HW 406933 to 935, HW 403365 to 368, HW 406807-828,

HW 406518) or the data showing Z Shield with the anhydrous solvent performing well in

16

Heat/Humidity Testing (HW 2350 to 2355), (11) did not provide Armor Holdings with any Heat/Humidity Testing data after January 2003 (based on the records disclosed by Honeywell and Armor Holdings to date), and (12) at no point in time told Croskrey or Scott O'Brien about Honeywell's internal concerns regarding the safety of Z Shield stemming from the Honeywell Heat/Humidity Testing data, or the problems with FMS, red thread, and the water-based resin wash (*see* Croskrey and O'Brien testimony).

In so doing, Honeywell knew that Armor Holdings relied on it for technical expertise regarding Z Shield. Armor Holdings' own ballistics researchers lacked advanced technical backgrounds and used trial and error methods of ballistics testing. Prior to becoming ballistics researchers at Armor Holdings, Bob Weber and Tom Dragone had been police officers while Dale Taylor had worked "odd jobs." None of them had a scientific background. As a result, Steve Croskrey, who had formerly worked at Honeywell's predecessor, Allied Signal, testified that he felt Weber, Taylor, and Dragone did not have the credentials, education, or technical backgrounds of the Honeywell scientists and that consequently Armor Holdings relied heavily on Honeywell for technical assistance, including relying on Honeywell for suggestions about body armor design. Honeywell knew this and emphasized its sophisticated ballistics research capabilities and teams of Ph.D scientists to Armor Holdings and the public in marketing communications and literature (*see, e.g.*, HW23157 to 158, HW 24443 to 51).

In response, Honeywell claims that its research scientists acted in good faith and that Honeywell's representations made to Armor Holdings about Heat/Humidity Testing data and the suitability of Z Shield as a ballistics-resistant material represent areas of legitimate scientific dispute rather than misrepresentations. Yet, Honeywell business people, who lacked any scientific

17

background, drove the risk disclosures to Armor Holdings and the marketing of Z Shield to the public, not the good faith judgment of Honeywell's scientists.

For example, just a month after discussing whether to abandon Z Shield due to the Heat/Humidity Testing data (*see* Swinger testimony), Honeywell attended a business meeting with Armor Holdings in January 2003 in which it emphasized defending Zylon and Z Shield against attacks from the public via technical bulletins (among other things), ensuring that all of the Heat/Humidity Testing data was stamped confidential, and including lawyers in all of the decisions about Z Shield communications with the outside world (HW 4728-29, HW 343990 to 4011, HW 405074-79). At the January 2003 meeting between Honeywell and Armor Holdings, contemporaneous notes from Thomas Woodham, a Honeywell marketing executive who attended the meeting, reflected that Honeywell barely discussed the Heat/Humidity Testing data with Armor Holdings except to note that the ". . . highest level of degradation - model with no Z Shield" (HW00405074 to 079). The notes also reflected that the "#1 Quality Issue = Curling," a cosmetic problem with Z Shield that unlike exposure to excessive heat and humidity played little role in the ballistics retention of Z Shield with age (HW00405074).

Also, it appears from the documents produced to date by Honeywell that the initial version of the draft report written by Honeywell's ballistics lab manager, David Hurst (Hurst Draft Report), contained no designation of confidentiality or for internal Honeywell review only (Confidentiality Designation) because the copy reviewed by Dr. Wagner, that she received on or about September 5, 2003, has no such Designation (HW 846-55). It also appears from the written comments of Dr. Wagner that she did not add the Confidentiality Designation, as there are no comments from her under the title, Exposure Sample Testing Report, and Mr. Hurst has testified that he did not discuss

18

the Draft Report with Dr. Wagner or review her written comments to it.  The other person who received a copy of the initial Draft Report was Lin Murray, formerly the Honeywell ballistics lab manager but at that time a business person working in the marketing department under Mr. Swinger (HW 61232).  By the time Mr. Murray  forwarded the Draft Report on to Mr. Swinger, on or about September 9, 2003, the following Confidentiality Designation had been added: "**DRAFT - INTENDED ONLY FOR HONEYWELL CONFIDENTIAL REVIEW PURPOSES**" (emphasis in original) (HW 61232 to 42).  Honeywell followed the Confidentiality Designation and never shared the Hurst Draft Report, or any of the accompanying exposure data or visual observations, with Armor Holdings or any Government officials.

Based on the foregoing, it appears that the business people at Honeywell, as opposed to the scientists, added the Confidentiality Designation to ensure that the Hurst Draft Report remained secret within Honeywell.  While Honeywell contends that the Hurst Draft Report represented nothing more than the musings of an inexperienced person new to his position as the Honeywell ballistics lab manager, the United States notes that Mr. Hurst had been the ballistics lab manager at Honeywell for over nine months prior to the Report, relied on extensive exposure test data that appears to have been done correctly by Hurst and Mike O'Meara (HW 26730 to 37), both of whom were competent at the time to perform such testing, and appears to have utilized advanced concepts like SEAT (specific energy absorption of target) analysis in the Draft Report.  In addition, in Honeywell's later attempt to gather all of its aging data circa March 2006, Honeywell characterized the Hurst report as the "D. Hurst study" and relied on the information in the Draft Report relating to Gold Flex and Spectra (HW0008579 to 602).

19

Similarly, Honeywell business people with no scientific backgrounds outlined the key points to make in the technical bulletins--such as emphasizing Z Shield's safety and suitability as a ballistics-resistant material and Honeywell's technical sophistication--that Honeywell publicly issued in the Fall of 2003 with the knowledge that the Armor Holdings sales force would use these bulletins to promote the sale of Z Shield body armor (HW 23157-58, HW 24443 to 51, AZE 4573 to 81).  These business people also edited out risk disclosure language and Heat/Humidity Testing data showing declines in Z Shield ballistics performance that Honeywell's lead scientific researcher on Z Shield, Dr. Lori Wagner, had originally included in the Fall 2003 technical bulletins (HW 118141 to 147, HW 118148 to 153, HW 23157 to 58, HW 344269 to 270), HW 22831 to 833, HW 24443 to 51).  Dr. Wagner expressed her frustration with the business people stating that "I still do not know what you want out of this, and hence it is very frustrating.  You say you just want the data and you and John will fill in the rest" (HW0118140 to 47).  *See also* the Response to Interrogatory No. 2 below.  Furthermore, as late as mid-2005, Honeywell business people and lawyers edited out risk disclosure language about the negative impact of hydrolysis on Z Shield that Dr. Wagner had originally drafted for the then president of Armor Holdings, Scott O'Brien (HW 36764 to 66, HW 400959 to 61, AZE 534565 to 66, AZE 750223 to 25).

Pursuant to Fed.R.Civ.P. 33(d), the United States also cites the documents used in the depositions in this case as containing additional information responsive to this interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 2**:

Identify each and every false record or statement in connection with the sale of body armor containing Z Shield that the United States contends Honeywell made, used, or caused to be made or used, to get a false claim paid or approved by the United States, and identify for each and every false record or statement the following: the date on which the false record or statement was made, the persons, or entities responsible for making the false record or statement or causing the false record or statement to be made; the particular body armor that was the subject of the false record or statement, and the Government's asserted basis for the falsity of the record or statement.

**RESPONSE**:

The United States objects to this Interrogatory No. 2 as overly broad and unduly burdensome. The United States also objects to this contention Interrogatory as premature as discovery remains ongoing. The United States further objects to this Interrogatory to the extent that the requested information is in the possession, custody, or control of Honeywell.

Subject to these objections and the General Objections, and without waiving any of these objections, the United States incorporates by reference its Response to Interrogatory No. 1 above, which details numerous false records and statements of Honeywell relating to Z Shield. In addition, false records and statements are also identified in the Complaint at ¶¶ 1-5, 11, 34-83 and in the documents that have already been produced to Honeywell in discovery and shown to witnesses at depositions in this case.

In particular, as detailed in the Complaint, the United States' Opposition to Honeywell's Motion to Dismiss, the testimony of witnesses in this case, and the Response to Interrogatory No. 1 above, Honeywell made numerous false records, statements, and material omissions in connection

21

with the sale of Z Shield for use as the key ballistics component in several models of Armor

Holdings' body armor, including but not limited to: (1) withholding from the Government

researchers involved with body armor any of its Heat/Humidity Testing data or other Z Shield

testing data despite several requests to do so (*see, e.g.*, HW 4268 to 72, HW 2350 to 55, HW

29925 to 27, AHJX 3720, HW 4212 to 15, HW 4833 to 34, HW 4871 to 75, HW 2308 to 2309,

AHJX 9078 to 88, AHON 37550 to 55, HW 3415 to 3426, HW 406792 to 794, HW 406791, HW

406939 to 941, HW 406518, HW 406933 to 35, HW 1630 to 1632, HW 29854 to 56, HW 344248

to 51, HW 343990 to 344011, HW 26074 to 075, HW 26730-37, HW 6464, HW 61232 to 42, HW

846 to 55, HW 26084 to 89, HW 118141 to 47, HW 118162 to 63, HW 118148 to 53, HW 118140

to 47, HW 403365 to 68, HW 2967, HW 119315, HW 91429 to 30, HW 25791, HW 116302 to

304, HW 88030 to 33, HW 88114 to 15, HW 26446 to 51, HW 1064 to 1072, HW 402204 to 240,

HW 36764 to 66, HW 400959 to 61, AZE 534565 to 66, AZE 750223 to 225, HW 401127 to 224,

and HW 8579 to 8602); (2) withholding from the Tekne Group, circa 2004, samples of Z Shield

material due to ballistics performance problems at that time with Z Shield that did not exist when

Honeywell had previously provided Z Shield samples to the Tekne Group; (3) withholding from

Armor Holdings and the Government researchers, including but not limited to the Tekne Group,

material information about the defects, problems, and risks of Z Shield, such as information about

Z Shield hydrolysis, its adverse reaction to light, sweat, rain, heat and humidity, the critical Hurst

Draft Report in which Honeywell admitted that even a small amount of degradation would render

Z Shield vests unfit for their ballistics purposes, and the patent application filed by Honeywell on

or about December 29, 2004, in which Honeywell recognized degradation problems with its

existing Z Shield resin system (*see, e.g.,* HW 343865 to 73, HW 4268 to 72, HW 2350 to 55, HW

29925 to 27, HW 4212 to 15, HW 4871 to 75, HW 2308-09, HW 3415 to 3426, HW 406792 to 94,

HW 406791, HW 406939 to 41, HW 406518, HW 406933 to 35, HW 1630 to 32, HW 29854 to

56, HW 26074 to 75, HW 26730 to 37, HW 6464, HW 61232 to 42, HW 846 to 55, HW 26084 to

89, HW 120265, HW 118141 to 47, HW 118162 to 63, HW 118148 to 53, HW 118140 to 47, HW

23157 to 58, HW 344269 to 70, HW 344269, HW 2967, HW 4974, HW 119315, HW 91429 to

430, HW 25791, HW 116302 to 304, HW 88030 to 33, HW 88114 to 15, HW 26446 to 51, HW

402204 to 240, HW 36764 to 66, HW 400959 to 61, HW 401127 to 224, and HW 8579 to 8602);

(4) misleading Armor Holdings about the problems and risks of Z Shield, such as a) the

Heat/Humidity Testing test data showing sharp drops in Z Shield's ballistics performance after

short periods of exposure to heat and humidity, including the 40° C and 70% RH heat and

humidity test data which Honeywell falsely characterized to Armor Holdings as showing no

significant declines in ballistics performance when Honeywell knew that was not the case (*see id.*),

b) the 70° and 90° C and high humidity data that Honeywell dismissed as not correlating to "real

world" conditions when Honeywell knew that Z Shield vests were routinely exposed to conditions

of high heat and humidity in the trunks of cars and that it was not always possible for officers and

agents wearing body armor to keep them in dry and cool places (*see id.*, HW 23510 to 27, and the

Croskrey and Herceg testimony), c) the Z Shield ballistics data at Honeywell (V0 and V50) that

Honeywell described internally as statistically significant, problematic, and not encouraging (*see,*

*e.g.*, HW 4833 to 34, HW 2308-09, HW 118140 to 147, HW 118148 to 153, HW 118162 to 163,

HW 61807 to 808) without making similar disclosures to Armor Holdings or the United States, d)

the degradation test data from Toyobo showing Zylon fiber degrading under a variety of heat and

humidity conditions (*see, e.g.*, HW344145 to 50, AHKL 3303 to 06, HW 2272 to 75, HW 1711 to

14), e) the data from Toyobo about Zylon containing red thread being even weaker than ordinary woven Zylon (HW 6997 to 7003), f) Honeywell's understanding that red thread represented a defect in Z Shield, and g) the data showing degradation problems with Z Shield's resin due to its exposure to a water-based wash in the manufacturing processing, which Honeywell had identified as a "technical risk" in its early Z Shield planning documents but never disclosed this to Armor Holdings despite seeking a patent on a process to make a non-water based, anhydrous resin system (HW 406791, HW 406939 to 41, HW 406518, HW 406931 to 35, HW 344248 to 51, HW 343990 to 4011, HW 403365 to 68, and HW402204 to 240); (5) editing out of both the Fall 2003 Z Shield technical bulletins and the July 2005 e-mail response from Anne Cook to Scott O'Brien the risk disclosure language and data that Dr. Wagner had originally included in these materials (*see, e.g.*, HW 118141 to 47, HW 118148 to 53, HW 118140 to 47, HW 23157 to 58, HW 344269 to 70, HW 22831 to 33, AZE 4573 to 4581, HW 24443 to 51, HW 36764 to 66, HW 400959 to 61, AZE 534565 to 66, and AZE 750223 to 25); (6) diminishing the significance of the DSM data (*see, e.g.*, HW 3444141 to 42) as described more fully in the Response to Interrogatory No. 1 above, which is incorporated herein by reference; (7) withholding from Armor Holdings the warnings from FMS about dramatic reductions in the strength of Zylon fiber received from Toyobo (which Honeywell's then chief quality control inspector, Pete Chalifoux, characterized as a "step change") that led FMS to suggest that Honeywell stop manufacturing Z Shield (*see, e.g.*, HW 26074 to 75, HW 6464, HW 118162 to 63, HW 2967, HW 119315, HW 91429 to 30, HW 20544 to 46, HW 88030 to 33, HW 88114 to 15); and (8) misrepresenting the risks of Z Shield to Armor Holdings, the United States, and the general public (as well as causing Armor Holdings to do so) by a) issuing false and misleading public statements, technical bulletins, and research papers about Z Shield that

24

selectively disclosed favorable data while ignoring unfavorable data, b) drafting sales literature for
Armor Holdings misrepresenting the risks and benefits of Z Shield and falsely telling the
marketplace that Honeywell anticipated that Z Shield vests would provide adequate ballistics
protection for at least five years, and c) removing risk disclosure language and data showing
declines in Z Shield ballistics performance under heat and humidity conditions from
communications to the public and Armor Holdings (*see, e.g.*, HW 118140 to 147, HW 118148 to
153, HW 23157 to 158, HW 22831 to 833, AZE 534565 to 566, AZE 750223 to 225). *See also* the
additional false statements and records identified in the Response to Interrogatory No. 1 above.

  Honeywell's attempts to avoid disclosing Z Shield's degradation problems can be seen in
the planning stages for its January 22, 2003 meeting with Armor Holdings.  Prior to this meeting,
Tim Swinger, a Honeywell business executive who frequently worked on Z Shield marketing
projects, testified that Honeywell researchers, including Dr. Wagner, presented Heat/Humidity
Testing data to David Knowles, a high-level Honeywell executive, so that Honeywell could
determine whether or not to continue selling Z Shield to Armor Holdings. Yet, Honeywell never
disclosed this to Armor Holdings.  Similarly on or about January 10, 2003, Honeywell had a
planning session to discuss what it would present to Armor Holdings at the January 22 meeting.
At this planning session, notes taken by Lin Murray indicate that Honeywell emphasized "stamping
all data 'Honeywell confidential' (every page)," showing data to Armor Holdings without drawing
conclusions from it, keeping the tone calm and avoiding panic, working on a strategy to defend the
body armor industry from attacks, and making sure the Honeywell lawyers were involved in any
disclosures about Z Shield to the outside world (HW 4728-29). Further, at the January 22, 2003
meeting, Honeywell downplayed the significance of the Heat/Humidity Testing data for Z Shield

and instead discussed the cosmetic issue of "curling" as the "#1 Issue" with Z Shield (HW00405074 to 079). In addition, Honeywell has not produced any records that it disclosed any Heat/Humidity Testing data to Armor Holdings after the January 22, 2003 meeting with Armor Holdings.

Moreover, in the Fall of 2003, Honeywell prepared technical bulletins for Armor Holdings, which Honeywell understood the Armor Holdings' sales force would use as sales materials with customers, highlighting that its warehouse data had shown no declines in Z Shield's ballistics retention for the three years of warehouse testing by Honeywell (HW 24443 to 51). Honeywell has not produced any records that it disclosed the actual warehouse data to Armor Holdings, and this warehouse data showed declines of over 5% in Z Shield's ballistics retention over this three-year period and a bigger decline in the later five-year warehouse data (HW 401127, HW 401204 to 219). The Z Shield technical bulletins also misleadingly claimed that " . . . there is no significant anticipated change in ballistics performance response of the Z Shield material for the five year suggested life span of most ballistics resistant vests" despite Honeywell having Heat/Humidity Testing data calling this conclusion into question (including both the warehouse data referenced above and the 40° C and 70% relative humidity data of Hurst and O'Meara from August 2003 that had been cited in the Hurst Draft Report (*see* HW 26730 to 37, HW 61232 to 42). Also, in earlier drafts of the same technical bulletin, Dr. Wagner had stated that "unexpected results were achieved in with [sic] higher than anticipated degradation in ballistics performance for this vest" (HW 118148 to 53). Tim Swinger, the Honeywell executive who reviewed Dr. Wagner's initial drafts and outlined and edited the technical bulletins, admitted in deposition testimony that Honeywell took out the aging data showing declines in Z Shield's ballistics retention because it was contrary

26

to the public message that Honeywell wanted to convey regarding the safety of Z Shield and because Honeywell did not want to publish data showing declines in Z Shield's ballistics performance (*see also* HW 23157 to 58).

Finally, Honeywell took steps to minimize its legal liability, such as the Z Shield Material: Handling, Care and Use Recommendations (HW 1614 to 16) that Honeywell required Armor Holdings to sign as a condition of Honeywell supplying Z Shield (AHHS 12873 to 74, HW 405074 to 79, AZE 705505 to 06) and a seven figure settlement that Honeywell reached with Armor Holdings relating to claims arising out of Honeywell's sale of Z Shield to Armor Holdings (AHJX 2904 to 06, HW 123069 to 73, HW 400667 to 69). Honeywell never disclosed this material information to the United States despite several opportunities to do so at meetings and through other means such as telephone calls.

*See also* the response to Interrogatory No. 1 above, which is incorporated herein by reference. Pursuant to Fed.R.Civ.P. 33(d), the United States cites the documents it has used in the depositions in this case as containing additional information responsive to this interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 3:**

Identify each and every contract concerning the purchase of body armor containing Z Shield that the United States or a state, local or tribal law enforcement entity entered into with Honeywell or Armor Holdings, including the date of the contract, the contracting parties, the product or products to which the contract applies, and whether the contract was entered into under the GSA

27

Program" described in ¶¶ 12-14 of the Complaint, was entered into as part of the "Other Federal Purchases" described in ¶ 15 of the Complaint, was entered into through some other federal program for purchasing or reimbursing the purchase of body armor and the name of that program, or whether funding or reimbursement was obtained for the contract through the Bullet Proof Vest Grant Partnership Act (BPVGPA) described in ¶¶ 16—18 of the Complaint.

**RESPONSE:**

The United States objects to this Interrogatory No. 3 as overly broad and unduly burdensome.

Subject to these objections and the General Objections, and without waiving any of these objections, these contracts, contract programs, and the applicable products referenced in the contracts have been identified in the documents that have already been produced to Honeywell in discovery, and, in the additional sales and claims data that the United States has produced to Honeywell. In particular, the United States understands that there were three contracts, and amendments and modifications thereto, between Armor Holdings' subsidiaries and GSA. These contracts, and the amendments and modifications thereto, have been  have been produced at AHJX 14738 to 15045 (Safariland), AHJX 14384 to 14737 (American Body Armor (ABA)), and AHJX 13482 to 13579 (ProTech). Also, the United States understands that there was a contract between the United States Postal Service and ABA, and amendments and modifications thereto, and this contract has been produced at AHJX 36010 to 36141; between the United States Immigration and Naturalization Service (INS) and ABA, and amendments and modifications thereto, and this contract has been produced at AHJX 69454 to 69468, AHJX 46709 to 46712, AHJX 46715 to 46718, AHJX 46721 to 46723, AHJX 69089 to 69103; between the INS and Safariland, and

amendments and modifications thereto, and this contract has been produced at AHJX 47319 to

47330, AHJX 47387 to 47389, AHJX 42110 to 42112, AHJX 47384 to 47386, AHJX 47390 to

47392, and AHJX47387 to 47389; and between ABA and the United States Secret Service (USSS),

and amendments and modifications thereto, and these contracts have been produced at AHJX

41658 to 41673 and AHJX 82565 to 82597.  Furthermore, there was a contract between Armor

Holdings Products LLC and the United States Navy Engineering Logistics Office (NELO).  This

contract has been produced at AHI170-0001 to 0036.  Moreover, the contracts with any other

federal agencies and with state, local, and tribal law enforcement authorities speak for themselves

and have been produced by the United States. *See also* the invoices from Armor Holdings that

contain additional information identifying the Government contracts relating to Z Shield body

armor (AIN001-0001 to 9999, AIN002-0001 to 9998, and AIN003-0001 to 8011) and the

electronic claims information from the BVP.  In addition, it is the understanding of the United

States that some smaller localities receiving BVP funds did not enter into detailed contracts but

instead submitted purchase orders for their body armor directly to Armor Holdings or one of its

subsidiaries.  These purchase orders have been produced by the United States.

Pursuant to Rule 33(d), the United States has produced and will produce additional

documents in lieu of further responding to this Interrogatory, including the contracts and purchase

orders identified in this Response.  The United States reserves the right to supplement this

Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 4**:

Identify each and every warranty that the United States contends Honeywell or Armor Holdings provided to the United States or a state, local, or tribal law enforcement entity for body armor containing Z Shield, and for each and every warranty, identify the person and entity that provided the warranty, the date of the warranty, the document or communication in which the warranty appears, the specific language of the warranty, and the body armor product or products to which the warranty applies.

**RESPONSE**:

The United States objects to this Interrogatory No. 4 as overly broad and unduly burdensome.  The United States also objects to this Interrogatory to the extent that the requested information is in the possession, custody, or control of third parties, like Armor Holdings.  The United States further objects that this is a premature contention Interrogatory as discovery remains ongoing.

Subject to these objections and the General Objections, and without waiving any of these objections, the warranties, the persons or entities providing the warranties, the warranty language, the products covered by the warranties, and the warranty dates where known have been identified in the documents that have already been produced to Honeywell in discovery, and, in the additional sales and claims data that the United States has produced to Honeywell.  All of the contracts for Armor Holdings' body armor contained five year warranties, save for a contract with the United States Secret Service (USSS) that contained a ten year warranty and any Government contracts relating to certain Z Shield body armor entered into after the Summer of 2004 when Armor

Holdings changed the warranty terms on a few Z Shield models from five years to 30 months. (*see, e.g.*, AHJX 5706 to 5715).

In particular, the GSA contract with Armor Holdings' subsidiary ABA, and the amendments and modifications thereto, contained the manufacturer's standard commercial warranty of five years (AHJX 14749; AHJX 14815; AHJX 14929). In addition, pursuant to the Federal Acquisition Regulations (FAR), the ABA contract also included an implied warranty of merchantability and fitness for a particular purpose because nothing in the GSA-ABA contract expressly excluded this warranty. *See* FAR Subpart 12.404(a). The GSA contract with Armor Holdings' subsidiary Safariland, and the amendments and modifications thereto, contained the manufacturer's standard commercial warranty of five years (AHJX 14392; AHJX 14430; AHJX 14531) and also a warranty of merchantability and fitness for the particular purposes specified in the contract (AHJX 14408; AHJX 14508). The GSA contract with Armor Holdings' subsidiary Pro-Tech, and the amendments and modifications thereto, contained the standard commercial warranty of five years (AHJX 13487, AHJX 13526) and also a warranty of merchantability and fitness for the particular purposes specified in the contract (AHJX 13504). In addition, the contract between ABA and the United States Postal Service (USPS), and the amendments and modifications thereto, contained a warranty of five years (AHJX 36015, AHJX 36102). The USPS-ABA contract also contained an implied warranty of merchantability and fitness for a particular purpose because nothing in the contract expressly excluded this warranty. *See* FAR Subpart 12.404(a).

The contracts between the Immigration and Naturalization Service (INS) and both ABA and Safariland contained the following warranty provision: "Ballistics Panel: For five years after

date of acceptance, the manufacturer warrants the ballistics panel against defects in materials and workmanship. The Government reserves the right to perform periodic quality assurance tests to ensure product integrity, in conformance with applicable NIJ standards." (AHJX 69467, AHJX 69102, AHJX 47328, AHJX 46284).   The INS contract with Safariland also provided that "[t]he contractor agrees that the supplies or services furnished under this BPA shall be covered by the most favorable commercial warranties, which it provides to any customer for such supplies or services." (AHJX 47322).   In the USSS contract with ABA, the warranty provision stated that: "All ballistics panels shall carry a ten (10) year warranty from the day of delivery against all defects in materials and workmanship, and a minimum acceptable five (5) year guarantee from the day of delivery that the ballistics panels will maintain the appropriate NIJ level of protection after regular use. Vests shall be labeled accordingly. This warranty shall include repair or replacement of the ballistics panels at no cost to the Government. All vests may be subject to a visual inspection by the USSS prior to, or at the time of, issue to the wearer." In a later contract between the USSS and ABA, the warranty provision stated that: "All soft body armor systems shall carry a five (5) year warranty from the day of delivery against all defects in materials and workmanship, and a minimum acceptable five (5) year guarantee from the day of delivery that the Zylon ballistics panels will maintain the appropriate NIJ level of protection after regular use. Vests shall be labeled accordingly. This warranty shall include repair or replacement of the zylon ballistics panels at no cost to the Government. All vests may be subject to a visual inspection by the USSS prior to or at the time of, issue to the wearer." (AHJX 41671).   The contract between Armor Holdings Products LLC and NELO does not contain a specific warranty (AHI170-0001 to 0036). The United States contends that NELO would have received a five year warranty as a purchaser of

Armor Holdings' body armor, subject to the exception detailed above after Armor Holdings

changed the warranty on certain Z Shield vest models from five years to 30 months. In addition,

pursuant to the FAR, all of these contracts included an implied warranty of merchantability and

fitness for a particular purpose because nothing in any of these contracts expressly excluded these

implied warranties. *See* FAR Subpart 12.404(a).

Moreover, the warranty provisions set forth in the contracts between Armor Holdings and

its subsidiaries and any other federal or state, local, and tribal law enforcement authorities speak

for themselves and have been produced by the United States. It is the understanding of the United

States that all of these contracts contained a five year warranty with the exception of any

Government contracts relating to certain Z Shield body armor entered into after the Summer of

2004 when Armor Holdings changed the warranty terms on a few Z Shield models from five years

to 30 months. In the event that express written contracts do not exist between Armor Holdings and

any federal, state, local, or tribal authorities, the United States contends that all of the body armor

purchased by these entities contained the Armor Holdings' five-year warranty with the exception of

any Government contracts relating to certain Z Shield body armor entered into after the Summer of

2004 when Armor Holdings changed the warranty terms on a few Z Shield models from five years

to 30 months. In addition, the United States contends that these body armor purchasers would have

been subject to the benefits of an implied warranty of merchantability and fitness for a particular

purpose under the FAR.

In addition to the warranties identified in the specific contracts between Armor Holdings

and its subsidiaries and the United States that are listed above, the warranties for Armor Holdings'

Z Shield body armor are identified, among other citations (in approximate chronological order), at

AHJX 32988, 32992; AZE 154976; AZE 154864 to 4942; AHJX 32977; AHJX 33101; AZE
79007 to 029; AZE00275344 to 00275354; AZE00275498 to 00275507; AZE00275366 to
00275376; AZE00200601 to 00200612; AZE00200613 to 00200623; AZE00275254 to 00275255;
AZE00213913 to 00213922; AZE00214328 to 00214338; AZE00208738 to 00208749;
AZE00200624 to 00200635; AZE00214294 to 00214305; AZE00205185 to 00205194; AHJX
33010; AHJX 5721; AHJX 33019; AHKL 0264; AHJX 5706, 5714; AZE00225069 to 00225080;
AZE00221300 to 00221314; and AZE00220837 to 00220860.

     Finally, it is the understanding of the United States that some smaller localities receiving
BVP funds did not enter into detailed contracts but instead submitted purchase orders for their
vests to Armor Holdings. The United States contends that all of the body armor purchased by
these entities contained the Armor Holdings' five-year warranty with the exception of any
Government contracts relating to certain Z Shield body armor entered into after the Summer of
2004 when Armor Holdings changed the warranty terms on a few Z Shield models from five years
to 30 months. In addition, the United States contends that these body armor purchasers would have
been subject to the benefits of an implied warranty of merchantability and fitness for a particular
purpose under the FAR.

     Pursuant to Rule 33(d), the United States has produced additional documents in lieu of
further responding to this Interrogatory. The United States reserves the right to supplement this
Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 5**:

For the documents attached as Exhibits D, E, and F to the United States' Opposition that the United States contends refer to warranties of service life provided by Armor Holdings, identify the officials, employees, agents, representatives or entities of the United States or of a state, local or tribal law enforcement entity that received such warranties, when the particular warranties were in effect, and the product or products to which the warranties applied.

**RESPONSE**:

The United States objects to this Interrogatory No. 5 as overly broad and unduly burdensome. The United States also objects to this Interrogatory to the extent that it seeks a legal conclusion and that the requested information is in the possession, custody, or control of third parties, like Armor Holdings.

Subject to these objections and the General Objections, and without waiving any of these objections, Armor Holdings warranted all of its Z Shield body armor sold to the United States or involving federal funds for at least a five year period, subject to the exception detailed in the Response to Interrogatory No. 4 above after Armor Holdings changed the warranty on certain Z Shield vest models from five years to 30 months. This is set forth in the documents that have already been produced to Honeywell in discovery, and, in the additional sales and claims data that the United States has produced to Honeywell. In addition, the Z Shield body armor purchased with federal funds contained implied warranties of merchantability and fitness for a particular purpose pursuant to the Federal Acquisition Regulations (FAR). *See* the Response to Interrogatory No. 4 above.

For the specific documents mentioned in this Interrogatory, Exhibit D is a copy of the ABA Xtreme Armor Owner's Manual (AHJX 32871 to 32980). Although undated, it is our understanding that this Xtreme Owner's Manual was used by Armor Holdings for all of its Xtreme vest models from 2001 until approximately 2004. Thus, this Owner's Manual would have been sent to all Government entities using federal funds to purchase this brand of body armor. The sales data that has been produced to Honeywell identifies the Government entities who purchased Xtreme body armor and, thus, who received this Owner's Manual. Exhibit E is a copy of the ABA limited warranty (AHJX 32988 to 32992). Although undated, it is our understanding that this limited warranty was inserted into shipping boxes for all ABA vest models from approximately 1995 through 2001. It is also our understanding that the last page (AHJX 32992) of Exhibit E was added to this literature in approximately 1999. The sales data that has been and will be produced to Honeywell identifies the Government entities who purchased ABA body armor and, thus, who received this warranty. Exhibit F identifies a letter from Scott O'Brien, the then president of Safariland and the current chief executive of Armor Holdings, to Jim Moody of the Los Angeles Police Department, dated October 20, 2003, regarding the life expectancy of the Xtreme XS ballistics package (AHON 29250). In the letter, Mr. O'Brien represented that Armor Holdings ". . . warranties all body armor ballistics for five years from the date of delivery. Our warranty ensures all AHI ballistics panels meet and will remain within tolerance as established by the NIJ-STD-0101-04 standard for the life of the warranty period." (Emphasis added.) Mr. O'Brien admitted at his deposition that he sent this letter and that it reflected what he and sales people at Armor Holdings were explaining to customers and potential customers about the warranties for Z Shield body armor.

Pursuant to Rule 33(d), the United States has produced additional documents in lieu of further responding to this Interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 6:**

Explain in detail the process by which warranty language in a bid specification, as referred to in ¶ 32 of the Complaint and in Exhibits A, B, and C to the United States' Opposition, becomes included in a contract for the sale of body armor, and the contracts (as opposed to initial bid specifications) containing or requiring the same or similar warranty language as that alleged in ¶ 32 of the Complaint.

**RESPONSE:**

The United States objects to this Interrogatory No. 6 as overly broad, unduly burdensome, and vague and ambiguous based on vague terminology like "process" and "becomes included." The United States also objects to this Interrogatory to the extent that it seeks a legal conclusion and that the requested information is in the possession, custody, or control of third parties, like Armor Holdings.

Subject to these objections and the General Objections, and without waiving any of these objections, the FAR describes in detail the process by which warranty language offered by a contractor becomes part of a Government contract for body armor. The FAR provisions speak for themselves and address warranties in Parts 2, 8, 12,  46, and 52, among others. As for the warranties included in the specifications for Z Shield body armor, most of these specifications state as follows: "Warranty.  Ballistics Panels: For five (5) years after the date of purchase the

37

manufacturer warrants the ballistics panels against defects in materials and workmanship. The alteration of ballistics panels in any way shall render the warranty void." *See, e.g.*, AZE 154864 to 942; AZE 79007 to 029; AZE00275344 to 00275354; AZE00275498 to 00275507; AZE00275366 to 00275376; AZE00200601 to 00200612; AZE00200613 to 00200623; AZE00275254 to 00275255; AZE00213913 to 00213922; AZE00214328 to 00214338; AZE00208738 to 00208749; AZE00200624 to 00200635; AZE00214294 to 00214305; AZE00205185 to 00205194; AZE00225069 to 00225080; AZE00221300 to 00221314; and AZE00220837 to 00220860.  The United States contends that this language identified warranties  applicable to the Armor Holdings' body armor identified in these specifications.  The United States also contends that Armor Holdings distributed these specifications to the Armor Holdings' sales force as sales and marketing tools to be used in the sale of its body armor products. *See id.*  The United States further contends that the Armor Holdings' sales force used these specifications to describe the body armor products to Government customers, including the applicable warranties, and at times provided these specifications to the customers. *See id.*  Based on the foregoing, the United States contends that the warranties in these specifications applied to all of the body armor products identified by these specifications in the absence of express contractual language containing a more specific warranty. *See also* the Response to Interrogatory No. 4 above, which is incorporated herein by reference, for examples of more specific contractual language.

Pursuant to Rule 33(d), the United States has produced and will produce the contracts for Z Shield body armor, which contain the express and implied warranties, in the contracts from GSA, direct agencies, and state, local, and tribal authorities in lieu of further responding to this

Interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 7**:

Identify the "claims for payment for Z Shield vests purchased under the BPVGPA [that] were submitted to the Office of Justice Programs (OJP) of the Department of Justice (DOJ)," Complaint ¶ 6, and the claims for payment concerning the purchase, finding, or reimbursement through the BPVGPA of 11,000 vests containing Honeywell's Z Shield," id. for which the United States claims a violation of the False Claims Act under either 31 U.S.C. § 3729(a)(l) or § 3729(a)(2), including the date of these claims for payment, the body armor product or products to which they applied, and the text of the false statement associated with each claim, including but not limited to the language appearing in any document or communication.

**RESPONSE**:

The United States objects to this Interrogatory No. 7 as overly broad and unduly burdensome.

Subject to these objections and the General Objections, and without waiving any of these objections, these claims, the body armor products to which they apply, and the dates of these claims have been identified in the documents, electronic records from the BVP, other electronic records, sales, claims, and the Armor Holdings' invoice data produced to Honeywell in discovery, including the additional Armor Holdings' invoice data that the United States produced to Honeywell a few weeks ago (see AIN001-0001 to 9999, AIN002-0001 to 9998, and AIN003-0001 to 8011). Furthermore, the United States hereby incorporates by reference its Responses to

39

Interrogatory Nos. 1 and 2 above, which identify additional BVP materials, the false claims at issue and the false records, statements, and material omissions giving rise to these false claims.

Pursuant to Rule 33(d), the United States has produced additional documents in lieu of further responding to this Interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 8**:

Identify the claims for payment concerning the 1700 vests containing the Honeywell Z Shield that the United States contends Armor Holdings sold to federal agencies in the District of Columbia between 2000 and 2005, Complaint ¶ 6, and for which the United States claims a violation of the False Claims Act under either 31 US C § 3729(a)( 1) or § 3729(a)(2), including the date of these claims for payment, the body armor product or products to which they applied, and the text of the false statement associated with each claim, including but not limited to the language appearing in any document or communication.

**RESPONSE**:

The United States objects to this Interrogatory No. 8 as overly broad and unduly burdensome.

Subject to these objections and the General Objections, and without waiving any of these objections, these claims, the body armor products to which they apply, and the dates of these claims have been identified in the documents, electronic records from the BVP, other electronic records, sales, claims, and the Armor Holdings' invoice data produced to Honeywell in discovery, including the additional Armor Holdings' invoice data that the United States produced to

40

Honeywell a few weeks ago (*see* AIN001-0001 to 9999, AIN002-0001 to 9998, and AIN003-0001 to 8011). Furthermore, the United States hereby incorporates by reference its Responses to Interrogatory Nos. 1 and 2 above, which identify additional BVP materials, the false claims at issue and the false records, statements, and material omissions giving rise to these false claims.

Pursuant to Rule 33(d), the United States has produced additional documents in lieu of further responding to this Interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

## INTERROGATORY NO. 9:

Identify any past or current officials representatives, or employees of the United States with personal knowledge of the research, evaluation, or decision to purchase Z Shield or body armor containing Z Shield, including their full name, job titles, and the agency or entity within the United States with which they are or were employed.

## RESPONSE:

The United States objects to this Interrogatory No. 9 as overly broad and unduly burdensome.

Subject to these objections and the General Objections, and without waiving any of these objections, the pertinent Government officials are Kirk Rice, Marc Caplan, Michael Riley, Joanie Chin, Amanda Forster, Gale Holmes, Lance Miller, and Linda Hammond Deckard, all of whom are identified in the United States' Initial Disclosures. In addition, as she testified, Debra Stoe managed the research effort. Further, Dennis Leber provided statistical support. Moreover, Philip Cuniff and Janet Ward of the Natick Soldier Systems Center worked on Zylon-related research

41

matters and also have responsive knowledge relating to Z Shield. These Government officials may be contacted through DOJ counsel. Furthermore, the GSA contracting officers were Kris Ann Andrews (ProTech contract) and Carol Batesole (ABA and Safariland contracts), both of whom have retired from government service. They can be contacted through DOJ counsel. The other contracting officers are identified in the documents that have already been produced in discovery by the United States.

The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 10**:

Identify any past or current officials, representatives, or employees of the United States who had they "known of the defective nature of the Z Shield Vests . . . would not have purchased them for use in the ballistics protection of law enforcement officers," Complaint ¶ 88, as alleged in ¶¶ 88, 92 and 96 of the Complaint, including their full names, job titles, and the agency or entity within the United States with which they are or were employed.

**RESPONSE**:

The United States objects to this Interrogatory No. 10 as overly broad and unduly burdensome.

Subject to these objections and the General Objections, and without waiving any of these objections, had they known of the defective nature of Z Shield body armor, neither NIJ, the National Institute of Standards and Technology (NIST), nor the National Law Enforcement and Corrections Technology Center (NLECTC), including Kirk Rice, Marc Caplan, Debra Stoe, and

Lance Miller, would have listed as compliant, or allowed this listing in the NIJ Voluntary

Compliance Testing Program of body armor containing Z Shield (or woven Zylon), and neither

GSA, including Carol Batesole and Kris Ann Andrews, BVP, including Linda Hammond-Deckard

(the Policy Adviser, Bureau of Justice Assistance, Office of Justice Programs at DOJ), nor any

other Government entities involved with Z Shield body armor would have purchased or reimbursed

any federal, state, local, or tribal authorities for Z Shield (or other Zylon) body armor's use in the

ballistics protection of law enforcement officers.

The United States reserves the right to supplement this Response, pursuant to the

Fed.R.Civ.P., as additional information becomes available in discovery.


**INTERROGATORY NO. 11**:

Identify each and every state, local, and tribal law enforcement entity that through the

BPVGPA purchased, or received funding or reimbursement for the purchase of, body armor

containing Z Shield.

**RESPONSE**:

The United States objects to this Interrogatory No. 11 as overly broad and unduly

burdensome.

Subject to these objections and the General Objections, and without waiving any of these

objections, the United States has produced the electronic records from the BVP identifying the

state, local, and tribal law enforcement authorities who purchased or received funding or

reimbursement for Z Shield body armor through the BVP. *See also* the Armor Holdings invoices

produced a few weeks ago (*see* AIN001-0001 to 9999, AIN002-0001 to 9998, and AIN003-0001 to 8011).

Pursuant to Rule 33(d), the United States has produced additional documents in lieu of further responding to this Interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 12:**

Identify every statute, regulation, contract provision, or other legal requirement that set durability or service life standards for body armor purchased, funded, or reimbursed by the United States, whether or not the body armor was composed in whole or in part of Z Shield.

**RESPONSE:**

The United States objects to Interrogatory No. 12 on the grounds that it is overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. The United States also objects to this Interrogatory because the undefined term "other legal requirement" is vague and ambiguous. Further, the United States objects to this Interrogatory to the extent that it seeks a legal conclusion.

Subject to these objections and the General Objections, and without waiving any of these objections, Armor Holdings provided at least five year warranties for all of its Z Shield body armor, subject to the exception after Armor Holdings changed the warranty on certain Z Shield vest models from five years to 30 months. *See, e.g.*, the warranty language at AHJX 32988, 992; AZE 154976; AZE 154864 to 942; AHJX 32977; AHJX 33101; AZE 79007 to 029; AZE00275344 to 00275354; AZE00275498 to 00275507; AZE00275366 to 00275376;

AZE00200601 to 00200612; AZE00200613 to 00200623; AZE00275254 to 00275255;

AZE00213913 to 00213922; AZE00214328 to 00214338; AZE00208738 to 00208749;

AZE00200624 to 00200635; AZE00214294 to 00214305; AZE00205185 to 00205194; AHJX

33010; AHJX 5721; AHJX 33019; AHKL-0264; AHJX 5706, 5714; AZE00225069 to 00225080;

AZE00221300 to 00221314; and AZE00220837 to 00220860.  Furthermore, the contracts between

Armor Holdings and the Government entities that purchased Z Shield body armor also

contained implied warranties of merchantability and fitness for a particular purpose. *See* the

Response to Interrogatory No. 4 above, which is incorporated herein by reference.

In addition, Dr. Wagner wrote to Armor Holdings in February 2003, that:

> Now the standard ACCEPTED policy is 5 year replacement for
>
> most vests . . . The fact that materials have prescribed usable lifetimes
>
> or that they might be susceptible to wear factors has been known for
>
> years in the industry (HW0199877).

Similarly, Honeywell represented that Z Shield vests would last for at least five years, stating, for

example, in a Fall 2003 technical bulletin published by Honeywell on behalf of Armor Holdings,

that:

> Based on the data and from experience with other ballistics
>
> materials, there is no significant anticipated change in the
>
> ballistics performance response of the Z Shield material for
>
> the five year suggested life span of most ballistics resistant
>
> vests assuming proper use and care (HW 24447).

This Honeywell technical bulletin also stated that:

> Typical life expectancy based on the body armor manufacturer's
> warranties . . . for a maintained ballistics garment is 5 years.
>
> Hence, a testing program is established to monitor the performance
> of the ballistics material up to and beyond five years of shelf life (HW 24446).

At least in part due to the five-year warranty, the Honeywell research on ballistics materials,
including Z Shield, typically focused on a five year life span. (*See, e.g.*, HW 64703)

Armor Holdings also represented to the marketplace that Z Shield vests would meet NIJ
specifications for new vests for five years:

> Ballistics Panels. For five years after date of purchase American Body
> Armor warrants that the ballistics panels will pass the NIJ protocol
> for ballistics intervention and their NIJ designated velocities during
> an actual occurrence, not necessarily during an NIJ independent
> laboratory retest procedure.

*See* American Body Armor: Limited Warranty, undated, at AHJX 32988. The American Body
Armor Owners' Manual contained similar language, stating in the section on "Body Armor
Replacement Guidelines" (AHJX 32975) that:

> Most manufacturers, including American Body Armor, warrant the
> body armor they sell for a period of five years. This is a reasonable
> period of time for a manufacturer to stand behind a ballistics product
> that has been in use for five years. The end of the warranty period

does not mean the armor will not work anymore. It simply means

the warranty is over.

In addition, Armor Holdings executives and sales representatives assured customers that Z

Shield vests would remain fit for performance for five years. For example, Scott O'Brien, then

president of Safariland (another subsidiary of Armor Holdings) and the general manager of ABA,

represented to Mr. Jim Moody of the Los Angeles Police Department, in a letter dated October 20,

2003 (AHON 29250) that:

> I am writing in response to your request of Stan Ferer regarding
>
> the warranty and life expectancy of our Xtreme XS ballistics
>
> package. Armor Holdings, Incorporated warranties <u>all</u> body
>
> armor ballistics for five years from the date of delivery. Our
>
> warranty ensures all AHI ballistics panels meet and will remain
>
> within tolerance as established by the NIJ-STD-010104 standard
>
> for the life of the warranty period. (Emphasis added.)

Mr. O'Brien admitted at his deposition that he sent this letter and that it reflected what he and sales

people at Armor Holdings were explaining to customers and potential customers about the

warranties for Z Shield body armor. Similarly, on January 9, 2004, John Geshay, Director, Body

Armor, Armor Holdings Product Division sent a letter to Randy Loftspring, president of a body

armor distributor in Cincinnati, Ohio in response to the City of Kettering's request to Mr.

Loftspring to return Zylon vests. In this letter, Mr. Geshay provided ". . . assurances that the

[ABA] vests you have sold containing a version of Zylon-based ballistics material meet all NIJ

47

certification requirements and are fully warranted for the five years as specified in our Use and Care Manual included with each vest sold" (AHJX 3607 to 3608; AZE 862634 to 862640).

Also, Steve Croskrey testified to his understanding that the warranty meant the vests would last for at least five years and that Armor Holdings did not expect its vests would be penetrated by rounds they were certified to stop for at least five years. Greg Herceg, the Honeywell executive who at that time managed Honeywell's business relationship with Armor Holdings, testified in similar fashion, that he expected and understood Z Shield body armor would continue to stop threat rounds that it was designed to meet for five or more years.

Indeed, such assurances happened even after NIJ effectively halted the sale of body armor containing Zylon. For example, in an April 27, 2006 letter from William Moles, Eastern Regional Manager, Armor Protective Division, Armor Holdings Products Group, to Captain Phil Byrd of the Guilford County Sheriff's Department in Greensboro, North Carolina, Mr. Moles clarified Armor Holdings' ". . . position concerning our Zylon based vests, including the Xtreme XS currently utilized by your department, that have a 5-year manufacturers warranty"; stated that: "[f]or those officers who desire to remain in one of our Zylon-based ballistics vest models, we fully stand behind the designated warranty as provided and maintain that our vests are safe for the level of threats in which they were originally designed and submitted for voluntary NIJ certification"; and further noted the testing of used vests pursuant to the Armor Holdings' VestCheck Program and represented that Armor Holdings ". . . will continue to test all of our models to ensure fitness for use for their stated warranty periods" (AZE 80651).

Pursuant to Fed.R.Civ.P. 33(d), the United States cites the documents it has used in the depositions in this case as containing additional information responsive to this interrogatory. The

United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 13**:

Identify the date on which the NIJ or any other agency of the United States first became aware that body armor containing Zylon or Z Shield "degraded quickly over time in hot and humid environmental condition." Complaint ¶ 4.

**RESPONSE**:

The United States objects to Interrogatory No. 13 on the grounds that it is overly broad, unduly burdensome, and is vague and ambiguous as it does not define the term "aware" or identify the level or rank of Government official that would be responsive to this Interrogatory.

Subject to these objections and the General Objections, and without waiving any of these objections, in 2001, the United States retained the Tekne Group (Steve Lightsey and Jon Lesko) to perform exposure testing of Zylon and other ballistics materials (NIJ008-9763 to 9865). By October 2001, the Tekne Group had performed a literature search and given a presentation to TSWG (composed of leaders at various Government agencies including NIJ, NIST, and Natick) officials in which they had gathered "anecdotal" data from the BSST web site and other public sources concerning Zylon fiber (as opposed to Z Shield or Zylon body armor) degrading in hot and humid environmental conditions. Also, Tekne and Government researchers had discussed the degradation of Zylon fiber in elevated heat and humidity conditions a few months before publication of the literature search (*see, e.g.*, NLE005 5437 to 38, NLE005 5425 to 26, NLE005 5427 to 29). Tekne's written summary of the literature search stated that "[a]fter review of the

49

collected preliminary data, insufficient information is available to extrapolate a true indication of the impact of moderate temperature and moisture over long periods of time with respect to the ballistics performance of the fiber materials that comprise the bulk of the body armors" (LES001 6739). The Tekne Group also reported to TSWG officials in oral communications that they lacked the back-up data (which they unsuccessfully attempted to obtain) for this anecdotal information and thus could not evaluate it in detail or correlate any of the fiber results into estimates of the ballistics retention of body armor and shoot paks over time. At this juncture, the Tekne Group did not believe that conditions of less than 77° C would cause substantial degradation of Z Shield and other materials in body armor and told this to TSWG (see Lightsey testimony and LES001 6739).

In 2002 and 2003, the Tekne Group performed research designed to evaluate the impact of short- and long-term exposure of heat and humidity on shoot paks of Zylon and Z Shield, as well as on other ballistics materials (NIJ008-9768). The short-term exposure did not find significant degradation in any of the ballistics materials, including Zylon and Z Shield, and the Tekne Group reported this finding to Government officials in the Final Report in 2006 (NIJ008-9814), as well as in interim reporting to TSWG circa 2003 (TEK028- 0046 to 59).

The long-term exposure research (performed at 50, 100, 150 and 200 days) evaluated the impact of 200° F and very high relative humidity of between 90-95% on Z-Shield and Zylon shoot paks, as well as shoot paks made of other ballistics materials. In the long-term research, the Tekne Group found and reported to Government officials that Zylon and Z Shield, as well as all of the other ballistics materials being tested including Kevlar, degraded very quickly at 200° F and 90-95% relative humidity and much more quickly than had been anticipated by the Tekne Group (see Lightsey and Lesko deposition testimony and NIJ008 9765, 9787 to 9800). At this juncture, the

50

Tekne Group's research had not found substantial data distinguishing any heat and humidity issue with Zylon or Z Shield different from the same issue with the other ballistic materials being tested.

After this long-term research, the Tekne Group asked for permission and funding from TSWG to try and "bracket" the degradation of these materials by lowering the heat and humidity levels in an attempt to find out at what exposure levels degradation began for Zylon, Z Shield, and shoot paks composed of other ballistics materials like Kevlar. TSWG, however, did not agree with this recommendation and, instead asked the Tekne Group to perform the long-term exposure research again using plastic bags to try and separate out the effects of heat and humidity on the ballistics performance of these materials, which included Zylon, Z Shield, and other ballistics materials like Kevlar. TSWG made this recommendation because of methodological problems with the Tekne Group's initial long-term research, including the "wash down" of water on the materials, inconsistent and improbable results (such as ballistics performance improving over time when exposed to hot and humid conditions), and other technical problems *(see* Lightsey deposition testimony and NIJ008 9765, 9800).

In 2004, the Tekne Group performed this long-term research (at 50 and 100 days), this time at 200° F and 35% relative humidity and again found substantial and quick degradation of all of the ballistics materials, including Zylon, Z Shield, and Kevlar shoot paks *(see* Lightsey deposition testimony and NIJ008 9765, 9800 to 9811). As part of this research, the Tekne Group attempted to pay Honeywell for Z Shield samples, as it had done twice before, but Honeywell would not supply any Z Shield to Tekne (NIJ008 9801, HW 14942 to 14944). While Honeywell claimed a lack of supply was the problem with providing Z Shield to Tekne, in reality at this time Honeywell could not maintain as high a ballistics performance for Z Shield as it had in the past samples that had

been provided to the Tekne Group (*see also* the Response to Interrogatory No. 1 above regarding the FMS problems tolling Z Shield for Honeywell at this time) and Honeywell did not want to alert the Tekne Group or the United States about this problem (*see, e.g.*, HW 28115 to 18, HW 4518, HW 25955 to 57, HW 8411 to 12, TEK026 402289 to 93, TEK026-8369 to 71, TEK026 8694 to 96, HW 400617 to 18, TEK001 418 to 19, TEK 025 9919 to 20, TEK026 8409, HW 4544, HW 402283 to 84, TEK026 8596, TEK026 8680 to 84). In addition to a lack of Z Shield, methodological problems once again hampered the Tekne Group's research as some of the bags broke during testing and the Tekne Group did not measure the humidity inside the bags as a control (*see* Lightsey deposition and NIJ008 9812 to 13).

Thereafter, TSWG and Tekne mutually agreed that assigning the Tekne Group further research tasks made little sense, as the NIJ had already issued the Zylon safety advisory on or about August 24, 2005 (NIJ003 7190) and thereafter no body armor manufacturers were selling body armor containing Zylon or Z Shield for domestic law enforcement in the United States (*see* Debra Stoe testimony). TSWG officials asked Tekne to write a final report, which the Tekne Group did, on or about March 2006, describing the results of their testing and the significant impact of heat and humidity at 200° F and various levels of relative humidity on shoot paks composed of Zylon, Z Shield, and other ballistics materials like Kevlar (*see* Lightsey testimony and NIJ008 9763 to 9868).

In addition to the Tekne Group's research, Phil Cunniff, a body armor researcher at Natick, did exposure research on Zylon under hot and humid conditions. Janet Ward of Natick managed this research. Mr. Cunniff testified that as of March 2001, he believed that Zylon fiber had excellent heat-resistant and mechanical properties, but that he had not performed any heat or

humidity testing of Zylon fiber as of that time.  By late September 2001, Mr. Cunniff stated that

Toyobo had provided Natick with a technical information bulletin (but not the data itself) showing

Zylon fiber losing tensile strength at very high temperature and humidity conditions (between 180°

C and 40-50% relative humidity and 500° C), but still performing better than other aramid fibers

(NAT007 001 to 0019).

In 2002 and 2003, Mr. Cunniff reviewed additional summary data from Toyobo and

Barrday showing Zylon fiber declining in tensile strength at more moderate conditions.  He also

undertook heat and humidity testing of Zylon fiber (but did not test Zylon fabric or Z Shield used

in actual body armor) at this time under conditions of 180° F and 85% relative humidity (NAT005

0708).  He found declines in Zylon fiber's tensile strength under those conditions.  In an effort to

learn more, Mr. Cunniff discussed the issue with Tadeo Kuroki of Toyobo and was assured  that

Zylon was a suitable ballistic-resistant material (*see, e.g.*, NAT005 0436 to 42) and that Toyobo

could remedy any heat and humidity issues.  Mr. Cunniff recalled that Kevlar initially had

performance issues before DuPont remedied them, and he expected that Toyobo would be able to

do the same thing with Zylon (*see* Cunniff testimony).

Furthermore, Mr. Cunniff's research focused on threats to soldiers in the Army, and thus

concentrated mainly on fragmentation testing rather than on the threats used by NIJ and NIST to

evaluate body armor for use by federal, state, local, and tribal authorities.  Because of this focus,

Mr. Cunniff did not report the results of his research to NIJ or NIST.  Nor did he recommend to

them (or anyone else) that the United States cease using Zylon as a ballistic-resistant material (*see*

Cunniff testimony).

Mr. Cunniff regularly spoke with Janet Ward about the results of his Zylon-related research. Both of them periodically reviewed Toyobo data about Zylon fiber, including heat and humidity exposure data. They were also aware of DSM degradation data for Zylon UD (DSM's term for Z Shield) from the BSST website (*see* Cunniff and Ward testimony). In addition, Ms. Ward served as a member of TSWG and thus was familiar with the Tekne's Group's research efforts described above.

By August 2002, Ms. Ward had performed testing and written a report evaluating the M93A soft body armor system used by the military (but not by domestic law enforcement). The M93A body armor contained woven Zylon fabric (12 of 36 layers), but not any Z Shield (NAT011 89 to 100). The test conditions (short-term exposure only) included a variety of environmental exposures, including "1) dry, 2) hot, 3) cold, wet-salt water sample intact, 5) wet saltwater sample cut, [and] 6) wet diesel-/salt-water/motor-oil sample cut" (NAT011 91, 98-99). Her report concluded that "[t]his series of tests do not provide sufficient data to make statistically based conclusions with a high degree of confidence/reliability regarding the performance of the evaluated systems [including the M93A system]" (NAT001 96). Ms. Ward also testified that this research did not uncover substantial degradation problems with the M93A system.

Nevertheless, by December 19, 2003, Ms. Ward had become "disturbed" after she received heat and humidity test data from Toyobo for Zylon fiber (not Z Shield) at continuous exposure to 104° F and 80% relative humidity (NAT005 1333). She viewed these exposure levels as approaching real world conditions and worried that the body armor of soldiers in the field could be exposed to conditions of 104° F or even higher (although likely at lower relative humidity levels). As a result, Ms. Ward sent a draft recommendation to the United States Special Operations

Command (SOCOM), which utilized M93A body armor, tentatively recommending increased surveillance and the gradual phase out of M93A body armor. She did not formally make this recommendation to SOCOM or tell any members of TSWG about it because she felt additional data was needed about Zylon. Ms. Ward testified that SOCOM did initiate a surveillance system for the M93A body armor, but that it also continued to use M93A body armor through at least October 18, 2006 (*see* Ward testimony, NAT005 1332 to 1333, NAT007 40).

Finally, in August 2006, Ms. Ward conducted ballistics testing of eight used M93A body armor inserts and compared these results with ". . . the initial assessment of the M93A-1 insert (produced by American Body Armor/Dec. 2001) in a new, unused condition as well as data generated from the first surveillance assessment circa October 2003" (NAT007 41). Although her limited testing did ". . . not provide sufficient data to make statistically based conclusions with a high degree of confidence/reliability regarding the performance of the evaluated systems," Ms. Ward noted, among other things, that ". . . the ballistics data suggests no significant change in performance from this series of vests to the first surveillance series, [h]owever, with this series of tests, a trend toward lower V50s was observed" (NAT007 41 to 42).

In addition to the research discussed above, on June 23, 2003, an incident occurred involving the failure of a relatively new piece of Zylon body armor (manufactured by Second Chance and not Z Shield) worn by Edward Limbacher, a Forest Hills, Pennsylvania police officer (Limbacher shooting). This body armor had been in use for approximately six months and failed to prevent penetration by a bullet it was designed to defeat. NIJ learned about this incident on or about June 25, 2003, from a body armor manufacturer who contacted the Body Armor Compliance Testing Program. The Limbacher shooting prompted the Attorney General to call for a review of

the incident and research into the cause of the Zylon body armor failure. NIJ and NIST led this effort, and it was called the Body Armor Safety Initiative.

An initial review of the Limbacher incident revealed that the woven Zylon (not Z Shield) in officer Limbacher's body armor was much weaker than expected, given that the vest was only six months old at the time of the shooting. The United States continued studying Zylon body armor, including body armor containing Z Shield, for several years after the Limbacher shooting. On or about March 10, 2004, NIJ sent a letter to Armor Holdings noting that in ballistics testing several Armor Holdings' vest models containing Z Shield had ". . . failed to satisfy the requirements of the NIJ standard for ballistic-resistant body armor" (AHJX 23964 to 65). Also, on March 11, 2004, NIJ held a Summit on body armor safety, attended by Honeywell among others (AHON 29329 to 38), and issued a Status Report (AHJX 3469 to 3486) on body armor containing Zylon. This Status Report noted that the "[p]reliminary" test results . . . were consistent with the working theory that there may be degradation occurring in the ballistics performance of used Zylon-based armors." (AHJX 3481). But the Status Report also noted that due to the "very small sample size . . . it is not possible to draw any statistically based conclusions about specific manufacturers, models, service life, or geographical regions at this time" and further noted that more testing and research was needed before NIJ could conclude that body armor containing Zylon or Z Shield was defective. (AHJX 3480 to 3482). In response to the NIJ letter and the Status Report, Armor Holdings reiterated the safety of its body armor containing both Z Shield and woven Zylon to NIJ and to the public (see, e.g., AZE00452665, AHJX00023966, AZE00899431, AZE 892375).

After the United States had performed more detailed research and testing of body armor containing Zylon and Z Shield, the United States became aware that Z Shield body armor and other

56

body armor containing woven Zylon were defective products. The United States first reached this awareness shortly before the publication of the NIJ's Third Status Report in August 2005 (NIJ021 2720 to 2766). The results of this research and testing are summarized in the Third Status Report and showed that Zylon degradation took place quickly over a short period of time in hot and humid conditions and that this degradation significantly compromised the ability of Zylon body armor, including Z Shield body armor, to protect law enforcement officers from injuries resulting from bullet penetrations and back face deformation. Specifically, the Third Status Report concluded that "[a]lthough these results do not conclusively prove that all Zylon containing body armor models have performance problems, the results clearly show that used Zylon-containing body armor may not provide the intended level of ballistics resistance." (NIJ021 0276). At the same time as the Third Status Report, NIJ also issued a safety advisory identifying Zylon ". . . as a material that appears to create a risk of death or serious bodily injury as a result of degraded ballistics performance when used in body armor." (NIJ003-7190).

The Government official who managed this research effort was Debra Stoe. She focused primarily on inter-agency coordination and funding issues, not on research (see Stoe testimony). The Government researchers who performed the research and testing that was reported in the Third Status Report were Marc Caplan and Kirk Rice of NIST, who are identified in the Initial Disclosures. At the request of NIJ, Kirk Rice and an assistant at NIST named Michael Riley, under the supervision of Marc Caplan, conducted the research and testing into Zylon and Z Shield body armor that is set forth in the Third Status Report. Dennis Leber provided statistical support. The Government researchers who performed the applied research for the Third Status Report included Amanda Forster, Joanie Chin, Gale Holmes, and Kirk Rice.

Pursuant to Fed.R.Civ.P. 33(d), the United States cites the documents it has used in the depositions in this case as containing additional information responsive to this interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

## INTERROGATORY NO. 14:

Identify each and every agency or entity of the United States that purchased body armor containing Z Shield or any state, local or tribal law enforcement entity that under the BPVGPA purchased or received funding or reimbursement for the purchase of body armor containing Z Shield, that did not receive the storage advisory issued by Armor Holdings on July 6, 2001, as referred to in ¶ 41 of the Complaint.

## RESPONSE:

The United States objects to Interrogatory No. 14 on the grounds that it is overly broad and unduly burdensome. The United States also objects to this Interrogatory to the extent that the requested information is in the possession, custody, or control of third parties, like Armor Holdings.

Subject to these objections and the General Objections, and without waiving any of these objections, on or about July 10, 2001, Armor Holdings sent via fax a storage advisory, dated July 9, 2001 (Storage Advisory) to the distributors of its body armor products that had purchased the Xtreme ZX, Xtreme X, ProTech Stealth Elite, and Safariland Platinum vests (AZE 553058 to 59). It also appears that on or about July 10, 2001, Armor Holdings sent the Storage Advisory to its sales force (AZE 553058). The United States does not know of specific instances in which the

sales force or distributors sent the Storage Advisory to agencies or entities of the United States or to state, local, and tribal authorities that, under the BVP, purchased or received federal funding or reimbursements for the purchase of body armor containing Z Shield or woven Zylon.  But the United States does not contest that Armor Holdings asked its distributors to send the Storage Advisory to all end-user customers who had purchased Zylon and/or Z Shield body armor (*see* O'Brien testimony) and that many distributors likely did so shortly after receiving the Storage Advisory.  In addition, on or about early October 2001, Armor Holdings placed a notice in all of the containers and boxes in which it shipped Zylon and Z Shield body armor (HW 292 to 93).  The notice stated that "[w]hen not in use body armor should be stored at room temperature in dry place" (HW 292 to 93, AHJX 3762).  So, by October 2001, and thereafter, the Government entities who purchased Zylon and/or Z Shield body armor would likely have received this notice. Pursuant to Rule 33(d), the United States has produced additional documents that further respond to this Interrogatory.  The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 15:**

Identify each and every date on which the United States or a state, local, or tribal law enforcement entity seeking funding or reimbursement under the BPVGPA, received a warning from Armor Holdings not to expose body armor to heat or humidity, including the text of the warning and the person or entity who received it.

**RESPONSE**:

The United States objects to Interrogatory No. 15 on the ground that the term "warning," which is not defined in Honeywell's Interrogatories, is vague and ambiguous. The United States also objects to this Interrogatory to the extent that the requested information is in the possession, custody, or control of third parties, like Armor Holdings.

Subject to these objections and the General Objections, and without waiving any of these objections, other than the Storage Advisory and shipping notice discussed in the Response to Interrogatory No. 14 above, the United States is not aware of anything else that could be construed as a "warning" from Armor Holdings telling any Government entities not to expose body armor to heat or humidity. The United States contends that it was clearly anticipated by Armor Holdings and Honeywell that localities and agencies in hot and humid places would utilize Armor Holdings' body armor in an attempt to protect their law enforcement officers (*see* Herceg, Croskrey, and O'Brien testimony). In addition, it was anticipated that law enforcement officers throughout the United States would wear this body armor close to their bodies, which would also expose the body armor to conditions of heat and humidity. Moreover, although the Storage Advisory and shipping notice advised against doing so, it was anticipated by Armor Holdings and Honeywell that some officers would store their body armor in very hot places like their car trunks (*see* Herceg and Croskrey testimony and HW 23510 to 27). Finally, Armor Holdings and Honeywell understood that it was not always possible for officers to keep their body armor in dry and cool places (*see* Croskrey Herceg testimony)

Pursuant to Rule 33(d), the United States has produced additional documents that further respond to this Interrogatory. The United States also reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 16**:

Have any law enforcement officers been injured or killed because of penetration or back face deformation of body armor containing Z Shield? Unless your answer is an unequivocal "no," please identify each and every such injury or death, including the name of the officer, the law enforcement agency or entity with whom he was employed at the time of the incident, the date of the incident, the body armor product that he was wearing, and a specific description of the incident that gave rise to the injury or death, including but not limited to the location on the body armor where a bullet or other projectile struck the armor.

**RESPONSE**:

The United States objects to Interrogatory No. 16 on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence, seeks premature expert opinion evidence, and seeks information in the possession, custody and control of third parties.

Subject to these objections and the General Objections, and without waiving any of these objections, the United States is not aware of any law enforcement officer being killed or injured because of a bullet penetration or back face deformation of body armor containing Z Shield. Neither the NIJ, NIST, NLECTC, nor any other federal agency attempt to track or verify in any systematic way alleged deaths or injuries from body armor (*see* Stoe testimony) and, thus, this Response does not constitute and should not be viewed as an admission that no such deaths or

61

injuries have occurred. From the anecdotal documentation at NIJ, it appears that one police officer may have died after being shot while wearing ABA body armor (*see* NIJ014 1993). But at this point in time the United States does not know if this body armor contained Z Shield or whether the vest actually failed or other circumstances led to the officer's death.

The United States reserves the right to supplement this Response, pursuant to the Federal Rules of Civil Procedure, as additional information becomes available in discovery.

**INTERROGATORY NO. 17**:

Identify each and every law enforcement official whose life was saved as a result of wearing body armor containing Z Shield, including those referenced on page 12 of the NIJ report entitled "Selection and Application Guide to Personal Body Armor," attached as Exhibit A to Honeywell's Motion to Dismiss.

**RESPONSE**:

The United States objects to Interrogatory No. 17 on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence, seeks premature expert opinion evidence, and seeks information in the possession, custody and control of third parties.

Subject to these objections and the General Objections, and without waiving any of these objections, the United States is not aware of any verified saves of life as the result of a law enforcement officer wearing body armor containing Z Shield. An initial effort by Armor Holdings to compile ". . . a comprehensive list of recent saves using any of our zylon vests" was completed circa September 2003. *See* AZE00900087. The resulting work product, which included but was not limited to purported saves from body armor containing Z-Shield and woven Zylon, did not

document any verified saves relating to Z Shield body armor and an Armor Holdings executive, John Geshay, termed the results "pretty pitiful." *See* AZE00900087 to 00900141.  A follow-up effort by Armor Holdings, about a year later, to further examine the data surrounding saves did not document any saves of life due to its body armor products containing Zylon. *See* AZE00217201 to 00217202.  Other Armor Holdings' documentation identified one possible save from a Z Shield vest, but Armor Holdings has not presented sufficient information to verify this save. *See* AZE 00221317 to 00221319.  In addition, Armor Holdings has represented to the United States that it knows of a handful of saves from body armor containing either woven Zylon or Z Shield and provided some information to the United States regarding those events.  The United States has provided this information to Honeywell in discovery.  But at this point in time the United States has not been able to verify any of these purported saves.

In addition, the United States is not aware of any body armor containing Z Shield that led to any saves identified in the "Selection and Application Guide to Personal Body Armor" and would not agree to the accuracy or veracity of any alleged saves identified by sources such as the IACP/DuPont Kevlar Survivors' Guide or other non-Government compilations of alleged saves. As noted in the Response to Interrogatory No. 16 above, neither NIJ, NIST,  NLETC, nor any other federal agency attempt to track or verify in any systematic way alleged saves from body armor.

Pursuant to Rule 33(d), the United States has produced additional documents that further respond to this Interrogatory.  The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

**INTERROGATORY NO. 18**:

Identify any and all data concerning Z Shield and the properties of Z Shield that the United States contends Honeywell did not provide to Armor Holdings, including the date on which the data were created, compiled, or assembled (including multiple dates if necessary); the person or persons at Honeywell responsible for creating, compiling, and assembling the data the document or documents in which the data appears; and the significance of the data in terms of the degradation, use, care, or performance of Z Shield.

**RESPONSE**:

The United States objects to Interrogatory No. 18 on the grounds that it is a premature contention interrogatory because discovery is ongoing and also that the underlying information called for rests in the possession, custody, and control of Honeywell.

Subject to these objections and the General Objections, and without waiving any of these objections, the United States is aware that Honeywell withheld from Armor Holdings and the Government the Hurst Draft Report, identified in the Complaint at ¶¶ 56-60, which detailed the degradation problems with Z Shield caused by humidity and high temperatures, noted that additional layers in Z Shield body armor (a "10-20% higher solution aerial density") were needed due to these degradation problems, and stated that even a two percent reduction in ballistics performance caused by degradation would be "significant" and material (HW 61232 to 61242). Honeywell also withheld from Armor Holdings and the Government, the underlying data cited in the Draft Report (*see, e.g.*, HW 26730 to 37). The Draft Report was created on or about September 2003 by Honeywell researchers, including David Hurst, who was then managing Honeywell's ballistics lab (*see* Hurst testimony and HW 61232 to 61242).

The Hurst Draft Report and the underlying data highlighted that in Honeywell's Heat/Humidity Testing, Z Shield had experienced more degradation than any of the other ballistics materials tested, including woven Zylon (HW 61336, HW 61240). Honeywell noted that there were 95% confidence intervals on this data (HW 61238). In addition to this analytical data, the Draft Report contained visual assessments of Z Shield exposed to humidity and high temperatures and detailed that visually the Z Shield looked significantly more degraded than any of the other ballistics materials tested, including woven Zylon, and that the Z Shield showed clear and obvious signs of degradation, including delamination and blistering (HW 61237).

Furthermore, the Draft Report stated that ". . . a V50 difference of only 5% could require anywhere between 10-20% higher solution aerial density" to pass a specification or certification requirement (HW 61238). This appears to mirror the type of SEAT (specific energy absorption of target) analysis that Honeywell researchers, including Dr. Ashok Bhatnagar, had used in the past to correlate "V50 drop vs. additional weight" (in other words, to correlate the amount of increased aerial density of a ballistics-resistant material needed to offset a decline in the V50 ballistics retention of that material in order to maintain the same level of ballistics performance) (HW400627). For example, Dr. Bhatnagar had used SEAT analysis several years earlier to correlate ". . . the aerial density (weight) increase as a function of drop in V50" and had noted "[i]n simple words, a 10% V50 drop means a 19% weight increase, and a 20% drop means a 36% weight increase" (HW 400627). *See also* HW 407872 to 873 ("We investigated the reduction in the ballistic results and our conclusion is that there is a very strong correlation between the ballistic results and the weight of the material."). This information would have been important to Armor

Holdings' efforts to design Z Shield body armor.  Yet, Honeywell did not share the Draft Report or

the underlying data with Armor Holdings, a fact that visibly upset Mr. Croskrey at his deposition.

Honeywell recognized almost immediately the materiality of the Hurst Draft Report and

undertook efforts to keep it secret.  Specifically, from the documents produced to date by

Honeywell, it appears that the initial version of the Draft Report contained no Confidentiality

Designation because the copy reviewed by Dr. Wagner, that she received on or about September 5,

2003, has no such Designation (HW 846-55).  It also appears from the written comments of Dr.

Wagner that she did not add the Confidentiality Designation, as there are no comments from her

under the title, Exposure Sample Testing Report, and Mr. Hurst has testified that he did not discuss

the Draft Report with Dr. Wagner or review her written comments to it.  The other person who

received a copy of the initial Draft Report was Lin Murray, formerly the Honeywell ballistics lab

manager but at that time a business person working in the marketing department under Mr.

Swinger (HW 61232).  By the time Mr. Murray forwarded the Draft Report on to Mr. Swinger, on

or about September 9, 2003, the following Confidentiality Designation had been added: "**DRAFT -**

**INTENDED ONLY FOR HONEYWELL CONFIDENTIAL REVIEW PURPOSES**"

(emphasis in original) (HW 61232 to 42).  Honeywell followed the Confidentiality Designation

and never shared the Hurst Draft Report, or any of the accompanying exposure data or visual

observations, with Armor Holdings or the Government despite having numerous opportunities to

share this data with Armor Holdings in conference calls held just a few days after the date of the

Hurst Draft Report (HW0116266, HW0022848, HW0120265, and HW0020822).  Also, just a few

days after the Draft Report, Bob Weber, Armor Holdings' ballistics researcher, asked Honeywell

for ". . . the last three years of performance data . . ." for Z Shield and Zylon, but in response he received neither the Draft Report nor the underlying data (HW0120265).

Just a few days after Mr. Hurst first distributed the Draft Report, Mr. Swinger testified that Honeywell had disseminated the final version of a Stand-By Statement, used at Honeywell as a communications tool to ensure that the company provided a consistent message to the outside world, stating that "[w]e have found no degradation in Z Shield performance. This is based on V-50 testing of Z Shield material stored in an uncontrolled warehouse environment for more than two years" (HW011119355 to 56). The Stand-By Statement makes no mention of the Draft Report or the underlying exposure data.

In addition, as detailed in the Response to Interrogatory No. 1 above, in July and August 2001, Honeywell withheld Heat/Humidity Testing data for several months from Armor Holdings that would have cast the DSM situation in a new light and likely led Armor Holdings to recall Z Shield vests and/or stop selling them. In correspondence with Steve Croskrey, dated August 9, 2001, Greg Herceg of Honeywell represented that "we found no statistically significant shift in V50 values for the 2-week Zylon shield test at 70° C (AHJX 3347). At this time, however, Honeywell failed to disclose its test results, from July 25, 2001, showing an over 13% drop in ballistics retention in short-term testing at 90° C (HW 4268 to 72). Honeywell did not disclose this data to Armor Holdings until several months later, after the crisis with DSM had passed, when Honeywell presented this data, among a host of other voluminous aging data, to Armor Holdings (AHJX 9078 to 88).

Honeywell also did not disclose to Armor Holdings the concerns about Zylon degradation that led Honeywell to discuss abandoning Z Shield as early as late 2002 and early 2003, prior to the

67

January 22, 2003 meeting with Armor Holdings (*see* Swinger testimony).  Nor has Honeywell

produced any records that it disclosed any Heat/Humidity Testing data to Armor Holdings after the

January 22, 2003 meeting with Armor Holdings.

Furthermore, in October 2003, Honeywell prepared technical bulletins for Armor Holdings

highlighting that its warehouse data had shown no declines in Z Shield's ballistics retention for the

three years of warehouse testing by Honeywell (HW 24447).  Honeywell cited this warehouse data

as the primary basis to assure the public via these technical bulletins that ". . . there is no

significant anticipated change in ballistic performance response of the Z Shield material for the

five year suggested life span of most ballistic resistant vests assuming proper care and use"

(TEK025 9107).  Yet, Honeywell has not produced any records that it disclosed the actual

warehouse data to Armor Holdings showing a decline of up to 5% in Z Shield's ballistics retention

over this three-year period and about a 10% decline over a period slightly longer than five years

(HW 401206).

Additionally, Honeywell business people with no scientific backgrounds outlined the key

points to make in the technical bulletins--such as emphasizing Z Shield's safety and suitability as a

ballistics-resistant material and Honeywell's technical sophistication--that Honeywell publicly

issued in the Fall of 2003 with the knowledge that Armor Holdings would use these bulletins with

customers to promote the sale of Z Shield body armor (HW 23157-58, HW 24443 to 51, AZE 4573

to 81).  The Honeywell business people also edited out risk disclosure language and Heat/Humidity

Testing data showing declines in Z Shield ballistics performance that Honeywell's lead scientific

researcher on Z Shield, Dr. Lori Wagner, had originally included in the Fall 2003 technical

bulletins (HW 118141 to 147, HW 118148 to 153, HW 23157 to 58, HW 344269 to 270), HW

68

22831 to 833, HW 24443 to 51).  Dr. Wagner expressed her frustration with the business people,

stating that "I still do not know what you want out of this, and hence it is very frustrating.  You say

you just want the data and you and John will fill in the rest" (HW0118140 to 47).  *See also* the

Responses to Interrogatory Nos. 1 and 2 above.  Indeed, as late as mid-2005, Honeywell business

people and lawyers edited out risk disclosure language about the negative impact of hydrolysis on

Z Shield that Dr. Wagner had drafted in response to a question from the president of Armor

Holdings (HW 36764 to 66, HW 400959 to 61, AZE 534565 to 66, AZE 750223 to 25).

Moreover, Honeywell minimized the significance of red thread on ballistics performance

and withheld from Armor Holdings that Honeywell's chief quality control inspector, Pete

Chalifoux, considered red thread a defect in the Z Shield (*see, e.g.,* HW. 1593 to 96, HW 6997 to

7003).  Similarly, Honeywell did not disclose to Armor Holdings the concerns of FMS about Zylon

degradation in late 2003 and early 2004 that led FMS to recommend abandoning Zylon (*see, e.g.,*

HW 2967, HW 119315, HW 911429-30, HW 20544 to 46).  Honeywell also did not disclose to

Armor Holdings either the December 29, 2004 patent application in which Honeywell sought to

patent an anhydrous wash for the resin in Z Shield that improved Z Shield's performance against

elevated levels of heat and humidity or the data associated with this patent application (*see, e.g.,*

HW 402204 to 40, HW 406518 to 26, HW 406791 to 794, HW 406939 to 941, HW 406933 to 935,

HW 403365 to 368, HW 406807-828, HW 406518, HW 2350 to 2355).

Finally, at no point in time did Honeywell tell Steve Croskrey or Scott O'Brien about

Honeywell's internal concerns regarding the safety of Z Shield stemming from the Honeywell

Heat/Humidity Testing data or the problems with FMS, red thread, and the water-based resin wash.

*See also* the Responses to Interrogatory Nos. 1 and 2 above, which are incorporated herein by

reference.  To the contrary, Honeywell engaged in a concerted effort to hide these risks from Armor Holdings.

For example, the planning notes for the January 22, 2003 meeting between Honeywell and Armor Holdings emphasized defending Zylon and Z Shield against attacks from the public via technical bulletins (which were misleading for the reasons detailed in the Response to Interrogatory Nos. 1 and 2 above), among other things, ensuring that all of the Heat/Humidity Testing data was stamped confidential, and including lawyers in all of the decisions about Z Shield communications with the outside world (HW 4728-29, HW 343990 to 4011, HW 405074-79).  Similarly, as noted above, Honeywell business people and lawyers edited out risk disclosure language from several communications to Armor Holdings (*see, e.g.*, AH 18141 to 147, HW 18148 to 153, HW 23157 to 58, HW 344269 to 270, HW 22831 to 833, HW 24443 to 51, HW 36764 to 66, HW 400959 to 61, AZE 534565 to 66, AZE 750223 to 225).  Moreover, Honeywell executives issued several internal directives emphasizing the need to keep all Z Shield data confidential and not to distribute this data outside of Honeywell (see, e.g., HW 12519, AHJX 9078 to 9088, HW 4728 to 29, HW 343990 to 011, HW 405074 to 5079, HW 27848, HW 21887).

Pursuant to Rule 33(d), the United States has produced additional documents that further respond to this Interrogatory. The United States reserves the right to supplement this Response, pursuant to the Fed.R.Civ.P., as additional information becomes available in discovery.

Dated: March 1, 2010

Respectfully submitted,

TONY WEST
Assistant Attorney General

MICHAEL D. GRANSTON
ALAN E. KLEINBURD
ALICIA J. BENTLEY
CALLIE R. OWEN
A. THOMAS MORRIS
JENNIFER CHORPENING
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
(202) 616-9854

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of March 2010, I caused to be served a true and correct copy of the foregoing document by pdf e-mail to Craig S. Primis, P.C., and Daniel Bress Hardy, Kirkland & Ellis LLP, 655 15th Street, N.W., Washington, D.C,. 20005, counsel for Defendant Honeywell International Inc.

_____
A. Thomas Morris

## VERIFICATION

I, Debra Stoe, declare:

I am an Operations Program Specialist and a Program Manager of the Operational Technologies Division of the Office of Science and Technology at the National Institute of Justice (NIJ). I have held this position for five years, four months and have been employed with NIJ for approximately twelve years. In my capacity as the Program Manager, among other things, I manage the NIJ Body Armor Program.

Based on information and belief, the United States' Supplemental Responses to Interrogatory Nos. 1-18 to Defendant Honeywell International Inc.'s First Set of Interrogatories to the United States are true and correct.

I declare that this Verification is true and correct under penalty of perjury under the laws of the United States. This verification was executed on March 15, 2010 in Washington, D.C.

_Debra Stoe_ 03/15/10

Debra Stoe

# EXHIBIT 4

# EXHIBIT

# FILED

# UNDER

# SEAL

# EXHIBIT 5

00001

1                 UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF COLUMBIA

2                   No. 1:08-CV-00961 (RWB)

3                        - - -

4  United States of America,

5      Plaintiff,

6      v

7  Honeywell International, Inc.,

8      Defendant.

9                        - - -

10

       Videotape deposition of LORI WAGNER, VOLUME I,

11

     taken in the offices of Kirkland & Ellis, 655

12

     15th Street, N.W., Washington, D.C., on

13

     Wednesday, July 15, 2009, commencing at 9:15 a.m.,

14

     before Alan L. Lesky, Certified Court Reporter of the

15

     State of New Jersey, pursuant to notice.

16

17

18

19

20

21

22

         ALAN L. LESKY & ASSOCIATES

23           18 Concord Drive

         Shamong, New Jersey 08088

24           856-983-3282

25

00002

1 APPEARANCES:

2

3      Thomas Morris, Esquire

       Alicia Bentley, Esquire

4      U.S. Department of Justice

       Commercial Litigation Branch

5      Civil Fraud Section

       601 D Street NW, Room 9126

6      Washington, D.C. 20004

7

       Kirkland & Ellis, LLP

8      By:  Craig S. Primis, Esquire

            Daniel Aaron Bress, Esquire

9      655 Fifteenth Street N.W.

       Washington D.C. 20005

10     Attorneys for Defendant, Honeywell

11

       Charles E. Graf

12     Chief Litigation Counsel

       101 Columbia Road

13     Morrisotwn, New Jersey 07962

       Honeywell International, Inc.

14

15

   Also Present:

16

       Lee Bitman, Videographer

17

18

19              WITNESS INDEX

20

   Lori Wagner

21

   By Mr. Morris                    6

22     **Wagner, Lori - 07/15/2009 (Vol. 01)**          **Page  2**

00018
1      MR. PRIMIS: That's what I had in mind. We'll
2  work with the court reporter at a break just to explain
3  what we mean.
4      (Off the record)
5  BY MR. MORRIS:
6     (Exhibit Wagner 4 was marked for identification.)
7  BY MR. MORRIS:
8     Q.  Have you had a chance to take a look at this
9  exhibit which is Exhibit 4 with the Honeywell number HW
10  0005135 through 5182?
11    A.  Briefly.
12    Q.  Okay.  Now, since you looked through all that,
13  I'm just going to -- I want to focus you on page 5160.
14  And I just have one brief question, although later in the
15  deposition, I may come back to this document.
16      MR. PRIMIS:  I just want to note for the record
17  that this appears to be a file containing multiple
18  documents and we're now focusing on one page within it.
19      MR. MORRIS:  Exactly.  And just also for purposes
20  of the record, I thought it was a file and there looked
21  like to me there was some discrete documents in there.
22  And so I put white paper in between what I thought were
23  the discrete documents.  So the white paper that doesn't
24  have a Bates number, that was my addition to it, just to
25  try to organize it in my own mind a little better.

00019

1       THE WITNESS:  Okay.

2  BY MR. MORRIS:

3      Q.  First of all, on the first page of the document,

4  the Z Shield Zylon, do you know whose file this is?

5      A.  I'm not sure of that from that small handwriting

6  sample.  It's possible it's Dr. Rammoorthy.

7      Q.  Okay.  It's not your file, though; is that

8  correct?

9      A.  It's not my writing.

10      Q.  Okay.  And that was the question.  Looking on

11  5160, there's some writing at the top of the page on the

12  left-hand side.  Do you recognize whose handwriting that

13  is?

14      A.  No, I don't.

15      Q.  Okay.  Do you know -- are you able to read the

16  part that says solvent?

17      A.  It says solvent-based Kraton.

18      Q.  Do you know what -- what is solvent-based Kraton?

19      A.  Solvent-based Kraton was the resin application

20  system that we used internal to Honeywell's production of

21  shield.

22      Q.  Did you use that system for Z Shield?

23      A.  In the experimental work that was originally done

24  in development of the product, yes.

25      Q.  What about in the commercial sales?

00020

1   A.   No.

2   Q.   Then the other looks like H2/O based, is that --

3   A.   That's what I read.

4   Q.   Okay.  And for the commercial sales of Z Shield,

5   did you use the H2/O-based resin?

6   A.   Yes.

7   Q.   And then under it, it looks to me like there's a

8   word liability.  Do you see that?

9   A.   Yes.

10   Q.   You do you remember in your work with the

11   H2/O-based resin, did anyone whose not an attorney at

12   Honeywell raise to you a concern that there could be a

13   liability with H2/O-based resin?

14   A.   No.  Not that I recall.

15   (Exhibit Wagner 5 was marked for identification.)

16   BY MR. MORRIS:

17   Q.   Mark this as Exhibit 5.  Have you seen this

18   document before?

19   A.   Yes, I have.

20   Q.   Do you have an understanding that you had been

21   designated on behalf of Honeywell to be their corporate

22   representative to speak on each of the 10 topics listed

23   here?

24   A.   If it's 10 topics, yes, I do.

25   Q.   I had to check, too.  The one I wanted to start

00021

1 with was number nine, the one on patents.

2    A.  Yes.

3    Q.  Did you do any work on patents relating to Z

4 Shield while you were at Honeywell?

5    A.  Yes.

6    Q.  What do you remember about that work?

7    A.  Honeywell has the approach that we patent

8 materials to -- or patent in advance of some innovations

9 to make sure that they are left open to us for

10 opportunities.  We had very preliminary results that

11 indicated -- after doing much of our environmental

12 exposure testing, that perhaps some of the original work

13 that we did with our solvent-based Kraton, might offer an

14 improvement to the Zylon Shield long-term resistance to

15 high temperature and high heat as compared to an

16 aqueous-based system.  Okay.

17    Q.  I didn't mean to cut you off.  My apologies.  Did

18 you have something more to add to that?

19    A.  Just that that was the direction that the

20 specific patent was taking.

21    Q.  Okay.  Do you remember what led to that idea that

22 there might be a better resin system for Z Shield?

23    A.  We believed that Z Shield was a very good

24 product.  We didn't -- we wanted to make it as robust as

25 possible.  And we were looking for continued improvements

00022

1  that we could make to the product.  And given the high

2  temperature and high-heat data that we were generating, we

3  were looking for opportunities where we could make

4  improvements to the product.  And one of the things that

5  came out was to look at, if we were to limit exposure to

6  water, would we enhance the potential of long-term

7  exposure properties.

8     Q.  And what did you decide on that?  Did you decide

9  that limiting the application of water would enhance the

10  long-term exposure opportunities?

11    A.  As I recall, we had very limited data that

12  indicated there might be an improvement.  But we hadn't --

13  and based on that, we filed a patent.  I'm not sure that

14  the subsequent data fully supported it and there was also

15  a -- it came back to us with obviousness and the matter

16  was not pursued.

17    Q.  When you say obviousness, that was the U.S.

18  Patent Office, their determination on the application?

19    A.  Their response, yes.

20    Q.  What was the issue that had been identified at

21  Honeywell about Z Shield's reaction with higher

22  temperatures and higher humidity?

23    A.  With the exposure testing that we did at extreme

24  conditions of high temperature, and combined with high

25  humidity, we found that there was some degradation of the

00023

1 material over time.

2    Q.  Did you find that when you used the solvent-based

3 system, there was less degradation given the same relative

4 temperature and humidity levels as with the water-based

5 system?

6    A.  I don't recall all of the data.  I know that some

7 preliminary results said perhaps there was, but the

8 variability in the response was great enough that we

9 needed to follow up on it.  And I'm not sure that some of

10 our subsequent data didn't say -- didn't confirm those

11 initial support claims that we used for the patent.

12 However, with the patent coming back as rejected for

13 obviousness, it didn't require us to continue to do

14 testing in that area.

15    Q.  As I recall -- we'll look at the patent in a

16 second, there are a number of -- I believe they're labeled

17 in inventors on the patent.  Was there any particular

18 person that you remember who did the lion's share of the

19 work on this patent?

20    A.  At that point in time, we had a team that was

21 working on the -- on the materials.  So I don't know that

22 there was one particular person that had the response for

23 the -- as you phrase it, for the lion's share.  There's a

24 distribution of effort associated with it -- with any of

25 the patents that we file.  We very rarely have single

00024

1  inventors on the patent because we work in a team

2  environment.

3    Q.  What was your work on this particular patent?

4  What was your involvement?

5    A.  At this time, more of just a review of the

6  concept for the patent and to coordinate the actual

7  drafting of it and -- with the legal department.

8    Q.  When you say to review the concept of the patent,

9  could you explain a little more what you mean by that?

10    A.  When any of the patent proposals or invention

11  ideas are moved forward, we have a review of all of the

12  ideas and their relevancy to the business, the potential

13  of it for a patent and whether the efforts should be put

14  into developing and the money put into it for drafting.

15    Q.  And was your role to present at the review or to

16  actually do the review?

17    A.  I would look at all of the invention disclosure

18  ideas that would come forward.

19    Q.  Do you remember who had the invention disclosure

20  idea for this particular patent?

21    A.  I'm not positive.

22    Q.  Before we get to the patent, I wanted to show you

23  one document that's been partially redacted.  I don't want

24  you to talk at all about the redacted part.  I do have

25  some questions about the rest of the document.

00025

1        MR. PRIMIS:  Are we up to 6?

2        MR. MORRIS:  Yes.  This is Exhibit 6. It's been

3    marked HW 00402258 through 403368.

4        THE WITNESS:  Okay.

5    BY MR. MORRIS:

6    (Exhibit Wagner 6 was marked for identification.)

7    BY MR. MORRIS:

8    Q.  The first question I have, do you recall this

9    document in the course of your business at Honeywell?

10    A.  Yes.

11        MR. PRIMIS:  Tom, before we get going, the copy I

12    got, and you may be aware of this, has two copies of the

13    --

14        MR. MORRIS:  Yes.  Let me make -- I'll make a

15    note of that.  It does have two copies.  And the reason

16    was, originally Honeywell produced it in the first form

17    and then they produced it a little less redacted to me in

18    the second form.  And so I just decided it would make

19    sense to have both copies together.

20        MR. PRIMIS:  That's fine.

21        MR. MORRIS:  Sure.  No, I appreciate that because

22    I wanted to say that, I had forgotten.

23        MR. PRIMIS:  That's okay.  Just so the record is

24    clear because it's hard to tell when you just look at the

25    first page.  The first document is Bates stamped HW

**Wagner, Lori - 07/15/2009 (Vol. 01)**          **Page  25**

00026

1  00402258 through 402261.  The attached document right

2  behind it is HW 00403365 through 403368.

3       MR. MORRIS:  Right.  Yeah.  Thank you.

4  BY MR. MORRIS:

5    Q.  The first question on this document is, who is

6  Sheldon Kavesh, Ph.D?

7    A.  Dr. Kavesh is our patent agent or a drafter.  We

8  hired him to draft patents for our business.

9    Q.  What was his role with this particular patent, if

10 you remember?

11   A.  He was drafting this patent for us.

12   Q.  Do you know why he was sending this data to you?

13   A.  Probably sharing it back to me because it was

14 sent to him and he wanted to have a conversation around

15 the patent that would be filed.  That's the only thing

16 that I can assume.

17   Q.  Do you know who at Honeywell hires Dr. Kavesh, is

18 that a --

19   A.  Kavesh.

20   Q.  Who hires him to work on the patents, do you

21 know?

22   A.  Our legal department does.  It would be our IP

23 attorney.  At that time, it was Virginia Szigeti.

24   Q.  Do you know, did he have a written agreement to

25 work on this particular patent, to your knowledge?

00027

1    A.  I can't confirm that because I'm not involved

2    with the agreements that are placed.  But to my knowledge,

3    they have an agreement with all of our IP patent agents to

4    be able to do that.  He performed -- he did many tasks for

5    us including any of the patent litigations that we had

6    overseas and he performed in many functions all around our

7    intellectual property.

8        MR. MORRIS:  And Craig, this isn't something I've

9    asked for before, but if there's a particular agreement

10   that relates to this patent with Dr. Kavesh, I would like

11   to see it.

12       MR. PRIMIS:  Okay.  We can check for you.

13       MR. MORRIS:  Thank you.

14   BY MR. MORRIS:

15   Q.  Now, looking at the subject line and I think

16   probably to do this, I want to show you the next -- take a

17   look at this.  What I want to make sure is that the

18   subject line relates to this particular patent.

19   A.  Okay.

20   Q.  Okay.  The question I had, if you could look at

21   Exhibit 6 that's got the subject and has a reference

22   number for Z Shield.  Do you see that?  It's right above

23   the material that's been redacted.

24   A.  Oh, this?

25   Q.  Yes, ma'am.

00028

1   A.  Yes.

2    Q.  Can you tell, if you look at the patent

3  application transmittal form, just the first page, it's

4  got a docket number on it in the upper right-hand corner.

5  Do you see that?

6   A.  Yes.  They correspond.

7   (Exhibit Wagner 7 was marked for identification.)

8 BY MR. MORRIS:

9    Q.  Are these two doc -- in other words, is this

10  communication, which is Exhibit 6, related to this patent

11  which I marked as Exhibit 7?

12   A.  Yes.

13   Q.  Thank you.  Have you ever been to Dr. Kavesh's

14  office?

15   A.  To my knowledge, he has a home office.

16   Q.  Do you know, does he work by himself or does he

17  have other professionals who work with him in his office?

18   A.  My understanding is that he works by himself.

19   Q.  I wanted to take a look at, again, this Exhibit

20  6, the third page in, which is Honeywell 402260.

21  Unfortunately, and I tried to get the absolute best copy

22  of this that I could, but it isn't a particularly good

23  copy.  Take a look at it.  And the first question I've got

24  for you, is do you recognize the handwriting on it?

25   A.  I'm not certain of this handwriting.

00029

1    Q.  Do you know, looking at the data, was this data

2  relating to the solvent-based resin?

3    A.  The top line on this page says Z Shield Kraton

4  resin needed PreCon, which does refer to solvent based and

5  that's indicated here on a handwritten format.

6    Q.  You're doing a better job reading this than I was

7  able to.  I appreciate that.  There's a couple of data

8  points circled on this document.  Those were not circles

9  that I did, those were part of the original document.  Do

10  you remember any discussions with Dr. Bhatnagar about

11  these particular data points?

12    A.  I think those are the ones that he was using to

13  -- as a basis for his invention disclosure.

14    Q.  How did these data points help with his invention

15  disclosure?  Could you explain that to me?

16    A.  The title of the invention disclosure dealt with

17  improving the performance of Zylon Shield.  And the claims

18  that eventually are reduced to the patent was that by

19  using a solvent-based resin versus an aqueous-based resin,

20  that the removal of water would enhance the long-term

21  performance at elevated temperature and humidity.

22    Q.  Did you agree that the data supported that

23  particular claim, at least at this point in time?

24    A.  At what he used as a basis, which was limited

25  data, did suggest that it could have a positive approach

00030

1 by using a solvent-based resin.

2    Q.   Okay.  And what was the positive approach?  If

3 you could explain to me what was the positive approach

4 that the solvent-based resin might lead to?

5    A.   That the degradation associated with the material

6 as measured by V-50 retention would not be quite as great

7 as experienced with the water-based resin or aqueous-based

8 resin.

9    Q.   When we talk about degradation, are we talking

10 again about the high temperature, high humidity condition?

11    A.   Correct.

12    Q.   Look at the next page.  And it's probably the

13 same person's writing, but I will ask, do you recognize

14 the writing on this page?

15    A.   I'm not -- it's just not enough of -- there's a

16 couple of words.  And I apologize.

17    Q.   This is what we call when lawyers -- like they

18 fish in the ocean just to see, but I completely understand

19 that it's not a big sample.  Now, this -- these particular

20 test results, does -- do these results relate to the

21 aqueous-based resin system, to your knowledge?

22    A.   Yes.  These are results that we generated on the

23 aqueous-based material made at DSM.

24    Q.   And was this testing that Honeywell did itself?

25    A.   Yes.

00031

1    Q.  Do you know who took the lead in this particular

2  testing?

3    A.  It was a group effort.  There were multiple

4  people involved with this.

5    Q.  Do you recall who was involved with this

6  particular testing effort?

7    A.  At this time, the V-50 retention would have been

8  done in our ballistics lab, so Lin Murray would have been

9  involved.  Madhu Rammoorthy was involved with the

10  program.  Ashok Bhatnagar had some support of the work

11  that was done.

12    Q.  And again, there are a few data points and column

13  headings circled here that I believe were circled on the

14  original document.  I didn't circle those.  Do you know

15  what are those data points referencing?

16    A.  It appears that it is the four-week and I think

17  that's eight-week V-50 retention percentage of Z Shield

18  after exposure at 70 degrees C and 80 percent relative

19  humidity.

20    Q.  And was it your understanding that this was also

21  part of the data used by Honeywell to make the claim for

22  the patent application H0003249 (4820)?

23    A.  I'd need to refer to the data table to see --

24    Q.  Sure.

25    A.  -- what was included in here.  It appears that

00032

1  data table, that appears on page 20 of the patent, is the

2  data that is referred to in the circled.

3    Q.  Okay.  And is it fair to say that at least in

4  association with this patent application, Honeywell felt

5  that the resin-based system worked better relating to high

6  temperature and high humidity degradation than the

7  aqueous-based system?

8      MR. PRIMIS:  Object to form.

9    A.  You said the resin-based system.  They're all

10  resins.  So forgive me.

11  BY MR. MORRIS:

12    Q.  You're absolutely right.  What I meant was the

13  solvent-based system.  In other words, in comparing the

14  data on page two and page three, was it Honeywell's view,

15  at least at this particular point in time that Dr. Kavesh

16  is sending you this data, that the solvent-based resin

17  system worked better relating to high temperature, high

18  humidity, limiting degradation than the H2/O-based system?

19      MR. PRIMIS:  Object to form.

20    A.  What I can say is that we had enough preliminary

21  results that indicated that there was a direction that

22  might have an improvement.  And I stress might because the

23  relative percentages that are listed here are within

24  experimental error.  And given the number of samples that

25  were taken, we needed to do additional testing to be able

00033
1   to prove this out, but most of the patents that we filed,

2   in order to get in early on patent filings, could be

3   done.  In fact, there's things, such as paper filings,

4   where it's just a premise that is used.  So we had this

5   preliminary data.  It had a general indication that it was

6   possible and the patent was filed in an attempt to have a

7   position in the future.

8      Q.  Now, did Honeywell tell Armor Holdings the

9   results of this particular testing that led to the filing

10  of this patent application?

11     A.  We shared all of the commercial data associated

12  with the Z Shield product with Armor Holdings.

13     Q.  Did you share the data with Armor Holdings -- and

14  I don't mean you personally, but Honeywell, share the data

15  with Armor Holdings on page two for the solvent-based

16  resin?

17     A.  Not that I know of.

18     Q.  Did you -- go ahead.

19     A.  It wouldn't be our practice to share data of an

20  experimental material with a customer.

21     Q.  Did Honeywell share the data on page three

22  relating to the aqueous-based resin system?

23     A.  Yes.  This data was provided to Armor Holdings.

24     Q.  Did Honeywell tell Armor Holdings that it had

25  preliminary data that suggested that a resin based --

00034

1  strike that.  That a solvent-based resin system might work

2  better against degradation than an H2/O-based system?

3     A.  I don't recall if we had the conversation with

4  them along those lines.

5     Q.  Let me now turn to Exhibit 7 which is the

6  patent.  For purposes of the record, this is HW 402204

7  through 402240.  And there are a number of inventors.  And

8  I understand you've already testified it's a group

9  effort.  But if you remember any particular areas that any

10  of these people covered, I'd appreciate it if you could

11  let me know.  Was there anything in particular that Brian

12  Arvidson did with this patent, that you recall?

13     A.  Brian Arvidson would have been the person

14  involved with making the shield material in-house for

15  Honeywell, or in other words, the solvent-based Z Shield.

16     Q.  And I want to make sure I understand.  Would he

17  have made all of the resins or just the solvent-based

18  resins?

19     A.  The aqueous-based resin material was made outside

20  at a toller.

21     Q.  Okay.  So that would have been initially DSM and

22  then FMS?

23     A.  That's correct.

24     Q.  But Brian Arvidson would make the solvent-based

25  resin system in-house at Honeywell; is that correct?

**Wagner, Lori - 07/15/2009 (Vol. 01)**              **Page  34**

00035

1     A.  That's correct.

2     Q.  How about Mr. Bhatnagar or Dr. Bhatnagar, I

3  should say.  My apologies.  What do you remember his role

4  in this patent was?

5     A.  Dr. Bhatnagar typically was someone in our group

6  who was identifying opportunities and would file a number

7  of the actual invention disclosures for the group.

8     Q.  Do you know, did he perform any of the research

9  associated with this patent?

10    A.  He was probably involved in some manner, but I

11  can't tell you at what level.

12    Q.  I take it you were not directly involved in the

13  research for this patent; is that correct, or am I wrong

14  about that?

15    A.  The group was doing it.  We had meetings to

16  discuss it.  And I was aware of all the work that was

17  going on.

18    Q.  In that position, during the discussions, did you

19  get an impression of who was actually doing the scientific

20  work in the lab relating to this patent?

21    A.  Can you tell me which scientific work you're

22  referring to?

23    Q.  We've just been talking about comparing the

24  results of the solvent-based resin system with the

25  water-based resin system.

00036

1    A.   Well, the comparison was done based on ballistic

2  results.  So as I mentioned, Brian Arvidson would have

3  made the material.

4    Q.   Uh-huh.

5    A.   Lin Murray would have tested material in the

6  lab.  I'm not sure of whether it was Ashok or Madhu who

7  would have assembled the ballistic data into the graph or

8  into the tables for review.  And then there would have

9  been a meeting where we sat down and talked about it.

10   Q.   Okay.  Now, that's helpful.  You also covered

11 everyone else on the list, too.  So I appreciate that.  Is

12 there a patent notebook for this patent application, to

13 your knowledge?

14   A.   Not to my knowledge.  I'm not sure when we

15 transitioned to a system for electronic invention

16 disclosures.  And the data would have just been the data

17 that we acquired.

18      MR. PRIMIS:  Tom, we've been going about an

19 hour.  We can go a little bit longer, but if there's a

20 natural breaking point, it might be a good time to break.

21      MR. MORRIS:  Sure.  Why don't we get done on the

22 questioning, not on the whole document, because I've got a

23 number of questions on the document, but maybe just on

24 this page.  Would that be okay?

25      MR. PRIMIS:  I don't mean to interrupt you,

00037

1  that's fine.

2      MR. MORRIS:  No problem.

3  BY MR. MORRIS:

4      Q.  And Dr. Wagner, since you're the one answering

5  the questions, which is always much tougher than asking,

6  if at any point in time you want a break for any reason,

7  just, let us know.  We're not in an endurance contest of

8  any sort.  Okay?

9      A.  Why thank you.

10     Q.  Sure.  And I'm sure if I forget, your counsel

11  will remind me.  It won't be a problem taking a break.  I

12  just want to understand this last answer about the patent

13  notebook.  There's not a patent notebook for this patent;

14  is that correct?

15     A.  Unfortunately, our group was not very good about

16  keeping patent notebooks, myself included.  Although they

17  are issued in Honeywell, our group is not very robust at

18  keeping the patent notebooks.  Patents typically are

19  generated based on experimental data that we generate as

20  opposed to something that's put into a documented patent

21  notebook.

22     Q.  Does Honeywell still have a copy of the

23  experimental data that formed the basis for this patent

24  application, to your knowledge?

25     A.  It would have been the documents that you saw

00038

1  here or the actual ballistic reports. And I'm not sure if

2  all the ballistic reports are still in existence. We had

3  some -- we switched over time to a number of different

4  computer systems. Ballistic reports are kept in a

5  computer system. I know that they're -- I don't know

6  where they're at. It was our policy to keep the ballistic

7  reports, but I don't know, through the transitions in

8  time, if they were all kept.

9      Q. Fair enough. Let me just make sure, if I wanted

10  to find that out, would the best person to ask be Lin

11  Murray to find out about the ballistic reports or you just

12  wouldn't know?

13     A. I wouldn't know. We had an external group that

14  did a program. It was a single-person type of program

15  that documented all of it and I know it's transitioned a

16  number of times in our ballistics lab. I don't know if

17  they kept copies of the old data records when they

18  transitioned it to the different types of IT programs that

19  we have in the lab that generates reports.

20     Q. And the last question before our break, you

21  mentioned that Honeywell had transitioned to an electronic

22  system?

23     A. For invention disclosures.

24     Q. Yeah. Could you just explain a little bit when

25  that transition happened?

00039

1     A.  I don't recall.  It came out as a corporate

2  policy that it was now done on-line.  You would go and

3  enter in the information, as opposed to writing it down

4  and entering it as a different type into the patent.

5     Q.  It's fair to say, at the time of this patent

6  application, that electronic system was not in place, to

7  your knowledge; is that correct?

8     A.  I don't recall when we transitioned to it.  I

9  apologize.

10    Q.  Oh, no, don't apologize.  There's no reason

11  necessary that you should recall that.  I'm just trying to

12  get -- all you can do is tell me what you remember.

13  That's all I'm trying to get.

14    To your knowledge, though, was information about this

15  patent application put on any electronic system?

16    A.  I don't know for certain.

17    Q.  Who would be the best person to ask who's on this

18  patent, who would most likely know the answer to that

19  question?

20    A.  If it was entered in, it would be entered in as

21  part of the IT system that we have in Honeywell.

22    Q.  And who would typically be the person who would

23  enter that information in, do you know?

24    A.  Ashok would have been.

25      MR. MORRIS:  Thank you.  Time for a break.

00040

1        THE WITNESS: All right. Thank you.

2        THE VIDEOGRAPHER: It is now 10:27. We're going

3   off the video record. This concludes tape number 1 in the

4   videotape deposition of Lori Wagner, Ph.D.

5        (Morning recess).

6        THE VIDEOGRAPHER: We're now back on the video

7   record. It's now 10:40. This begins tape number 2 of the

8   videotape deposition of Lori Wagner, Ph.D.

9   BY MR. MORRIS:

10    Q.  Dr. Wagner, when did the work start, if you

11   remember, the research work, that was behind this patent

12   application that's been marked as Exhibit 7?

13    A.  The work that was associated with this was not

14   done for a patent. The work was done in development of

15   the material. The original work that was done, associated

16   with the solvent-based resin system, was our first

17   attempts and a prior document that you gave me actually

18   cited the month and date where we had some trials that had

19   failed around production of a solvent-based resin system.

20   And I'm sorry, I don't remember the exact month and date

21   associated with it, but it would have been back in the '99

22   time frame.

23    Then subsequently, the commercial product was done.

24   Now, no testing at elevated temperature and humidity was

25   done until 2001.

00041

1   Q.  All right.  Okay.  Do you remember any

2  discussions with anyone else working on this patent about,

3  you know, whether it made sense for Honeywell to apply for

4  it?

5     MR. PRIMIS:  Non-lawyers, right?

6     MR. MORRIS:  Strike that.  I'm sorry, I couldn't

7  hear you.

8     MR. PRIMIS:  I want to clarify.  Your question is

9  related to non-legal conversations?

10  BY MR. MORRIS:

11   Q.  Absolutely.  No lawyers.

12   A.  We probably consulted with Greg Herceg around the

13  patent that we were going to potentially file for one, if

14  we felt that there was enough around the claims to be able

15  to produce a draft and file.

16   Q.  Who would have made the determination whether it

17  was enough around a claim to actually file a patent

18  application?

19   A.  There's a process that's in place associated with

20  it where we would work with our IP attorney and they would

21  work with the person drafting the patent.  There's a

22  background search done to determine if there's prior art.

23   Q.  And I don't want to know anything about your

24  discussions with an IP attorney at all, but what I'm

25  interested in, was it the feeling of the group of

00042

1   scientists looking at this patent, that there was enough

2   there to make the particular claim in the patent?

3       MR. PRIMIS:  Object to form.

4     A.   When you say enough there, you're talking about,

5   --

6   BY MR. MORRIS:

7     Q.   There was a sufficient scientific basis to make

8   the claim that is set forth in this patent?

9     A.   We had an indication, based on the preliminary

10  data, that there might be an improvement.  And as I

11  expressed, our policy for going after some of our patents

12  are more of a direction for the business.  And Z Shield

13  was an exceptional product.  We wanted to make sure that

14  we had the opportunity to continue to produce it if we had

15  potential improvements that could be made and that someone

16  else, in recognizing all of the testing that was going on,

17  wouldn't try to come in and patent above and beyond.  So

18  we looked at the data and said that there was enough of a

19  premise that we could move forward on a patent. .We have

20  many paper patents with ideas that are not necessarily

21  always completely supported by data.

22    Q.   Did you -- strike that.  Did you know, did anyone

23  at Honeywell tell anyone at Armor Holdings about this

24  particular patent application which has been marked as

25  Exhibit 7?

00043

1     A.  It wouldn't be our policy to talk about patent

2   applications because patents usually aren't discussed

3   because of the proprietary nature of them until they are

4   published or issued.  But given our relationship with

5   Armor Holdings, the potential might have been a mention

6   that we were looking at product improvements.

7     Q.  Do you personally recall any discussions with

8   Armor Holdings about this particular patent application?

9     A.  No.

10     Q.  Do you personally recall any discussions with

11   anyone at Armor Holdings about the possibility that a

12   solvent-based resin system would work better against

13   degradation than an H2/O-based resin system?

14        MR. PRIMIS:  Object to form.

15     A.  No, not that I recall.

16   BY MR. MORRIS:

17     (Exhibit Wagner 8 was marked for identification.)

18   BY MR. MORRIS:

19     Q.  Let's mark this as the next exhibit.  This is

20   Wagner 8, take a look at that.

21     A.  Okay.

22     Q.  I'm just going to focus on the first few pages.

23   Are you familiar with the term called an information

24   disclosure statement?

25     A.  Yes.

00044

1    Q.   What is that in the context, at least, of

2  patents?

3    A.   It's a statement that we're asked to sign

4  associated with patents.

5    Q.   I'm sorry.  I couldn't hear that last answer.

6    A.   It's a statement that we are asked to sign by our

7  IP attorney associated with patents.

8    Q.   And again, I don't want to get into any of the

9  discussions with your IP attorney, but generally, what is

10  the purpose of this statement, to your understanding?

11    A.   That the information included -- that there's

12  been a research of information associated with the patent.

13    Q.   Why is that important?

14    A.   For prior art and work that may have been done.

15    Q.   If you could turn to HW 00401879.  It's a couple

16  of pages in.

17    A.   Yes.

18    Q.   I see that there's a list of what appears to be

19  patents there.  Generally, do you know what this is --

20  what information this is conveying?

21    A.   This would be a list of patents that our patent

22  agent deemed reference documents that he had reviewed

23  during his preparation for the patent.

24    Q.   At this point, I don't want to get into any

25  discussions between you and the patent agent because

00045

1   there's been a privilege assertion made there, but I am

2   interested in what is a reference document?

3      A.  They would be looking for areas where prior art

4   may have existed associated with the invention that you

5   would be putting forth in a patent.

6      Q.  If you'd turn to 401883.  And looking at the

7   bottom of the page, although it's a little bit difficult

8   to see on the copy, is that a copy of your signature

9   associated with this document?

10     A.  Yes, it is.

11     Q.  Do you have an understanding, what is the purpose

12  of you signing this document?

13     A.  That the statements that are associated with it

14  have been -- to my knowledge, are true.

15     Q.  Let's go back to Exhibit 7 for a second.  And

16  turning to the second page, which is HW 00402205, am I

17  right that the field of this invention did have a

18  ballistic resistance application; is that correct?

19     A.  Yes.

20     Q.  Go to 402214.  And what I'm looking at here

21  starts on what's marked on the left as line 25, where it

22  says, the sealant material serves as a moisture barrier to

23  protect the PBO fibers and may also serve as a binder to

24  provide coherence to a non-woven fiber sheet.  Do you see

25  that?

00046

1   A.  Yes, I do.

2   Q.  Could you explain what that means, that sentence?

3   A.  This was -- this was describing that the system

4  that was used -- the sealant material, or in this case,

5  resin system or any type of material, would act in

6  addition to a binder.  It would have a -- it says may also

7  serve as a binder, which would be like a glue, and the

8  moisture barrier being it would prevent moisture to get to

9  the fiber, the PBO fibers.

10   Q.  And just so it's clear, the sealant material

11  we're talking about here, that's the solvent-based resin;

12  is that correct?

13   A.  It could be a solvent-based resin.  I think the

14  patent -- and if you'd like me to read it, I'd have to

15  look at the scope that it finally encompassed.  I'm not

16  aware of how broad it was eventually drafted.  It could

17  have been multiple materials.  Our patents tend to be

18  written as broad as possible to try to incorporate any

19  potential inventions that we might have down the road.  So

20  many of our shield patents aren't always resin based, but

21  could be a film base or it could be some other type of

22  coating applied.

23   Q.  Would all of those coatings have involved the

24  solvents as opposed to water that would have been

25  associated with this patent?

00047

1    A.  I'm not sure how it was written.  I would need to
2  read it to see.  There is -- there are statements on this
3  page that discuss an anhydrous solvent, but I would need
4  to read the whole patent to understand exactly all the
5  claims that we had in here.  I apologize for not knowing
6  this.  It never was issued, so I'm not fully aware of all
7  of them.
8    Q.  So you do see here that anhydrous solvent, is
9  that a material -- strike that.  Is that a term you're
10  familiar with, anhydrous solvent?
11    A.  Yes.
12    Q.  What does that mean?
13    A.  Anhydrous means without water.
14    Q.  Do you know, were there any water-based sealants,
15  to your knowledge, associated with this patent?
16    A.  Not that I am aware.
17    Q.  If you could look at 402217.  And what I'm
18  looking at here, it's around line 22 where it says, the
19  anhydrous solvent is chosen to be a good solvent for the
20  sealant material.  Do you see that?
21    A.  Yes.
22    Q.  What was the basis for that conclusion?
23    A.  That's a statement, not necessarily a conclusion.
24    Q.  Fair enough.  What's the basis for that
25  statement?

00048

1   A.   If a solvent is not a good solvent, it will not

2   provide the role of a solvent.

3   Q.   Well, what made an anhydrous solvent a good

4   solvent for this purpose with ballistic-resistant

5   materials, to your understanding?

6   A.   There -- in this case, there are many things that

7   would constitute -- that could constitute a good solvent.

8   It depends on the situation.  In this case, one thing that

9   they spell out is the boiling point associated with it for

10  ease of manufactureablility.  That the boiling point is

11  such that it would be able to be evaporated easily.

12  Q.   Anything else you recall about why an anhydrous

13  solvent was chosen to be a good solvent for purposes of

14  this application other than the boiling point?

15  A.   The absence of water.

16  Q.   Why -- strike that.  I'm sorry, go ahead.

17  A.   I'm sorry.  I need to go back and read this --

18  Q.   That's fine.

19  A.   -- to be able to answer your questions.

20  Q.   Fair enough.

21  A.   I've read the background, so your question

22  again?

23  Q.   Sure.  No problem.  I think you had mentioned

24  that the melting point of the anhydrous solvent was one

25  reason that it was chosen to be a good solvent for

00049

1  purposes of this application.  Now, I was asking you were

2  there any other reasons it was chosen to be a good

3  solvent?

4     A.  Well, actually, it's stated in here the

5  evaporation point.

6     Q.  Okay.

7     A.  And it's for ease of removal of the solvent.  And

8  earlier on, the description of the invention is that it

9  does not have water present to -- in the resin.  So that

10  would be another description of the solvent.

11     Q.  Was the absence of water, to your understanding,

12  helpful in addressing degradation issues with Z Shield?

13     A.  There was --

14        MR. PRIMIS:  I'm sorry, object to form.  You can

15  go ahead.

16     A.  Okay.  There was a thought that there could be a

17  link.  There was no proof around that.  This was just a

18  concept.

19  BY MR. MORRIS:

20     Q.  Do you remember who wrote this application?

21     A.  Dr. Kavesh would have been the drafter.

22     Q.  Did you review this application before it was

23  sent in?

24     A.  I may not have reviewed it in entirety.  The team

25  gets it as well as our IP attorney and people review

00050

1 certain sections.

2    Q.  Do you remember which sections you reviewed?

3    A.  No, I don't.

4    Q.  Do you remember, was there anybody on the team,

5 not the attorneys, but on the scientific team, who

6 reviewed the entire patent application?

7    A.  I don't know.

8    Q.  Take a look at 402220, a couple more pages over,

9 which is page 16 of the actual application.  And I'm

10 looking at particularly -- it starts on line 18 and goes

11 through line 23 or 24.

12    A.  Yes.

13    Q.  Okay.  Do you know -- the term more preferably

14 and also most preferably, are those terms of art that mean

15 anything to you?

16    A.  They're patent terminology.

17    Q.  Are you familiar with what they signify?

18    A.  Relative degrees of preference, but not any

19 absolutes.

20    Q.  Okay.  Do you have any understanding why the most

21 preferably ballistic resistant article the invention was

22 determined to have at least 85 percent retention of its

23 initial V-50 rated after accelerated aging for six weeks

24 at 70C, 80 percent RH, why that was most preferable over

25 the more preferable one which just had 87 which was a

00051

1 higher percentage?

2    A.  The 87--

3       MR. PRIMIS:  Object to form.  I think there are

4 other variables, but you can go ahead and answer.

5    A.  Okay.  The 87 refers to a four-week and the 85

6 refers to a six-week.  So I don't know that there's any

7 correlation even between the two of them in the time.

8    Q.  Okay.  My question is one has a higher percentage

9 than the other.  Was it the time element that led --

10 because it was after six weeks of aging that that would be

11 considered most preferable as opposed to the testing that

12 was only with the four weeks of aging?

13    A.  I don't know that there's any correlation here

14 beyond what correlates to the data that he had at his

15 hand.  There was no scientific correlation associated with

16 it.  He was probably just taking the data that he had,

17 which was very limited, and drawing some association to

18 time and temperature exposure that would show an

19 improvement over where we were at.

20    Q.  Okay.  If you look at the first example, which is

21 on Honeywell 00402222, which is also page 18 of the

22 application.  It's example 1. I had a question about the

23 first paragraph once you have a chance to take a look at

24 it.

25    A.  I've read it.

00052

1    Q.  Okay.  Is the material referred to in this

2  example the same as the commercial Z Shield except for the

3  different type of solvent-based sealant?

4    A.  I'm not sure that it's exactly the same as the

5  commercial because these materials may not have been made

6  on the commercial equipment.  So -- and in fact, we do not

7  know -- it references in comparative example 1 PRINLIN

8  7137AL.  And that material is our own internal water-based

9  material that we use for Kraton when we do experiments.

10  It is not necessarily what is used to put in the

11  commercial base.  DSM did not share with us what their

12  resin system was.

13    Q.  Okay.  Let's look at 402225.  I wanted to ask

14  about the first paragraph there, which is also page 21 of

15  the application, once you've a chance to take a look at

16  it.

17    A.  Yes.

18    Q.  Okay.  I wanted to ask you about the first

19  sentence where it says it will be seen that the articles

20  of the invention where the sealant was applied from

21  solution in an anhydrous solvent compared to articles

22  where the sealant was applied from the aqueous dispersion,

23  showed significantly greater retention of ballistic

24  properties after exposure to high humidity.

25    Could you explain what is being stated here?

00053

1    A.  It's a comparison of the data where they're

2  showing the percent V-50 retention of the two materials

3  after exposure to high heat and humidity.  However, the

4  term significantly greater retention is probably used at

5  the -- at Dr. Kavesh's patent language as opposed to

6  scientific language.

7    Q.  Okay.  What language would -- you know, could you

8  substitute it kind of in hindsight, what language would

9  you rather use here, the significantly greater retention

10  based on the data as you knew it at the time?

11    A.  The data showed -- indicated that there was an

12  improvement there, but it was -- for patent purposes, the

13  language is sometimes -- perhaps stated in a different way

14  in order to stress the point associated with it.  So he is

15  saying that the data here showed that there was a

16  difference in the performance.  And I would say that there

17  was a difference and indicated there was a change.  So as

18  opposed to -- we had told him and had asked him -- and I

19  don't know if this goes to -- but it goes to how

20  patents --

21    Q.  Before you mention what you told them.  There's

22  been an issue and I'm still mulling over what I think

23  about the patent agent approach.  I haven't quite decided

24  where I come down on that.  So at least until Craig and I

25  can work out that issue, please do not describe any

00054

1 communications you had with Dr. Kavesh. And I've been

2 trying, in phrasing my questions, to avoid that because we

3 have not worked that issue up quite yet.

4    A. Okay. And this is an area where we had those

5 discussions so I need to --

6       MR. PRIMIS: Why don't we hold off on that. We

7 can clarify it without privilege issues.

8       MR. MORRIS: Yeah, let me think -- right.

9       MR. PRIMIS: And we can provide the information,

10 we'll do that, but let's talk at a break or at lunch.

11       MR. MORRIS: Sure. And -- yeah, let me think for

12 a second if there is a way we might be able to get around

13 this without waiving any possible privilege that you might

14 assert.

15 BY MR. MORRIS:

16    Q. Let me ask it this way. You mentioned before

17 that some of this patent application you would have

18 reviewed before it got sent, but not all of it, as I

19 recall.

20   Do you recall reviewing, you know, this particular

21 statement?

22    A. Not necessarily. My focus tended to be on the

23 claims of the patent since that was the area that -- and

24 at times it would not be on all of the distinct claims,

25 but it would be the general -- the general approach that

**Wagner, Lori - 07/15/2009 (Vol. 01)**          **Page 54**

00055
1  we were taking to the claims in the patent.

2     Q.  Do you know on the team whose focus it was to

3  deal with examples?  And again, I'm talking about the

4  scientific team.

5     A.  In this case, it may have been -- it could have

6  been anybody that was part of the process in product

7  development.

8     Q.  Okay.

9     A.  But they would have reviewed it for scientific

10  description accuracy.  In other words, when he talks about

11  what it was composed of, how it was manufactured, what the

12  measurements associated with it were, not for the crafting

13  of the words associated with the patent.  That's why we

14  hire somebody to draft the patents for us, to use it in

15  the typical patent language.

16    Q.  Do you know -- to your understanding, why did the

17  anhydrous solvent work better than the aqueous solution in

18  terms of leading to at least -- and I won't use the term

19  significantly greater retention because you've talked

20  about that, but at least some measure of better retention

21  of ballistic properties after exposure to high humidity;

22  do you know why was that?

23       MR. PRIMIS:  Objection to form.  You can answer.

24    A.  I don't know why this data turned out that it was

25  better.  We did not have controlled data and in that

00056

1  method, I mean, where the fiber was the exact fiber that

2  was used and we were able to control all of the parameters

3  associated with the manufacturer of the shield. That all

4  contributes to where the retention numbers or the velocity

5  measurements or actually even the testing that was

6  performed in the ballistic lab. The testing was done on

7  different days. There can be variability in test labs of

8  3 to 5 percent. So the relative number here was an

9  indication. There was a thought that this might be

10  directionally appropriate and the data was very limited in

11  support of this.

12  BY MR. MORRIS:

13      Q.  Is there anywhere -- and I take it -- and I know

14  you read the -- at least parts of this application where

15  it has any of those caveats in there that this was based

16  on very limited data and this is kind of just what we

17  think at the time -- strike that.

18      Is there anything in here that you read that indicates

19  this was just based on limited data?

20      A.  That isn't the typical approach to a patent. You

21  can write paper patents that are based on no data and it's

22  still a concept.

23      Q.  Right.  But this was based on some data, correct?

24      A.  Yes.

25      Q.  And is there anything you've read on this patent

00057

1 that indicates that the data was just very preliminary or

2 limited or anything to that effect?

3   A.  The number of data points are not typically

4 mentioned.  An example is an example of a single

5 occurrence.  It doesn't reference a generation of multiple

6 data points.

7   Q.  Now, was there any policy at Honeywell about the

8 amount of data needed before you would submit a patent

9 application, before a scientist at Honeywell would do

10 that?  How much data there had to be?

11   A.  No.

12   Q.  Would Honeywell ever submit a patent application

13 where the data didn't support the claims in the patent?

14   A.  If -- not at the time.  If the data -- if we had

15 data, it would have to be in alignment with the patent

16 claims.

17   Q.  And that was the case here, correct?  The data

18 that you had did support the claims in the patent,

19 correct?

20   A.  That's correct.

21   Q.  I want to go to Honeywell 402231 dealing with the

22 claims.  As I recall -- is this a section you did review

23 before the application was filed?

24   A.  At some point in time, perhaps not the final

25 version of it.

00058

1    Q.  But you would have reviewed it at some point in

2  time before the filing; is that correct?

3    A.  The general format, yes, of what the claims were.

4    Q.  And I just want to ask you about the first claim

5  that's listed.  It says, what is claimed as number one, a

6  method of forming a sheet comprised of PBO fibers and

7  resistant to the effects of heat and humidity.  Was that

8  the first claim listed on this patent application?

9    A.  Yes.  That's what it reads.

10    Q.  And could you explain to me in maybe more

11  layman's terms, what is being claimed there in number one?

12    A.  It's the method of actually making a Zylon Shield

13  product, the steps, the general steps, in forming a

14  product.

15    Q.  And it would be the general steps in forming a

16  Zylon Shield product that was resistant to the effects of

17  heat and humidity; is that correct?

18    A.  As stated, yes.

19    Q.  The last question on this, if you could go to --

20  well, not quite the last page, it's 402239, the abstract.

21  Do you have an understanding in association with a patent

22  application what the purpose of an abstract is?

23    A.  An overview of what the patent is covering.

24    Q.  Okay.  And were you involved with the writing of

25  this particular abstract?

00059

1   A.  No.

2   Q.  Were you involved with the review of this

3   particular abstract?

4   A.  Not necessarily.

5   Q.  Not necessarily.  In other words, you don't

6   remember?

7   A.  I don't know if I read the abstract and made

8   comment to it or not.

9   Q.  And the last question I've got, if you could look

10  at the last figure, which is the last page of HW

11  00402240.  Do you have an understanding, what is that

12  figure depicting?

13  A.  That's methodology of making a shield product.

14  It shows a creel simulating fiber packages going through a

15  series of roles, dipping it into a bath, and then drying

16  it and taking the material up.

17  Q.  And the bath, which number -- there's a number of

18  numbers associated with this figure.  Which number relates

19  to the bath?

20  A.  105.

21  Q.  Would that be the bath where -- for purposes of

22  this patent, as we've seen the anhydrous solvent, would

23  be?

24  A.  As depicted, yes.

25  Q.  I'm sorry, I want to make sure I got an answer to

00060

1  that.

2    A.  As depicted in the schematic, yes.

3    Q.  And then what's 112 showing?

4    A.  This is the solvent being removed by evaporation.

5    Q.  Okay.  And the technology to do this depicted on

6  figure 1, was that technology that Honeywell had available

7  to it as of the date of this patent application?

8    A.  Can you clarify that?

9    Q.  What I'm trying to understand is -- you know,

10  it's one thing -- well, I won't -- I'm trying to

11  understand if Honeywell wanted to do what's depicted on

12  figure one, did they have the technological ability to do

13  it as of the time this patent application came in?

14    A.  In a trial form or in a commercial form?

15    Q.  Okay.  Let's ask both questions.  In trial form,

16  did they have the capacity to do it?

17    A.  Not as depicted here, but as simulated in a trial

18  or pilot type of facility, which would mean it could

19  potentially be decoupled or you would have to formulate it

20  by doing it in different ways.

21    Q.  And what about in commercial form?

22    A.  No.  We weren't able to do it in commercial form

23  as was mentioned in one of the prior documents that said

24  our internal trials failed.

25    Q.  Those internal trials were several years before

00061
1  this patent application was filed; is that correct?

2    A.  Yes.

3    Q.  Over the course of those years, to your

4  understanding, did the Honeywell technology improve at all

5  in terms of an ability to do what's depicted here?

6    A.  I wish.  No.

7    Q.  No?  Okay.  And just so I understand, the reason

8  for the technology issue, was it just as of this time

9  there hadn't been a business reason to do it or was it --

10  in other words, kind of a money or resources issue or was

11  it a true technology issue or even if you really wanted to

12  do it, Honeywell didn't have the capacity to set it up?

13      MR. PRIMIS:  Objection to form.  In particular,

14  just in terms of time frame, I'm not clear what your

15  question is talking about.

16      MR. MORRIS:  That's fair.  Let me -- that was

17  probably objectionable and a couple of other grounds,

18  too.  So let me try it again.

19  BY MR. MORRIS:

20    Q.  As of the time frame of this patent application,

21  it's my understanding that the technology here in figure 1

22  was not available to Honeywell, correct?

23    A.  Correct.

24    Q.  And I'm trying to get an understanding, to your

25  knowledge, was it a money and resources issue or just a

00062

1  capacity to technologically put this together?

2      A.  It wasn't a money and resources, as a fair amount

3  of effort had been placed in our manufacturing

4  capabilities across the board for all of our products.

5  And ultimately, we use a toller associated with it because

6  we lacked the technology to be able to make the shield

7  products.  And there's a technology -- there's a technique

8  that we never were able to develop.  And it's a

9  combination of equipment, of the systems that are used, of

10  a number of things.  We never were able to figure it all

11  out as to how to make it work.

12      Q.  And I appreciate that background because

13  I wanted -- that's helpful.  What I'm -- who was in charge

14  of that effort, if you know, to try to figure this out

15  back in '99 or 2000 when this work was initially being

16  done?

17      A.  We had large resources looking at our whole

18  shield manufacturing process.  Greg Herceg commissioned

19  our engineering group to look at shield manufacturing in

20  general.  And there were a number of design efforts that

21  were done to be able to improve our shield manufacturing

22  techniques

23      Q.  Do you know any particular engineers from that

24  group that Greg commissioned who were particularly

25  involved in that area?

00063

1    A.  I'm trying to remember who was involved with the

2    shield manufacturing effort at that time.  There were, in

3    that time frame -- forgive me, there were a number of

4    efforts that we had over different time periods as we

5    increased our capacity because we did have some internal

6    capabilities.  So we had different engineering teams

7    working on improvements to our manufacturing capabilities

8    at times.

9    Q.  Okay.  And forgetting about the time frame for a

10   second, is there any engineer you can think of in any

11   particular point in time who has been involved with sort

12   of looking at technologically whether a system similar to

13   figure 1 could be done at Honeywell?

14   A.  Brian Arvidson did try internal to our group and

15   he coordinated with engineering.  One gentleman that

16   worked with us is Michael Fubara who is part of our

17   engineering team.

18   Q.  Could you just spell that last name for me?

19   A.  F-u-b-a-r-a. But the efforts that we did were not

20   in conjunction with any one product, it was across the

21   board for all of our shield manufacturing.

22   Q.  Do you know, at the time that this patent

23   application was submitted, which I believe was in late

24   December of 2004, was -- to your knowledge, was there any

25   renewed effort to see if technologically Honeywell could

00064

1 either -- strike that -- could at least on a trial basis

2 come up with a technology to do something as depicted on

3 figure 1?

4     A.  Well, the failed trials that were done, the

5 original intent was not to produce Zylon Shield or Z

6 Shield at an outside toller.  Our intent was to produce it

7 internally.  And those failed trials, which were more than

8 one, just reaffirmed that we had a difficulty in our

9 manufacturing process.  We had never been able to produce

10 our aramid-base shield in-house and it had been in

11 production since 1995.  And there was large-scale effort

12 when that was first worked on and we were never able to

13 manufacture that product in-house.

14     Q.  Do you know, in late 2004, to your knowledge, was

15 there any renewed effort to try to master that

16 technological process?

17     A.  We had failed so miserably that our whole shield

18 operation is now external to Honeywell.

19     Q.  Okay.  And I guess one question I've got is,

20 given the technological issues you talked about, what was

21 the point of filing this patent, if technologically

22 Honeywell wasn't able to do this on even a trial basis

23 much less a commercial basis?

24     A.  We protect space and areas.  There's patents that

25 we have filed for our business that didn't even address

00065

1  things that we would manufacture.  It would allow us

2  either to work with somebody to get it manufactured or it

3  might allow us to have a customer to be able to work in

4  that area using our materials or our technologies.  So

5  there's many different reasons why we would protect things

6  with patents.

7      Q.  Got you.  So hypothetically, if this had turned

8  out to be a really good idea -- not that it wasn't or was

9  a good idea, but if it had turned out well and the patent

10  office had approved it and the Honeywell business people

11  thought, you know, they could make a good rate of return

12  doing this, it would have been possible for Honeywell to

13  partner with another manufacturing entity that did have

14  this technology?

15      MR. PRIMIS:  Objection to form.

16      MR. MORRIS:  Fair enough.  Let me try again.

17  BY MR. MORRIS:

18      Q.  Do you know, is there any manufacturing entity

19  outside of Honeywell, to your knowledge, that has the

20  capacity to do, on a commercial basis, what's outlined in

21  figure 1?

22      A.  Not on a commercial basis that I'm aware of at

23  this time.

24      Q.  How about on a trial basis?

25      A.  There are a few individual companies that can do

00211
1
2
3
4
5          CERTIFICATION
6
       I, ALAN L. LESKY, a Certified
7  Shorthand Reporter of New Jersey, License
   Number XI000730, Approved Reporter of the
8  United States District Court, and Notary
   Public, hereby certify that the foregoing is a
9  true and accurate transcript.
10       I further certify that I am neither
   attorney nor counsel for, not related to nor
11  employed by any of the parties to the action in
   which this transcript was taken; and further,
12  that I am not a relative or employee of any
   attorney or counsel employed in this action,
13  nor am I financially interested in this case.
14

   _____

15  Alan L. Lesky,
   Certified Court Reporter
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 6

00001

1              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLUMBIA

2              No. 1:08-cv-00961 (RWB)

3                  - - -

4  United States of America,

5    Plaintiff,

6    v

7  Honeywell International, Inc.,

8    Defendant.

9                  - - -

10

      Videotape deposition of SHELDON KAVESH,

11

   taken at the offices of Tompkins, McGuire, Wachenfeld &

12

   Barry, Four Gateway Center, 100 Mulberry Street, Newark,

13

   New Jersey, on Tuesday, November 10, 2009, commencing at

14

   9:30 a.m., before Alan L. Lesky, Certified Court Reporter

15

   of the State of New Jersey, pursuant to notice.

16

17

18

19

20

21

22

23

         ALAN L. LESKY & ASSOCIATES

24         18 Concord Drive

       Shamong, New Jersey 08088

25           856-983-3282

**Kavesh, Sheldon (Vol. 01) - 11/10/2009**          **Page  1**

00002
1 APPEARANCES:

2

3    A. Thomas Morris, Esquire
      U.S. Department of Justice
4    Commercial Litigation Branch
      Civil Fraud Section
5    601 D Street NW, Room 9126
      Washington, D.C. 20004

6

7    Kirkland & Ellis, LLP
      By:  Daniel Aaron Bress, Esquire
8    655 Fifteenth Street N.W.
      Washington, D.C. 20005
9    Attorneys for Defendant, Honeywell

10

11

   Also Present:

12

   Lee Bitman, Videographer

13

14

15        W-I-T-N-E-S-S  I-N-D-E-X

16

   Sheldon Kavesh

17

      By Mr. Morris              5, 103
18    By Mr. Bress                100

19

20

21

22

23

24

25

**Kavesh, Sheldon (Vol. 01) - 11/10/2009          Page 2**

00007

1  I am still doing patent work, primarily for Honeywell, but

2  also for law firms and for individuals, former colleagues.

3     Q.  What type of patent work are you doing for

4  Honeywell?

5     A.  Well, I don't do patent law precisely, but I

6  draft applications.  I prosecute applications, meaning

7  that when the patent office says, for one reason or

8  another that the draft, the application, is not allowable,

9  then I will argue and bring the application hopefully to

10 an allowance.  Excuse me.

11    Q.  Sure.  Take your time.  No problem.  And just

12 generally, if you could describe the type of patent work

13 you've done with Honeywell just -- I'm curious?

14    A.  With Honeywell?

15    Q.  Yes, sir.

16    A.  Primarily related to Spectra.  There were a few

17 patents that I did related to ammonium sulfate, ammonium

18 nitrate compositions.  And I believe there was one -- yes,

19 there was one on a weed killer composition.  There were

20 some in the agricultural area, but I don't recall the

21 exact inventions.

22    Q.  Have you done any patent work for Honeywell

23 involving Zylon?

24    A.  Yes.

25    Q.  Could you describe that work?

00008

1    A.  Yes.  An innovation was brought to me and asked

2 to be filed as a patent application and it had to do with

3 protecting the Zylon material against heat and moisture.

4    Q.  Is that the only patent work that you've done for

5 Honeywell relating to Zylon?

6    A.  Yes.

7    Q.  Who retained you for that project?

8    A.  It was Virginia Szigeti who was the assistant

9 patent counsel at Honeywell.

10    Q.  Is she an attorney?

11    A.  She is.

12    Q.  Did you have a retainer agreement for that

13 engagement?

14    A.  No. No. Every -- all the work I've done with

15 Honeywell has been without any formal agreement.  No

16 written agreement.

17       MR. BRESS:  Just let Tom finish his question

18 before you answer.

19    A.  Okay. One clarification. I also -- I also had

20 served as a consultant to Honeywell and that was with a

21 written agreement.

22    Q.  Okay. Did your consulting work for Honeywell

23 involve Zylon?

24    A.  No.

25    Q.  So just so I'm clear, the only matter you've

00009
1  worked on relating to Zylon for Honeywell was that one

2  patent application that you previously described; is that

3  correct?

4     A.  That is correct.

5     Q.  What were the nature of your duties on that

6  patent application relating to Zylon?

7     A.  I was presented with certain data and I used that

8  data as a template for drafting claims and a specification

9  of the patent.

10    Q.  What was the data you were presented with related

11  to that project?

12    A.  I believe it was 2002.  I can't remember the

13  exact date.

14    Q.  What was it?  What was the nature of the data?

15    A.  It was data showing the V-50 -- I'll explain that

16  term, if it's not familiar to you.  The V-50 of a target,

17  ballistic target, that had been exposed to heat and

18  humidity for some period of time.  At various periods of

19  time, if I remember, two, four, and six -- six and eight

20  weeks, as compared -- in one case where the target had

21  been constructed using an aqueous dispersion of Kraton and

22  in another case, where the Kraton had been deposited from

23  an anhydrous solution.

24    Q.  A couple of terminology, if you could go over.

25  First, Kraton, could you explain to me what Kraton is?

00010

1    A.  Yes.  Okay.  It's an elastomeric material.  More

2  specifically, it's a styrene isoprene, styrene block

3  co-polymer.

4    Q.  What applications does Kraton have generally?

5    A.  It's used in rubber goods, sometimes in sneakers,

6  sometimes in hoses, and just generally where elastomers

7  are used.

8    Q.  Does Kraton, to your understanding, have any

9  application to any Zylon products that you're aware of?

10      MR. BRESS:  Objection to form.

11    A.  I'm sorry?

12      MR. BRESS:  I just objected to form.  You can

13  answer.

14    Q.  The question was, does Kraton have any

15  applications, to your understanding, to Zylon products?

16    A.  It has been used as a matrix material in

17  ballistic composites.

18    Q.  When you say "a matrix material," could you

19  explain what you mean by that?

20    A.  Yes.  Before I can answer that, I have to tell

21  you about Shield.

22    Q.  Sure.

23    A.  Ballistic fabrics or ballistic articles made of

24  fibrous, fibrous articles, are made either by weaving or

25  with a non-woven construction.  One of the innovations

00011

1  that Honeywell brought to bear was a non-woven

2  construction consisting of unidirectional fibers in a

3  layer and then aligned perpendicular at -- or at an angle

4  with another layer of unidirectional fibers. This

5  construction was held together by a matrix, a material

6  which bonded the fibers and bonded the layers.

7     Q.  Is a matrix material the same as a resin or is it

8  different?

9     A.  A matrix material can be a resin, but more

10  generally, it can be any kind of material depending upon

11  the composite.

12     Q.  Got you. Okay. And in this instance, relating

13  to the Zylon non-woven product, what was the nature of the

14  composite?

15     A.  If we're talking about specifically Zylon Shield,

16  the nature of the composite, as I recall, was layers of

17  Zylon fibers uniaxially oriented and then aligned at

18  angles, each layer to another, and bonded together with a

19  matrix. There may also have been -- I'm not sure. There

20  may also have been Zylon Spectra, that is polyethylene

21  material, all in one material. All in one product.

22     Q.  Was Kraton that matrix material that binded the

23  Zylon Shield layers together?

24     A.  To my knowledge, yes.

25     Q.  And you used the phrase aqueous dispersion.

00012

1    A.  Right.

2    Q.  Could you explain to me what that is?

3    A.  Okay.  Kraton is a hydrocarbon polymer.  It's not

4    soluble in water.  If one wants to put the Kraton onto a

5    fabric or a fibrous material, if the Kraton is a solid --

6    one has to put it on in a -- generally, you have to put it

7    on in a liquid form.  In order to do that, one either has

8    to dissolve it or disperse the solid in a carrier liquid.

9    For safety purposes, it's preferable to disperse in water

10   so that one doesn't have flammable solvents involved in

11   the commercial process.

12      Have I answered your question?  I'm not sure.

13   Q.  Yeah.  What -- then you also mentioned another

14   case the Kraton -- or strike that.  There was an anhydrous

15   solution involved with the Kraton.  What is an anhydrous

16   solution?

17   A.  A solution which contains virtually no water.

18   Q.  Who at Honeywell were you working on this project

19   on?  I don't want any of your communications.  I've

20   already talked with them.  I'm not going to try to erase

21   your privilege, but I'm just interested in who you worked

22   with on that?

23   A.  The people who were -- the people who were most

24   active in doing the work were Brian Arvidson and Ashok

25   Bhatnagar.

00013

1   Q.  And the data that you got comparing the Kraton

2   that had the aqueous dispersion with the Kraton that had

3   the anhydrous solution, do you know who at Honeywell gave

4   you that data?

5   A.  Ashok Bhatnagar.

6   Q.  Do you know if he was the one who compiled the

7   data?

8   A.  No, I don't.

9   Q.  What do the comparisons show between the Kraton

10  that had the aqueous dispersion and the Kraton in the

11  anhydrous solution in the data that you saw?

12  A.  Okay.  In the ballistic results and after

13  exposure to high heat and high humidity, very high, we're

14  talking about -- I think, as I recall, the data was 80

15  percent relative humidity and 70 degrees centigrade,

16  something of that order.  At the end of one, two, four,

17  six, and eight weeks, the material with -- that had been

18  processed with the aqueous dispersion had degraded more

19  than the material that had been prepared using an

20  anhydrous solution.

21  Q.  Again, I don't want to get into any specifics,

22  but did you discuss those results with Dr. Bhatnagar?  And

23  that's just a yes or no.

24  A.  Yes.

25  Q.  How did you use that data in connection with the

00014
1  patent application that you worked on?

2    A.  I'm sorry?

3    Q.  Let me try again.  How did you use that data that

4  you've just described in connection with the patent

5  application that you worked on?

6    A.  Okay.  That was the basis of a claim for improved

7  resistance to heat and humidity.

8    Q.  Do you recall when you started work on that

9  patent application?

10    A.  About a year after I received the data.

11    Q.  Do you know why there was a delay?

12    A.  I had reservations as to whether this was --

13      MR. BRESS:  Before you get into that, I want to

14  instruct you that we don't want you to disclose any patent

15  advice that you would have given to Honeywell.  So with

16  that instruction on the table, if you can answer

17  Mr. Morris's question without the disclosing that advice,

18  you can go ahead and do so.

19    Q.  Yeah.  And also just another caveat, too.  If

20  you're not sure, just say I'm not sure.  If you have an

21  understanding, then tell me, but I'm not interested in

22  your speculations.

23    A.  Right.  I was given the data, but I felt the data

24  was not unobvious in light of the prior art.  And so I did

25  not move on drafting a patent application.

00015

1    Q.  And when you say you thought the data was

2  non-obvious, could you just -- in terms of patent terms,

3  what does non-obvious mean?

4    A.  It means that the information appears in the

5  prior art in at least one or more references.

6    Q.  Now, at some point in time, you did put a patent

7  application together based on the data that you described,

8  correct?

9    A.  Say again, please?

10    Q.  Sorry.  I'm talking to go my pad here rather than

11  you.  My apologies.  At some point in time, you did put

12  together a patent application based on the data you

13  described; is that correct?

14    A.  Yes.

15    Q.  Did something change your mind about the

16  obviousness of the --

17    A.  No.

18      MR. BRESS:  Please be careful not to disclose any

19  patent advice that you gave to Honeywell.

20    Q.  So just so I'm clear, and again, I don't want you

21  to disclose any patent advice.  I agreed with them, we're

22  not getting into that.  I'm not going to try to revoke my

23  agreement.

24      Just so I'm clear, though, your understanding of the

25  obviousness of this process did not change throughout the

00016

1  time you worked on the application; is that correct?

2      MR. BRESS:  I'm going to have to instruct you not

3  to answer that.

4      MR. MORRIS:  Why?  That's just a yes or no.

5      MR. BRESS:  Are you asking just for yes or no in

6  that case?

7      MR. MORRIS:  Yeah.  That was the question.

8  Repeat the question.  It's just a yes or no.

9      (Read back question.)

10   A.  No.

11 BY MR. MORRIS:

12   Q.  No, it's not correct?

13   A.  That's not correct.

14   Q.  Did there come a point in time where you thought

15 the application was not obvious?

16   A.  Yes.

17   Q.  Did that point in time come before you drafted

18 the patent application?

19   A.  It came during the drafting of the patent

20 application.

21   Q.  What was the time frame when you were drafting

22 the patent application?

23   A.  I can't be absolutely sure.  It started in 2003.

24 I'm not sure exactly over what period of time that

25 progressed.

00017

1    Q.   When you say "drafting the patent application,"

2  were you the one who actually wrote it?

3    A.   Yes.

4    Q.   Did you have assistance in writing it from anyone

5  at Honeywell?  That's just a yes or no.

6    A.   Yes.

7    Q.   Who assisted you?

8    A.   After I drafted it, I sent copies to the

9  inventors and to Virginia Szigeti, who was the in-house

10  counsel, and received comments from both.

11    Q.   Then was it you, then, who took those comments --

12  and I don't want to know what the comments were, but were

13  you the one who did the revisions to the patent

14  application based on the comments?

15    A.   Yes.

16    Q.   Let's mark as the first exhibit, a few bills that

17  you sent.  Take a look at that and I'll have a couple

18  questions on that.

19    A.   Yes.

20      MR. BRESS:  Wait for a question.

21    A.   Yes.  No question.

22    Q.   You were going to point something out to me.

23  What were you going to point out to me?

24    A.   The leads files really don't tell you anything

25  the way they're printed out, but I believe Mr. Bress has

00018

1  sent copies of the actual invoices or some better form of

2  the invoice to you.

3     Q.  Yeah, I was going to ask about that because I'm

4  not sure I do have a better form of the invoice, but be

5  that as it may, if you could take a look at the first two

6  bills for a second?

7     A.  Yeah.

8     Q.  Were these the only two bills that you gave to

9  Honeywell relating to your work on that PBO patent

10  application?

11    A.  No.

12    Q.  Do you have in your possession the other bills

13  that you grave to Honeywell?

14    A.  Here?

15    Q.  No.  Just generally?

16    A.  Yes.

17    Q.  Was there some reason that you know of that you

18  didn't produce those other bills to Honeywell for

19  production to the United States?

20    A.  I thought I had.

21       MR. MORRIS:  The only bills I have here are these

22  two bills.  I don't have any other ones.

23       MR. BRESS:  Yes.  In the e-mail I sent you, I

24  guess it was last week, there were some additional

25  invoices attached to that.

00019

1     MR. MORRIS:  Were they bills or invoices?

2     MR. BRESS:  I can't recall exactly what they

3  were.  They were additional documents that Dr. Kavesh had

4  provided to me and I provided to you.

5  BY MR. MORRIS:

6    Q.  Let me ask the question this way.  Were there any

7  bills that you're aware of that you did not provide to

8  Honeywell --

9    A.  No.

10    Q.  -- relating to your work with the PBO?

11    A.  No.

12    Q.  Now, the first bill, was this the entirety of

13  your billing on the draft of the patent application or was

14  there additional billing in addition to the $6,000?

15    A.  Yes.  There was additional billing shown on the

16  next page.

17    Q.  It says here, extension of the patent application

18  on the second page which is HW 406787.  What does that

19  mean?

20    A.  As I recall, there was a request to cover felt

21  materials, PBO in felt form, and that required revision of

22  the patent application in order to incorporate.

23    Q.  Who made that request to you at Honeywell?

24    A.  I believe it was Lori Wagner.

25    Q.  Now, in addition -- this first bill talks about

00020

  1  drafting the patent application and the second bill talks

  2  about extending this patent application.  Was there other

  3  work you did on this particular patent application other

  4  than what's reflected in these two bills?

  5    A.  Yes.

  6    Q.  What other work did you do?

  7    A.  After an initial office action and I think a

  8  second office action, I wrote responses to the office

  9  actions.

 10    Q.  And are the responses amendments to the

 11  application or different?

 12    A.  They're called amendments, but they also are

 13  responses to the objections, the rejections, of the

 14  examiner.  There were amendments of the claims.

 15    Q.  In addition to this bill, did you give Honeywell

 16  any itemized descriptions of the work that you did?

 17    A.  No.

 18    Q.  I'm going to mark this as Exhibit 2. Have you had

 19  a chance to take a look at this, Doctor?

 20    A.  I'm familiar with it, yes.

 21    Q.  Okay.  Can you identify what is this document

 22  that I've marked as Exhibit 2 which is also Bates numbered

 23  HW 00402204 through 402248?

 24    A.  It's a copy of the patent application which I

 25  drafted and which was filed by Virginia Szigeti.

00021

1    Q.  And is this the patent application referenced in

2  that first bill that we saw which was the first page of

3  Exhibit 1?

4    A.  Yes.

5    Q.  Is this a true and accurate copy of the patent

6  application that you drafted for Honeywell?

7  .  A.  So far as I can tell.

8    Q.  If you could take a look towards the back on page

9  402237, and when I refer to these page numbers, I'm

10  referring to the top Bates number --

11    A.  Okay.

12    Q.  -- in the right-hand corner.  That's the one you

13  like, right, the HWs?

14      MR. BRESS:  Yeah, that's the one we have.

15    Q.  It's HW 402237.  It's towards the back.

16    A.  Got it.

17    Q.  Do you have an understanding what Roger Criss's

18  role was with this patent application?

19    A.  I believe he was Virginia's supervisor.

20    Q.  What about Margaret S. Millikin, do you know what

21  her role was?

22    A.  She was also assistant general counsel, same

23  title as Virginia.  Worked in the same location.

24    Q.  I'm going to come back to this with a slightly

25  different exhibit a little bit later.  And I've now marked

00022

1  what's Exhibit 3 which is HW were 00401882 through 884.

2  I'd ask you to take a look at this. Have you had a chance

3  to look at it?

4     A.  Yes, I have.

5     Q.  Okay. First of all, what is declaration for

6  patent application, sole or joint?

7     A.  The United States Patent Office, under law,

8  requires that the inventors be identified. The inventors

9  have to be individuals. That's what this form represents.

10    Q.  If you take a look at the next two pages, there's

11  a form and some signatures. Do you see that?

12    A.  Yes.

13    Q.  What is the purpose of those signatures?

14    A.  It reads at the top, "I hereby declare" -- it

15  goes back to the first page that, "As a below named

16  inventor, I hereby declare." The signatures attest that

17  the below signed individuals are indeed inventors of the

18  claimed invention.

19    Q.  How did you first hear of Zylon?

20    A.  I really don't recall. If you ask a different

21  question.

22    Q.  How about PBO, how did you first hear --

23    A.  All right. PBO, as a material, was first

24  developed probably in the 1950s or 1960s. It had been

25  picked up as a commercial product by several companies. I

00035

1     MR. BRESS:  Objection to form.

2     A.  As a matter of law, I believe, the patent

3  applications are confidential and treated as such.  I

4  think I would like to take break at this time.

5     MR. MORRIS:  That's fine.  Perfect.

6     THE VIDEOGRAPHER:  It is 10:35.  We're going off

7  the video record.  This concludes tape number one of the

8  videotape deposition of Dr. Sheldon Kavesh.

9     (Morning recess.)

10     THE VIDEOGRAPHER:  We're now back on the video

11  record.  It's now 10:45.  This begins tape number two of

12  the videotape deposition of Dr. Sheldon Kavesh.

13  BY MR. MORRIS:

14     Q.  Dr. Kavesh, I am showing you what's been marked

15  as Exhibit 7, HW 00406936.  This came from, I think, the

16  collection of documents that Honeywell had obtained from

17  you.  Do you recall this?

18     A.  Yes.

19     Q.  What was the purpose of you getting this

20  information?

21     A.  In the example of the -- one of the examples of

22  the patent, I needed dimension information for the Z

23  Shield and that's why I requested this product spec.

24     Q.  And when you say "the patent," was that the

25  patent application that we saw in Exhibit 2 earlier today?

00036

1    A.  I don't recall the number, but it is the only

2  application which I drafted -- yes.

3    Q.  Thank you.  Did you use any of the information on

4  Exhibit 7 for the patent application other than the

5  dimensions?

6    A.  I don't believe so.

7    Q.  I've a marked as Exhibit 8 another document from

8  your collection.  This is some data.  I'd like you to take

9  a look at this.  I just have a couple of questions about

10  that.

11    A.  Yeah.

12    Q.  Can you identify what this is?

13    A.  It's testing of yarns of different types for

14  tensile properties.

15    Q.  Did you get this information from Honeywell?

16    A.  Yes.

17    Q.  Who at Honeywell provided you this information?

18    A.  Either Ashok Bhatnagar or Brian Arvidson, in all

19  likelihood, but I really don't recall.

20    Q.  Okay.  Do you know who compiled the data for

21  Honeywell?

22    A.  One or the other of the two that I mentioned, I

23  think.

24    Q.  And did you use any of the data in Exhibit 8 for

25  the patent application that has been marked as Exhibit 2?

00037

1   A.  No.

2   Q.  Does any of the data in Exhibit 8 relate to PBO?

3   A.  Yes.

4   Q.  Could you identify the pages?

5   A.  Sure.  Yeah.  The sample IDs that have a Z

6 following the numero are materials that contained PBO

7 Zylon.

8   Q.  And just taking a look, first, at that second

9 page where there's some Z samples.  What's being described

10 there in that Series IX, automated testing system, and

11 then that is a chart?

12   A.  What's being done here is tensile testing of yarn

13 bundles and the input to the test is a measurement of the

14 denier and then the rest is calculated by the testing

15 machine.

16   Q.  And could you describe what is the testing

17 machine?

18   A.  It's an Instron tensile tester, if I recall.

19   Q.  When it says percentage of strength retention,

20 kind of in the middle column --

21   A.  Right.

22   Q.  -- what's that reflecting?

23   A.  If you look at the first sample, 4795-Z, that is

24 evidently a control sample that's been exposed to no

25 conditions of accelerated aging.  The second sample, 2W90C

00038

1 is that same yarn that has been exposed -- probably, if I

2 recall this nomenclature, for two weeks at 90 degrees

3 centigrade. I don't know what humidity level.

4    Q.  Just so I understand, the sample IDs, if it has a

5 Z by it, does that mean it's a Z Shield sample?

6    A.  No.  It's not a Shield.

7    Q.  What does that mean?

8    A.  It's not a Shield.  It's Zylon fiber or yarn.

9    Q.  What is the A, what type of --

10   A.  Aramid.

11   Q.  Got you.  And ZK?

12   A.  A combination of Zylon with Kraton.

13   Q.  Do you know the Kraton there, is that the aqueous

14 or the solvent?

15   A.  No.  That would be solvent.

16   Q.  And what about AK?

17   A.  Aramid and Kraton.

18.  Q.  And ZP?

19   A.  Zylon and Prinlin which is the aqueous Kraton.

20   Q.  And AP?

21   A.  Aramid and Prinlin.

22   Q.  Do you recall what the purpose of Mr. Bhatnagar

23 was in sending you this data?  Again, I'm not asking for

24 any communications with him, just your understanding of

25 why he sent this to you?

00039

1   A.  I may have requested it.

2   Q.  Do you remember why you requested it?

3   A.  I was interested in seeing whether I could write

4 a claim on protection of the yarn as well as in terms of

5 protection of the ballistic material, the Shield.

6   Q.  You said you thought this reflected accelerated

7 aging at 90 C; is that correct?

8   A.  Yes.

9   Q.  What's the basis of that recollection, is there

10 something on the document or is it just your memory?

11   A.  Just the designation on the document.

12   Q.  What designation are you referring to?

13   A.  The 2W90C, the 4W90C, that's my interpretation.

14   Q.  Got you.  Okay.  Did you give this information to

15 anyone after you received it, other than your counsel for

16 purposes of this case?

17   A.  No.

18   Q.  Did you have any discussions with anyone in the

19 government about this data?

20   A.  No.

21   Q.  I show you what's been marked as Exhibit 9.

22   A.  And I'll return your pen.

23   Q.  I'm with the government.  So I need to keep my

24 equipment.  It's not as easy to get these pens as it was

25 when I was in the private sector.  Let me know when you've

00040

1  had a chance to look at that.

2     A.  Go ahead.

3     Q.  Can you identify what this is?  Again, this is

4  some of the documents that were turned over by Honeywell

5  in connection with the subpoena that I sent you.

6     A.  I have no recollection of what this data

7  represents.

8     Q.  And there's nothing in this data that refreshes

9  your recollection?

10    A.  No.

11    Q.  And you don't recall using this data for purposes

12  of the patent application that's been marked as Exhibit

13  2?

14    A.  No.  I'm looking at the first page and answering

15  that question.  But if I look at the second page, that may

16  be a different matter.

17    Q.  You're good.  Thank you.  You're more careful

18  than I am.  Those questions relate to the first page.

19  What about the second page -- does any of this -- strike

20  that.  Can you identify what this data is on the second

21  page which is marked HW 00406514?

22    A.  Yeah.  There's a notation that it represents two

23  layers of Z Shield, 95 grams per meter square, with

24  polyethylene film and Prinlin, but beyond that, I don't

25  know what these data represent.

00041

1   Q.  Do you recall using this data on the second page

2  which is HW 406514 in connection with the patent

3  application?

4   A.  It doesn't ring a bell.

5   Q.  Did you give this data to anyone outside of

6  Honeywell?

7   A.  No.

8   Q.  Including the government?

9   A.  No.

10   Q.  How about on page three, which is also --

11  actually, on this document, it's page one, but it's HW

12  00406515, do you recall this at all?

13   A.  No.

14   Q.  How about on the next page, HW 00406516, do you

15  recall this at all?

16   A.  I don't recall it, but if I look at 15 and 16,

17  the two pages that we just looked at, and we have aramid

18  fiber, no aging on 15, and aramid fiber aged two weeks on

19  16, it looks like, and I'm not real sure of this, it looks

20  like it's yarn testing after some kind of aging, and I

21  can't tell both before and after aging.  And I can't tell

22  from the table, what that aging would have been.

23   Q.  In connection with Exhibit 2 that we saw, the

24  patent application --

25   A.  Yes.

00042

1    Q.  -- you don't recall using this data in connection

2    with that application; is that correct?

3    A.  That's correct.

4    Q.  If you take a look at the next page, which is HW

5    00406517, do you recall this data?

6    A.  It looks like the data that we saw in an earlier

7    sample, but I'm not real sure.  Similar.

8    Q.  Is that earlier sample what you're referring to

9    what has been marked as Exhibit 8?

10   A.  Yes.

11   Q.  Is it your understanding that the designations on

12   the sample ID are the same designations that you described

13   in connection with Exhibit 8 in terms of --

14   A.  What I see on HW 00406796 and the HW 0046517,

15   those designations are the same, some of them.

16   Q.  But the columns are a little bit different,

17   though, right?

18   A.  Yes.

19   Q.  So it's your understanding that the sample IDs

20   referenced there, the Z, the A, have the same --

21   abbreviations for the same designations that we talked

22   about on Exhibit 8?

23   A.  Yes.

24   Q.  Got you.  Okay.  Good.  Do you recall -- what

25   about the next page, do you recall anything on HW

00043

1   00406518?

2     A.  If I remember correctly, there was an objection

3   raised by the patent office that one could not tell the

4   difference between a Shield material that had been

5   prepared using the aqueous system or the anhydrous

6   system.  And this data was obtained by Brian Arvidson

7   which demonstrated that one could readily tell the

8   difference between a Shield material made by the two

9   processes by simply exposing them to water.  I don't

10  recall whether it was in the form of humidity or in the

11  form of liquid water, but after exposing them -- it must

12  have been humidity, I think.  After exposing them for 24

13  hours, there was considerable -- yes, I see my notes, 70

14  degrees centigrade, 80 percent relative humidity.  There

15  was a considerable difference in the amount of moisture

16  that had been picked up by the two materials.

17    Q.  So that's your handwriting --

18    A.  Yes.

19    Q.  -- on the document, the 70 C, 80 percent relative

20  humidity?

21    A.  Yes.

22    Q.  And you said there was quite a difference in the

23  moisture picked up by the two materials.  Could you

24  explain that referencing the data on HW 00406518?

25    A.  Yes.  My recollection is that the SR-1214 and the

00044

 1  SR-3124 were made with Prinlin.  I don't recall, I think

 2  this is a Shield material or at least one layer of fiber,

 3  and the SS11-3111 was made with a solution of Kraton,

 4  probably and cyclohexane.

 5    Q.  Was that a non-aqueous solution?

 6    A.  Yes.

 7    Q.  What was the difference in terms of picking up

 8  moisture between the two solutions with the Prinlin versus

 9  with the Kraton?

10    A.  Well, as you can see, the Prinlin -- the material

11  which had been coated with Prinlin, which had a Prinlin

12  matrix, picked up between point 95 and 1 point 98 weight

13  percent water, whereas the non-aqueous Kraton-based

14  material, picked up essentially no water within the error

15  of measurement.

16    Q.  When you say "picked up water" was that due to

17  exposure to the humidity conditions, to your

18  understanding?

19    A.  Yes.

20    Q.  Do you have an understanding, for ballistic

21  performance, is it a -- picking up water is something that

22  helps ballistic performance or hurts ballistic performance

23  or you need more factors to know?

24       MR. BRESS:  Objection to form.

25    A.  I need more factors to know.

00045
1    Q.  What else would you need to know?

2    A.  In many instances, in using a ballistic material,

3  the material is protected from moisture by being placed in

4  a waterproof envelope.  That is typically done with

5  Kevlar, for example.  So the answer to your question is

6  not simple.

7    Q.  Do you know, is it your understanding that the

8  waterproof envelope shields the material from the effects

9  of humidity as well?

10    A.  I don't know the answer.

11    Q.  Do you recall, when you obtained this particular

12  data, which is on HW 00406518, even a ballpark?

13    A.  Ballpark?  2005 or so.  It was in response to an

14  office action rejecting the application.

15    Q.  And the rejection of the application we're

16  talking about is the application on Exhibit 2; is that

17  correct?

18    A.  Yes.

19    Q.  Without disclosing the nature of the

20  communications, did you talk about this data on HW

21  00406518 with anyone at Honeywell?

22    A.  Yes.

23    Q.  Who?

24    A.  The person who obtained the data, Brian Arvidson

25  and it was submitted to the patent office in an

00046

1 amendment. I don't recall whether that amendment was

2 submitted by Virginia Szigeti or by another one of the

3 in-house attorneys.

4    Q.  Let me have you take a look at the next page,

5 which is HW 00406519, and ask if you recall this data?

6    A.  It's the identical data we had seen in --

7    Q.  Exhibit 8?

8    A.  -- Exhibit 8.

9    Q.  Got you.  Okay.  Turn the page to HW 00406520 and

10 ask you if you recall this data?

11    A.  Not very well, no.  I've seen it before, but I

12 don't recall what the significance of it is.

13    Q.  How about on the next page, do you recall the

14 data on HW 00406521?

15    A.  Yes.

16    Q.  What do you recall about this?

17    A.  Well, by my notes, it represents the exposure of

18 Zylon fiber and aramid fiber of both coated with Kraton,

19 that is the anhydrous solution of Kraton, and also water

20 dispersion of Kraton, called Prinlin.  These are tests of

21 yarn samples which had received this exposure two weeks at

22 70 percent relative humidity, at 90 degrees centigrade.

23    Q.  Was it your understanding that Ashok Bhatnagar

24 performed this testing -- or strike that, compiled this

25 data?

00047

1    A.  He, I'm sorry, say again, please?

2    Q.  Who was it, who compiled this data at Honeywell,

3  do you know?

4    A.  This data looks like it comes directly from the

5  testing lab.

6    Q.  Do you know when you received this data from

7  Honeywell?

8    A.  No.  I don't recall when I received it.

9    Q.  Did you use this data in connection with any of

10  the applications or amendments relating to the PBO?

11    A.  No, to my knowledge, I did not.

12    Q.  Any of the data that we've seen in Exhibit 9, did

13  you provide any of this data to any government agencies?

14    A.  No.

15    Q.  Did you provide any of this data to anyone

16  outside of Honeywell?

17    A.  No.

18    Q.  If you could look at Exhibit 10.

19    A.  Okay.

20    Q.  Do you recall this data on Exhibit 10 which is

21  Bates stamped HW 00406933 through 406935?

22    A.  Yes.

23    Q.  What do you recall about this data?

24    A.  I was attempting to see whether we could get --

25  well, first, let's talk about the first page, the 406933.

00048

1　Here is a calculation from the Shield specification data

2　that would allow me to calculate what the void volume was

3　in the Shield material.

4　　Q.　Was this data that you compiled into the

5　calculations on?

6　　A.　I did the calculation.　The data under

7　specification, I believe, came from the specification data

8　sheet that we had seen earlier.

9　　Q.　Why did you want to do the calculation leading to

10　a void?

11　　A.　As one of the attempts to make the patent

12　application non-obvious, I brought in the question of

13　water vapor permeability in the Shield.　Ballistic

14　material, I argued, should be, on the one hand,

15　comfortable to wear, and on the other hand, impervious to

16　moisture.　So how does one obtain this compromise or the

17　best of both situations?

18　　I argued that if one protected the fibers, but left

19　void volume between the fibers, that there would be an

20　opportunity for humidity to pass out of the ballistic

21　material and still have the fibers protected and maintain

22　ballistic integrity.

23　　Q.　How would you protect the fibers so that would

24　happen?

25　　A.　By coating the individual fibers, the individual

00049

1    filaments, of the -- of the yarn.

2    Q.   Coating them with what?

3    A.   Coating them with a moisture vapor barrier which

4    could be Kraton material.

5    Q.   Would it be a non-aqueous material?

6    A.   Preferably.

7    Q.   Why do you say preferably?

8    A.   There is protection that is afforded by the

9    Prinlin aqueous system as well, but not as great.

10   Q.   When do you recall doing these calculations which

11   are on HW 00406933?

12   A.   Sometime prior to filing the application or

13   submitting the application to Virginia Szigeti for filing.

14   Q.   And without disclosing any specific

15   communications with Honeywell, do you recall discussing

16   the results of these calculations on HW 00406933 with

17   anyone at Honeywell?

18       MR. BRESS:  This is a yes or no?

19   Q.   Yes or no.

20   A.   Yes.

21   Q.   Who?

22   A.   Lori Wagner.

23   Q.   When?

24   A.   Again, sometime during the course of final

25   drafting of the patent application.

00050

1    Q.   When we say "final drafting of the patent

2  application" we're still referring to that patent

3  application in Exhibit 2?

4    A.   Yes.

5    Q.   Do you recall talking about these calculations

6  with anyone else at Honeywell?  And that's a yes or a no?

7    A.   No.

8    Q.   How about the second page of this document, which

9  is HW 00406934, do you recall this data?

10    A.   Vaguely, yes.

11    Q.   What do you vaguely recall about this data?

12    A.   It's a compilation of the data for the testing of

13  yarn samples, which have been coated with the various

14  materials, the various yarns and the various yarn

15  coatings.

16    Q.   Do you have an understanding of who compiled this

17  data?

18    A.   That probably is mine.

19    Q.   What does this data show?

20    A.   Not a heck of a lot, as I recall.  Unfortunately,

21  in this printout, it doesn't show the graph all in one

22  place.

23    Q.   Sure.

24    A.   But there was no coherent story that I could make

25  of the data.

00051

1    Q.  If you could, and I know it's tough because the

2  graph is on a couple of different pages --

3    A.  Right.

4    Q.  -- but could you explain to me, as best you can

5  from this graph, why there's no coherent story?

6    A.  Well, let's -- let's see if we can identify the

7  Zylon fiber data because that was really the issue with

8  respect to the patent.

9    Q.  Okay.  Sure.

10    A.  Now, with respect to the Zylon fiber -- well, as

11  best I can tell, the curves are all very close together.

12    Q.  That's why there's no coherent story?

13    A.  Right.

14    Q.  Got you.  Okay.  Let's mark this as Exhibit 11.

15  Let me show you this and ask if you recall this data?

16    A.  Yes.

17    Q.  What do you recall about this data which has been

18  marked Exhibit 11, HW 00406791?

19    A.  This is my compilation and plot of data provided

20  to me by Dr. Bhatnagar very early on.  I think it was the

21  first information I received from him.  But it's not his

22  compilation, it's my compilation and my plot.

23    Q.  What does the compilation show?

24    A.  It shows the V-50 of a Z Shield made with Kraton

25  using different systems for the Kraton.

00052
1    Q.   What are the different systems?

2    A.   The one was an aqueous-based system using Kraton

3    in the form of Prinlin and a solvent base, an anhydrous

4    system, using Kraton in, I believe, cyclohexane.

5    Q.   What does the comparison show, to your

6    understanding?

7    A.   It shows that the V-50, which is a measure of the

8    ability of a projectile to be stopped -- the ability of a

9    target to stop a ballistic projectile, was less degraded

10   by the conditions shown, 70 centigrade, 80 percent

11   relative humidity, than if the solvent -- if the Kraton

12   was applied from a solvent anhydrous-based system as

13   compared to a water-based system.

14   Q.   So just restating that, tell me if this is fair.

15   Based on this compilation, the V-50 results for the

16   solvent-based Kraton showed less degradation than for the

17   water-based Kraton?

18   A.   Yes.

19   Q.   Did you provide this information to anyone at

20   Honeywell?

21   A.   Yes.

22   Q.   Who?

23   A.   It appears in the patent application.  Keeping in

24   mind I am not the author of this data.  I am not the

25   person who made the measurements, but this data appears in

00053

1  the patent application.

2     Q.   Just so I understand, you're not the author of

3  the data, but you compiled the chart; is that correct --

4     A.   That's correct.

5     Q.   -- or just the graph?

6     A.   Yes.

7     Q.   And putting aside the patent application for a

8  second, did you provide the graph to anyone at Honeywell

9  that's reflected on Exhibit 11?

10    A.   Yes.

11    Q.   Who did you provide it to?

12    A.   Dr. Bhatnagar.

13    Q.   Do you recall approximately when you provided it

14  to him?

15    A.   The day following -- I believe the day following

16  his sending the data to me.

17    Q.   Did you provide this graph to anyone in the U.S.

18  Government?

19    A.   No.

20    Q.   When I say that, we're accepting -- because

21  you've already testified that the graph was put in the

22  patent application --

23    A.   Right.

24    Q.   -- and arguably the U.S. PTO is the U.S.

25  Government, but excepting the U.S. PTO, did you provide it

00054

1 to anyone else in the government?

2    A.  No.

3    Q.  Let me show you Exhibit 12.  Take a look at this.

4    A.  Okay.

5    Q.  Can you identify what this is?

6    A.  It is the data which is referenced in the patent

7 application.

8    Q.  And it appears, Dr. Bhatnagar sent you this data

9 on or about May 22nd, 2002, is that your recollection?

10    A.  Yes.

11    Q.  And do you have an understanding, what was the

12 purpose of Dr. Bhatnagar sending you this data?

13    A.  He wished me to draft a patent application.

14    Q.  Did the data assist you in drafting the patent

15 application?

16    A.  Yes.

17       MR. BRESS:  Objection to form.

18    Q.  How did it assist you?

19    A.  It shows a difference between the two types of

20 matrix deposition.

21    Q.  What are those two types?

22    A.  And aqueous-based system and an anhydrous-based

23 system.

24    Q.  What is that difference in performance?

25       MR. BRESS:  Objection to form.

00055

1   Q.   Strike that.  What is the difference between the

2   two systems that you used to --

3   A.   The difference --

4   Q.   Let me just finish my question, sir.  It gets

5   confusing.  It's kind of like a dinner table conversation,

6   but instead at dinner, when we all sort of know what we're

7   talking about, there might be a judge sometime who wasn't

8   privy to this.

9   A.   Yes.

10   Q.   So we want to let me ask the question and you

11   give the answer, but it's not a big deal.

12   What was the difference that you saw from this data,

13   based on these two types of matrixes?

14   A.   The data shows a difference in the V-50 for the

15   two types of material, the degradation of the reduction

16   from a control material was less when the matrix was based

17   on an anhydrous system.

18   Q.   So it was less on an anhydrous system than --

19   what was the other system?

20   A.   The measured V-50 was less after exposure to the

21   environment, the accelerated aging, when the matrix had

22   been put on the Shield material by an anhydrous system,

23   than with an aqueous system.

24   Q.   So again, tell me if this is a fair summary.

25   This data, to your understanding, showed less V-50

00056

1 degradation in accelerated age testing for the anhydrous

2 solution than the aqueous solution?

3     MR. BRESS:  Objection to form.

4   A.  Yes.

5   Q.  Do you know, if you look at the second page of

6 this document, HW 406793, there's some writing on it and

7 some circles?

8   A.  Uh-huh.

9   Q.  Do you remember -- do you know who put those

10 circles on?

11   A.  I think I may have.

12   Q.  Do you remember what the purpose of you circling

13 that data was?

14   A.  To align it up with the information on the

15 following page.

16   Q.  If you could look at the following page, did you

17 circle that data, too, on the following page?

18   A.  I believe so.

19   Q.  HW 00406794?

20   A.  Yes.  I believe so.

21   Q.  Then in terms of the V-50 percent retention, your

22 understanding was that the data showed a higher retention

23 for the solvent-based Kraton than the aqueous-based one;

24 is that correct?

25   A.  Yes.

00057

1    Q.  And I don't want to know the nature of the

2  communications, but do you recall discussing this data

3  that is marked as Exhibit 12 with Dr. Bhatnagar, yes or

4  no?

5    A.  Yes.

6    Q.  Do you recall discussing this data, marked as

7  Exhibit 12, with anyone else at Honeywell, yes or no?

8    A.  I don't recall.

9    Q.  When do you recall discussing this data with

10  Dr. Bhatnagar?

11    A.  I believe the following day when I sent him the

12  compilation and Exhibit 11.

13    Q.  That would have been on or about May 23rd, 2002?

14    A.  Yes.

15    Q.  I marked this as Exhibit 13.  The first question,

16  can you identify what this document is?  Just so you know,

17  some of this document has been redacted because you're a

18  patent agent and we're trying not to infringe upon your

19  privilege.  But putting aside the redactions, can you

20  identify what this is?

21    A.  Yes.  It's a discussion of the data that

22  Dr. Bhatnagar sent to me and the graph as one that I had

23  produced as part of the compilation of Exhibit 11.

24    Q.  So your understanding is the graph here, which is

25  on Exhibit 39, HW 00406941, was based on the graph that we

00058

1  talked about in Exhibit 11; is that correct?

2     A.   That is the same graph.

3     Q.   That was the one that you compiled?

4     A.   Yes.

5     Q.   And you recall sending this to Dr. Bhatnagar and

6  the people on the CC on or about May 23rd, 2002?

7     A.   Yes.

8     Q.   I'm marking as Exhibit 14 another document that

9  I'll show you.

10    A.   Uh-huh.  Okay.

11    Q.   And again, putting aside the redactions, can you

12  identify what this is?

13    A.   It's a note to Dr. Lori Wagner with some comments

14  that apparently have been redacted.

15    Q.   Right.  And don't try to recall what the comments

16  were.

17    A.   Yes, no, I'm not going to.

18    Q.   I just want to make sure you don't

19  unintentionally do it.

20    A.   It is the same information with a copy of the fax

21  that Dr. Bhatnagar sent to me, and is shown in Exhibit 12.

22    Q.   Do you recall sending this fax and the

23  accompanying data to Dr. Wagner on or about November 14,

24  2003?

25    A.   Yes.

00059
1     Q.  And this is just a yes or no answer.  Do you
2  recall discussing this data with Dr. Wagner?
3     A.  Yes.
4     Q.  And do you recall discussing it with her sometime
5  in November of 2003?
6     A.  Yes.
7     Q.  You had mentioned before that Honeywell had asked
8  you to look at Zylon felt.  Do you recall that?
9     A.  Yes.
10    Q.  What was your understanding of the purpose of
11  looking at Zylon felt?
12    A.  Well, let's be more specific.  When you say
13  "looking at," they wished me to include Zylon felt as one
14  of the embodiments of the invention.  And the purpose was
15  to have as broad coverage as possible in this patent
16  application.
17    Q.  We'll get to this a little later when we look at
18  the application in more detail, but you used the term
19  "embodiment."  What does embodiment mean?
20    A.  The invention -- I'll give you an example. An
21  invention may be a chair.  Another embodiment might be a
22  blue chair or a chair with four legs or a chair with three
23  legs.  It might be a species of a generic claim.  That's
24  one possibility.  It might be an entirely independent
25  invention.

00060

1       THE WITNESS:  As long as you're looking for

2   documents, this might be a good time to take another

3   break.

4       MR. MORRIS:  That's fine with me.  Good idea.

5       THE VIDEOGRAPHER:  We're now going off the video

6   record.  It is 11:29.  This concludes tape number two of

7   the videotape deposition of Sheldon Kavesh.

8       (Morning recess.)

9       THE VIDEOGRAPHER:  We're now back on the video

10  record.  It is now 11:45.  This begins tape number three

11  of the videotape deposition of Dr. Sheldon Kavesh.

12  BY MR. MORRIS:

13     Q.  I am marking as Exhibit 15 -- take a look at this

14  and also at Exhibit 2, which I think Dan pulled out, have

15  you had a chance to look at it?

16     A.  Yes.

17     Q.  Can you identify what this is, which is Bates

18  number HW 00406524 through 558?

19     A.  Yes.  When the application was filed, Virginia

20  Szigeti sent me a copy of what the actual filed document

21  was and I printed it out.  That's what we have here.

22     Q.  Is it your understanding, that other than some

23  pagination changes, the background of the invention

24  section on Exhibit 15 is the same as on Exhibit 2?

25     A.  It should be the same.  I'll just glance over it

00061

1  and see.

2     Q.  Sure.

3     A.  There appears to be a little bit -- no, wait a

4  minute.  Okay.  It appears to be the same.  It appears to

5  be identical.

6     Q.  I think there's some pagination differences, but

7  other than the pagination differences, I thought it was

8  the same?

9     A.  Yeah.  It may have been filed as an a-four paper

10  and my copy is letter size, so the pagination may be

11  different.

12     Q.  The first question I've got, field of the

13  invention, that section, what does that mean?

14        MR. BRESS:  Which exhibit are we working off of?

15        MR. MORRIS:  15.

16        MR. BRESS:  Thanks.

17        MR. MORRIS:  Sure.

18     A.  This is a guide to the examiner as to what the

19  related art is.

20  BY MR. MORRIS:

21     Q.  When you say "related art," what does that mean?

22     A.  It means anything that might bear on the

23  inventiveness of the current application.

24     Q.  And then description of the related art, the

25  second section, what does that mean?

00062

1    A.   That goes into that related art and I'm

2    attempting to spell out how the related art is impacted by

3    the present invention, and what are the differences.

4    Q.   In this case, how was the related art impacted by

5    the invention that you guys are filing this application

6    for?

7    A.   I relate that there is a known problem with

8    Zylon.  That it has a loss of 26 percent of its strength

9    after six-weeks accelerated aging at 70 degrees

10   centigrade, 80 percent relative humidity.  This

11   information comes directly from Toyobo.  So here is a

12   problem.  What can we do about the problem?

13   Q.   What could we do about the problem is reflected

14   in this patent application?

15   A.   Well, we -- as --

16        MR. BRESS:  Objection to form.  Go ahead.

17   A.   As noted in the second paragraph, of -- or

18   starting on line nine of page two, "Construction of body

19   armor from PBO fibers may thus require addressing two

20   conflicting issues.  Protecting the PBO fibers from the

21   effects of humidity, while simultaneously providing water

22   vapor permeability through the armor, for the comfort of

23   the wearer."

24   Q.   And did this invention that this patent

25   application relates to, do that?

00063

1    A.  I'm sorry --

2    Q.  Did this invention that this patent application

3  relates to, do that?

4    A.  It is a step towards that.

5    Q.  How is it a step towards that?

6    A.  It shows that a Shield construction can be

7  improved in terms of its resistance to heat and moisture.

8    Q.  How can it be improved?

9    A.  By constructing the Shield with an anhydrous

10  solution of a material that acts as a moisture-vapor

11  barrier.  And I didn't state that exactly correctly.  The

12  object is not to enclose the Shield, but to enclose the

13  fibers in the Shield with the moisture-vapor barrier.

14    Q.  Could you explain that distinction a little bit

15  more, please?

16    A.  Sure.  The intent is to leave open spaces between

17  the fibers so that moisture can pass through the Shield

18  and still have protection at the level of the individual

19  filaments of the fibers.

20    Q.  How does the anhydrous solution accomplish that

21  purpose, to your understanding?

22    A.  That's an open question.  It is not absolutely

23  clear how it does that.  Whether the immersion of the

24  Shield in an aqueous system traps moisture or whether it

25  leaves a permeable coating, as compared to an anhydrous

00064

1  system.  We don't know -- I don't know what the structure

2  of the coating is at the level -- at a molecular level or

3  close to it.

4     Q.  Just so I understand, what you're saying is that,

5  to your understanding, it is understood that the anhydrous

6  solution has this benefit of protecting the layers of the

7  fiber, but the mechanism through which that benefit works

8  isn't understood?

9        MR. BRESS:  Objection to form.

10    A.  The answer -- it's not understood by me.

11    Q.  But other than that, is the answer yes?

12    A.  Yes.

13    Q.  I just want to identify the publication for the

14  record that you referenced.  Let me mark that.  I'm

15  marking as Exhibit 16, a document HW 00406761 through

16  778.  Have you had a chance to take a look at it?

17    A.  I'm familiar with it.

18    Q.  Is this the document that you're referencing on

19  page two of Exhibit 15?

20    A.  Yes.

21    Q.  When did you obtain this document?

22    A.  I'm not absolutely sure, but about the time that

23  Honeywell became interested in making PBO Shield,

24  apparently.

25    Q.  Did you find this document or did someone at

00065

1  Honeywell give it to you?

2     A.  I found it.

3     Q.  Did you give it to somebody at Honeywell once you

4  found it?

5     A.  Yes.

6     Q.  Who?

7     A.  At least to Ashok Bhatnagar, but possibly others

8  as well.

9     Q.  Now, in Exhibit 15, on page two, you reference

10  the publication and then you say that the publication --

11  I'm just going to skip the title -- "shows that PBO

12  fibers, after six weeks accelerated aging at 70 C, 80

13  percent relative humidity, lose about 26 percent of their

14  strength." Do you see that?

15     A.  Yes.

16     Q.  Where in the publication did you obtain that

17  information?

18     A.  Go to page 769, HW 00406769 --

19     Q.  Yes.

20     A.  -- at the bottom of the page, there is a graph

21  that shows strength retention as a function of time at 80

22  percent relative humidity and there are three curves

23  shown, 40 centigrade, 60 centigrade, 80 centigrade.

24  There's a vertical line that's drawn at about 42 days, as

25  close as I can measure it, I drew that line. And at the

00066

1  intersection of the curve or 60 percent -- sorry, 60

2  degrees centigrade and 80 degrees centigrade -- no, let me

3  just make sure which graph -- which curve is which.

4     Q.  Sure.

5     A.  Yeah.  It looks like 60 and 80.  I picked off,

6  with a caliper, what the number was on the strength

7  retention and that looked like 67 percent and 81 percent

8  and I interpolated between the two to get a number for 70

9  degrees centigrade.  And the reason for doing that was so

10  I'd have a comparable number for the data that was

11  provided to me by Dr. Bhatnagar.

12     Q.  What's a caliper?

13     A.  A caliper is a measuring instrument that will

14  measure a dimension into typically a thousandth of an

15  inch.

16     Q.  And is the handwriting on Exhibit 16, page 769,

17  is that your handwriting?

18     A.  Yes.

19     Q.  And the line going from 40 days up to

20  intersecting two of the lines on the chart, is that your

21  line?

22     A.  That is my line.  I attempted to draw it at 42

23  days or six weeks.

24     Q.  What was the purpose of you doing that?

25     A.  So that I could make a direct comparison between

00067

1  this published data and the data that was provided to me.

2     Q.  Do you recall providing this graph with your

3  handwriting in it to Dr. Bhatnagar?

4     A.  I don't recall whether I provided the graph with

5  the handwriting in it.  I think I may have only sent the

6  original document that I had pulled off-line.

7     Q.  Do you recall, and this is just a yes or no

8  answer, discussing your work on this graph with the

9  caliper with Dr. Bhatnagar?

10     A.  No.

11     Q.  The work you did on this graph, though, is where

12  you derived that 26 percent figure in the patent

13  application; is that correct?

14     A.  Yes.

15     Q.  Did you have any discussions with the government

16  about any of the data referenced in this patent

17  application which is Exhibit 15?

18     A.  No.

19     Q.  Did you have any discussions with anyone at Armor

20  Holdings about any of the data mentioned in this patent

21  application?

22     A.  No.

23     Q.  Then there's a summary of the invention section

24  on the same page we've been looking at.  Can you explain

25  what is a summary of the invention?

00068

1   A.  The summary of the invention sets forth

2  succinctly what is the nature -- what is the invention,

3  what is being claimed.  And good form, the summary of

4  invention, is exactly the same language as appears in the

5  main claim or the main claims of the application, so there

6  is no conflict between the two.

7   Q.  If you could turn the page to HW 00406526.

8   A.  Yes.

9   Q.  And here you reference a couple different

10  embodiments of the invention.  Without going through every

11  different embodiment of this invention, could you just

12  give me or try to give me at least a little understanding

13  of why this patent application talked about different

14  embodiments?

15   A.  It is a good idea, good practice, to claim, as

16  broadly as possible, but also set out narrower areas that

17  might also be inventive if there was an objection to a

18  broader concept.  There are also different inventions

19  here.  Let's see if I can explain that.

20   Q.  Sure.

21   A.  We speak about a method -- a method and then on

22  page HW 00406527, we say, at line 23, "And in other

23  embodiments, the invention comprises the PBO fibers, fiber

24  sheets, and articles comprised of one or more fiber

25  sheets."  That's a different category of invention.

00069

1    The other embodiments were methods where in the

2  section I just mentioned, we're discussing the fibers and

3  the sheets themselves.

4    Q.  What is a method for purposes of a patent?

5    A.  It's a process consisting of a number of steps

6  which must be carried out.

7    Q.  Can you patent a method?

8    A.  Yes.

9    Q.  If you take a look back on -- the Bates number,

10  the last three digits 526.

11    A.  Yup.

12    Q.  There's some statistics on line 16, the 87

13  percent.  Do you see that, V-50 rating against a Geco 9

14  millimeter, 124 grain, full metal jacket bullet.  Do you

15  see that?

16    A.  Uh-huh.

17    Q.  Where did this data come from?

18    A.  That's the data that Dr. Bhatnagar had sent to

19  me, I believe.  We'd have to look back at an earlier

20  reference.

21    Q.  Was that the data on exhibit -- is it your

22  understanding this was the data he faxed to you on or

23  about May 22nd, 2002, which is Exhibit 12?

24    A.  Yes.  There may be -- there may be a slight

25  difference.  I'll have to see.  Let's take a look.

00070

1    Q.  Sure.

2    A.  The condition is 70 percent relative humidity, 80

3  percent -- sorry, 70 centigrade, 80 percent, four weeks.

4  Okay.  And that would be -- I should be looking at page

5  two of reference 12.

6    Q.  Right.

7    A.  And four weeks shows 90.3 percent.  However, if

8  we look at the Prinlin material, the following page, the

9  Prinlin material is 85 percent after four weeks.  And so

10  the claim was, at least 87 percent, which excludes the

11  prior art of 85 percent, and claims greater than 87

12  percent which would include the 90 percent that was

13  actually measured.

14    Q.  Sure.  Thank you for that explanation.  That

15  makes it understandable.  But it is your understanding

16  that this data that's referenced in the application

17  relating to the 87 percent of the V-50 rating was based on

18  Exhibit 12, correct?

19    A.  Correct.

20    Q.  Take a look at HW 00406528.  There's a reference

21  to figure one.

22    A.  Uh-huh.

23    Q.  Then figure one, I think, is the last page which

24  is HW 00406558?

25    A.  Got it.

00071

1   Q.  Did you put that figure together?

2   A.  I think partially.  I think partially I copied

3  this from an earlier application.  I may have copied it

4  entirely, I don't recall.

5   Q.  What is figure one depicting, if you could

6  explain that?

7   A.  It's depicting a process where yarn is being

8  unwound from rolls on a creel at station 102, passed

9  through a series of combs to align the yarns parallel to

10  one another, and then carried through rollers 20 into a

11  bath which contains the solvent, the solution or the

12  dispersion of the matrix material.  The rolls 106 apply

13  the matrix solution or dispersion to the yarns.  They are

14  mated with a web, generally a very thin polyethylene film

15  at the second roll of that combination of the film being

16  107.  Then this material being carried through an oven

17  where forced air and elevated temperature dries the

18  dispersion, or the solvent, and then the material is

19  carried through nip rolls and wound up on another roll,

20  118.

21   Q.  Let me just take this in stages.  That was very

22  helpful to my understanding.  What goes in at 102?  You

23  know, what starts --

24   A.  Each one of those is a package of yarn.

25   Q.  What comes out at 118?

00072

1    A.   One eighteen is a half a Shield, if you will.

2    It's a unidirectional lay up of fibers, parallel fibers,

3    on a web, on a carrier web.

4    Q.   Is 105 the stage where you have that Kraton or

5    Prinlin solution that we talked about?

6    A.   Yes.

7    Q.   And then 112 is the heating stage?

8    A.   Heating and drying.  There's force convection

9    air, heated air, being blown through there to carry off

10   the solvent or the water.

11   Q.   Is everything that you wrote in this patent

12   application, to your understanding, truthful and accurate?

13   A.   Yes.

14   Q.   If you could take a look at HW 00406533 for a

15   second?

16   A.   Five?

17   Q.   Five three three.

18   A.   Five three three.

19   Q.   It's also page 10 in the upper --

20   A.   Okay.  Yup.

21   Q.   Okay.  Look, starting at line 22, where it says,

22   "The sealant material serves as moisture barrier to

23   protect the PBO fibers and may also serve as a binder to

24   provide coherence to a non-woven fiber sheet."  Could you

25   explain to me what that means?

00073

1   A.  As I indicated, if we are dealing with a

2  non-woven material, something has to hold the fibers

3  together.  When we speak about a binder, we're speaking

4  about something that holds the fibers in some sort of an

5  array.  The preferred array is this uniaxial array plied

6  up at angles.  The binder holds the fibers and may hold

7  the array together.

8   Q.  What's the sealant material that's being

9  referenced here?

10   A.  Well, generically, it's a material that we wish

11  to serve as a moisture barrier.  It's not spelled out at

12  this point.

13   Q.  Did this patent application have any candidates

14  for the sealant material that it dealt with?

15     MR. BRESS:  Objection to form.

16   Q.  Was there a sealant material specific to this

17  patent application?

18   A.  I have to look at the claims.  Certainly, the

19  claims were based upon data with Kraton as the sealant

20  material, but the claims speak more generally.  If you

21  notice, starting at line 24, we specify the sealant

22  material in terms of its water vapor permeability, which

23  doesn't encompass Kraton, but it includes other materials

24  which may also be used.

25   Q.  If you can just explain that a little more what

00074

1  you mean.  It doesn't refer to Kraton, but encompasses

2  other materials that may be used.  What other materials

3  are you referring to?

4      A.   If you look at table one on page 535 --

5      Q.  Yeah.

6      A.  -- these are other materials which could also

7  serve as the sealant material.  The material, fourth from

8  the bottom -- I'm sorry, second from the bottom, styrene

9  isoprene, styrene block copolymer is the Kraton.

10     Q.  Are none of these materials Kratons?

11     A.  One is, the second from the bottom, styrene

12  isoprene, styrene block copolymer is Kraton.

13     Q.  Got you.  Okay.  And did this patent application

14  envision any one of these sealant materials or any of

15  them?

16     A.  Any of them.

17     Q.  Are all these sealant materials anhydrous?

18     A.  In their pure form, they're all solid materials,

19  so far as I know.  So one would have to dissolve them or

20  melt them or in some manner apply them to the fibers.

21     Q.  Just so I understand, because I want to make sure

22  I understand this process.  If you turn the page back to

23  532 which is also number nine.  And looking at line 29 --

24     A.  Yup.

25     Q.  -- where it says, "The concentration of sealant

**Kavesh, Sheldon (Vol. 01) - 11/10/2009**          **Page  74**

00075

1  material in the anhydrous solvent is such that when the

2  solvent is dried, the sealant material does not completely

3  fill the volume between the filaments." Do you see that?

4    A.  Yup.

5    Q.  So just so I'm clear, the sealant material is not

6  the anhydrous solvent, correct?

7    A.  It's not the solvent, no.

8    Q.  And the patent application relates to an

9  anhydrous solvent -- this patent application; is that

10  correct?

11    A.  It relates to -- let me see what the claims read

12  on them.

13    Q.  Sure.

14    A.  Well, claim one doesn't even mention the solvent

15  -- oh, yes, it does.  I beg your pardon.

16    Q.  What page are you on?

17    A.  I'm on page 550.  Step B, "Encapsulating the PBO

18  fibers in the sealant materials by anhydrous means." That

19  doesn't say what that anhydrous means is.  What

20  alternatives are, are spelled out on page 532, which

21  includes also using an anhydrous solvent, but it's more

22  general.

23    Q.  What part of 532 are you referencing there?

24    A.  Well, "Anhydrous means for encapsulating the PBO

25  fibers in the sealant material include" --

00076

1    Q.  Got you.  Okay.  And so are you saying that in

2  this application, any of those anhydrous means could work

3  for purposes of this invention?

4        MR. BRESS:  Objection to form.

5    A.  I can't answer whether they would work.  I

6  believe they would work, but they are included in our

7  claim.

8    Q.  Some of these anhydrous means are different than

9  Kraton; is that correct?

10        MR. BRESS:  Objection to form.

11    A.  No, sorry, this is more general, again.  They

12  would include Kraton, but they could -- other materials

13  could also be used.  This paragraph deals with the method

14  of applying the sealant material.

15    Q.  What other materials could be used that are

16  anhydrous?

17    A.  I'll have to go back to table one.  These are

18  some of the materials that we envision that could be

19  used.  It's a non-exclusive list.  Other materials might

20  also be used, but these are some that are appropriate.

21    Q.  I just want to be clear for the record, table one

22  is on 535?

23    A.  Five three five, yeah.

24    Q.  Was it your understanding that any of these

25  anhydrous -- strike that.  Any of these materials in table

00077

1   one, if this method with the anhydrous solvent was used,

2   would lead to the retention of at least 87 percent of the

3   initial V-50 rating against a Geco 9 millimeter, 124

4   grain, full metal jacket?

5       A.   That is my belief.

6           MR. BRESS:  Objection to form.

7           (Off the record)

8   BY MR. MORRIS:

9       Q.   So just so I'm clear, your understanding was that

10  any of the materials listed in table one, if used in the

11  embodiment of the invention, as described on lines 15

12  through -- strike that, in line 15, on page 526, that any

13  of those materials could produce the results described on

14  15 through 19 on page 526; is that correct?

15          MR. BRESS:  Objection to form.

16      Q.   Let me try that again.

17      A.   Yeah, that would be good.

18      Q.   Is it your understanding that any of the

19  materials listed in table one, if used in the embodiment

20  of the invention that is described on line 15, could

21  produce the results described on lines 15 through 19 on

22  page 526?

23      A.   Well, let's be more specific.  Produce the result

24  -- yes.  Okay.  Your statement -- your statement is

25  correct.  Then, yes, I agree.  I should say that that

00078

1  is --

2    Q.  There's no question.

3    A.  -- my belief.

4    Q.  We got that.  It's your belief.  You don't know

5  that for a fact?

6    A.  I don't know that for fact, except with respect

7  to the Kraton material.

8    Q.  Right.  But for the Kraton material, you do know

9  for a fact?

10    A.  Yes.

11    Q.  But you believe that for the other materials

12  listed in table one, you would get the same results, but

13  you haven't tested that belief, correct?

14    A.  Yes.

15      MR. BRESS:  Objection to form.

16    Q.  What is being shown in table two, if you could

17  take a look at page 543?

18    A.  I have a different page number, I guess.  546?

19    Q.  Three, 543.  It's also got 20 at the top?

20    A.  Yes.

21    Q.  What's table two showing us?

22    A.  Let's see.  Okay.  This probably should be the

23  data that Dr. Bhatnagar had sent to me in 2002 and it is

24  showing the properties, the V-50 and specific energy

25  absorption of a Shield material, a laminate of the

00079

1  dimensions that are provided up on top and having a

2  certain areal density.  The initial properties and after

3  conditioning for four weeks and six weeks at those

4  conditions that are specified.

5     Q.  And the data you're referring to from

6  Dr. Bhatnagar, was that the data we saw in Exhibit 12?

7     A.  Yes.

8     Q.  And then there's a couple columns, comparative

9  example one, is that an aqueous-based solution there?

10    A.  Yes.

11    Q.  Then example one, is that a solvent-based

12  solution?

13    A.  Yes.

14    Q.  If you look at page 550, which is also page 27 at

15  the top --

16    A.  Yes.

17    Q.  -- what does claim mean?  If you could tell me as

18  a non-patent person?

19    A.  It sets out the limits of the invention.  What is

20  the monopoly that is claimed by the invention.

21    Q.  Last page, if you could look at page 557, there's

22  an abstract there.  Do you see that or the second to last?

23    A.  I'm with you.  Yes.

24    Q.  It's also 34 on the document?

25    A.  Five fifty-seven, yes.  Okay.

00080

1    Q.  Did you draft that abstract?

2    A.  I did.

3    Q.  What's the purpose of an abstract?

4    A.  It is published in the Patent Gazette.  If it's

5  not amended by the examiner, he may decide to abbreviate

6  it.  It's published along with the title, the filing date,

7  the invention -- the patent number, the application

8  number, all the data related to the application.  This,

9  along with the title, is intended to tell the person who

10  is just examining the Patent Gazette what is the subject

11  of this particular application, summarize it.  So if you

12  were looking through the Patent Gazette and you were

13  interested in PBO fibers or ballistic material, you would

14  have some sense of what --

15    Q.  Is it your understanding that the description in

16  this abstract is true and accurate?

17    A.  Yes.

18        MR. MORRIS:  Let's take a break.

19        THE VIDEOGRAPHER:  It is now 12:23.  Going off

20  the video record.

21        (Lunch recess)

22        THE VIDEOGRAPHER:  We're now back on the video

23  record.  It's now 1:07.

24  BY MR. MORRIS:

25    Q.  Dr. Kavesh, good afternoon.

00106

1  Dr. Sheldon Kavesh.

2          (Deposition concluded.)

3

4

5          CERTIFICATION

6

          I, ALAN L. LESKY, a Certified

7  Shorthand Reporter of New Jersey, License

   Number XI000730, Approved Reporter of the

8  United States District Court, and Notary

   Public, hereby certify that the foregoing is a

9  true and accurate transcript.

10       I further certify that I am neither

   attorney nor counsel for, not related to nor

11  employed by any of the parties to the action in

   which this transcript was taken; and further,

12  that I am not a relative or employee of any

   attorney or counsel employed in this action,

13  nor am I financially interested in this case.

14

   _____

15  Alan L. Lesky,

   Certified Court Reporter

16

17

18

19

20

21

22

23

24

25