## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CV No. 08-961 PLF-DWR |
| | ) | |
| Plaintiff, | ) | Judge Paul L. Friedman |
| | ) | |
| v. | ) | Magistrate Judge Deborah Robinson |
| | ) | |
| HONEYWELL INTERNATIONAL INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT HONEYWELL INTERNATIONAL INC.'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Honeywell International Inc. ("Honeywell") moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on all claims in this case. As set forth in the accompanying Memorandum in Support of Honeywell International Inc.'s Motion for Summary Judgment, and demonstrated by Honeywell's Statement of Facts and supporting record evidence, the government cannot succeed under any theory of FCA liability or on its state law claim for unjust enrichment.  Thus, there is no genuine dispute as to any material fact and Honeywell is entitled to judgment as a matter of law.

This is a dispositive motion, and under Local Civil Rule 7(m), there is no requirement that the parties meet and confer prior to filing.  Pursuant to Local Civil Rule 7(f), Defendant respectfully requests an oral hearing on its Motion for Summary Judgment.

Dated: June 7, 2019                    Respectfully Submitted,


                                       ___/s/ Craig S. Primis, P.C._____
                                       Craig S. Primis, P.C.
                                       Katherine R. Katz
                                       Zachary A. Avallone
                                       KIRKLAND & ELLIS LLP
                                       1301 Pennsylvania Ave, N.W.
                                       Washington, D.C. 20004
                                       Tel: (202) 389-5000
                                       Fax: (202) 389-5200

                                       *Attorneys for Defendant*
                                       *Honeywell International Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CV No. 08-961 PLF-DWR |
| | ) | |
| Plaintiff, | ) | Judge Paul L. Friedman |
| | ) | |
| v. | ) | Magistrate Judge Deborah Robinson |
| | ) | |
| HONEYWELL INTERNATIONAL INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF HONEYWELL INTERNATIONAL INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 4

    A.    Honeywell's Z Shield Product .................................................................... 4

    B.    Z Shield Vests Saved Lives ....................................................................... 7

    C.    Honeywell Responded Quickly To Concerns About Heat and Humidity ............. 9

    D.    Honeywell Conducted Testing And Shared The Data With AHI ........................ 11

    E.    The Government Had Extensive Knowledge That Zylon And Z Shield
        Could Degrade Under High Heat And Humidity ................................................. 16

    F.    Honeywell's Offers To Share Data With The Government ................................. 19

    G.    Zylon Decertification And This Lawsuit .............................................................. 25

ARGUMENT ................................................................................................................... 27

I.    THIS COURT HAS ALREADY REJECTED AS A MATTER OF LAW
    THREE OF THE UNITED STATES' FOUR FCA THEORIES. ............................... 28

II.    THE UNITED STATES' FRAUDULENT INDUCEMENT THEORY FAILS
    AS A MATTER OF LAW ON MULTIPLE GROUNDS ............................................ 31

    A.    Honeywell's Repeated Offers To Share Test Data With The Government
        Preclude Scienter And Materiality As A Matter Of Law ..................................... 31

    B.    The FCA Claim Fails On Additional Grounds Specific To GSA and BVP
        Methods Of Purchasing ....................................................................................... 34

    C.    Honeywell Had No Duty To Disclose In The First Place .................................... 36

    D.    Honeywell's Scientific Judgement Cannot Form The Basis Of An FCA
        Claim ................................................................................................................... 39

    E.    The DOJ Cannot Base Its FCA Claim On The Theory That Honeywell
        Caused AHI To Submit False Claims ................................................................. 43

III.    THE DOJ CANNOT DEMONSTRATE DAMAGES FOR FCA
    STATUTORY DAMAGES AND UNJUST ENRICHMENT CLAIMS. ................... 46

    A.    The DOJ Cannot Recover FCA Statutory Damages from Honeywell. ............... 46

      B.      The DOJ Cannot Recover Restitution From Honeywell. ..................................... 50

**CONCLUSION** ....................................................................................................................... **52**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allison Engine Co. v. U.S. ex rel. Sanders*,
    553 U.S. 662 (2008)...................................................................................43, 46

*Aston v. Johnson & Johnson*,
    248 F. Supp. 3d 43 (D.D.C. 2017) ...................................................................51, 52

*Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*,
    82 F. Supp. 3d 344 (D.D.C. 2015) ...................................................................51, 52

*D'Agostino v. ev3, Inc.*,
    845 F.3d 1 (1st Cir. 2016)...................................................................................35

*Druding v. Care Alternatives, Inc.*,
    346 F. Supp. 3d 669 (D.N.J. 2018) .................................................................39, 40

*Grant Thornton, LLP v. FDIC*,
    694 F. Supp. 2d 506 (S.D.W.Va. 2010), *aff'd in part, reversed and remanded
    in part,* 435 Fed. Appx. 188 (4th Cir. 2011)...........................................................49

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*,
    2010 WL 2813788 (D.N.J. 2010) ........................................................................51

*Kagan v. K-Tel Entm't, Inc.*,
    172 A.D.2d 375 (N.Y. App. Div. 1991) ................................................................51

*Miller v. Holzmann*,
    563 F. Supp. 2d 54 (D.D.C. 2008), *aff'd in part, vacated in part, remanded
    sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,* 608 F.3d 871
    (D.C. Cir. 2010) ...............................................................................47, 48, 49

*News World Commc'ns, Inc. v. Thompsen*,
    878 A.2d 1218 (D.C. 2005) ...............................................................................50

*Safeco Ins. Co. of Am. v. Burr et al.*,
    551 U.S. 47 (2007)...........................................................................................40

*Shenandoah Assocs. Ltd. P'ship v. Tirana*,
    182 F. Supp. 2d 14 (D.D.C. 2001) ......................................................................51

*U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*,
    297 F. Supp. 2d 272 (D.D.C. 2004), *aff'd* 393 F.3d 1321 (D.C. Cir. 2005).....................39, 45

*U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*,
   2011 WL 5005313 (E.D. Va. Oct. 19, 2011) ................................................................47, 48

*U.S. ex rel. Davis v. District of Columbia.*,
   793 F.3d 120 (D.C. Cir. 2015) ........................................................................................32

*U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
   530 F.3d 980 (D.C. Cir. 2008) ........................................................................................32

*\*U.S. ex rel. McBride v. Halliburton Co.*,
   2014 WL 12691854 (D.D.C. Dec. 10, 2014) ..................................................................39

*\*U.S. ex rel. Milam v. Regents of Univ. of Cal.*,
   912 F. Supp. 868 (D. Md. 1995) ...............................................................................37, 40

*U.S. ex rel. Morton v. A Plus Benefits, Inc.*,
   139 F. App'x 980 (10th Cir. 2005) .................................................................................39

*\*U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*,
   128 F. Supp. 3d 1 (D.D.C. 2015) ............................................28, 29, 30, 31, 35, 37, 38, 39

*\*U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*,
   2016 WL 3033937 (D.D.C. Feb. 11, 2016) ........................................................28, 29, 30

*\*U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*,
   2017 WL 8809510 (D.D.C. March 31, 2017) .................................................28, 29, 30, 31

*\*U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*,
   266 F. Supp. 3d 110 (D.D.C. 2017) ................................................................................28

*U.S. ex rel. Yannacopoulos v. Gen. Dynamics*,
   652 F.3d 818 (7th Cir. 2011) .........................................................................................39

*U.S. v. AseraCare Inc.*,
   176 F. Supp. 3d 1282 (N.D. Ala. 2016) .........................................................................40

*\*U.S. v. Bornstein*,
   423 U.S. 303 (1976) ................................................................................................47, 48

*U.S. v. Honeywell Int'l Inc.*,
   281 F.R.D. 27 (D.D.C. 2012) .........................................................................................27

*\*U.S. v. Honeywell Int'l. Inc.*,
   798 F. Supp. 2d 12 (D.D.C. 2010) ...........................................................................28, 43

*U.S. v. Zan Mach. Co.*,
   803 F. Supp. 620 (E.D.N.Y. 1992) ..........................................................................47, 48

iv

*United Health Servs. Inc. v. U.S. ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ................................................................................32, 33, 34

*United States v. Prabhu*,
   442 F. Supp. 2d 1008 (D. Nev. 2006) .....................................................................50

**Statutes**

31 U.S.C. § 3729 ....................................................................................32, 43, 47

## INTRODUCTION

The DOJ's case against Honeywell pushes the False Claims Act well past its breaking point.  When it filed its complaint in this case over a decade ago, the DOJ alleged that Honeywell's Z Shield ballistic product degraded prematurely under conditions of high heat and humidity, and made the serious allegation that bullet-resistant vests containing Z Shield put police officers at risk of death or serious injury.  The DOJ also alleged at the outset of this case that Honeywell failed to share its high heat and humidity test data with Armor Holdings, Honeywell's sole customer for Z Shield, and that Honeywell thereby caused Armor Holdings to submit false and fraudulent claims for payment to the United States.  And perhaps even more serious, the DOJ maintained that Honeywell had failed to cooperate with government researchers' own investigation of issues relating to Z Shield and Zylon (the underlying high-strength fiber in Z Shield), while asserting that government researchers knew nothing about Zylon's supposed susceptibility to high heat and humidity.

But allegations and facts are two very different things, and the ten-plus years of costly discovery that Honeywell was forced to endure has revealed that every one of the DOJ's central allegations was unfounded.  There is not a single identified instance where a vest containing Z Shield failed to perform as intended in the field.  Discovery has instead revealed that five police officers—each of whom voluntarily gave depositions in this case—are alive today because their vests containing Z Shield worked when they were shot in the line of duty.  In addition, and contrary to the DOJ's original allegations, when Honeywell learned that Z Shield could degrade under extreme heat and humidity, it stopped sales of Z Shield, gave Armor Holdings its own testing data on Z Shield after exposure to hot and humid conditions, and only resumed sales once Armor Holdings confirmed it had designed its vests with an adequate margin of safety.  Far from keeping the facts from Armor Holdings, an extensive record that the DOJ was unaware of when it brought

this case shows that Honeywell repeatedly provided Armor Holdings with the very information about Z Shield that the DOJ had alleged was withheld.

Perhaps the greatest disparity between the DOJ's allegations and the true facts is exposed by Honeywell's extensive attempts to share information about Z Shield with government researchers.   Whereas the DOJ alleged that Honeywell tried to thwart government ballistic researchers' investigation into Zylon, what the record actually shows is that Honeywell repeatedly offered to share its test data in correspondence, emails, and phone calls, including offers to ballistic researchers and lawyers at the most senior levels of the Justice Department.   Those letters, calls, and emails went unanswered, with government investigators claiming they were too busy to respond or concluding they did not need Honeywell's information.   In fact, government researchers already had extensive knowledge of their own about Zylon and Z Shield and knew that those products degraded under high heat and humidity.   But they did not recommend that law enforcement agencies stop purchasing vests containing these products, instead reaching their own scientific judgment that testing under accelerated conditions of heat and humidity did not prove that the vests would fail to perform under expected conditions of use.   That was, in fact, the very same scientific judgment that Honeywell's scientists made.

The DOJ knew none of this because it failed properly to investigate this lawsuit before bringing it.   That explains why this case has taken over ten years to wend its way through discovery.   When Honeywell deposed the government's ballistic scientists, it learned that the DOJ had not conducted even the most basic searches of those scientists' files.   And sure enough, after Honeywell's persistent pressing, out tumbled the most important documents in this case, namely, emails and other internal government records showing Honeywell attempting to share information with government researchers, and those researchers receiving extensive information about how

Zylon and Z Shield degraded under high heat and humidity.  The undisputed facts now make it impossible for the DOJ to prove basic elements of the False Claims Act, such as falsity, materiality, and scienter.  And the undisputed facts confirm that Honeywell should never have been put through the hardship of over ten years of unjustified litigation.

This Court's own prior rulings in the *Toyobo/Second Chance* case only confirm this.  In a series of rulings, this Court already rejected the DOJ's central False Claims Act theories as a matter of law.  Whereas this case began with the allegation that the "false claim" was the vests' failure to meet a supposed five-year durability warranty, this Court has now rejected that theory several times over, and those rulings apply with equal force to the claims against Honeywell.  And while the Court in *Toyobo* allowed a limited fraudulent inducement theory to proceed, it did so based on facts unique to Toyobo, the manufacturer of Zylon fiber.  Those facts do not exist here.  Nor could Toyobo present the facts that Honeywell has: a demonstrated pattern of responsible corporate conduct including halting sales pending an investigation and explicit warnings to customers; information sharing with its customer and the government, with repeated direct offers to share more with the government that went ignored; and no evidence of any person ever being injured on account of Honeywell's product.  Although the DOJ has attempted to tarnish Honeywell with guilt by association, Honeywell deserves to be judged on the merits of its own conduct and its own facts, not Toyobo's.

Finally, there is no reason for this case to proceed to trial when the United States has already received triple compensation for what it spent on vests containing Z Shield.  Since, as a matter of law, the government cannot receive any further compensation for those vests, a trial on the merits would be a purely academic exercise.  Honeywell is entitled to summary judgment, and this case— which has dragged on for more than a decade with the DOJ lurching from theory to theory to keep

3

it alive—should be brought to an end once and for all.

## BACKGROUND[1]

### A.    Honeywell's Z Shield Product

In evaluating the DOJ's claims against Honeywell, it is important to understand Honeywell's position in the body armor supply chain—midway between Toyobo, the manufacturer of the Zylon fiber at the center of this case, and Armor Holdings International ("AHI"), the company who made the vests.  *See* Honeywell's Statement of Facts ("SOF") ¶¶ 6, 9, 18, 44-49.  After purchasing Zylon fiber from Toyobo, Honeywell used its patented technology to bind Zylon together using a rubber-like resin to create sheets of ballistic-resistant materials called "Z Shield."  *Id.* ¶¶ 12-14, 16.  At the end of the supply chain sat AHI, Honeywell's sole Z Shield customer and the only manufacturer that incorporated Z Shield into its finished body armor vests. *Id.* ¶¶ 24, 49.  Honeywell thus neither made Zylon nor the vests that incorporated Z Shield. *See id.* ¶¶ 18, 48-49.  Toyobo made all decisions concerning the design and development of the Zylon fiber—not Honeywell.  *See id.* ¶¶ 5- 6.  And AHI, not Honeywell, made all decisions concerning the design and construction of vests containing Z Shield.  *Id.* ¶¶ 45-49.

In the late 1990s, at a time when woven Zylon fiber was already being successfully used in bullet-resistant vests, Honeywell began to evaluate incorporating Zylon into a shield configuration.  *Id.* ¶¶ 8-11, 12, 15, 17-18, 20, 22-23.  As part of that process, Honeywell reviewed Toyobo's extensive test data, which confirmed Zylon was an outstanding ballistic material. *Id.* ¶¶ 25, 27-33.  Toyobo's data showed that Zylon's strength was incredible—much stronger than any ballistic material commercially available at the time, or even today.  *Id.* ¶¶ 1-4, 7, 29-30, 37-42.

---

[1] To assist the Court in its review, Honeywell is attaching a glossary of key terms and a brief description of key witnesses.  Those are attached hereto as Addendum A (Glossary of Frequently Used Terms) and Addendum B (The Parties' Key Fact and Expert Witnesses).

Toyobo's data also showed Zylon's performance after exposure to a number of adverse conditions, including heat, humidity, water, salt water, light, bending, abrasion, and strong chemicals like acids. *Id.* ¶ 28.  Those results showed that after exposure to those conditions, Zylon performed better than, or at least similarly to, ballistic-resistant fibers that were already widely used in the market, like aramid (sold under the brand-names Kevlar and Twaron).  *See generally* Ex. 95; *see also* SOF ¶¶ 29-31.  In addition to reviewing the materials from Toyobo, Honeywell did its own "extensive testing of the [Zylon] material," including ballistic testing, to measure Zylon's bullet-stopping power and physical characteristics under various conditions. *Id.* ¶¶ 25-26.

Bullet resistance and weight are critical factors for any body armor. *See id.* ¶ 36.  Low weight is particularly important for user comfort, which ensures that officers actually wear the armor. *Id*. ¶ 43.  Honeywell's final Z Shield product delivered outstanding ballistic protection at a fraction of the weight of other ballistic materials on the market. *See, e.g.*, *id.* ¶ 37.  Stephen Croskrey, AHI's President and CEO of AHI's Products Division, testified that "[i]t was the best performing product that any of us had ever seen." *Id.* ¶ 40; *see also id.* ¶¶ 41-42.  For the commercial manufacture of Z Shield, Honeywell entered into a tolling (or production) contract with its chief competitor, DSM, by which DSM agreed to manufacture Honeywell's Z Shield in DSM's Netherlands facility. *Id.* ¶¶ 18-21, 24.[2]

While Honeywell developed Z Shield, AHI handled the design, manufacture, marketing and sale of the vests at issue in this case. *Id.* ¶¶ 45-47.  Before AHI decided to incorporate Z Shield into its vests, it conducted its own extensive testing on Z Shield and prototype vests. *Id.* ¶ 50.  Based on the impressive results from its own testing, AHI incorporated Z Shield into a number of

---

[2] Honeywell later entered into a tolling contract for Z Shield with a different toller, FMS. SOF ¶ 139.

its vest models, usually along with other ballistic-resistant materials, creating what are known as "hybrid" vests.  *Id.* ¶¶ 45-46, 51.  AHI, not Honeywell, chose which materials to use in its vests, whether to use Z Shield alone or with other materials, and how many layers of each material to use and in what sequence.  Ex. 80, (Mar. 3, 2010 B. Weber Tr. at 49:13-50:10).

In order to sell vests containing Z Shield (or any other ballistic material) in the U.S., AHI had to meet certification standards established by the National Institute of Justice ("NIJ"). SOF ¶ 53.  NIJ is "the research, development and evaluation agency of the U.S. Department of Justice" "that tests and certifies body armor to ensure" it meets minimum ballistic standards, which are set forth in the NIJ Standards.  *Id.* ¶ 52.  NIJ developed its Standards in partnership with another government agency, the National Institute of Standards and Technology ("NIST").  *Id.* ¶ 55.  From 2000 to 2005—the time period relevant to this case—NIJ evaluated ballistic materials under NIJ's 0101.04 Ballistic Resistance of Body Armor Standard (the "NIJ .04 Standard").  *Id.* ¶ 54.  The NIJ .04 Standard required manufacturers like AHI to submit each vest model for destructive testing, *i.e.*, testing where the vest would be shot by bullets of sizes and speeds specified by NIJ at specific locations on the vest.  *Id.* ¶¶ 61-63.  The NIJ .04 Standard did not require or prohibit the use of particular ballistic materials, nor did it require testing of ballistic material used in vests; a manufacturer could use as much or as little of whatever material it wished so long as the final vest could stop the specified threat.  *Id*. ¶¶ 56-57.

Importantly, the NIJ .04 Standard only required testing of new armor.  *Id*. ¶ 58.  It did not set ***any*** performance standards or testing requirements for used armor or armor subjected to "accelerated aging" or environmental exposure testing, *i.e.*, armor that was exposed to extreme conditions over a period of weeks.  *Id.* ¶¶ 59-60.  In fact, the NIJ .04 Standard did not require, or even contemplate, testing of body armor that had been exposed to particular environmental factors

such as high heat and humidity, *see id.* ¶ 60, and it had no requirement for how long body armor was supposed to last, *id*. ¶ 65.  New armor was required only to meet the standard at the time of testing.  *Id*. ¶ 64.  It is undisputed that all AHI vests that contained Z Shield met the applicable NIJ certification requirements.  *Id*. ¶ 66.

After NIJ certified AHI's vests containing Z Shield, AHI sold them under two programs relevant to this case.  *Id.* ¶ 67.  ***First***, AHI sold vests containing Z Shield to federal law enforcement agencies through the General Services Administration's ("GSA") contracting program known as the Multiple Award Schedule ("MAS"), which allows federal agencies to purchase certain commercially available products.  *Id.* ¶¶ 68-69.  AHI and government entities purchasing vests containing Z Shield using the MAS were the only parties to the relevant contracts—Honeywell, as a materials supplier, was not a party.  *Id.* ¶ 70.  The GSA did not require that bullet-resistant vests be certified by NIJ in order for them to be included in the MAS (although all of AHI's vests containing Z Shield sold through the MAS program were NIJ-certified).  *Id.* ¶¶ 66, 71.

***Second***, a federal grant program called the Bulletproof Vest Partnership ("BVP") allowed state and local law enforcement agencies to seek reimbursement for their vest purchases.  *Id.* ¶¶ 72-73.  NIJ certification was the only requirement for vests to be included in this program.  *Id.* ¶¶ 75-77.  Under the BVP, AHI sold vests containing Z Shield to law enforcement agencies who then sought reimbursement from the federal government.  *Id.* ¶¶ 74, 78.  As a materials supplier, Honeywell was not involved in the sale of vests or the reimbursement process.  *Id.* ¶ 79.

### B.    Z Shield Vests Saved Lives

Although this case has been pending for over a decade, the DOJ has not identified a single instance where a vest containing Z Shield failed to perform as intended.  *See* SOF ¶ 85.  But discovery in this case has demonstrated that vests containing Z Shield saved the lives of at least five law enforcement officers who were shot in the line of duty and who are alive today because

they were wearing AHI vests containing Z Shield, *see id.* ¶ 86:



**Ofr. David Tallant** (Gaithersburg, Maryland).  Shot in the chest in suburban Maryland, Ofr. Tallant is alive today because his vest containing Z Shield stopped a bullet that exceeded the certified threat level of his vest. *Id.* ¶ 92; Ex. 70, (Aug. 6, 2010 D. Tallant Tr. at 227:3-8. ("Q.  The vest saved your life?  A.  Yes, sir.  Q.  You are here today to talk to us because the vest sitting right there on the table that we looked at stopped the bullet?  A.  Yes, sir."))[3]



**Sgt. Brian Kyle Bennett** (Oklahoma City, Oklahoma).  Shot squarely in the chest while wearing a vest containing Z Shield, Sgt. Bennett testified that the Z Shield-containing vest saved his life.  SOF ¶ 90; *id.* ¶ 91 ("My son was born after this event.  He was conceived after this event.  So I mean, every time I even look at him I think about what could have been different, how so many lives would have changed if I would have died.").



**Ofr. Derek Whipps** (Boise, Idaho).  Shot three times at point-blank range while wearing a vest containing Z Shield, *id.* ¶ 89, Ofr. Whipps testified that "I'm here standing and breathing and talking to you, and I believe that the vest saved my life."  Ex 82, (Aug. 23, 2010 D. Whipps Tr. at 87:20-88:1).



**Det. Jack Bishop** (Denver, Colorado).  Shot at close range in the back while wearing a vest containing Z Shield, Det. Bishop credits his vest for saving his life.  SOF ¶ 93; Ex 29, (July 27, 2010 J. Bishop Tr. at 62:17-63:1; *id.* at 41:7-18).  Det. Bishop explained that "the vest performed . . . it worked.  It stopped the bullet.  That's what mattered to me. . . . It did what I needed it to do that night, that early morning."  SOF ¶ 94.



**Sgt. Joel Winfrey** (Ft. Lauderdale, Florida).  Shot in the back while wearing a vest containing Z Shield, Sgt. Winfrey testified that the vest saved his life.  SOF. ¶ 87; Ex. 83, (Dec. 3, 2010 J. Winfrey Tr. at 41:4-8; 48:22-24).  Sgt. Winfrey explained: "I'm not one to get overly melancholy about stuff.  I had a vest on, and it worked and it was supposed to work, so that is what I was happy with."  *Id.* at 40:16-19.

---

[3] Even though Ofr. Tallant was shot just a few miles from NIST—the federal agency that was investigating Zylon—government researchers never analyzed his vest, even after becoming aware that a Zylon-containing vest was involved.  SOF ¶¶ 248-252; *see also* Ex. 59, (Apr. 29, 2010 K. Rice Tr. at 374:2-8 ("Q. The question is, you became aware of an officer who was shot wearing armor that you were testing in the county that you work in.  And my question is, did you not follow up on that because you had other stuff to do?  Is that your testimony?  A. That's correct.")).

The incidents described above occurred in different parts of the country with vests of varying ages that had been exposed to varying levels of heat and humidity.  *See* SOF ¶¶ 87-89, 91-92.  Every time, the vest stopped the bullet and the officer survived.  *See id.* ¶¶ 87-89, 91-92.  Yet according to the DOJ's position in this lawsuit, each of these vests was defective and valueless.  *See id.* ¶ 346.

### C.     Honeywell Responded Quickly To Concerns About Heat and Humidity

On July 5, 2001, DSM, Honeywell's manufacturer of Z Shield sent a fax to Honeywell, AHI, and Toyobo identifying for the first time supposedly "serious indications that the use of [Z Shield] in bullet resistant vests is not justified."  SOF ¶¶ 95-98, 108.  Although it questioned DSM's motives, Honeywell took DSM's fax seriously.  *Id.* ¶¶ 99-103, 111, 128; *see also id.* ¶¶ 104, 107.  As a contemporaneous memo to file shows, Honeywell received the DSM fax at 10:50 a.m. on July 5, and by 11:25 a.m., Greg Herceg, Honeywell's General Manager for the Advanced Fibers and Composites unit, called Steve Croskrey, President of AHI, on his cell phone.  Ex. 115.  Herceg left "a detailed message" explaining that Honeywell "had received a disturbing fax from DSM claiming that there were potential problems with the [Zylon] shield in bullet resistant vests."  *Id*.  Herceg then called Croskrey's office and left a message with Croskrey's secretary "to make sure Steve called me back ASAP as I had an urgent matter to discuss."  *Id.*  After their subsequent call, Herceg followed up their conversation with an email that same day to confirm that Honeywell would "cease shipping [Z Shield] to Armor Holdings until we have an opportunity to review DSM's results, obtain Toyobo's response and determine our path forward."  SOF ¶¶ 101-101; Ex. 118.  Honeywell also encouraged AHI to "take all actions they deem prudent with their customers in order to mitigate and avoid potential risk to their customers in light of the preliminary information our companies have received this morning from DSM."  SOF ¶ 102; Ex. 118.

The next day, Friday, July 6, 2001, Honeywell learned the conditions DSM had used for

its testing of Z Shield.  SOF ¶¶ 105-106; *see also id.* ¶¶ 109-110.  DSM reported that it had "oven age[d]" Z Shield for two weeks at 70°C [158°F] and 90°C [194°F].  *Id.* ¶ 105; Ex. 119.  Those conditions were extreme—well beyond any condition a vest would experience in the real world, much less for two weeks.  *See id.* ¶¶ 159-161.  This type of testing was also unprecedented: Honeywell did not conduct this type of extreme conditioning, the NIJ Standard did not require it, and Honeywell was not aware of any ballistic material manufacturer who was doing this type of testing.  *Id.* ¶¶ 60, 120-121.  That is why AHI's President testified that DSM's oven aging was "a test that nobody had ever seen before."  Ex. 33, (Sept. 15, 2009 S. Croskrey Tr. at 99:17-19).

Honeywell reached out to Toyobo, the manufacturer of Zylon fiber, to get its reaction to the DSM data.  SOF ¶ 109.  Toyobo responded that, at the request of a German customer, Toyobo had recently exposed Zylon to high temperature and humidity—80°C [176°F] and 60°C [140°F] at 80% relative humidity ("RH").  *Id.* ¶ 110.  Toyobo stressed that although Zylon's strength declined under those extreme conditions, the results showed no "serious indication about woven fiber" or "Zylon fiber" for in-service use.  *Id.*

Honeywell also took immediate steps not only to disclose the DSM information to AHI but also to ensure it was provided to end users as well.  *Id.* ¶¶ 96, 102.  By Tuesday, July 10, 2001— just days after the DSM fax—and with Honeywell's support and encouragement, AHI issued a special Storage Advisory concerning Z Shield and Zylon.  *Id.* ¶¶ 113-114.  That Storage Advisory informed end-users of the DSM test results and provided care and handling recommendations:

> Please be advised that in order to maintain and protect optimal ballistic performance of Xtreme ZX, Xtreme Z, Xtreme X, PROTECH Stealth Elite and Safariland Platinum model body armor products, they should be stored in a dry cool place.  Do not store these products at temperatures above 120°F [48°C] and 50% humidity.  Recent laboratory "accelerated aging" tests of Zylon fiber used in the above products, indicate that the ballistic performance of such material can be adversely affected if it is stored in a manner that exposes the material to extreme temperature (158°F [70°C] and above) and excessive humidity (80% and above) for a continuous period of two (2) weeks or more.

10

*Id.* ¶ 115; Ex. 123.  According to its sworn discovery responses in this case, the "United States does not contest that Armor Holdings asked its distributors to send the Storage Advisory to all end-user customers who had purchased Zylon and/or Z Shield body armor" and "that many distributors likely did so shortly after receiving the Storage Advisory."  Ex. 18 at 59.  Those end-users included each U.S. government agency that purchased a vest with Z Shield and any local, state, or tribal agency that sought reimbursement under the BVP program.  SOF ¶ 116.

In the months that followed, AHI and Honeywell took additional steps to make sure that future end-users were aware of the potential issue.  After July 2001, AHI updated the owner's manuals for AHI vests containing Z Shield to state: "When not in use, avoid storing your vest in places where it is exposed to persistent high temperatures, 120 degree Fahrenheit [48.8°C] and above, in combination with high humidity, 50 percent and above, for long uninterrupted periods of time to weeks or more."  *Id.* ¶ 117.  By October 2001, AHI had begun affixing a special label to the packaging of every vest that contained Zylon that stated: "WHEN NOT IN USE BODY ARMOR SHOULD BE STORED AT ROOM TEMPERATURE IN DRY PLACE."  *Id.* ¶ 118 (emphasis in original).  The DOJ admits that "by October 2001 and thereafter, entities that purchased Zylon and/or Z Shield body armor, including Government entities, would likely have received this notice."  Ex. 18 at 59; *see also* SOF ¶ 119.

## D.      Honeywell Conducted Testing And Shared The Data With AHI

With sales of Z Shield suspended as of July 5, 2001, Honeywell began its own extensive testing program for evaluating the performance of Z Shield after exposure to conditions of extreme heat and humidity.  SOF ¶ 122.  Because this type of testing was unprecedented in the ballistics materials field, Honeywell initially did not even have the equipment or facilities necessary to conduct it.  *Id.* ¶ 123.  As a result, Honeywell constructed its own conditioning chamber, which it

dubbed "The Florida Room." *Id.* ¶ 124. Starting in summer 2001, Honeywell placed Z Shield and other ballistic materials in the Florida Room for weeks on end at conditions of 50°C [122°F], 70°C [158°F], and 90°C [194°F] with uncontrolled humidity, and conditions of 70°C [158°F] and 80% RH, and 40°C [104°F] and 70% RH. *Id.* ¶¶ 125-126; Ex. 129 at 337; Ex. 148 at 632.

Although there was scatter in the data, Honeywell's testing generally showed that Z Shield lost some ballistic stopping power after prolonged exposures to extreme conditions, with the degradation eventually tapering off after a reduction of around 15%. SOF ¶ 175. Importantly, however, even the mildest condition Honeywell used, 40°C [104°F] / 70% RH, is an extreme condition. *Id.* ¶ 159. As Honeywell's expert meteorologist Rodger Getz has explained, that combined condition does not exist in the United States. *Id.* ¶ 160; Ex. 4 at 4. And no matter how hot or sweaty an officer might get while wearing a vest, an officer would not experience those conditions in the real world even for a moment—much less for the weeks on end that Honeywell subjected its materials to in the lab—because human beings can only survive for a few minutes in those conditions. *Id.* ¶ 161; Ex. 7 at 4. In addition to exposure testing, Honeywell also regularly tested Z Shield that had been stored at uncontrolled temperature and humidity in its warehouse to see if there was any degradation over time. *See* Ex. 1 at 107; SOF ¶ 142. That testing showed no material drop in Z Shield's performance after real-time "warehouse" aging. SOF ¶ 143.

Between 2001 and 2003, Honeywell consistently shared its environmental testing results with AHI. *See* SOF ¶¶ 125, 127, 129, 136, 173-174; 176. On at least four occasions, Honeywell transmitted significant amounts of data to AHI that clearly showed Z Shield could degrade after exposure to high heat and humidity.

- **October 4, 2001:** Honeywell shared results from tests of four types of ballistic materials (Z Shield, Zylon fabric, Gold Flex (Kevlar shield), and Kevlar fabric) after exposure to conditions of 50°C [122°F], 70°C [158°F], and 90°C [194°F], for one, two, and four weeks, and to the combined conditions of 70°C [158°F] and 80% RH for two and four weeks. *Id.*

¶¶ 130-131.   AHI President Steve Croskrey testified that he understood that in both the two-week and four-week tests Z Shield's retention was "the lowest of the four items tested." Ex. 33, (Sept. 15, 2009 S. Croskrey Tr. at 153:8-154:18).   AHI's vest designer, Bob Weber testified that "[a]s the person at [AHI] responsible for vest design," he took "this type of information into account as [he] received it from Honeywell in designing the vests for [AHI]." SOF ¶ 133.   Honeywell also shared testing results of completed vests after exposure to 70°C [158°F] and 80% RH, which showed that some vests containing Z Shield lost up to 15% of ballistic stopping power after exposure.   Ex. 129 at 341.

- **December 3, 2001:**  By December 2001, Honeywell had completed another round of testing and provided the results to AHI.   SOF ¶¶ 135-136.   Those tests exposed various samples of ballistic materials and completed vests to the combined conditions of 40°C [104°F] / 70% RH for four weeks.   *Id.* ¶ 135.   Scott O'Brien, President of AHI's subsidiary, Safariland, agreed that the data showed degradation.   Ex. 56, (Nov. 18, 2009 S. O'Brien Tr. at 128:20-22).

- **July 25, 2002:**  Honeywell continued its testing of Z Shield after exposure to 40°C [104°F] / 70% RH, including 12-week and 24-week continuous and cyclic exposures (where the conditions alternated between 40°C [104°F] / 70% RH and ambient conditions).   *See* Ex. 146. It is again undisputed that Honeywell provided these testing results to AHI.   SOF ¶ 173.   AHI's vest designer, Bob Weber, testified that he understood the 24-week exposure of Z Shield resulted in retention of "86.4 percent" (a reduction of about 15%).   Ex. 80, (Mar. 3, 2010 R. Weber Tr. at 135:15-19).   When asked if this data caused him concern, Weber responded that "it's a piece of data that should be noted [] when you're going to build future designs" but that it was "not a red flag."   *Id.* at 135:24-136:4.

- **January 22, 2003:**  Representatives from Honeywell and AHI met on January 22, 2003.   SOF ¶ 174.   During this meeting, Honeywell provided AHI with all high heat and humidity testing data on Z Shield that Honeywell had generated up to that point, including the results discussed above and additional test results on Z Shield subjected to even longer periods of exposure to 40°C [104°F] / 70% RH.   *See* Ex. 148.

There is no dispute that Honeywell provided AHI with all of its high heat and humidity test data on Z Shield generated between July 2001 and January 2003.   *See* SOF ¶¶ 125, 127, 129, 136, 173-174.   Honeywell also discussed these test results with AHI to make sure that AHI personnel understood the potential limitations of Z Shield so that they could evaluate their vest designs and account for those limitations when designing and constructing vests.   *See id.* ¶¶ 133, 137.

After many rounds of warehouse and environmental exposure testing, Honeywell decided to resume sales of Z Shield to AHI.   *Id.* ¶ 138.   Honeywell's scientific team, led by Dr. Lori Wagner, participated in the decision to resume sales, along with Honeywell's General Manager Greg Herceg.   *Id.* ¶ 141.   Dr. Wagner, an experienced and respected materials scientist,

recommended resuming sales of Z Shield based on "the extensive testing" that Honeywell had done, both the "warehouse testing and the elevated conditions testing, and the experiences that [Honeywell] had with the [Z Shield] material." *Id.* ¶ 142; *see also id.* ¶ 144.

Specifically, testing on Z Shield stored for lengthy periods of time in an uncontrolled warehouse environment showed no measurable degradation. *Id.* ¶ 143.  And while the high heat and humidity testing showed that Z Shield could degrade under extreme conditions, in Honeywell's scientific judgment there was no known correlation between this so-called accelerated aging under unnatural conditions and how Z Shield would perform in a completed vest under normal conditions of use. *Id.* ¶¶ 145-147, 159.  As Dr. Wagner testified:

> We had data associated with exposure testing, elevated heat and humidity, that were not realistic to the current conditions we were aware of exposure to that demonstrated a performance drop but leveling off over time.  We were not aware of, no matter who we spoke to, of any relationship that that data had to a real world condition.  We had the data compared to warehouse data which didn't show any correlation.  We didn't have anything that supported that information being reflective of performance in a user application. Ex. 73, (Dec. 17, 2014 L. Wagner Tr. at 604:18-605:6).

Critically, and as discussed below, government researchers came to the exact same scientific judgment, which is why the government continued to purchase vests containing Z Shield even after it had long known that Z Shield could degrade under hot and humid conditions. *See infra*, at Background, E & F; *see also* SOF ¶¶ 148-158, 227.

Honeywell's decision to resume sales of Z Shield was made in close coordination with AHI. *See id.* ¶ 163.  Among other things, it was clear that AHI understood that like all ballistic materials, Z Shield had weaknesses, in this case susceptibility to high heat and humidity. *Id.* ¶¶ 137, 165-166.  As AHI's President Croskrey testified, "[Honeywell] shared data with me that ***clearly showed*** at high temperature, high humidity there was degradation." *Id.* ¶ 165 (emphasis added).  He explained that "[a]ll of the data we were getting from Honeywell, Toyobo, internally,

any data we had actually seen" showed "yes, there was degradation at these extreme high temperatures and humidities," but AHI "didn't see any degradation in real world conditions." *Id.* ¶ 164; *see also id.* ¶ 132.

AHI assured Honeywell that AHI had built significant "margins of safety" into its vests, meaning that the vests provided more protection than was required for NIJ certification and could accommodate environmental degradation that may occur over time. *Id.* ¶ 167. AHI's vest designer Weber testified that "that the hybrid designs that [AHI] put together, including Z Shield, had adequate margin of safety even if there w[as] some degradation because of environmental conditions." *Id.* ¶ 168. Gary Lemanski, General Manager of Body Armor at AHI, testified that AHI "had designed its vest[s] with an adequate margin of safety," and built in "an additional amount of safety on top of the NIJ standard." *Id.* ¶ 167; *see also* ¶¶ 169-171. AHI told Honeywell that it had designed its vest with a sufficient margin to account for any environmental degradation that might occur over time. *Id.* ¶ 163; Ex. 39, (Oct. 7, 2009 G. Herceg Tr. at 203:12-14 ("We knew that they had built safety margin into each of their vests, above and beyond the [NIJ] requirements.")). Honeywell also found significant the fact that AHI had undertaken extensive efforts to warn its end-users not to store their vests in hot and humid conditions. SOF ¶ 162. These factors, combined with the warehouse testing and the inconclusive nature of the high heat and humidity tests, convinced Honeywell that it was appropriate to resume sales.

In fact, there is no dispute that Zylon and Z Shield can be safely incorporated into a vest, so long as the vest manufacturer—in this case AHI—builds in an adequate margin of safety. As NIST's Kirk Rice, the DOJ's lead witness and the government scientist who led the charge to decertify Zylon, conceded during his deposition, it is "possible to have a vest that is a hybrid vest that includes Zylon" without risk to the wearer and to create a safe Zylon-only vest provided the

15

manufacturer "builds plenty of margin into it."  Ex. 62, (Dec. 21, 2017 K. Rice Tr. at 21:17-22, 22:14-23:10); *see also* SOF ¶¶ 262-263.  Given the above, Honeywell had no reason to doubt that AHI was constructing its vests with appropriate margins to ensure those end-products were safe.[4]

### E.  The Government Had Extensive Knowledge That Zylon And Z Shield Could Degrade Under High Heat And Humidity

Although the DOJ was evidently unaware when it brought this case, government researchers knew as early as Honeywell did that Zylon and Z Shield could degrade when exposed to high heat and humidity.  Around 2001, the government hired The Tekne Group, a contractor, to study the performance of ballistic-resistant materials after long-term exposure to heat and humidity, including Zylon and Z Shield.  SOF ¶¶ 205-208.  Discovery in this case has shown that as far back as 2001, government scientists, contractors, and officials received information from numerous sources about how Zylon can degrade in high heat and humidity:

- **August 8, 2001:** Just a month after Honeywell received DSM's urgent fax, government researchers exchanged emails with the subject "HOT!—Issues with Zylon," that contained links to two websites.  The first website discussed the same testing data that Honeywell had received from DSM, *i.e.*, that Zylon could degrade under extreme heat and humidity. *Id.* ¶¶ 209-210; *see also* Ex. 158.  The webpage circulated among government researchers explained that "[a]ccording to DSM, the use of [Z Shield] in bullet resistant vests may not be justified" because DSM's "aging tests"—where "the material is exposed to increased temperature and humidity conditions, for a certain period of time"—resulted in "a significant loss of strength." *Id.* ¶ 212.  This is a reference to the *same* fax that DSM sent to Honeywell.  *Compare* SOF ¶ 95 *with id.* ¶ 212.  The second website, which government researchers testified that they reviewed by August 2001, showed a loss of strength retention in Zylon fiber—the building block of Z Shield—of 20%, at conditions of 80°C [176°F] and 80% relative humidity. *Id.* ¶¶ 213-216. A Tekne Group researcher replied to the group email: "We are going to be paying a great deal of attention to this information." *Id.* ¶ 211.

---

[4] AHI over the years would undertake further testing to ensure that its vests had been constructed with an adequate margin of safety.  Starting in 2003, AHI worked with Exponent, a leading engineering consulting firm, to collect used vests to assess the impact of age and wear. *See* SOF ¶¶ 253-254.  AHI found that the vast majority of its vests were performing as expected, but one of its lightest vest models was under-designed and thus "more susceptible to wear and tear." *Id.* ¶¶ 255-262.  Although that was a design issue and not a Z Shield issue, AHI created a special replacement program for the particular affected models. *Id.* ¶¶ 362-363.

- **September 2001:** By this time, Janet Ward and Philip Cunniff, two government body armor researchers at U.S. Army Natick, were aware of the information in the "HOT! — Issues with Zylon," email, as well as the fact that "[t]he strength of Zylon® gradually decreases even at the temperature of less than 100°C [212°F]." *Id.* ¶¶ 221-222; *see also id.* ¶¶ 217-219.

- **February 2002:** The Tekne Group delivered a presentation to government researchers which reported that Zylon and Z Shield's ballistic performance degraded after exposure to high heat and humidity due to a chemical process known as "hydrolysis." *Id.* ¶ 223. The Tekne Group reported that Zylon's performance dropped 38% after about six weeks exposure to 80°C [176°F] and 80% RH, and dropped by 20% after about seven weeks of exposure to 60°C [140°F] and 80% RH. *Id.* ¶¶ 224-225. The Tekne Group also reported that Z Shield's performance dropped by about 15% after two weeks of exposure to 70°C [158°F] and uncontrolled humidity. Ex. 143 at 335.

- **June 29, 2002:** Government scientists circulated an email with testing results from Toyobo showing that after "160 days, 40 deg C [104°F], [8]0% humidity the fiber is at approximately 90% of its original strength." *Id.* ¶ 226. Importantly, the government continued to purchase and reimburse for vests containing Z Shield even after learning this information—confirming that this type of accelerated aging data was not material to the government's payment decision. *See infra* at 17.

- **May 30, 2003:** By May 2003, the Tekne Group reported that its tests showed that "PBO [Zylon] materials exhibited extreme reductions in their ballistic limits when compared to the baseline samples." SOF ¶ 228. In those extreme testing conditions [200°F and 90% RH], Z Shield lost more ballistic performance than any other material. Ex. 170 at 670.

- **September 2003:** The GSA learned from Second Chance, another body armor manufacturer that used Zylon (but not Z Shield), that "previously worn Zylon vests wear out sooner than expected." SOF ¶¶ 237-238.

- **January 13, 2004:** The government began providing *its own warning* to customers concerning degradation of Zylon. *Id.* ¶¶ 241-242, 244. The BVP website provided warnings to any state or local law enforcement agency that sought reimbursement for a vest containing Zylon (or Z Shield), which stated: "you have selected a vest model that contains Zylon . . . vests containing Zylon have been subject to a special replacement or upgrade program [by their manufacturers], *due to a reported degradation of its ballistic qualities under certain environmental conditions*." *Id.* ¶ 241 (emphasis added). As a result, by January 2004, *every purchaser* of a vests containing Z Shield who sought reimbursement through BVP was aware of potential degradation from high heat and humidity, as a purchaser was required to check a box to acknowledge this warning. *Id.* ¶¶ 243, 245.

- **February 2004:** Relator Aaron Westrick told the DOJ that he had information that Zylon degraded in conditions of high heat and humidity. He eventually filed a qui tam lawsuit alleging the same (which became the *Toyobo/Second Chance* case). *Id.* ¶ 247.

Notwithstanding its own extensive knowledge of Z Shield's propensity to degrade under conditions of high heat and humidity, the government continued to purchase and reimburse for vests containing Z Shield.  SOF ¶¶ 78, 240, 246.  The reason was that government scientists made the same scientific judgment that Honeywell did: that testing of ballistic materials under extreme heat and humidity was not probative of how those materials would perform under actual conditions of use.  The record on this point is overwhelming and conclusive, to give just several examples:

- The Tekne Group's Jon Lesko testified that as of July 2002, "there was not a good correlation between accelerated aging and real-world data.  By real world I mean operational use by the average officer.  That link had not been established.  And so to make that extrapolation may be incorrect."  *Id.* ¶ 227.

- In September 2004, Rice (NIST) emailed other government researchers: "'[A]ccelerated aging' is a misnomer, because the rates at which environmental factor degrade the armor are not known yet so 6 months under one set of conditions that seem to be 'bad' for the armor may not necessarily lead to the same extent of damage as 6 months on the street."  Ex. 136; *see also* SOF ¶ 149.

- The lack of correlation between exposure testing and "real-life armor" was one reason why the government decided ***not*** to publish the ballistic testing results from The Tekne Group's studies.  *See id.* ¶¶ 278-283.  As NIST's Kirk Rice explained when advocating against releasing the results to the public, the exposure testing data "***could easily be misinterpreted to cause widespread panic***."  *Id.* ¶ 279 (emphasis added).

In 2005, and after the federal government had already recommended that Zylon no longer be used in body armor, *id.* ¶¶ 268, 270, NIJ tried to develop a methodology that would reliably predict service life of body armor using environmental exposure protocols.  But after years of work, it was unable to do so.  *See id.* ¶¶ 150, 155.  NIJ issued a new Standard (0101.06) in 2008 that required new vests to be tested after exposure to heat and humidity before being certified.  Ex. 137 at 368.  But the government researchers who developed that exposure protocol were clear that because of "the challenges involved in developing correlations between field and laboratory aging, ***this protocol will not predict the service life of body armor***."  SOF ¶ 155 (emphasis added).  Even as late as 2012, after this case had been pending for four years, NIJ publicly acknowledged

that "[t]here is currently no known way to predict the amount and rate of change of the ballistic performance of an individual vest due to environmental exposures and normal daily wear and tear, or due to the intrinsic chemical or physical properties of the ballistic materials." *Id.* ¶ 156.

That is why NIJ in 2012 sponsored a "Body Armor Challenge" that offered an award up to $50,000 for anyone who could develop an approach utilizing "existing technologies, statistical methods, or innovative new strategies" to "provide a means to predict to a high degree of certainty at any point during its service life whether a body armor system continues to maintain the level of ballistic performance for which it was originally rated." Ex. 141 at 2.  But no contestant was able to develop such an approach.  Ex. 52, (Apr. 3, 2014 L. Miller Tr. at 203:12-18 (government witness testifying that he believes it is still "an open question")).  Even today, almost 20 years after the testing at issue in this case, there is still no way to predict expected vest performance in the field based on environmental testing of armor.  *See* SOF ¶ 150.

### F.     Honeywell's Offers To Share Data With The Government

Once questions were raised about Zylon, Honeywell offered—numerous times—to share its testing data with the government, but government scientists repeatedly and collectively decided they did not want or need Honeywell's data.  Critically, the DOJ was unaware of virtually any of these communications when it brought this case (and for a significant time thereafter), due to its failure properly to search for documents in government files, an issue discussed below.  *See infra,* at 26.  But now, after extensive discovery, the record overwhelmingly shows that Honeywell was trying to ***help*** the government, not defraud it.

***August 2001—Honeywell Tells Government It Started Testing.***  One month after Honeywell received the DSM fax, Honeywell scientist Dr. Ashok Bhatnagar called Janet Ward, a lead ballistics researcher for the U.S. Army and a government technical representative for The Tekne Group project.  SOF ¶ 285.  During that call, Dr. Bhatnagar told Ward that Honeywell was

"conducting a series of tests to understand [the] [e]ffect of heat and moisture" on Z Shield.  *Id*.  He told her that Honeywell's "test data will be available by mid September" and that Honeywell "would like to share" that data.  *Id.*

Later that year, The Tekne Group researchers requested that Honeywell provide information and samples to be used as part of the Tekne Group's testing.  *Id.* ¶ 286.  In February 2002, Honeywell responded "with a few question[s]" related to the request, including about the test protocols and requested samples.  *Id.* ¶ 287.  Honeywell reiterated that it was "very interested in working with" the Tekne Group.  *Id*.  Of the many companies in the industry that received The Tekne Group's request, Honeywell was the only company that even responded.  *Id.* ¶ 288.

***March 2002—Honeywell Told The Government The Testing Showed Degradation***.  On March 20, 2002, Honeywell representatives again met with Ward.  SOF ¶ 289.  Ward's notes of this critical meeting were only turned over years into this case, because the DOJ had failed previously to search for these materials, even though they were sitting in Ward's desk.  *Id.* ¶¶ 375-377.  The first time Honeywell deposed Ward, it did not have her critical notes.  But at her second deposition and when confronted with her notes, Ward admitted that on "March 20, 2002, Honeywell told [her] that it was exposing Z Shield to conditions of high heat and humidity" and "had been conducting accelerated aging tests on Z Shield."  *Id.* ¶¶ 290-294.  She also admitted that "on March 20, 2002, Honeywell told [her] that when it had conducted that accelerated aging testing on Z Shield it was seeing some environmental effects," which "mean[t] that Z Shield was showing degradation after exposure to heat and humidity."  *Id.* ¶ 278.  Ward's contemporaneous handwritten notes state that "Z Shield—[f]rom testing at Honeywell" was exhibiting "some environmental effects" from "accelerated aging" testing, *id.* ¶ 292—which is precisely what the DOJ's complaint alleged that Honeywell had failed to disclose.  *See e.g.*, Am. Compl., ¶ 20

("Honeywell knew, and failed to disclose to . . . the United States that Z Shield . . . degraded quickly over time in hot and humid conditions.").

Of note, on March 21, 2002, and the next day after Ward met with Honeywell, government researchers and The Tekne Group exchanged emails about Honeywell's offers to assist with The Tekne Group study that the government was sponsoring.  *See* SOF ¶ 295.  In these emails, which included Ward, government researchers noted that they all "agreed . . . that [Honeywell's] participation would not necessarily be in the best interests of [The Tekne Group] program, and that *[Honeywell's] information, or lack of it, would not hinder progress in any way*."  *See id.*; Ex. 196 (emphasis added).  Even though she had learned just the day before about Honeywell's high heat and humidity testing program, there is no evidence that Ward intervened to suggest that government researchers work more closely with Honeywell to obtain Honeywell's information.

*July 2002—Honeywell Offers To Assist Tekne Group.*  In July 2002, Dr. Wagner sent a letter to the Tekne Group, and copied Lance Miller, another government ballistics researcher.  *See* SOF ¶¶ 297-298.  Dr. Wagner again offered Honeywell's assistance to The Tekne Group: "[W]e would welcome the opportunity to input our extensive materials and applications technical knowledge for the development testing protocol and the analysis of the results."  *Id.* ¶ 299.  Dr. Wagner testified that through her July 2002 letter, Honeywell was "offering what knowledge [it] had on environmental testing and the results that [it] had had to help them design their test," and this necessarily included "an offer to share Honeywell's testing data."  *Id.* ¶ 300.

Remarkably, no one in the federal government or The Tekne Group ever responded to Dr. Wagner's July 2002 letter or to Honeywell's offer of assistance.  *See id.* ¶¶ 303-304.  Contemporaneous internal government documents indicated the government's view that "no response is warranted at this time," and that "we did not need to respond."  Ex. 201; Ex. 224.

21

Government witnesses in this case have confirmed that nobody responded to Honeywell, even though "Honeywell was the only company that made an offer of assistance like this." *Id.* ¶¶ 305-306.

*October 2002—Honeywell Discusses Testing With The Government.* On October 22, 2002, Honeywell met again with ballistics researchers for the U.S. Army, including Ward. SOF ¶ 307. During that meeting Honeywell discussed the testing of various materials in its product line "at elevated temperatures and humidities as well as the warehouse testing of [its] products." *Id.* ¶ 308. Government researcher Ward confirmed that she recalled "some data shown" during that meeting. *Id.* ¶ 309. There is thus no doubt that the government knew that Honeywell had conducted testing on Z Shield after exposure to high heat and humidity. Later notes from Ward specifically reference Honeywell's "Florida Room" and testing materials at conditions of "40 degrees C [104°F]/80 percent relative humidity." *Id.* ¶¶ 323-327.

*May 2003—Honeywell Meets With Government Scientists.* After years of non-responsiveness, Honeywell finally secured a meeting with government ballistics researchers in May 2003. SOF ¶ 310. At this meeting, Honeywell informed the government researchers that it had performed exposure testing on ballistic materials. *Id.* ¶ 311. And as to Z Shield specifically, Honeywell "shared that [Honeywell] had [observed] degradation" after exposure to high heat and humidity conditions. *Id.* ¶ 312. At the meeting, Honeywell "offered to share [its] data and Kirk Rice [of NIST] was supposed to follow up with us to get the data." *Id.* ¶ 313. But Rice never did so, nor did he direct anyone on his team to do so. *Id.* ¶ 314.

*Fall 2003—Honeywell Tries To Follow Up With Government Scientists.* Over the next several months, Honeywell employees Lin Murray and Dr. Wagner reached out *at least seven times* to government researchers Rice and Miller to arrange meetings and share data:

- **September 3, 2003:** Rice transcribed a voicemail he received from Miller indicating that Miller had "rec[eived a] call from Lori Wagner at Honeywell, [and] she is asking about where we stand with various studies and again offered to provide assistance re: samples, ***testing, data***, ***they are willing to help us***." SOF ¶ 316 (emphasis added). This is yet another critical document the government belatedly located and produced years into this case. *Id.* ¶ 378.

- **September 9, 2003:** Rice's phone log notes that Murray called Rice to request a meeting "to review some issues," and also noted Honeywell "would like to pursue a nondisclosure" to facilitate sharing of data. *Id.* ¶ 317.

- **September 15, 2003:** Honeywell's Murray emailed Rice (NIST), copying Miller (NLECTC): "I understand you are a busy man these days which makes getting [in] touch sometimes difficult, so I elected to email you this time. I left you a message last week regarding a follow up meeting to continue some of our discussions which we started back in May [2003]. I spoke with Lance [Miller] last week and he indicated that we should work at getting a couple of dates from you first." *Id.* ¶ 318.

- **September 22, 2003:** Murray called Rice trying again to schedule a meeting. *Id.* ¶ 319.

- **September 26, 2003:** Murray called Rice with suggested dates for a meeting. *Id.* ¶ 320.

- **October 2, 2003**: Murray called Rice about his availability for a meeting. *Id.* ¶ 321.

- **October 7, 2003:** Murray called Rice to tell him that he would be in Washington, D.C. the following week, and inquired about a meeting. *Id.* ¶ 322.

On January 9, 2004, and after weeks of silence, Honeywell's Dr. Wagner followed up these attempts by reaching out to Miller via email stating that "*[o]ur offer still stands* to come and visit and *share some of our data and testing experience*. Let me know if we can be of help." *Id.* ¶ 335 (emphasis added). It is undisputed that the government declined Dr. Wagner's offer to share Honeywell's data. Instead, Miller finally responded to Dr. Wagner: "I agree that it will be important to furthering our efforts to sit down and discuss issues in this regard. But, as you have noted, *we are absolutely maxed out at this point*." *Id*. ¶ 336 (emphasis added).

***December 2003—Honeywell Sends Letter Offering To Share Data.*** Meanwhile on November 18, 2003, the DOJ announced it would be reviewing vests containing Zylon and Z Shield as part of a Body Armor Safety Initiative, which launched after a police officer was shot

wearing a Second Chance vest containing woven Zylon (not Z Shield).  SOF ¶¶ 236, 239, 328.  On

December 3, 2003, Honeywell senior executive Mike Ryan sent a letter directly to Deborah J.

Daniels, who was the Assistant Attorney General at DOJ overseeing the Initiative.  *Id.* ¶ 329.  The

letter stated:

> I am writing to offer Honeywell's assistance in the recently announced Department of
> Justice initiative.... Several months ago, Honeywell provided samples of its Z Shield®
> product for an aging study being conducted by the NIJ [a reference to the Tekne Group
> study].  Since then, ***Honeywell has accumulated additional technical data on the
> performance of its Z Shield® product***.  ***We believe these data are relevant to the
> Department's investigation and would be happy to meet with the NIJ investigators to
> provide these data and discuss their significance***.

*Id.* (emphasis added).  As Ryan testified, "I stated in very clear, no uncertain terms, in my letter .

. . that we had the data and that we were willing to share it."  Ex. 65, (Dec. 1, 2010 M. Ryan Tr. at

143:2-4); *see also* SOF ¶¶ 330-332.

The Director of NIJ responded to the Ryan letter on January 20, 2004.  *Id.* ¶ 334.  Her

response thanked Honeywell for "offer[ing] assistance to the Department of Justice's Body Armor

Safety Initiative," but the Director never asked Honeywell for the data it offered to share.  *Id.*

Instead, she wrote that she "forwarded a copy of [Honeywell's] correspondence to the appropriate

parties at [the DOJ] to inform them of [Honeywell's] willingness to assist in these efforts."  *Id.*

The DOJ admits that more than ten people within DOJ reviewed Honeywell's letter, including the

Director of NIJ, and multiple government scientists and researchers.  *Id.* ¶ 333.  None of them

followed up with a request for Honeywell's data, even though the accompanying the DOJ

"Correspondence Control Form"—a DOJ-drafted description of Mr. Ryan's letter—stated

(accurately) that the purpose of his letter was to: "OFFER[] HONEYWELL'S ASSISTANCE . . .

HONEYWELL HAS ACCUMULATED TECHNICAL DATA ON THE PERFORMANCE OF Z

SHIELD AND WOULD BE HAPPY TO MEET WITH NIJ INVESTIGATORS TO PROVIDE

DATA AND DISCUSS SIGNIFICANCE."  Ex. 214 (emphasis in original).

***May 2004—Government Again Fails To Follow Up.***  Honeywell finally secured a further meeting with government ballistics scientists in May 2004.  SOF ¶ 340.  Leading up to the meeting, Honeywell scientist Dr. Wagner told government researchers that "we have laboratory and testing information involving procedures, variation, materials."  *Id.* ¶¶ 338-339.  But no one at the government asked Honeywell to bring any data to the meeting.  At the meeting, the government researchers "met with representatives of Honeywell . . . to discuss Honeywell's ongoing research efforts and to determine what information and assistance Honeywell can provide to NIJ."  *Id.* ¶ 340.  After the meeting, Honeywell sent the government a draft nondisclosure agreement intended to facilitate the sharing of Honeywell's testing data.  *Id.* ¶ 341-342.  Nobody from the government ever responded to Honeywell further.  *Id.* ¶ 343.

## G.     Zylon Decertification And This Lawsuit

Even after everything the government learned about Zylon and Honeywell's offers of assistance, the government continued to purchase and reimburse for vests containing Z Shield through August 2005, when the DOJ released the results from its Body Armor Safety Initiative.  SOF ¶¶ 78, 240, 246, 263.  Based on unscientific and deeply flawed testing that even the government scientists who authored the final report refuse to stand behind today, *see id.* ¶¶ 264-276, the DOJ concluded that vests containing Zylon created a "risk of death or serious injury as a result of degraded ballistic performance when used in body armor," *id.* ¶ 270.[5]  Even still, the DOJ "continue[d] to strongly encourage public safety officers to wear their Zylon-containing body armor until it can be replaced."  *Id.* ¶ 277.  Afterwards, the DOJ initiated an investigation and eventually sued (or threatened to sue) under the FCA virtually every company

---

[5] Even though NIJ decertified body armor containing Zylon, Ex. 109, the military continued to procure vests containing Zylon for servicemen and women in the Special Forces Division through at least 2007.  SOF ¶¶ 229-235.

in the supply chain for Zylon-containing vests, *see id.* ¶¶ 349, 351, 353-354, 356, 358, 360, even though the government had known since at least August 2001 that Zylon and Z Shield could degrade in high heat and humidity.  *See supra* at Background, E & F.  Most companies settled without gaining access to this extensive record of government knowledge, which was only revealed through discovery in this case.

In 2008, the DOJ filed its complaint against Honeywell.  ECF 1.  Even though it spent years investigating beforehand, the government's initial investigation was woefully inadequate. When it filed, the government attorneys who filed the complaint did ***not know*** that:

- Vests containing Honeywell's Z Shield product saved the lives of at least five officers, SOF ¶ 374;

- AHI had informed its customers that Zylon and Z Shield could degrade after exposure to high heat and humidity as far back as 2001, *id.* ¶ 373;

- Government researcher Ward had met with Honeywell in 2002 and learned that Honeywell's testing showed degradation; *id.* ¶¶ 375-377, 379 (DOJ did not review Ward's notes as part of its pre-suit investigation);

- Government scientists decided (a day after Honeywell discussed its testing data with Ward) that Honeywell's "information, or lack of it, would not hinder the progress in any way" of the government's research, *see id.* ¶¶ 375-377, 379;

- Dr. Wagner emailed government researchers stating "our offer still stands to come and visit and share some of our data and testing experience" or that the government scientist declined the invitation noting that "we are absolutely maxed out at this point," *see id.* ¶¶ 335-336, 375-377, 379;

- Honeywell had sent a letter offering to share its Z Shield testing data ***directly to the Assistant Attorney General at the DOJ*** overseeing NIJ and the Body Armor Safety Initiative that was circulated widely within DOJ itself.  *Id.* ¶ 379.

The DOJ's pre-suit investigation was clearly deficient.  Yet it leveled serious allegations against Honeywell without knowing all, or even many, of the key facts even though these facts were readily available to the DOJ.  The DOJ's failure to preserve, collect, and produce key exculpatory information resulted in deficient document productions, protracted discovery disputes, and numerous delays that required the Court to intervene and closely supervise discovery to ensure

that the government met its obligations.  *U.S. v. Honeywell Int'l Inc.*, 281 F.R.D. 27, 32 (D.D.C. 2012).

In 2016, and after eight years of litigation, the DOJ filed an Amended Complaint, dropping allegations from the initial complaint that had fallen apart during discovery and asserting new allegations (all of which turned out to be unsupported after additional discovery as described below).  Am. Compl.  The DOJ's constantly shifting litigation positions have forced Honeywell to play litigation whack-a-mole for more than a decade.  There have been over 850,000 documents produced, over 100 days of deposition testimony by 68 deponents, and 28 expert reports served by 13 experts.  The incredible volume of discovery in this case has confirmed that the DOJ is not entitled to a trial.  Honeywell accordingly moves for summary judgment.

## ARGUMENT

This is a False Claims Act case that should never have been filed and that should end now. After years of discovery, the evidence shows that far from defrauding the government, Honeywell repeatedly offered to help and share its data, but government scientists rejected or ignored Honeywell's invitations.  Since the government knew Honeywell had data and deliberately chose not to follow up while still purchasing vests containing Z Shield, Honeywell's purportedly omitted data could not have been material to the government's purchase decisions as a matter of law. Honeywell's consistent disclosure of information and offers of assistance likewise preclude any finding of scienter as a matter of law.  For these and other reasons described below, the DOJ cannot succeed under any theory of FCA liability or on its state law claim for unjust enrichment.  And this whole case is almost entirely moot anyway because due to other settlements and Armor Holdings' replacement programs, the government has already been compensated in full—three times over—for money it spent on Z Shield-containing vests.  Further recovery of statutory damages would be a windfall and is unavailable as a matter of law under the FCA.

## I.      THIS COURT HAS ALREADY REJECTED AS A MATTER OF LAW THREE OF THE UNITED STATES' FOUR FCA THEORIES.

The DOJ has advanced four different theories of FCA liability, none of which survives summary judgment.  Three of the four theories already have been considered and rejected by the Court in previous rulings in this case and in the parallel *Toyobo* litigation.  There is no reason for the Court to revisit those decisions here.

The first theory, actual falsity, applies when a defendant "invoices for services that were not rendered or incorrectly describes the goods or services provided."  *U.S. v. Honeywell Int'l. Inc.*, 798 F. Supp. 2d 12, 19 (D.D.C. 2010).  The second theory, express false certification, applies when a party "falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite for payment."  *Id.*  This Court already rejected the DOJ's actual falsity and express false certification theories in its decision on Honeywell's motion to dismiss. *See id.* at 20.  The DOJ has offered no new allegations in its Amended Complaint requiring the Court to revisit that prior ruling.

The Court's rulings in the *Toyobo* case entitle Honeywell to summary judgment to the extent the DOJ is still proceeding on its third theory: implied certification.  An implied certification violation occurs when a "contractor with[holds] information about its noncompliance with material contractual requirements" or a "law or regulation."  *See id.* at 19-20 & n.3.  The DOJ has not identified any applicable law or regulation that required Honeywell, which had no contractual relationship with the government, to share ***any*** information (no such requirement exists).  And in a series of opinions in the *Toyobo* case,[6] the Court already decided that the contract between the

---

[6] *U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1 (D.D.C. 2015); *recons. denied in part*, 2016 WL 3033937 (D.D.C. Feb. 11, 2016); *recons. granted in part and denied in part*, 2017 WL 8809510 (D.D.C. March 31, 2017); *recons. granted in part and denied in part*, 266 F. Supp. 3d 110 (D.D.C. 2017).

government and AHI—the only company to include Z Shield in its vests—does not include any contractual requirement that could support an implied certification theory. *Toyobo*, 128 F. Supp. 3d at 13-17. While there are material differences between Honeywell and Toyobo in other respects (discussed more below), the Court's conclusion that AHI's government contracts provide no basis for an implied certification claim applies equally in this case.

**AHI's Warranty.** This Court has already held that AHI's commercial warranty, *see* SOF ¶¶ 80-82, 84, cannot support an implied certification claim. An implied certification claim requires proof "(1) that [the contractor] withheld information about its noncompliance with (2) material contract requirements." *Toyobo*, 128 F. Supp. 3d at 17. The DOJ alleges that AHI's five-year warranty amounted to a promise that vests would last five years with no deterioration, and that Honeywell knew that vests containing Z Shield could not last for five years. Am. Compl., ¶¶ 135, 139 (Counts 1 and 2). This Court has already held that AHI's standard commercial warranty did not require "vests [to] function perfectly for the five-year period." *Toyobo*, 128 F. Supp. 3d at 14. In analyzing the standard warranty used by body armor manufacturers (including AHI), this Court found that "[n]othing in the language of the warranty explicitly guarantees that the vests will function perfectly for the five-year period; indeed the warranty presupposes that some of the vests may not survive the five-year period." *Id.* As a result, the Court held that the DOJ could not rely on a vest manufacturers' warranty language as a basis for its false certification claim (express or implied). *Toyobo*, 128 F. Supp. 3d at 13-17. Moreover, the DOJ moved for reconsideration three times and lost each time. *See Toyobo*, 2016 WL 3033937 at *5; *Toyobo*, 2017 WL 8809510 at *2, *6; *Toyobo*, 266 F. Supp. 3d at 132. There is no need for the Court to revisit this issue yet again.[7]

---

[7] The Court also considered and rejected the DOJ's arguments that workmanship and new materials contract clauses in the MAS contracts with vest manufacturers—including AHI—could provide a basis for an express or implied certification claim. *Toyobo*, 128 F. Supp. 3d at 15-16.

*Extra-Contractual Considerations*.   The Court has also repeatedly rejected the DOJ's argument that extra-contractual considerations can form the basis of an implied certification claim. In *Toyobo*, the DOJ advanced two extra-contractual bases for implied certification that are relevant to this case: (1) an alleged body armor "industry standard" that purportedly amounted to "a five year guarantee on the protective qualities of ballistic panels," and (2) NIJ's purported expectation that vests sold as NIJ-certified "would continue to stop bullets they had been designed to stop through the warranty period." *Toyobo*, 128 F. Supp. 3d at 11.

The Court rejected both arguments, finding that there was nothing in the "government's solicitation, [the body armor manufacturer's offer], or the 'Award/Contract' that explicitly incorporates the government's interpretation of the five year industry standard." *Id.* at 13.   The Court also held that there was no dispute that vests sold with Zylon and Z Shield were actually NIJ-certified and that "NIJ expectations, at least as the government has presented them, are not explicit terms in [GSA's] contractual agreement." *Id*.   This ruling is consistent with NIJ's own guidance, which stated that "*a manufacturer's warranty should not be interpreted as a benchmark for service life*" and that the warranty is "not a reflection of the anticipated service life of the product." Ex. 100 at 227 (emphasis added).   The DOJ moved for reconsideration twice and the court rejected both motions, holding that "(1) a guarantee that vests would meet NIJ regulations and (2) a guarantee that the vests would have certain protective properties — were not material to the United States' payment decision under the FCA." *Toyobo*, 2017 WL 8809510, at *6; *Toyobo*, 266 F. Supp. 3d at 132.   There is no reason to reconsider that issue a fourth time in this case.

***The Court's Basis For Denying Summary Judgment In Toyobo Does Not Apply Here.***

---

Given that the same clauses in the same contracts are at issue here, they cannot form the basis for an express or implied certification claim here either. *U.S. ex rel. Westrick v. Second Chance Body Armor Inc. et al.*, 2016 WL 3033937 at *5 (D.D.C. Feb. 11, 2016).

The Court denied summary judgment on the DOJ's implied certification claim in *Toyobo* on a single ground—a "catalog guarantee" that does not exist in this case.  There, the Court found that vest manufacturer Second Chance provided a 6% "catalog guarantee" that might have applied to some vests that contained woven Zylon and that might have reflected a durability requirement. *Toyobo*, 2017 WL 8809510, at *6.  The Court twice affirmed that this catalog guarantee was the **only** basis on which the DOJ could bring an implied certification claim against Toyobo.  *Id.* ("The United States' implied false certification claim under the FCA therefore is limited to its theory that the 6% catalog guarantee was a durability requirement."); *Toyobo*, 266 F. Supp. 3d at 132 (same). This "6%" provision was unique to a Second Chance vest contract—AHI did not have a similar guarantee.  *See* SOF ¶ 82.  Z Shield was never used in a vest that had a 6% catalog guarantee, so that narrow avenue for a potential implied certification claim is not available in this case against Honeywell.  *See id.* ¶ 49.

## II.   THE UNITED STATES' FRAUDULENT INDUCEMENT THEORY FAILS AS A MATTER OF LAW ON MULTIPLE GROUNDS.

Given that the DOJ has no express or implied certification claims under the FCA, its case rises and falls on fraudulent inducement.  Honeywell is entitled to summary judgment on this theory as well.[8]

### A.   Honeywell's Repeated Offers To Share Test Data With The Government Preclude Scienter And Materiality As A Matter Of Law

Honeywell is entitled to summary judgment because the DOJ cannot prove scienter or materiality in the face of Honeywell's repeated offers to provide ***the very data*** the DOJ claims Honeywell tried to hide.  In *Escobar*, the Supreme Court set out demanding materiality and scienter

---

[8] Most of the grounds for granting summary judgment discussed in this section also require summary judgment under any theory of FCA liability—including no duty to disclose, no scienter, no materiality, and no falsity.  They are discussed here because fraudulent inducement is the only theory that this Court's prior decisions do not already foreclose.

standards for FCA claims.  In light of "concerns about fair notice and open-ended liability," the Court held that the FCA's "materiality and scienter requirements" are "rigorous" and must be "strict[ly] enforce[d]."  *United Health Servs. Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016).  In this case, the DOJ cannot make out either of these essential elements.

First, and as a matter of law, the DOJ cannot establish that Honeywell acted with the required scienter.  To prove scienter, the DOJ must show that a defendant "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b); *see U.S. ex rel. Davis v. District of Columbia.*, 793 F.3d 120, 124 (D.C. Cir. 2015).  "To successfully oppose summary judgment, [the] DOJ must show that a reasonable factfinder, drawing all 'justifiable inferences' from the evidence in [the DOJ's] favor, could find [defendant] at least recklessly disregarded the falsity of its claims."  *U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983-84 (D.C. Cir. 2008) (affirming summary judgment when the defendant "made no secret" of the purported omission, and even "brought" it to the agency's "attention, albeit for a somewhat different issue" and there was no evidence the agency "expressed any concerns").  Even when an FCA claim is based on an omission, the DOJ must show the defendant "knowingly failed to disclose" noncompliance with "a statutory, regulatory, or contractual requirement."  *Escobar*, 136 S. Ct. at 1995.

The DOJ cannot establish scienter on this record.  The undisputed evidence establishes that (1) starting in 2001, Honeywell told government researchers that Honeywell was conducting in-house testing that showed that Z Shield's performance degraded after exposure to high heat and humidity, *see supra* Background, E; (2) Honeywell repeatedly offered to share its testing data with the government, *see supra* Background, F; and (3) no government official in any agency at any

level ever followed up with Honeywell to acquire that data, *id*.  The offers to assist the government were clear.   In one letter to DOJ officials, a Honeywell executive wrote: "Honeywell has accumulated additional ***technical data on the performance of its Z Shield® product***.  We believe these data are relevant to the Department's investigations and ***would be happy to meet with the NIJ investigators to provide these data and discuss their significance***."   SOF ¶ 329 (emphases added).  The DOJ cannot establish that Honeywell knowingly tried to conceal the information it explicitly offered to share.

Honeywell's test data also could not have been not material to the government's decision to continue to purchase vests containing Z Shield.  "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 136 S. Ct. at 2003-04 & n.6 (rejecting "assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment").  Here, the undisputed evidence shows that government scientists knew Honeywell possessed data related to the performance of its Z Shield product and that Honeywell's data showed declines in performance (in fact, the government was aware of many companies who had such data).  *See supra*, Background, E.  Discovery revealed that government researchers collectively decided—***multiple times***—that they did not need or want Honeywell's data.  *See supra*, Background, F; *see, e.g.*, Ex. 196 (government scientists concluded that "***[Honeywell's] information, or lack of it, would not hinder progress in any way***") (emphasis added).  And, as discussed below, the reason the government did not regard the data as material was because it assessed similar data and had arrived at the same scientific judgment that Honeywell did: that testing of ballistic materials at extreme condition was not probative of how that material would actually perform under expected conditions of use.  *See infra*, Section II, D.  In light of

33

*Escobar*, the DOJ cannot now claim that the very data that government scientists knew existed—but repeatedly declined—was somehow material to the government's purchasing decisions.

The DOJ also cannot prove materiality because government scientists knew from numerous sources (including, but by no means limited to, Honeywell) that Zylon could degrade after exposure to high heat and humidity, yet the government continued to fund the purchase of vests containing Z Shield.  Under *Escobar*, information about a product cannot be material under the FCA when the government already knew that information and continued purchasing the product anyway.  *Escobar*, 136 S. Ct. at 2003.  That is exactly what happened here.  As early as 2001, and no later than a month after Honeywell received the DSM fax, the government learned of the heat/humidity risk from multiple sources, including from government researchers at Army Natick, NIJ, NLECTC, and NIST, and government-funded contractors at the Tekne Group.  *See supra* Background, E.  Despite that knowledge, the government continued to purchase and reimburse for vests containing Zylon and Z Shield for many more years.  SOF ¶¶ 78, 240, 246, 263.  There is no basis for a jury to conclude that any potential incremental knowledge from Honeywell's testing data—which showed the same results as extensive data from other sources of which the government was long aware—would have had any impact on the government's conduct.

**B.    The FCA Claim Fails On Additional Grounds Specific To GSA and BVP Methods Of Purchasing**

For the same reasons it cannot show materiality and scienter, the DOJ cannot demonstrate the element of causation for those vests sold pursuant the GSA Multiple Award Schedules program or the BVP reimbursement program.  "Even if the alleged fraudulent representations were material as defined by the FCA, the elements of [the DOJ's] fraudulent inducement claims include not just materiality but also causation; the defendant's conduct must cause the government to make a payment or to forfeit money owed."  *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7-8 (1st Cir. 2016).

34

In *Toyobo*, the DOJ submitted three declarations from GSA contract specialist Kellie Stoker in support of causation. 266 F. Supp. 3d at 129 n.21. Stoker claimed that "[u]pon a scientific determination of Zylon's risks by NIST and NIJ . . . GSA would have removed Zylon-containing vests from the Schedule." D.D.C. No. 07-1144, ECF 97-11 at ¶ 15. The Court ultimately concluded that Stoker's affidavit created a triable question of fact "as to whether defendants' false statements or omissions were capable of influencing the United States in the negotiations and award of the GSA MAS contracts or contract modifications at issue." *Toyobo*, 266 F. Supp. 3d at 130-31. Whatever her procurement qualifications, Stoker is not qualified to opine about what other agencies might have done. But there is no need to speculate about how those agencies might have acted because, as Honeywell has shown, officials at NIST and NIJ actually ***knew*** that Honeywell had data about Z Shield's performance after exposure to high heat and humidity because Honeywell offered to share it with them. None of those agencies ever followed up with Honeywell, *see supra* Background F, and contrary to Stoker's misinformed speculation, no researcher ever alerted or advised GSA of the mountain of information the government had amassed about potential Zylon degradation. Nor did any of the multiple government agencies or researchers armed with data comparable to Honeywell's ever, on the basis of that data, direct GSA to remove body armor containing Z Shield from the GSA schedule.

The record also confirms that reimbursements under the BVP cannot give rise to FCA liability. NIJ certification was the only requirement for a vest to be eligible for reimbursement in that program. SOF ¶ 76. There is no evidence (or allegation) that Honeywell fraudulently induced NIJ to certify vests containing Z Shield. The NIJ Standard in place at the time did not certify vests based on future performance, it did not require testing of used vests, testing for durability, or testing following environmental conditioning. *Id.* ¶¶ 58-60, 64. Thus, there is no way that Honeywell's

35

purported omissions caused the BVP to reimburse for vests containing Z Shield.

If anything, the BVP highlights the absurdity of the government's claim that it unwittingly purchased vests that could degrade in high heat and humidity.  Starting in January 2004, BVP's own website included an explicit warning that disclosed to purchasers the very information the DOJ now claims the government never had.  SOF ¶¶ 241-242, 244.  It was so explicit that BVP's website issued a "pop-up" alert that warned any user who selected a vest that contained Zylon (or Z Shield) of potential degradation in high heat and humidity.  SOF ¶ 241; Ex. 179 ("Certain vests containing Zylon® have been subject to a special replacement or upgrade program by their manufacturers, *due to a reported degradation of its ballistic qualities under certain environmental conditions*") (emphasis added).

This "pop-up" confirms beyond dispute that *at the very least* as of January 2004, the government knew of potential degradation from high heat and humidity and decided to reimburse purchasers through BVP anyway.  *See* SOF ¶¶ 245-246.  More broadly, the BVP pop-up warnings preclude a finding of materiality for purchases through the GSA schedule because government scientists and officials reviewed and approved the pop-up warning before it went on the website, including officials from the DOJ, NLECTC, and NIST.  *See* Ex. 179; Ex. 180.  In fact, the BVP program continued to reimburse purchasers for their Zylon-containing vests for years after the NIJ in 2005 effectively decertified Zylon as a ballistic material.  SOF ¶¶ 245-246, Ex. 109.  This only underscores the inherent implausibly of the DOJ's causation and materiality theories.

## C.    Honeywell Had No Duty To Disclose In The First Place

Although Honeywell's repeated and unanswered offers of assistance to the government preclude any finding of scienter, materiality, or causation, it is also important to recognize that Honeywell had no duty to disclose in the first place—an entirely separate ground for granting summary judgment.  The DOJ can prevail on a fraudulent inducement theory only if the

government "was induced by, or relied upon, the fraudulent statement or omission when it awarded

a contract or . . . when it agreed to contract modifications." *Toyobo*, 266 F. Supp. 3d at 125.  The

DOJ has not alleged a single instance where Honeywell made any purported misrepresentation to

the government that induced it to award or modify a contract.  Instead, it argues that Honeywell's

***omissions*** somehow fraudulently induced the government to purchase vests containing Z Shield.

Am. Compl., ¶¶ 20, 130.  But in this case that theory fails as a matter of law.

Honeywell cannot be held liable for fraudulent inducement based on an omission because

Honeywell had no duty to share information with the government in the first place.  "The False

Claims Act does not impose liability for omissions unless the defendant has an obligation to

disclose the omitted information."  *U.S. ex rel. Milam v. Regents of Univ. of Cal.*, 912 F. Supp.

868, 883 (D. Md. 1995).  In this case, the DOJ has identified no statutory, regulatory, or contractual

obligation giving rise to a duty to disclose.  Honeywell did not have any contract with the

government for Z Shield, and AHI's contract with the government did not include any durability

requirement (like Second Chance's 6% guarantee) and thus could not have created any legal

obligation to share data concerning durability.  *See* SOF ¶¶ 70, 80-84.  And neither the GSA, the

BVP, nor NIJ's certification process created an ongoing requirement for materials suppliers (or

even vest manufacturers) to share testing data or other information.  *Id*. ¶¶ 64, 76-77, 82.

Although the Court found that Toyobo had a disclosure obligation, it did so on the basis of

vastly different facts not present here.  There, the Court explained that "[w]hether the United States

can ground its fraudulent inducement FCA claim against Toyobo on . . . omissions requires a

finding that either the vest manufacturers or Toyobo had a 'legal obligation' to disclose the testing

data to the United States in the course of their GSA MAS contracting, contract negotiations, or

contract modifications."  *Toyobo*, 266 F. Supp. 3d at 125.  The Court concluded that no vest

manufacturer other than Second Chance had a duty to speak—a duty only arising out of its unique 6% catalog guarantee, *id.* at 125, which AHI's warranties and other materials did not contain.

The Court also found that Toyobo's misleading partial disclosures made directly to the government created a duty to disclose.  *Id.* at 126-27.  But Honeywell did not make any partial disclosures to the government that could have created such a duty.  In *Toyobo*, the Court reasoned that "from 1995 to 2005 Toyobo publicly and privately shared information on a regular basis with the United States generally and federal scientists specifically."  *Id.* at 127.  In "addition to simply downplaying the problem of Zylon degradation, the Court [found] that ***Toyobo made several statements to the United States that one could charitably consider partial disclosures, but a jury may find to be outright misdirection***."  *Id.* at 128 (emphasis added).  Toyobo had evidence that "the cause" of Zylon's degradation was "residual solvent (phosphoric acid)."  *Id.* at 126.  But Toyobo publicly denied that phosphorus was a potential cause of degradation and tried to divert federal scientists' attention away from phosphorous-degradation issues.  *Id.* at 127.  The Court also found that Toyobo misrepresented that it "had improved the heat/humidity problem," even though no test results supported such a claim.  *Id.* at 128.  The Court denied summary judgment because Toyobo's partial disclosures were affirmatively misleading, and thus created a duty to speak.  *Id.*[9]

There are no remotely similar facts here.  To the contrary, the evidence shows that Honeywell told the government that its tests showed that Z Shield degraded after exposure to heat and humidity.  *See supra*, Background, E.  There is also no allegation—much less any evidence— that Honeywell knew about the purported role of residual phosphorous in Zylon's degradation in

---

[9] Toyobo also made partial disclosures to others, including Honeywell.  As the Court explained: "Of course, the vest manufacturers other than Second Chance did not know about Toyobo's testing data at the time they contracted with the United States under the GSA MAS and modified those contracts . . . , so they are not liable under the FCA."  *Toyobo*, 266 F. Supp. 3d at 126.  Honeywell also was unaware of the full scope of Toyobo's data.

high heat and humidity.  *Toyobo*, 266 F. Supp. 3d. at 128.  Thus, the bases for allowing the DOJ's

fraudulent omissions claims against Toyobo to survive summary judgment are inapplicable here.

###### D.    Honeywell's Scientific Judgement Cannot Form The Basis Of An FCA Claim

Honeywell is also entitled to summary judgment because the DOJ cannot, as a matter of

law, prove "falsity."   "To satisfy the first element of an FCA claim, the statement or conduct

alleged must represent an objective falsehood."  *U.S. ex rel. McBride v. Halliburton Co.*, 2014 WL

12691854 (D.D.C. Dec. 10, 2014).  In order "to survive a motion for summary judgment, evidence

of an ***objective falsehood*** is required."  *Druding v. Care Alternatives, Inc.*, 346 F. Supp. 3d 669,

685 (D.N.J. 2018) (emphasis added); *see U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d

818, 836 (7th Cir. 2011) ("A statement may be deemed 'false' for purposes of the False Claims

Act only if the statement represents 'an objective falsehood.'"); *U.S. ex rel. Morton v. A Plus*

*Benefits, Inc*., 139 F. App'x 980, 982 (10th Cir. 2005) (same).  But whether Honeywell's high heat

and humidity tests showed that vests containing Z Shield would degrade unacceptably is not

susceptible to a "true or false" answer.  Honeywell believed, based on its own scientific judgment,

that accelerated testing on Z Shield was not probative of how the material would perform under

expected conditions of use.   SOF ¶¶ 145-147, 159.   Such an exercise of scientific judgment

precludes a finding of "falsity," particularly where, as here, government scientists arrived at the

very same scientific judgment that Honeywell did.

As a matter of law, disagreements over scientific opinions can only form the basis of an

FCA claim in the very limited circumstance "where the speaker knows facts which would ***preclude***

such an opinion, [and] the 'facts' are those that the speaking party could reasonably classify as true

or false. . . . In short, the claim must be a lie." *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal.,*

*Inc.*, 297 F. Supp. 2d 272, 277 (D.D.C. 2004), *aff'd* 393 F.3d 1321 (D.C. Cir. 2005) (emphasis in

original); *see Regents of Univ. of Cal.*, 912 F. Supp. at 886 (granting summary judgment when

"[a]t most, the Court is presented with a legitimate scientific dispute, not a fraud case"); *U.S. v. AseraCare Inc.*, 176 F. Supp. 3d 1282, 1286 (N.D. Ala. 2016).  This rule of law arises from both the requirement that the purported falsity be "objectively false," *Druding*, 346 F. Supp. 3d at 685, and from the FCA scienter requirement that to be liable a defendant must have acted at least with "reckless disregard of the truth," 31 U.S.C. § 3729(b).  This minimum "recklessness" standard means that if Honeywell's interpretation of its exposure testing "was not objectively unreasonable, [it] falls well short of raising the 'unjustifiably high risk'. . . necessary for reckless liability." *Safeco Ins. Co. of Am. v. Burr et al.*, 551 U.S. 47, 70 (2007).  Honeywell's scientific judgment cannot possibly satisfy the standard of recklessness required for FCA scienter when its opinion is based on evidence and is consistent with long-held views of the government's own ballistic scientists.

After DSM's surprise fax, Honeywell embarked on an unprecedented testing program in which it subjected Z Shield and other materials to extreme heat and humidity in a special chamber. *See supra*, Background, D.  The results showed that Z Shield degraded under those conditions. However, Z Shield stored for an extended period in an uncontrolled warehouse showed no material degradation and AHI reported that its vests containing Z Shield continued to perform acceptably after years in service.  SOF ¶¶ 191, 260, 262.  Under these circumstances, Honeywell made the scientific judgment that testing of Z Shield under extreme heat and humidity—temperatures that do not exist in the United States and that would kill a person within minutes—was not indicative of how that material would perform under actual conditions of use.  As Honeywell's Dr. Wagner explained, "We were not aware of, no matter who we spoke to, of any relationship that [exposure testing] data had to a real world condition.  We had the data compared to warehouse data which didn't show any correlation.  We didn't have anything that supported that information being reflective of performance in a user application." *Id.* ¶ 146.  Honeywell's lead expert witness in

this case, Dr. Anoush Poursartip, a renowned materials scientist at the University of British Columbia, explained, "In 2001 and today, there was and is no known correlation between the 'accelerated aging' of ballistic materials, and how those materials would perform in a completed vest construction in the conditions they would expect to face in real life."  Ex. 1 at 3.[10]

While Honeywell's own scientific judgment is enough to preclude a finding of falsity, this case is unique because *the government's own scientists* reached the same scientific judgment, agreeing that there was no known correlation between accelerated aging of ballistic materials and their actual performance under real-life conditions.  That scientific judgment explains why government researchers, who knew about high heat and humidity test results on Zylon and Z Shield, never recommended that these materials not be used based on this testing.  The government's own scientific judgment is confirmed in numerous documents, extensive deposition testimony, and in actions they took.  Government witness after government witness agrees that "accelerated aging" cannot be used to predict service life.  Government researcher Debra Stoe who helped NIJ develop its Standards testified that she "stopped using" the "term 'artificial aging'" because "we know we are inducing physical degradation, but we don't know what that equals to in real time." SOF ¶¶ 151-152.  NIST's Kirk Rice advocated against releasing The Tekne Group's "accelerating aging" test results to the public because the data "*could easily be misinterpreted to cause widespread panic*."  *Id.* ¶ 279 (emphasis added).  And even after the NIJ developed an exposure protocol for the 0101.06 Standard, the government was explicit that "*this protocol will not predict the service life of body armor*."  *Id.* ¶ 155 (emphasis added). The conclusion that

---

[10] For the same reasons, the DOJ's claim that Honeywell "downplayed" the risks of Z Shield is not a viable FCA theory either.  *See* Am. Compl., ¶¶ 67, 77, 78, 115.  The alleged "downplaying" was just Honeywell accurately informing AHI of Honeywell's scientific judgment, which government witnesses shared, that accelerated aging did not correlate to actual aging.

41

accelerated aging does not predict service life was widely known among government researchers who studied this question.  *See id*. ¶ 149 (Marc Caplan, Director for the Technology Assistance Division within the Office of Science and Technology at NIJ, agreed that "'accelerated aging' is a misnomer because the rates at which environmental factor[s] degrade the armor are not known"); *id*. ¶ 150 (in 2017, NIST's Rice admitted that government still did not have "enough information" to say that "the conditioning test relates to a particular period of time of field use"); *id*. ¶ 227 (The Tekne Group's Jon Lesko testified that as of July 2002, "there was not a good correlation between accelerated aging and real-world data. . . .  And so to make that extrapolation may be incorrect").

While it ultimately does not matter whether Honeywell's and government scientists' shared scientific judgment was in fact correct, the evidence in support of this shared judgment is overwhelming.  *See* Ex. 1 (May 18, 2016 A. Poursartip Expert Report) at 49 ("The actions of government researchers show that they, like Honeywell, did not believe there was a scientific basis for concluding that the degradation observed in accelerated aging meant that the products could not be used.").  And that scientific judgment is borne out by the fact that notwithstanding that Z Shield did degrade under extreme heat and humidity, vests containing Z Shield performed as expected in the field.  No police officer was ever killed or injured wearing a vest containing Z Shield where the vest failed to perform as intended, whereas five police officers are alive today due to their Z Shield vests.  SOF ¶¶ 85-86.  Government scientists conceded that it is "possible" to create "a hybrid vest that includes Zylon" that does not put the wearer at risk and possible to create a safe "Zylon-only vest" provided the manufacturer "builds plenty of margin into it."  SOF ¶¶ 272-273.  That is what AHI did here and why five police officers survived being shot in the chest and can testify in this case.

E.     **The DOJ Cannot Base Its FCA Claim On The Theory That Honeywell Caused AHI To Submit False Claims**

The DOJ's theory that Honeywell caused AHI to violate the FCA also fails as a matter of law.  In order to survive summary judgment, the DOJ must show either that Honeywell actually caused AHI to present a false claim in violation of section 3729(a)(1) or, pursuant to section 3729(a)(2), that Honeywell made a false record or statement *for the purpose* of having AHI submit "a false or fraudulent claim paid or approved by the Government." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008).[11]  The claim under section 3729(a)(1) fails right out of the gate, because the Court already ruled that the DOJ cannot advance a theory that AHI presented a factually false claim or an express or implied certification false claim.  *See infra* Section I.

The DOJ's claim under section 3729(a)(2) fares no better.  The DOJ alleges that "Honeywell knew . . . that Z Shield had latent defects in that it degraded quickly over time in hot and humid conditions," but "did not disclose these degradation problems to Armor Holdings."  Am. Compl., ¶ 20.  As a result of these alleged misleading omissions, the DOJ claims, "Honeywell knowingly caused Armor Holdings to submit false claims." *Id*.  The problem with these allegations is that discovery has proven they are completely inaccurate.  Far from causing AHI to submit a false claim, discovery showed the opposite: Honeywell shared its data Z Shield's performance after exposure to high heat and humidity with AHI, and AHI thoroughly understood it.

As described above, from the moment Honeywell learned of a potential issue related to Z Shield's performance after exposure to heat and humidity in July 2001, it coordinated closely with AHI.  *See supra*, Background, C.  Honeywell immediately suspended sales of Z Shield and worked with AHI to make sure that end-users knew about the potential issue through the AHI

---

[11] As this Court has already held, "[s]ince the alleged conduct here occurred before 2009," the post-2009 FCA "does not apply" in this case. *See Honeywell*, 798 F. Supp. 2d at 19, n.2.  Thus, DOJ must satisfy the heightened intent standard for sub-contractors set forth in *Allison Engine*.

Storage Advisory.  *See id.*  The Storage Advisory unambiguously informed customers that "[r]ecent laboratory 'accelerated aging' tests of the Zylon fiber . . . indicate that the ballistic performance of such material can be adversely affected if it is stored in a manner that exposes the material to extreme temperatures (158°F and above) and excessive humidity (80% and above)." Ex. 123.  AHI sent this advisory to all end-users—including the government.  SOF ¶ 116. Honeywell then spent months conducting environmental exposure testing, which it shared with AHI.  *See supra*, Background, D.  An extensive documentary record shows Honeywell transmitting to AHI the very information about Z Shield that the government originally alleged was withheld.[12]

The DOJ suggests that Honeywell's disclosures to AHI were inadequate because Honeywell should have known that AHI did not understand the testing data.  Am. Compl. ¶ 130.

---

[12] The DOJ has identified only one round of Z Shield high heat and humidity testing, from late 2003, that was potentially not shared with AHI.  But this does not remotely create a dispute of material fact.  Specifically, DOJ claims that Honeywell did not share a document referred to in this case as the "Draft Report," which was developed after January 2003 as part of Honeywell's testing of new prototype materials.  *See* Am. Compl., ¶¶ 98-103; *see also* Ex. 71, (July 15, 2009 L. Wagner Tr. 169:3-18).  A Honeywell junior employee (and recent college graduate) prepared the Draft Report on his own initiative and to "impress [his] boss."  SOF ¶¶ 178-181.  Honeywell's Dr. Wagner (the boss) reviewed the draft and her contemporaneous handwritten notes specifically note that the content in the report was wrong.  *Id.* ¶¶ 182-185.  Both AHI and government witnesses who were shown the report agree.  *Id.* ¶¶ 186-187.  Regardless, the data on Z Shield in the Draft Report, which was conducted after exposure to 40°C [104°F] / 70% RH, was cumulative of other data at those same conditions that Honeywell had already provided to AHI.  *Id.* ¶ 188.  Experts and fact witnesses on both sides, as well as from AHI, agree on this point.  *Id.*  Honeywell did not provide AHI with the Draft Report because senior scientists at Honeywell thought the report, prepared by a junior engineer, was wrong, and that AHI had the data from prior tests.

The DOJ also faults Honeywell for not sharing information about a prototype product that used a different rubber resin—a product Honeywell never commercially manufactured.  Am. Compl., ¶ 57.  Importantly, there is no evidence that sharing this data would have materially impacted AHI's understanding that Z Shield degraded after long-term exposure to high heat and humidity. None of this allegedly omitted data conflicts with or undermines the extensive data that Honeywell indisputably shared with AHI.  *See* SOF ¶¶ 197-204.  In other words, there is nothing "false" or "fraudulent" about Honeywell choosing not to share incorrect, irrelevant, or duplicative data.  The DOJ cannot flyspeck the record for stray information Honeywell allegedly did not share with its customer when an overwhelming record shows Honeywell sharing the core information in dispute.

But discovery showed that entire premise was wrong.  Croskrey, AHI's President, testified that "when we were discussing the data [with Honeywell] . . . ***it became clear to everybody*** that at high temperature and high humidity [Z Shield] was degrading."  Ex. 34, (Sept. 16, 2009 S. Croskrey Tr. at 485:3-8) (emphasis added).  Croskrey testified that "[Honeywell] shared data with me that ***clearly showed*** at high temperature, high humidity there was degradation."  *Id.* at 566:21-567:1; SOF ¶ 165.  AHI also signed care and use instructions that specifically stated that "Zylon fiber and products made from Zylon fiber such as Z Shield material are known to be affected by prolonged exposure to high heat and humidity conditions."  SOF ¶ 17.  Like the government, AHI was fully aware of the risk of degradation after prolonged exposure to high heat and humidity.[13]

It is also significant that the government purchased vests from AHI, where layers of Z Shield were typically combined with other materials to create finished vests.  AHI had the responsibility to design its own hybrid vests, taking into account the relative strengths and weaknesses of each material.  Ex. 2, at 7-8.  Thus, AHI was in the best position to determine the implications of Honeywell's test data on a vest's overall design, which almost always included other materials besides Z Shield.  *See id.* ¶¶ 45-47.  There is simply no evidence to support a theory that Honeywell's disclosure of its data to AHI was part of a scheme to confuse or befuddle AHI

---

[13] The DOJ claims that certain Honeywell "Technical Bulletins" on warehouse aging contained false data, but this is yet another scandalous and poorly researched theory that expert discovery proved was unfounded.  The Amended Complaint claimed that the data Honeywell presented in those Bulletins was false because "none of the actual warehouse data or any other data produced by Honeywell in discovery matches the warehouse data cited."  Am. Compl., ¶ 90.  The DOJ was just wrong about that.  The DOJ expert who advanced the theory that the data was "fabricated" was forced to admit he made a mistake and that every single data point in Honeywell's warehouse aging bulletins is supported by actual data.  *See* SOF ¶¶ 189-196; Ex. 57, (July 24, 2018 S. Phoenix Tr. at 349:4-12 ("Q. Do you retract this comment that you made here about the data being at worst actually fabricated?  A. Yes.")).  At most, this expert nitpicks Honeywell's selection of data points and how Honeywell graphically displayed the data in the Technical Bulletins.  But those types of disagreements are differences of scientific opinion and cannot form the basis of an FCA claim.  *See U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 297 F. Supp. 2d 272, 277 (D.D.C. 2004).

into submitting a purportedly false claim.

In short, the DOJ cannot prove the required falsity or scienter to show a violation of sections 3729(a)(1) or (a)(2).  The DOJ may only succeed under this theory if it can show that "the subcontractor [Honeywell] submit[ed] a false statement to the prime contractor [AHI] intending for the statement to be used by the prime contractor to get the Government to pay its claim."  *See Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008) (explaining that unless plaintiff makes this heightened showing of scienter, "the direct link between the false statement and the Government's decision to pay or approve a false claim is too attenuated to establish liability").  The DOJ cannot remotely meet this heightened standard when the evidence shows that Honeywell transmitted its heat and humidity data to AHI and that AHI understood it.

## III.  THE DOJ CANNOT DEMONSTRATE DAMAGES FOR FCA STATUTORY DAMAGES AND UNJUST ENRICHMENT CLAIMS.

Because the DOJ's case fails as a matter of law on the merits, it necessarily cannot recover damages.  But even if these claims survive summary judgment as to liability in any part, the DOJ still cannot recover any statutory damages on its FCA claim, nor can it prove any damages for its unjust enrichment claim.  This over ten-year-old case is thus worth virtually nothing.[14]

### A.  The DOJ Cannot Recover FCA Statutory Damages from Honeywell.

Even if the Court finds a disputed issue of fact with respect to liability, Honeywell is entitled to summary judgment on the DOJ's claim for statutory damages because the government has already recovered the full amount of its alleged damages, three times over.  As explained in detail below, Honeywell is entitled to statutory offsets for the DOJ's past settlements with other companies in the Zylon supply chain, and here, the magnitude of the settlements wipes out

---

[14] This argument is directed at statutory damages and does not apply to penalties.  The issue of FCA penalties would only be relevant if some aspect of the case were to survive summary judgment on the merits.

Honeywell's potential statutory damages liability.  The DOJ is not entitled to a windfall, or more than three times the full value of the Z Shield-containing vests that it purchased.

The FCA authorizes treble damages.  *See* 31 U.S.C. § 3729(a).  It is clear, however, that "a plaintiff cannot recover twice for the same injury."  *U.S. v. Zan Mach. Co.*, 803 F. Supp. 620, 623 (E.D.N.Y. 1992).  That leads to the basic rule under the FCA that "compensatory payments previously received" by the government "from any source" offset a party's potential FCA statutory damages liability.  *U.S. v. Bornstein*, 423 U.S. 303, 316 (1976).  Under the FCA, "[a] non-settling defendant is entitled to offset his liability based on amounts received from settling joint wrongdoers . . . to the extent those settlement payments relate to the same item(s) of damages," *i.e.*, "common damages."  *Miller v. Holzmann*, 563 F. Supp. 2d 54, 144, n.144 (D.D.C. 2008), *aff'd in part, vacated in part, remanded sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010) (per curium); *U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*, 2011 WL 5005313, at *16 (E.D. Va. Oct. 19, 2011).  Offsets for "common damages" are applied "pro tanto," meaning that the non-settling party receives a dollar-for-dollar reduction.  *Miller*, 563 F. Supp. 2d at 144; *Bunk*, 2011 WL 5005313, at *17 at n. 23.  Offsets are calculated after trebling; in other words, a FCA defendant's liability is calculated, trebled, and offsets are deducted from the trebled amount.  *See Bornstein*, 423 U.S. at 315-16.

Here, the DOJ claims that it is entitled to $11,483,216 in FCA damages related to its GSA and BVP purchases of vests containing Z Shield after July 5, 2001, which when trebled amounts to $34,449,648.  SOF ¶ 344; *see also* Am. Compl., ¶¶ 1, 15, 135, 139.  To be clear, this damages amount is fanciful.  To calculate its damages, the DOJ assumes, for example, that all vests containing Z Shield—even ones that saved lives—had zero value.  SOF ¶¶ 345-346.  The DOJ's damages number also includes reimbursements of vests made at any time after July 5, 2001

including after the BVP put its "pop-up" warning online and even after the NIJ effectively decertified vests containing Z Shield.  *Id.* ¶ 347.  The inputs into DOJ's damages calculations are clearly unreasonable.  But for purposes of this motion only, Honeywell will assume that DOJ's damages estimate is correct because even then, all liability is offset.

The government has settled many FCA cases involving Zylon over the last decade.  These include settlements with AHI, Toyobo, Zylon distributors (Itochu and Teijin), and Zylon weavers (Hexcel and Barrday).  *See* SOF ¶ 348.  The government has already recovered over $120 million from these parties.  *Id.* ¶¶ 350, 352, 355, 357, 359, 361.  Starting in 2005, AHI offered federal agencies a merchandise voucher to receive non-Zylon replacement body armor under voluntary vest exchange program.  *Id.* ¶¶ 362-363.  The DOJ has stipulated that under that program, it "received non-Zylon replacement body armor valued at $3,908,791 in total from [AHI]" "for purchases of [AHI's] body armor containing Honeywell's Z Shield by federal agencies off of the GSA schedule from July 5, 2001 through August 24, 2005."  *Id.* ¶ 364; *see also* ECF 197.

Because the government has already received prior "compensatory payments" from other parties in the supply chain for the value of the vests containing Z Shield, those prior payments "offset" the FCA damages alleged against Honeywell.  *Bornstein*, 423 U.S. at 316; *see also Miller*, 563 F. Supp. 2d at 144, n.144; *Bunk*, 2011 WL 5005313, at *17.  As a result, Honeywell is entitled to a dollar-for-dollar credit for "common damages"—or amounts compensating the government for its Z Shield-containing vest purchases—already paid by other parties.  *See Zan Mach. Co.*, 803 F. Supp. at 623; *U.S. ex rel. Bunk*, 2011 WL 5005313, at *17; *Miller*, 563 F. Supp. 2d at 144, n.144.  The DOJ does not dispute that Honeywell can receive a setoff based upon the government's settlements with other companies for vests that contained Z Shield.  SOF ¶¶ 365-367.

Because the prior settlements released FCA claims related to the government's purchases

of both Z Shield and non-Z Shield-containing vests, Honeywell is only entitled to, and only seeks set-offs for, the portion of each settlement that related to the government's purchases of vests containing Z Shield—the "common damages" at issue in this case. *Miller*, 563 F. Supp. 2d at 144; *Grant Thornton, LLP*, 694 F. Supp. 2d at 527, 530. Applying these principles, Honeywell's damages expert, Dr. John Johnson, calculated the portion of the prior settlements attributable to the government's purchase of Z Shield-containing vests during the relevant timeframe. SOF ¶ 368. With respect to each settling party, Dr. Johnson evaluated the government purchases at issue and determined the percentage of those purchases that involved vests containing Z Shield. *See id.* ¶ 369. He then applied that percentage to the settlement amount for that party in order to arrive at the portion of the settlement attributable to Z shield-containing vests. *See id.* ¶ 370.

Based on Dr. Johnson's calculations (to which the government did not offer any expert rebuttal), $32,133,450 of the prior settlements are attributable to common damages, *i.e.*, damages related to the government's purchase of vests containing Z Shield. *See* Figure 2 below; *see* Ex. 6, (Feb. 15, 2019 J. Johnson Decl. at 12, Figure 3), Ex. 23, (May 1, 2019 J. Anastasi Tr. at 54:13-18) (Q. "[W]ere there any calculations in Dr. Johnson's report that you found to be erroneous or that were wrong? A. No."). This is how the offsets work:

**Figure 2: Settlement Offsets**

| Settling Party | Total Amount of Settlement | Portion of Settlement Attributable to Common Damages |
|---|---|---|
| Armor Holdings | $30,000,000 | $18,104,257 |
| Toyobo | $66,000,000 | $11,890,291 |
| Itochu | $6,750,000 | $503,125 |
| Teijin | $1,500,000 | $472 |
| Hexcel | $15,000,000 | $1,634,975 |
| Barrday | $1,050,834 | $330 |
| **TOTAL** | **$124,300,834** | **$32,133,450** |

In addition to the settlement offsets, Dr. Johnson also reduced Honeywell's potential damages by

$3,908,791—the value of "non-Zylon replacement body armor" that the United States received from Armor Holdings "for purchases of Armor Holdings' body armor containing Z Shield by federal agencies off of the GSA" during the relevant time period. *See* Ex. 6, (Feb. 15, 2019 J. Johnson Decl. at 12, Figure 3).

Subtracting the the total amount that the government previously received as compensation for its Z Shield-containing vest purchases, $36,042,241, from the DOJ's alleged damages against Honeywell post-trebling—$34,449,648—results in remaining statutory damages against Honeywell of *negative* $1.5 million. *See* Figure 3; *see also* SOF ¶ 371.

**Figure 3: Remaining Statutory Damages**

| Description | Amount |
|---|---|
| Alleged Damages Trebled | $34,449,648 |
| Settlement Offsets | ($32,133,450) |
| Vest Exchange Program Offset | ($3,908,791) |
| **Remaining Statutory Damages** | **($1,592,593)** |

In other words, the government has already received ***more than the full amount of its alleged damages in this case*** from settling parties. There are no statutory damages left to be determined at trial and Honeywell is entitled to summary judgment on this ground as well.

**B.     The DOJ Cannot Recover Restitution From Honeywell.**

Honeywell is also entitled to summary judgment on the DOJ's unjust enrichment claim because the government did not confer a benefit on Honeywell and because Honeywell did not retain any benefit from the government that would be unjust for it to keep. *See News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005) ("Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.").[15]

---

[15] Honeywell is separately entitled to summary judgment on the unjust enrichment claims for the same reasons it is entitled to summary judgment on the FCA claims. *See United States v. Prabhu,*

It is well-settled that, where a defendant retained a benefit that was not conferred by, or "at the behest" of the plaintiff, the plaintiff has no cognizable injury, and thus no standing to maintain its unjust enrichment claim. *See, e.g.*, *Shenandoah Assocs. Ltd. P'ship v. Tirana*, 182 F. Supp. 2d 14, 24 (D.D.C. 2001) ("The only way for the plaintiffs to succeed on a claim of unjust enrichment is to prove that the money paid to the defendant actually belonged to the plaintiffs."); *see also Kagan v. K-Tel Entm't, Inc.*, 172 A.D.2d 375, 376 (N.Y. App. Div. 1991); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2010 WL 2813788, at *18 (D.N.J. July 9, 2010). Courts also dismiss unjust enrichment claims where the only benefit that the defendant has received is from a third party. *See, e.g.*, *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 358-359 (D.D.C. 2015) (plaintiff's unjust enrichment claim failed, where plaintiff did not have "any 'dealings'" with the defendants, did not "confer[] any benefits upon them," and "identified only benefits that [d]efendants had received from third parties or from other defendants"); *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 56-57 (D.D.C. 2017) (finding that plaintiffs could not seek unjust enrichment damages where they did not allege "that ***they*** conferred a benefit on the [] defendants") (emphasis in original).

Here, the government never purchased Z Shield or any product that contained Z Shield from Honeywell. SOF ¶¶ 69-70, 74, 79; *see also* (5/1/19 J. Anastasi Tr. at 40:16-41:7). Instead, the government purchased Z Shield-containing vests exclusively from AHI. AHI purchased Z Shield from Honeywell and any "benefit" that Honeywell retained in the form of profits relating to its sale of Z Shield was conferred by AHI—a third party—not the government. *See Shenandoah Assocs. Ltd. P'ship*, 182 F. Supp. 2d at 24; *In re Ford Motor Co.*, 2010 WL 2813788, at *18. AHI

---

442 F. Supp. 2d 1008, 1035 (D. Nev. 2006) ("Because [Defendant] is entitled to summary judgment with respect to the False Claims Act, [its] retention of any benefit cannot constitute unjust enrichment as a matter of law.").

has not asserted a claim for unjust enrichment against Honeywell, and the DOJ is not entitled to Honeywell's profits from its Z Shield sales to AHI—transactions in which the government had no interest or involvement.  *See Council on American-Islamic Relations Action Network*, 82 F. Supp. 3d at 358-359; *Aston*, 248 F. Supp. 3d at 56-57.  For these same reasons, it would not be unjust for Honeywell to retain its profits from its sale of Z Shield to AHI.

In any event, there is no evidence to support any claim for unjust enrichment damages in this case.  The DOJ set forth one calculation of so-called "unjust enrichment damages": a "single damages" calculation of the total amount of the government's purchases of Z Shield-containing vests after July 5, 2001.  *See* Ex. 16.  The amount that the government paid AHI for vests containing Z Shield is not an appropriate measure of restitution damages in this case, as the DOJ's own expert freely admitted at his deposition. Ex. 23, (May 1, 2019 J. Anastasi Tr. at 39:21-40:7 (acknowledging that determining unjust enrichment damages requires calculating of "the amount of sales and money that have been *received by the defendant* with respect to the subject being alleged") (emphasis added)).  The DOJ never disclosed any calculation of Honeywell's profits attributable to sales of AHI's vest containing Z Shield—the only unjust enrichment damages at issue according to the Complaint—or explained how it would go about calculating such damages.[16] *See id.* at 42:20-43:22.  Given the complete lack of evidence to support the DOJ's unjust enrichment theory, this claim should not proceed to trial.

## CONCLUSION

Discovery has confirmed that this is a case that the DOJ should never have brought.  For all these reasons, this Court should grant Honeywell's motion for summary judgment in full.

---

[16] As indicated above, Honeywell's profits related to its Z Shield sales to AHI are not relevant to *the DOJ's* unjust enrichment claim.  Nor is there sufficient evidence in the record to calculate these profits, in any event.

Dated: June 7, 2019                              Respectfully Submitted,


                                                  /s/ Craig S. Primis, P.C.
                                                 Craig S. Primis, P.C.
                                                 Katherine R. Katz
                                                 Zachary A. Avallone
                                                 KIRKLAND & ELLIS LLP
                                                 1301 Pennsylvania Ave, N.W.
                                                 Washington, D.C. 20004
                                                 Tel: (202) 389-5000
                                                 Fax: (202) 389-5200

                                                 *Attorneys for Defendant*
                                                 *Honeywell International Inc.*