UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0961 (PLF) |
| | ) | |
| HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Defendant, Honeywell International Inc. ("Honeywell") moves for summary

judgment. Plaintiff, the United States, opposes the motion. Upon consideration of the parties'

written submissions, the relevant case law, and the relevant portions of the record in this case,

the Court will deny the defendant's motion for summary judgment.[1]

---

[1] The documents considered in connection with the pending motion include: Amended Complaint ("Am. Compl.") [Dkt. No. 163]; Defendant Honeywell International Inc.'s Motion for Summary Judgment ("Def. Mot.") [Dkt. No. 204]; Honeywell's Statement of Undisputed Material Facts ("HSUMF") [Dkt. No. 204-4]; The United States of America's Opposition to Honeywell International Inc.'s Motion for Summary Judgment ("Gov't Opp.") [Dkt. No. 209]; United States' Response to Honeywell's Statement of Undisputed Material Facts ("USRHSUMF") [Dkt. No. 209-2]; United States' Counter Statement of Undisputed Material Facts ("USCSUMF") [Dkt. No. 209-3]; Reply in Support of Honeywell International Inc.'s Motion for Summary Judgment ("Def. Reply") [Dkt. No. 214]; Honeywell's Responses to United States' Counter Statement of Undisputed Material Facts ("HRUSCSUMF") [Dkt. No. 214-1]; Plaintiff United States of America's Supplemental Brief Requested By Order of This Court ("Gov't Supp.") [Dkt. No. 221]; Honeywell International Inc.'s Supplemental Brief ("Def. Supp.") [Dkt. No. 222]; and Plaintiff United States of America's Sur-Reply to Honeywell's Supplemental Brief [Dkt. No. 224].

## I.  FACTUAL AND PROCEDURAL HISTORY

This action has been the subject of three prior opinions:  United States v. Honeywell Int'l Inc. ("Honeywell I"), 798 F. Supp. 2d 12 (D.D.C. 2011) (motion to dismiss); United States v. Honeywell Int'l Inc. ("Honeywell II"), 841 F. Supp. 2d 112 (D.D.C. 2012) (motion to strike); United States v. Honeywell Int'l Inc. ("Honeywell III"), 318 F.R.D. 202 (D.D.C. 2016) (motion for leave to amend complaint).  Also pertinent are a series of decisions in a separate but related action:  United States ex rel. Westrick v. Second Chance Body Armor Inc. ("Second Chance I"), 128 F. Supp. 3d 1 (D.D.C. 2015) (motion for summary judgment); United States ex rel. Westrick v. Second Chance Body Armor Inc. ("Second Chance II"), Civil Action No. 04-280, 2016 WL 3033937 (D.D.C. Feb. 11, 2016) (first motion to reconsider); United States ex rel. Westrick v. Second Chance Body Armor Inc. ("Second Chance III"), Civil Action No. 04-0280, 2017 WL 8809510 (D.D.C. Mar. 31, 2017) (second motion to reconsider); United States ex rel. Westrick v. Second Chance Body Armor Inc. ("Second Chance IV"), 266 F. Supp. 3d 110 (D.D.C. 2017) (third motion to reconsider).

The procedural history and facts relevant to this motion are recounted below.

### A.  Procedural History

On June 5, 2008, the government filed a complaint naming as the defendant, Honeywell International Inc. ("Honeywell") and alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and unjust enrichment under the common law.  Complaint ("Compl.") [Dkt. No. 1] ¶¶ 86-97.  On July 8, 2011, the Court denied Honeywell's motion to dismiss, holding that the government had pled its claims with sufficient particularity. Honeywell I, 798 F. Supp. 2d at 12.  Subsequently, on January 25, 2012, the Court struck Honeywell's affirmative defenses of waiver and estoppel.  Honeywell II, 841 F. Supp. 2d at 112.

On July 29, 2016, the Court permitted the government to amend its complaint.

Honeywell III, 318 F.R.D. at 202.  The Amended Complaint, filed on August 1, 2016, included

allegations about Z Shield degradation due to its water-based coating and fragility, and

Honeywell's manipulation of Z Shield warehouse data.  Gov't Opp. at 6; Am. Compl.

¶¶ 48-60, 90-96.  Discovery has closed, and Honeywell now moves for summary judgment.  See

Def. Mot. at 1.

### B.  Facts

Honeywell is a United States corporation "which manufactures, *inter alia*, high

performance fabrics and shields made of high performance fibers for use in ballistic vests."

USCSUMF ¶ 1; HRUSCSUMF ¶ 1 (undisputed).[2]  One of Honeywell's products was Z Shield,

made using Zylon fiber, which Honeywell obtained from Toyobo Co. ("Toyobo").  USCSUMF

¶¶ 4,7; HRUSCSUMF ¶¶ 4,7 (undisputed).  Honeywell contracted with Dutch States Mines High

Performance Fibers ("DSM"), from 2000 to 2001, and FMS Enterprises Migun Ltd. ("FMS"),

from 2002 to 2005, to manufacture Z Shield.  USCSUMF ¶¶ 14-15; HRUSCSUMF ¶¶ 14-15

(undisputed).  Honeywell sold Z Shield to Armor Holdings Inc. ("AHI") from

approximately 2000 to July 2001 and from March 2002 to 2005 for the purpose of incorporating

Z Shield into bullet resistant vests.  See USCSUMF ¶ 17; HRUSCSUMF ¶ 17 (undisputed).

AHI was made up of three body armor divisions:  (1) American Body Armor ("ABA"),

(2) Safariland, and (3) ProTech.  USCSUMF ¶ 18; HRUSCSUMF ¶ 18 (undisputed).  AHI

purchased over 120,000 pounds of Z Shield from Honeywell for more than fifteen million

---

[2]      For the purposes of this opinion, the Court will use "undisputed" when a party has responded to a cited fact and acknowledged that there is no dispute.  The Court will use "not disputing cited fact" when a party has not raised any objection to a cited fact, but also did not acknowledge that the fact was undisputed.

dollars.  USCSUMF ¶ 261; HRUSCSUMF ¶ 261 (undisputed).  Honeywell marketed Z Shield to

AHI as "the best ballistic product in the market for ballistic resistance, even better than woven

Zylon fabric."  USCSUMF ¶ 16; HRUSCSUMF ¶ 16 (undisputed); see also USCSUMF ¶ 24;

HRUSCSUMF ¶ 24 (undisputed).

### 1.  Sales Under the GSA MAS and BVPGA

AHI sold vests containing Z Shield under two programs that are at issue here:

(1) "the General Services Administration's ('GSA') contracting program known as the Multiple

Award Schedule[s] ('MAS')," and (2) "a federal program called the Bulletproof Vest Partnership

('BVP')."  HSUMF ¶ 67; USRHSUMF ¶ 67 (undisputed).

### a.  GSA MAS

AHI, through its subsidiaries, sold Z Shield containing vests directly to federal

government agency purchasers through GSA MAS contracts.  HSUMF ¶ 69; USRHSUMF ¶ 69

(undisputed).  "On July 24, 1995, GSA released a solicitation 7FXG-B3-95-84 l l-B seeking

offers for law enforcement equipment, including body armor, to be listed on the GSA MAS."

USCSUMF ¶ 27; HRUSCSUMF ¶ 27 (undisputed).  GSA awarded ABA contract

No. GS-07F-9549G (hereinafter "1997 ABA Contract") for the term of June 1, 1997 through

July 31, 2001.  USCSUMF ¶ 27; HRUSCSUMF ¶ 27 (undisputed); Gov't Opp., Ex. 32 [Dkt.

No. 209-7] (ABA's GSA Contract).  This contract provided that the warranty was the "[s]tandard

[c]ommercial [w]arranty."  Gov't Opp., Ex. 32 at GSA002-0180 (ABA's GSA Contract).

The 1997 ABA warranty provided that "'[f]or five years after date of purchase [ABA] warrants

that the ballistic panels will pass the [National Institute of Justice ("NIJ")] protocol for ballistic

intervention and their [NIJ] designated velocities during an actual occurrence, not necessarily

during the [NIJ] independent laboratory retest procedure.'"  USCSUMF ¶ 33 (quoting Gov't

Opp., Ex. 46 [Dkt. No. 209-8] at GSA002-0358 (ABA Limited Warranty)); HRUSCUMF ¶ 33

(not disputing cited fact).  On March 10, 1997, ABA provided this written warranty to a GSA

representative.  USCSUMF ¶ 33; HRUSCUMF ¶ 33 (undisputed) Gov't Opp., Ex. 45 [Dkt.

No. 209-8] (Mar. 10, 1997 letter from ABA to GSA).

In 2000, AHI began selling vests containing Z Shield.  USCSUMF ¶ 27;

HRUSCSUMF ¶ 27 (undisputed).  GSA renewed ABA's contract to run for an additional five-

year period from August 1, 2001 through July 31, 2006.  USCSUMF ¶ 29; HRUSCSUMF ¶ 29

(undisputed); Gov't Opp., Ex. 36 [Dkt. No. 209-7] (ABA's GSA Contract renewal).  The

renewal makes no mention of the warranty.  See Gov't Opp., Ex. 36 (ABA's GSA Contract

renewal).  The renewal states that "[a]ll other terms and conditions remain unchanged."  Id. at

GSA002-0841.  At least as early as November 28, 2001, vests containing Z Shield were included

on the 1997 ABA Contract's distributor pricelist under the GSA.  USCSUMF ¶ 30;

HRUSCSUMF ¶ 30 (undisputed); Gov't Opp., Ex. 39 [Dkt. No. 209-7] (Nov. 28, 2001 contract

modification).  The modification makes no mention of the warranty.  See Gov't Opp., Ex. 39

(Nov. 28, 2001 contract modification).  The modification states that "[a]ll other terms and

conditions remain as initially negotiated or subsequently modified.  No other changes."  Id. at

GSA002-0779.

GSA awarded ProTech contract No. GS-07F-9947H (hereinafter "1998 ProTech

Contract") for the term of April 1, 1998 through March 31, 2003.  USCSUMF ¶ 27;

HRUSCSUMF ¶ 27 (undisputed); Gov't Opp., Ex. 33 [Dkt. No. 209-7] (ProTech's GSA

Contract).  This contract provided that the warranty was the "[s]tandard [c]ommercial

[w]arranty."  Gov't Opp., Ex. 33 at GSA002-1288 (ProTech's GSA Contract).  The 1998

ProTech warranty provided that "PROTECH ARMORED PRODUCTS warrants the ballistic integrity of its products for a period of five (5) years from the date of original purchase from PROTECH.  This warranty covers only the ballistic performance for which the product is specifically designed for and the ballistic threat level stated."  USCSUMF ¶ 34; HRUSCSUMF ¶ 34 (not disputing cited fact); Gov't Opp., Ex. 47 [Dkt. No. 209-8] (ProTech's Limited Warranty).  In 2000, AHI began selling vests containing Z Shield.  USCSUMF ¶ 27; HRUSCSUMF ¶ 27 (undisputed).  GSA renewed ProTech's contract to run for an additional five year-period from April 1, 2003 through March 31, 2008.  USCSUMF ¶ 29; HRUSCSUMF ¶ 29 (undisputed); Gov't Opp., Ex. 37 [Dkt. No. 209-7] (ProTech's GSA Contract renewal).  Like ABA's renewal, this renewal makes no mention of the warranty language, see Gov't Opp., Ex. 37 (ProTech's GSA Contract renewal), and states that "[a]ll other terms and conditions remain as initially negotiated or subsequently modified. . . . No other changes," id. at AHI016-2088.

In August 2005, GSA removed all vests containing Zylon from its GSA MAS schedules.  USCSUMF ¶ 237; HRUSCSUMF ¶ 237 (undisputed); HSUMF ¶ 240; USRHSUMF ¶ 240 (undisputed).

b.  BVP

"[AHI] also sold Z Shield vests to state, local and tribal police with reimbursements paid for by the Federal Government via the BVP [The Bulletproof Vest Partnership] Program."  USCSUMF ¶ 31; HRUSCSUMF ¶ 31 (undisputed).  BVP "is a federal program through which state and local law enforcement agencies receive federal funding for body armor."  HSUMF ¶ 72; USRHSUMF ¶ 72 (undisputed).  The BVP program "reimburses states, localities, and tribal jurisdictions up to 50% of the cost of each unit of eligible body armor

purchased."  HSUMF ¶ 73; USRHSUMF ¶ 73 (undisputed). "Under the BVP program, the federal government would only reimburse for certain vest models identified on the BVP website."  HSUMF ¶ 75; USRHSUMF ¶ 75 (undisputed).  Honeywell was aware that the federal government provided funding to reimburse local police forces through the BVP program. USCSUMF ¶ 32; HRUSCSUMF ¶ 32 (not disputing cited fact).

"In order to qualify for reimbursement under the BVP program, body armor was required to have been certified under the relevant NIJ Standard."  HSUMF ¶ 76; USRHSUMF ¶ 76 (undisputed).  "To achieve compliance with the NIJ .04 Standard, a vest manufacturer was required to submit a number of a given body armor model to NIJ's voluntary Compliance Testing Program at a NIJ-approved testing facility for destructive ballistic testing."  HSUMF ¶ 61; USRHSUMF ¶ 61 (undisputed).  Once a model has been successfully tested for compliance with the NIJ .04 standard, a manufacturer receives NIJ certification.  HSUMF ¶ 63; USRHSUMF ¶ 63 (undisputed).  On August 24, 2005, Z Shield containing vests were removed from NIJ's Consumer Product List.  HSUMF ¶ 78; USRHSUMF ¶ 78 (undisputed); USCSUMF ¶ 199; HRUSCSUMF ¶ 199 (undisputed).  Vests containing Zylon that were purchased after this date "were no longer eligible for reimbursement via the BVP Program."  USCSUMF ¶ 199; HRUSCSUMF ¶ 199 (undisputed).  After August 24, 2005, BVP continued to reimburse for vests that were ordered prior to the date of removal from NIJ's Consumer Product List. USCSUMF ¶ 199; HRUSCSUMF ¶ 199 (undisputed); Gov't Opp., Ex. 291 [Dkt. No. 209-25] at 69:9-12 (July 29, 2015 L. Hammond-Deckard Tr.).

c. Oral and Written Guarantees

AHI employees also made specific oral and written representations and guarantees about vests containing Z Shield.  See USCSUMF ¶¶ 37-38; HRUSCSUMF ¶¶ 37-38

(not disputing cited fact).  First, Bob Weber, a vest designer at AHI, testified that he made statements to customers at vest shooting demonstrations that "[w]e stand behind our product and we say that it will protect for its intended use if it's cared for properly."  USCSUMF ¶ 38; HRUSCSUMF ¶ 38 (undisputed); Gov't Opp., Ex. 282 [Dkt. No. 209-25] (Mar. 4, 2010 B. Weber Tr.).  Second, Scott O'Brien, President of Safariland, an AHI subsidiary, made written guarantees in a letter to the Los Angeles Police Department in response to a question about the "Xtreme XS Z Shield vest," an ABA vest model containing Z Shield.  USCSUMF ¶ 37; HRUSCSUMF ¶ 37 (undisputed); Gov't Opp., Ex. 49 [Dkt. No. 209-8] (Oct. 20, 2003 O'Brien Letter).  This letter stated that "[AHI] warranties all body armor ballistic ballistics for five years from the date of delivery.  Our warranty ensures all AHI ballistic panels meet and will remain within tolerance as established by the National Institute of Justice (NIJ) in the NIJ-STD-0101-04 standard for the life of the warranty period."  USCSUMF ¶ 37; HRUSCSUMF ¶ 37 (undisputed); Gov't Opp., Ex. 49 (Oct. 20, 2003 O'Brien Letter).

### d.  BVP Pop-Up Warning

Beginning in January 2004, a pop-up alert on the BVP website warned any user who selected a Zylon or Z Shield containing vest of potential degradation in certain environmental conditions.  HSUMF ¶ 241; USRHSUMF ¶ 241 (undisputed).  The pop-up warning was issued in conjunction with a Zylon vest replacement and upgrade program created by Second Chance, another vest manufacturer.  USRHSUMF ¶ 241.  This warning stated that "[c]ertain vests containing Zylon have been subject to a special replacement or upgrade program due to a reported degradation of its ballistic qualities under certain environmental conditions."  HSUMF ¶ 241; USRHSUMF ¶ 241 (undisputed).

8

### 2.  Honeywell's Knowledge and Testing

### a.  Z Shield Commercialization Process

During the commercialization process of Z Shield in 2000, Honeywell identified

two "technical risks":  (1) the "[l]ong-term durability of the aqueous system," and (2) the

"[p]hoto/UV effects on Shield performance."  USCSUMF ¶ 12; HRUSCSUMF ¶ 12 (not

disputing cited fact); Gov't Opp., Ex. 20 [Dkt. No. 209-6] (Z Shield Gate Review doc).  On

July 5, 2000, Dr. Madhu Rammoorthy, a Honeywell scientist, specifically noted his concern

about the "long term damage that moisture can do to the product" and stated that "[s]weat/rain is

the biggest threat."  USCSUMF ¶ 13; HRUSCSUMF ¶ 13 (not disputing cited fact).  During the

commercialization process, Honeywell also noted that Z Shield "turns dark and stiff when

exposed to ultra violet light[] and lost 3% in V-50 on 40 hours exposure in a Xenon arc

chamber."  USCSUMF ¶ 12; HRUSCSUMF ¶ 12 (not disputing cited fact). [3]

### b.  The Urgent DSM Letter

On July 5, 2001, DSM, which manufactured Z Shield for Honeywell

from 2000-2001, sent a letter to several members of the body armor industry labeled "URGENT

URGENT URGENT" stating that "Z Shield, was not justified for use in bullet resistant vests[]

[and] that Zylon fiber in general might not be justified for use in bullet resistant vests."

USCSUMF ¶ 59; HRUSCSUMF ¶ 59 (undisputed).  Then "[o]n or about July 6, 2001, DSM

informed Honeywell and AHI that it had conducted testing on Z Shield in which samples of the

material were subjected to two weeks of continuous oven aging at temperatures of 70°C [158°F]

---

[3]      "V-50" is "a test that measures ballistic performance and provides an estimate of
the velocity at which 50% of bullets shot at body armor do not penetrate and 50% of the bullets
do penetrate."  HSUMF ¶ 126.

and 90°C [194°F] with no humidity control." HSUMF ¶ 105; USRHSUMF ¶ 105 (undisputed).

"DSM's data graphically illustrated an approximate 20% reduction in the [V-50] value of Z

Shield at 70°C [158°F] after approximately two weeks and an approximately more than 20%

reduction at 90°C [194°F] after approximately twenty days, as compared to the control sample."

HSUMF ¶ 106; USRHSUMF ¶ 106 (undisputed).

   Toyobo sent a response to the DSM letter on July 6, 2001, advising AHI and

Honeywell to "carefully examine" Z Shield. USCSUMF ¶ 63; HRUSCSUMF ¶ 63 (undisputed).

Toyobo also disclosed that it had "'expose[d] [Zylon] material to higher temperature and higher

humidity[,] . . . 80 and 60 degree C [176°F and 140°F] at 80% relative humidity[,]' and found

that 'the strength of Zylon fiber decreases under high temperature and humidity conditions,' but

that it 'ha[d] not confirmed any serious indication about woven fabric made of Zylon fiber at this

moment,' and 'ha[d] not found any serious indication from [its] test[s] using Zylon fiber up to

now.'" HSUMF ¶ 110 (quoting Def. Mot., Ex. 117 [Dkt. No. 204-10] (July 6, 2001 letter from

Toyobo to Herceg)); USRHSUMF ¶ 110 (not disputing cited fact); see also USCSUMF ¶ 63;

HRUSCSUMF ¶ 63 (undisputed).

   DSM provided data to Honeywell on September 3, 2001, which "showed that

after eight weeks at 70°C, uncontrolled humidity, Z Shield lost more than 25 percent of its

ballistic stopping power based on V-50 testing" and "Zylon fabric exposed to 70°C, 63%

[Relative Humidity ('RH')] lost more than 20 percent of its ballistic stopping power after only

five weeks." USCSUMF ¶ 95; HRUSCSUMF ¶ 95 (not disputing cited fact); Gov't Opp., Ex. 87

[Dkt. No. 209-11] (Sept. 3, 2001 fax from DSM to Honeywell).

c. Honeywell's Testing

In July 2001, Honeywell began its own testing to "replicate and expand on DSM's testing." HSUMF ¶ 122; USRHSUMF ¶ 122 (undisputed).

i. *Heat and Humidity*

By July 25, 2001, Honeywell generated data showing a drop in ballistic performance of Z Shield with high heat. USCSUMF ¶ 86; HRUSCSUMF ¶ 86 (not disputing cited fact). Specifically, testing showed a 13.3% drop in Z Shield ballistic performance at 90°C with no humidity. USCSUMF ¶ 86; HRUSCSUMF ¶ 86 (not disputing cited fact).

By September 2001, Honeywell had data showing that Z Shield degraded when exposed to high heat and humidity. See USCSUMF ¶ 101; HRUSCSUMF ¶ 101 (not disputing cited fact). On September 25, 2001, Honeywell had V-0 testing (testing at NIJ Standard reference velocities) showing Z Shield vests continuously exposed to "70°C, 80% RH for four weeks experienced complete penetrations." USCSUMF ¶ 101; HRUSCSUMF ¶ 101 (not disputing cited fact).[4] One vest, "containing a majority Z Shield, was penetrated four times and was described as having lost 9% of its V-50." USCSUMF ¶ 101; HRUSCSUMF ¶ 101 (not disputing cited fact). "The control sample vest, that was not so exposed, was not penetrated." USCSUMF ¶ 101; HRUSCSUMF ¶ 101 (not disputing cited fact). By September 26, 2001, Honeywell also had data showing a "12.6 percent loss in V-50 stopping power of Z Shield exposed for four weeks at 70°C, 80% RH." USCSUMF ¶ 104; HRUSCSUMF ¶ 104 (not disputing cited fact).

---

[4] "V-0" is a test that provides an estimate of the velocity at which 0% of bullets shot at body armor penetrate. See HSUMF ¶ 126; Gov't Opp., 269 [Dkt. No. 209-24] at 316:22-23 (Mar. 11, 2010 Lindemulder Depo.).

Dr. Lori Wagner, Honeywell's lead scientist, stated in an email to Mr. Greg Herceg, the General Manager for Advanced Fibers and Composites at Honeywell, that the "'[V-0] testing results were not encouraging.'"  USCSUMF ¶ 101 (quoting Gov't Opp., Ex. 90 [Dkt. No. 209-11] (Sept. 25, 2001 email from Wagner to Herceg)); HRUSCSUMF ¶ 101 (not disputing cited fact).  Dr. Wagner's internal September 25, 2001 email concluded that "'[a]t this time, it appears extreme conditions as demonstrated in this testing are significantly detrimental to the Z Shield performance to warrant a statement issued to the effect that prolonged exposure to high heat and humidity will compromise vest performance.  Recommended maximum temperature is yet to be determined but expected range will be 40°C; perhaps 50°C at the highest depending on humidity conditions.  This is not based on significant data at this time and hence is just an educated guess.'"  USCSUMF ¶ 102 (quoting Gov't Opp., Ex. 90 (Sept. 25, 2001 email from Wagner to Herceg)); HRUSCSUMF ¶ 102 (not disputing cited fact).  On October 3, 2001, Dr. Wagner learned from another Honeywell scientist that "using only Honeywell's dry heat aging data, rather than the data using both heat and humidity, Honeywell could expect a 1% loss of V-50 at 40°C."  USCSUMF ¶ 111; HRUSCSUMF ¶ 111 (not disputing cited fact) (emphasis in original).

By October 18, 2001, Honeywell started continuous exposure testing at a lower heat and humidity, "at 40°C, 70% RH."  USCSUMF ¶ 113; HRUSCSUMF ¶ 113 (undisputed).  By December 3, 2001, these tests "showed that Z Shield lost about 3.3% V-50 over four weeks.  But the Z Shield control, which was not exposed to 40°C, 70% RH conditions, showed an increase in stopping power of 4.7%."  USCSUMF ¶ 114; HRUSCSUMF ¶ 114 (undisputed).  "By January 15, 2002, Honeywell had tested a roll of Z Shield made by DSM exposed to the continuous conditions of 40°C, 70% RH for twelve weeks and had a V-50 loss of 7 percent."

USCSUMF ¶ 115; HRUSCSUMF ¶ 115 (not disputing cited fact).  Another DSM roll of Z Shield in the same conditions showed "a loss of 11.8% V-50 after the same 12 weeks exposure." USCSUMF ¶ 115; HRUSCSUMF ¶ 115 (not disputing cited fact).

In the fall of 2001, Honeywell began conducting cyclic exposure testing in conditions of high heat and humidity.  USCSUMF ¶ 121; HRUSCSUMF ¶ 121 (not disputing cited fact).  "During Honeywell's cyclic testing, samples of Z Shield were put in the accelerated aging chamber for one week, then removed and stored at room conditions, then repeated." USCSUMF ¶ 121; HRUSCSUMF ¶ 121 (not disputing cited fact).  By May 2002, this testing showed "a decline of 8.1% with cyclic exposure, 13.6% loss with continuous exposure." USCSUMF ¶ 121; HRUSCSUMF ¶ 121 (not disputing cited fact).  "By December 2002, Honeywell had 52-week cyclic data at 40°C, 70% RH. That data showed that Z Shield lost 15.1% of its V-50 after continuous exposure, and 13.7% V-50 after cyclic exposure. . . ." USCSUMF ¶ 123; HRUSCSUMF ¶ 123 (not disputing cited fact).  By September 2003, see Gov't Opp. Ex. 112 [Dkt. No. 209-12] (Sept. 8, 2003 email from Murry to Hurst et al.), Honeywell's 52-week cyclic exposure testing showed that Z Shield lost nearly as much V-50 during cyclic exposure as it did during continuous exposure:  84.9 percent (continuous) vs. 86.3 percent (cyclic), USCSUMF ¶121; HRUSCSUMF ¶ 121 (not disputing cited fact).

## ii. *Z Shield vs. Non Z Shield Vests*

By September 2001, Honeywell had comparative testing data showing Z Shield containing vests performed worse than vests without Z Shield in conditions of high heat and humidity.  See USCSUMF ¶ 109; HRUSCSUMF ¶ 109 (not disputing cited fact).  Honeywell's testing "showed new vests of multiple models containing Zylon or Z Shield exposed at 70°C, 80% RH for four and eight weeks with V-50 losses of 14.3% (XTZX2-1); 9.2%

(XTX2-1); 14% (XTZXSK1-3); 8% (PII-4.4); 21% (SE2-3); 8% (XTXSK1-4).  The only vest

without Zylon or Z Shield lost just 1% V-50 at these same conditions (XT2-2)."  USCSUMF

¶ 109; HRUSCSUMF ¶ 109 (not disputing cited fact).

       In the summer of 2003, Honeywell conducted "additional comparative testing of

its commercial ballistic materials alongside some of the ballistic materials that were under

development (such as the Zylon-containing Zebra Flex and Mega Flex), at conditions of high

temperature and humidity."  USCSUMF ¶ 148; HRUSCSUMF ¶ 148 (undisputed).  The results

showed that Z Shield "performed the worst of all the ballistic fabrics tested (including Spectra

Shield and Kevlar) in conditions of 40°C (104°F) and 70% RH."  USCSUMF ¶ 149;

HRUSCSUMF ¶ 149 (not disputing cited fact).  A ballistics lab manager at Honeywell prepared

a draft report entitled "Exposure Test Sampling Report," summarizing and analyzing these

results.  USCSUMF ¶ 150; HRUSCSUMF ¶ 150 (undisputed).  Dr. Wagner later testified that

parts of the report were erroneous.  HSUMF ¶ 185; USRHSUMF ¶ 185 (not disputing cited fact).

### iii.   *Used Z Shield Vests*

       Honeywell also conducted testing of used Z Shield vests.  USCSUMF ¶ 108;

HRUSCSUMF ¶ 108 (not disputing cited fact).  On November 15, 2001, Honeywell conducted

comparative testing of used Z Shield vests and new vests and found that the used, six to nine

months old vests "showed a V-50 retention of 93.1 percent, as compared to a new vest."

USCSUMF ¶ 108; HRUSCSUMF ¶ 108 (not disputing cited fact).

       On May 31, 2002, Honeywell conducted V-0 NIJ Standard Level II testing on the

front panel of a used, one-year old vest from Florida.  USCSUMF ¶ 124; HRUSCSUMF ¶ 124

(not disputing cited fact).  This one-year old vest "showed four complete penetrations . . . and a

shot that stopped in the armor had a back face measurement of 66mm."  USCSUMF ¶ 124; HRUSCSUMF ¶ 124 (not disputing cited fact).

### iv.  *Solvent-Based vs. Water-Based Resin*

Commercial Z Shield was manufactured using a water-based resin.  See USCSUMF ¶ 119; HRUSCSUMF ¶ 119 (not disputing cited fact).  In May 2002, Honeywell began experimental testing of "Z Shield with a solvent-based resin system to see [if] it would improve [the] performance of Z Shield."  HSUMF ¶ 197; USRHSUMF ¶ 197 (undisputed).  By May 2002, Honeywell had data showing "V-50 retention of the solvent-based resin was 89.2% after four weeks at 70°C, 80% RH, while commercial Z Shield with water-based resin had a V-50 retention of 83.5% under the same conditions."  USCSUMF ¶ 120.  Honeywell explained that these results were very preliminary.  HRUSCSUMF ¶ 120.  Based on this data, in December 2004, Honeywell filed a patent application for "'Moisture Resistant PBO Fiber Articles, and Method of Making,' relating to Zylon Shield with 'improved retention of properties after exposure to high humidity.'"  USCSUMF ¶ 188; HRUSCSUMF ¶ 188 (not disputing cited fact).

### 3.  Honeywell's Disclosures to AHI

### a.  Response to DSM Letter

In response to the urgent letter sent by DSM to members of the body armor industry on July 5, 2001, Honeywell sent an email to AHI stating that "[AHI] should take all actions they deem prudent with their customers in order to mitigate and avoid potential risk to their customers in light of the preliminary information our companies have received this morning from DSM."  HRUSCSUMF ¶ 68; see USCSUMF ¶ 68.

On July 6, 2001, Honeywell sent a letter to AHI stating that "'from the little information we have on DSM's testing, we do not believe the testing mimics conditions to which the PBO Zylon shield would be subjected.  Therefore, at this time, Honeywell is not taking any further action beyond temporary suspension of sales of PBO shield and follow-up testing and analysis of our product.'"  HRUSCSUMF ¶ 71 (quoting Gov't Opp., Ex. 68 [Dkt. No. 209-10] (July 6, 2001 letter from Herceg to Croskrey)); see USCSUMF ¶ 71.

"[O]n July 9, 2001, [AHI] sent its customers a body armor storage advisory, advising them to store Z Shield vests in dry and cool places and to avoid exposing them to temperatures above 120°F (about 50°C) and 50 percent relative humidity (% RH)."  USCSUMF ¶ 81; HRUSCSUMF ¶ 81 (undisputed).

b. Data Sharing

On July 24, 2001, Honeywell sent data to AHI – the same data it had sent to DSM on July 11, 2001 – and new data which showed "only small losses in Z Shield ballistic performance at six hours exposure to 150°F (about 65°C)."  USCSUMF ¶ 86; HRUSCSUMF ¶ 86 (not disputing cited fact).  The following day, July 25, 2001, Honeywell generated new data showing a 13.3% drop in Z Shield ballistic performance at 90°C.  USCSUMF ¶ 86; HRUSCSUMF ¶ 86 (not disputing cited fact).  Honeywell did not share this data with AHI until October 4, 2001.  USCSUMF ¶ 86; HRUSCSUMF ¶ 86 (not disputing cited fact).  Honeywell then sent a letter to AHI on August 9, 2001, stating that it had found "'no statistically significant shift' in V-50 values for the 2-week Z Shield test at 70°C (158° F) but without elevated humidity levels."  USCSUMF ¶ 90 (quoting Gov't Opp., Ex. 81 [Dkt. No. 209-11] (Aug. 9, 2001 letter from Herceg to Croskrey)); HRUSCSUMF ¶ 90 (not disputing cited fact).

16

On September 4, 2001, Honeywell provided AHI with the "results of its testing after four weeks of exposure at 50°C [122°F], which showed 'no change' in [V-50], and after four weeks exposure at 70°C [158°F], in which the [V-50] was 8% less than its control." HSUMF ¶ 129 (quoting Def. Mot., Ex. 131 [Dkt. No. 204-10] (Sept. 4, 2001 email from O'Brien to Weber)); USRHSUMF ¶ 129 (not disputing cited fact).  On September 6, 2001, AHI sent a "letter to its vest distributors relying only on Honeywell's 2-week 70°C Z Shield data from August 9, 2001, data that Honeywell had described as having 'no statistically significant shift in [V-50] values.'  [AHI] attached Honeywell's letter to it, which also criticized the DSM testing []as having 'no control samples' and 'only one or two data points.'"  USCSUMF ¶ 99 (quoting Gov't Opp., Ex. 85 [Dkt. No. 209-11] (Sept 6, 2001 email from O'Brien to Hermann)); HRUSCSUMF ¶ 99 (not disputing cited fact).

Honeywell sent AHI a voluminous amount of data on October 4, 2001, including: "several rounds of [V-50] testing of Z Shield and other ballistic materials that had been exposed to one, two, and four week periods at conditions of 50°C [122°F], 70°C [158°F], and 90°C [194°F], and to combined conditions of 70°C [158°F] and 80% relative humidity."  HSUMF ¶ 130; USRHSUMF ¶ 130 (not disputing cited fact).  Honeywell and AHI had a conference call to discuss this data.  USCSUMF ¶ 112; HRUSCSUMF ¶ 112 (undisputed).  During this call, "Dr. Wagner emphasized that Honeywell had predicted only a 1% loss at 40°C (no elevated humidity) after five years."  USCSUMF ¶ 112; HRUSCSUMF ¶ 112 (not disputing cited fact).

On December 3, 2001, Honeywell shared additional test data – the results of its November 2001 used Z shield vest testing.  HSUMF ¶ 136; USRHSUMF ¶ 136 (not disputing cited fact).  Honeywell resumed sales of Z Shield to AHI in March 2002.  HSUMF ¶ 136; USRHSUMF ¶ 136 (not disputing cited fact).  On July 25, 2002, Honeywell sent the May 2002

cyclic test data and the 2002 used vest data to AHI.  USCSUMF ¶ 125; HRUSCSUMF ¶ 125

(undisputed).

### c.  January 2003 meeting

"On January 22, 2003, Honeywell and AHI held an in-person meeting where

Honeywell shared additional exposure testing data with AHI."  HSUMF ¶ 174; USRHSUMF

¶ 174 (not disputing cited fact).  Prior to this meeting, at an internal Honeywell meeting,

Honeywell executives, scientists, and lawyers met to discuss the sharing of additional Z Shield

data with AHI.  USCSUMF ¶¶ 133-34, HRUSCSUMF ¶¶ 133-34 (not disputing cited fact).

Notes from this internal meeting reflect that Honeywell's strategy was to:  "(1) mark all data

Honeywell confidential (every page); (2) show the data but don't draw conclusions; (3) keep our

tone calm [and] explore/share together; (4) tell [AHI] we need to continue to test [and] evaluate;

(5) formulate a defense to attacks [on Z Shield] by industry; (6) safety-marketing

communications; and (7) talk about how the lawyers are excited to make sure all involved are

covered."  USCSUMF ¶ 134; HRUSCSUMF ¶ 134 (internal quotations omitted) (not disputing

cited fact).  After the January 2003 meeting, Honeywell did not provide any additional written

accelerated aging data to AHI.  USCSUMF ¶ 137; HRUSCSUMF ¶ 137 (undisputed).

### d.  2003 Technical Bulletin

"At [AHI's] request, in the fall of 2003 Honeywell began putting together a

technical bulletin about Z Shield. . . ."  USCSUMF ¶ 163; HRUSCSUMF ¶ 163 (undisputed).

"The completed bulletins were widely distributed at trade shows[,] [] used by [AHI's] sales

force . . . [and] provided to Honeywell's government relations office."  USCSUMF ¶ 163;

HRUSCSUMF ¶ 163 (not disputing cited fact).

The technical bulletin included a warehouse data chart which showed 100%

retention of ballistic capabilities.  USCSUMF ¶ 168; HRUSCSUMF ¶ 168 (undisputed); Gov't

Opp., Ex. 147 [Dkt. No. 209-14] at HW0024447 (Oct. 29, 2003 email from Swinger to Bruco).

The technical bulletin also stated:

> The data presented regarding Z Shield® materials demonstrates that
> there has been no loss of ballistic performance over a three-year time
> period when stored in an uncontrolled warehouse environment.
> Based on the data, and from experience with other ballistic
> materials, there is no significant anticipated change in the ballistic
> performance response of the Z Shield® material for the five year
> suggested lifespan of most ballistic resistant vests assuming proper
> care and use.

Gov't Opp., Ex. 147 at HW0024447 (Oct. 29, 2003 email from Swinger to Bruco); see also

USCSUMF ¶ 167; HRUSCSUMF ¶ 167 (not disputing cited fact).

The bulletin did not disclose data showing that "Z Shield material lost about 15

percent of its V-50 after a year of exposure at 40°C, 70% RH."  USCSUMF ¶174;

HRUSCSUMF ¶ 174 (not disputing cited fact).  The government alleges that Honeywell "had to

manipulate its Z Shield warehouse data" in order to achieve the results shown in the bulletin.

USCSUMF ¶ 168.

### e.  2004 AHI Testing

In 2004, AHI performed its own testing on used vests; "[s]ome used vest samples

tested showed a V-50 decrease of nearly 40 percent, with many vest samples losing greater

than 20 percent V-50."  USCSUMF ¶ 185; HRUSCSUMF ¶ 185 (not disputing cited fact).  Then,

on August 31, 2004, AHI reduced the warranty on some of its Z Shield containing vests from 60

months to 30 months.  USCSUMF ¶ 187; HRUSCSUMF ¶ 187 (undisputed).

4. Honeywell's Meetings with and Disclosures to Representatives of the Government

a. 2000 – Initial Meetings

In July 2000, Honeywell met with government employees to discuss Honeywell products and provide data related to Spectra, another Honeywell product. USCSUMF ¶ 55; HRUSCSUMF ¶ 55 (not disputing cited fact). During this meeting, Honeywell represented that Z Shield performed better than Spectra Shield and other Honeywell Shield products. USCSUMF ¶ 55; HRUSCSUMF ¶ 55 (not disputing cited fact).

Honeywell shared additional information with government employees on November 3, 2000, related to Honeywell materials including Spectra Shield, GoldFlex, and Z Shield. USCSUMF ¶ 56; HRUSCSUMF ¶ 56 (not disputing cited fact). At this meeting, Honeywell provided the government with its testing of "Hybrid Vests" configuration, "to show what Z Shield could do ballistically." Honeywell also provided a "Ballistic Performance" chart comparing ballistic materials, including Z Shield. USCSUMF ¶ 56; HRUSCSUMF ¶ 56 (not disputing cited fact).

b. 2001 – The Government's Initial Request for Information

On August 10, 2001, Honeywell stated that it would be willing to share Z Shield test data with government representatives when the results became available in mid-September. HSUMF ¶ 285; USRHSUMF ¶ 285 (not disputing cited fact). On November 29, 2001, Jon Lesko of The Tekne Group ("Tekne"), a contractor engaged by the government to conduct testing on body armor, followed up with Honeywell to request information on "'ballistic materials subject to temperatures from -25°C to +100°C both dry and with humidity at saturation.'" USCSUMF ¶ 203 (quoting Gov't Opp., Ex. 187 [Dkt. No. 209-18] (Nov. 29, 2001 letter from Lesko to Murray)); HRUSCSUMF ¶ 203 (not disputing cited fact). Honeywell

responded with a series of fourteen questions about the study and its potential impact on

Honeywell.  USCSUMF ¶¶ 205-06; HRUSCSUMF ¶¶ 205-06 (not disputing cited fact); see

Gov't Opp., Ex. 194 [Dkt. No. 209-18] (Apr. 9, 2002 letter from Tekne to Honeywell).

   Tekne answered all fourteen of Honeywell's questions and explained that

Honeywell could not participate in the study in order to preserve the study's independence,

USCSUMF ¶ 206; HRUSCSUMF ¶ 206 (not disputing cited fact); Gov't Opp., Ex. 194

(Apr. 9, 2002 letter from Tekne to Honeywell).  Tekne again specifically asked for "'any data

available concerning any of your fabric/soft body armor products with respect to environmental

testing, particularly for temperature and humidity.  This includes short and long term exposures,

or any aging attempts.'"  USCSUMF ¶ 207 (quoting Gov't Opp., Ex. 194 (Apr. 9, 2002 letter

from Tekne to Honeywell)); HRUSCSUMF ¶ 207 (not disputing cited fact).

c.  March 20, 2002 Meeting

   On March 20, 2002, the first of several meetings between Honeywell and

representatives of the government occurred.  See HSUMF ¶ 289; USRHSUMF ¶ 289

(undisputed).  At this meeting, Honeywell stated that Z Shield had "higher performance" and

"lower back face trauma," and "long term performance."  USCSUMF ¶ 219; HRUSCSUMF

¶ 219 (undisputed); Gov't Opp., Ex. 193 [Dkt. No. 209-18] (Mar. 20, 2002 PowerPoint).  At this

meeting Honeywell disclosed that "'it was exposing Z Shield to conditions of high heat and

humidity'" and "'had been conducting accelerated age tests of Z Shield.'"  HSUMF ¶ 290

(quoting Def. Mot., Ex. 78 [Dkt. No. 204-8] (July 29, 2014 J. Ward Tr. at 114:20-24));

USRHSUMF ¶ 290 (undisputed).  Dr. Ward's notes reflect that Z Shield was experiencing

"some environmental effects" from "accelerated aging" testing, but that the "impact [was] less

significant [at conditions] closer to reality."  See USCSUMF ¶ 221 (citing Gov't Opp., Ex. 248

[Dkt. No. 209-21]); USCSUMF ¶ 221 (not disputing cited fact).  Dr. Wagner testified that she

shared actual data at this meeting.  See USCSUMF ¶ 220; HRUSCSUMF ¶ 220 (not disputing

cited fact).  Dr. Ward testified that she did not recall any data being shared.  USCSUMF ¶ 221;

HRUSCSUMF ¶ 221 (not disputing cited fact).

   On March 21, 2002, the day after the first meeting between Honeywell and

Tekne, Steve Lightsey of Tekne emailed other government affiliates stating that they had all

previously "'agreed . . . that [Honeywell's] participation [in the Tekne study] would not

necessarily be in the best interests of [The Tekne Group] program, and that [Honeywell's]

information, or lack of it, would not hinder the progress in any way.'"  HSUMF ¶ 295 (quoting

Def. Mot., Ex. 196 [Dkt. No. 204-11] (Mar. 21, 2002 email from Lightsey to Rice et al.));

USRHSUMF ¶ 295 (not disputing cited fact).

### d.  October 22, 2002 and May 22, 2003 Meetings

   On July 15, 2002, Honeywell wrote a letter to Tekne stating it was providing

samples of ballistic materials and again offered to share data.  HSUMF ¶ 297; USRHSUMF

¶ 297 (not disputing cited fact).  It did not, however, share any data with government

representatives at this time.  See HSUMF ¶ 297; USRHSUMF ¶ 297 (not disputing cited fact).

   Honeywell had its second meeting with representatives of the government on

October 22, 2002.  HSUMF ¶ 307; USRHSUMF ¶ 307 (not disputing cited fact).  At this

meeting, Honeywell discussed its "'Aging and Heat Data,'" HSUMF ¶ 307; USRHSUMF ¶ 307

(not disputing cited fact) and addressed its testing of various materials in its product line "'at

elevated temperatures and humidities as well as the warehouse testing of [its] products.'"

HSUMF ¶ 308 (quoting Def. Mot., Ex. 72 [Dkt. No. 204-8] (July 16, 2009 L. Wagner Tr.

at 368:22-25)); USRHSUMF ¶ 308 (not disputing cited fact).  The government alleges that

Honeywell did not provide any data at this meeting.  USCSUMF ¶ 232.

   At the third meeting between Honeywell and Tekne on May 22, 2003, Honeywell

told Tekne that it was conducting exposure testing, HSUMF ¶ 311; USRHSUMF ¶ 311 (not

disputing cited fact), and had observed some degradation to Zylon and Z Shield after exposing

materials to elevated heat and humidity levels.  HSUMF ¶ 312; USRHSUMF ¶ 312 (not

disputing cited fact).  The May 22, 2003 meeting minutes reflect that NIJ was interested in "'any

help Honeywell can provide which may accelerate the education [on environmental testing of

ballistic materials] so that they will be able to address it faster.'"  USCSUMF ¶ 223 (quoting

Gov't Opp., Ex. 200 [Dkt. No. 209-18] (June 11, 2003 email from Murry to Wagner));

HRUSCSUMF ¶ 223 (not disputing citied fact).[5]  The government alleges that Honeywell did

not provide any data at this meeting.  USCSUMF ¶ 232.

   e. <u>2003-2004 Correspondence and Final Meetings</u>

   In the fall of 2003, Honeywell repeatedly reached out to government employees.

HSUMF ¶¶ 315-22; Def. Exs. 204-10 (record showing telephone contacts between government

representatives and Honeywell on the following dates:  August 7 and 25, 2003;

September 3, 9, 15, 22, and 26, 2003; October 2 and 7, 2003); USRHSUMF ¶¶ 315-322 (not

disputing cited fact).  On November 19, 2003, Honeywell had its fourth meeting with

---

   [5] According to the government, at the October 22, 2002, meeting, "Honeywell told
Ms. Ward that Z Shield was experiencing some environmental effects, at 'extreme conditions'
but that they could not correlate how those conditions related to a 'natural aging environment.'"
USCSUMF ¶ 222; HRUSCSUMF ¶ 222 (undisputed).  To support this contention, however, the
government cites NIJ meeting minutes from May 22, 2003.  <u>See</u> USCSUMF ¶ 222 (citing Gov't
Opp. Ex. 200 (June 11, 2003 email re May 22, 2003 NIJ Meeting Minutes)).

government representatives.  HSUMF ¶ 323; USRHSUMF ¶ 323 (undisputed).  The government

alleges that no Z Shield data was provided at this meeting.  USRHSUMF ¶ 324.

On December 3, 2003, Honeywell wrote a letter to Assistant Attorney General

Deborah J. Daniels, Office of Justice Programs ("OJP"), Department of Justice, offering

"'assistance'" and to provide data in response to the Body Armor Safety initiative announced by

the DOJ.  HSUMF ¶¶ 328-29 (quoting Def. Mot., Ex. 213 [Dkt. No. 204-11] (Dec. 3, 2003 letter

from Ryan (Honeywell) to Asst. Atty. Gen. Daniels)); USRHSUMF ¶¶ 328-29 (not disputing

cited fact).  In response, NIJ Director Sara Hart "thanked Honeywell for its 'offered assistance,'

and 'forwarded a copy of [Mr. Ryan's] correspondence to the appropriate parties at OJP to

inform them of [his] willingness to assist in these efforts,' in the event OJP wished to select

Honeywell as an 'industry participant to participate in [a] summit' on NIJ's preliminary review

of Zylon based armors."  HSUMF ¶ 334 (quoting Def. Mot., Ex. 215 [Dkt. No. 204-11]

(Jan. 20, 2004 letter from Hart (NIJ) to Ryan)); USRHSUMF ¶ 334 (not disputing cited fact).

There is no record of any other direct response to this letter.  See USRHSUMF ¶¶ 333-34.

Following this letter, on January 9, 2004, Dr. Wagner emailed Lance Miller, a

government ballistics researcher, stating that the "'offer still stands to come and visit and share

some of our data and testing experience.'"  HSUMF ¶ 335 (quoting Def. Mot., Ex. 216 [Dkt.

No. 204-11] (Jan. 9, 2004 email from Wagner (Honeywell) to Miller)); USRHSUMF ¶ 335 (not

disputing cited fact).  Mr. Miller responded to Dr. Wagner on January 12, 2004, stating that he

"agree[d] that it will be important to furthering our efforts to sit down and discuss issues in this

regard.  But, as you have noted, we are absolutely maxed out at this point."  HSUMF ¶ 336

(quoting Def. Mot., Ex. 216 (Jan. 12, 2004 email from Miller)); USRHSUMF ¶ 336 (not

disputing cited fact).

On March 30, 2004, James Wong from the NIJ emailed Dr. Wagner to set up a meeting with Honeywell.  HSUMF ¶ 337; USRHSUMF ¶ 337 (not disputing cited fact).  As a result, on May 6, 2004, Honeywell had its fifth meeting with government representatives. HSUMF ¶ 340; USRHSUMF ¶ 340 (not disputing cited fact).  The government alleges that no data was provided at this meeting.  USRHSUMF ¶ 340.

### 5.  Testing by the NIJ and Local Authorities

In March 2004, after the D.C. Metro Transit Police Department and the Prince Georges County Police Department conducted testing of used AHI vests, which failed, USCSUMF ¶ 184; HRUSCSUMF ¶ 184 (not disputing cited fact), "NIJ informed AHI that it could submit data showing the ongoing ballistic performance of these models, submit the models in question for statistically-based safety testing, or request that the models be removed from the NIJ's Consumer Product List (CPL)."  USCSUMF ¶ 184; HRUSCSUMF ¶ 184 (not disputing cited fact).

"On August 24, 2005, the [NIJ] released the Third Status Report to the Attorney General on Body Armor Safety Initiative Testing and Activities."  USCSUMF ¶ 196; HRUSCSUMF ¶ 196 (undisputed).  "In conjunction with the release of the Third Status Report, NIJ also issued a Body Armor Standard Advisory Notice which stated that 'NIJ has identified . . . Zylon as material that appears to create risk of death or serious injury as [a] result of degraded ballistic performance when used in body armor.'"  HSUMF ¶ 270 (quoting Def. Mot., Ex. 109 [Dkt. No. 204-10] (Aug. 24, 2005 NIJ Body Armor Standard Advisory Notice #01-2005)); USRHSUMF ¶ 270 (undisputed).

On August 24, 2005, all ballistic vests containing Zylon (including Z Shield) were removed from the Consumer Product List by the NIJ.  See USCSUMF ¶ 199; HRUSCSUMF

¶ 199 (undisputed).  Vests containing Zylon that were purchased after this date "were no longer eligible for reimbursement via the BVP Program."  USCSUMF ¶ 199; HRUSCSUMF ¶ 199 (undisputed).  GSA also removed all Zylon containing vests from its GSA MAS schedules. USCSUMF ¶ 237; HRUSCSUMF ¶ 237 (undisputed); HSUMF ¶ 240; USRHSUMF ¶ 240 (undisputed).

## II.  LEGAL FRAMEWORK

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); see also Baumann v. District of Columbia, 795 F.3d 209, 215 (D.C. Cir. 2015); FED. R. CIV. P. 56(a), (c).  In making that determination, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  Baumann v. District of Columbia, 795 F.3d at 215; see also Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

A disputed fact is "material" if it "might affect the outcome of the suit under the governing law." Talavera v. Shah, 638 F.3d at 308 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  A dispute over a material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Grimes v. District of Columbia, 794 F.3d 83, 94-95 (D.C. Cir. 2015); Paige v. DEA, 665 F.3d 1355, 1358 (D.C. Cir. 2012).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment.  Thus, [the Court] do[es] not determine the truth of the

matter, but instead decide[s] only whether there is a genuine issue for trial."  Barnett v. PA

Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting Pardo-Kronemann v.

Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)); see also Tolan v. Cotton, 134 S. Ct. at 1866;

Baumann v. District of Columbia, 795 F.3d at 215; Allen v. Johnson, 795 F.3d 34, 38 (D.C.

Cir. 2015).  When a motion for summary judgment is under consideration, "[t]he evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power

Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156

F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).

       The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-moving

party is required to provide evidence that would permit a reasonable jury to find in his favor.

Laningham v. United States Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the non-movant's

evidence is "merely colorable" or "not significantly probative," summary judgment may be

granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 550 U.S.

at 380 ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Electric Industrial

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

       On a motion for summary judgment, the Court must "eschew making credibility

determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C.

Cir. 2007).  "The inquiry performed [at this phase] is the threshold inquiry of determining

whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.

## III.  DISCUSSION

The False Claims Act ("FCA") subjects to liability anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (B).

FCA causes of action generally take the following forms:  (1) factual falsity; (2) legal falsity, also referred to as false certification, which can be either express or implied, United States v. Kellogg Brown & Root Servs., Inc., 800 F. Supp. 2d 143, 154 (D.D.C. 2011); or (3) fraudulent inducement, also referred to as promissory fraud, United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc., 393 F.3d 1321, 1326 (D.C. Cir. 2005).

Under all theories, the essential elements of liability include "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  United States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d 890, 902 (9th Cir. 2017) (citing Universal Health Servs., Inc. v. United States ex rel. Escobar ("Escobar I"), 136 S. Ct. 1989, 2000-02 (2016)).

The government is proceeding here on the following two theories:  (1) implied false certification and (2) fraudulent inducement. [6]

---

[6]     The Court previously found that the government had not adequately pled factual falsity and express false certification theories, Honeywell I, 798 F. Supp. 2d at 20 ("Because the government does not allege in the complaint that [AHI] or Honeywell invoiced for services not

## A. Implied False Certification

Honeywell moves for summary judgment on the government's implied false certification theory. Def. Mot. at 43.

The distinction between express and implied false certification has been described in this way:

> [a]n express false certification occurs when a claimant explicitly represents that he or she has complied with a contractual condition, but in fact has not complied. . . . By contrast, an implied false certification occurs when the claimant makes no affirmative representation, but fails to comply with a contractual or regulatory provision where certification was a prerequisite to the government action sought.

United States v. Kellogg Brown & Root Servs., Inc., 800 F. Supp. 2d at 154 (internal quotations omitted); see United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1266 (D.C. Cir. 2010).

As the Court has previously explained, "[o]ne way to plead a false claim under this theory [implied false certification] is to plead 'that the contractor withheld information about its noncompliance with material contractual requirements.'" Honeywell I, 798 F. Supp. 2d at 19-20 (quoting United States v. Sci. Applications Int'l Corp., 626 F.3d at 1269). "A contractual requirement can be considered material if 'both parties to the contract understood that payment was conditional on compliance with the requirement at issue.'" Honeywell I, 798 F. Supp. 2d at 20 (quoting United States v. Sci. Applications Int'l Corp., 626 F.3d at 1269). The

---

rendered or described incorrectly the goods [AHI] or Honeywell provided, the government has not pled that Honeywell submitted a factually false claim. Nor has the government pled an express false certification theory, since the complaint does not allege that any of the relevant contracts contained express provisions requiring five-year warranties against defects."). The government concedes that these theories are not being pursued in this action. Gov't Opp. at 5 n. 2 ("Neither side disputes the case does not include FCA theories of factual falsity or express false certification.").

D.C. Circuit has explained:  "The existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not, as [the defendant] argues, a necessary condition.  The plaintiff may establish materiality in other ways, such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue."  Second Chance I, 128 F. Supp. 3d at 17 (quoting United States v. Sci. Applications Int'l Corp., 626 F.3d at 1269).

Honeywell argues that the Court's prior ruling in Second Chance I precludes the government from pursuing an implied false certification theory because, "this Court has already held that AHI's standard commercial warranty did not require 'vests [to] function perfectly for the five-year period.'"  Def. Mot. at 29 (quoting Second Chance I, 128 F. Supp. 3d at 14).  The government alleges, however, that its "warranty theories against Honeywell are different and much broader" than those at issue in Second Chance I.  Gov't Opp. at 29.  Specifically, it points to (1) both oral and written guarantees to customers, and (2) the 1997 ABA and 1998 ProTech written warranties.  Gov't Opp. at 29.  Honeywell argues that none of these are material contractual requirements.  Def. Reply at 2.[7]

### 1.  Oral and Written Guarantees

The government contends that the following guarantees should be considered for purposes of the implied false certification theory:  (1) oral guarantees by Bob Weber, an AHI vest designer, to customers at vest shooting demonstrations, USCSUMF ¶ 38; Gov't Opp.,

---

[7]     Honeywell argues that the AHI, ABA, and ProTech warranties cannot form the basis of an implied certification claim, Def. Mot. at 29; Def. Reply at 2-3, but does not challenge the Safariland warranty, see Def. Mot. at 29; Def. Reply at 2-3.  Therefore, the Court will not address whether the Safariland warranty imposes a durability requirement.

Ex. 282 [Dkt. No. 209-25] (Mar. 4, 2010 B. Weber Tr.); and (2) written guarantees by Scott

O'Brien, President of Safariland, an AHI subsidiary, in a letter to the Los Angeles Police

Department in response to a question about the "Xtreme XS Z Shield vest," an ABA vest model

containing Z Shield, USCSUMF ¶ 37; Gov't Opp., Ex. 49 [Dkt. No. 209-8] (Oct. 20, 2003

O'Brien letter).  First, Mr. Weber testified that he made statements to customers at vest shooting

demonstrations that "[w]e stand behind our product and we say that it will protect for its intended

use if it's cared for properly."  USCSUMF ¶ 38; Gov't Opp., Ex. 282 [Dkt. No. 209-25]

(Mar. 4, 2010 B. Weber Tr.); HRUSCSUMF ¶ 38 (not disputing cited fact).  Second, Mr.

O'Brien stated in a letter that "[AHI] warranties all body armor ballistic ballistics for five years

from the date of delivery.  Our warranty ensures all AHI ballistic panels meet and will remain

within tolerance as established by the National Institute of Justice (NIJ) in the NIJ-STD-0101-04

standard for the life of the warranty period."  USCSUMF ¶ 37; Gov't Opp., Ex. 49

(Oct. 20, 2003 O'Brien Letter); HRUSCSUMF ¶ 37 (not disputing cited fact).

       As the Supreme Court made clear in Escobar, only violations of "statutory,

regulatory, or contractual requirements" may form the basis of an implied false certification

claim.  Escobar I, 136 S. Ct. at 1999.  Here there are no statutory or regulatory requirements at

issue; the only question under Escobar I is whether there was a contractual requirement.  Thus, to

determine whether these oral and written statements by Mr. Weber and Mr. O'Brien are terms of

the contract, this Court must look to contract law.

       Under contract law, a completely integrated written agreement "'supersedes all

other understandings and agreements with respect to the subject matter of the agreement between

the parties, whether consistent or inconsistent.'"  Second Chance I, 128 F. Supp. 3d at 11

(quoting Daisley v. Riggs Bank, N.A., 372 F. Supp. 2d 61, 68 (D.D.C. 2005)).  When a contract

is completely integrated, "no additional terms may be considered." Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley, 999 F. Supp. 34, 49-50 (D.D.C. 1998).

A contract is fully integrated if it is "adopted by the parties as the complete and exclusive statement of the terms of the agreement." Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley, 999 F. Supp. at 49-50. Thus, the Court must determine "'the intent of the parties at the time they entered into the agreement.'" Second Chance I, 128 F. Supp. 3d at 11 (quoting Daisley v. Riggs Bank, N.A., 372 F. Supp. 2d at 68). To determine intent, the Court must look to the contract itself. Hercules & Co., Ltd. v. Shama Rest. Corp., 613 A.2d 916, 927-28 (D.C. 1992). "'[I]f a document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent.'" Second Chance I, 128 F. Supp. 3d at 11 (quoting Daisley v. Riggs Bank, N.A., 372 F. Supp. 2d at 68).

By contrast, if parts of the contract are facially ambiguous, a court may look to extra-contractual statements to resolve this ambiguity. Second Chance I, 128 F. Supp. 3d at 16 (citing Mesa Air Grp., Inc. v. Dep't of Transp., 87 F.3d 498, 503 (D.C. Cir. 1996)) ("However, when a court determines that a contract's language is ambiguous as a matter of law, it must consider other factors in determining the intentions of the parties in constructing the agreement. To be sure, the existence of an ambiguity must be demonstrated by objective evidence.").

Here, the GSA awarded MAS contracts to ABA and ProTech. USCSUMF ¶ 27; HRUSCSUMF ¶ 27 (undisputed). Both contracts contain nearly identical provisions: "This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document[s] [are] necessary." Gov't Opp., Ex. 32 [Dkt. No. 209-7] at GSA002-0177 (ABA's

GSA Contract); Gov't Opp., Ex. 33 [Dkt. No. 209-7] at GSA002-1285 (ProTech's GSA

Contract).

        This contractual provision makes clear that the identified documents are intended

to be the complete and exclusive statement of the terms of the agreement.  See Piedmont

Resolution, L.L.C. v. Johnston, Rivlin & Foley, 999 F. Supp. at 49-50.  In other words, the

contracts awarded by GSA to ABA and ProTech were fully integrated.  This ruling accords with

Judge Roberts' determination in Second Chance I, which considered similar language in the

Second Chance MAS contract and concluded that the language was "facially unambiguous."

Second Chance I, 128 F. Supp. 3d at 11-12 (holding that it was the parties' intent for (1) the

government's solicitation, (2) Second Chance's offer, and (3) the Award/Contract letter to serve

as the complete and integrated terms of the contractual agreement) (internal quotations omitted).

        Furthermore, the government does not argue that there is any ambiguity in the

ABA or ProTech contracts.  See Mesa Air Grp., Inc. v. Dep't of Transp., 87 F.3d at 504.  Thus,

because the contract is fully integrated and there is no alleged ambiguity in the contract

provisions, the oral guarantees by Mr. Weber and the written guarantee by Mr. O'Brien are not

terms of the ABA or ProTech contracts for purposes of the implied certification theory.[8]

     2.  1997 ABA Warranty and 1998 ProTech Warranty: Prior Ruling

        Honeywell argues that Judge Roberts' prior ruling which excluded the ABA and

ProTech warranties in Second Chance II precludes their use in this action in connection with the

implied certification theory.  This argument is mistaken.  It is true, as Honeywell notes, that the

admissibility of these identical warranties was raised in Second Chance II.  Def. Reply at 3 n.2

---

[8]    This ruling does not preclude introduction of this evidence, if relevant, on the
government's fraudulent inducement theory.

(citing Motion for Reconsideration, Civil Action No. 07-1144, [Dkt. No. 184] at 16-17

(Sept. 28, 2015); United States' Reply ISO Motion for Reconsideration, [Dkt. No. 187] at 13-14

(Oct. 19, 2015); United States' Second Motion for Reconsideration, [Dkt. No. 206-1] at 24-25

(July 12, 2016)).   But Judge Roberts excluded the ABA and ProTech warranties only because

ABA and ProTech were not parties to the case.   Second Chance II, 2016 WL 3033937, at *5

("The Zylon vest manufacturers are not defendants in this case").   But that rationale is not

applicable here.   While ABA and ProTech are not parties to this action, the purchase of vests

through the GSA MAS were made pursuant to the ABA and ProTech contracts.   Those contracts,

therefore, are directly at issue here.   Thus, Judge Roberts's prior ruling does not have preclusive

effect in this action.

### 3.  Applicability of Warranties to Sales in and After 2000

Honeywell next argues that the 1997 ABA warranty and 1998 ProTech warranty

were not the standard commercial warranty used in contracts in or after 2000, and therefore they

do not apply to the sales of vests containing Z Shield.   Def. Reply at 2; HRUSCSUMF ¶ 33.

Honeywell further argues that the applicable warranty for ABA vests is the AHI warranty.   Def.

Reply at 2.

### a.  ABA Warranty

For ABA, Honeywell argues that the 1997 ABA warranty was not applicable to Z

Shield vests sold under the MAS beginning in 2000 because the standard commercial warranty

had changed by that time.   Honeywell does not deny that the 1997 ABA warranty was the

standard commercial warranty at the contract's inception.   Def. Reply at 2 (citing HRUSCSUMF

¶ 33).   Nor does Honeywell argue that the underlying language of the contract changed when it

was renewed.  Rather, it argues that the applicable warranty changed because the warranty offered to the marketplace changed.  Def. Reply at 2 (citing HRUSCSUMF ¶ 33).

To explain its position, Honeywell relies on an expert report from Steve Charles, an expert in government contracting and GSA schedule contracts.  HRUSCSUMF ¶ 33; Def. Mot., Ex. 10 [Dkt. No. 204-6] at 7-9 (May 18, 2016 S. Charles Expert Report).  According to Mr. Charles, under a scheduling contract, "the then-current commercial warranty for a particular product applies . . . so that the government is always treated equal[ly] to all other customers in the competitive commercial marketplace."  Def. Mot., Ex. 10 at 8 (May 18, 2016 S. Charles Expert Report).  Mr. Charles opines that it is the warranties that AHI offered to the marketplace beginning in 2000 that are applicable to vests containing Z Shield.  Id.  Thus, Mr. Charles concludes that "[a]ny assertion that an earlier 1997 ABA warranty applies to ABA manufactured products containing Z Shield would be mistaken."  Id.

While an applicable warranty may change, the GSA contract with ABA states that it is the contractor's standard commercial warranty that is applicable.  Def. Mot., Ex. 113 [Dkt. No. 204-10] at AHJX000014749 (GSA Contract with ABA) ("Unless specified otherwise in this contract, the Contractor's standard commercial warranty as stated in the Contractor's commercial price list will apply to its contract.") (emphasis added).  The contractor in this case is ABA, not AHI.  ABA's March 10, 1997 letter is further evidence that the 1997 ABA warranty applies to the contract.  Gov't Opp., Ex. 45 [Dkt. No. 209-8] (Mar. 10, 1997 letter from ABA to GSA providing ABA warranty provision).  While Mr. Charles clearly has a different view, whether Mr. Charles' opinion that the warranty changed is persuasive is a disputed question of fact for the jury.

b.  <u>ProTech Warranty</u>

Honeywell argues that the ProTech warranty does not apply to Z Shield vests.

Honeywell does not deny that the ProTech warranty applied to vests sold under the MAS

contract awarded in 1998.  <u>See</u> Def. Reply at 2.  Honeywell also does not say that the underlying

language of the contract changed; it did not.  <u>Id</u>.  Instead, Honeywell again relies on the expert

report of Mr. Charles to argue that the "standard commercial warranty" changes as different

warranties are offered to the commercial market.  HRUSCSUMF ¶ 33; Def. Mot., Ex. 10 at 7-9

(May 18, 2016 S. Charles Expert Report).  Honeywell does not cite any evidence that another

warranty was applicable.  Rather, Honeywell maintains that the government does not provide

any evidence that the 1998 ProTech warranty was still offered to the commercial marketplace

when AHI began selling Z Shield containing vests in 2000.  Def. Reply at 2.

Even accepting that the applicable warranty could change, Honeywell does not

allege or cite to any evidence showing that the warranty provision did change.  Whether Mr.

Charles' opinion is persuasive is again a disputed question of fact for the jury.

4.  Durability Requirement

Finally, Honeywell argues even if the ABA and ProTech warranties apply, then

like the warranty language in <u>Second Chance I</u>, neither implies a durability requirement.  Def.

Reply at 2 (citing <u>Second Chance I</u>, 128 F. Supp. 3d at 7).  In <u>Second Chance I</u>, the language of

the warranty used by the vest manufacturers stated that the vests were

> warranted to provide protection as stated on the protective panel
> label and to be free of defects in material and workmanship for the
> applicable warranty period. . . . The protection properties of the
> PANELS are warranted for five (5) years from the date of
> purchase . . . . If a defect is found in material or workmanship . . .
> during the applicable warranty period, return the vest directly to
> SECOND CHANCE. SECOND CHANCE, in its discretion,

without cost to you, will repair or replace the defective part or the
entire vest.

Second Chance I, 128 F. Supp. 3d at 7.[9]  The Court ultimately held that there was no durability

requirement in the warranty because "[n]othing in the language of the warranty explicitly

guarantees that the vests will function perfectly for the five-year period."  Id. at 14.  The court

further explained:  "indeed the warranty presupposes that some of the vests may not survive the

five-year period."  Id.

The language of the ABA and ProTech warranties is different from the warranty

at issue in Second Chance I.  The ABA warranty here provided that "[f]or five years after date of

purchase American Body Armor warrants that the ballistic panels will pass the [NIJ] protocol for

ballistic intervention and their [NIJ] designated velocities during an actual occurrence, not

necessarily during the [NIJ] independent laboratory retest procedure."  Gov't Opp., Ex. 46 [Dkt.

No. 209-8] (ABA Limited Warranty); Gov't Opp. at 29.  The ProTech warranty provided:

"PROTECH ARMORED PRODUCTS warrants the ballistic integrity of its products for a period

of five (5) years from the date of original purchase from PROTECH.  This warranty covers only

the ballistic performance for which the product is specifically designed and the ballistic threat

level stated."  Gov't Opp., Ex. 47 [Dkt. No. 209-8] (ProTech's Limited Warranty); Gov't Opp.

at 29.

Neither the ABA nor the ProTech warranties contains any language similar to the

Second Chance I language:  "[i]f a defect is found in material or workmanship . . . [Second

Chance] will repair or replace the defective part or the entire vest."  Second Chance I, 128 F.

---

[9]     The Court noted that "Second Chance's standard commercial warranty on its
body armor was stated differently at different times, though remained consistent in substance."
Second Chance I, 128 F. Supp. 3d at 7.

Supp. 3d at 7.  For this reason, the warranties at issue here do not "presuppose that some of the vests may not survive the five-year period."  Id. at 14.

The government argues that the ABA and ProTech warranties are actually more similar to the 6% catalogue guarantee which met the standards for implied false certification in Second Chance I.  Def. Mot. at 29-30 (citing Second Chance I, 128 F. Supp. 3d at 16).  The Court agrees.  The 6% catalogue guarantee "guaranteed that the vests would not fail to perform at the certified V-50 level within 'normal statistical variation (+/–6%) during the five year guaranteed life of the vest.'"  Second Chance I, 128 F. Supp. 3d at 16 (quoting Second Chance Catalog Statement at 5).  Like the 6% catalogue guarantee, the ProTech warranty guarantees the "ballistic performance" of the vests for five years, and the ProTech warranty guarantees the vests will pass NIJ ballistic intervention protocols for five years.  The ABA and ProTech warranties do not contain the equivocating language found in the Second Chance warranty.  Thus, like the 6% catalogue guarantee, the ABA and ProTech warranties are admissible in support of the government's implied certification theory.

Having rejected Honeywell's arguments for exclusion of the 1997 ABA warranty and 1998 ProTech warranty, the Court concludes that Honeywell is not entitled to summary judgment on the implied false certification theory.

### B.  Fraudulent Inducement

"Although the focus of the FCA is on false 'claims,' courts have employed a 'fraud-in-the-inducement' theory to establish liability under the Act for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves."  United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc., 393 F.3d at 1326; see also United States ex rel. Marcus v. Hess, 317

U.S. 537 (1943); Escobar I, 136 S. Ct. at 1996.  "'Fraudulent inducement exists where a contract was procured by fraud or when a party to a contract makes promises at the time of contracting that it intends to break.'"  Second Chance IV, 266 F. Supp. 3d at 125 (quoting United States ex rel. Barko v. Halliburton Co., 241 F. Supp. 3d 37, 61 (D.D.C. 2017)).  To prevail under a fraudulent inducement theory, the government must prove that there was an initial false representation, see Second Chance IV, 266 F. Supp. 3d at 125 (citing United States ex rel. Keaveney v. SRA Int'l, Inc., 219 F. Supp. 3d 129, 141-42 (D.D.C. 2016)), which is made with scienter.  United States v. DynCorp Int'l, LLC, 253 F. Supp. 3d 89, 108 (D.D.C. 2017).  "Once the United States has established that a defendant made a false representation or omission, the FCA also requires proof that the omitted or false information was material and that the [party] was 'induced by, or relied on, the fraudulent statement or omission when it awarded the contract.'"  Second Chance IV, 266 F. Supp. 3d at 129 (quoting Second Chance I, 128 F. Supp. 3d at 18).

The government asserts three separate theories of fraudulent inducement: (1) fraudulent inducement of AHI; (2) fraudulent inducement of the market; and (3) fraudulent inducement of the United States government.  Gov't Supp. at 12-13.  Honeywell challenges each of these theories.

1.  Fraudulent Inducement of AHI

In order to support the theory of fraudulent inducement of AHI, the government must show that Honeywell made a false record or statement to AHI for the purpose of getting "a false or fraudulent claim paid or approved by the Government."  Allison Engine Co. v. United

States ex rel. Sanders, 553 U.S. 662, 671, (2008).[10]  "[A] subcontractor violates § 3729(a)(2) [of

the False Claims Act] if the subcontractor submits a false statement to the prime contractor

intending for the statement to be used by the prime contractor to get the government to pay its

claim."  Id.  In Allison, "the Court interpreted the provision to make a defendant 'answerable for

. . . the natural, ordinary and reasonable consequences of his conduct' but not more."

Honeywell I, 798 F. Supp. 2d at 24 (quoting Allison Engine Co. v. United States ex rel.

Sanders, 553 U.S. at 672).

　　　　　Honeywell argues that the government cannot prove that Honeywell made a false

record or statement to AHI for the purpose of getting a false or fraudulent claim paid or approved

by the government because Honeywell shared its testing data with AHI.  Def. Mot. at 43.

Although the government acknowledges that Honeywell disclosed its testing data to AHI, the

government alleges that Honeywell sent "bad" data to AHI slowly, often in voluminous amounts,

while emphasizing positive data and de-emphasizing and misrepresenting negative data, thereby

evincing the requisite wrongful purpose.  USCSUMF ¶¶ 86-97, 133-36.

　　　　　The government highlights specific evidence which it contends demonstrates that

Honeywell sent "bad" data slowly to AHI.  For example, "[o]n July 24, 2001, Honeywell sent

AHI the same data it had sent to DSM on July 11, 2001, and new Honeywell data showing only

small losses in Z Shield ballistic performance at six hours exposure to 150°F (about 65°C)."

USCSUMF ¶ 86; HRUSCSUMF ¶ 86 (not disputing cited fact).  But the following day,

July 25, 2001, Honeywell generated data "showing a (13.3%) [loss] in Z Shield ballistic

---

[10]　　　　On May 20, 2009, Congress amended the FCA with the Fraud Enforcement and
Recovery Act of 2009 ("FERA").  P.L. 111-21, § 4 at 1625.  Among other changes, FERA
relaxed the intent requirement.  See id.  In a prior ruling, Judge Roberts held that the pre-FERA
intent requirement applied to this action.  Honeywell I, 798 F. Supp. 2d at 19 n. 2.

performance at temperatures comparable to the DSM data (90°C)." Id.  Honeywell did not share

this less favorable data with AHI until October 4, 2001.  Id.  While holding on to this new data

until October, Mr. Greg Herceg, the General Manager for Advanced Fibers and Composites at

Honeywell, sent Mr. Stephen Croskrey, AHI's President, a letter on August 9, 2001 in which he

criticized the methodology behind DSM's research and claimed that Honeywell had found "'no

statistically significant shift' in V-50 values for the 2-week Z Shield test at 70°C (158° F) but

without elevated humidity levels." Id. ¶ 90.  This letter did not mention the July 25, 2001 data

that Honeywell had generated. See id.  On October 4, 2001, Honeywell finally shared the

July 25, 2001 data. Id. ¶ 86.

    The government points to the following evidence which it contends shows that

Honeywell sent voluminous amounts of data to AHI and emphasized only the positive data.  On

October 4, 2001, Honeywell sent AHI a large quantity of data.  HSUMF ¶ 130; USRHSUMF

¶ 130 (not disputing cited fact).  The government asserts that on a conference call discussing this

data, Honeywell again "cherry pick[ed]" and emphasized the positive data.  USRHSUMF ¶ 130.

The government alleges that on September 4, 2001 Honeywell sent favorable data to AHI and

failed to disclose that "at 90°C (without elevated humidity) testing show[ed] Z Shield degrading

substantially more than Zylon." Id. ¶ 129.  The government points out that AHI personnel,

unlike Honeywell personnel, were not scientists, Gov't Opp. at 10, and argues that AHI relied on

Honeywell's scientific expertise.  USCSUMF ¶ 41; see also id. ¶ 42 ("[Honeywell] had much

more sophisticated laboratories, and they had teams of scientists with Ph.D's, you know,

expertise in these matters.") (citing testimony of AHI President Croskrey).  The government also

alleges that "Honeywell knew [AHI] relied on the expertise of Honeywell scientists concerning

Z Shield materials, including their knowledge about Z Shield's ballistic performance and

durability over time and what exposure conditions matter to a ballistic vest's durability."  Id.
¶ 43.

Finally, the government contends that the following evidence shows that
Honeywell de-emphasized negative test data in its communications with AHI, see USCSUMF
¶ 134; USRHSUMF ¶ 174, and misrepresented that Z Shield was safe in real world conditions,
Gov't Opp. at 43.  According to the government, "Croskrey, O'Brien, and Weber each testified
about Honeywell misrepresenting that Z Shield remained safe at environmental levels close to
field use conditions."  Gov't Opp. at 43.  In addition, on January 22, 2003, Honeywell and AHI
held a meeting in which Honeywell shared voluminous amounts of exposure testing data.
USCSUMF ¶ 43.  But just prior to this meeting, Honeywell had an internal meeting at which the
government alleges it developed a plan for disclosing this data.  Id.  Specifically, Honeywell
instructed personnel, "don't draw conclusions" about the data, "keep our tone calm," and
discussed the involvement of "the lawyers" who "are excited to make sure all involved are
covered."  USCSUMF ¶ 134; USRHSUMF ¶ 174.

There is at the very least a factual dispute as to whether the information
Honeywell shared with AHI contained material omissions and whether Honeywell omitted the
most harmful data intending that it would induce the government to pay AHI's claims.  Drawing
reasonable inferences in favor of the government, a finder of fact may infer Honeywell's
wrongful purpose from this evidence.  Honeywell therefore is not entitled to summary judgment
on the government's theory of fraudulent inducement of AHI.

2.   Fraudulent Inducement of the Market

The government alleges that "Honeywell fraudulently induced the larger vest
market (including Government agencies and state, local and tribal authorities) [to] continue to

purchase [Z Shield] vests and [to seek] reimbursement from the United States."  Gov't Supp.

at 13.  Honeywell argues that fraudulent inducement of the market is not legally cognizable and

"its claim based on that theory must fail because DOJ cannot establish materiality or causation."

Def. Reply at 19.

 The False Claims Act is "intended to reach all types of fraud, without

qualification, that might result in financial loss to the Government."  <u>United States ex rel.</u>

<u>Hendow v. Univ. of Phoenix</u>, 461 F.3d 1166, 1170 (9th Cir. 2006) (quoting <u>United States v.</u>

<u>Neifert-White Co.</u>, 390 U.S. 228, 232 (1968)).  Therefore courts "construe the act broadly."

<u>United States ex rel. Campie v. Gilead Scis., Inc.</u>, 862 F.3d at 899.


### a.  <u>Legal Basis</u>

 Honeywell first argues that the government has no legal basis for its fraudulent

inducement of the market claim.  Def. Reply at 19.  In response, the government points to Judge

Roberts' prior rulings in this matter as upholding such a theory.  <u>See</u> Gov't Supp. at 13.  Despite

the government's contentions, the Court's prior rulings do not resolve this issue.  In <u>Second</u>

<u>Chance I</u>, the plaintiff argued that fraudulent inducement theories should not extend to third

parties.  <u>Second Chance I</u>, 128 F. Supp. 3d at 21.  Judge Roberts correctly stated that a

contractual relationship is not necessary under a fraudulent inducement theory.  <u>Id</u>.  Defendant

also argued that the nexus between the government and Toyobo on the BPVGA was "too

attenuated," but the Court declined to resolve this issue because there was an issue of material

fact as to whether Toyobo actually disseminated false information.  <u>Id</u>.  Thus, while Judge

Roberts' decision makes clear that third-party theories are plausible, Judge Roberts did not

resolve whether a theory of fraudulent inducement of the market is viable under the FCA.

Similarly, in <u>Honeywell I</u>, Judge Roberts ruled that the government had adequately pled

fraudulent inducement and denied Honeywell's motion to dismiss, relying in part on the

allegation that "Honeywell had actual knowledge of the falsity of its representations" where

"Honeywell intentionally obscured its Z Shield data, as it 'understood' that the negative data

could have a detrimental impact upon its market share."  Honeywell I, 798 F. Supp. 2d at 23.

This again does not determine whether a theory of fraudulent inducement of the market is viable

under the FCA.

       While Judge Roberts' prior decisions do not resolve this issue, Honeywell is

incorrect in alleging there is no legal basis for a fraudulent inducement of the market claim.

"The legislative history to the 1986 FCA amendments has long made clear that directing fraud at

intermediaries as opposed to government payors, does not break the causal chain of FCA

liability."  S. Rep. No. 99-345, at 21-22 (1986), reprinted in, 1986 U.S.C.C.A.N. 5266, 5286-87.

The government points to two circuit court decisions which upheld claims of fraudulent

inducement "directed at intermediaries in the marketplace rather than government payors of the

claims."  Gov't Supp. at 14 (citing United States ex rel. Nargol v. DePuy Orthopaedics, Inc., 865

F.3d 29, 37 (1st Cir. 2017) (upholding FCA claim in which defendant sold defective versions of

FDA approved device to doctors and patients who sought government reimbursement)); United

States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d at 905 (upholding FCA claim in which drug

manufacturer sold adulterated and misbranded HIV medication to private buyers who sought

government reimbursement).

       Here, the government alleges that "Honeywell fraudulently induced the larger

vest market (including Government agencies and state, local and tribal authorities) that continued

to purchase [Z Shield] vests and sought reimbursement from the United States."  Gov't Supp.

at 13.  Honeywell notes that the government "appears to have abandoned the sweeping and

unprecedented 'fraud on the market' theory of liability it advanced in its [initial briefing]."  Def. Supp. at 12.  In its initial briefing, the government alleged that "Honeywell fraudulently induced the <u>public</u> to keep buying Z Shield vests."  Def. Reply at 43 (emphasis added).  In its supplemental briefing, the government makes clear that its theory only encompasses vest sales to the market for which the government reimbursed.  Gov't Supp. at 13.  Thus, the government alleges a theory similar to that in <u>Nargol</u> and <u>Campie</u> in which sales were made to intermediaries who ultimately sought reimbursement from the government.  The Court rejects Honeywell's contention that fraudulent inducement of the market is not a legally cognizable theory under the FCA.

### b.  <u>Materiality</u>

Honeywell next alleges that the government's fraudulent inducement of the market theory cannot meet the materiality requirement established in <u>Escobar I</u>.  Def. Supp. at 2, 14.  The Supreme Court has explained that materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  <u>Escobar I</u>, 136 S. Ct. at 2002 (citing 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003) (Williston)).  For example, the Supreme Court has held that the FCA's materiality requirement is met when

> the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.  Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

<u>Escobar I</u>, 136 S. Ct. at 2003-04.

Honeywell also relies on Petratos, where a drug manufacturer allegedly submitted false statements to the FDA for drug approval, but after the falsity of these statements was brought to the attention of the FDA, the FDA continued to approve the drug, allowing the Centers for Medicare and Medicaid Services to continue to reimburse Medicare claims for the drug.  United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481, 490 (3d Cir. 2017).  The Third Circuit concluded that the misrepresentation was not material because the government consistently reimbursed claims "with full knowledge of the purported noncompliance."  Id. at 489 ("[I]t is 'very strong evidence' that a requirement is not material 'if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated.'") (quoting Escobar I, 136 S. Ct. at 2003).

In response, the government again cites Nargol, in which the First Circuit reversed the district court's dismissal of an FCA claim.  In Nargol, the defendant allegedly sold defective versions of an FDA approved device directly to doctors and patients, who in turn submitted claims for reimbursement to the government.  United States ex rel. Nargol v. DePuy Orthopaedics, Inc., 865 F.3d at 37.  Unlike the situation in Petratos, in Nargol there was no allegation that the government was aware of the defects in the devices and yet, despite this knowledge, continued to reimburse Medicare claims.  See id.  The government also relies on Campie, in which a drug manufacturer received FDA new drug approval and sold the HIV medication to private buyers who subsequently sought reimbursement from the government. United States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d at 905.  For a time, the manufacturer sold misbranded and adulterated HIV medication, but ultimately returned to selling the FDA approved version of the drug.  Id. at 896.  The government never ceased making payments and reimbursements for the drug, possibly even after it knew of the FDA violation.  Id. at 905.  The

Ninth Circuit ultimately concluded that what the government knew and when was a disputed issue of fact that precluded dismissal of the claim.  Id. at 906-07.  The court in Campie also held that "[m]ere FDA approval cannot preclude False Claims Act liability, especially where, as here, the alleged false claims procured certain approvals in the first instance," noting that "it is not the FDA's purpose to prevent fraud on the government's fisc."  Id. at 905.  The court therefore reversed the dismissal of the FCA claims.  Id.

        The cases can be distilled to the following principles:  If the government knows of a fact and continues to reimburse, that is strong evidence that the fact is not material.  If the government continues to reimburse after a defective product is substituted for an approved product or if the government's actual knowledge of a fact is in dispute, the facts must be established through evidence in order to resolve the issue of materiality, and dismissal of the claim is not appropriate.  Further, government approval or certification cannot be used as a shield from liability, especially where that approval or certification was gained through fraudulent means.

        In this case, neither a GSA MAS award nor NIJ certification and placement on the BVP Consumer Product List immunizes Honeywell from liability under the False Claims Act, because, as alleged here, additional false statements were made to induce buyers to purchase the product.  See United States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d at 905.  To foreclose such a claim under the FCA would erroneously allow the presence of a product on the GSA MAS or BVP Consumer Product List to be used as a shield from fraud liability.  See id. at 906.  Furthermore, there is a substantial factual dispute as to whether the government had "full knowledge of the purported noncompliance."  See United States ex rel. Petratos v. Genentech Inc., 855 F.3d at 489; Section III(B)(3)(c).  Indeed, both GSA's removal of the vests from the

47

MAS and NIJ's removal of the vests from the Consumer Product List once they became aware of the vests' shortcomings suggest that, unlike the situation in Petratos, neither GSA nor NIJ was aware of the negative information.  Thus, Honeywell's contention that the government cannot meet the materiality standard under Escobar I must be rejected.

### c.  Inducement/Causation

Honeywell also argues that the government cannot show causation on its fraudulent inducement of the market claim because (1) Honeywell "never sold a vest [] to anyone, whether in the 'larger vest market' or at any of the government agencies DOJ cites as part of that 'market,'" and (2) the government only pointed to statements made to AHI and not to evidence that Honeywell made any representation to any vest purchasers.  Def. Supp. at 16.  The government argues that it is not foreclosed from showing fraudulent inducement of the market because fraud and false claims may be directed at intermediaries as opposed to government payors.  Gov't Supp. at 15.

"In essence, the essential element of inducement or reliance is one of causation. [The government] must show that the false statements upon which [it] relied . . . caused [it] to award the contract at the rate that it did."  Second Chance I, 128 F. Supp. 3d at 18 (citations omitted); D'Agostino v. ev3, Inc., 845 F.3d 1, 8 (1st Cir. 2016) ("[T]he defendant's conduct must cause the government to make a payment or to forfeit money owed.").  Causation under the FCA requires a showing of proximate cause, United States v. Sci. Applications Int'l Corp., 653 F. Supp. 2d 87, 108 (D.D.C. 2009) (citing United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 200 (D.C. Cir. 1995)), which requires "some direct relation between the

injury asserted and the injurious conduct alleged," Bank of Am. Corp. v. City of Miami, Fla., 137 S. Ct. 1296, 1305 (2017) (internal quotations and citation omitted).[11]

As discussed supra at Section III(B)(2)(a), it is established that the use of intermediaries does not break the causal chain under the FCA.  S. Rep. No. 99-345, at 21-22 (1986), reprinted in, 1986 U.S.C.C.A.N. 5266, 5286-87; United States ex rel. Nargol v. DePuy Orthopaedics, Inc., 865 F.3d at 37 ("This theory—that [the defendant] got FDA approval for a device and then palmed off a defective version of that device both directly on the government itself and on unsuspecting doctors and patients, who then submitted claims for payment to unsuspecting government payors—is a theory of actionable misconduct under the FCA, to which [the First Circuit's decision in D'Agostino v. ev3, Inc.] poses no impediment."); see also United States ex rel. Petratos v. Genentech Inc., 855 F.3d at 492 ("The alleged fraud's effect on physicians is relevant to the extent that it caused claims eventually to reach CMS.").

While, as Honeywell points out, the government does not allege that Honeywell directly made false statements or omissions to vest purchasers, see Def. Supp. at 16, it does allege that Honeywell indirectly made such false statements or omissions to vest purchasers through an intermediary, see Gov't Supp. at 15.  Specifically, the government alleges that

---

[11]        While some judges in this district have previously applied the "but-for" or "substantial factor" test for causation, see United States v. Toyobo Co., 811 F. Supp. 2d 37, 48 (D.D.C. 2011); Miller II, 563 F. Supp. 2d at 119 n. 95, others have applied the more restrictive proximate cause test.  United States v. Sci. Applications Int'l Corp., 653 F. Supp. 2d at 108; United States ex rel. Morsell v. Symantec Corp., Civil Action No. 12-0800, 2020 WL 5651277, at *34 (D.D.C. Mar. 30, 2020).  The D.C. Circuit has given deference to the "more restrictive" test, while also acknowledging the "but-for" test.  United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d at 200.  In Escobar I the Supreme Court stated that "absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses."  Escobar I, 136 S. Ct. at 1999.  Thus, absent other indication, causation under the FCA must refer to the common law understanding in fraud cases, which is proximate cause.  See Escobar I, 136 S. Ct. at 1999; United States v. Luce, 873 F.3d 999, 1009-14 (7th Cir. 2017) (abandoning a but-for test post-Escobar I and adopting a proximate cause test).

Honeywell prepared marketing materials and other information for AHI which were provided to vest purchasers.  See Gov't Opp. at 44; see e.g., USCSUMF ¶ 141 (citing February 26, 2003 email from Dr. Wagner to John Geshay, AHI's director of marketing, with Zylon "talking points" meant for the "public"); HRUSCSUMF ¶ 141 (not disputing cited fact); see also USCSUMF ¶ 146 (citing 2003 Z Shield bulletin "designed to be shown to a police officer during a bid process"); HRUSCSUMF ¶ 146 (not disputing cited fact).  Similarly, while Honeywell only sold vests to AHI, it is undisputed that AHI sold vests, directly and through its subsidiaries to (1) federal government agency purchasers through GSA MAS contracts, HSUMF ¶ 69; USRHSUMF ¶ 69 (undisputed), and (2) "state, local and tribal police with reimbursements paid for by the Federal Government via the BVP Program," USCSUMF ¶ 31; HRUSCSUMF ¶ 31 (undisputed).  This use of AHI as an intermediary does not break the causal chain.  Just as the government can be fraudulently induced through sales and false statements to an intermediary, so too can members of the market.  Thus, Honeywell's contention that the government cannot show inducement or causation must be rejected.

### 3.   Fraudulent Inducement of the United States

As noted supra at Section III(B), fraudulent inducement requires a showing of the following:  (1) a false representation or omission; (2) that the false representation or omission was material, Escobar I, 136 S. Ct. 1989, 2000-02; (3) that the false statement or omission was made with scienter, United States v. DynCorp Int'l, LLC, 253 F. Supp. 3d at 108; and (4) that the party awarding the contract was induced by, or relied on, the fraudulent statement or omission when it awarded the contract, Second Chance I, 128 F. Supp. 3d at 18.

Honeywell argues that there was no false representation or omission because it had no duty to share data with the government, Def. Mot. at 36-37, and because scientific

judgment cannot form the basis of a falsity or omission, Def. Mot. at 39.  Honeywell further

alleges that the government cannot prove materiality, scienter, or inducement.  Def. Mot.

at 32-36.

### a.  False Representation or Omission

#### i.  *Duty to Disclose*

Honeywell argues that it cannot be held liable for fraudulent inducement based on

an omission because it had no duty to share data with the government.  Def. Mot. at 36-37.  The

government contends that Honeywell's partial disclosures created a duty to disclose.  Gov't Opp.

at 37.

"'[M]ere silence does not constitute fraud unless there is a duty to speak.'"

Second Chance IV, 266 F. Supp. 3d at 127 (quoting Intelsat USA Sales Corp. v. Juch-Tech,

Inc., 24 F. Supp. 3d 32, 47 (D.D.C. 2014)) (internal quotations and citations omitted).  As such,

"[t]he False Claims Act does not impose liability for omissions unless the defendant has an

obligation to disclose the omitted information."  United States ex rel. Milam v. Regents of Univ.

of Cal., 912 F. Supp. 868, 883 (D. Md. 1995).

A duty to speak arises "where the 'disclosure of the omitted fact is necessary in

order to make a defendant's affirmative statements not misleading.'"  Second Chance IV, 266 F.

Supp. 3d at 127 (quoting Intelsat USA Sales Corp. v. Juch-Tech, Inc., 24 F. Supp. 3d at 47);

Kapiloff v. Abington Plaza Corp., 59 A.2d 516, 518 (D.C. 1948) ("[U]nder the familiar principle

that when one undertakes to speak, either voluntarily or in response to inquiry, he must not only

state truly what he tells but also must not suppress or conceal any facts within his knowledge

which materially qualify those stated.  If he speaks at all he must make a full and fair

disclosure.").

This principle is illustrated in <u>Second Chance IV</u>, in which "Toyobo knowingly disclosed positive information about Zylon to the government while omitting the most damaging information about Zylon in its possession."  <u>Second Chance IV</u>, 266 F. Supp. 3d at 126. Toyobo's testing data suggested that the cause of the degradation problem was a phosphorous issue.  <u>Id</u>.  Yet, Toyobo disclosed relevant information in "bland, inconclusive language."  <u>Id</u>. Through public statements Toyobo specifically denied that phosphorous was the cause of the degradation and continued to assert that Zylon was appropriate for ballistic use.  <u>Id</u>.  Toyobo also repeatedly emphasized Zylon's performance in conditions of "high temperature," "moisture," and "humidity."  <u>Id</u>. at 127.  This Court found that "[i]n addition to simply downplaying the problem of Zylon degradation, [] Toyobo made several statements to the United States that one could charitably consider partial disclosures, but a jury may find to be outright misdirection," including the fact that "Toyobo failed to mention its December 2001 phosphorous testing data. . . . when a federal scientist indicated he was looking into phosphorus as a potential cause of the degradation."  <u>Id</u>. at 128.  It appeared that Toyobo attempted to divert the federal scientist away from the degradation issue, claiming that it had improved the heat humidity problem, despite no evidence indicating this was true.  <u>Id</u>.  Thus, there were factual questions for a jury to resolve, precluding summary judgment.

The government contends that Honeywell's disclosures to the government have omitted facts necessary to make its statements not misleading.  Honeywell's disclosures to the government and alleged omissions are recounted below.

### a.  2000 – Initial Disclosures

By July 2000, during the commercialization process of Z Shield, Honeywell was aware that moisture could cause "long term damage" to Z Shield and that "[p]hoto/UV [had]

effects on Shield performance."  USCSUMF ¶¶ 12-13; HRUSCSUMF ¶¶ 12-13 (not disputing

cited fact).  Yet, during a July 21, 2000 meeting with government representatives, Honeywell

represented that Z Shield performed better than Spectra Shield and other Honeywell Shield

products.  USCSUMF ¶ 55; HRUSCSUMF ¶ 55 (not disputing cited fact).  During a

November 3, 2000 meeting, Honeywell also provided the government with its testing of the

"Hybrid Vests" configuration, "to show what Z Shield could do ballistically."  USCSUMF ¶ 56;

HRUSCSUMF ¶ 56 (not disputing cited fact).  Honeywell also provided a "Ballistic

Performance" chart comparing ballistic materials, including Z Shield.  USCSUMF ¶ 56;

HRUSCSUMF ¶ 56 (not disputing cited fact).  Despite these disclosures to government

representatives about the superiority of Z Shield, Honeywell made no mention at either meeting

of the Z Shield technical risks identified during the commercialization process. USCSUMF

¶¶ 55-56; HRUSCSUMF ¶¶ 55-56 (not disputing cited fact).

### b. 2001 – Data, Government Request, and Initial Meeting

By 2001, Honeywell became aware, through data provided by DSM and through

Honeywell's own testing, that heat and humidity negatively impacted Z Shield's performance.

See HSUMF ¶¶ 105-06 (July 6, 2001 DSM data provided to Honeywell showing Z Shield

samples subjected to continuous oven aging with no humidity control resulted in V-50 ballistic

losses of approximately 20% after 2 weeks at 70°C and approximately more than 20% at 90°C

after approximately 20 days); USRHSUMF ¶¶ 105-06 (undisputed); see also USCSUMF ¶ 82

(July 18, 2001 data showing Z Shield shoot packs performed far worse than woven Zylon,

Spectra, and Goldflex shoot packs which lost 13.2% ballistic stopping power after 1 week

at 90°C); HRUSCSUMF ¶ 82 (not disputing cited fact); see also USCSUMF ¶ 102 (Dr. Wagner

concluded "prolonged exposure to high heat and humidity will compromise vest performance"

based on September 2001 V-0 testing that had experienced complete penetrations for two Z

Shield containing vests after 4 weeks at 70°C, 80% Relative Humidity ("RH")); HRUSCSUMF

¶ 102 (not disputing cited fact); see also USCSUMF ¶ 95 (September 3, 2001 DSM data

provided to Honeywell showing Z Shield V-50 ballistic losses of more than 25% after 8 weeks

at 70°C and uncontrolled humidity); HRUSCSUMF ¶ 95 (not disputing cited fact); Gov't Opp.,

Ex. 87 [Dkt. No. 209-11] (September 3, 2001 fax from DSM to Honeywell); see also USCSUMF

¶ 100 (September 25, 2001 data showing Z Shield shoot packs lost 17% in V-50 stopping power

after 4 weeks at 70°C, 80% RH); HRUSCSUMF ¶ 100 (not disputing cited fact); see also

USCSUMF ¶ 104 (September 26, 2001 data showing Z Shield lost 12.6% in V-50 stopping

power after 4 weeks "at 70°C, 80% RH"); HRUSCSUMF ¶ 104 (not disputing cited fact); see

also USCSUMF ¶ 109 (November 2001 testing on multiple new vest models made with Z Shield

showing V-50 ballistic losses of 8-14.3% after 4-8 weeks at 70°C, 80% RH); HRUSCSUMF

¶ 109 (undisputed); see also USCSUMF ¶ 114 (December 3, 2001 data showing Z Shield, as

compared to the control vest which increased in ballistic stopping power, experienced an 8%

ballistic loss for 4 weeks at 40°C, 70% RH); HRUSCSUMF ¶ 114 (not disputing cited fact).

Specifically, "[b]y August 7, 2001, Honeywell knew that, unlike Spectra Shield, Z Shield

absorbed water when exposed to humidity."  USCSUMF ¶ 89; HRUSCSUMF ¶ 89 (not

disputing cited fact).  This was internally considered to be "not good news!"  USCSUMF ¶ 89;

HRUSCSUMF ¶ 89 (not disputing cited fact).

   On November 29, 2001, the government contacted Honeywell requesting

information specifically on "ballistic materials subject to temperatures from -25°C to +100°C

both dry and with humidity at saturation."  USCSUMF ¶ 203; HRUSCSUMF ¶ 203 (not

disputing cited fact); Gov't Opp., Ex. 187 [Dkt. No. 209-18] (Nov. 29, 2001 letter from Lesko to

Murray).  Rather than provide data or disclose Honeywell's concern about light and moisture, Honeywell responded with a series of questions about the study and its potential impact on Honeywell.  USCSUMF ¶ 206; HRUSCSUMF ¶ 206 (not disputing cited fact); Gov't Opp., Ex. 194 [Dkt. No. 209-18] (Apr. 9, 2002 letter from Tekne to Honeywell).  Even after the government answered all fourteen questions posed and again requested information, Honeywell still did not provide any of its data.  See USCSUMF ¶¶ 206-07; HRUSCSUMF ¶¶ 206-07 (not disputing cited fact); Gov't Opp., Ex. 194 (Apr. 9, 2002 letter from Tekne to Honeywell).

Rather than provide data in response to this request, Honeywell requested to meet with representatives of the government.  As a result, Honeywell participated in five meetings with government representatives.  See HSUMF ¶ 289 (Mar. 20, 2002 meeting); USRHSUMF ¶ 289 (undisputed); see also HSUMF ¶ 308 (Oct. 22, 2002 meeting); USRHSUMF ¶ 308 (not disputing cited fact); see also HSUMF ¶ 310 (May 22, 2003 meeting); USRHSUMF ¶ 310 (undisputed); see also HSUMF ¶ 323 (Nov. 19, 2003 meeting); USRHSUMF ¶ 323 (undisputed); see also HSUMF ¶ 340 (May 6, 2004 meeting); USRHSUMF ¶ 340 (not disputing cited fact).  It is disputed whether any data was disclosed at these meetings.  Compare USCSUMF ¶ 232, with HSUMF ¶ 294.  But at no point during these meetings did Honeywell disclose to the government its concerns about the threat of moisture to water-based Z Shield, see USCSUMF ¶ 13, HRUSCSUMF ¶ 13 (not disputing cited fact), or that Z Shield absorbed water when exposed to humidity, see USCSUMF ¶ 89, HRUSCSUMF ¶ 89 (not disputing cited fact).  Nor did Honeywell correct its prior assertions that Z Shield performed better than Spectra Shield and other Honeywell Shield products, see USCSUMF ¶ 55; HRUSCSUMF ¶ 55 (not disputing cited fact), despite its knowledge that Z Shield shoot packs degraded more rapidly than woven Zylon, Spectra, and Goldflex shoot packs, see USCSUMF ¶ 82, HRUSCSUMF ¶ 82 (not disputing cited

fact); USRHSUMF ¶ 129.  Instead, Honeywell continued to emphasize the superiority of Z

Shield at the March 20, 2002 meeting, stating that Z Shield had "higher performance" and

"lower back face trauma," and "long term performance."  USCSUMF ¶ 219 (quoting Gov't

Opp., Ex. 193 [Dkt. No. 209-18] (Mar. 20, 2002 PowerPoint)); HRUSCSUMF ¶ 219 (not

disputing cited fact).

    Although Honeywell disclosed that it was conducting accelerated aging testing on

Z Shield and observed some environmental effects, and that Z Shield was degrading after

exposure to high heat and humidity, HSUMF ¶ 291, Dr. Ward of Honeywell allegedly

"downplayed" this problem by stating the impact would be less in real world conditions, see

USRHSUMF ¶ 291; Gov't Opp., Ex. 248 [Dkt. No. 209-21] (meeting notes of Dr. Wagner state

"impact less significant [at] closer to reality").  Dr. Lori Wagner, Honeywell's lead scientist,

testified in her deposition that she understood the "impact would be less with temperatures and

humidity closer to reality."  Gov't Opp., Ex. 281 [Dkt. No. 209-25] at 122:20-2 (July 29, 2014 J.

Ward Tr.).

### c. 2002 – Data and Additional Meetings

    By May 31, 2002, Honeywell testing showed four complete penetrations of the

armor for one-year old vests from Florida.  USCSUMF ¶ 124; HRUSCSUMF ¶ 124 (not

disputing cited fact).  Notably, one of these penetrations had a back face measurement of 66mm,

which exceeded the NIJ Standard requirement of 44mm.  USCSUMF ¶ 124; HRUSCSUMF

¶ 124 (not disputing cited fact) (explaining NIJ requirement was designed "to reduce blunt force

injuries to the wearer such as bruising and abrasions").

    Also, by May 2002, Honeywell had conducted cyclic exposure testing in high

heat and humidity which continued to show significant declines in ballistic stopping power.  See

USCSUMF ¶ 121; HRUSCSUMF ¶ 121 (not disputing cited fact) (May 2002 data showing

samples declined 8.1% with cyclic exposure and 13.6% with continuous exposure over 24

weeks); see also USCSUMF ¶ 121; (May 2002 data showing vest declined 12% with cyclic

exposure over 24 weeks); HRUSCSUMF ¶ 121 (not disputing cited fact); see also USCSUMF

¶ 121; (May 2002 data showing 84.9% with continuous exposure vs. 86.3% with cyclic exposure

after 52 weeks); HRUSCSUMF ¶ 121 (not disputing cited fact); see also USCSUMF ¶ 123;

(December 2002 data showing Z Shield lost 15.1% V-50 after continuous exposure, and 13.7%

V-50 after cyclic exposure after 52 weeks at 40°C, 70% RH); HRUSCSUMF ¶ 123 (not

disputing cited fact).

       In addition to this testing of water-based Z Shield, by May 2002 Honeywell had

data showing that the Z Shield made with non-water (solvent) based resin performed better in

heat and humidity.  USCSUMF ¶ 121; HRUSCSUMF ¶ 121 (not disputing cited fact) (May 2002

data showing 89.2% V-50 retention of solvent-based resin and 83.5% V-50 retention for

commercial Z Shield after 4 weeks at 70°C, 80% RH).  Honeywell ultimately filed a patent for

this non-water-based Z Shield in December 2004.  USCSUMF ¶ 188; HRUSCSUMF ¶ 188 (not

disputing cited fact).

       Honeywell did not disclose any of this troubling information about water-based Z

Shield or that one of its one-year old vests from Florida had experienced four complete

penetrations.  Instead, in a July 15, 2002 letter to Tekne, a contractor engaged by the government

to conduct testing on body armor, Dr. Wagner said that Zylon and two other fiber families were

"excellent ballistic protection materials advancing protection to new levels."  Gov't Opp.,

Ex. 196 [Dkt. No. 209-18] (July 12, 2002 email from Wagner to Murray, Honeywell's ballistics

facility manager).

Honeywell continued to have meetings with government representatives in which it generally discussed its testing but never disclosed any actual data or its specific concerns about Z Shield.  See HSUMF ¶¶ 307-08; USRHSUMF ¶¶ 307-08 (not disputing cited fact).  The May 22, 2003, meeting minutes reflect that "NIJ [was] interested in any help Honeywell [could] provide which may accelerate the education of this issue so that they will be able to address it faster."  USRHSUMF ¶ 311 (quoting Gov't Opp., Ex. 200 [Dkt. No. 209-18] at HW0062255-62259 (June 11, 2003 email from Murray to Wagner re May 22, 2003 NIJ Meeting Minutes)).  At this meeting, Honeywell alleges that it told government representatives that it was doing exposure testing and had observed some degradation to Zylon and Z Shield after exposing materials to elevated heat and humidity levels.  HSUMF ¶¶ 311-12; USRHSUMF ¶¶ 311-12 (disputing that Honeywell shared its testing results).  Yet, Honeywell did not disclose its knowledge of the threat of moisture to water-based Z Shield, see USCSUMF ¶ 13; HRUSCSUMF ¶ 13 (not disputing cited fact), or water absorption when exposed to humidity, see USCSUMF ¶ 89; HRUSCSUMF ¶ 89 (not disputing cited fact).  There is also no evidence that Honeywell attempted to correct Dr. Wagner's prior assertion to Dr. Ward that the impact of Honeywell's accelerated aging testing would be less with temperatures and humidity closer to real world conditions.  See HRUSCSUMF ¶ 221.  In addition, Honeywell did not disclose the May 2002, Penetration Data which showed that a vest used in the real world experienced four complete penetrations, one of which specifically failed NIJ standards.  USCSUMF ¶ 124; HRUSCSUMF ¶ 124 (not disputing cited fact).  As a result, the government thought that the degradation was not an issue because the temperatures achieved in testing would not occur in real world conditions.  By not providing actual data, Honeywell prevented the government from

learning that these temperatures could occur in real world conditions, and thus prevented it from realizing that the degradation was a serious issue.

### d. 2003 – Comparative Testing and Meetings

By 2003, Honeywell had completed comparative testing of its ballistic materials, which included testing under "combined conditions of 40°C [104°F] / 70% relative humidity involving exposure periods of 4, 8, 16, and 28 weeks." USRHSUMF ¶ 178.[12]  According to the government, the results showed Z Shield performed "by far [] the worst of all the ballistic fabrics tested." USCSUMF ¶ 149.

Honeywell met with representatives of the government again on November 19, 2003, and May 6, 2004.  See HSUMF ¶ 323 (Nov. 19, 2003 meeting); USRHSUMF ¶ 323 (undisputed); see also HSUMF ¶ 340 (May 6, 2004 meeting); USRHSUMF ¶ 340 (not disputing cited fact).  The government states, and Honeywell does not dispute, that Honeywell did not share the results of the August 2003 comparative testing data at either meeting.  USCSUMF ¶ 149; HRUSCSUMF ¶ 149 (not disputing cited fact).  Nor does Honeywell allege that it provided government representatives with its 2001 and 2002 negative Z Shield data, its general safety concerns about Z Shield, or correct its prior statements that Z Shield was the "best" ballistic material.  See HSUMF ¶¶ 326, 340.

### e. 2003 Technical Bulletin

Honeywell prepared a technical bulletin in the fall of 2003, which was distributed at trade shows, used by AHI sales force, and provided to Honeywell's government relations

---

[12]        The results of the 2003 comparative testing were compiled into a report, the circumstances of which are disputed.  Compare HSUMF ¶¶ 179-85, with USRHSUMF ¶¶ 179-85.  Dr. Wagner testified that parts of the report were erroneous.  HSUMF ¶ 185.

office.  USCSUMF ¶ 163; HRUSCSUMF ¶ 163 (not disputing cited fact).  The technical bulletin included a warehouse data chart which showed 100% retention of ballistic capabilities. USCSUMF ¶ 167; HRUSCSUMF ¶ 167 (not disputing cited fact).  The bulletin further stated that "there has been no loss of ballistic performance over a three-year time period when stored in an uncontrolled warehouse environment," and that based on this data "there is no significant anticipated change in the ballistic performance response of the Z Shield® material for the five year suggested lifespan of most ballistic resistant vests assuming proper care and use."  Gov't Opp., Ex. 147 [Dkt. No. 209-14] at HW0024447 (Oct. 29, 2003 email from Swinger to Bruco); USCSUMF ¶ 167; HRUSCSUMF ¶ 167 (not disputing cited fact).

The government contends that not only did the bulletin fail to disclose important data showing a 15% drop in V-50 after one year of exposure at conditions at 40°C, 70% RH, USCSUMF ¶¶ 164, 174, but also that that Honeywell "had to manipulate" data in the bulletin, id. ¶ 168.  Specifically, the government alleges that Honeywell manipulated data by: (1) "comparing different lots of Z Shield from different time periods;" (2) "using testing from a noncommercial roll of Z Shield that had a lower resin content," and (3) "primarily relying on data generated on DSM-manufactured material rather than the marginal FMS material it had been selling for more than a year and a half at the time the technical bulletin was published."  Id. ¶ 168.

A recitation of these largely undisputed facts leads to but one conclusion:  there are material issues of fact as to whether Honeywell's disclosures were misleading and omitted necessary facts to make its affirmative statements not misleading.  These are questions for the finder of fact, not for summary judgment.

## ii. *Scientific Judgment*

Honeywell argues that the government's fraudulent inducement theory is faulty because it is based on disagreements over scientific judgment.  Def. Mot. at 39.  As noted in the Court's ruling on Honeywell's motion to dismiss, "mere disagreements over scientific opinion, methodology, and judgments do not amount to claims under the FCA."  Honeywell I, 798 F. Supp. at 23 (citing United States ex rel. Harris v. Bernad, 275 F. Supp. 2d 1, 6 (D.D.C. 2003)); see also United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 87 (1st Cir. 2012) ("[E]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false.") (internal quotations and citations omitted); United States ex rel. Milam v. Regents of Univ. of California, 912 F. Supp. at 886 ("At most, the Court is presented with a legitimate scientific dispute, not a fraud case.  Disagreements over scientific methodology do not give rise to False Claims Act liability.").

As Judge Roberts already concluded, however, the government in this case "alleges not merely objective scientific disagreement as to the findings of the various tests Honeywell conducted, but Honeywell's bad faith in selectively disclosing those findings." Honeywell I, 798 F. Supp. 2d at 24; see also Advanced Tech. Corp. v. Instron, Inc., 66 F. Supp. 3d 263, 271 (D. Mass. 2014) ("[I]ssues of continued scientific debate are protected, so long as non-fraudulent data is used and the author accurately discloses the data and methodology used to form the conclusions."); United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d at 88 (holding data revisions in scientific research studies presented an issue of fact as to "whether the data was falsified" and was not a matter of scientific judgment).  This is a crucial distinction.

In this case, the government alleges that Honeywell manipulated test data that was shared in its 2003 technical bulletin.  USCSUMF ¶ 168.  The government also alleges that

Honeywell failed to disclose information, such as Dr. Wagner's concern about Z Shield's performance under "extreme conditions."  USCSUMF ¶ 102; Gov't Opp., Ex. 90 [Dkt. No. 209-11] (Sept. 25, 2001 email from Wagner to Herceg).  While Dr. Wagner's concern is a matter of scientific judgment, the failure to disclose this judgment, as alleged by the government, could be construed by the factfinder as an act of bad faith.  See Honeywell I, 798 F. Supp. 2d at 24.  Such bad faith omissions can form the basis of an FCA claim.  Id.

In addition, the government alleges instances of falsity that are not attributed to scientists.  See Gov't Opp. at 40 ("[N]on-scientists, like Herceg and Swinger, misrepresented Z Shield").  For example, a non-scientist was responsible for the final 2003 technical bulletin which omitted certain negative test data and kept only positive test data.  USCSUMF ¶ 166.  In fact, this decision ran counter to the judgment of a scientist, who originally opted to include some of the negative test data.  Id. ¶¶ 165-66.  These omissions and selective disclosures of scientific opinion and judgment by non-scientists are not shielded from scrutiny under the FCA. Whether there were such failures to disclose information and whether Honeywell acted in bad faith are questions of fact for the jury.

b.  Materiality

i.  Disputed Data

Honeywell argues that the government cannot prove that the disputed test data was material because (1) the government knew that Honeywell possessed data related to the performance of its Z Shield product, and (2) the government knew that data from Honeywell and others showed declines in performance.  Def. Mot. at 33-34.  Honeywell maintains that the data was not material because government representatives decided they did not want or need this data and continued to purchase vests containing Z Shield.  Id.

62

As discussed <u>supra</u> at Section III(B)(2)(b), the Supreme Court has explained that materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." <u>Escobar I</u>, 136 S. Ct. at 2002 (citing 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003) (Williston)).  In <u>United States ex rel. Scutellaro v. Capitol Supply, Inc.</u>, this Court found that there were disputed issues of material fact where the GSA gave "mixed signals . . . as to whether the impliedly false certifications were material." <u>United States ex rel. Scutellaro v. Capitol Supply, Inc.</u>, Civil Action No. 10-1094, 2017 WL 1422364, at *21 (D.D.C. Apr. 19, 2017) (denying summary judgment where "GSA employees in New York were sending the defendant regular notices for contract breaches," while GSA's regional office gave the defendant "'exceptional' ratings on its report cards").  As described below, the record in this case reflects just such mixed signals from the government.

On the one hand, at the November 29, 2001 meeting, government representatives explicitly expressed interest in any information Honeywell could provide related to Zylon and Z Shield.  HSUMF ¶ 286; USRHSUMF ¶ 286 (undisputed); Gov't Opp., Ex. 187 [Dkt. No. 209-18] (Nov. 29, 2001 letter from Lesko to Murry).  When Honeywell's ballistics facility manager, Dr. Lin Murray, responded on February 15, 2002 to Tekne's request for information, she did not provide any information; rather, she posed a series of fourteen questions.  USRHSUMF ¶ 287; Gov't Opp., Ex. 192 [Dkt. No. 209-18] (Feb. 19, 2002 email from Murray to Lesko et al.).  A government representative responded by answering all fourteen of Dr. Murray's questions and clarified the type of data the government was seeking.  Gov't Opp., Ex. 194 [Dkt. No. 209-18] (Apr. 9, 2002 letter from Tekne to Honeywell).  Honeywell did not provide the information, and instead began requesting meetings with government representatives.

Government representatives met with Honeywell five times to obtain the requested information.  See HSUMF ¶ 289 (Mar. 20, 2002 meeting); USRHSUMF ¶ 289 (undisputed); see also HSUMF ¶ 308 (Oct. 22, 2002 meeting); USRHSUMF ¶ 308 (not disputing cited fact); see also HSUMF ¶ 310 (May 22, 2003 meeting); USRHSUMF ¶ 310 (undisputed); see also HSUMF ¶ 323 (Nov. 19, 2003 meeting); USRHSUMF ¶ 323 (undisputed); see also HSUMF ¶ 340 (May 6, 2004 meeting); USRHSUMF ¶ 340 (not disputing cited fact).  Despite these repeated meetings, it is disputed whether Honeywell ever provided any data to the government.  Compare USCSUMF ¶ 232, with HSUMF ¶ 294.  For example, Dr. Wagner has testified that she shared actual data at the March 2002 meeting, see HSUMF ¶ 223; USRHSUMF ¶ 220 (not disputing cited fact); USCSUMF ¶ 220, while Dr. Ward testified that she did not recall any data being shared, USCSUMF ¶ 221; HRUSCSUMF ¶ 221 (not disputing cited fact).  Further, at the May 22, 2003 meeting, the government alleges that Honeywell did not provide any data, USCSUMF ¶ 232, despite the fact that NIJ represented that it was "interested in any help Honeywell [could] provide which may accelerate the education of this issue so that they will be able to address it faster,'"  USRHSUMF ¶ 311 (quoting Gov't Opp., Ex. 200 [Dkt. No. 209-18] (June 11, 2003 email from Murry to Wagner)).

On the other hand, despite these examples of genuine interest, the record also reflects instances in which government representatives seemed less than enthusiastic about obtaining data from Honeywell.  For example, Honeywell points to a March 21, 2002 email in which the Tekne Group agreed that "'[Honeywell's] participation would not necessarily be in the best interests of [the Tekne] program, and that [Honeywell's] information, or lack of it, would not hinder the progress in any way.'"  HSUMF ¶ 295 (quoting Def. Mot., Ex. 196 [Dkt. No. 204-11] (Mar. 21, 2002 email from Lightsey to Rice)).  Thus, Honeywell argues, the data

could not have been material if Tekne believed the lack of information would not hinder Tekne's work.

The government puts a different spin on Mr. Lightsey's email, arguing that Mr. Lightsey's statement that Honeywell's "information, or lack of it, would not hinder the progress in any way," only "reflected his frustration with Honeywell's faux offers of cooperation without any actual help." USRHSUMF ¶ 295. Mr. Lightsey testified that "he believed at the time that the offer was not a serious offer." Gov't Opp., Ex. 268 [Dkt. No. 209-24] at 254:17-19 (Oct. 24, 2014 S. Lightsey Tr.). He further testified that he believed Honeywell's offers of assistance were "precautionary" so Honeywell could "protest [the] results if they [felt] they need[ed] to." Id. at 254:6-8. The government argues that ultimately, Honeywell only offered to share data to "stay 'close' to the [Tekne] study." USRHSUMF ¶ 298; see also id. ¶ 311; Gov't Opp., Ex. 274 [Dkt. No. 209-24] at 321:10-323:20 (July 11, 2013 K. Rice Tr.) (describing "in-person meetings with Honeywell 'as a sort of fishing expedition' in which Honeywell sought to gain information about the Government Zylon study while not providing anything useful about Honeywell's Z Shield work."). But whether a request for information was genuine or a stalling tactic is a question of fact. Only by hearing from witnesses at trial can this matter be resolved.

To be sure, Honeywell openly acknowledged its "'business interest' in the outcome of the [Body Armor Safety Initiative Zylon ('BASI')] study." USRHSUMF ¶ 329; Gov't Opp., Ex. 275 [Dkt. No. 209-24] at 78:19-21 (Dec. 1, 2010 M. Ryan Tr.) ("Certainly, we had a business interest in the outcome of the investigation, and we wanted to participate in that."). The record also reflects Honeywell's attempts to learn more about the Tekne Study. For example, as noted above, in Honeywell's February 15, 2002 email, Dr. Murray asked a series of fourteen questions focused on learning as much as possible about Tekne's work and the

65

"potential negative impact on the marketplace for Z Shield vests." USRHSUMF ¶ 287. She also stated that Honeywell was "very interested in working with" Tekne. Id.; Gov't Opp., Ex. 192 [Dkt. No. 209-18] (Feb. 19, 2002 email from Murray to Lesko et al.).

The record also reflects instances in which government representatives failed to accept Honeywell's offers to share data, even when a representative believed an offer was in fact genuine. For example, on December 3, 2003, Honeywell wrote a letter to Assistant Attorney General Deborah Daniels stating its offer to share data. HSUMF ¶ 329; USRHSUMF ¶ 329 (not disputing cited fact); Def. Mot., Ex. 213 [Dkt. No. 204-11] (Dec. 3, 2003 letter from Ryan (Honeywell) to Asst. Atty. Gen. Daniels). While NIJ Director Sara Hart "thanked Honeywell for its 'offered assistance,' and 'forwarded a copy of [Mr. Ryan's, Honeywell's Vice President and General Manager of Performance Products,] correspondence to the appropriate parties at OJP," HSUMF ¶ 334 (quoting Gov't Opp., Ex. 215 [Dkt. No. 209-19] (Jan. 20, 2004 letter from Hart (NIJ) to Ryan)), there is no record of any other direct response to this letter, see USRHSUMF ¶ 334. The government concedes that the recipients believed this offer was genuine. Id. ¶ 333 (noting the recipients' "assumption of good faith on Honeywell's part").

The initial Tekne request, the Tekne response to the fourteen questions posed by Honeywell, and the repeated meetings are evidence from which a jury could infer the government representatives' genuine interest in Honeywell's data.[13] Balanced against this is evidence of Honeywell's offers to share data that were not accepted and apparent disinterest by

---

[13]     The government contends that Mr. Lightsey "practically begged for Honeywell's Z Shield data and help" when he stated "[w]e are interested in any data available concerning any of your fabric/soft body armor products with respect to environmental testing, particularly for temperature and humidity." Gov't Opp. at 34 (internal quotations and citations omitted). Regardless of whether this statement constitutes begging, this evidence is probative of Tekne's interest in Honeywell data and its willingness to answer questions to get that data.

some government representatives.  At best, the evidence shows mixed signals.  Whether the interest of government representatives was genuine and the offer of data by Honeywell was faux, and ultimately whether the omissions were material, are questions of fact for the jury.  See United States ex rel. Scutellaro v. Capitol Supply, Inc., Civil Action No. 10-1094, 2017 WL 1422364, at *21 (D.D.C. Apr. 19, 2017).

### ii.  *Pop-Up Warning*

Honeywell also argues that pop-up warnings that began appearing on the BVP website in January 2004 "preclude a finding of materiality for purchases through the GSA schedule because government scientists and officials reviewed and approved the pop-up warning before it went on the website."  Def. Mot. at 36.  The pop-up alerts on the BVP website arose from Second Chance's Zylon vest replacement and upgrade program.  It stated that "[c]ertain vests containing Zylon have been subject to a special replacement or upgrade program by their manufacturers, due to a reported degradation of its ballistic qualities under certain environmental conditions."  HSUMF ¶ 241; USRHSUMF ¶ 241(undisputed).  Despite these alerts, BVP continued to reimburse for Zylon and Z Shield containing vests.  Def. Mot. at 36.

The Supreme Court has noted that "[i]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."  Escobar I, 136 S. Ct. at 2003-04.  As the First Circuit subsequently observed, however, "the [Supreme] Court did not state that such knowledge is dispositive."  United States ex rel. Escobar v. Universal Health Servs., Inc. ("Escobar II"), 842 F.3d 103, 110 (1st Cir. 2016) (internal quotations and citations omitted).  The First Circuit explained:  "Courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive."  Id.

(quoting Escobar I, 136 S. Ct. at 2001 ("[M]ateriality cannot rest on a single fact or occurrence

as always determinative") (internal quotations and citations omitted)).  The court concluded that

"the fundamental inquiry is 'whether a piece of information is sufficiently important to influence

the behavior of the recipient.'"  Escobar II, 842 F.3d at 110 (quoting United States ex rel.

Winkelman et al. v. CVS Caremark Corp., 827 F.3d 201, 211 (1st Cir. 2016)).[14]

Furthermore, the First Circuit noted, "[m]ere awareness of allegations concerning

noncompliance with regulations is different from knowledge of actual noncompliance."

Escobar II, 842 F.3d at 112 (holding that actual knowledge was not established where state

regulators had notice of complaints of noncompliance but "did not conclusively discover the

extent of the violations until. . . . well after the commencement of the litigation").  In this case,

knowledge that "certain vests" may have degraded under "certain environmental conditions" is

not the same as knowledge of vest degradation in real world conditions.

Viewing the evidence here in the light most favorable to the government and

conducting a holistic approach to determining materiality, the Court concludes that a jury could

find that the pop-up warning might or might not be material.  See Escobar II, 842 F.3d at 110.

The jury might find that the government did not have actual knowledge of the extent of the

degradation issue; that Honeywell downplayed the degradation issue upon disclosing it to the

government by stating that the degradation impact would not be as significant in real world

conditions; and that Honeywell failed to provide data, despite numerous meetings with

---

[14]     In Escobar II, the First Circuit concluded that the misrepresentation was material
because (1) there was no evidence that claims were paid despite knowledge of the violations;
(2) regulatory compliance was a condition of payment; and (3) the licensing and supervision
requirements were central to the program, went to the very essence of the bargain, and were
strong evidence that failure to comply with the regulations would be sufficiently important to
influence the behavior.  Escobar II, 842 F.3d at 110-11.

government representatives, which would have revealed the extent of the degradation of Z Shield after exposure to high heat and humidity.[15]  In sum, the significance to be accorded the pop-up warning is a question of fact for the jury.

c.  Scienter

Honeywell argues that the government cannot prove that it knowingly withheld data from the government because (1) Honeywell told government representatives that it was conducting in house testing and found that Z Shield's performance degraded after exposure to high heat and humidity, and (2) it repeatedly offered to share test data, but the government failed to follow up to acquire this data.  Def. Mot. at 32-33.

The scienter requirement is met under the FCA if the defendant (i) "has actual knowledge of the information;" (ii) "acts in deliberate ignorance of the truth or falsity of the information;" or (iii) "acts in reckless disregard of the truth or falsity of the information." Escobar I, 136 S. Ct. at 1996 (citing 31 U.S.C. § 3729(b)(1)(A)).

In United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency, the D.C. Circuit concluded that where the defendant disclosed relevant facts to government officials, the plaintiff failed to establish knowledge (or reckless disregard) of falsity.  United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency, 530 F.3d 980, 984 (D.C. Cir. 2008).  There, the defendant "specifically brought the 1993 refund [the source of the dispute] to HUD's attention" and there was "no evidence HUD expressed any concerns and, in fact, HUD continued (and

---

[15]     This same pop-up warning argument was raised by defendants in Second Chance I.  See Defendant Toyobo's Motion for Partial Summary Judgment, Second Chance I, Civil Action No. 07-1144, [Dkt. No. 95-1] at 28 (June 24, 2013).  While the Court did not specifically address the advertisement in its ruling, the Court ultimately allowed the government's claim to proceed under both the GSA and BVP.  Second Chance I, 128 F. Supp. 3d 1.

continues) to pay."  Id.  In such circumstances "it seems that the claimant has not 'knowingly'

presented a false claim."  Id. (quoting United States ex rel. Totten v. Bombardier Corp., 380

F.3d 488, 496 (D.C. Cir. 2004)).

Other courts have pointed out that a government official's knowledge of the false

information, by itself, does not disprove that a defendant knowingly or recklessly presented a

false claim.  See United States ex rel. Hagood v. Sonoma Cty. Water Agency, 929

F.2d 1416, 1421 (9th Cir. 1991) ("That the relevant government officials know of the falsity is

not in itself a defense."); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442

(E.D.N.Y. 1995) (holding government knowledge of the fraud and continued payment did not

disprove that defendants knowingly caused false claims to be presented to the government).

Honeywell argues that it told the government that it was conducting in house

testing and had found that Z Shield's performance degraded after exposure to high heat and

humidity and repeatedly offered to share test data.  Def. Mot. at 32.  The government responds

that Honeywell was less than forthcoming and that:  (1) Honeywell downplayed the little

information it shared; (2) Honeywell never disclosed the source of the degradation

problem; (3) Honeywell never shared any actual data; (4) its offers to share data were faux,

Gov't Opp. at 32; USRHSUMF ¶¶ 290-91; and (5) when the deficiencies were recognized

payments by the government ceased.  Gov't Opp. at 35.  These all are disputes of fact which

cannot be resolved on summary judgment.

As discussed supra at Section III(B)(3)(a)(i)(c), Honeywell asserts that at a

meeting with government representatives, it disclosed that it was exposing Z Shield to conditions

of high heat and humidity which resulted in "some degradation" to Z Shield, and it was

conducting accelerated aging tests of Z Shield which resulted in "some environmental effects."

HSUMF ¶¶ 289-91.  But, the government alleges that Honeywell downplayed the degradation problem by stating that the impact would be less at temperatures and humidity closer to reality, USRHSUMF ¶ 291, leading the government to believe the degradation was not as significant in real world conditions.  See Section III(B)(3)(a)(i)(b)-(c).

As discussed supra at Section III(B)(3)(a)(i)(a), by July 2000 Honeywell was aware of the safety "threat" of moisture to water-based Z Shield.  USCSUMF ¶ 13; HRUSCSUMF ¶ 13 (not disputing cited fact).  Also, by 2001, Honeywell was aware of the negative impact of humidity on Z Shield.  See USCSUMF ¶ 102; HRUSCSUMF ¶ 102 (not disputing cited fact).  Specifically, "[b]y August 7, 2001, Honeywell knew that, unlike Spectra Shield, Z Shield absorbed water when exposed to humidity."  USCSUMF ¶ 89; HRUSCSUMF ¶ 89 (not disputing cited fact).  The government asserts that Honeywell did not disclose this at any of the meetings with government representatives despite specific requests for such information.  See, e.g., Gov't Opp., Ex. 200 [Dkt. No. 209-18] (meeting minutes, taken by Dr. Murray, reflect that NIJ was "still trying to understand what high temperature [and] high humidity levels of exposure represent in regards to accelerated aging . . . [and they were] interested in any help Honeywell can provide which may accelerate the education of this issue so they will be able to address it faster.").

The government disputes that any actual data was shared at the meetings between Honeywell and the government.  See e.g., USRHSUMF ¶¶ 307-09, 323-26.  For example, it is disputed whether Honeywell provided any data at a meeting between the government and Honeywell that occurred on March 20, 2002.  Compare HSUMF ¶ 294 (Dr. Wagner,

"'specifically recall[ed] giving [Dr. Ward] actual data relating to Z Shield.'")[16] (citing Def. Mot.,

Ex. 73 [Dkt. No. 204-8] at 600:3-6 (Dec. 17, 2014 L. Wagner Tr.)) with USRHSUMF ¶ 291

(stating Dr. Ward did not recall receiving any data and her notes did not reflect receiving any

data) (citing Gov't Opp., Ex. 281 [Dkt. No. 209-25] at 346:1-10, 357:3-16 (July 30, 2014, J.

Ward Tr.)).

        The government also contends that any offers by Honeywell to share data with

government representatives were not genuine.  As discussed at length supra at

Section III(B)(3)(a)(i), Honeywell participated in five meetings with government representatives,

see HSUMF ¶ 289 (Mar. 20, 2002 meeting); USRHSUMF ¶ 289 (undisputed); see also HSUMF

¶ 308 (Oct. 22, 2002 meeting); USRHSUMF ¶ 308 (not disputing cited fact); see also HSUMF

¶ 310 (May 22, 2003 meeting); USRHSUMF ¶ 310 (undisputed); see also HSUMF ¶ 323

(Nov. 19, 2003 meeting); USRHSUMF ¶ 323 (undisputed); see also HSUMF ¶ 340

(May 6, 2004 meeting); USRHSUMF ¶ 340 (not disputing cited fact), and the government

alleges no data was disclosed at any of these meetings, USCSUMF ¶ 232.

        The government stopped making payments or reimbursements for vests

containing Z Shield in or about 2005.  See Gov't Opp. at 35 ("Indeed, once GSA learned of

Zylon's safety problems from the NIJ advisory, it removed all Zylon (including Z Shield) vests

from the MAS.  BVP also stopped subsidizing Zylon-containing vests upon NIJ's removal of

them from the compliance list."); see also USCSUMF ¶ 199 (explaining NIJ removed all Zylon

containing vests from its Consumer Product List in August 2005); HRUSCSUMF ¶ 199

---

[16]    The government points out that Dr. Ward's testimony has been inconsistent on
this point.  USRHSUMF ¶ 293 (noting other testimony in which Dr. Ward did not recall
disclosing data).

(undisputed); see also USCSUMF ¶ 237 (explaining GSA removed all Zylon containing vests

from its MAS contracts in October 2005); HRUSCSUMF ¶ 237 (undisputed).

    To state what should be obvious, the issue of scienter in this case is disputed; it

cannot be resolved on summary judgment.  It is for a finder of fact to determine whether

Honeywell was or was not sufficiently forthcoming with information and offers of information

so as to negate the inference that it knew the claims were false.


        d. Inducement/Causation

    As discussed supra at Section III(B)(2)(c), "an essential element of inducement is

causation.  [The government] must show that the false statements upon which [it] relied . . .

caused [it] to award the contract at the rate that it did."  Second Chance I, 128 F. Supp. 3d at 18

(citations omitted); see also D'Agostino v. ev3, Inc., 845 F.3d at 8 ("[T]he defendant's conduct

must cause the government to make a payment or to forfeit money owed.").

    Causation under the FCA requires a showing of proximate cause.  United States v.

Sci. Applications Int'l Corp., 653 F. Supp. 2d at 108 (citing United States ex rel. Schwedt v.

Planning Research Corp., 59 F.3d at 200).  "[P]roximate cause [] requires some direct relation

between the injury asserted and the injurious conduct alleged."  Bank of Am. Corp. v. City of

Miami, Fla., 137 S. Ct. at 1305 (internal quotations and citation omitted).  Under this standard,

"a defendant is liable [] 'for those damages that arise because of the falsity of the claim, i.e., . . .

those damages that would not have come about if the defendant's misrepresentations had been

true.'"  United States v. Sci. Applications Int'l Corp., 653 F. Supp. 2d at 108 (quoting United

States ex rel. Schwedt v. Planning Research Corp., 59 F.3d at 200).

Honeywell alleges that the government cannot prove causation as to (1) vests sold via GSA MAS contracts or (2) vests reimbursed for under the BVP reimbursement program. Def. Mot. at 34-46.

### i.  *GSA – Stoker Declaration*

In Second Chance IV, the Court relied on the declaration of Kellie Stoker, a GSA employee, to show causation for vests sold via the GSA MAS contract.  Second Chance IV, 266 F. Supp. 3d at 130-31.  In Second Chance I, Judge Roberts initially held that because GSA personnel relied on pricing issues and did not require the submission of data with contract modifications, it could not have relied on Toyobo's manipulated data.  Second Chance I, 128 F. Supp. 3d at 19.  Upon a motion to reconsider, this Court ruled that the Stoker declaration created a triable issue of fact.  The Court cited the relevant parts of the Stoker Declaration as follows:

> Stoker attests that "[i]f GSA had been provided in 2001 with Toyobo documents showing the extent of Zylon's degradation, GSA would have provided those documents to agencies within the United States . . . for a scientific interpretation of the data to determine whether any Zylon-containing vests should remain on the GSA MAS schedule."  She further states that "[i]f GSA had known that Zylon was defective in bulletproof vests prior to 2005, GSA would have removed all Zylon-containing vests from the GSA MAS schedule whenever that fact was determined by [government agencies], but could have also done so earlier than 2005 if Zylon Vest Manufacturers had voluntarily recalled their defective products."  She also claims that the fact that Zylon "degrades unpredictably and quickly over time . . . and makes vests containing it defective was material to GSA's decision to remove Zylon-containing vests from the GSA MAS contracts with Zylon vest manufacturers."

Second Chance IV, 266 F. Supp. 3d at 130 (quoting Second Stoker Declaration ¶¶ 12-16) (internal citations omitted).  While it is true that the Court in Second Chance IV only made findings as to Toyobo's data, Second Chance IV, 266 F. Supp. 3d at 123-24, the same logic

applies to Honeywell's data.  The Stoker Declaration creates the same triable issue of fact here as to whether the fraudulent data influenced the GSA's decision.[17]

While the Court in Second Chance IV did not specify whether it used the but for or the proximate cause test for causation, see Second Chance IV, 266 F. Supp. 3d at 129, the Stoker Declaration creates a triable issue of fact as to causation under the stricter standard now adopted because there is a "direct relation between the injury asserted and the injurious conduct alleged.'"  Bank of Am. Corp. v. City of Miami, Fla., 137 S. Ct. at 1305.  Here, Honeywell's alleged misrepresentation about the quality of Z Shield and its failure to provide the negative test data, see Section III(B)(3)(a)(i), are directly related to the injury asserted – the payments made by the government for vests that contained Z Shield, see Section III(C)(1).  A jury may reasonably conclude that there would not be any damage to the government if Honeywell's misrepresentations had been true.  See United States v. Sci. Applications Int'l Corp., 653 F. Supp. 2d at 108.

Honeywell argues this Court should disregard the Stoker Declaration, but offers no reason why the Court should distinguish the present case from Second Chance IV.  Rather, Honeywell attempts to relitigate this issue with a single statement, arguing that "[w]hatever her procurement qualifications, Stoker is not qualified to opine about what other agencies might have done."  Def. Mot. at 35.  Whether Ms. Stoker's qualifications and opinion are persuasive is a question of fact for the jury.  See Second Chance IV, 266 F. Supp. 3d at 131 ("It will be the

---

[17]    Honeywell argues that "[t]here is no basis for a jury to conclude that any potential incremental knowledge from Honeywell's testing data—which showed the same results as extensive data from other sources of which the government was long aware—would have had any impact on the government's conduct."  Def. Mot. at 34.  But the Stoker Declaration provides evidence from which a jury may infer that such incremental knowledge would have had such an impact.

province of the jury to resolve whether the United States cared solely about price and warranty as defendants maintain, or whether the United States would have terminated its GSA MAS contracts had it known earlier of Toyobo's testing data.").

Honeywell further argues that "there is no need to speculate about how those agencies might have acted because, as Honeywell has shown, officials at [National Institute of Standards and Technology] and NIJ actually knew that Honeywell had data about Z Shield's performance after exposure to high heat and humidity because Honeywell offered to share it with them.  None of those agencies ever followed up with Honeywell," and "no researcher ever alerted or advised GSA of the mountain of information the government had amassed about potential Zylon degradation . . . [or] direct[ed] GSA to remove body armor containing Z Shield from the GSA schedule."  Def. Mot. at 35.  As discussed supra at Sections III(B)(3)(a) and III(B)(3)(c), the government alleges that Honeywell downplayed degradation issues, never shared the source of the degradation issue, and only made faux offers to share test data.  Gov't Opp. at 35.  In addition, in August 2005, when NIJ issued an advisory stating that "'Zylon [containing vests] appear[] to create risk of death or serious injury,'"  HSUMF ¶ 270 (quoting Def. Mot., Ex. 109 [Dkt. No. 204-10] (Aug. 24, 2005 NIJ Body Armor Standard Advisory Notice #01-2005)); USRHSUMF ¶ 270 (undisputed), and removed these vests from the Consumer Product List, USCSUMF ¶ 199; HRUSCSUMF ¶ 199 (undisputed), GSA also removed all Zylon containing vests from its GSA MAS schedules, USCSUMF ¶ 237; HRUSCSUMF ¶ 237 (undisputed); HSUMF ¶ 240; USRHSUMF ¶ 240 (undisputed).

The Stoker Declaration creates a genuine issue of material fact as to the likely impact of the data.

### ii. *BVP Reimbursement Program*

In <u>Second Chance I</u>, Judge Roberts denied summary judgment as to the BVP claims where "[t]he government argue[d] that it was fraudulently induced to make reimbursements due to false statements made by [the defendant] that were relied on by the various agencies when they selected vests." <u>Second Chance I</u>, 128 F. Supp. 3d at 20. This ruling, however, only applied to the government's theory of fraudulent inducement of the market. Currently, the government makes clear that it also alleges an additional theory of fraudulent inducement of the United States, Gov't Opp. at 36, as to which Honeywell now mounts a separate attack, Def. Mot. at 35.

For the cost of a vest to be reimbursable under the BVP reimbursement program, the vests were required to be NIJ certified. USRHSUMF ¶ 76 (citing Gov't Opp., Ex. 108, [Dkt. No. 209-12] (May 2014 BJA Fact Sheet, Bulletproof Vest Partnership Initiative)). The government argues that under its theory of fraudulent inducement of the United States, because of "BVP's requirement to remove vests taken off the NIJ compliance list, every day [] a Z Shield vest model remained on the compliance list under false pretenses effectively represented a renewal of the right to participate in the [] program," Gov't Opp. at 35, and thus a fraudulent inducement. This Court has previously allowed fraudulent inducement claims based on contract modifications or renewals. See <u>Second Chance IV</u>, 266 F. Supp. 3d at 125, 130-31.

Honeywell argues that "[t]here is no evidence (or allegation) that Honeywell fraudulently induced NIJ to certify vests containing Z Shield. The NIJ Standard in place at the time did not certify vests based on future performance, it did not require testing of used vests, testing for durability, or testing following environmental conditioning." Def. Mot. at 35. The record, however, does reflect NIJ requests for additional testing or data regarding the ongoing ballistic performance of Z Shield vests. USCSUMF ¶ 184; HRUSCSUMF ¶ 184 (not disputing

cited fact).  Specifically, "[i]n March 2004, NIJ informed [AHI] that it could submit data

showing the ongoing ballistic performance of these models, submit the models in question for

statistically-based safety testing, or request that the models be removed from the NIJ's

[Consumer Product List]."  USCSUMF ¶ 184; HRUSCSUMF ¶ 184 (not disputing cited fact).

Thus, there is a dispute of fact as to whether Z Shield vests remained on the BVP reimbursement

list as a result of Honeywell's misrepresentations and omissions.

In addition, Honeywell argues that the government cannot show causation

because "the BVP program continued to reimburse purchasers for their Zylon-containing vests

for years after the NIJ in 2005 effectively decertified Zylon as a ballistic material."  Def. Mot.

at 36.  A similar argument was made in D'Agostino v. ev3, Inc., 845 F.3d at 8.  In D'Agostino,

the defendant made three allegedly fraudulent representations in seeking FDA approval to

market its product.  Id. at 7.  Despite the FDA's awareness of allegations of fraud, it did not

demand a recall or relabeling of the product.  Id. at 8.  The First Circuit ultimately held that

because the FDA did not withdraw its approval, the plaintiff could not "establish a causal link

between the alleged fraudulent representations made to the FDA and the payment of claims for

reimbursement by the government."  Id. at 10.[18]

The facts here, however, are distinguishable.  While BVP reimbursed for Z Shield

products after they were removed from the Consumer Product List, BVP only did so for vests

ordered prior to the date of NIJ's decertification.  Gov't Opp., Ex. 291 [Dkt. No. 209-25]

---

[18]     The First Circuit in D'Agostino does not specify whether it applied the but-for
standard or the proximate cause standard, although it does use the term "but for."  D'Agostino v.
ev3, Inc., 845 F.3d at 9 ("How would a relator prove that the FDA would not have granted
approval but for the fraudulent representations made by the applicant?") (emphasis added).  If
the First Circuit was applying the but-for standard, D'Agostino also would not have been able to
meet the more restrictive proximate cause standard.

at 67:23-68:5 (July 29, 2015 L. Hammond-Deckard Tr.).  As BVP's chief administrator Linda

Hammond explains in her testimony, BVP did so out of fairness to those who had already

purchased the vests.  Id. at 69:9-12 (noting "it wasn't the jurisdiction or the law enforcement

Agency's fault that they ordered a vest [which at the time was NIJ compliant] that was later

removed").  In fact, the record reflects that "BVP turned down orders for Zylon-containing vests

starting on August 24, 2005, the same date as NIJ's Zylon advisory and removal of those vests

from the compliance list."  Gov't Opp. at 37.  Thus, unlike the situation before the First Circuit

in D'Agostino, here BVP stopped reimbursing for vests purchased after the date of NIJ

decertification and only reimbursed for vests purchased prior to the date of decertification.

Because the continued reimbursement for Zylon containing vests was only for

those purchased prior to the date of NIJ decertification, these continued reimbursements do not

prevent the government from establishing causation.  Ultimately, there remains a dispute of fact

as to whether Z Shield vests remained on the BVP reimbursement list as a result of Honeywell's

omissions and misrepresentations.

In summary, having rejected Honeywell's underlying arguments for precluding

the government's theories of fraudulent inducement of the United States, AHI, and the market,

Honeywell's motion for summary judgment on all fraudulent inducement theories is denied.

### C.  Statutory Damages

The False Claims Act authorizes treble damages.  31 U.S.C. § 3729(a)(1).  A

defendant's liability is determined by the factfinder (judge or jury) and then trebled by the Court.

See United States v. Sci. Applications Int'l Corp., 626 F.3d at 1264, 1278.  As the parties agree,

after trebling, a defendant found liable is then entitled to offset its liability based on amounts the

government has received through settlements with others jointly responsible for loss to the

plaintiffs.  See McDermott, Inc. v. AmClyde, 511 U.S. 202, 208 (1994); United States v. Bornstein, 423 U.S. 303, 316 (1976).  There are two recognized methodologies for determining damages to be offset by a prior settlement or multiple prior settlements after liability is found against at least one nonsettling defendant at trial:  the proportionate share of wrongdoing method and the *pro tanto* (dollar for dollar) method.  McDermott, Inc. v. AmClyde, 511 U.S. at 209. Honeywell and the government disagree about how to calculate Honeywell's total statutory damages liability and the appropriate offsets.

First, and most fundamentally, the government argues that the Court should apply the proportionate share approach in calculating Honeywell's total damages liability, Gov't Opp. at 45-46, while Honeywell maintains that the Court should apply the *pro tanto* approach in calculating its total damages liability, Def. Reply at 20.

Second, while the parties agree that if found liable, Honeywell would be entitled to statutory offsets for common damages under a *pro tanto* approach, they disagree on how to calculate such common damages and offsets.  Honeywell asserts that once credits for common damages are applied, its total damages liability reduces to zero ($0), and it therefore is entitled to summary judgment.  See Def. Mot. at 50.  The government maintains, however, that after appropriate credit for common damages is applied, Honeywell's total damages liability is still in the millions of dollars.  Gov't Opp. at 47.

The Court will first address whether, under the *pro tanto* approach, Honeywell's total damages liability reduces to zero ($0) after applying statutory offsets for common damages. The Court then will consider which approach to apply in this case:  the *pro tanto* or the proportionate share approach.

### 1. Common Damages Under the *Pro Tanto* Approach

The government and Honeywell agree that should the Court decide it is appropriate to apply the *pro tanto* approach, Honeywell is entitled to some amount of credit from prior government settlements with other entities to the extent that they represent common damages.  Compare Def. Mot. at 48 with Gov't Opp. at 46; see also Singer v. Olympia Brewing Co., 878 F.2d 596, 600 (2d Cir. 1989) ("[W]hen a plaintiff receives a settlement from one defendant, a nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages.").  The government and Honeywell disagree, however, on the amount of any such credit.  Honeywell maintains that it is entitled to a credit for common damages in the amount of $36,042,241, see Def. Mot., Ex. 6 [Dkt. No. 204-6] at 12, Figure 3, while the government contends that Honeywell is only entitled to a credit for common damages in the amount of $18,023,899, see Gov't Opp., Ex. 4 [Dkt. No. 209-6] at 12, Table 7 (Apr. 5, 2019 J. Anastasi Decl.).

This disagreement is critical because the government says that Honeywell's total liability for Z shield containing vests is $34,922,273.  USCSUMF ¶ 253; HRUSCSUMF ¶ 253 (not disputing cited fact).  Thus, if Honeywell's calculation of $36,042,241 for credits is correct, then the credit exceeds Honeywell's total liability, HSUMF ¶ 371, its total obligation reduces to zero ($0), and Honeywell is entitled to summary judgment on the government's FCA claims.  But if the government's calculation of $18,023,899 for credits is correct, Honeywell would still owe $16,898,374 in statutory damages if it is found liable at trial on the FCA claims.  Gov't Opp., Ex. 4 at 12, Table 7 (Apr. 5, 2019 J. Anastasi Decl.).

The disagreement between the parties about how much to credit Honeywell turns on the issue of which portions of the government's prior settlements with offsets represent

"common damages" under the *pro tanto* approach.  It is understood that common damages are damages which arise from "a single, indivisible harm." Chisholm v. UHP Projects, Inc., 205 F.3d 731, 737 (4th Cir. 2000); see also United States v. Burlington N. R. Co., 200 F.3d 679, 698 (10th Cir. 1999) (finding common damages "where the defendant's conduct resulted in a single injury"); Singer v. Olympia Brewing Co., 878 F.2d at 600 (holding common damages are based on amount actually recovered rather than "provable damages" that could have been recovered against the settling defendant).  Conversely, damages are not common if the harm is divisible. United States v. Burlington N. R. Co., 200 F.3d at 698.  Applying this principle, the parties agree on some offsets and disagree on others.

First, Honeywell and the government agree that the government's settlement with Lincoln Fabrics Ltd., another Zylon weaver, included no common damages.  Def. Mot., Ex. 6 at 12, Figure 3 (Feb. 15, 2019 J. Johnson Decl.).

Second, the parties agree that the stipulated value of AHI's 2005 Vest Exchange Program, $3,908,791, represents common damages that should be credited to Honeywell. Compare Gov't Opp., Ex. 4 at 12, Table 7 (Apr. 5, 2019 J. Anastasi Decl.), with Def. Mot., Ex. 6 at 12, Figure 3 (Feb. 15, 2019 J. Johnson Decl.).

Third, the parties agree that a portion of the October 5, 2008 settlement with AHI includes common damages, but they disagree on the amount.  Compare Gov't Opp., Ex. 4 at 12, Table 6 (Apr. 5, 2019 J. Anastasi Decl.) (calculating common damages portion of settlement as $14,115,108), with Def. Mot., Ex. 6 ¶¶ 7-9 (Feb. 15, 2019 J. Johnson Decl.) (calculating common damages portion of settlement as $18,104,257).  So the dispute as to this settlement is over roughly four million dollars.

Finally, and most important, Honeywell contends – but the government disputes – that settlements with five defendants include the following common damages: (i) a manufacturer of Zylon fiber, Toyobo ($11,890,291); (ii) two distributors of Zylon fiber, Itochu International, Inc. and N.I. Teijin Shoji ($503,125 plus $472); and (iii) two weavers of Zylon fiber, Hexcel Corporation and Barrday Inc. ($1,634,975 plus $330).  Def. Mot., Ex. 6 ¶¶ 11-17 (Feb. 15, 2019 J. Johnson Decl.).

The government argues that common damages should be defined in terms of whether the reason for the settlement with others related to Z Shield.  See Gov't Opp. at 47; USCSUMF ¶ 244.  It contends that the five settlements identified by Honeywell are "non-Z Shield recoveries," Gov't Opp. at 47, because they related to woven Zylon and Zylon fiber, see Gov't Opp., Ex. 257 [Dkt. No. 209-23] (Fed. R. Evid. 1006 Exhibit and Demonstrative), and include liabilities arising from different "time periods," "misconduct," and "causes of action," Gov't Opp. at 47.  The relevant question, however, is not whether the five settlements at issue are for the same time period, misconduct, and causes of action, but whether the resulting harm or injury is the same.  See Chisholm v. UHP Projects, Inc., 205 F.3d at 737; United States v. Burlington N. R. Co., 200 F.3d at 698.  Here, the injury or harm to the government is the amount paid or reimbursed by the government for the purchase of vests.  If a prior settlement compensated the government for what it paid or reimbursed for a particular vest because the vest contained woven Zylon, and the government is now seeking compensation from Honeywell for the same vest because it contained Z Shield, these are common damages.  There has been one singular common injury to the government.  See Miller v. Holzmann ("Miller II"), 563 F. Supp. 2d 54, 144 (D.D.C. 2008) ("[C]ommon damages" are damages for which "settling co-defendants shared joint and several liability" with non-settling defendants), aff'd in part, vacated

in part, remanded sub nom. United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 608 F.3d 871 (D.C. Cir. 2010).

The two weavers of Zylon fiber (Hexcel Corporation and Barrday Inc.) sold woven Zylon to vest manufactures, including AHI, who incorporated this woven Zylon into vests whose purchase price was paid or reimbursed by the government.  HSUMF ¶ 353; USRHSUMF ¶ 353 (undisputed); see also Gov't Opp., Ex. 257 (Fed. R. Evid. 1006 Exhibit and Demonstrative).  Some of these vests contained both Z Shield and Zylon.  See HSUMF ¶ 351("AH[I] manufactured and sold bullet proof vests which incorporated woven Zylon fabric, Zylon Shield . . . and/or both. . . .") (quoting Oct. 5, 2008 AHI Settlement Agreement, United States ex rel. Westrick v. Second Chance Body Armor Inc., Civil Action No. 04-280 [Dkt. No. 511-7] at 1 (Jan. 16, 2018)); USRHSUMF ¶ 351 (undisputed).  Those portions of the two Zylon weaver settlements that compensated the government for amounts it paid or reimbursed for vests, manufactured by AHI, that contained both Z Shield and woven Zylon reflect a single, indivisible monetary harm.

The two distributors of Zylon fiber, (Itochu International, Inc. and N.I. Teijin Shoji) sold Zylon fiber to weavers who manufactured woven Zylon; the woven Zylon was sold to vest manufactures, including AHI, who incorporated this woven Zylon into vests whose purchase price was paid or reimbursed by the government.  HSUMF ¶ 353; USRHSUMF ¶ 353 (undisputed); see Gov't Opp., Ex. 257.  Those portions of the two Zylon fiber distribution settlements that compensated the government for amounts it paid or reimbursed for vests, manufactured by AHI, that contained both Z Shield and woven Zylon reflect a single, indivisible monetary harm.

Finally, the manufacturer of Zylon fiber (Toyobo) sold Zylon fiber to manufacturers, including Honeywell, who used Zylon fiber to manufacture Z Shield. USCSUMF ¶ 7; HRUSCSUMF ¶ 1 (undisputed).  Toyobo also sold Zylon fiber which was used to manufacture woven Zylon, and subsequently was used in Z Shield containing vests.  HSUMF ¶ 353; USRHSUMF ¶ 353 (undisputed).  The portion of the settlement with Toyobo that compensated the government for amounts it paid or reimbursed for vests, manufactured by AHI, that contained Z Shield reflects a single, indivisible monetary harm.

Here, common damages include the portion of each settlement that represents compensation for amounts the government paid or reimbursed for the purchase of vests, manufactured by AHI, that contained Z Shield, including the portions of settlements with entities in the supply chain whose materials were ultimately used in, and whose settlement compensated for, those same vests.  While the government's theories and evidence as to why particular defendants are liable may differ, the fact remains that the vests for which compensation is sought against Honeywell are the same as those for which the government already has been compensated through its settlements with others.

To the extent that Honeywell's calculation includes only payments or reimbursements for the purchase of vests that contained Z Shield, see Def. Mot., Ex. 6 ¶¶ 7-17 (Feb. 15, 2019 J. Johnson Decl.); Def. Mot. at 49, these are common damages.  The government paid or reimbursed a total of $11,483,216 for the purchase of certain Z Shield containing vests after July 5, 2001 and $472,625 for the purchase of certain Z Shield containing vests prior to July 5, 2001.  See Gov't Opp., Ex. 4 at 10, Table 5 (Apr. 5, 2019 J. Anastasi Decl.).  For its damages, the government trebles $11,483,216 to $34,449,648 and adds $472,625 for a total of $34,922,273.  See id.  Honeywell has calculated that settling defendants have paid a total

of $36,042,241 to compensate the government for amounts it paid or reimbursed for purchase of the very same vests for which the government now seeks compensation from Honeywell.  See Def. Mot., Ex. 6 at 12 at Figure 3 (Feb. 15, 2019 J. Johnson Decl.).  In the Court's view, these are common damages.

Were this Court to apply the *pro tanto* approach, the damages amount for which Honeywell may be responsible, after offsets, reduces to zero ($0).

### 2.  *Pro Tanto* or Proportionate Share Approach?

While Honeywell urges the Court to apply the *pro tanto* approach (without the right to contribution) to calculate offsets to damages, Def. Reply at 20, the government contends that the proportionate share approach is more appropriate in this case, Gov't Opp. at 45-46.  The parties agree that under either approach Honeywell is entitled to a credit for prior government settlements.  Compare Def. Mot. at 46 with Gov't Opp. at 46; see also McDermott, Inc. v. AmClyde, 511 U.S. at 208 ("It is generally agreed" that when a plaintiff settles with one of several joint tortfeasors, the nonsettling defendant is "entitled to a credit for that settlement" against the nonsettling defendant's total damages.).

Under the *pro tanto* approach, a nonsettling defendant receives a dollar for dollar credit for all amounts paid by others in settlement of common damages.  Miller II, 563 F. Supp. 2d at 144 (citing Singer v. Olympia Brewing Co., 878 F.2d at 600); United States v. Zan Mach. Co., 803 F. Supp. 620, 623 (E.D.N.Y. 1992).  Under the *pro tanto* approach, a credit or offset may be applied (1) with a right of contribution against the settling defendant, or (2) without contribution.  McDermott, Inc. v. AmClyde, 511 U.S. at 210.  Honeywell seeks the *pro tanto* approach without contribution because there is no right to contribution in FCA cases. Def. Supp. at 5, 7.

Under the proportionate share approach, a nonsettling defendant receives, "a credit" for each settling defendant's "'proportionate share' of responsibility for the total obligation," which is based on each defendant's degree of fault.  McDermott, Inc. v. AmClyde, 511 U.S. at 209.  This is to be distinguished from a *pro rata* approach, in which damages are equally allocated among all defendants "without regard to their relative responsibility for the loss."  Id. at 210 n. 9.[19]

The Court will consider which approach to apply, guided by the principles identified and applied by the Supreme Court in McDermott:  consistency with prior decisions, promotion of settlement, judicial economy, and equity.  See McDermott, Inc. v. AmClyde, 511 U.S. at 208-17.

### a. Consistency with Prior Decisions

The relative merits of the *pro tanto* approach (both with and without contribution) and the proportionate share approach were most recently considered by the Supreme Court in the context of an admiralty case.  See McDermott, Inc. v. AmClyde, 511 U.S. 202 (1994).  In McDermott, the Court noted that while "it is generally agreed" that when a plaintiff settles with one of several joint tortfeasors, the nonsettling defendant is "entitled to a credit for that settlement," there is "a divergence" of views "about how that credit should be determined."  Id. at 208.  Ultimately, the Supreme Court held that "although the arguments for [the *pro tanto* approach without contribution and the proportionate share approach] are closely matched, we are

---

[19]     Under some circumstances it makes sense to place defendants in groups rather than to count each defendant individually.  See Rose v. Associated Anesthesiologists, 501 F.2d 806, 808 n. 5 (D.C. Cir. 1974) (identifying three groups, a hospital, a group practice, and an individual surgeon, for the determination of *pro rata* share of damages even though there were nine individuals (in addition to the surgeon) in the group practice).

persuaded that the proportionate share approach is superior."  Id. at 217 (citing United States v. Reliable Transfer Co., 421 U.S. 397 (1975)).  In so holding, the Supreme Court explained that "[t]he proportionate share rule is more consistent with" its analysis in Reliable Transfer. McDermott, Inc. v. AmClyde, 511 U.S. at 212.  In Reliable Transfer, the Supreme Court explained, it had "replaced the divided damages rule, which required an equal division of property damage whatever the relative degree of fault may have been, with a rule requiring that damages be assessed on the basis of proportionate fault when such an allocation can reasonably be made."  Id. at 207 (emphasis added).  The Court explained that under the proportionate share rule, "a litigating defendant ordinarily pays only its proportionate share of the judgment.  Under the pro tanto approach, however, a litigating defendant's liability will frequently differ from its equitable share, because a settlement with one defendant for less than its equitable share requires the nonsettling defendant to pay more than its share."  McDermott, Inc. v. AmClyde, 511 U.S. at 212.

While the Supreme Court found the proportionate share approach to be "superior" at least for admiralty cases, Judge Lamberth has noted that "the pro tanto rule without contribution remains a viable alternative" in non-admiralty cases.  Miller II, 563 F. Supp. 2d at 144 n. 143.  While that may be true, there is no decision from the D.C. Circuit endorsing either the pro tanto or the proportionate share approach in FCA cases, and the only judge in this District to have examined the question in the FCA context in a published opinion is Judge Lamberth.  In Miller I, Judge Lamberth, applying McDermott, at first adopted the proportionate share approach in apportioning damages.  United States ex rel. Miller v. Bill Harbert Int'l Construct., Inc. ("Miller I"), 501 F. Supp. 2d 51, 55 (D.D.C. 2007).  In Miller II, however, he reversed course and held that in FCA cases, where joint and several liability pertains, the

nonsettling defendant who is found liable "is entitled to a credit of the settlement amount against

any judgment obtained by the plaintiff against the nonsettling defendant as long as both the

settlement and judgment represent common damages." Miller II, 563 F. Supp. 2d at 144

(quoting Singer v. Olympia Brewing Co., 878 F.2d at 600). Hence, "a simple *pro tanto* credit" is

appropriate "to the extent those [prior] settlement payments relate to the same item(s) of

damages." Miller II, 563 F. Supp. 2d at 144 n. 144.

   The government incorrectly argues that Judge Lamberth in Miller II applied a

proportionate share approach. Gov't Opp. at 46 (arguing Miller II "appl[ies] the proportionate

share approach of McDermott and giv[es] one defendant a small credit based on this

methodology"); but see Gov't Supp. at 4-5 (arguing Miller II's holding is inconsistent with

McDermott and Rose despite relying on those cases). While Judge Lamberth did use the term

"proportionate credit" in Miller II to refer to the amount of payments already received by the

defendant, the discussion in his analysis makes clear that he was in fact applying the *pro tanto*

approach. Miller II, 563 F. Supp. 2d at 144.

   In the face of Judge Lamberth's second Miller opinion, the government argues

that "Honeywell [] fails to cite a single FCA case applying the *pro tanto* approach in a way that

exhausted a defendant's monetary liability," as it would here. Gov't Supp. at 7 (citation

omitted). In response, Honeywell points to United States ex rel. Bunk v. Birkart Globistics

GmbH & Co. ("Bunk"), Def. Supp. at 4, where the district court, after concluding that the

Gosselin defendants' equitable share of damages was $865,000, reduced that award "to zero after

crediting against that amount the amounts already collected by the United States through

restitution and settlement payments." Bunk, Civil Action No. 02-1168, 2011 WL 5005313,

at *18 (E.D. Va. Oct. 19, 2011) (emphasis added). Even though the *pro tanto* approach in this

case would reduce Honeywell's damages to zero as in <u>Bunk</u>, there is a crucial distinction

between this case and <u>Bunk</u>.  While in <u>Bunk</u> there were payments from other settling defendants,

the court reduced the Gosselin defendants' share from $865,000 to zero ($0) as a credit for the

Gosselin defendants' <u>own</u> payments, and <u>not</u> for payments made by others.  <u>Bunk</u>, 2011

WL 5005313, at *17 n. 23.  The court in <u>Bunk</u> further noted that, following either a *pro rata* or

*pro tanto* approach, the Gosselin defendants would be credited with what they themselves

already had paid, so their obligation reduced to zero ($0) under either approach.  <u>Id</u>.

   None of the payments at issue in this case came from Honeywell itself, so <u>Bunk</u> is

distinguishable and unhelpful in determining whether this Court should apply the *pro tanto* or

proportionate share approach.  Nor is this Court bound by Judge Lamberth's <u>Miller II</u> decision.

And, as will be discussed, the Court concludes that the application of the proportionate share

approach is more equitable, does not undermine the incentive to settle, and is no less efficient or

workable than the *pro tanto* method without contribution.


       b.  <u>Promotion of Settlement</u>

   Honeywell argues that the *pro tanto* approach without contribution should be

applied because the *pro tanto* approach better promotes settlement.  Def. Supp. at 9.  Honeywell

emphasizes "without contribution" because the Supreme Court was emphatic that *pro tanto*

setoff with the right of contribution was "clearly inferior" to either the proportionate share

approach or *pro tanto* without contribution, <u>McDermott, Inc. v. AmClyde</u>, 511 U.S. at 212-13,

and because there is no right to contribution in FCA cases, <u>Miller II</u>, 563 F. Supp. 2d at 144.  The

claim for contribution, the Court noted, necessarily "burdens the courts with additional

litigation," <u>id</u>. at 212, because it may involve separate lawsuits for contribution from the settling

defendants, <u>id</u>. at 209.

As for the other two approaches, the Supreme Court found the proportionate share rule fairer "because a litigation defendant ordinarily pays only its proportionate share of the judgment" while the *pro tanto* approach is more likely to lead to "inequitable apportionment of liability." McDermott, Inc. v. AmClyde, 511 U.S. at 212-13.  It observed that while settlement rates appeared "similarly high" under both the *pro tanto* and proportionate share approach, the *pro tanto* rule "comes at too high a price in unfairness." Id. at 215.

This Court agrees with the Supreme Court:  The proportionate share rule is fairer and more equitable than the *pro tanto* approach, and the *pro tanto* approach "has no clear advantage in promoting settlements." McDermott, Inc. v. AmClyde, 511 U.S. at 216.  The promotion of settlements is at least as likely under the proportionate share approach.

### c.  Judicial Economy

Honeywell further maintains that the *pro tanto* approach would better promote judicial economy because under the proportionate share approach, "the trial would turn into a series of mini-trials concerning absent defendants." Def. Supp. at 8.

The Supreme Court, in considering the merits of the *pro tanto* versus the proportionate share approach also addressed the concern of judicial economy. McDermott, Inc. v. AmClyde, 511 U.S. at 217.  It focused on whether the *pro tanto* approach was adopted with or without the requirement of a good faith hearing at which the "settling defendant's share of responsibility will have to be ascertained." See id.[20]  If the parties do not require a good faith

---

[20]    At a good faith hearing, the court will "examine the merits of nonsettling defendants' individual contribution claims" just as the court would assess the fairness of a settlement agreement.  In re Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1032 n. 4 (2d Cir. 1992).

hearing, the *pro tanto* approach is superior in terms of judicial economy because it does not require adjudicating the relative fault of the settling defendant.  Id.

If application of the *pro tanto* approach requires a good faith hearing, however, the settling defendants' share of responsibility would have to be ascertained at a separate pretrial evaluation hearing.  McDermott, Inc. v. AmClyde, 511 U.S. at 217.  Similarly, under the proportionate share approach, the settling defendant's share of responsibility will have to be ascertained at the trial against the nonsettling defendants.  Id.  Thus, the Supreme Court observed that neither the *pro tanto* approach with a good faith hearing nor the proportionate share approach has a "clear advantage."  Id.  Both require factual determinations of the parties' relative fault.  Id.

While the *pro tanto* approach without a good faith hearing would require less time than the proportionate share approach, as the Supreme Court points out "the apportionment of damages required by the proportionate share rule may require little or no additional trial time."  McDermott, Inc. v. AmClyde, 511 U.S. at 217.  This is because separate from the question of apportioning damages, the parties at any trial "will often need to describe the settling defendant's role in order to provide context for the dispute."  Id.  Furthermore, in many cases, substantial discovery will have taken place before settlement, and the nonsettling party will have the benefit or be given access to discovery that bears on the settling parties' responsibility.  RESTATEMENT (THIRD) OF TORTS § 16 cmt. c (AM. L. INST. 2000).[21]  Thus, the toll on judicial economy in

---

[21]     "The Comment appended to an ALI black-letter provision is mainly explanatory. Like the black letter, it is intended to be published ultimately as the official product of the Institute and to represent its institutional voice rather than the voice of the Reporter."  American Law Institute, ALI Style Manual 42 (2015), https://www.ali.org/media/filer_public/08/f2/08f2f7c7-29c7-4de1-8c02-d66f5b05a6bb/ali-style-manual.pdf.

ascertaining the settling defendants' share of responsibility may be limited.  Indeed, the Supreme

Court concluded that "[t]he *pro tanto* rule [] has no clear advantage with respect to judicial

economy."  McDermott, Inc. v. AmClyde, 511 U.S. at 217.

### d.  Equity and the One Satisfaction Rule

Honeywell next suggests that the *pro tanto* approach is preferable because

applying the proportionate share approach would be unfair and would contravene the one

satisfaction rule.  Def. Reply at 20.  Under the one satisfaction rule, a plaintiff should not be

permitted to recover more than the loss it actually suffered.  See, e.g., Rose v. Associated

Anesthesiologists, 501 F.2d at 809 (Under this principle, "the plaintiff [is] entitled to but one

compensation for his loss."); see also Singer v. Olympia Brewing Co., 878 F.2d at 600; Snowden

v. D.C. Transit Sys., Inc., 454 F.2d 1047, 1048 (D.C. Cir. 1971).  The purpose of the rule is to

avoid unjust enrichment.  Rose v. Associated Anesthesiologists, 501 F.2d at 810; Snowden v.

D.C. Transit Sys., Inc., 454 F.2d at 1048.

It is established, however, that the one satisfaction rule does not apply to punitive

damages.  See Snowden v. D. C. Transit Sys., Inc., 454 F.2d at 1048 ("[A]n 'injured person may

[not] have more than full satisfaction, except as punitive damages.").  As the Supreme Court has

noted, the current version of the FCA, which imposes treble damages, exacts damages that are

"essentially punitive in nature."  Escobar I, 136 S. Ct. at 1996 (quoting Vermont Agency of Nat.

Res. v. United States ex rel. Stevens, 529 U.S. 765, 784 (2000) (noting that treble damages and a

penalty of up to $10,000 per violation, as opposed to double damages and a penalty of up

to $2,000 per violation, are essentially punitive)); cf. United States v. Bornstein, 423 U.S. at 315

(suggesting that double damages are remedial rather than punitive).  "'The very idea of treble

damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate

the liability of wrongdoers.'" <u>Vermont Agency of Nat. Res. v. United States ex rel. Stevens</u>, 529

U.S. at 786 (quoting <u>Tex. Indus., Inc. v. Radcliff Materials, Inc.</u>, 451 U.S. 630, 639 (1981)).

Thus, to the extent that the FCA is punitive, concern for the one satisfaction rule diminishes.

        Furthermore, unjust enrichment cuts both ways.  The one satisfaction rule is an

equitable principle that is not to be rigidly applied, particularly if it would enrich the wrongdoer.

As the D.C. Circuit has explained, "[t]he one-compensation rule, grounded in unjust enrichment,

is not to be applied in such a way as to generate unjust enrichment to the only litigating

defendant." <u>Rose v. Associated Anesthesiologists</u>, 501 F.2d at 809.  In <u>Rose</u>, a medical

malpractice action, the court held that a credit "is subject to a limitation of amount so as to assure

that the defendant held liable in the litigation does not pay less than its equitable share." <u>Id</u>.

at 810.  "This limitation avoids needless irony that a rule grounded in avoidance of unjust

enrichment might be applied to accomplish an unjust enrichment." <u>Id</u>.

        Indeed, in weighing the relative merits of the *pro tanto* and proportionate share

approaches in <u>McDermott</u>, the Supreme Court recognized that overcompensation could result

from application of the proportionate share approach.  <u>McDermott, Inc. v. AmClyde</u>, 511 U.S.

at 209-17.  The Court decided, however, that the prospect of overcompensation in contravention

of the one satisfaction rule did not require rejecting the proportionate share approach because

"[e]ven if . . . the proportionate share approach would overcompensate McDermott, we would

not apply the one satisfaction rule.  The law contains no rigid rule against overcompensation. . . .

[M]aking tortfeasors pay for the damage they cause can be more important than preventing

overcompensation." <u>Id</u>. at 219.  The Court added that "[i]t seems to us that a plaintiff's good

fortune in striking a favorable bargain with one defendant gives other defendants no claim to pay

less than their proportionate share of the total loss." <u>Id</u>. at 220.  The proportionate share

methodology generally produces "a fairer ultimate allocation of responsibility among all

parties – plaintiff, settling tortfeasor, and nonsettling tortfeasor."  RESTATEMENT (THIRD) OF

TORTS § 16 cmt. c (AM. L. INST. 2000).[22]

### e.  Practicality

Finally, Honeywell emphasizes that to apply the proportionate share rule is not

"workable" or practical in a case like this because it would require a jury to "allocate a non-

settling defendant's responsibility as compared to the prior settling defendants' share of fault."

Def. Supp. at 7; see id. at 3, 8.  It argues that "[h]ere, no jury has allocated fault between

Honeywell and prior settling defendants.  Nor is there any way for a jury to do so in this case."

Id. at 8.  Honeywell asks:  "[H]ow would the jury determine Honeywell's share of fault?"  Def.

Supp. at 8.

While this Court agrees that litigating relative fault is not always a simple task, its

experience with the trial of multi-defendant medical malpractice, insurance, and other cases in

which a well-instructed jury is asked to apportion fault undermines Honeywell's contention that

this is an impossible feat for a jury.  As the government points out, "[t]he proportionate share

approach is typically applied in complex cases . . . involving (1) multiple defendants,

(2) multiple avenues of liability based on different contracts and viable claims, and (3) multiple

settling and non-settling parties."  Gov't Supp. at 4.  The Court agrees.  "Potential problems of

---

[22]        Honeywell also argues that McDermott, an admiralty case, and Rose, a medical
malpractice case, are distinguishable because they involved claims where defendants had a right
to contribution from joint tortfeasors.  Def. Reply at 6-7.  While it is true that under the FCA
there is no right to contribution, Miller II, 563 F. Supp. 2d at 144, the Supreme Court in
McDermott explicitly considered the pro tanto approach both with and without the right to
contribution, McDermott, Inc. v. AmClyde, 511 U.S. at 208-09, and nevertheless concluded that
the proportionate share approach was superior, id. at 217.

proof in some cases hardly require adherence to an archaic and unfair rule in all cases."

McDermott, Inc. v. AmClyde, 511 U.S. at 208.

Nevertheless, Honeywell asserts that it is "without evidence of the prior settling defendants' proportionate share of fault" and without such evidence "it would be impossible for a jury to parse how much of the government's alleged overpayment for Z Shield-containing vests was a result of alleged statements and/or omissions by Honeywell, as compared to Toyobo, AHI, or other prior settling parties."  Def. Supp. at 8.  Should Honeywell determine that additional discovery is necessary, it may file a motion seeking to reopen discovery, specifically identifying the additional discovery that it requires.  See Section III(C)(2)(c).

In sum, the Court finds none of Honeywell's arguments in support of applying the pro tanto approach to be persuasive.  Further, application of the pro tanto rule would be inconsistent with the proposition that "making tortfeasors pay for the damage they caused can be more important than preventing overcompensation."  McDermott, 511 U.S. at 219.  The Court concludes that it would be wholly inequitable to permit Honeywell to escape damages liability altogether, and it therefore would be much fairer in this case to apply the proportionate share rule.  Since Honeywell concedes that proportionate fault has not been adjudicated, Def. Supp. at 6, a question of fact remains and summary judgment is inappropriate.

### D.  Unjust Enrichment

"Unjust enrichment occurs when:  (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  News World Commc'ns, Inc. v. Thompsen, 878 A.2d 1218, 1222 (D.C. 2005).

Honeywell argues that regardless of the Court's conclusions with respect to the False Claims Act, it is entitled to summary judgment on the government's unjust enrichment claim because the government did not confer a benefit on Honeywell and Honeywell did not retain any benefit from the government "that it would be unjust for it to keep."  Def. Mot. at 50. Honeywell maintains that the government cannot recover restitution on its unjust enrichment claim because the government never purchased Z Shield from Honeywell, id. at 51, and the government had "no interest or involvement" in the transactions between Honeywell and AHI, id. at 52.  Instead, the government purchased Z Shield containing vests from AHI, not from Honeywell.  Id. at 51.  It is settled, Honeywell maintains, that where a defendant retains a benefit that was not conferred by or "at the behest" of the plaintiff, then the plaintiff has "no cognizable injury."  Id.

As the government points out, Judge Roberts already rejected this argument in ruling on Honeywell's motion to dismiss.  Gov't Opp. at 49 (citing Honeywell I, 798 F. Supp. 2d at 25).  In doing so, he relied on In re Lorazepam & Clorazepate Antitrust Litig., 295 F. Supp. 2d 30, 51 (D.D.C. 2003).  In Lorazepam, Judge Hogan concluded that "the theory of unjust enrichment could apply to indirect payments because plaintiffs had properly alleged defendants' enrichment to the plaintiffs' own detriment and not just to the detriment of plaintiffs' subscribers."  Honeywell I, 798 F. Supp. 2d at 25 (citing In re Lorazepam & Clorazepate Antitrust Litig., 295 F. Supp. 2d at 51); see also JSC Transmashholding v. Miller, 70 F. Supp. 3d 516, 523 n. 5 (D.D.C. 2014) ("While this benefit was conferred on [the defendant] through [a third-party], the theory of unjust enrichment could apply to indirect payments conveyed through a third-party intermediary") (international citation omitted); Ca de Lupis v. Bonino, Civil Action No. 07-1372, 2010 WL 1328813, at *12 (D.D.C. Mar. 31, 2010) ("The

defendant mistakenly asserts that because the actual agreement . . . was with a third party and conferred no benefit to him, he cannot be held liable. . . . His position is flawed due to the essence of the unjust enrichment doctrine, which operates from the premise that an actual contract is lacking, but nonetheless provides an avenue for relief to avert an injustice.").

Honeywell responds that Judge Roberts in <u>Honeywell I</u> "merely held that whether '[AHI] and the government each received the benefit of their bargains [wa]s a question of fact that [wa]s inappropriate for resolution at the motion to dismiss stage.'"  Def. Reply at 24 (quoting <u>Honeywell I</u>, 798 F. Supp. 2d at 25).  Honeywell asserts that "[n]ow that discovery is closed, the undisputed evidence confirms that Honeywell did not sell Z Shield or Z Shield-containing vests to the government."  Def. Reply at 24.

Of course, the government never alleged that Honeywell sold Z Shield or Z Shield containing vests directly to the government.  Judge Roberts' specifically relied on allegations in the complaint that the government "'paid for defective Z Shield vests due to false statements and omissions by Honeywell' and that Honeywell 'received money . . . indirectly, to which they were not entitled.'"  <u>Honeywell I</u>, 798 F. Supp. 2d at 25 (quoting Compl. ¶¶ 95, 97); <u>see also</u> Am. Compl. ¶¶ 143, 145.  And now that discovery is closed, Honeywell does not deny that it sold Z Shield to AHI, who then sold Z Shield containing vests (1) to government agencies under the GSA MAS and (2) to local, state, and tribal authorities who were subsequently reimbursed with government funds.  HRUSCSUMF ¶¶ 30-31.  These "indirect payments" can properly be considered a benefit under an unjust enrichment theory.  <u>See</u> <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 295 F. Supp. 2d at 51; <u>JSC Transmashholding v. Miller</u>, 70 F. Supp. 3d at 523; <u>Ca de Lupis v. Bonino</u>, 2010 WL 1328813, at *12.  Honeywell is not entitled to summary judgment on the government's unjust enrichment claim.

IV. CONCLUSION

For the foregoing reasons, the Court will deny defendant Honeywell's motion for summary judgment.  An Order consistent with this Opinion will issue this same day.

SO ORDERED.


_/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  November 25, 2020